UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| DEFENDERS OF WILDLIFE and SIERRA CLUB; | ) ) ) |
| Plaintiffs, | ) Civil Action No. ) ) |
| vs. | ) ) |
| BUREAU OF LAND MANAGEMENT; U.S. DEPARTMENT OF THE INTERIOR; U.S. ARMY CORPS OF ENGINEERS; and U.S. DEPARTMENT OF HOMELAND SECURITY | ) ) ) ) ) ) |
| Defendants. | ) ) ) |

## PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER

Pursuant to Rule 65(b) of the Federal Rules of Civil Procedure and Local Rule 65.1, plaintiffs hereby move for a temporary restraining order suspending further border fence and road construction on the San Pedro Riparian National Conservation Area. For the reasons set forth in the accompanying memorandum, this motion is necessary to prevent immediate and irreparable injury to plaintiffs and the natural environment; plaintiffs can demonstrate probable success on the merits; and an injunction would serve the public interest. In support of this motion, plaintiffs submit the accompanying memorandum of law, Exhibits 1-15, and a proposed order.

Respectfully submitted,

_____

Brian Segee, D.C. Bar No. 492098
Defenders of Wildlife
1130 Seventeenth Street, N.W.

Washington, D.C. 20036
(202) 682-9400


Bob Dreher, D.C. Bar. No. 398722
Defenders of Wildlife
1130 Seventeenth Street, N.W.
Washington, D.C. 20036
(202) 682-9400


Dated:  October 5, 2007

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| DEFENDERS OF WILDLIFE and SIERRA CLUB; | ) ) ) | Civil Action No. |
| Plaintiffs, | ) ) | **PLAINTIFFS' MEMORANDUM IN** |
|  | ) | **SUPPORT OF MOTION FOR** |
| vs. | ) | **TEMPORARY RESTRAINING ORDER** |
|  | ) | **IN RELATION TO BORDER WALL AND** |
| BUREAU OF LAND MANAGEMENT; U.S. | ) | **ROAD CONSTRUCTION ON THE SAN** |
| DEPARTMENT OF THE INTERIOR; U.S. | ) | **PEDRO RIPARIAN NATIONAL** |
| ARMY CORPS OF ENGINEERS; and U.S. | ) | **CONSERVATION AREA** |
| DEPARTMENT OF HOMELAND | ) |  |
| SECURITY | ) |  |
|  | ) |  |
| Defendants. | ) |  |
|  | ) |  |
| _____ | ) |  |

TABLE OF CONTENTS

INTRODUCTION ...................................................................................................... 1

THE STATUTORY AND REGULATORY SCHEME ........................................... 2

    A.    The National Environmental Policy Act ..................................... 2

    B.    The Arizona-Idaho Conservation Act of 1988 .................................... 3

    C.    The Secure Fence Act ........................................................... 4

RELEVANT FACTS .................................................................................. 4

    A.    The San Pedro River and San Pedro Riparian National Conservation Area ........................................................................................... 4

    B.    The BLM's Decision .......................................................... 6

ARGUMENT ......................................................................................... 7

    A.    Plaintiffs Are Likely To Succeed On The Merits ............................ 7

        1.    The BLM's Decision Violates NEPA .................................. 7

            a.    A Regional Environmental Impact Statement Is Required for the Proposed Arizona Border Fence ..................... 8

                i.    There Is a Comprehensive Federal Plan for the Development of the Arizona Border Fence ........................................... 9

                ii.    Individual Fence Projects within Arizona Will Have Significant Synergistic and Cumulative Impacts on Wildlife and Landscape Connectivity ........ 11

            b.    An Individual EIS Must be Prepared for the San Pedro Fence Project .......................................................... 14

                i.    The Border Fence Will Significantly Impact the San Pedro River and Watershed, a Unique and Ecologically Critical Area ............................ 14

                ii.    The Border Fencing Involves Highly Uncertain, Unique, and Unknown Risks to the San Pedro River That Are Not Adequately Addressed by the Proposed Mitigation ......................................... 16

                iii.    The Proposed Border Fence, In Conjunction With Other Actions, Will Have a Significant Cumulative Impact on the San Pedro River and National Conservation Area ....................................... 17

            c.    The BLM's Failure to Provide Opportunity for Public Participation on the Environmental Assessment Violates NEPA ..................................................... 19

2.   The BLM's Decision Violates The Arizona-Idaho Conservation
     Act Of 1988 ........................................................................................ 19

B.   The Balance Of Equities And The Public Interest Also Favor
     Injunctive Relief .................................................................................. 20

     1.   Plaintiffs Are Harmed By the Irreparable Impacts to
          The San Pedro River and NCA ............................................... 21

     2.   Plaintiffs Are Irreparably Harmed By The Impacts to
          Wildlife Within The San Pedro NCA ...................................... 22

     3.   Defendants Are Irreparably Injuring Plaintiff by Depriving
          Them Of Their Statutory Rights to Advance Notice And Public
          Participation ............................................................................ 23

     4.   Federal Defendants Will Not Suffer Irreparable Harm If
          the Court Issues A Temporary Restraining Order ................... 23

     5.   Injunctive Relief Is In the Public Interest ............................... 24

REQUESTED RELIEF ...................................................................................... 26

## INTRODUCTION

Plaintiffs seek an order temporarily enjoining construction of border fencing, an all-weather road, and drainage structures within the San Pedro Riparian National Conservation Area ("San Pedro NCA"). See San Pedro Riparian National Conservation Area Border Fence ("Border Fence EA") (Plf. Exh. 1). This construction is currently being undertaken pursuant to a perpetual right-of-way ("ROW") issued on August 31, 2007 by the Bureau of Land Management ("BLM") to the U.S. Army Corps of Engineers ("Army Corps"), on behalf of Department of Homeland Security ("DHS"), having apparently commenced on Saturday, September 29, 2007. See Clark Decl. and accompanying photographs (Plf. Exh. 15).

As explained in detail below, plaintiffs are entitled to emergency injunctive relief. First, plaintiffs are likely to prevail on the merits of their claims. Defendant BLM issued its perpetual ROW without any prior public notice or opportunity for comment, violating the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 et seq. Additionally, although BLM did produce the Border Fence EA under NEPA, this EA is inadequate under the law, and the significant impacts of border wall construction, both within the San Pedro NCA specifically, and at a cumulative level throughout the Arizona borderlands region, requires the preparation of an Environmental Impact Statement ("EIS"). Finally, the BLM's decision violates the Arizona-Idaho Conservation Act of 1988, 100 P.L. 696, 102 Stat. 4571, because the BLM's authorization of border wall and road construction will not further the San Pedro NCA's primary purposes, which include the conservation, protection, and enhancement of the NCA's riparian area as well as its aquatic, wildlife, archeological, paleontological, scientific, cultural, educational, and recreational resources.

The balance of the equities and public interest also support the relief sought by plaintiffs. Plaintiffs are not only in danger of losing their right under NEPA to be informed of, and participate, in federal government actions that impact the environment before they are made, but plaintiffs' members will suffer serious harm to their use and enjoyment of the San Pedro NCA and its natural resources from the construction of a border wall and road currently occurring

within the San Pedro NCA.  Such uses are precisely the type of interests that Congress intended

to conserve and protect when it created the San Pedro NCA.  Therefore, as reflected in the policy

determination of Congress itself, the balance of equities and public interest strongly favor

injunctive relief.

Moreover, the Army Corps began construction of the border fence and road immediately

after plaintiffs filed an appeal and associated Petition for Stay of the BLM's action with the

Interior Board of Land Appeals ("IBLA").  Plf. Exh. 2.  Because ROW decisions are

immediately effective under Department of the Interior ("DOI") regulations, plaintiffs in good

faith requested that the BLM voluntarily suspend its ROW issuance during the 45-day period in

which the IBLA has to respond to a Petition for Stay.  Instead, however, BLM and Army Corps

apparently rushed to begin construction on Saturday, September 29, 2007, the day after plaintiff

mailed its appeal to BLM.  Before filing this action, plaintiff contacted the DOI Field Solicitor in

Arizona, again requesting a voluntary—and temporary—suspension of activities in order to

avoid litigation and the need for emergency injunctive relief, but DOI need not agree to such

suspension.  With this motion, plaintiffs again simply seek a temporary suspension of

construction activities until the merits of its preliminary injunctive request—either before this

Court or before the IBLA—are resolved.

## THE STATUTORY AND REGULATORY SCHEME

### A.    The National Environmental Policy Act

NEPA is the "basic national charter for protection of the environment."  40 C.F.R. §

1500.1(a).  Among the critical purposes of the statute are to "insure that environmental

information is available to public officials and citizens before . . . actions are taken," and to "help

public officials make decisions that are based on understanding of environmental consequences."

Id. § 1500.1(b)-(c).  To accomplish these purposes, NEPA requires all agencies of the federal

government to prepare a "detailed statement"—an EIS—regarding all "major federal actions

2

significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). NEPA's implementing regulations further direct that "[p]roposals or parts of proposals which are related to each other closely enough to be, in effect, a single course of action shall be evaluated in a single impact statement." 40 C.F.R. § 1502.4(a).

NEPA requires that when an agency proposes to undertake any "action," the agency "must first determine whether the action is one that normally requires" the preparation of an EIS pursuant to NEPA and the Council on Environmental Quality ("CEQ") regulations implementing NEPA. 40 C.F.R. § 1501.4(a). If the agency is not certain whether an EIS is required, it must prepare an EA to determine whether an EIS is necessary. 40 C.F.R. § 1501.4. The EA must discuss the need for the proposal, evaluate alternatives that would cause less adverse environmental impacts, and provide sufficient evidence and analysis to support the agency's determination as to whether the proposed action will significantly affect the environment. Id.

In determining whether a proposed action may significantly affect the environment, NEPA requires that both the context and intensity of that action be considered. 40 C.F.R. § 1508.27. In considering context, "[s]ignificance varies with the setting of the proposed action." Id. Consideration of intensity, on the other hand, "refers to the severity of the impact," including the unique characteristics of the area, proximity to ecologically sensitive areas, whether the action is related to other actions with cumulatively significant impacts, and to what degree the action involves unique or unknown risks. 40 C.F.R. § 1508.27(b)(3), (5), (7).

**B.    The Arizona-Idaho Conservation Act of 1988**

The San Pedro Riparian National Conservation Area was created pursuant to the Arizona-Idaho Conservation Act of 1988. 100 P.L. 696, 102 Stat. 4571. Under this designation, the BLM is charged with managing the area "in a manner that conserves, protects, and enhances the

riparian area and the aquatic, wildlife, archeological, paleontological, scientific, cultural, educational, and recreational resources of the conservation area." 16 U.S.C. § 460xx-1(a). The BLM is specifically directed to "only allow such uses of the conservation area as [it] finds will further [these] primary purposes." Id. § 460xx-1(b).

## C.    The Secure Fence Act

The Secure Fence Act of 2006 authorizes the Homeland Security Secretary to provide for "at least 2 layers of reinforced fencing" on five distinct sections of the U.S.-Mexico border totaling approximately 700 miles. P.L. 109-367, Sec. 3, codified at 8 U.S.C. § 1103 note; Plf. Exh. 3 & 4. The longest of these sections, totaling approximately 370 miles, would run from Calexico, in the middle of California's border with Baja California Norte, eastward to Douglas, Arizona—walling off the vast majority of Arizona's border with the Mexican state of Sonora. P.L. 109-367, Section 3(2)(1)(A)(ii). The proposed wall would cross several protected areas of federal lands, including the Cabeza Prieta National Wildlife Refuge, Organ Pipe Cactus National Monument, Coronado National Forest, and San Pedro NCA. These lands provide habitat for a high concentration of imperiled and sensitive species, including several listed under the federal Endangered Species Act (ESA), 16 U.S.C. § 1531 et seq. For example, the Arizona fence segment would block critical corridors for numerous wildlife species, including at least three such corridors utilized by the only known jaguars in the U.S. See Plf. Exh. 3 & 4.

## RELEVANT FACTS

## A.    The San Pedro River and San Pedro Riparian National Conservation Area

The San Pedro River is a unique and invaluable environmental resource—an undammed, free-flowing river, its perennial flow "is now a rare occurrence in the Southwest." See Border Fence EA at p. 5. A binational River, the San Pedro flows from its headwaters near the town of Cananea, in Sonora, Mexico, approximately 25 miles before crossing the U.S.-Mexico border and into the San Pedro NCA, and ultimately joins the Gila River near Winkelman, Arizona.

In 1988, the 56,431-acre San Pedro Riparian National Conservation Area was established by Congress—the first such area to be created.  16 U.S.C. § 460xx.  In 2000, the BLM created the National Landscape Conservation System ("NLCS"), the agency's first attempt to create a unified system consisting of its premier lands and to raise public awareness concerning these areas' scientific, cultural, educational, ecological, and other values.  The NLCS consists of National Conservation Areas, National Monuments, Wilderness areas, Wilderness study areas, Wild and Scenic Rivers, and National Historic and Scenic Trails.  The BLM today manages 15 National Monuments and 14 National Conservation Areas—including the San Pedro NCA—as part of the NLCS.

The San Pedro River and surrounding watershed are one of the most biologically diverse areas of the United States.  *See* C. Hass, <u>Landscape Fragmentation and Connectivity for Carnivores in the Upper San Pedro Basin</u>.  Plf. Exh. 5.  This diversity stems from the San Pedro's location at the convergence of four major ecosystems—the Sierra Madre and Rocky Mountains, and the Sonoran and Chihuahuan deserts.  The River and its larger watershed consequently "contain[] floristic and faunal components of all four ecosystems."  <u>Id</u>.  The San Pedro NCA "may represent an important conduit for genetic exchange" for wildlife "between source populations in Mexico and populations north of the border."  <u>Id</u>.   Additionally, the "forested expanses" of the surrounding "Sky Island" mountain ranges "may also serve this function," and "animals normally found in the forested areas of the sky islands may use the San Pedro River as an oasis while dispersing between isolated forests."  <u>Id</u>.  Thus, maintaining these habitat linkages "may be critical for genetic exchange over a long time scale."

The San Pedro River and NCA harbor particularly rich avian diversity—more than 100 species of breeding birds and an additional 250 species of migrant and wintering birds occur in the area, representing approximately half of all known breeding species in North America. Consequently, the San Pedro was recognized by the National Audubon Society as its first Globally Important Bird Area, and designated as a world heritage natural area by the United Nations World Heritage Program.

5

In addition, the San Pedro also harbors remarkable mammalian diversity, and was historically occupied by grizzly bears, wolves, jaguars, and ocelots. Today, "[c]arnivores currently found in the area include three species of procyonids (raccoons, coatis, and ringtails), four species of mephitids (hooded skunks, hog-nosed skunks, and striped skunks), two species of mustelids (badgers, and long-tailed weasels), three species of canids (coyotes, gray foxes, and kit foxes), two cats (bobcat and puma), and one bear (black bear)." Landscape Fragmentation and Connectivity, at p. 6.

**B.    The BLM's Decision**

In September 2006, the Army Corps, on behalf of DHS, requested a perpetual ROW on the San Pedro NCA for the construction of vehicle barriers along the U.S.-Mexico border. The decision on this request was never finalized. On August 10, 2007, the Army Corps submitted an amended ROW application to instead build border "pedestrian fencing" and an all-weather road along the NCA's southern boundary.[1]  Without public notification or opportunity for public comment, BLM issued the Border Fence EA, Decision Record ("DR") and Finding of No Significant Impact ("FONSI") on August 31, 2007. In its DR, the BLM chose to implement a "combination" Alternative which would build pedestrian fencing along most of the San Pedro NCA's southern boundary, but would use temporary vehicle barriers within the San Pedro River corridor and floodplain, as well as the "corrals" area, and use permanent vehicle barriers rather than pedestrian fencing within five dry washes. Under the DR, temporary vehicle barriers would

---

[1] "Pedestrian fencing" is a generic term used to describe border fences or "walls." The fencing considered in this instance is either "Bollard" or "Sandia" design. Under the Bollard design, offsetting double rows of 14' to 17' high steel pipe poles, approximately 6" in diameter are set in the 8.5" centers, and the pipes are then filled with concrete. This construction requires trenching 5' deep and 2' wide along the entire fence length. Under the Sandia design, vertical secure metal mesh panels are attached to 16' steel poles, and then additional 6' panels are secured to the top of these panels at an angle of 45 degrees. The poles are anchored by a 12" wide by 4' deep concrete footing along the length of the fence. In this case, the Army Corps proposes to utilize a "modified" Sandia design with steel pipes arranged horizontally to a height of 3', and the remaining height consisting of mesh. In contrast to pedestrian fencing, "vehicle barrier" refers to less intensive border barriers generally consisting of old railroad ties, which effectively block vehicular traffic but which are permeable to wildlife.

apparently be removed by crane "during periods of seasonal flooding." Border Fence EA at p. 8-9.

As noted above, plaintiffs filed an IBLA appeal and Petition for Stay of this action pursuant to DOI regulations. Although plaintiffs requested that BLM voluntarily stay its action during the 45 days in which the IBLA has to decide on its Petition for Stay, the BLM and Army Corps apparently began construction on Saturday, September 29, 2007. See Clark Decl. and accompanying photographs. In addition to requests to the DOI Field Solicitor to voluntarily halt this construction, we also requested Department of Justice, on October 4, 2007, to help bring a voluntary suspension of construction activities so that this matter would not need to be heard on an emergency basis, but these efforts were unsuccessful.

## ARGUMENT

### A.    Plaintiffs Are Likely To Succeed On The Merits

#### 1.    The BLM's Decision Violates NEPA

In reviewing whether an agency has complied with NEPA, it is the Court's role "'to ensure that the agency has adequately considered and disclosed the environmental impact of its actions and that its decision[s] [are] not arbitrary or capricious.'" Nat'l Comm. for the New River v. FERC, 373 F.3d 1323, 1327 (D.C. Cir. 2004) (quoting Balt. Gas & Elec. v. NRDC, 462 U.S. 87, 97-98 (1983)). The Court must ensure that "the agency considered the relevant factors in a rational way," Public Citizen v. Nat'l Highway Traffic Safety Admin., 848 F.2d 256, 266 (D.C. Cir. 1988) and "took a 'hard look' at the environmental consequences of its decision to go forward with the project." Nat'l Comm. for the New River, 373 F.3d at 1327 (internal citations omitted). Because a fundamental objective of NEPA is to ensure that an "agency will not act on incomplete information, only to regret its decision after it is too late to correct," Marsh v. Oregon Natural Resources Council, 490 U.S. 360, 374 (1990), as in all cases brought under the Administrative Procedure Act ("APA"), if the agency has "entirely failed to consider an

important aspect of the problem" its decision must be set aside.  Motor Vehicle Mfs. Ass'n v. State Farm Mut. Auto Ins., 463 U.S. 29, 43 (1983).  By failing to analyze the individual, regional, and cumulative impacts resulting from its decisions to construct border fences within Arizona, the BLM has not taken the requisite "hard look" at the consequences of its actions or informed the public of these consequences, and has otherwise entirely failed to "consider an important aspect of the problem."  Id.

      a.    **A Regional Environmental Impact Statement Is Required for the Proposed Arizona Border Fence**

    The border fence and road currently being constructed on the San Pedro NCA is not an isolated project, but rather a part of a larger, regional plan by the federal government to wall off the vast majority of Arizona's common border with Mexico.  Numerous federal agencies are involved in the planning, permitting, and construction of this proposal, including BLM; other federal land management agencies within DOI including Fish and Wildlife Service ("FWS") and National Park Service; Army Corps, which is serving as a construction consultant, and is responsible for administering aspects of the Clean Water Act relating to the dredge and fill of waters of the United States; and DHS and its component agencies, which have primary responsibility for border security and construction of border security infrastructure projects.  Under NEPA, the existence of this type of multi-agency, integrated program requires analysis in a regional or comprehensive EIS, produced cooperatively by all the involved federal agencies.  See 42 U.S.C. § 4332(2)(C); Kleppe v. Sierra Club, 427 U.S. 390 (1976).  Because border fence construction in Arizona constitutes a comprehensive federal plan with significant and cumulative environmental impacts, a regional EIS on such construction must be prepared before further work on the San Pedro fence project is conducted.

        i.    *There Is a Comprehensive Federal Plan for the Development of the Arizona Border Fence*

    As defined by the Supreme Court in Kleppe, a "proposal" exists for purposes of NEPA when there is "a regional plan of development . . . [which] define[s] fairly precisely the scope

and limits of the proposed development of the region." 427 U.S. at 401-02. Similarly, NEPA's implementing regulations direct that "[p]roposals or parts of proposals which are related to each other closely enough to be, in effect, a single course of action shall be evaluated in a single impact statement." 40 C.F.R. § 1502.4(a). In this instance, several factors demonstrate that a border fence construction "proposal" for the State of Arizona exists, including the simultaneous planning and development of several individual and segmented fence construction projects in different areas of the State, Congressional direction in the Secure Fence Act, and DHS's actions in treating its activities in Arizona and other areas as programs.

In Kleppe, conservation organizations alleged that the actions of several federal agencies in permitting and authorizing development of coal reserves in the Northern Great Plains constituted a federal program demanding the preparation of a regional, comprehensive EIS. 427 U.S. at 395. In rejecting plaintiffs' arguments, the Supreme Court found that there was "no evidence in the record of an action or proposal for an action of regional scope . . .[and] no evidence that the individual coal development projects undertaken or proposed by private industry and public utilities in that part of the country are integrated into a plan or otherwise related." Kleppe, 427 U.S. at 400.

In contrast to Kleppe, and vividly illustrating the plain existence of an Arizona border fencing program and the clear need to conduct an EIS on that program now, before further construction goes forward, the scope and extent of fence construction within the Arizona borderlands has rapidly accelerated in the late summer and fall of 2007. Indeed, there are currently at least six distinct areas of fence construction that have been separately approved or proposed thus far this calendar year, including segments within the San Pedro NCA, Buenos Aires National Wildlife Refuge, Barry M. Goldwater Range, and Organ Pipe Cactus National

Monument.  See Plf. Exh. 6.[2]  The simultaneous construction of these fence segments together

will total approximately 74 miles, or approximately 21% of Arizona's total shared border with

Mexico.  The fact that more than a fifth of the Arizona border would be walled under individual

fence segments proposed in a period of less than nine months provides strong evidence of a

"program" which will have a significant impact on the environment, and thus requires the

preparation of a regional EIS.

      The existence of an Arizona border fence proposal is further illustrated by provisions of

the Secure Fence Act, which authorizes DHS to construct border fencing along a 370 mile-long

corridor running eastward from Calexico, California to just east of Douglas, Arizona.  P.L. 109-

367, Section 3(2)(1)(A)(ii); Plf. Exh. 3 & 4.  While the Act provides discretion to DHS on the

manner of construction to utilize within areas where the topography is greater than a 10 percent

grade, and does not override the duty of federal land management agencies to conserve the lands

under their administration (as illustrated by BLM's refusal to allow pedestrian fence

construction within the river corridor and flood plain of the San Pedro River), it nonetheless

establishes with considerable precision the geographical areas in which border fences will likely

be constructed.

      Additionally, DHS, the agency responsible for fence construction under immigration law

generally, and the Secure Fence Act specifically, recently announced its intention to prepare an

EIS on a similar proposal in southern Texas, within the Border Patrol's Rio Grande Valley

Sector.  Notably, in the Federal Register notice announcing the initiation of this NEPA process,

DHS explained that it "is proposing to install and operate tactical infrastructure consisting of

pedestrian fences, supporting patrol roads, lights, and other infrastructure along approximately

---

[2]  This map does not portray the construction proposed on the Barry Goldwater Range and Organ Pipe
Cactus National Monument.

70 miles of the U.S/Mexico international border." 72 Fed. Reg. 54,726 (Sept. 24, 2007). DHS further noted that the proposal "includes the installation of tactical infrastructure in 21 segments" in the vicinity of several Texas communities, and that "[i]ndividual segments might range from approximately 1 mile to more than 13 miles." Id. (emphasis added). DHS's recognition of a larger fencing proposal and need for an EIS in the Texas region highlights the urgency of conducting a similar analysis in Arizona, which may involve DHS acting as lead agency, but which must also include all other federal agencies that administer federal land or otherwise have permitting authority or involvement in the construction of the Arizona border fence. See 40 C.F.R. § 1501.5(a) ("A lead agency shall supervise the preparation of an environmental impact statement if more than one Federal agency either: (1) Proposes or is involved in the same action; or (2) Is involved in a group of actions directly related to each other because of their functional interdependence or geographical proximity.").[3]

> ii. *Individual Fence Projects within Arizona Will Have Significant Synergistic and Cumulative Impacts on Wildlife and Landscape Connectivity*

A regional EIS must also be prepared because of the cumulative and synergistic effects the construction of individual fence segments will have on the Arizona borderland environment, particularly wildlife and their habitat. Under NEPA, "[a]n action insignificant in itself may be significant . . . if it is 'related to other actions with individually insignificant but cumulatively significant impacts,'" Nat'l Wildlife Fed'n v. Norton, 332 F. Supp. 2d 170, 182 (D.D.C. 2004) (quoting 40 C.F.R. § 1508.27(b)(7)), or if "it is reasonable to anticipate a cumulatively

---

[3] DHS has also itself defined its border security activities within the Arizona borderlands region as a "program" for purposes of NEPA analysis. In November 2002, the agency released a draft Programmatic EIS for its Arizona operations proposing 250 miles of pedestrian fencing and 880 miles of border roads.

11

significant impact on the environment."  40 C.F.R. § 1508.27(b)(7).  The purpose of NEPA's cumulative effects requirement "is to prevent agencies from <u>dividing one project into multiple individual actions</u>."  <u>Natural Res. Def. Council v. Hodel</u>, 865 F.2d 288, 297 (D.C. Cir. 1988) (emphasis added) (internal quotations and citations omitted).

The need to prepare a regional and cumulative EIS is further heightened when the actions being considered have "similarities that provide a basis for evaluating their environmental consequences together, such as common timing or geography."  40 C.F.R. § 1508.25.  In this case, because the "individual" fence projects being constructed and planned throughout the Arizona border region will have significant and cumulative adverse environmental consequences and are similar in terms of construction, timing, and geography, the federal agencies involved in permitting such construction must prepare a comprehensive EIS.

There is substantial scientific evidence that the six fence projects currently being constructed or planned will have significant cumulative effects on the Arizona border region's wildlife, and the landscape habitat connectivity needed to sustain viable populations of those species.  Hass Decl. (Plf. Exh. 7) ¶ 13; Flesch Decl. (Plf. Exh. 8) ¶ 9; Avila Decl. (Plf. Exh. 9) ¶ 22.  Nonetheless, the BLM's EA for the ROW on the San Pedro NCA—like previous border fence EAs—only considered potential cumulative impacts within <u>the specific project area</u>, rather than the overall impacts of fence construction on wildlife within the Arizona borderlands region.

Such analysis is especially imperative, however, given the unique position of the borderlands region at the convergence of several major ecosystems, and the resulting high diversity of wildlife.  Hass Decl. ¶ 4 ("Southeastern Arizona is one of the most biologically diverse areas in the United States"); Avila Decl. ¶ 8  (noting over 2000 species of plants, more than 550 species of vertebrates, and countless species of invertebrates in Sonoran desert within

southwestern Arizona).  Indeed, the Arizona borderlands region contains many species of plants and wildlife that have otherwise limited distributions within the United States, and in some circumstances, provide a species' only habitat in the country.  Hass Decl. ¶ 5 ("Many subtropical species reach the northern extent of their ranges in this area, including jaguars, ocelots, white-nosed coatis, hooded skunks, Mexican fox squirrels, Merriam's deermice, Coue's deer, white-sided jackrabbits, [and the] Sonoran subspecies of the Virginia opossum); Avila Decl. ¶ 3 (discussing jaguar and ocelot).

For these species, which have larger core habitats within Mexico and countries further south, the construction of significant fencing along the San Pedro NCA and the majority of Arizona's border will result in fragmentation of habitat, genetic isolation, and high risk of extinction within the U.S.  Hass Decl. ¶ 13 ("The biological integrity of the whole Madrean Archipelago region relies on genetic interchange through the region—by both plants and animals.  Barriers to this genetic interchange may influence the long-term viability of populations, especially north of the border."); Avila Decl. ¶ 13 (border fencing projects "threaten the survival of jaguars in the United States, endanger the establishment of individuals and/or a viable breeding population and block passages the jaguars, as well as other big, medium, and small sized mammals use to reach the habitats where they naturally occur.").

The need to prepare a comprehensive EIS based on cumulative and regional effects on wildlife has been specifically recognized by the D.C. Circuit.  For example, in Natural Resources Defense Council v. Hodel, 865 F.2d 288, conservation organizations alleged that DOI failed to consider adequately the cumulative effects of simultaneous offshore oil and gas leasing and development in the Pacific and Atlantic Oceans on migratory species including endangered cetaceans, marine mammals, salmon, and marine and coastal birds.  The D.C. Circuit agreed with

plaintiffs, finding that the EIS "for the most part considers only the impact <u>within each area</u>" of leasing. <u>Id</u>. at 298 (emphasis in original). The Court thus held that the analysis did "not address the issue [] which NEPA requires the Secretary to consider: the cumulative impacts of [oil and gas leasing] development in <u>different</u> areas," and that "allowing the Secretary's 'analysis' to pass muster here would eviscerate NEPA." <u>Id</u>. at 298-99 (quotations and emphasis in original); <u>see also</u> <u>Friends of the Earth v. Army Corps of Eng'rs.</u>, 109 F. Supp. 2d 30 (D.D.C. 2000) (requiring consideration of the cumulative effects of constructing three barges in the Mississippi River).

Similarly, in this instance the Border Fence EA contains a brief discussion of cumulative impacts within the San Pedro River watershed but does not address or acknowledge the potential cumulative impacts of simultaneous <u>fence construction</u> being undertaken or planned within <u>different</u> areas of the Arizona border on natural resources adversely affected by fence construction within the San Pedro Riparian NCA, including the wildlife species discussed in detail above. Nor have previous EAs conducted recently, including those prepared for fence construction within Buenos Aires National Wildlife Refuge and Organ Pipe Cactus National Monument, considered such regional impacts. As this failure is directly comparable to the Army Corps' segmentation of impacts in <u>Friends of the Earth</u>, a regional EIS must be prepared.

**b.      An Individual EIS Must be Prepared for the San Pedro Fence Project**

In addition to the responsibilities of BLM, other federal land management agencies, and DHS to prepare a regional EIS on the border fence construction program within Arizona, the BLM is independently responsible for preparing an individual EIS on the significant environmental effects of its grant of a ROW to Army Corps for border fence construction within the San Pedro NCA. BLM's action squarely implicates several of the factors identified in NEPA's implementing regulations as indicators of significance, and the agency's failure to take a "hard look" at these impacts renders its FONSI arbitrary and capricious. Because the existence

14

of only <u>one</u> factor has been held sufficient to establish significance, an EIS on the San Pedro border fence project must be prepared.

> i.    *The Border Fence Will Significantly Impact the San Pedro River and Watershed, a Unique and Ecologically Critical Area*

One factor for determining significance under NEPA is the "unique characteristics of the geographic area such as proximity to historic or cultural resources, park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas." 40 C.F.R. § 1508.27(b)(3). The San Pedro River, San Pedro NCA, and its larger watershed implicate nearly <u>all</u> of these criteria. Specifically, the San Pedro is: (1) one of the last free-flowing rivers in the Southwest, protected within the park land of the San Pedro Riparian NCA, Border Fence EA at p. 5; (2) an area of incredible biological diversity, Hass Decl. ¶¶ 5-6; (3) an area of <u>global</u> importance to avian diversity, as demonstrated by the National Audubon Society's designation of it as the first Globally Important Bird area, and its designation as a United Nations World Heritage Site, Border Fence EA at p. 5; (4) eligible for Wild and Scenic River designation, <u>id.</u> at p. 10; and (5) one of only two National Riparian Conservation areas in the nation. Just as the Ninth Circuit in <u>National Parks & Conservation Association v. Babbitt</u>, 241 F.3d 722, 731 (9th Cir. 2001), noted that the "unique characteristics of Glacier Bay [National Park and Preserve] are undisputed and of overwhelming importance," so too are the unique characteristics of the San Pedro, and thus an EIS on the effects of border fence and road construction on this irreplaceable treasure must be conducted.

> ii.    *The Border Fencing Involves Highly Uncertain, Unique, and Unknown Risks to the San Pedro River That Are Not Adequately Addressed by the Proposed Mitigation*

Another factor for determining significance pursuant to NEPA is the "degree to which the possible effects on the . . . environment are highly uncertain or involve unique or unknown risks." 40 C.F.R. § 1508.27(b)(5); <u>Grand Canyon Trust v. FAA</u>, 290 F.3d 339, 340 (D.C. Cir. 2002) (If "<u>any</u> significant environmental impact <u>might result</u> from the proposed action" then an EIS must be prepared) (emphasis in original) (internal citation omitted). In this instance, BLM

presents very troubling predictions concerning the potential effects of fence and road

construction on the overall hydrology of the San Pedro River, its wetlands, and even the course

of the River itself—predictions that are supported by the effects of border fence construction that

have already occurred in Arizona.  Specifically, BLM  predicts that building a border fence

across more than 60 desert ephemeral washes will "significantly alter[] and rapidly de-

stabilize[]," those drainages, resulting in increased erosion and sedimentation into the San Pedro

River, potentially causing the River to "adjust laterally," causing mass "bank failure and loss of

riparian vegetation."  Border Fence EA at p. 6, 9.  Additionally, as discussed in detail above, the

border fence and road construction will adversely affect the unique and diverse assemblage of

wildlife species within the San Pedro NCA.  These unique potential impacts to the wildlife,

hydrology, wetlands function, and riparian vegetation of the San Pedro River—in short, the

overall environmental integrity and health of the River and its larger watershed—demand the

preparation of an EIS.

      While in some circumstances, mitigation measures can arguably justify a finding of no

significant impact, this principle does not apply here.  Davis v. Mineta, 302 F.3d 1104, 1225

(10th Cir. 2002) (citing Forty Most Asked Questions Concerning CEQ's National

Environmental Policy Act Regulations, 46 Fed. Reg. 18,026, 18,038 (Mar. 23, 1981)).  Such

measures must be "more than a possibility, and must be either required by statute or regulation

or so integrated into the initial proposal that it is impossible to define the proposed project

without them."  Id.; Nat'l Parks & Conservation Ass'n, 241 F.3d at 734 (holding a "perfunctory

description" or "mere listing" of mitigation, without supporting analytical data, is insufficient to

support finding of no significant impact). Here, however, the Border Fence EA demonstrates

that: (1) the construction of pedestrian fencing across 66 ephemeral washes, common to all

alternatives considered in the EA, is a primary contributor to the predicted effects to the San

Pedro, and thus will not be mitigated by the use of vehicle barriers in other, limited areas; (2)

BLM has little confidence in the proposed mitigation measures, and no data or experience to

demonstrate their effectiveness; and (3) mitigation measures have not even been identified in

some circumstances.  As a result, the uncertainty of the effectiveness of these measures further demonstrates the need for an EIS.

Thus, for example, BLM states that potential watershed impacts "may" be reduced if the pedestrian fencing is "designed to pass flood flows and sediment . . . for all drainages in the basin."  Border EA at p. 7; id. ("[T]here is a large degree of uncertainty concerning the effectiveness of the some [sic] of the proposed mitigation as many of the details have not been determined.") (emphasis added).  In circumstances such as these, the BLM's "lack of knowledge does not excuse the preparation of an EIS; rather it requires [the BLM] to do the necessary work to obtain it."  Nat'l Parks & Conservation Ass'n, 241 F.3d at 733.  An agency's failure to gather additional data, or to explain why it cannot do so, provides additional grounds for finding its NEPA analysis unlawful.  Blue Mountains Biodiversity Project v. Blackwood, 161 F.3d 1208, 1213 (9th Cir. 1999) (remanding EA where agency failed to provide "justification regarding why more definitive information could not be provided.").

iii.    *The Proposed Border Fence, In Conjunction With Other Actions, Will Have a Significant Cumulative Impact on the San Pedro River and National Conservation Area*

Not only would the construction of a border fence affect an ecologically critical area and pose enormous risks to the hydrology of the San Pedro River, but the impacts of the construction in conjunction with the current degradation of the river from other actions would cause cumulatively significant impacts, another factor to consider when determining significance.  See 40 C.F.R. § 1508.27(b)(7).  The CEQ regulations define "cumulative effect" as "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of which agency (Federal or non-Federal) or person undertakes such other actions."  Id. § 1508.7.  In light of all the other actions already degrading and severely threatening the San Pedro River currently, any additive adverse impact to the River is arguably "significant."  That conclusion is inescapable in this case

given the potentially devastating risks to the River from the proposed pedestrian fencing described above.

For example, according to a recent June 17, 2007 FWS Biological Opinion addressing the operations of Fort Huachuca, the San Pedro River has suffered a long-term decline in peak and overall water flows.[4]  As a result, the River is already experiencing an increasing number of no-flow days, and any additional decline in the flows of the San Pedro will threaten various endangered and threatened plant species, including the Huachuca water umbel.  Biological Opinion at p. 81-86.

Given the extreme stress already affecting the San Pedro River from dewatering and other activities degrading the River and its watershed, it is clear that the construction of pedestrian fencing and roads will only exacerbate the already precarious ecological situation of the river.  As described in detail above, the list of environmental impacts resulting from border fence construction on the San Pedro River is long and extensive, and the cumulative effects of these impacts in conjunction with dewatering and other activities that are already literally threatening the survival of the San Pedro River make it clear that an EIS must be prepared.

     c.     **The BLM's Failure to Provide Opportunity for Public Participation on the Environmental Assessment Violates NEPA**

One of NEPA's primary purposes is to provide the public with information and an opportunity to participate in gathering information.  40 C.F.R. § 1500.1(b); Baltimore Gas & Elec. Co. v. Nat'l. Res. Defense Council, 462 U.S. 87, 97-100 (1978).  To this end, NEPA and its implementing regulations provide for significant public involvement in the drafting of both Environmental Assessments and Environmental Impact Statements.  40 C.F.R. § 1500.2 ("[f]ederal agencies shall to the fullest extent possible . . . implement procedures to . . . encourage and facilitate public involvement in decisions which affect the quality of the human

---

[4] Available at:
http://www.fws.gov/southwest/es/arizona/Documents/Biol_Opin/070132_FortHuachucaFINAL.pdf

environment."); Id. § 1500.1(b) ("NEPA procedures must insure that environmental information is available to public officials and citizens before decisions are made and before actions are taken."); Id. § 1506.6(b) (federal agencies must "provide public notice of . . . the availability of environmental documents so as to inform those persons and agencies who may be interested or affected."). Despite the central importance of public participation under NEPA, and the myriad ways that the CEQ regulations emphasize that importance, the BLM has simply provided no notice of its proposed action to the public before approving the ROW on the San Pedro Riparian National Conservation Area, and no opportunity for public comment or involvement—a clear violation of NEPA.

    2.    The BLM's Decision Violates The Arizona-Idaho Conservation Act Of 1988

    The San Pedro NCA was created pursuant to the Arizona-Idaho Conservation Act of 1988. 100 P.L. 696, 102 Stat. 4571. Under this designation, the BLM is charged with managing the area "in a manner that conserves, protects, and enhances the riparian area and the aquatic, wildlife, archeological, paleontological, scientific, cultural, educational, and recreational resources of the conservation area." 16 U.S.C. § 460xx-1(a). The BLM is specifically directed to "only allow such uses of the conservation area as [it] finds will further [these] primary purposes." Id. § 460xx-1(b).

    The proposed border fence and road construction permitted under the BLM's August 31 decision will have pronounced negative impacts on the area's wildlife, the San Pedro River's riparian area, and the River itself. Indeed, in addition to impacts of wildlife, the agency's analysis suggests that fence and road construction will cause significant erosion and sedimentation, as well as the risk that these effects will be so pronounced that the entire river area will suffer a lateral shift. Thus, it is not apparent how BLM's grant of a ROW for border

19

fence and road construction would possibly be consistent with its duty to "conserve, protect, and enhance" the natural and cultural resources of the San Pedro NCA. Moreover, there is no indication that the BLM even <u>considered</u> this relevant factor—the agency's governing mandate for the San Pedro NCA—a cardinal example of arbitrary and capricious decision-making. <u>Motor Vehicle Mfs. Ass'n.</u>, 463 U.S. at 43.

**B.    The Balance Of Equities And The Public Interest Also Favor Injunctive Relief**

Since Plaintiffs have demonstrated a "particularly strong likelihood of success on the merits," "even . . . a relatively slight showing of irreparable injury" is sufficient in order for them to prevail at the temporary restraining order or preliminary injunction stage. <u>City Fed Fin. Corp. v. Ofc. Of Thrift Supervision</u>, 58 F.3d 738, 747 (D.C. Cir. 1995); <u>see also</u> <u>Cuomo v. United States Nuclear Regulatory Comm'n</u>, 772 F.2d 972, 974 (D.C. Cir. 1985) (justifying injunction with "either a high probability of success and some injury, or <u>vice</u> <u>versa</u>"). However, plaintiffs fully satisfy the remaining standards for emergency injunctive relief.

As demonstrated by the attached Clark Declaration and accompanying photographs, construction activities have commenced within the San Pedro NCA, involving substantial grading and filling of areas for road construction, bulldozing and piling of vegetation, and trenching in preparation for the erection of border fencing. Plf. Exh. 15. A significant amount of work has been done in the short time since plaintiffs filed their IBLA appeal and BLM, Army Corps, DHS have clearly indicated that they will not halt or slow construction efforts before the merits of plaintiffs' claims are heard either before this Court or the IBLA. The length of border within the San Pedro NCA is only approximately two miles, and thus construction could be completed rapidly. The ongoing irreparable harm to plaintiffs' interests, and the great risk that its legal claims could be mooted in short order, compel the request for emergency relief in this instance.

1.      Plaintiffs Are Harmed By the Irreparable Impacts to the San Pedro River and
        NCA

Under its decision, the Army Corps is currently taking the following actions within the
granted ROW, all of which will create irreparable injury: (1) clearing and grading of a 60-foot
wide strip of land along the entire southern boundary of the NCA; (2) new road construction
involving grading and leveling of proposed roadbeds, filling areas with existing materials or
engineered fill, lifting and bedding stretches of road, and installing of drainage structures; and (3)
construction of "pedestrian fencing" utilizing either "Bollard" or "Sandia" design.

The proposed fencing, permanent vehicle barriers, and temporary vehicle barriers will
cross the San Pedro River and its floodplain, as well as 30 ephemeral drainages to the east of the
River, and 36 ephemeral drainages to the west of the River.  Border Fence EA at p. 6.  "Field
observation of pedestrian fence built through ephemeral drainages" in adjacent areas of the
Arizona border "indicated excessive deposition above crossings and channel entrenchment
below" to a maximum depth of six feet.  Id.; see also Carlson Decl. (Plf. Exh. 10) and
Photographs.  The expected increased erosion from these tributary ephemeral drainages "will
increase deposition of sediment in the San Pedro River," resulting in bank erosion and channel
incision, in turn "alter[ing] stream channel morphologic stability."  Border Fence EA at p. 7.
"Potentially, if enough sedimentation occurs, then the river may adjust laterally, which will cause
bank failure and loss of riparian vegetation."  Id. at p. 9.

This construction, and the negative environmental impacts, will irreparably harm
plaintiffs' members and their interests in their use and enjoyment of the San Pedro River.  Miller
Decl. (Plf. Exh. 11) ¶ 9 ("I was drawn to the San Pedro River because of its lush vegetation,
abundant surface water and unmatched wildlife viewing opportunities."); Neeley Decl. (Plf. Exh.
12) ¶ 8 (Noting that construction "will greatly impact my ability to enjoy the resources found in
the San Pedro River and surrounding areas . . . by negatively impact[ing] the associated
vegetation and water flows of the river, diminishing the remote and [quiet] nature of the outdoor

experience currently found there."); Leonard Decl. (Plf. Exh. 13) ¶ 2 ("The greatest attraction of the Riparian Area is the presence of flowing water—an inestimable boon in our desert environment—and the attendant proliferation of wildlife, both avian and mammalian.").

> 2.    Plaintiffs Are Irreparably Harmed By the Impacts to Wildlife within the San Pedro NCA

Plaintiffs will also be harmed by the significant and irreparable impacts to wildlife. Notably, the "biological integrity" of this region "relies on genetic interchange . . . by both plants and animals." Hass Decl. ¶ 13. As "barriers to this genetic interchange may influence the long-term viability of populations, especially north of the border," construction of border fencing and roads thus presents "serious threats to long-term survival of wildlife on the border." Id.; Avila Decl. ¶ 13; (border fencing projects "threaten the survival of jaguars in the United States"); Flesch Decl. ¶ 10 (noting that because cactus ferruginous pygmy-owls "tend to fly near the ground, virtually never fly above the height of canopy vegetation and tend to stay in areas with moderate to high vegetation cover," border development "including fences and large clearings may reduce landscape connectivity for pygmy-owls," which will "result in some degree of physical and perhaps genetic isolation from populations in Mexico.").

The significant and irreparable harm to wildlife in turn negatively affects plaintiffs and their members' interests—their use and enjoyment of the San Pedro NCA is heavily reliant on wildlife observation, as well as the mere knowledge that the area provides substantial habitat for healthy populations of wildlife. Miller Decl. ¶ 4 (border construction "will have significant negative impacts on both my professional life and goals, and my personal interest in the preservation of wildlife and our shared natural heritage with Mexico"); id. ¶ 10 (describing "outstanding birding experience" and "two full days birding, tracking wildlife, and exploring features" within San Pedro NCA as "exceptionally unique for Arizona"); Neeley Decl. ¶ 6

(describing visiting to enjoy "plant and animal species"); id. ¶ (construction and "resultant habitat destruction will subsequently decrease the number of wildlife species available for viewing."); Bahr Decl. (Exh. 14) ¶ 4 (describing hiking along the River and viewing "a variety of wildlife species including coatimundi, turkeys, and several kinds of hummingbirds.").

     3.     <u>Defendants Are Irreparably Injuring Plaintiff by Depriving Them of Their Statutory Rights to Advance Notice and Public Participation</u>

Defendants also irreparably harmed plaintiffs by depriving plaintiffs of prior notice and any opportunity to participate in the NEPA review process. "[W]here participation in the NEPA process is denied" to those who would otherwise participate, "irreparable" harm is presumed, as in an APA claim. <u>Natural Res. Def. Council v. Lujan</u>, 768 F. Supp. 870, 890 n.36 (D.D.C. 1991) (<u>citing</u> <u>Cmty. Nutrition Inst. v. Butz</u>, 420 F. Supp. 751, 757) (D.D.C. 1976). Here, Plaintiffs are being deprived of their legal right to fully participate in, and influence, the NEPA process, and are thus losing the opportunity (outside of litigation) to bring to BLM's attention—before the border fence and road construction is completed—the serious impacts to the environment from the proposed construction on the San Pedro NCA, and serious cumulative impacts from that construction in conjunction with all other border fence construction being conducted in Arizona. <u>See</u> <u>Sierra Club v. Marsh</u>, 872 F.2d 497, 504 (1st Cir. 1989) (Breyer, J.) ("the difficulty of stopping a bureaucratic steam roller, once started, [is] a perfectly proper factor for a district court to take into account in assessing [the risk of injury] on a motion for a preliminary injunction").

     4.     <u>Federal Defendants Will Not Suffer Irreparable Harm If the Court Issues a Temporary Restraining Order</u>

In contrast to the serious, irreparable harm to plaintiffs' interests that will result if the border fence and road construction ROW is not <u>temporarily</u> enjoined and/or rescinded, defendant BLM will not suffer any substantial injury in the case of an injunction. BLM has no protectable interest in its discretionary grant of a ROW to Army Corps and DHS for construction of a border

fence and roads within the San Pedro NCA.  Indeed, as detailed at length in this brief, this

decision has been made without lawful environmental analysis and in violation of its duty to

protect the natural resources of this protected area.  In contrast, although Army Corps and DHS

may have some interests in the ROW and construction, these impacts cannot be outweighed by

the clear irreparable harm to plaintiffs, and the limited impact of a small delay for adjudication of

plaintiffs' claims.

       As for any potential financial impact on any private contractors that may be conducting

the construction, to the extent that those interests should factor into the Court's analysis at all, "it

is well established in this Circuit that monetary loss is usually accorded little or no weight in the

irreparable-harm analysis."  Pharmaceutical Research and Mfrs. of Am. v. U.S., 135 F. Supp. 2d

1, 18 (D.D.C. 2001), rev'd on other grounds by Pharmaceutical Research and Mfrs. of Am. v.

Thompson, 251 F.3d 219 (D.C. Cir. 2001).  This is because "[t]he key word in this consideration

is irreparable. . . Financial injury . . . can [ ] be mitigated in the course of litigation."  Segar v.

Civiletti, 516 F. Supp. 314, 320 (D.D.C. 1981) (internal citations omitted).[5]

      5.    Injunctive Relief Is In the Public Interest

       Preserving the San Pedro River and San Pedro NCA, one of the last free-flowing rivers in

the Southwest and an area of incredible beauty, ecological importance, and biological diversity,

is absolutely in the public interest.  Possible "[e]nvironmental injury, by its nature, can seldom be

adequately remedied by money damages and is often permanent or at least of long duration, i.e.,

---

[5] If the Court grants this motion, plaintiffs respectfully request that the Court require the posting of no
more than a nominal bond, as is ordinarily the case in public interest litigation.  See Citizen's Alert
Regarding Environment v. U.S. Dept. of Justice,  1995 WL 748246, *12 n.10 (D.D.C. 1995) (stating that
"federal courts have broadly recognized that [a] nominal bond is sufficient and appropriate where public
interest groups seek enforcement of environmental laws"); see also Natural Res. Def. Council v. Morton,
337 F. Supp. 167, 169 (D.D.C. 1971), aff'd, 458 F.2d 827 (D.C. Cir. 1972)  (setting $100 bond for
preliminary injunction against large-scale offshore oil lease).

irreparable." <u>Amoco Prod. Co. v. Village of Gambel</u>, 480 U.S. 531, 545 (1987).  Additionally,

"the public interest is best served by having federal agencies comply with the requirements of

federal law." <u>Patriot, Inc. v. United States HUD</u>, 963 F. Supp. 1, 6 (D.D.C. 1997); <u>see</u> <u>also</u> <u>Fund</u>

<u>for Animals v. Clark</u>, 27 F. Supp. 2d 8, 15 (D.D.C. 1998) ("[T]he public interest expressed by

Congress was frustrated by the federal defendants not complying with NEPA. Therefore, the

public interest would be served by having the federal defendants address the public's expressed

environmental concerns, as encompassed by NEPA, by complying with NEPA's requirements.")

(<u>citing</u> <u>Fund for Animals v. Espy</u>, 814 F. Supp. 142, 152 (D.D.C. 1993)).

Plaintiffs anticipate the federal government will argue—and plaintiffs agree—that there is

also a public interest in ensuring national security.  However, Congress in passing the Secure

Fence Act did not waive compliance with other laws.[6]  Moreover, the fact that DHS has recently

announced its intention to prepare a regional EIS on border security operations in south Texas

illustrates that the public interests inherent in both environmental preservation and national

security are not mutually exclusive, but that each can be integrated with the other.  Indeed, it is

plaintiffs' position that protecting our irreplaceable natural resources, and ensuring that our

Nation's environmental laws are adhered to, will compliment and strengthen our national

security efforts.

In this case, Congress itself has articulated the strong public interest in protecting the San

Pedro River and its rich natural heritage, by creating the San Pedro Riparian National

Conservation Area and directing the BLM to protect its irreplaceable natural resources.

---

[6] The DHS Secretary does have authority to waive laws pursuant to section 106 of the REAL ID, necessary to ensure the expeditious construction of border roads and barriers.  DHS has not invoked this authority in this case, however.

Temporary injunctive relief against the BLM ROW in this matter would strongly serve the public interest by protecting this unparalleled area.

## REQUESTED RELIEF

For the foregoing reasons, the Motion for a Temporary Restraining Order and/or Preliminary Injunction should be granted.

Respectfully Submitted this 5th day of October, 2007.

_____

Brian Segee, Staff Attorney. D.C. Bar. 492098
Defenders of Wildlife
1130 Seventeenth Street, N.W.
Washington, D.C. 20036
(202) 682-9400

_____

Bob Dreher, Vice President for Conservation Law and Litigation, D.C. Bar. No. 398722
Defenders of Wildlife
1130 Seventeenth Street, N.W.
Washington, D.C. 20036
(202) 682-9400

Counsel for Plaintiff

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that service of the foregoing plaintiff's Motion for Temporary Restraining

Order, accompanying  memorandum, plaintiffs' exhibits 1-15,  and a proposed Order has been

made directly to the Court on this 5th day of October, 2007.


_____


Brian Segee, D.C. Bar No. 492098
Staff Attorney
Defenders of Wildlife
1130 Seventeenth Street, N.W.
Washington, D.C. 20036
(202) 682-9400

**PROGRAM CONSULTATION & COORDINATION**
**BUREAU OF LAND MANAGEMENT**
**TUCSON FIELD OFFICE**

**ENVIRONMENTAL REVIEW**                                 NEPA #: AZ-420-2007-051

**ASSIGNMENT AND REVIEW**                                Subactivity: 422-1430-ER
                                                        Case/Project No.: AZA33680

Project Name: San Pedro RNCA Border Fence
Location: T. 24 S., R.22 E., section 19, lots 1-3; section 20, lots 1-4
Quad Name: Bob Thompson Peak 7.5'
Project Lead: Susan Bernal

Project Reviewed:
Unit Manager/Supervisor:      /s/ Cindy Alvarez                Date:   8/10/07
Technical Review:

| Will Be Impacted Yes No | Can Be Mitigated Yes No | Attach Mitigation? Yes No | NAME | CRITICAL ELEMENTS | SIGNATURE | DATE |
|---|---|---|---|---|---|---|
| ( ) ( ) | ( ) ( ) | ( ) ( ) | Dan Moore | Air Quality | C. Alvarez | 8/31/07 |
| ( ) ( ) | ( ) ( ) | ( ) ( ) | Francisco Mendoza | Areas of Critical Env. Concern | F. Mendoza | 8/31/07 |
| ( ) ( ) | ( ) ( ) | ( ) ( ) | Jane Childress | Cultural Resources/Paleo | J. Childress | 8/31/07 |
| ( ) ( ) | ( ) ( ) | ( ) ( ) | Linda Marianito | Environmental Justice | L.Marianito | 8/31/07 |
| ( ) ( ) | ( ) ( ) | ( ) ( ) | Dan Moore | Farm Lands (Prime or Unique) | C. Alvarez | 8/31/07 |
| ( ) ( ) | ( ) ( ) | ( ) ( ) | Nathan Dieterich | Floodplain/Hydrology | C. Alvarez | 8/31/07 |
| ( ) ( ) | ( ) ( ) | ( ) ( ) | Jane Childress | Native American Religious Concerns | J. Childress | 8/31/07 |
| ( ) ( ) | ( ) ( ) | ( ) ( ) | Darrell Tersey | Threatened or Endangered Species | D. Tersey | 8/31/07 |
| ( ) ( ) | ( ) ( ) | ( ) ( ) | Bill Auby | Wastes, Hazardous or Solid | B. Auby | 8/31/07 |
| ( ) ( ) | ( ) ( ) | ( ) ( ) | Dan Moore | Water Quality, Drinking or Ground | C. Alvarez | 8/31/07 |
| ( ) ( ) | ( ) ( ) | ( ) ( ) | Jeff Simms | Wetlands/Riparian Zones | J. Simms | 8/31/07 |
| ( ) ( ) | ( ) ( ) | ( ) ( ) | Francisco Mendoza | Wild and Scenic Rivers | F. Mendoza | 8/31/07 |
| ( ) ( ) | ( ) ( ) | ( ) ( ) | Francisco Mendoza | Wilderness | F. Mendoza | 8/31/07 |
| ( ) ( ) | ( ) ( ) | ( ) ( ) | Darrell Tersey | Invasive & Non Native Weeds | D. Tersey | 8/31/07 |
| ( ) ( ) | ( ) ( ) | ( ) ( ) | Bill Auby | National Energy Policy | B. Auby | 8/31/07 |

Additional Specialists Review:

| SPECIALTY | NAME | COMMENTS | SIGNATURE | DATE |
|---|---|---|---|---|
| Visual Resources | Jim Mahoney | None | F. Mendoza | 8/31/07 |
| Migratory Bird Treaty Act | Keith Hughes | None | K. Hughes | 8/31/07 |
| | | | | |

Final Review:

Unit Manager/Supervisor:      /s/ Cindy Alvarez                          Date:   8/31/07

Environmental Coordinator:   /s/ Linda Marianito                     Date:   8/31/07

UNITED STATES DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT
ARIZONA
TUCSON FIELD OFFICE

**EA #:**            AZ-420-2007-051
**Project Name:**   San Pedro RNCA Border Fencing
**BLM Contact Person:** Susan Bernal

**Legal Description and Map Name:** Public land administered by the BLM in the San Pedro Riparian National Conservation Area (SPRNCA), within the 60 foot strip along the U.S. Mexico international boundary southeast of the city of Sierra Vista, Cochise County, Arizona. The general location is T. 24 S., R.22 E., section 19, lots 1-3; section 20, lots 1-4 of the Gila and Salt River Principal Meridian. The area is covered by the Bob Thompson Peak 7.5' quadrangle, shown on Map 1.

## I. INTRODUCTION

**A. Background:** In September 2006, the Department of Homeland Security (DHS) through the Army Corps of Engineers (ACOE), and the U.S. Customs and Border Patrol (CBP) requested a perpetual right-of-way (ROW) for permanent and temporary vehicle barriers along the U.S. – Mexico international border within the SPRNCA. As a response to this request, BLM conducted an independent review of the *"Final Supplemental Environmental Assessment for Infrastructure within U.S. Border patrol Naco-Douglas Corridor, Cochise County, Arizona, November 2003" (2003 EA)*. The review was to verify that it adequately addressed impacts for this request. BLM concluded that it was adequate and proceeded with preparing a Determination of NEPA Adequacy (DNA) and Decision Record (DR) to authorize the use of temporary and permanent vehicle barriers. This was never finalized due to the submission of an amended application.

The ACOE submitted an amended ROW application on August 10, 2007. The amended application changed the request to add the installation of a combination of pedestrian fence and vehicle barriers along this project area. Once again, BLM conducted an independent review for NEPA adequacy of the 2003 EA. The BLM concluded the 2003 EA did not adequately address the impacts of installing a pedestrian fence along the 60-foot strip within the SPRNCA. In order for BLM to respond to the amended ROW application, an analysis of impacts of installing the pedestrian fence was needed. Therefore, BLM is analyzing four different alternatives in this EA, which meets the BLM standards and regulations.

**B. The Need for the Proposal:** The federal action being evaluated in the EA is the granting a ROW to ACOE/CBP from the BLM for the proposed construction, maintenance, and operation of vehicle barriers, pedestrian fence, drainage structures, and roads along the U.S. – Mexico border within the SPRNCA boundary.

**C. Conformance with Land Use Plan:** The proposed action is subject to the San Pedro Riparian Management Plan; an Activity Level Plan tiered from the Safford District Resource Management Plan (RMP), approved in 1992 and amended in July 1994. This proposed action has been reviewed to determine if it conforms to the RMP terms and conditions as required by 43 CFR 1610.5, BLM MS 1617.3. According to page 22 of the RMP, "Rights-of-way, leases and permits will be considered on a case-by-case basis, in accordance with the decisions of this Resource Management Plan."

**D. Relationship to Statutes, Regulations or Other Plans or Policies:** The application for ROW is consistent with requirements of 43 CFR 2800, and the Federal Land Policy Management Act (FLPMA) Title V. The BLM Decision authorizes use of BLM land only. Use of non-BLM land (National Forest, State Trust land, private land) is subject to the agency or private landowners' permission. Public lands in the area are subject to the Endangered Species Act protocol for listed species in the project area and the Migratory Bird Treaty Act. The application for ROW is subject to the SPRNCA Proclamation (P.L. 100-696) which states under 102. (b) USES. – "The Secretary shall only allow such uses of the conservation area as he finds will further purposes of which the conservation area is established. Except where needed for

administrative or emergency purposes."  The action is also subject to the "Memorandum of Understanding Among US Department of Homeland Security and US Department of the Interior and US Department of Agriculture Regarding Cooperative national Security and Counterterrorism Efforts on Federal lands along the United States' Borders", signed by the Secretary of the Interior on 3/31/06.

**II. THE ACTION ALTERNATIVES and No Action:**  This document analyzes four (4) Alternatives.  Each action Alternative proposes the installation of a mix of the following design components:

### A. Design Components:

1. Temporary Vehicle Barriers (TVB):  are placed on ground level and are made of old railroad rail. They will be installed using a small crane to lift and place the barrier onto the ground with no ground excavation. They are designed as temporary because they will be able to be removed as necessary. The barriers will stand at a height of approximately 4' to 6' from the ground surface (diagram a).

2. Permanent Vehicle Barriers (PVB): are constructed using old railroad rails.  They will require the drilling of a 1' x 3' hole in the ground for each steel post and filled with concrete.   The height of PVBs is approximately 4' to 6' from ground surface (diagram b).

3. Pedestrian Fence using "Bollard" design: this design consists of a double row of 14' to 17' high steel pipe poles, approximately 6" in diameter, placed on 8.5" centers. The pipes will be filled with concrete for added strength and security. The two rows are offset, such that the gaps between the poles will be filled by the poles of the other row. The construction of the fence involves trenching 5' deep and 2' wide along the entire length (diagram c).

4. Pedestrian Fence using "Sandia" design: this consists of vertical secure metal mesh panels attached to 16' steel poles. Additional 6' panels are secured to the top panels at an angle of 45 degrees toward the south. The poles will be anchored to a 12" wide by 4' deep concrete footing that runs the length of the proposed fence line (diagram d).

5. Pedestrian Fence using a "modified Sandia/mesh" design: this design is a combination of steel pipes arranged horizontally at the bottom approximately 3' high, with 6" spacing and the remaining height of the fence consisting of mesh (diagram e).

### B. The following proposed actions are common among Alternatives 1-3:

1. Construction of the fence will require clearing and grading the area within a 60-foot wide strip along the U.S.-Mexico international border. The road that traverses outside of this 60-foot strip will not be improved or upgraded without BLM approval.

2. For roads inside the 60-foot strip, new road construction will involve grading and leveling proposed roadbeds, filling areas with existing materials (existing on roadways) or engineered fill, lifting and bedding stretches of road, and installing drainage structures to aid with water drainage. Installation of primary fences and vehicle barriers generally requires the construction of a road (approximately 10' wide) immediately adjacent to construction activities. To allow future maintenance on fences, these construction roads are considered a permanent infrastructure component. In order to minimize cut and fill activities, these roads follow the contour of the land and will be used infrequently. Therefore, all weather surfaces along the construction roads are not required because ACOE or CBP traffic can access these areas from adjacent patrolled roads.

3. Any temporarily disturbed soils will be stabilized and re vegetated with native tree and shrub species, including cottonwood and willow saplings at washes/arroyos, to provide erosion and sedimentation control. Disturbed areas will also be sprayed with a hydroseed mixture to establish an herbaceous cover more rapidly. Post-construction stabilization of eroding areas will be required where fencing and ground disturbance results in accelerated erosion. This may include reseeding, water bars or other treatment as necessary (adaptive management).

4. Work will be conducted in the daylight hours to the extent practicable. Nighttime construction activities will be conducted only when absolutely necessary for adequate concrete pours or in the case of an accelerated construction schedule to meet Congressional mandates. Portable lights with generators will be used during nighttime construction. However, lights will be equipped with shields to focus the illumination on the work area and reduce light trespass into other areas.

5. The ACOE/CBP will conduct a survey for Huachuca Water Umbel (HWU) annually to identify the presence of the species in the portion of the San Pedro River where TVBs are to be placed. Should HWU occur in the area the BLM and U.S. Fish and Wildlife Service (USFWS) will be notified. An Alternative location will be used until the USFWS can be consulted for appropriate guidance.

6. No invasive weeds will be introduced to the area by construction equipment. All construction equipment will be pressure washed prior to entering the project area.

7. All conservation measures from all Biological Opinions (BO) from the USFWS will be adhered to. See Final BO, signed August 29, 2007.

8. All pedestrian fences and vehicle barriers in dry washes will be designed and constructed to ensure proper conveyance of floodwaters and to lessen the potential to cause backwater flooding on either side of the border.

9. The disposal of solid and/or hazardous wastes is not authorized as part of any of the four Alternatives. The applicant is responsible for developing and implementing a plan for the safe use and storage of hazardous materials required for the proposed action. The storage of fuels or other hazardous materials is not authorized on the SPRNCA. Fuel tenders are not to enter the floodplain or channel of the San Pedro River. Any hazardous materials releases must be reported to BLM and appropriate responders. No painting is authorized within the floodplain or channel of the San Pedro River. Pressurized gas cylinders and acetylene tanks be properly secured and will not be left unattended within the SPRNCA.

**C. Description of Alternative 1 ACOE Proposed:** The ACOE requests a ROW to construct 1.6 mi. of pedestrian fence and 490' of TVBs. The pedestrian fence will be installed within 2-6-feet north of and along the U.S. – Mexico border, see attached Map 1. Either Bollard or "modified Sandia/mesh" fence design will be used. The TVBs will be installed in two segments, one segment in the San Pedro River, approximately 250 feet long. The second segment will be installed within the area known as "corrals", approximately 240 feet long.

Summary table – Alternative 1:

| Feature | Length | Location |
|---|---|---|
| Temporary Vehicle Barriers | 490 ft | Two segments - Within the river corridor and the corrals. |
| Bollard or "modified Sandia/mesh" style Pedestrian Fence | 8448 ft | Three segments – from western SPRNCA boundary to west bank of San Pedro River; from east bank San Pedro River to Corrals; from corrals to the east SRPNCA boundary |
| Permanent or temporary vehicle barrier | 1000 ft | OPTIONAL: One segment west of the San Pedro River to western SPRNCA boundary. No proposal has been submitted by ACOE however this option is analyzed in this EA. |

**D. Description of Alternative 2 Combination:** The Combination Alternative consists of authorizing a ROW to use a combination of vehicle barriers and pedestrian fence. TVBs will be placed in the San Pedro River, within the floodplain, and in the historic "corral" area, see Map 2. PVBs will be installed in dry wash areas along the SPRNCA boundary. Bollard style pedestrian fence will be installed in all other areas.

Summary table    Alternative 2:

| Feature | Length | Location |
|---------|--------|----------|
| Temporary Vehicle Barriers | 1,490 ft | Three segments - Within the river corridor, within the floodplain and the corrals area. |
| Permanent Vehicle Barriers | 275 ft | In five (5) dry washes along the project area. |
| Bollard style Pedestrian Fence | 8173 ft | In all other areas along the Border not covered by TVB or PVB. |

**E. Alternative 3 vehicle barriers only:** The proposed infrastructure consist of the installation of permanent and temporary 6" steel rail or pipe vehicle barriers along the international border on public lands within the SPRNCA see attached Map 3. The vehicle barriers are designed to impede illegal vehicle entry, and will not preclude pedestrian or wildlife movement and will be placed within 60' from the international boundary. The PVBs will be placed outside of the river corridor, and the TVBs will be placed inside of the river floodplain.

Summary table – Alternative 3:

| Feature | Length | Location |
|---------|--------|----------|
| Temporary Vehicle Barriers | 250 ft | One segment - Within the river corridor |
| Permanent Vehicle Barriers | 9688 ft | Outside river corridor on each side of the river. |

**F. Alternative 4 No Action Alternative:** BLM will not issue a ROW for construction and installation of the vehicle barriers and pedestrian fence within SPRNCA.

## III. AFFECTED ENVIRONMENT AND ENVIRONMENTAL CONSEQUENCES:

The SPRNCA is located in southeastern Arizona, stretching south of Benson to the U.S. – Mexico border. The SPRNCA, containing about 40 miles of the upper San Pedro River, was designated by Congress as a National Conservation Area on November 18, 1988, to protect and enhance the riparian ecosystem and related resources. Recognized by the National Audubon Society as the first Globally Important Bird Area, it attracts birders from all over the world. The area also contains significant cultural resources dating back approximately 11,000 years to the Clovis people, the first known human occupants in the upper San Pedro River Valley. The San Pedro River enters Arizona from Sonora, Mexico, flows north between the Huachuca and Mule Mountain ranges, and joins the Gila River 100 miles downstream near the town of Winkelman, Arizona. The San Pedro's perennial flow, though sometimes a trickle, is now a rare occurrence in the Southwest. In addition, a number of springs occur within the SPRNCA. Water is the critical element in a riparian ecosystem. Without an adequate supply, this rare ecosystem will vanish. There is currently an existing 4-strand barbed wire fence and primitive road along the U.S. – Mexico International Border within SPRNCA.

**Critical Elements:** The following critical elements are not affected by the proposed action or Alternatives because they do not occur in the proposed use area, or because of the nature of the proposed action:

- Area of Critical Environmental Concern: There is no designated ACEC within the project boundary.
- Wilderness: There is no designated wilderness in the project boundary.
- National Energy Policy: This project is not an energy related project.
- Prime and Unique Farmlands: The terraces of the San Pedro River were historically used for irrigated agriculture. With the incorporation of these lands into the SPRNCA, agricultural use of the lands has ceased. Therefore, no prime or unique farmlands will be affected by any of the Alternatives.
- Environmental Justice: there will be no impacts anticipated to specific groups of the population due to the remoteness of the project area.

**A. Floodplain/Hydrology:** A complex sub-surface geology creates a surface hydrology of perennial and intermittent reaches along the upper San Pedro River. Shallow bedrock helps to maintain perennial flows, i.e. reaches that have surface flow throughout the year. Intermittent reaches typically lack surface flow during periods of drought and dry summer months.

### 1. Impacts of Alternative 1, ACOE/CBP Proposed:

Under Alternative 1, a permanent bollard or mesh pedestrian fence will be constructed throughout all upland areas (including dry washes) and throughout the flood prone width of the San Pedro River. TVBs will be positioned within the active channel of the San Pedro River. Once complete, the proposed pedestrian fence will tie in with the pedestrian fence currently being constructed, which together will effectively bisect the entire San Pedro River Basin (HUC 15050202) at the U.S./Mexico border. Once completed, the proposed pedestrian fence combined with existing pedestrian fence and segments currently under construction will cross more than 30 unnamed ephemeral drainages east of the San Pedro River and 36 named and unnamed ephemeral drainages west of the river. All effected drainages are tributary to the San Pedro River or Green Bush Draw (tributary to the San Pedro River).

*Surface Water/Groundwater/Morphology:*

An on-site evaluation of newly constructed pedestrian fence and the proposed project area was conducted on 8/21/07 by BLM. The design and construction techniques employed on the existing pedestrian fence appear to be similar to design and construction methods outlined in the proposed action. Field observation of pedestrian fence built through ephemeral drainages (permanent bollard and mesh design) indicated excessive deposition above crossings and channel entrenchment below. Deposition above structures (at drainage crossings) reached a maximum depth of ~6 ft. while entrenchment below crossings approached similar depths. Evaluation of the existing pedestrian fence in upland settings indicated lower potential for debris build up.

Field observations indicate that the pedestrian fence currently in place (bollard and mesh designs) does not adequately allow passage of sediment and debris through ephemeral drainage paths during seasonal flood flows. Debris accumulation behind the pedestrian fence starves run-off water of sediment subsequently resulting in channel incision and increased erosion immediately below the fence. Because Alternative 1 proposes the installation of pedestrian fence within the floodplain of the San Pedro River, it is reasonable to assume sediment and debris accumulation behind the fence at this location will occur at a scale significantly larger than was observed in ephemeral washes much higher in the watershed. It should be noted that U. S. Geological Service stream flow gage 09470500 (San Pedro River at Palominas, AZ) located ~ 4 miles downstream has a 69-year record of peak stream flow for the San Pedro River (see Table 1). Over the 69 year period of record this gage has recorded maximum peak stream flows of 5,000 cubic feet per second (cfs) or greater in 40 of those 69-years. Maximum peak stream flow occurred in 1940 and was recorded at 22,000 cfs. Minimum peak stream flow occurred in 1987 and was recorded at 978 cfs. Average peak stream flow since 2000 has been measured at ~8,400 cfs (USGS 2007). ). Flood flows of this magnitude have high velocities and shear stresses that can remove riparian vegetation and eroded banks. Changes in floodplain function can lead to degradation of channel function through the redirection of flood energies (Rosgen 1996).

Remote analysis of the project area (aerial photographs and topographic map) indicate ephemeral drainages directly effected by the proposed action have low to moderate sinuosity (>1.2) and slopes ranging from ~2 to ~4 %. Stream channels possessing these characteristics can be loosely defined as "G-type" or Gullied channels. It is documented that "G" stream types typically have very high bank erosion rates and high sediment supply (Rosgen, 1996). Field and remote observation of the San Pedro River at the U.S./Mexico International border characterized this particular reach as having a broad floodplain (flood prone width was measured to be ~1,490 ft on 8/21/07 by BLM), the presence of point bars, high width to depth ratio, gentle slope (~1-2%), and sinuosity greater that 1.4 (~1.5 measured remotely). Based on these characteristics, this reach of the San Pedro River can be generally defined as a "C-type" channel. The channel aggradation/degradation and lateral extension processes, notably active in "C-type" channels, are inherently dependent on the natural stability of stream banks, the existing upstream watershed

conditions and flow and sediment regime. It is documented that "C type" channels can be significantly altered and rapidly de-stabilized when the effects of imposed changes in bank stability, watershed condition, or flow regime are combined to cause an exceedance of a channel stability threshold (Rosgen, 1996).

Increased erosion from tributary drainages will increase deposition of sediment in the San Pedro River. Increased deposition in the San Pedro River at these locations will effectively increase the width to depth ratio (wider, shallower, channel development). As the width to depth ratio increases, stability thresholds are exceeded, hydraulic stress against banks increases and bank erosion is accelerated. Increases in the sediment supply to the channel develop from bank erosion, reducing the systems capability to transport sediment. As a result, deposition occurs, further accelerating bank erosion, and the cycle continues (Rosgen, 1996).

Construction of the proposed pedestrian fence in the uplands could to some degree alter natural drainage patterns during wet periods. Sheet flows associated with intense monsoonal precipitation could carry debris into the fence, restricting natural flow paths and increasing erosive potential. However, the extent and significance of such impacts will depend on the timing and intensity of rainfall, hill slope, soil type, soil saturation, and vegetation. Additionally, disturbed surfaces associated with construction activities will also likely elevate erosive potential as vegetation is removed and soils are compacted. Furthermore, maintenance activities associated with the pedestrian fence will likely include removal of dirt and debris from the fence in drainages. However, it is unclear as to the method or location of disposal for the material recovered from the fence. Thus, potential environmental impacts associated with maintenance are uncertain.

Channel incision associated with debris build up above the pedestrian fence within the floodplain of the San Pedro River will alter stream channel morphologic stability. Channel incision will disconnect and dewater existing floodplains as a new hydrologic balance between stream channel and water table is created. Accelerated erosion immediately below the pedestrian fence will be coupled with measurable downstream deposition. Excessive erosion and deposition associated with vertical/lateral morphologic instability, alterations to stream sinuosity, width to depth ratio, and gradient (outside of what would normally be expected) combined with reduced riparian vigor and density will likely degrade channel function.

In addition to impacts from surface flow, there could be impacts from funneling vehicle and foot traffic into the San Pedro River corridor. Trampling of the river bank by vehicle and foot traffic could also lead to associated erosion problems.

Construction of a "hanging bollard" fence or other designs may help mitigate this issue of debris build-up behind the structure and erosion below. However, no formal designs have been presented by the applicant in this alternative and success of these structures in the project area is uncertain. Sediment production and alteration of natural drainage function occurring as a result of existing road conditions would persist under the alternative 1.

Potential watershed impacts may be reduced under alternative 1 if the TVB option is selected for all drainages and the flood prone area of the San Pedro River (as measured by BLM). Potentially, impacts will be reduced further by proposed mitigation and implementation of best management practices to control erosion during and following construction. However, there is a large degree of uncertainty concerning the effectiveness of the some of the proposed mitigation for erosion as many of the details have not been determined.

**2. Impacts of Alternative 2, Combination:** Alternative 2 is identical to Alternative 1 with the exception being that PVBs will be installed in ephemeral drainages (dry washes) and TVBs will be installed throughout the flood prone area of the San Pedro River.

*Surface Water/Groundwater/Morphology:*

Installation of PVBs in dry washes and TVB;s throughout the flood-prone area of the San Pedro River will be far less likely to catch sediment/debris during flood flows than the pedestrian fence requested in Alternative 1. Because the vehicle barriers will trap less sediment, it is anticipated that environmental impacts associated with downstream channel incision and erosion will be less severe than under Alternative 1. Potential environmental impacts associated with construction of the pedestrian fence in the uplands will be the same as under Alternative 1. Environmental impacts to permanence of perennial surface water in effected reaches of the San Pedro River will be the same as in Alternative 1. However, the severity of potential impacts may be reduced as erosion in ephemeral drainages is anticipated to be lower. Depth to groundwater in monitoring wells adjacent to ephemeral washes may increase as under Alternative 1. However, evidence indicating depth to ground water in monitoring wells is occurring as a result of Alternative 2 will be difficult to quantify. Foot traffic would be confined to ephemeral stream crossings and riparian areas. Erosion rates due to foot traffic in ephemeral drainages and riparian areas would be greater than under current conditions until law enforcement deterrents stem the flow of illegal foot traffic. Sediment production and alteration of natural drainage occurring as a result of existing road conditions would persist similar to alternative 1.

### 3. Impacts of Alternative 3, Vehicle Barriers Only:
Under Alternative three, PVBs will be installed in place of pedestrian fence in upland settings while TVBs will be installed through ephemeral drainages. TVBs will be installed within the floodplain of the San Pedro River.

*Surface Water/Groundwater/Morphology:*

Because TVBs will be removed from washes during periods of seasonal flooding, accumulation of sediment and debris behind as a result of the structures will be less than under either Alternative 1 or 3. As a result, potential adverse environmental impacts associated with downstream channel incision and erosion could be significantly reduced in comparison to impacts associated with Alternative 1 and 2. Additionally, construction of vehicle barriers as opposed to pedestrian fence will require less surface disturbance and maintenance, reducing erosion from the ROW. Furthermore, vehicle barriers will not significantly alter natural drainage patterns in the uplands, which will additionally reduce environmental impacts associated with erosion (in comparison to Alternative 1 and 3). Under Alternative 3 it is anticipated that erosion from ephemeral drainages will persist at near natural rates as will deposition of sediments in the San Pedro River. As a result, no alteration of the permanence of perennial surface water flow in the San Pedro River is expected under this Alternative. Depth to groundwater in monitoring wells will be unaffected by Alternative 3. Under this Alternative, damage caused by unauthorized vehicle use within the watershed will be nearly eliminated. Impacts to the floodplain of the San Pedro River resulting from seasonal installation and removal of TVBs will be the same in Alternative 3 as in Alternative 2.

Foot traffic will not be confined to ephemeral drainages or riparian areas. Thus impacts associated with foot travel will be dispersed over a greater area. No substantial increase in erosion rates would be expected. Sediment production and alteration of natural drainage occurring as a result of existing road conditions would persist similar to alternative 1.

### 4. Impacts of Alternative 4, No Action Alternative:
No fence would be built in The SPRNCA and thus, no impacts associated with fence design or construction methods would occur. The impacts of the border fence are largely cumulative from activities outside the San Pedro RNCA (see Cumulative impacts below). Damage caused by unauthorized vehicles use (damaging upland and riparian vegetation, altering natural drainage patterns, accelerated erosion...) would continue to accumulate.

**B. Wetlands/Riparian Zones and Vegetation:** The SPRNCA, known for its extensive riparian corridor, is a composite of several vegetation communities. Fremont cottonwood and Goodding willow dominate the riparian corridor. Lesser amounts of Arizona ash and walnut, netleaf hackberry, and soapberry occur as well. Chihuahuan desert-scrub, typified by thorny species such as tarbush, creosote and acacia, characterize the uplands bordering both sides of the river, while mesquite and native and exotic grass dominate the bottomland adjacent to the riparian corridor.

    **1. Impacts of Alternative 1, ACOE/CBP Proposed:** In the Floodplains/hydrology section, the impacts include increased sedimentation with the potential for accelerated channel migration and shifts in channel function. Bollard or Sandia fencing on the floodplain down to the active channel will likely impound water during floods, leading to increased energies and shear stresses (erosion energies) on downstream riparian habitat and vegetation. Vertical scouring may lead to head cutting that may impact riparian function upstream in Mexico. Back water effects or head cutting could negatively impact this upstream vegetation and channel function leading to destabilization of riparian habitat. If the flood plain is constrained by pedestrian fencing, large negative impacts to riparian function and vegetation can be anticipated. Excessive erosion and deposition associated with Vertical/lateral morphologic instability, alterations to stream sinuosity, width to depth ratio, and gradient (outside of what would normally be expected) combined with reduced riparian density and wide spread bank alteration, would likely degrade riparian function to a of classification of Functional at Risk (FAR). (BLM 1998).However, these impacts would be largely mitigated by constructing pedestrian fencing to the edge of the entire flood prone area as determined by BLM hydrologists (includes 100 year floodplain) and placing TVBs across the floodplain and river as prescribed in ACOE 2003 EA.

The placement and removal of TVBs with a crane in the active channel will likely result in vegetation and soil loss on the flood plain and river banks. Impacts associated with installation and removal of TVB's within the flood prone area of the San Pedro River could develop if noxious and invasive riparian plant species are introduced to the riparian area. Once established, these species could compete with the native vegetation which is essential for maintaining stream bank stability and riparian function. This damage is anticipated to be localized as long as the same route is used annually, avoided when soils are saturated and route is appropriately placed on the floodplain (perpendicular to flow). Weed prevention procedures are anticipated to minimize the risk of the introduction of invasive plants.

The disturbance of land along the 60-foot-wide ROW with its varied slopes, some steep, is anticipated to result in localized accelerated erosion and increased runoff rates on 11 acre of BLM on the eastern portion of the basin and up to 4.3 acres on BLM to the west. The erosion and runoff rates are anticipated to increase as a result of the continuous cement footings under the "modified Sandia/mesh" and closely spaced bollard fencing. The fences will likely redirect overland flow down fence lines over time. Surfacing the all-weather road with stabilizing material and reseeding will assist in stabilizing the 60-foot-wide footprint, but will not prevent the erosion process alone. The use of all mitigation measures proposed will reduce impacts of construction activities and monitoring the ROW will help reduce erosion over the life of the project.

Construction of pedestrian fence and 60' of cleared ROW will likely result in excess sediment in drainages from storm runoff. Bollard pedestrian fencing in washes will likely result in head cutting and under-scour footings. The bollard pedestrian fence will collect sedimentation, debris and slow flood flows causing them rise and spill out along the fence line, leading to lateral erosion. The head cutting at bollards in washes will run once the depth of the downstream scour hole reaches 4' to 6'. This excess sediment will reach the San Pedro River where it may cover existing herbaceous vegetation and create point bars and sand bars that promote tree seedling germination. Potentially, if enough sedimentation occurs, then the river may adjust laterally (lateral migration) which will cause bank failure and loss of riparian vegetation until the river reaches a new dynamic equilibrium with increased the sediment and water supplied from the areas of disturbance. This will have a minor to large negative impact to riparian function that will diminish down stream of tributary washes. Only with improved construction methods for PVBs over washes that allow flood flows to pass largely unimpeded will sedimentation and erosion be reduced at washes that flow to the river. Preventing excess sediment discharge through PVB design improvements at washes will offset these negative impacts to riparian function to a large degree, depending on the level of success.

Potential watershed impacts may be reduced under Alt 1 if the TVB option is selected for all drainages and the flood prone area of the San Pedro River (as measured by BLM). Potentially, impacts will be reduced further by proposed mitigation and implementation of best management practices to control erosion during and following construction. However, there is a large degree of uncertainty concerning the effectiveness of the some of the proposed mitigation for erosion as many of the details have not been determined.

**2. Impacts of Alternative 2, Combination:** The impacts to riparian function and vegetation will be similar to alternative 1, assuming that designs for PBs at wash crossings are as effective as PVBs in passing sediment and water discharge. Routine monitoring and Maintenance of wash crossings for debris accumulation would help preserve current functionability of washes.

**3. Impacts of Alternative 3, Vehicle Barriers only:** The impacts to riparian function and vegetation will be largely the same as in Alternative 1 and 2. However, potential erosion impacts will be lessened by using VBs only, as overland flows will not be redirected by footers that hold up a pedestrian fence. . Barb-wire fencing would be required to restrict livestock movements that could negatively impact riparian function.

Foot traffic will increase with related impacts to the watershed, washes and the river bottom. This may result in damage to riparian vegetation and increases in erosion on the watershed and bank damage to the river.

**4. Impacts of the No Action Alternative:** No fence would be built in The SPRNCA and thus, no impacts associated with fence design or construction methods would occur. The impacts of the border fence would be largely cumulative from activities outside the San Pedro RNCA (see Cumulative impacts below). Damage caused by unauthorized vehicles use (damaging upland and riparian vegetation, altering natural drainage patterns, accelerated erosion...) would continue to accumulate.

**C. Wild and Scenic Rivers:** The San Pedro River in the SPRNCA, including the three mile segment in the area being evaluated in this proposed federal action, was determined to be eligible for inclusion in the Wild and Scenic Rivers System by the BLM because the river is free flowing, and has outstandingly remarkable scenic, recreation, fish and wildlife habitat, hydrologic, paleontologic, and cultural/historic values. The San Pedro River is recommended for inclusion in the National Wild and Scenic Rivers System, in the 1994 – Final Arizona Statewide Wild and Scenic Rivers Legislative Environmental Impact Statement would require certain management actions to be initiated and carried forward.

### 1. Impacts of Alternative 1 ACOE/CBP Proposed:

Alternative 1 calls for the seasonal placement and removal of temporary vehicle barriers in the riparian corridor of the San Pedro River and the construction of bollard-style pedestrian fences at wash crossings and mesh fences at other locations within the uplands. This Alternative will diminish outstanding scenic and recreation values due to the visual impact of the project. This alternative would not impair the suitability of the river for consideration of its inclusion to the W&SR system.

### 2. Impacts of Alternative 2 Combination:

Alternative 2, calling for the seasonal placement and removal of temporary vehicle barriers in the riparian corridor of the San Pedro River, the construction of permanent vehicle barriers at wash crossings and bollard style fences on the uplands, would diminish outstandingly scenic and recreation values due to the visual impact of the project. This alternative would not impair the suitability of the river for consideration of its inclusion to the W&SR system

### 3. Alternative 3 vehicle barriers only:

The proposed infrastructures consist of the installation of permanent and temporary 6" steel rail or pipe vehicle barriers along the international border on public lands within the SPRNCA. This Alternative will not likely affect outstanding remarkable scenic values. This alternative would not impair the suitability of the river for consideration of its inclusion to the W&SR system

**4. Impacts of the No Action Alternative:**
This Alternative will not likely affect outstanding remarkable scenic values. This alternative would not impair the suitability of the river for consideration of its inclusion to the W&SR system

**D. Wildlife and Aquatic Habitat:** Wildlife abounds in the SPRNCA because of the abundant food, water and cover within and surrounding the riparian zone. The SPRNCA supports more than 400 species of birds, more than 80 species of mammals, two native species and several introduced species of fish and more than 40 species of amphibians and reptiles. More than 150 species of breeding-birds and more than 250 species of migrant and wintering birds can be found in the area, representing roughly half of the number of known breeding species in North America. Mammals are abundant throughout the area, although some are mostly nocturnal and therefore rarely seen. Included in this group are many species of rodents, several bats, mountain lions and bobcats. Other mammals like the white-tailed deer, mule deer, javelina, desert cottontail and black-tailed jackrabbit are commonly observed. Historically, the San Pedro River contained 14 species of native fish. Today, these have been largely replaced by introduced species such as common carp, yellow bullhead and mosquito fish. Only the long fin dace and desert sucker remain from the original populations.

The Arizona Game and Fish Department's Heritage Data Management System was accessed and the species list for Cochise County was reviewed. The only species that was on either the state Wildlife of Special Concern (WSC) list or the BLM's Special Status Species list that may be impacted by the project is the Northern Mexican Garter Snake. Any activities that produce sediment into the San Pedro River Channel or have heavy equipment driving within the stream channel has the potential to harm the snake, although the latest available information is that there have not been any recent sightings of the Mexican Garter Snake in the San Pedro river for many years due to the presence of bullfrogs *(Rana spp.)* that prey on the garter snakes.

**1. Impacts of Alternative 1, ACOE/CBP Proposed:** The proposed action may have a short term effect of disturbance of local wildlife due to construction activities. This disturbance will end once the construction is complete. There will be wildlife mortality from vehicles using the border road, however this is not expected to be that much higher than current levels, as the fencing is expected to reduce the amount of undocumented alien traffic in the area requiring a CBP response by vehicle. The border fence has the potential to separate portions of wildlife populations from existing watering points, which will potentially change wildlife distributions and population levels if species are effectively separated from currently used water sources. In addition, the border fence has the potential to "funnel" animal movements to areas were undocumented alien traffic is also funneled. Continuous disruptions of wildlife movements may result both from the physical barrier of the fence and also from increased contact between wildlife and humans.

**2. Impacts of Alternative 2, Combination:** Same as Alternative 1

**3. Impacts of Alternative 3, Vehicle Barriers only:** Same as Alternative 1

**4. Impacts of Alternative 4, No Action:** There will not be any change in impacts as the fence will not be constructed.

Aquatic Habitat

**1. Impacts of Alternative 1 ACOE/CBP Proposed:** The fishes, frogs and turtles that occupy the San Pedro River require a variety of habitats (i.e., pools, runs, riffles) for feeding, reproduction, shelter and escape cover. Perennial aquatic habitat occurs one-half mile (approx.) downstream.

Few measurable negative effects to aquatic habitat are likely to occur from the crane moving TVBs in the San Pedro River. Minor amounts of sediment and limited bank alteration is not anticipated to effect habitat quality to aquatic habitat located downstream. With the proposed mitigation, HWU habitat is expected to be impacted because proper identification and handling will prevent HWU to be harmed.

In the "Wetlands/Riparian Zone and Vegetation" and "Floodplains/Hydrology" sections the impacts include increased upland erosion and river sedimentation, resulting in the potential for accelerated channel

migration (destabilization) and shifts in channel function. Vertical scouring in the San Pedro River may lead to head cutting that may impact aquatic habitats in Mexico by channelizing river habitat. This "gully" effect would result in poor habitat development (e.g. few poorly developed pools, runs and riffles). Cut banks and mass wasting are anticipated to occur to an unknown extent in the project area and beyond from channel destabilization resulting from alteration of flood plain function. In areas of excess sediment supply from bank collapse or upstream head cutting and drainage inputs beyond the channel conveyance capability could result in the "smothering" of habitats important to fish, turtles and frogs. This type of channel function is likely to result in a substantial loss of habitat quality from the formation of multiple threads; and poorly developed pools, runs and riffles.

Potential watershed impacts may be reduced under Alt 1 if the TVB option is selected for all drainages and the flood prone area of the San Pedro River (as measured by BLM). Potentially, impacts will be reduced further by proposed mitigation and implementation of best management practices to control erosion during and following construction. However, there is a large degree of uncertainty concerning the effectiveness of the some of the proposed mitigation for erosion as many of the details have not been determined.

**2. Impacts of Alternative 2, Combination:** Because the TVBs will be placed in the floodplain and PVBs will be placed in washes, there will be no impacts to HWU. The use of TVBs in the San Pedro River and floodplain will eliminate drastic changes in channel stability that would degrade aquatic habitat quality and limit the ability of the HWU to establish; the natural hydraulics in the location will be maintained to a large degree in Alternative 2. The use of PVBs in washes will allow for the normal flow of sediment and water, which will reduce the likelihood of head cutting resulting from "damming" behind bollard fences. By inspecting wash crossings for accumulated debris and clearing it, the function of washes will remain relatively unaffected leading to less sedimentation that could result in changes in channel function that effect HWU habitat.

**3. Impacts of Alternative 3, Vehicle Barriers Only:** The impacts to riparian function and vegetation will be largely the same as in Alternative 1 and 2. However, potential erosion impacts will be lessened by using vehicle barriers only, as overland flows will not be redirected by concrete footers that hold up a pedestrian fence. Foot traffic and related actions will continue to impact not only the aquatic habitat but upland habitat as well.

**4. Impacts of the No Action Alternative:** No fence would be built in The SPRNCA and thus, no impacts associated with fence design or construction methods would occur. The impacts of the border fence would be largely cumulative from activities outside the San Pedro RNCA (see Cumulative impacts below). Damage caused by unauthorized vehicles use (damaging upland and riparian vegetation, altering natural drainage patterns, accelerated erosion...) would continue to accumulate.

## E. Threatened and Endangered Species:

**1. Impacts of Alternative 1, ACOE/CBP Proposed:** impacts of this Alternative were analyzed in the 2007 ACOE Biological Assessment (attached) and offered the following determinations:

Jaguar *(Panthera onca)*, Lesser Long-nosed Bat *(Leptonycteris curasoae yerbabuenae)*: Both of these species could realize beneficial effects with the reduction of illegal traffic and consequent CBP pursuit within the areas north of the fence. The installation of fence will hinder jaguar migration and could indirectly result in increased illegal alien traffic and consequent CBP enforcement actions in higher quality habitat away from the fence locations. The direct impediments and the potential increased human activity in the normal travel corridors "may effect, will likely adversely effect" the jaguar. Conservation measures are incorporated into the proposed action to mitigate these effects.

The loss of foraging habitat for the lesser long-nose bat "may effect" the bat, but "will not adversely effect" the U.S. populations, provided conservation measures are incorporated to this Alternative.

Ocelot *(Felis pardalis)*: This species was not evaluated in the ACOE documents. Because of the lack of recent evidence that Ocelots occur in or near the project area, it is likely that during the life of the project, that ocelots will not reoccupy habitat along the San Pedro River, therefore there will be no effects to the Ocelot.

Southwestern (SW) Willow Flycatcher *(Empidonax traillii extimus)* and Yellow billed Cuckoo *(Coccyzus americanus occidentalis)*: In the Biological Assessment for the Proposed San Pedro river crossing (Biological Assessment 2007), the CBP determined that there was a "may effect, not likely to adversely effect" for the SW Willow Flycatcher within the project area because of the mitigation measures included in the consultation. This has been confirmed by the USFWS. (Doug Duncan, Personal Communication).

Huachuca Water Umbel (HWU) *(Lilaeopsis schaffneriana ssp. Recurva)*: This species was not evaluated in the ACOE documents. Due to the presence of perennial water in the reach and adjacent populations, it is likely that during the life of the project, that HWU will occupy habitat within the project area, therefore, there may be adverse effects to the water umbel. The HWU is known to be damaged by trampling. Past illegal alien traffic has been heavy in some areas along the San Pedro River. More recently this traffic has diminished along the river. Short term trampling effects may increase as the pedestrian fence funnel foot traffic down to the river and CBP apprehensions increase. Over time, trampling effects will be greatly diminished and vehicle traffic from illegal activities will cease. This will provide a beneficial impact to the HWU.

The placement and removal of TVBs with a crane in the active channel is anticipated to result in HWU mortality should they colonize the project location in the future. This species is a colonizer of previously unoccupied habitats under the right conditions (USFWS 2003) and may colonize this reach, especially since the species is present upstream and patches of permanent water can be found in this river reach (BLM files, wet dry run data). The crane will cause vegetation and soil loss on the flood plain and river banks. This damage will be localized as long as placement is carefully selected to avoid redirecting flood flows down the crane travel lane.

In the "Wetlands/Riparian Zone and Vegetation" and "Floodplains/Hydrology" sections the impacts include increased upland erosion and river sedimentation, resulting in the potential for radical channel migration and shifts in channel function. Bollard or Sandia fencing on the floodplain down to the active channel will likely impound water during floods, leading to increased energies and shear stresses (erosion energies) on downstream habitat currently suitable for HWU. Vertical scouring may lead to head cutting that may impact the HWU upstream in Mexico. Haas and Frye (1997) documented the species on the San Pedro River approximately 0.5 mile south of the international boundary. The entire SPRNCA is considered potential habitat for the HWU. It is the largest contiguous potential habitat of the HWU, and as such is considered the most important site for recovery. Back water effects or head cutting could negatively impact this upstream population and suitability of habitat for re-colonization.

After a flood, it can rapidly expand its population and occupy disturbed habitat until inter-specific competition exceeds its tolerance. The expansion and contraction of the HWU populations appear to depend on the presence of refugia where the species can escape the effects of scouring floods, a watershed that has an unaltered hydrograph, and a healthy riparian community that stabilizes the channel (USFWS 2003). This healthy dynamic of moderate flood scour and deposition will likely be disrupted, leaving doubt about the habitat suitability for this species downstream of the pedestrian fence. Cut banks and mass wasting of the San Pedro River will likely occur to an unknown extent in the project area and beyond. These impacts may extend downstream 9.5 river miles to designated critical habitat, ultimately leading to habitat alteration in this reach as well.

Should down-cutting occur in the San Pedro River, the species will only be able to colonize relatively small patches of habitat and will be subjected to increased scour during flood events. The upstream and downstream extent of these affects is difficult to estimate.

Potential watershed impacts that affect HWU habitat may be reduced under Alt 1 if the TVB option is selected for all drainages and the flood prone area of the San Pedro River (as measured by BLM). Potentially, impacts will be reduced further by proposed mitigation and implementation of best management practices to control erosion during and following construction, monitoring for the presence of HWA, and proper location of crane access. With proposed mitigation in place, the impacts to HWU from the heavy equipment, increased watershed instability, increased river channel instability is anticipated to be lessened considerably. The residual impacts to HWU are likely to be relatively small over the life of the project. However, there is a large degree of uncertainty concerning the effectiveness of the some of the proposed mitigation for erosion as many of the details have not been determined.

**2. Alternative 2 Combination:** Since this Alternative allows for spaces or breaks in the continuity along the project area, more opportunities will exist for large animals, including the jaguar, to move across the border.

HWU Impacts: Because the TVBs will be placed in the floodplain and PVBs will be placed in washes, the impacts to the HWU will be much less than those for Alternative 1. The use of TVBs in the San Pedro River and flood prone area will eliminate drastic changes in channel stability that will limit the ability of the HWU from establishing; the natural hydraulics in the location will be maintained to a large degree in Alternative 2. The use of PVBs in washes will allow for the normal flow of sediment and water, which will reduce the likelihood of head cutting resulting from "damming" behind bollard fences. By inspecting wash crossings for accumulated debris and clearing it, the function of washes will remain relatively unaffected leading to less sedimentation reaching the river that could result in changes in channel function that effect the HWU habitat.

**3. Alternative 3 vehicle barriers only:** The impacts of Alternative 3 will be the same as Alternative 4, the No Action Alternative because the PVBs do not hinder movement of wildlife or water flows across the international border.

HWU Impacts: Since the impacts to channel function and vegetation will be largely the same as in Alternative 2, impacts to HWU will lessen negative impacts to the HWU. However, potential erosion impacts will be lessened by using vehicle barriers only, as overland flows will not be redirected. Foot traffic may increase leading to trails that result in gullies and other watershed problems that lead to increased sediment loads and flood peaks in the San Pedro River. However, this impact is likely to be limited in scope and negligible

**4. Alternative 4 No Action Alternative:** The No Action Alternative will not have any effects on the Threatened or Endangered species within the project area.

HWU Impacts: No fence would be built in The SPRNCA and thus, no impacts to HWU associated with fence design or construction methods would occur. The impacts of the border fence would be largely cumulative from activities outside the San Pedro RNCA (see Cumulative impacts below). Damage to HWU and habitat caused by unauthorized vehicles use and foot traffic would result in negative impacts such as degradation of upland and riparian vegetation, increased sedimentation from accelerated erosion, and direct damage to HWU from trampling.

**F. Cultural Resources:** The San Pedro River Valley has been continuously occupied by humans for at least the past 13,000 years. The oldest known archaeological sites, of the Clovis Culture, are among the best examples of the late Ice Age mega-fauna hunting complex ever found in the U.S. The traces left by later Archaic people (circa 9,000 B.C    A.D. 300) are also found buried in the rich deposits of the valley.

The Formative Period (A.D. 300- 1450) was an especially highly populated period along the San Pedro valley and hundreds of archaeological sites of this time period have been recorded, though few have been excavated or fully investigated. Many cultural influences were present during this time, including the well-known and extensively investigated cultural complexes of the Hohokam (Gila-Salt-Santa Cruz Rivers), the Mogollon (northern Arizona and New Mexico-Mogollon Rim) and the Anasazi (Four Corners area), as well as influences from the Casas Grandes

area in Mexico. Architectural styles, mortuary practices and material culture (especially ceramics) show clear ties to all of these cultures, either as a result of colonization, or trade, or both.

After a collapse in population and social organization, possibly caused by extended droughts, of all three major cultural complexes around A.D.1450, the area was inhabited by people of a variety of cultural groups, the most well-known being the Sobaipuri and the Apache. Often called the Protohistoric, this period experienced the first contact with Europeans, particularly the Spanish who came to colonize the American Southwest.

Eventually, the Apache dominated the landscape, driving away the Piman, or O'odham-related Sobaipuri and the Spanish when the Presidio Santa Cruz de Terrenate was abandoned in 1780. This period saw the San Pedro at possibly its least populated, until the 1870s when silver was discovered in Tombstone.

In the Historic Period, Fort Huachuca was established, the mines in Tombstones rose, the milling communities sprung up along the river, transportation routes were established (railroads, stage lines, and freight lines), cattle ranchers arrived, and farmers grew crops. The area was flooded with Europeans, Mexicans, and Indian groups who came here to make a living, and quite often, seeking fame and fortune.

A class III, intensive cultural resources inventory was conducted in the project area in 2002 by Aztlan Archaeology, Inc.. Two historic properties, AZ EE:12:60 and EE:12:61 (ASM), were recorded during the inventory. AZ EE:12:60 (ASM) is a prehistoric village site with a Mogollon/Hohokam cultural affiliation dating to approximately A.D. 900-1400. The border road, a dirt two-track, and the present border fence, a three-strand barbed wire, go through the site. This site has been determined "eligible" for the National Register of Historic Places (NRHP) under criterion "d" (36 CFR 60.4) for its ability and likelihood to yield information important to understanding the prehistory of the San Pedro River, and southern Arizona.

AZ EE:12:61 (ASM) is a historic corral and cattle processing site. The site was built by the Green Cattle Company, owned by William Cornell (Colonel) Greene, a very influential partner of the Cananea Mine (Mexico) and cattle baron of the late 19th and early 20th century. His large ranching complex straddled the International Border. The hacienda and related structures are in Mexico, and the corrals and related features lay on both sides of the border. Aztlan recommended this site "eligible" for the NRHP under criteria "a" and "c", "within the context of U.S.-Mexico commercial relations (the cooperative cross-border infrastructure of the Sonora-Arizona cattle industry)" (Reider and Slawson 2002). This site has been determined "eligible" under criterion "a" for its contribution to the broad pattern of history concerning the developing cattle ranching industry and cross-border interactions during the late 19th to early 20th century. The site may also be eligible under criterion "c", based on the workmanship and design of the structure. The workmanship displayed by the wooden corrals is probably typical of the time period, but is becoming increasingly rare to find, especially along the U.S.-Mexican border. More research will be needed in order to determine the site's eligibility under "c".

> **1. Impacts of Alternative 1 ACOE/CBP Proposed:** The proposed pedestrian fence will be placed within the boundaries of site EE:12:60, and a TVB will be placed within the boundaries of EE:12:61. A portion of the site (60' wide, 760' long, and 6' deep) will be destroyed by the excavation for the concrete footers, and the construction activity itself. On site EE:12:61 (known as Greene's corral), a TVB will be placed within the site features. It will be a permanent, physical and modern addition to the site. The barrier will be a visual element which will diminish the integrity of the property's significant historic features. The bollard or mesh fence will be built directly adjacent to the historic corrals, further diminishing its integrity. In applying the criteria of effect, from 36 CFR 800.5, the proposed project will result in an "adverse effect" determination. Eligibility and effect determinations have been made by the BLM under the National Programmatic Agreement with the Advisory Council on Historic Preservation and the Arizona Protocol with the Arizona State Historic Preservation Office.
>
> A treatment plan has been developed to minimize and mitigate the adverse effects that the project activities may have on these National Register of Historic Places-eligible sites (Hutira 2007). The BLM has determined that these adverse effects can be satisfactorily minimized and/or mitigated through an effective treatment plan. In anticipation of this project, an excavation permit was issued to Northland Research, Inc., to implement the treatment measures. In early July, 2007, a single backhoe trench was dug through most

of the length of EE:12:60 (ASM) (as recorded). The trench measured 230 meters long, 61 centimeters wide, dug to a depth of 4' and was offset from the barbed wire border fence by about 4'. The trench depth was determined based on an initial proposal for a vehicle barrier. Twenty-three prehistoric features were discovered as a result, 7 of them being possible pithouses, and the rest described as ashy pits or thermal features. After the features were recorded in profile and mapped, the trench was backfilled. A sampling strategy is being developed by Northland as well as a plan to deepen the trench and strip the excavation areas, due to the proposal of a larger, deeper, pedestrian fence. Due to Occupational Health and Safety Agency regulations, a deeper trench will require stepping back of excavation areas, requiring additional ground disturbance.

The treatment for EE:12:61 (ASM) was carried out in late June 2007. All field mapping and photo-documentation was completed. A report is in preparation.

**2. Impacts of Alternative 2 Combination:** Same impacts as Alternative 1.

**3. Impacts of Alternative 3 Vehicle Barriers only:** In this alternative, PVBs will be placed within the boundaries of EE:12:60. A portion of the site (60' wide, 760' long, and 3' deep) will be destroyed by the excavation for the concrete footers, and the construction activity itself. On site EE:12:61 (known as Greene's corral), a TVB will be placed within the site features. It will be a permanent, physical and modern addition to the site. The barrier will be a visual element which could diminish the integrity of the property's significant historic features. In applying the criteria of effect (36 CFR 800.5), the proposed project will result in an "adverse effect" determination. Eligibility and effect determinations have been made by the BLM under the National Programmatic Agreement with the Advisory Council on Historic Preservation and the Arizona Protocol with the Arizona State Historic Preservation Office.

A treatment plan has been developed to minimize and mitigate the adverse effects that the project activities may have on these National Register of Historic Places-eligible sites (Hutira 2007). The BLM has determined that these adverse effects can be satisfactorily minimized and/or mitigated through an effective treatment plan. In anticipation of this project, an excavation permit was issued to Northland Research, Inc., to implement the treatment measures. In early July 2007, a single backhoe trench was dug through most of the length of EE:12:60 (ASM) (as recorded). The trench measured 230 meters long dug to a depth of 4 feet and was offset from the barbed-wire border fence by about 4 feet. The trench depth was determined based on an initial proposal for a vehicle barrier. Twenty-three prehistoric features were discovered as a result, 7 of them being possible pithouses, and the rest described as ashy pits or thermal features. After the features were recorded in profile and mapped, the trench was backfilled. A sampling strategy is being developed by Northland, as well as a plan to strip the excavation area. Under this Alternative, the existing trench will not have to be deepened and fewer features will have to be excavated due to the less-impacting proposal of a vehicle barrier.

The treatment for EE:12:61 (ASM) was carried out in late June 2007. All field mapping and photo documentation was completed. A report is in preparation.

**4. Impacts of Alternative 4 No Action:** If the proposed fence is not built, then the adverse effects to site EE:12:60 will be greatly minimized. In anticipation of this action, a test trench was already excavated through a portion of the site (230 meters long, 61 cm wide and 4 feet deep) in July 2007. The numerous features discovered during this phase of the data recovery were only minimally mapped and recorded, with the expectation that further work will be done in the near future once a sampling strategy was developed and the full data recovery excavations were completed. If the "no action" Alternative is chosen, then the data recovery will not be completed, resulting in reduced damage to the site (caused by further excavations) but the data that was expected to be recovered will not be recovered. In this case, the "adverse effect" will not be mitigated through data recovery. In this case, the BLM will not be in compliance with the National Historic Preservation Act of 1966. For site EE:12:61 (ASM), the mitigation strategy of mapping and intensive recording has been completed.

**G. Native American Religious Concerns** Tribal consultation was initiated for the ACOE's initial ROW application (which only requested vehicle barriers) with the Tohono O'odham Nation on April 17, 2007, through a letter to the tribal chair and copied to the tribal archaeologist, Peter Steere. A copy of the draft treatment plan was provided to Mr. Steere on June 15, 2007. His comments were provided via email the same day. These comments were incorporated into the final treatment plan (Hutira 2007). Their concerns regarded the possible disturbance of human remains during data recovery, their handling and disposition, and protection of the site during construction. A Plan of Action, per the Native American Graves Protection and Repatriation Act (NAGPRA) was incorporated into the treatment plan, and additional monitoring requirements were added to address these concerns.

> **1. Impacts of Alternative 1 ACOE/CBP Proposed:** The proposed data recovery will likely result in the disturbance of one or more interred or cremated individuals, whom the Tohono O'odham (and the other Four Southern Tribes) claim as their ancestors. Proper handling and eventual repatriation of the individuals and any burial-related objects will lessen this impact, but the tribe considers the disturbance and unearthing of relatives to be unacceptable.

> **2. Impacts of Alternative 2 Combination:** Same as Alternative 1.

> **3. Impacts of Alternative 3 Vehicle Barriers only:** Same as Alternative 1.

> **4. Impacts of Alternative 4 No Action:** No additional data recovery or construction will eliminate the possibility of disturbing human remains, which will greatly lessen the impact to Native American Religious Concerns.

**H. Visual Resources:** The BLM is responsible for ensuring that the scenic values of public lands are considered before allowing uses that may have visual impacts. The BLM accomplishes this through its Visual Resource Management (VRM) system, which involves inventorying scenic values and establishing management objectives for those values through the resource management planning process, and then evaluating proposed activities to determine whether they conform to the management objectives. A visual resources management inventory was completed for lands within the SPRNCA. The project area being evaluated in this EA, is managed as VRM Class I and II, thereby protecting the scenic quality and visual character of this area.

The riparian forest along the San Pedro River, adjacent grasslands, and desert upland vegetation are the most recognizable features of the SPRNCA. Most of the landscape to the east and west of the riparian forest is dominated by gently sloping valley terraces with many small to several major drainages. As well as these visual values mentioned, the long-distance views available from the area being evaluated in this EA are dramatic, including the Mule and Dragoon Mountains to the northeast, the Huachuca and Whetstone Mountains to the northwest, and to the south the San Jose, Ajos-Bavispe, Santa Elena, and Mariquitez Mountains in Sonora, México. Vistas both near and far are important because of the associated sightseeing values.

Though generally natural in appearance, the area has been modified over the past 100 years. These changes include several miles of dirt approximately one lane wide road, a historic livestock corral, and rangeland fences. On the Mexican side of the international border, there are several adobe ranch houses and ranch facilities. A single human feature added in the past three years to the SPRNCA in the area being evaluated, is a U. S. Border Patrol camera tower located 1 ½ mile from the Border.

> **1. Impacts of Alternative 1 ACOE/CBP Proposed:** Alternative 1, calling for the seasonal placement and removal of temporary vehicle barriers in the riparian corridor of the San Pedro River, the construction of bollard style pedestrian fences at wash crossings and mesh fences at other locations within the uplands, would be highly noticeable and attract attention from locations within at least one mile where the public commonly views the project area. Visual impacts under this Alternative did exceed VRM Class II objectives in views within one mile of the project due to the visual contrast of the proposed design components.

> **2. Impacts of Alternative 2 Combination:**
> The design components from implementing this alternative will be noticeable and attract attention from locations within at least one mile where the public commonly views the project area. Based upon Visual

Contrast Rating criterion conducted for this Alternative, the implementation of this Alternative does not meet visual resource management objectives due to the visual contrast of the design components.

### 3. Alternative 3 vehicle barriers only:
Visual impacts under this alternative will be noticeable and attract attention from locations within 100 yards where the public commonly views the project area. The height of the permanent barriers would correspond to the height of the current and historic barbed wire fence.

Based upon Visual Contrast Rating criterion conducted for this Alternative, the implementation of this Alternative would meet visual resource management objectives within the foreground and middle ground views, due to the open/see-through character of the project.

### 4. Impacts of the No Action Alternative:
The character of the existing landscape will generally remain the same as they are now.

**I. Air Quality:** The project area is outside of any U.S. Environmental Protection Agency designated non-attainment area.

### 1. Impacts of Alternative 1, ACOE/CBP Proposed:
Heavy equipment, vehicles, and generators will produce exhaust during the construction phase. Ongoing vehicle patrols and maintenance activities along the border road will also produce exhaust. Exhaust is expected to dissipate quickly. Construction activities within the SPRNCA will result in the clearing of a swath 1.75 miles long along the border and up to 60 ft in width, disturbing up to 12.7 acres of soils. Dust is expected to be generated during construction. Dust is also expected to be generated by vehicle passage during ongoing patrols and maintenance activities.

### 2. Impacts of Alternative 2, Combination:
Effects on air quality for this Alternative will be substantially the same as those for the Alternative 1, with slightly fewer impacted acres at wash crossings.

### 3. Impacts of Alternative 3, Vehicle Barriers Only
Heavy equipment, vehicles, and generators will produce exhaust during the construction phase. Ongoing vehicle patrols and maintenance activities along the border road will also produce exhaust. Exhaust is expected to dissipate quickly. The fabrication and placement of vehicle barriers will result in less soil disturbance than the Alternative 1 as trenching and the pouring of footers is not required.

### 4. Impacts of Alternative 4, No Action Alternative
Ongoing vehicle patrols and maintenance activities along the existing border fence will produce exhaust. Exhaust is expected to dissipate quickly. Dust will be generated by vehicle passage during ongoing patrols and maintenance activities along the existing border fence.

**J. Wastes, Hazardous or Solid:** There are no existing hazardous waste sites in the project area. The disposal of solid and/or hazardous wastes is not authorized as part of any of the four Alternatives. Incidental releases of hazardous materials could result in the contamination of soils, groundwater, or surface water.

### K. Water Quality, Drinking or Ground:
**1. Impacts of Alternative 1 ACOE/CBP Proposal:** The proposed action calls for the seasonal placement and removal of TVBs in the channel of the San Pedro River. This activity will require the use of heavy equipment within the channel and floodplain. Some disturbance of soils, river banks, and riparian vegetation can be expected each time the barriers are moved. This may result in increased water turbidity, thereby reducing water quality.

The proposed action calls for the clearing of up to 12.7 acres of soils which can be expected to result in increased sediment runoff to tributary washes and eventual increased sediment loading and turbidity in the San Pedro River.

Hanging bollards may be used in lieu of fixed bollard fencing at ephemeral wash crossings. Hanging bollards have the potential of avoiding the sediment trapping expected from the use of fixed bollards though there is a high degree of uncertainty in the effectiveness of this design as sediments trapped by the bollards during relatively low flow events may immobilize the bollards during high flow events, preventing them from swinging.

The proposed action calls for the placement of TVBs within the channel of the San Pedro River and pedestrian barriers across most of the San Pedro Valley. This may result in a concentration of pedestrian use along the channel of the San Pedro. Expected affects include an increase in human and solid wastes left in the floodplain and channel of the river, potentially degrading water quality in the river. Funneling pedestrian traffic into the river channel also increases the likelihood that pedestrians will come in contact with potentially contaminated water.

Vehicle barriers are expected to reduce the number of vehicles crossing the border in the floodplain, potentially decreasing the opportunities for hazardous materials spills and leaks effecting water quality in the river. Ongoing road maintenance activities are expected to continue as described in the No Action Alternative.

**2. Impacts of Alternative 2, Combination:** The affects of periodically removing and replacing TVBs in the San Pedro River would be the same as in Alternative 1. The placement of PVBs is expected to have the same impacts as TVBs for water quality.

Project design resulting in impacts described previously in the Surface Water/Groundwater/Morphology section would result in increased sediment loading in the San Pedro River, increasing water turbidity and reducing water quality.

Project design is expected to concentrate pedestrian use along the river, resulting in an increase in human and solid wastes left in the floodplain of the river and in ephemeral washes, potentially degrading water quality in the river.

Vehicle barriers are expected to reduce the number of vehicles crossing the border in the floodplain, potentially decreasing the opportunities for hazardous materials spills and leaks effecting water quality in the river.

**3. Impacts of Alternative 3, Vehicle Barriers Only:** Vehicle barriers are expected to reduce the number of vehicles crossing the border in the SPRNCA during the seasons the barriers are in place, potentially decreasing the opportunities for hazardous materials spills and leaks effecting water quality in the river. Cross-border pedestrian traffic patterns will not be altered by vehicle barriers.

**4. Impacts of Alternative 4, No Action:** There will be no impact to water quality under this alternative.

**L. Socioeconomics:** The current conditions are "incorporated by reference" from pages 3-57 through 3-60 in the 2003 EA. The population in Cochise County rose 15 percent in one year, from 1999 to 2000. The racial diversity of Cochise County is comprised mainly of Caucasians (76.7 percent) and African-American (4.5percent). The remaining 18.8 percent is split between Asian and Pacific Islanders, Native American and other races. The total number of jobs in Cochise County was 50,041 in 2000. The annual average unemployment rate for Cochise County was 4.6 percent in 2001. When compared to a steady statewide unemployment rate, data suggest that Cochise County has experienced a significant drop in the unemployment rate since the early 1990s. The average annual growth rate for total personal income in the past 10 years was lower than growth rates for the state and nation. The per capita personal income for Cochise County is lower than the state and national average. Twenty one percent of the population in the county lives below the poverty level. The density of housing units in Cochise County is 8.3 units per square mile. There are no houses within the SPRNCA. There are approximately 55,000 visitors to the SPRNCA each year. These visitors contribute to the local economy by renting hotel rooms, eating in restaurants and purchasing goods in Sierra Vista.

**1. Impacts of the Alternatives 1, 2, and 3:** Negative effects to the aesthetics and/or quality of life will be incurred in SPRNCA due to the new construction actions, the increase in patrolling activities, and the funneling effect of foot traffic through areas where illegal aliens can get through. Approximately 30% of the total cost of construction of the proposed action will be spent in the local communities. The long term economic benefits will be beneficial due to the improvement in effective enforcement corridor across the project area.

**2. Impacts of the No Action Alternative:** The socioeconomics will generally remain the same as they are now. However, not building the pedestrian fence will benefit the aesthetics of SPRNCA. Numbers of illegal aliens crossing the international border within the SPRNCA is estimated to be less than 50 per day. This number could fluctuate, and an increase could diminish the aesthetic quality to visitor, because the negative impacts of undocumented immigration, e.g., trash, trampling vegetation, heightened law enforcement presence

## IV.    Cumulative Impacts

Cumulative impacts are the impacts on the environment which result from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time. (40 CFR 1508.7) The cumulative impacts for the EA are organized by alternative. The geographic scope of the analysis is the San Pedro River watershed and the reasonable foreseeable future timeframe for impacts to the San Pedro river corridor and the watershed.

## A.  Cumulative Impact of Alternative 1:  Installing pedestrian fencing along the international border except within the San Pedro River and within the historic corrals area.

Upland and Watershed Cumulative Impacts:
Upland and watershed cumulative impacts expected from installing pedestrian fence is likely to be both beneficial and negative. The upland habitat will likely see an improvement adjacent to the pedestrian fence because the fence will stop vehicle and foot traffic impacts. However, the pedestrian fence is likely to create diversions of flow due to the build up of debris on the upstream side of the fence and diverting flows along the fence to the San Pedro River. As a result, negative cumulative impacts to stream channel morphology, surface water quality, and groundwater resources in the San Pedro watershed may occur under Alternative 1. However, with the proposed mitigation measures these negative impacts will decrease over time.

The pedestrian and vehicle barriers, and related construction access roads, and operational roads, will have cumulative, long term visual impacts that will be noticeable and attract attention in foreground views within a mile of the project. The visual impact of the project will be partly screened by vegetation cover on landform features from some viewing locations.   The views most affected will be those from the immediate project vicinity in the NCA due to the scale of the fencing, and from elevated viewing locations outside the NCA, primarily on lands in the bajada slopes west of the NCA in the foreground middle-ground distance. The project will also affect views from nearby mountains in the background distance zone, areas over 1.5 miles from the project, mainly due to the visual contrast of the exposed ground surface of the roads and drag beds against the surrounding vegetation. Visual impacts of the project will increase the influence of manmade modifications on the landscape character in the vicinity of the project, including within the NCA, and contribute to visual impacts from other existing and potential land use in the vicinity of the border.

Implementing the conservation measures of the Final Biological Opinion (August 29, 2007) will lessen the severity of the impact to large mammals, such as jaguar.

River Corridor Cumulative Impacts:
The construction of a pedestrian fence and placement of TVB's is expected to reduce cross-border vehicle traffic within the SPRNCA. However, as the border fence project proceeds in other areas of the watershed,

funneling of cross-border traffic into the channel of the San Pedro can be expected to negatively impact the entire river system, including water quality, riparian habitat, HWU habitat, and hydrology impacts.

Under this Alternative, there is expected to be an increase pedestrian traffic being funneled into the river corridor. Impact to water quality will be a result from increased amounts of human and solid wastes deposited in the floodplain and channel of the San Pedro River. As mentioned above, the pedestrian fence diverts flows and is expected to increased erosion in the vicinity of the fence due to flow concentration along the fence. This erosion could ultimately lead to sediment loading in the San Pedro River.

Cumulative impacts to the river corridor associated with seasonal installation and removal of TVB's could develop if noxious and invasive riparian plant species are introduced to the riparian area if the proposed mitigation is not followed. The washing of all equipment during construction will help control the spread of noxious and invasive plant species. Once established these species could out-compete the native vegetation which is essential for maintaining stream bank stability and proper functioning riparian conditions. Once established these species could out-compete the Huachuca water umbel which is listed as endangered and is essential for maintaining stream bank stability and proper functioning riparian conditions.

As the border fence project proceeds in other areas of the watershed, it will restrict and funnel wildlife movement corridors into the channel of the San Pedro and can be expected to block movement of larger mammals using the San Pedro valley as a travel corridor. This could have negative impacts on genetic interchange between populations required to prevent extirpation of small populations of Threatened or Endangered species. However, the mitigation to conduct jaguar survey and monitoring should provide basic information on jaguar locations and movements, and may also answer management questions. The conservation and recovery actions are expected to improve the conservation status of the jaguar.

Once completed, the proposed pedestrian fence combined with existing pedestrian fence and segments currently under construction will cross more than 30 unnamed ephemeral drainages east of the San Pedro River and 36 named and unnamed ephemeral drainages west of the river. All impacted drainages are tributary to the San Pedro River or Green Bush Draw (tributary to the San Pedro River). Like the proposed action, if impacts are left unmitigated, the disturbance of land will result in accelerated erosion on 123 acres (approx) of fence line outside the SPRNCA and 66 washes that drain into the San Pedro River. Potentially, if enough sedimentation occurs watershed disturbance, then the river may become laterally unstable, which would cause bank failure and loss of water umbel habitat and, potentially, HWU plants. This channel instability will continue until the river reaches a new dynamic equilibrium with increased the sediment and water supplied from the disturbance of the right of way.

The precarious nature of the San Pedro River and the HWU increase the risk from additional alteration of riparian function and aquatic habitat. The most acute threat to riparian areas in the basin is ground water overdraft (USFWS 2003, 2007). The population continues to grow at a rate of 2 % annually, increasing the threat of wetland and riparian loss with time. Decreasing trends in base flow have already been noted in the upper reaches of the San Pedro River within the United States (USFWS 2007). Limited numbers of populations and the small size of populations make the water umbel vulnerable to extinction as a result of random events that are often exacerbated by habitat disturbance. For instance, the restriction of this species to a relatively small area in southeastern Arizona and adjacent Sonora increases the chance that a single environmental catastrophe, such as a severe tropical storm or drought, could eliminate populations or cause extinction (USFWS 2003).

The impacts to HWU from watershed degradation and resulting river channel instability is anticipated to be lessened considerably with the implementation of mitigation for erosion (excess sediment discharge) and flood plain alteration. The residual impacts to riparian function, aquatic habitat and limited loss of HWU patches in the project area are likely to be relatively modest over the life of the project.

Potential watershed impacts may be reduced under alternative 1 if the pedestrian fencing or vehicle barriers are designed to pass flood flows and sediment (e.g. TVB option) for all drainages in the basin regardless of ownership. Potentially, impacts will be reduced further across the entire watershed by the proposed mitigation and implementation of best management practices to control erosion during and following construction. However, there is a large degree of uncertainty concerning the effectiveness of the some of the proposed mitigation for erosion as many of the details have not been determined.

Construction activities within the San Pedro watershed will result in the clearing of a swath 34 miles long along the border and up to 60 ft in width, disturbing up to 247 acres of soils. Exhaust and dust is expected to be generated during construction. Exhaust and dust is also expected to be generated by vehicle passage during ongoing patrols and maintenance activities.

### B. Cumulative Impact of Alternative 2: Installation of a combination of vehicle barriers and pedestrian fences along the SPRNCA border.

River Corridor Cumulative Impacts
Cumulative impacts from installing vehicle barriers within 5 dry washes and in the San Pedro River will be far less prone to impede sediment and debris during flood flows than Alternative 1. It can also be expected that cumulative impacts associated with downstream channel incision and erosion will be less much less severe than a solid pedestrian fence across the entire width of the SPRNCA.

Placing TVBs within 5 dry wash areas will allow these drainages to not be impeded. However, areas outside the dry wash areas could still create debris jams and divert high flow events along the bollard fence, creating erosion and contributing sediment and high flows into the San Pedro River. This potentially could result in the river becoming laterally unstable, which will cause bank failure and loss of riparian areas, soil and more importantly loss of HWU habitat/individuals. Following the Storm Water Pollution Prevention Plan and all mitigation of keeping the bollard fence clear of flood water debris will lessen the severity of this impact.

Upland Habitat and Watershed Cumulative Impacts
As the border fence project proceeds in other areas of the watershed, large mammal movement will be funneled to the SPRCA where there will be openings scattered throughout the international border within the SPRNCA. Since there will be more openings along the border under this Alternative, the funneling of pedestrians, vehicles and wildlife will be spread out to more areas, thereby decreasing the impacts to the river corridor. Implementing the conservation measures of the Final Biological Opinion (August 29, 2007) will lessen the severity of the impact to large mammals, such as jaguar.

The impacts from the seasonal installation of TVBs are the same as Alternative 1. Effects of this alternative on Air Quality are expected to be substantially the same as those described for the Alternative 1, with slightly fewer acres of soil disturbance. Cumulative visual impacts under this alternative will be similar to those under Alternative 1, except the visual contrast of the pedestrian fence will be reduced in extent due to the shorter length of this type of structure.

### C. Cumulative Impact of Alternative 3: Installation of vehicle barriers only

River Corridor Cumulative Impacts
The cumulative impacts to water quality from Alternative 3 are expected to be similar to impacts associated with Alternative 1. However, because Alternative 3 serves to control vehicular traffic, but does not direct pedestrian traffic to the arroyos or river channel itself. the impacts to water quality from pedestrian traffic will be less concentrated in nature.

Cumulative impacts to the riparian area are the same as Alternative 1 and 2. The length of border abutting the SPRNCA is approximately 5% of the total border in the San Pedro watershed. Selecting this alternative

would have little effect on the total amount of dust generated by the border fence project within the watershed.

Upland Habitat and Watershed Cumulative Impacts
The placement of TVB's and PVB's is expected to reduce cross-border vehicle traffic but not pedestrian traffic within the SPRNCA. As the border fence project proceeds in other areas of the watershed, funneling of cross-border pedestrian traffic into the SPRNCA can be expected to affect habitat of the river corridor and the upland habitat. Including increased amounts of human and solid wastes deposited in the SPRNCA Cumulative visual impacts under this alternative will be similar to those under Alternative 2, except the visual contrast of the pedestrian fence will be eliminated. Vehicle barriers will be screened more effectively by vegetation cover and landform features, and they will only be noticeable and attract attention in views under ¼ to ½ mile from the project. This alternative presents the least visual impact

## D. Cumulative Impact of Alternative 4:  No action

River Corridor Cumulative Impacts
Unauthorized vehicle travel may continue to alter drainage patterns, destroy vegetation, and modify channel morphologic conditions. If the problem persists, individually minor watershed impacts could collectively result in cumulative impacts detrimental to channel morphology, surface water and groundwater resources within the San Pedro River Basin.

Vehicle patrols within the SPRNCA can be expected to increase as the border fence project proceeds in other areas of the watershed, funneling cross-border traffic into the SPRNCA. Increased dust generation can be expected in the SPRNCA as a result.

Cumulative visual impacts under this alternative will be less than those under the other alternatives. Visual impact related to the existing roads and fencing outside the SPRNCA boundary, and border patrol operations will remain, and will only be noticeable and attract attention from the immediate vicinity

## V.    Description of Mitigation Measures: per 43CFR 10.4(g):

1.  No construction is to occur in dry wash drainages areas until the BLM has been coordinated with, allowed to comment on, and approves the type of fence modifications or barriers ACOE's desires to be constructed within these areas. The dry wash drainages areas and the river active channel are identified on Map A, along with BLM's recommended types of infrastructures.
2.  A preconstruction meeting will be required between BLM, Border Patrol, ACOE and the project contractor.
3.  All approved construction activities shall be contained within the authorized 60-foot strip.
4.  The ACOE and Border Patrol shall comply with all conditions and stipulations set forth in the U.S. Fish and Wildlife Biological Opinion dated August 29, 2007.
5.  Prior to the placement and removal of the temporary vehicle barriers in the river corridor and banks, the area will be surveyed and cleared for the Huachuca Water Umbel(HWU) by a qualified biologist. Should the HWU occur in the area the BLM and USFWS will be notified and appropriate mitigation measures will be determined and made.
6.  There shall be no ground disturbances or vegetation removal outside of the authorized 60-foot strip.
7.  There shall be no modifications or repairs to the existing road that meanders outside of the 60-foot authorized area. If any road maintenance is needed outside of the 60-foot authorized strip, the Border Patrol's authorized officer will communicate with the Manager of the San Pedro Riparian National Conservation Area, or the Tucson Field Manager on the needs for the required road maintenance.
8.  All construction equipment and associated vehicles brought into the SPRNCA are to be washed every time prior to entering the SPRNCA for the prevention of spreading invasive weeds. Vehicle washing will consist of the under carriage, exterior, and tires.
9.  All vehicular use shall be confined to existing roads.

10. The construction of the pedestrian fence and road will be permitted only upon the completion of the site treatment, and clearance from the BLM Archaeologist. The pedestrian fence shall be placed in the existing archaeological test trench excavated in July 2007 that is located 3-6 feet north of the barbed wire fence currently representing the international border.

11. For roads inside the 60-foot strip, new road construction would involve grading and leveling proposed roadbeds, filling areas with existing materials (existing on roadways) or engineered fill, aggregate materials, dust suppressant agents, lifting and bedding stretches of road, and installing drainage structures to aid with water drainage.

12. Temporary barriers are to be placed inside the historic corrals, the river and the floodplain, no construction or ground disturbances are ever to occur in these areas.

13. The temporary barriers inside the river are to be placed after the flood season and be removed before the flood season. The Border Patrol and BLM will coordinate on time frames for these activities.

14. A BLM approved onsite monitor will be required during the construction period to monitor all construction activities and archaeological matters. A biological monitor would be required if construction occurs during birding breeding/migration seasons of February 1st thru August 31st.

15. Construction will not be permitted during the rainy seasons when the soil conditions are muddy and unmanageable.

16. All equipment will be inspected for leaks to prevent any contamination from petroleum, oil, and lubricant spills that could occur.

17. The ACOE will consult with and obtain BLM's and the USFWS's approval on the proposed bank stabilization techniques on the east and west banks of the San Pedro River, and the construction lane within the floodplain. It is recommended that the fence would end approximately 50 feet east of the eastside river embankment to avoid subsequent erosion.

18. The Border Patrol will monitor and remove all debris and sediment buildup within all permanent structures. Removal of the debris and sediment shall be preformed prior to and after high water events. All trash debris is to be disposed of and removed from the San Pedro Riparian National Conservation Area boundaries.

19. BLM will be provided with a copy of ACOE's Storm Water Pollution Prevention Plan prior to be beginning of construction.

20. The BLM retains the right to occupy and use the right-of-way.

## Compliance and Area Monitoring:
All compliance and monitoring will be completed by Tucson BLM personnel.

## Preparers
Linda Marianito, NEPA Coordinator
Susan Bernal, Realty Specialist
Darrell Tersey, Natural Resource Specialist
Keith Hughes, Natural Resource Specialist
Jeff Simms, Fishery Biologist
Dan Moore, Hydrologist
Nathan Dieterich, Hydrologist
Jane Childress, Archeologist
Jim Mahoney, Outdoor Recreation Planner
Francisco Mendoza, Outdoor Recreation Planner

## Persons and Agencies Consulted:
Bill Childress, Manager, SPRNCA
Cindy Alvarez, Assistant Field Manager
Chris Horyza, State Program Lead for Planning
Lorraine Buck, Public Affairs Specialist

**Literature Cited:**

ACOE Final Biological Assessment 2007

Arizona Department of Water Resources (ADWR). 1994. Upper San Pedro River case study. Pages 147-208 in Arizona riparian protection program, legislative report, July 1994.

Anderson, G. 2006. Huachuca water umbel in the Upper San Pedro watershed of Sonora, Mexico. Unpublished report for the U.S. Fish and Wildlife Service, Arizona Ecological Services State Office, Phoenix, Arizona. 37 pp.

Arizona Game and Fish Department (AGFD). 2004. Heritage management data system. Arizona Game and Fish Dept., Nongame Branch, Phoenix.

Bahre, C.J. 1991. A legacy of change: Historic human impact on vegetation of the Arizona borderlands. University of Arizona Press, Tucson, Arizona. 231pp.

Belnap, J. 1992. Potential role of cryptobiotic soil crusts in semiarid rangelands. Paper presented at the Symposium on Ecology, Management, and Restoration of Intermountain Annual Rangelands, Boise, Idaho, May 18-22, 1992.

Belsky, A.J., and D.M. Blumenthal. 1997. Effects of livestock grazing on stand dynamics and soils in upland forests of the interior west. Conservation Biology 11(2):315-327. Bryan, K. 1925. Date of channel trenching (arroyo cutting) in the arid southwest. Science 62:338-344.

Bent, A. C. 1960. Life histories of North American flycatchers, larks, swallows and their allies. Dover Press, New York, New York. 555pp.

Blackburn, W.H. 1984. Impacts of grazing intensity and specialized grazing systems on watershed characteristics and responses. Pp. 927-983. In: Developing strategies for rangeland management. National Research Council/National Academy of Sciences. Westview Press. Boulder, CO.

Brown, B. T. 1988. Breeding Ecology of a Willow Flycatcher Population in Grand Canyon, Arizona. Western Birds 19:25-33.

Browning, M. R. 1993. Comments on the taxonomy of *Empidonax traillii* (willow flycatcher). Western Birds 24:241-257.

Bryan, K. 1925. Date of channel trenching (arroyo cutting) in the arid southwest. Science 62:338-344.

Bureau of Land Management (BLM). 1989. San Pedro River riparian management plan and environmental impact statement. Final. Safford, AZ: US Department of the Interior, BLM. 381 p.

Bureau of Land Management (BLM). 1998. The upper San Pedro River Basin of the United States and Mexico, A resource directory and an overview of natural resource issues confronting decision-makers and natural resource managers. Arizona State Office, Bureau of Land Management, Report No. BLM/AZ/PT-98/021. 110 pp.

Busby, F.E., and G.F. Gifford. 1981. Effects of livestock grazing on infiltration and erosion rates measured on chained and unchained pinyon juniper sites in southeastern Utah. Journal of Range Management 34:400 405.

Busch, J. D., M. P. Miller, E. H. Paxton, M. K. Sogge, and P. Keim. 2000. Genetic variation inthe endangered southwestern willow flycatcher. The Auk: 117 (3): 586-595.

Cardinal S.N., and E.H. Paxton. 2005. Home range, movement, and habitat use of the southwestern willow flycatcher at Roosevelt Lake, AZ    2004. U.S. Geological Survey report to the U.S. Bureau of Reclamation, Phoenix, AZ.

DeBano, L.F., and L.J. Schmidt. 1989. Interrelationship between watershed condition and riparian health. Pages 45-52 in: Practical approaches to riparian resource management. US Bureau of Land Management, Billings, MT.

DeLoach, C. J. 1991. Saltcedar, an exotic weed of western North American riparian areas: a review of its taxonomy, biology, harmful and beneficial values, and its potential for biological control. Report to the Bureau of Reclamation, Boulder City, NV, Contract No. 7-AG-30-04930.

Dobyns, H. F. 1981. From fire to flood: historic human destruction of Sonoran Desert riverine oases. Ballena Press, Socorro, New Mexico. 222pp.

DuBois, S.M., and A.W. Smith. 1980. The 1887 earthquake in the San Bernardino Valley, Sonora: historic accounts and intensity patterns in Arizona. Bureau of Geology and Mineral Technology, University of Arizona Special Paper 3:1-112.

Doug Duncan, Personal Communication

Durst, S. L. 2004. Southwestern willow flycatcher potential prey base and diet in native and exotic habitat. Masters Thesis. Northern Arizona University, Flagstaff, AZ.

EEC 2001a. Final Report Huachuca Water Umbel Surveys, Cienega Creek Preserve, Bingham Cienega Preserve, La Cebadilla Property, Pima County, Arizona. Prepared for Pima County Flood Control District, Tucson, Arizona.

EEC 2001b. Final 2001 Huachuca Water Umbel Fort Huachuca Monitoring and San Pedro Riparian NCA Inventory Reports. Prepared for Directorate of Installation Support, US Army Garrison, Fort Huachuca, Arizona.
EEC 2001c. Southwestern Willow Flycatcher 2001 Surveys of the San Pedro Riparian National Conservation Area. Prepared for US Army Garrison, Fort Huachuca, Arizona.

EEC 2004. Year 2004 Huachuca Water Umbel (*Lilaeopsis schaffneriana recurva*) Fort Huachuca Monitoring and San Pedro Riparian National Conservation Area Inventory. Prepared for Directorate of Installation Support, US Army Garrison, Fort Huachuca,  Arizona.

English, Heather C., A.E. Graber, S.D. Stump, H.E. Telle, and L.A. Ellis. 2006. Southwestern Willow Flycatcher 2005 Survey and Nest Monitoring Report. Research Branch, Wildlife Management Division, Arizona Game and Fish Department. Technical Report 248. March 2006. 82 pp.

Falk, D. and P.L. Warren. 1994. Rare plants of the Coronado National Forest: Population studies and monitoring recommendations. Report to the Coronado National Forest, Tucson, Arizona.

Geraghty and Miller, Inc. 1995. Historical flows and conditions in the San Pedro River. Report to the Water Action Task Force, Sierra Vista Economic Development Foundation, Project No. AZ0473.001. 33pp +figures.

Gifford, G.F., and R.H. Hawkins. 1978. Hydrologic impact of grazing on infiltration: a critical review. Water Resources Research. 14:305-313.

Gori, D.F., P.L. Warren, and L.S. Anderson. 1990. Population studies of sensitive plants of the Huachuca, Patagonia, and Atascosa Mountains, Arizona. Unpublished report. Coronado National Forest, Tucson, Arizona. 114 pp.

Graber, A.E., D.M. Weddle, H.C. English, S.D. Stump, H.E. Telle, and L.A. Ellis. 2007. Southwestern willow flycatcher 2006 survey and nest monitoring report. Nongame and Endangered Wildlife Program. Technical Report 249. Arizona Game and Fish Department, Phoenix, Arizona. 96pp.

Haas, S.K. and R.J. Frye. 1997. Hydrology and water quality effects on *Lilaeopsis schaffneriana* ssp. *recurva*. Report to Arizona Department of Agriculture and Fort Huachuca.

Hanna, W. C. 1928. Notes on the dwarf cowbird in southern California. Condor 30:161-162.

Harrison, H. H. 1979. A field guide to western birds' nests of 520 species found breeding in the United States west of the Mississippi River. Houghton Mifflin Co., Boston. 279pp.

Hastings, J.R. and R.M. Turner. 1980. The Changing Mile. University of Arizona Press, Tucson. 317 pp.

Hendrickson, D.A., and W.L. Minckley. 1984. Cienegas - vanishing climax communities of the American Southwest. Desert Plants 6(3):131-175.

Hereford R. 1993. Entrenchment and widening of the upper San Pedro River, Arizona. Boulder, CO: Geological Society of America. Special Paper 282. 46 p.

Howell, S. N. G., and S. Webb. 1995. A guide to the birds of Mexico and northern Central America. Oxford University Press, New York, New York. 851pp.

Hutira, J. and D. Hart "Proposed Archaeological Investigations at AZ cc:12:60 (ASM) and AZ EE:12:61(ASM) Located Along the U.S./Mexico Border, Cochise County, Arizona." Northland Research, Inc., Tempe.

Kenwood, K. E., and E. H. Paxton. 2001. Survivorship and movements of southwestern willow flycatchers at Roosevelt Lake, Arizona    2001. US Geologic Survey report to the US Bureau of Reclamation, Phoenix.

King, J. R. 1955. Notes on the life history of Traill's flycatcher (*Empidonax traillii*) in southeastern Washington. The Auk 72:148-173.

Koronkiewicz, T. J,. and M. K. Sogge. 2001. Southwestern willow flycatchers recaptured at wintering sites in Costa Rica. North American Bird Bander 26:161-162.

Krueper, D. J. 1993. Effects of land use practices on western riparian ecosystems. In Status and Management of Neotropical Migratory Birds, General Tech. Rep. RM-229, U. S. Forest Service, Rocky Mountain Forest and Range Experiment Station, Fort Collins, Colorado.

Ligon, J. S. 1961. New Mexico Birds and where to find them. The University of New Mexico Press, Albuquerque, New Mexico. 360pp.

Martin, S.C. 1975. Ecology and management of southwestern semidesert grass shrub ranges: The status of our knowledge. US Forest Service, Rocky Mountain Forest and Range Experiment Station, Fort Collins, CO. 39 pp.

Mayfield, H. F. 1977. Brown-headed cowbird: agent of extermination? American Birds 31:107-113.

Maynard, W. R. 1995. Summary of 1994 survey efforts in New Mexico for southwestern willow flycatcher (*Empidonax traillii extimus*). Contract # 94-516-69, New Mexico Department of Game and Fish, Sante Fe, New Mexico. 48pp.

McCabe, R. A. 1991. The little green bird: ecology of the willow flycatcher. Palmer Publications, Inc., Amherst, Wisconsin. 171pp.

McCarthey, T.D., C.E. Paradzick, J.W. Rourke, M.W. Sumner, and R.F. Davidson. 1998. Arizona partners in flight southwestern willow flycatcher 1997 survey and nest monitoring report. Report to the Bureau of Reclamation, Phoenix, AZ.

McKernan R. L., and G. Braden. 2001. Status, distribution. and habitat affinities of the southwestern willow flycatcher along the lower Colorado River: year 5  2000. Report submitted to the U.S. Bureau of Reclamation, Boulder City, Nevada.

McLeod, M. A., T. J. Koronkiewicz, B. T. Brown, and S. W. Carothers. 2005. Southwestern willow flycatcher surveys, demography, and ecology along the lower Colorado River and tributaries. Annual report submitted U.S. Bureau of Reclamation, Boulder City, Nevada, by SWCA Environmental Consultants, Flagstaff, AZ.

Muiznieks, B. D., S. J. Sferra, T. E. Corman, M. K. Sogge, and T. J. Tibbitts. 1994. Arizona Partners In Flight southwestern willow flycatcher survey, 1993. Draft report: Nongame and Endangered Wildlife Program, Arizona Game and Fish Department, Phoenix, Arizona. Draft of April 1994. 28pp.

Owen, J. C., and M. K. Sogge. 2002. Physiological condition of southwestern willow flycatchers in native and saltcedar habitats. US Geological Survey report to the Arizona Department of Transportation.

Paradzick, C. E., R. F. Davidson, J. W. Rourke, M. W. Sumner, A. D. Wartell, T. D. McCarthey. 2000. Southwestern willow flycatcher 1999 survey and nest monitoring report. Tech. Rept. 151, Nongame & Endangered Wildl. Progr., Arizona Game & Fish Dept., Phoenix.

Paradzick, C.E.. R.F. Davidson, J.W. Rourke, M.W. Sumner, and T.D. McCarthey. 1999. Southwestern willow flycatcher 1998 survey and nest monitoring report. Nongame and Endangered Wildlife Program, Arizona Game and Fish Department, Phoenix, AZ, Technical Report 141.

Paxton, E., J. Owen, and M. K. Sogge. 1996. Southwestern willow flycatcher response to catastrophic habitat loss. U.S. Geological Survey Biological Resources Division, Colorado Plateau Research Station, Northern Arizona University, Flagstaff. 12pp.

Peterson, R.T. 1990. A field guide to western birds. 3rd ed. Houghton Mifflin Company, Boston, Massachusetts. 432 pp.

Phillips, A. R. 1948. Geographic variation in *Empidonax traillii*. The Auk 65:507-514. Phillips, A. R., J. Marshall, and G. Monson. 1964. The Birds of Arizona. University of Arizona Press, Tucson, Arizona. 212pp.

Rieder, M. and L.V. Slawson 2002 "Cultural Resources Inventory of 57.7 Miles Along the United States-Mexico International Border in the Vicinity of Naco and Douglas, Cochise County, Arizona," DRAFT; Atzlan Archaeology, Inc., Tucson.

Rogers, W.M. 1965. Historical land occupance of the upper San Pedro River valley since 1870. Unpublished Masters Thesis, University of Arizona, Tucson, AZ.

Rosgen, Dave. 1996. Applied River Morphology. Wildland Hydrology, Pagosa Springs, Colorado: 4-10, 5-22 pp.

Science Application International Corporation (SAIC). 1998a. Programmatic biological assessment for Fort Huachuca, Arizona. Report to Directorate of Engineering and Housing, Environmental and Natural Resources Division, US Army Garrison, Fort Huachuca, AZ.

Science Application International Corporation (SAIC). 1998b. 29 January 1998 letter to Jackie Record, US Fish and Wildlife Service, Phoenix, AZ. A report of southwestern willow flycatcher surveys on the San Pedro River in 1997.

San Diego Natural History Museum. 1995. *Empidonax traillii extimus* in California. The willow flycatcher workshop. 17 November 1995. 66pp.

San Pedro Expert Study Team. 1999. Sustaining and enhancing riparian migratory bird habitat on the upper San Pedro River. Report to the Secretariat of the Commission for Environmental Cooperation.

Saucedo Monarque, E. 1990. Proyecto: Prospeccion de plantas raras en el Norte de Sonora. Centro Ecologico de Sonora, Subdireccion de Investigacion, Area de Ecologia Terrestre,Hermosillo, Sonora, Mexico. 65pp.

Sferra, S.J., Corman, T.E., C.E. Paradzick, J.W. Rourke, J.A. Spencer, and M.W. Sumner. 1997. Arizona Partners in Flight, southwestern willow flycatcher survey 1993-1996 summary report. Technical Report. Nongame and Endangered Wildlife Program. Arizona Game and Fish Department, Phoenix, AZ. 97 pp.

Shafer, C.L. 1990. Nature Reserves, Island Theory and Conservation Practice. Smithsonian Institution Press, Washington DC 189 pp.

Skagen, S. 1995. The importance of riparian corridors and oases to migrating birds: a research, inventory, and monitoring project. Report to the Arizona Game and Fish Heritage Fund and National Fish and Wildlife Foundation. 35pp – figures and appendices.

Smith, Alexander B, Charles E. Paradzick, April A Woodward, Patrick E.T. Dockens, Tracy D. McCarthey. 2002. Southwestern Willow Flycatcher 2001 Survey and Nest Monitoring Report. Nongame and Endangered Wildlife Program, Arizona Game and Fish Department, Phoenix, AZ, Technical Report 191.

Sogge, M. K, and T. J. Tibbitts. 1992. Southwestern willow flycatcher (*Empidonax traillii extimus*) surveys along the Colorado River in Grand Canyon National Park and Glen Canyon National Recreation Area. NPS CPSU/N. Arizona University, Flagstaff. Arizona. 43pp.

Sogge, M. K, and T. J. Tibbitts. 1994. Distribution and status of the southwestern willow flycatcher along the Colorado river in the Grand Canyon   1994. Summary Report. Natl.  Biol.  Serv., Colorado Plateau Res. Stn./N. Arizona Univ., Flagstaff, Arizona. 37pp.

Sogge, M. K, T. J. Tibbitts, and S. J. Sferra. 1993. Status of the southwestern willow flycatcher along the CO River between Glen Canyon Dam and Lake Mead - 1993. Summary Report. Natl. Park Serv. Coop. Park Studies Unit/N. Ariz. University, U.S. Fish and Wildlife Service, and AZ Game and Fish Department, Flagstaff, Arizona. 69pp.

Sogge, M. K., R. M. Marshall. S. J. Sferra, and T. J. Tibbitts. 1997. A southwestern willow flycatcher natural history summary and survey protocol. Tech. Rep. NPS/NAUCPRS/NRTR-97/12, USGS Colorado Plateau Research Station/Northern Arizona State University. 39 pp.

Spencer, J. A., S. J. Sferra, T. E. Corman, J. W. Rourke, and M. W. Sumner. 1996. Arizona Partners In Flight 1995 southwestern willow flycatcher survey. Technical Report 97, Arizona Game and Fish Department, Phoenix. 69pp.

Stromberg, J.C., and M.K. Chew. 1997. Herbaceous exotics in Arizona's riparian ecosystems. Desert Plants 1997(2):11-17.

Stromberg, J.C., R. Tiller, and B. Richter. 1996. Effects of ground water decline on riparian vegetation of semiarid regions: the San Pedro River, Arizona. Ecological Applications 6(1):113-131.

Tibbitts, T.J., M.K. Sogge, and S.J. Sferra. 1994. A survey protocol for the southwestern willow flycatcher (*Empidonax traillii extimus*). National Park Service, Colorado Plateau Research Station, Technical Report NPS/NAUCPRS/NRTR-94/04.

Turner, R.M., Webb, R.H., Bowers, J.E., and Hastings, J.R.. 2003. The changing mile revisited: Tucson, University of Arizona Press, 334 p.

U.S. Fish and Wildlife Service (FWS). 1995. Final rule determining endangered status for the southwestern willow flycatcher. Federal Register 60:10694-10715.

U.S. Fish and Wildlife Service (FWS). 1997a. Endangered and threatened wildlife and plants; determination of endangered status for three wetland species found in southern Arizona and Northern Sonora, Mexico. Federal Register 62(3):665-689.

U.S. Fish and Wildlife Service (FWS). 1997a. Final determination of critical habitat for the southwestern willow flycatcher. Federal Register 62(140):39129-39146.

U.S. Fish and Wildlife Service (FWS). 1997b. Correction; final determination of critical habitat for the southwestern willow flycatcher. Federal Register 62 (161):44228.

U.S. Fish and Wildlife Service (FWS). 1997b. Endangered and threatened wildlife and plants, final determination of critical habitat for the southwestern willow flycatcher. Federal Register 62(140):39129-39146.

U.S. Fish and Wildlife Service (FWS). 1999b. Endangered and threatened wildlife plants; Designation of Critical Habitat for Huachuca Water Umbel. A plant. Final rule. 50 CFR Part 17. July 12, 1999. Federal Register 64 (132); 37441-37453.

U.S. Fish and Wildlife Service (FWS). 2002a. Southwestern Willow Flycatcher Recovery Plan, Region 2, Albuquerque, NM.

U.S. Fish and Wildlife Service (FWS). 2005. Designation of critical habitat for the southwestern willow flycatcher: final rule. Federal Register 70 (201):60886.

USFWS Final Biological Opinion 2007. Transmittal letter from USFWS to Mr. George Hutchinson, U.S. Department of Homeland Security, Customs and Border Protection, dated August 29, 2007.

USGS 2007

Unitt, P. 1987. *Empidonax traillii extimus*: An endangered subspecies. Western Birds 18:137-162.

Walkinshaw, L.H. 1966. Summer biology of Traill's Flycatcher. *Wilson Bulletin* 78:31- 46.

Warren, P.L., and F.R. Reichenbacher. 1991b. Sensitive plant survey of Fort Huachuca, Arizona. Unpublished report for the US Army, Fort Huachuca, Arizona.

Warren, P.L., D.F. Gori, L.S. Anderson, and B.S. Gebow. 1991. Status report for *Lilaeopsis schaffneriana* ssp. *recurva*. US Fish and Wildlife Service, Arizona Ecological Services State Office, Phoenix, Arizona. 30 pp.

Warren, P.L., L.S. Anderson, and P.B. Sheffroth. 1989. Population studies of sensitive plants of the Huachuca and Patagonia Mountains, Arizona. Unpublished report. Coronado National Forest, Tucson, Arizona. 99 pp.

Webb, R. H., and J. L. Betancourt. 1992. Climatic variability and flood frequency of the Santa Cruz River, Pima County, Arizona. US Geological Survey, Water-supply Paper 2379.

Whitfield, M.J. 1990. Willow flycatcher reproductive response to brown-headed cowbird parasitism. Masters Thesis, California State University, Chico, California. 25pp.

Whitfield, M.J., and C. M. Strong. 1995. A brown-headed cowbird control program and monitoring for the southwestern willow flycatcher, South Fork Kern River, California. Calif. Dept. Fish and Game, Bird and Mammal Cons. Program Report 95-4, Sacramento, California. 17pp.

Wilcox, B.A., and D.D. Murphy. 1985. Conservation strategy: the effects of fragmentation on extinction. American Naturalist 125:879-887.

Willard, F. C. 1912. A week a field in southern Arizona. The Condor 14:53-63.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**UNITED STATES DEPARTMENT OF THE INTERIOR**
**OFFICE OF HEARINGS AND APPEALS**
**BOARD OF LAND APPEALS**

_____

Defenders of Wildlife and Sierra Club )
)
)
)
                        Appellants,    )        IBLA Docket No.
)
)
)
*San Pedro Riparian National Conservation* )
*Area Border Fence* )
EA Number AZ-420-2007-051 )
Serial/Case File No. AZA 33680 )
)
)
)
)
)
)
_____ )

**NOTICE OF APPEAL & PETITION FOR STAY**

# <u>TABLE OF CONTENTS</u>

NOTICE OF APPEAL ................................................................................................. 1

BACKGROUND ....................................................................................................... 3

    I.    The San Pedro River and the San Pedro Riparian National Conservation Area .. 3

    II.   The DHS *Southwest Strategy* and Its Impact on Arizona Borderlands ............... 5

    III.  The *Secure Fence Act* ......................................................................... 7

    IV.  The BLM's Decision .......................................................................... 8

PETITION FOR STAY .......................................................................................... 10

    I.    APPELLANTS HAVE STANDING ............................................................. 11

    II.   IMMEDIATE IRREPARABLE HARM WILL RESULT IF THE STAY IS NOT GRANTED .................................................................................. 14

          A.    Border Fence and Road Construction Will Cause Irreparable Adverse Impacts to the San Pedro River, Wildlife Habitat and Other Natural Resources of the San Pedro Riparian National Conservation Area ....... 14

          B.    Implementation of the BLM's Decision Will Cause Irreparable Harm to the Decision-Making Process and Consultation Rights of the Affected Public ..................................................................................... 17

    III.  APPELLANTS ARE LIKELY TO PREVAIL ON THE MERITS ................. 19

          A.    The BLM's Decision Violates NEPA .............................................. 18

               1.    A Regional Environmental Impact Statement Is Required for the Proposed Arizona Border Fence ............................................. 18

                    a.    There Is a Comprehensive Federal Plan for the Development of the Arizona Border Fence ................. 19

                    b.    Individual Fence Projects within Arizona Will Have Significant .Synergistic and Cumulative *Direct* Impacts on Wildlife and Landscape Connectivity ............................ 23

                    c.    Individual Fence Projects within Arizona Will Have Significant Synergistic and Cumulative *Indirect* Impacts on Wildlife and Landscape Connectivity ....................... 27

               2.    An Individual EIS Must Be Prepared for the San Pedro Fence Project ............................................................................. 30

                    a.    The Proposed Border Fence Will Significantly Impact the San Pedro River and Its Watershed, a Unique and Ecologically Critical Area ............................................. 31

                    b.    The Proposed Border Fencing Involves Highly Uncertain, Unique, and Unknown Risks to the San Pedro River that

Are Not Adequately Addressed by the Proposed
Mitigation ........................................................................ 31

c.    The Proposed Border Fence, In Conjunction With Other
Actions, Will Have a Significant Cumulative Effect on the
San Pedro River and National Conservation Area ......... 35

3.    The BLM's Failure to Provide Opportunity for Public
Participation on the Environmental Assessment Violates
NEPA   ......................................................................................... 36

B.    The BLM's Decision Violates the Arizona-Idaho Conservation Act of
1988................................................................................................................. 38

IV.    THE RISK OF IRREPARABLE HARM IF THE STAY IS DENIED
OUTWEIGHS ANY HARM THAT MIGHT RESULT IF THE STAY IS
GRANTED............................................................................................................. 38

V.    A STAY OF THE BLM DECISION WOULD SERVE THE PUBLIC
INTEREST............................................................................................................. 39

REQUESTED RELIEF ................................................................................................... 39

## TABLE OF AUTHORITIES

<u>Cases</u>

*Amoco Prod. Co. v. Village of Gambell,*
480 U.S. 531 (1987) ........................................................................................ 16, 39

*Baltimore Gas & Electric Co. v. Nat. Res. Defense Council,*
462 U.S. 87 (1978) ................................................................................................. 36

*Blue Mountains Biodiversity Project v. Blackwood,*
161 F.3d 1208 (9th Cir. 1999) ............................................................................. 35

*Border Power Plant Working Group v. Dep't of Energy,*
260 F. Supp. 2d 997 (S.D. Cal. 2003) ................................................................. 28

*Citizens for Better Forestry v. U.S. Dep't of Agriculture,*
341 F.3d 961 (9th Cir. 2003) ............................................................................... 37

*City of Tenakee Springs v. Clough,*
915 F.2d 1308 (9th Cir. 1990) ............................................................................. 20

*Commonwealth of Massachusetts v. Watt,*
716 F.2d 946 (1st Cir. 1983) ............................................................................... 17

*Davis v. Mineta,*
302 F.3d 1104 (10th Cir. 2002) ........................................................................... 32

*Kleppe v. Sierra Club,*
427 U.S. 390 (1976) ................................................................................. 19, 20, 23

*Methow Valley Citizens Council v. Regional Forester,*
833 F.2d 810 (9th Cir. 1987) ............................................................................... 28

*Nat'l Parks & Cons. Ass'n v. Babbitt,*
241 F.3d 722 (9th Cir. 2001) ......................................................................passim

*Natural Res. Def. Council v. Hodel,*
865 F.2d 288 (D.C. Cir. 1988) ................................................................. 23, 26, 27

*Ocean Advocates v. U.S. Army Corps of Engineers,*
402 F.3d 846 (9th Cir. 2005) ............................................................................... 32

*Robertson v. Methow Valley Citizens Council,*
490 U.S. 332 (1989) .............................................................................................. 28

*Save Our Sonoran, Inc. v. Flowers,*
408 F.3d 1113 (9th Cir. 2005) ............................................................................. 16

*Save the Yaak v. Block,*
840 F.2d 714 (9th Cir. 1988) ............................................................................... 39

*Sierra Club v. U.S. Forest Service,*
843 F.2d 1190 (9th Cir. 1988) ............................................................................. 16

*Sierra Nevada Forest Protection Campaign v. U.S. Forest Service,*
376 F. Supp. 2d 984 (E.D. Cal. 2005)...................................................37

*Spiller v. Walker,*
1998 U.S. Dist. LEXIS 18341 (Aug. 25, 1998)...................................23

*Thomas v. Peterson,*
753 F.2d 754 (9th Cir. 1985) ...............................................................39


IBLA Decisions

*Animal Protection Institute of America,*
117 IBLA 208 (1990)............................................................................11

*Craig M. Weaver,*
141 IBLA 276 (1992) ...........................................................................11

*Glenn Gerke,*
122 IBLA 123 (1992) ...........................................................................11

*Kendall's Concerned Area Residents,*
129 IBLA 130 (1994) ...........................................................................11

*Klamath-Siskiyou Wildlands Center,*
153 IBLA 110 (2000) ...........................................................................37

*Lynn Canal Conservation, Inc.,*
169 IBLA 1 (2006) ...............................................................................37

*Lynn Canal Conservation, Inc.,*
167 IBLA 136 (2005) ...........................................................................37

*Mark S. Altman,*
93 IBLA 265 (1986) .............................................................................11

*Southern Utah Wilderness Alliance,*
127 IBLA 325 (1993) ...........................................................................11

*Southern Utah Wilderness Alliance,*
140 IBLA 341 (1997) ..............................................................11, 13, 14

*Southwest Resource Council,*
96 IBLA 105 (1987) .......................................................................18, 20
*The Wilderness Society,*
110 IBLA 67 (1989) .............................................................................11

*Wyoming Outdoor Council,*
153 IBLA 379 (2000) ...........................................................................10


Statutes

8 U.S.C. § 1103 *note* .............................................................................7

16 U.S.C. § 460xx ...................................................................................3

16 U.S.C. § 460xx-1(a)......................................................................3, 38

16 U.S.C. § 460xx-1(b)..........................................................................3, 38

42 U.S.C. § 4332(2)(C) ...............................................................................18

100 P.L. 696, 102 Stat. 4571 ......................................................................38

109 P.L. 367, Sec. 3 ............................................................................7, 8, 20

Regulations

40 C.F.R. § 1500.2 ......................................................................................36

40 C.F.R. § 1500.1(b) ...........................................................................36, 37

40 C.F.R. § 1501.4(b) .................................................................................37

40 C.F.R. § 1501.5(a) .................................................................................22

40 C.F.R. § 1502.3 ......................................................................................18

40 C.F.R. § 1502.4(a) .................................................................................19

40 C.F.R. § 1506.6(b) .................................................................................37

40 C.F.R. § 1508.7 ......................................................................................36

40 C.F.R. § 1508.8(b) .................................................................................27

40 C.F.R. § 1508.25 ....................................................................................23

40 C.F.R. § 1508.27(b)(3) .....................................................................30, 31

40 C.F.R. § 1508.27(b)(5) .................................................................30, 31,32

40 C.F.R. § 1508.27(b)(7) .................................................................30, 35

40 C.F.R. § 1508.27(b)(10) .........................................................................29

43 C.F.R. § 4.21(a)(1) ...................................................................................9

43 C.F.R. § 4.21(b)(1)(i)-(iv) ......................................................................10

43 C.F.R. § 4.410 ..................................................................................1, 11

43 C.F.R. § 4.410(d) ...................................................................................12

43 C.F.R. § 2801.10 ..................................................................................1, 9

Federal Register

46 Fed. Reg. 18,026 (Mar. 23, 1981) .....................................................31-32

72 Fed. Reg. 54,726 (Sept. 24, 2007)..........................................................21

Miscellaneous

GAO Report 04-590, *Border Security:  Agencies Need to Better Coordinate Their Strategies and Operations on Federal Lands*..................................................................29

## NOTICE OF APPEAL

1

2      Pursuant to Department of Interior regulations at 43 C.F.R. § 4.410 and § 2801.10,

3  Defenders of Wildlife (1130 Seventeenth Street, Washington, D.C.,  20036, (202) 682-9400),

4  and the Sierra Club (85 Second Street, 2nd Floor, San Francisco, CA 94105, (415) 977-5500),

5  hereby appeal the Bureau of Land Management (BLM) Tucson Field Office's August 31, 2007

6  Decision Record and Finding of No Significant Impact (FONSI) authorizing a right-of-way to

7  the U.S. Army Corps of Engineers to construct pedestrian fencing, an all-weather road, vehicle

8  barriers, and drainage structures within the San Pedro Riparian National Conservation Area (*San

9  Pedro Riparian National Conservation Area Border Fence*, EA Number AZ-420-2007-051,

10  Serial/Case File No. AZA 33680) (Border Fence EA).  The organizations are represented in this

11  appeal by Brian Segee, Staff Attorney with Defenders of Wildlife and an active member in good

12  standing of the California (Bar No. 200795) and District of Columbia (Bar No. 490298) bars.

13      Defenders of Wildlife and Sierra Club are non-profit organizations dedicated to the

14  conservation and protection of the natural environment that together represent more than 1.7

15  million members interested in the preservation of wildlife, wildlife habitat, and protected public

16  lands such as the San Pedro Riparian National Conservation Area.  Defenders of Wildlife and

17  Sierra Club are national organizations, with headquarters in Washington, D.C. and San

18  Francisco, California, respectively.  Both have significant presence and conservation interest

19  within Arizona:  Defenders of Wildlife maintains a Field Office with five full-time employees in

20  Tucson and has more than 5,000 active members in the state, while Sierra Club's Grand Canyon

21  Chapter has an office in Phoenix with two full-time employees and an office in Flagstaff with one

22  full-time employee and is comprised of six volunteer-run regional groups (Plateau

23  Group/Flagstaff, Verde Valley/Sedona, Yavapai Group/Prescott, Palo Verde Group/Phoenix,

24  Saguaro Group/northern Maricopa County, and Rincon Group/Tucson) as well as a 15 member

25  volunteer executive committee with members from throughout Arizona.  The Sierra Club

26  represents 14,000 members in Arizona.   In total, Defenders of Wildlife has more than 500,000

27  members while Sierra Club has more than 1.2 million members nationwide.

28

The San Pedro River is a unique and invaluable environmental resource—an undammed, free-flowing river, its perennial flow "is now a rare occurrence in the Southwest." *See* Border Fence EA at p. 5. In 1988, approximately 40 miles of the upper San Pedro River corridor administered by the BLM was designated by Congress as the Nation's first Riparian National Conservation Area, and the River and its larger watershed are widely recognized as one of the most biologically diverse areas in North America. The San Pedro is particularly renowned for its avian diversity, and in addition to attracting tens of thousands of birders each year, it was recognized by the National Audubon Society as its first Globally Important Bird Area, and designated as a world heritage natural area by the United Nations World Heritage Program. In addition to its global importance for bird species, the San Pedro River and watershed provide habitat for a great diversity of mammals, reptiles, insect, and plant species. A binational resource, the headwaters of the San Pedro begin near the town of Cananea, Sonora, Mexico, flowing approximately 25 miles before crossing the U.S.-Mexico border and into the San Pedro Riparian National Conservation Area.

Appellants' interests are adversely affected by the BLM's decision, as the proposed construction of "pedestrian" border fencing and an all-weather road will adversely affect wildlife by fragmenting their habitat and precluding cross-border wildlife movement within the San Pedro Valley. *Id.* at p. 11 ("Continuous disruptions of wildlife movements may result both from the physical barrier of the fence and also from increased contact between wildlife and humans."). Additionally, the proposed construction will lead to increased sedimentation and erosion into the San Pedro River, resulting in potential lateral migration of the River, bank failure and loss of riparian vegetation, with consequent negative impacts to wildlife.

As detailed in this appeal and associated Petition for Stay, the BLM's decision violates the National Environmental Policy Act (NEPA) and its implementing regulations, as well as the Arizona-Idaho Conservation Act of 1988. In order to remedy these violations, appellants request that the BLM undertake the following actions before the construction of pedestrian fencing and an all-weather road commences within the San Pedro Riparian National Conservation Area: (1) in conjunction with other federal land management agencies, the Army

Corps of Engineers, Environmental Protection Agency, and the Department of Homeland

Security (DHS), prepare a regional, comprehensive Environmental Impact Statement (EIS) on

the Arizona border fence program; (2) prepare an EIS on the environmental effects of the

individual proposal to build pedestrian fencing and an all-weather road within the San Pedro

Riparian National Conservation Area; and (3) make the requisite finding that the chosen action

will further the purposes for which the San Pedro Riparian National  Conservation Area was

established.  *Finally, appellants respectfully request that the BLM exercise its discretion to stay*

*implementation of this project during the 45-day period under which the IBLA is obligated to*

*respond to appellants' Petition for Stay.*

## BACKGROUND

I.    The San Pedro River and San Pedro Riparian National Conservation Area

The San Pedro River is renowned as one of the last undammed, free-flowing rivers in the

Southwest.  A binational river, the San Pedro flows from its headwaters near the town of

Cananea in Sonora, Mexico approximately 145 miles north to its junction with the Gila River

near the town of Winkelman, Arizona.  The River is generally characterized as having an upper

basin and a lower basin.  The upper basin, which includes the San Pedro Riparian National

Conservation Area, extends from the headwaters region in Sonora to an area known as "the

Narrows," located approximately 12 miles north of Interstate 10 and the town of Benson,

Arizona.

In 1988, the 56,431-acre San Pedro Riparian National Conservation Area was

established by Congress—the first such area to be created.  16 U.S.C. § 460xx.  Under this

designation, the BLM is charged with managing a corridor of the River, approximately forty

miles long and 2.5 miles wide, stretching north from the U.S-Mexico border "in a manner that

conserves, protects, and enhances the riparian area and the aquatic, wildlife, archeological,

paleontological, scientific, cultural, educational, and recreational resources of the conservation

area."  *Id*. § 460xx-1(a).  The BLM is further directed to "only allow such uses of the

conservation area as [it] finds will further [these] primary purposes."  *Id*.  § 460xx-(1)(b).

1    In 2000, the BLM created the National Landscape Conservation System (NLCS), the

2    agency's first attempt to create a unified system consisting of the agency's premier lands, and to

3    raise public awareness concerning these areas' scientific, cultural, educational, ecological, and

4    other values.  The NLCS consists of National Conservation Areas, National Monuments,

5    Wilderness areas, Wilderness study areas, Wild and Scenic Rivers, and National Historic and

6    Scenic Trails.  The BLM today manages 15 National Monuments and 14 National Conservation

7    Areas—including the San Pedro Riparian NCA—as part of the NLCS.

8    The San Pedro River and surrounding watershed are one of the most biologically diverse

9    areas of the United States.  *See* C. Haas, *Landscape Fragmentation and Connectivity for*

10    *Carnivores in the Upper San Pedro Basin* (Mar. 5, 2001) (EXH. 5B).  This diversity stems from

11    the San Pedro's location at the convergence of four major ecosystems—the Sierra Madre and

12    Rocky Mountains, and the Sonoran and Chihuahuan deserts.  The River and its larger watershed

13    consequently "contain[] floristic and faunal components of all four ecosystems." *Id*. The San

14    Pedro River and NCA harbor particularly incredible avian diversity—more than 100 species of

15    breeding birds and an additional 250 species of migrant and wintering birds occur in the area,

16    representing approximately half of all known breeding species in North America.  Additionally,

17    at least 35 raptor species are found within the Riparian NCA.  The San Pedro attracts tens of

18    thousands of birdwatchers from around the world each year, contributing millions of dollars to

19    local economies in neighboring communities such as Sierra Vista, Tombstone, and Bisbee,

20    Arizona.

21    In addition to its central importance to bird species, the San Pedro also harbors

22    incredible mammalian diversity, and was historically occupied by grizzly bears, wolves, jaguars,

23    and ocelots.  As stated by Haas, "[c]arnivores currently found in the area include three species

24    of procyonids (raccoons, coatis, and ringtails), four species of mephitids (hooded skunks, hog-

25    nosed skunks, and striped skunks), two species of mustelids (badgers, and long-tailed weasels),

26    three species of canids (coyotes, gray foxes, and kit foxes), two cats (bobcat and puma), and one

27    bear (black bear)." *Landscape Fragmentation and Connectivity*, at 6.

28

The San Pedro River and San Pedro Riparian NCA "may represent an important conduit for genetic exchange" for wildlife "between source populations in Mexico and populations north of the border." *Id*. Additionally, the "forested expanses" of the surrounding "Sky Island" mountain ranges "may also serve this function," and "animals normally found in the forested areas of the sky islands may use the San Pedro River as an oasis while dispersing between isolated forests." *Id*. Thus, maintaining these habitat linkages "may be critical for genetic exchange over a long time scale."

II.    The DHS *Southwest Strategy* and Its Impact on Arizona Borderlands

In 1993, rising levels of illegal immigration across major urban centers along the U.S-Mexico border, most notably San Diego, California and El Paso, Texas prompted the Immigration and Naturalization Service (INS) to develop and begin implementing an initiative known as the *Southwest Strategy*, a "prevention through deterrence" border enforcement strategy. EXH. 2B AND 3C. Under the Strategy, these urban areas were assigned large numbers of U.S. Border Patrol (USBP) agents and fortified through the construction of an extensive infrastructure of fences, roads, and lighting and sensor systems. *Id*. The INS and USBP believed that once these urban areas were secured, future immigrants would be deterred from crossing by the formidable and remote mountains and deserts dominating the vast majority of the U.S.-Mexico border. EXH. 2C.

This fundamental assumption, however, has been proven wrong. Although illegal immigration levels have decreased in some localized areas where enforcement resources have been concentrated, overall levels have actually increased since the initiation of the *Southwest Strategy*. According to one recent estimate, approximately 260,000 undocumented migrants per year from Mexico were entering the country when the Border Patrol first initiated its strategy in the early 1990s. By the late 1990s, that figure had risen to 400,000 per year, and as of 2005 it was estimated that approximately 485,000 undocumented migrants, from Mexico alone, were successfully crossing the border each year. EXH. 3A.

The shift of immigration flows into the U.S. has been especially apparent on federal lands within Arizona, such as the San Pedro Riparian National Conservation Area. According to the

1  Department of the Interior (DOI), the number of undocumented migrants apprehended on its

2  lands increased exponentially between 1997 and 2000, from only 512 to more than 113,000.

3  The National Park Service estimates that 200,000 undocumented migrants entered the Organ

4  Pipe Cactus National Monument alone in 2001.  EXH. 2A.  As a consequence of this shift,

5  federal lands in the Arizona borderlands, including the San Pedro River and San Pedro Riparian

6  NCA, have experienced a multitude of adverse environmental effects to wildlife and wildlife

7  habitat including habitat fragmentation, water pollution, soil damage and compaction,

8  destruction of vegetation, wildlife disturbance, and displacement from light and noise.  EXH. 5A

9  AND 2C.

10         For example, the hundreds of thousands of undocumented immigrants passing through

11  protected federal lands have significantly impacted those lands by leaving behind both personal

12  belongings and trash such as backpacks, clothing, plastic water bottles, and diapers.  Other

13  impacts include high concentrations of human fecal matter in heavily-traveled areas resulting in

14  water quality impacts to streams and springs; and warming, cooking, and rescue fires lit by

15  undocumented migrants escaping control and becoming wildfires, causing damage to both

16  cultural and natural resources.  EXH. 6A AND 6C.

17         Available scientific information demonstrates that the main agency responsible for border

18  security efforts, USBP, is also causing extensive environmental harm in a number of respects.

19  For example, in addition to patrolling existing roads, the USBP regularly utilizes four-wheel

20  drive vehicles, all terrain vehicles, and motorcycles off-road in the course of enforcement

21  actions.  Under a recent Memorandum of Understanding among DHS, DOI and the Department

22  of Agriculture, USBP was officially granted wide latitude to drive off-road on protected lands

23  including the San Pedro Riparian National Conservation Area, National Monuments, National

24  Wildlife Refuges, National Forests, and even designated Wilderness areas.  EXH. 4A.  As a

25  consequence of both illegal immigration and border enforcement efforts, many new roads have

26  been created on protected federal lands throughout the Arizona borderlands. For example, since

27  2001 approximately 500 miles of roads, and an additional 700 miles of trails have been created

28  on Arizona's Cabeza Prieta National Wildlife Refuge.  EXH. 6.  At neighboring Organ Pipe

1   Cactus National Monument, more than 450 miles of roads have been created in the same time

2   period. EXH. 6B. Similarly, in a survey of the Buenos Aires National Wildlife Refuge, the U.S.

3   Fish and Wildlife Service (FWS) recorded an average of 4 kilometers of newly-created trails per

4   square kilometer of land, and half the trails were found within the habitat of the endangered

5   Pima pineapple cactus. EXH. 4B.

6       Other facets of USBP operations that adversely affect plants, wildlife, and habitat include

7   construction of camps and other base operations within remote areas, "drag road" creation for

8   tracking and sign cutting, and use of high-intensity, artificial night lighting. While the effects of

9   night lighting are difficult to measure and quantify, it is believed that such lights can act

10  effectively as a wall for some transborder species, and can disorient birds and disturb nocturnal

11  wildlife. EXH. 6C.

12      Despite the significant and mounting environmental damage within Arizona's

13  borderlands from the combined and cumulative effects of illegal immigration and border security

14  operations, there has not yet been any comprehensive effort by DHS or federal land management

15  agencies to measure or analyze these effects, and even individual studies that assess specific

16  aspects of the degradation are rare. As discussed in detail below, while DHS initiated a

17  programmatic NEPA process in 2002 to address such impacts and assess future border security

18  options within Arizona, this process was never completed.

19  III.    The Secure Fence Act

20      The *Secure Fence Act of 2006* authorizes the Homeland Security Secretary to provide

21  for "at least 2 layers of reinforced fencing" on five distinct sections of the U.S.-Mexico border

22  totaling approximately 700 miles. P.L. 109-367, Section 3, *codified at* 8 U.S.C. § 1103 *note*;

23  *see Map of proposed border fencing pursuant to Secure Fence Act* (EXH. 1); *Map of proposed*

24  *border fencing pursuant to Secure Fence Act within California, Arizona, and New Mexico, and*

25  *approximate jaguar movement corridors* (EXH. 1B). However, the Secretary is provided with

26  further discretion to "use other means to secure such area, including the use of surveillance and

27  barrier tools," in areas where the topography of the land exceeds 10 percent. P.L. 109-367,

28  Section 3(C). Additionally, the Secretary is authorized to provide for "additional barriers, roads,

1   lighting, cameras, and sensors" on the five specified border segments, although he is provided

2   with the discretion to choose where and to what extent these additional border security

3   measures will be deployed.

4       The longest of these sections, totaling approximately 370 miles, would run from

5   Calexico, in the middle of California's border with Baja California Norte, eastward to Douglas,

6   Arizona—walling off the vast majority of Arizona's border with the Mexican state of Sonora.

7   P.L. 109-367, Section 3(2)(1)(A)(ii); *see* EXH. 1.  The proposed wall would cross several

8   protected areas of federal lands, including the Cabeza Prieta National Wildlife Refuge, Organ

9   Pipe Cactus National Monument, Coronado National Forest, and San Pedro Riparian National

10  Conservation Area.  These lands provide habitat for a high concentration of imperiled and

11  sensitive species, including several listed under the federal Endangered Species Act (ESA).  For

12  example, the Arizona fence segment would block critical corridors for numerous wildlife

13  species, including at least three critical corridors utilized by the only known jaguars in the U.S.

14  *See Map of proposed border fencing pursuant to Secure Fence Act within California, Arizona,*

15  *and New Mexico, and approximate jaguar movement corridors.*  EXH. 1B AND 6C.

16      Despite the fact that the *Secure Fence Act* calls for construction of fences and other

17  border security infrastructure on significant expanses of protected federal land, Congress

18  appears to have given no consideration to this fact.  For example, in its limited debate and

19  consideration of the bill, Congressional representatives failed to address the relation of the

20  *Secure Fence Act* to the numerous laws requiring the conservation and careful management of

21  the Nation's public lands, and federal land managers' duties to provide protection to the

22  diversity of wildlife, plants, and fish that depend upon these lands—including the BLM's

23  obligation to conserve and protect the natural and cultural resources of the San Pedro Riparian

24  National Conservation Area.

25  IV.   The BLM's Decision

26      In September 2006, the Army Corps of Engineers, on behalf of DHS, requested a

27  perpetual right-of-way on the San Pedro Riparian National Conservation Area for the

28  construction of vehicle barriers along the U.S.-Mexico border.  In response, the BLM conducted

1    a "review" of the DHS's *Supplemental Environmental Assessment for Infrastructure within the*

2    *U.S. Border Patrol Naco-Douglas Corridor, Cochise County, Arizona, November 2003*, in

3    order to "verify that it adequately addressed impacts" of the DHS's requests.  Border Fence EA

4    at p. 2.  BLM did not solicit public comment on this review or disclose its analysis to the public.

5    Although BLM concluded the right-of-way request was indeed covered under the 2003

6    Supplemental EA, its determination of NEPA adequacy and decision record was never finalized.

7    *Id*.

8            On August 10, 2007, the Army Corps submitted an amended right-of-way application to

9    instead build "pedestrian fencing" and an all-weather road along the NCA's southern boundary.

10   Without public notification or opportunity for public comment, BLM issued the *San Pedro*

11   *Riparian National Conservation Area Border Fence Environmental Assessment* and associated

12   Decision Record three weeks later, on August 31, 2007.  In its EA, BLM considered three

13   alternatives:  (1) the Army Corps proposal, which called for Bollard or modified Sandia/mesh

14   fence construction along all of the NCA except for 490 feet of temporary vehicle barriers within

15   the river corridor and an historic corral area; (2) a "combination" alternative which would use

16   temporary vehicle barriers within the San Pedro River floodplain, and permanent vehicle barriers

17   rather than pedestrian fencing within five dry washes; and 3) a vehicle barrier only alternative,

18   which would use permanent vehicle barriers throughout the project area, with the exception of

19   the San Pedro River corridor, where temporary vehicle barriers would be utilized.   Under all

20   alternatives, temporary vehicle barriers would apparently be removed by crane  "during periods

21   of seasonal flooding."  *Id*. at p. 8-9.  BLM's August 31 decision granting the perpetual right-of-

22   way to the Army Corps authorized implementation of the combination alternative 2.  *See*

23   Decision Record and FONSI at p. 1.

24           Under Department of the Interior regulations, as a general rule BLM decisions are not

25   effective during the 30-day appeal period provided to the public.  43 C.F.R. § 4.21(a)(1).  BLM

26   decisions authorizing rights-of-way are an exception to this rule, and are considered effective

27   immediately.  43 C.F.R. § 2801.10.  To the best of appellants' knowledge, however,

28   construction on the approved project has not commenced, nor has a contractor been chosen for

1  such construction. Thus, *appellants respectfully request that BLM voluntarily stay its decision*
2  *during the 45 days in which the IBLA has to decide on appellants' Petition for Stay, so that the*
3  *parties can resolve the appeal without resorting to federal litigation.*

4                              **PETITION FOR STAY**

5      Appellants respectfully request a stay of the effectiveness of the Decision Record (DR)
6  and FONSI issued on August 31, 2007, by Patrick Madigan, Field Manager for the Tucson Field
7  Office of BLM, authorizing the Army Corps of Engineers, on behalf of DHS, a perpetual right-
8  of-way on the San Pedro Riparian National Conservation Area in order to construct
9  "pedestrian" border fencing, an all weather road and drainage structures, permanent vehicle
10 barriers, and temporary vehicle barriers along the U.S.-Mexico border. Under Department of
11 the Interior regulations, this decision is effective immediately.

12      As explained in detail below, appellants satisfy their burden of proof to demonstrate that
13 a stay is warranted. Department of the Interior regulations establish a four-part test for the
14 issuance of stays by the Interior Board of Land Appeals: (1) the relative harm to the parties if
15 the stay is granted or denied; (2) appellants' likelihood of success on the merits; (3) the
16 likelihood of immediate and irreparable harm if the stay is not granted; and (4) whether the
17 public interest favors granting a stay. 43 C.F.R. § 4.21(b)(1)(i)-(iv). Under these regulations,
18 the IBLA has held that when Appellants have "raised substantial questions regarding compliance
19 with NEPA" and those questions "require careful consideration," a stay should be granted.
20 *Wyoming Outdoor Council*, 153 IBLA 379, 389 (2000). Here, appellants have raised
21 substantial questions on the merits, their interests are adversely affected by the BLM's decision,
22 immediate and irreparable harm will occur if the stay is not granted, and the public interest
23 strongly favors the granting of a stay. Appellants therefore respectfully request that the Board
24 issue an order instructing BLM and Army Corps of Engineers to take no further action to
25 implement the San Pedro Riparian National Conservation EA authorizing border fence and road
26 construction, until such time as the Board has had a full opportunity to resolve the merits of the
27 issues raised by this appeal. Appellants also respectfully request that the BLM voluntarily stay
28 its own actions during the 45-day period in which the IBLA has to respond to this request.

## I.    APPELLANTS HAVE STANDING

Appellants Defenders of Wildlife and Sierra Club have standing to file this appeal pursuant to Department of the Interior regulations at 43 C.F.R. § 4.410. The IBLA has established a two-part test to determine standing: (1) appellants must demonstrate an adversely affected interest; and (2) appellants must have been active participants in the decision-making process. *Southern Utah Wilderness Alliance*, 140 IBLA 341, 344 (1997); *Kendall's Concerned Area Residents*, 129 IBLA 130, 136-137 (1994); *The Wilderness Society*, 110 IBLA 67, 70-71 (1989) (*quoting Mark S. Altman*, 93 IBLA 265, 266 (1986)). The appellants to this decision meet both elements of this test.

Under IBLA precedent, the first standing factor is satisfied when a party demonstrates a legally recognizable "interest" that is, or may be, adversely affected by the underlying decision. *Glenn Grenke*, 122 IBLA 123, 128 (1992). The requisite "interest" need not be economic. Instead, the IBLA has explicitly recognized numerous non-economic concerns as "interests" sufficient to confer standing, including cultural, recreational, environmental, and aesthetic. *Southern Utah Wilderness Alliance*, 127 IBLA 325, 326 (1993); *Animal Protection Institute of America*, 117 IBLA 208, 210 (1990). Indeed, simple "[u]se of the land will suffice." *Craig M. Weaver*, 141 IBLA 276, 281 (1997); *Kendell's Concerned Area Residents*, 129 IBLA 130, 136-37 (1994).

Appellants have members with specific and adversely affected interests in this case, as demonstrated by the Miller (EXH. 7B), Neeley (EXH. 7C), Leonard (EXH. 7G), and Bahr (7H) declarations. These declarations establish that members of Defenders of Wildlife and Sierra Club use and enjoy the San Pedro Riparian National Conservation Area, and further demonstrate that BLM's decision to authorize a right-of-way for the construction of pedestrian fencing and an all-weather road on the NCA injures the organizational interests of appellants as well as the personal interests of their individual members. For example, the Miller Declaration, submitted by Craig Miller, an employee and member of Defenders of Wildlife since 1992, states:

1
2
3
4
5
6

> I first visited the San Pedro River in 1989, just after the designation of the upper San Pedro as a National Conservation Area. I was drawn to the San Pedro River because of its lush vegetation, abundant surface water and unmatched wildlife viewing opportunities. Because of the uniqueness of the area, and because it was a relatively short distance from where I was living, the San Pedro River became a favorite location to spend my free time . . . Since that time, I have visited the San Pedro River on at least 20 occasions. Because of the exceptional opportunities to experience nature afforded by the San Pedro, and because much of my work involves travel through rural southeastern Arizona in the vicinity of the San Pedro, visiting the area has become a valued part of my personal and professional experience.

7
8
9
10
11
12
13
14

Miller Decl. at ¶¶ 9, 11. The Miller Declaration and other submitted declarations establish that Defenders of Wildlife and Sierra Club members regularly visit and use the San Pedro Riparian NCA, where they pursue both personal and professional interests in wildlife observation, environmental education, recreation, and rejuvenation. The declarations further address how those interests will be harmed by the proposed fence and road construction. As the declarations establish that members of both Defenders of Wildlife and Sierra Club have specific interests that will be adversely affected by the BLM's decision, appellants are adversely affected by the decision being appealed. *See* 43 C.F.R. § 4.410(d).

15
16
17
18
19
20
21
22
23
24
25
26
27
28

Additionally, Defenders of Wildlife and Sierra Club have organizational interests in the preservation and conservation of the San Pedro Riparian National Conservation Area that will be adversely harmed by the BLM's grant of right-of-way for border fence and road construction. Defenders of Wildlife and Sierra Club share similar missions relating to the conservation of the natural environment, advocacy on behalf of wildlife and wildlife habitat, and preservation of federal lands, including the BLM's National Landscape Conservation System of which the San Pedro Riparian National Conservation Area is a part. Both have a history of engagement on issues relating to the San Pedro River, as well as borderlands conservation. Defenders of Wildlife, for example, has played a leading role on efforts to educate and advocate for better integration of environmental considerations into immigration policy generally, and border security efforts specifically. These efforts have included the 2006 publication of *On the Line: The Impacts of Immigration Policy on Wildlife and Habitat in the Arizona Borderlands*, and the convening of an annual collaborative meeting of borderlands stakeholders in an effort to formulate solutions to the issue of border security and its effect on the natural environment—

1  culminating this year in the publication of *Addressing the Impacts of Border Security Activities*

2  *on Wildlife and Habitat in Southern Arizona: Stakeholder Recommendations*.  *See* EXH. 3B AND

3  3C.  As demonstrated in this appeal, these interests are adversely affected by the BLM's decision

4  to grant Army Corps a right-of-way to construct pedestrian fencing within the San Pedro

5  Riparian NCA, and its failure to comply with environmental laws in making that decision.

6           Regarding the second factor, although the IBLA normally requires participation in the

7  decision-making process, in this case there was simply *no* process to participate in.  Thus, it is

8  neither fair nor logical for this factor to be applied in this instance.  Although the Board does not

9  appear to have squarely addressed this issue, *Southern Utah Wilderness Alliance*, 140 IBLA

10  341 (1997), provides analogous support for this conclusion.  *Id*. at 344, 347.  In that appeal,

11  BLM argued that the appellant lacked standing because it did not participate fully in the public

12  comment period by failing to respond to BLM's letter soliciting public comment. The appellant

13  countered that although it did receive a letter notifying it of BLM's intended action, it did not

14  receive the cover letter describing the intended action and formally requesting comment.  *Id*.  In

15  rejecting BLM's contention, the IBLA noted that the appellant had actively sought to participate

16  in the decision-making process by corresponding with BLM concerning its interest and that

17  BLM had included appellant on its mailing list as an interested party, thus finding that the

18  appellant met the test for standing even though it did not comment on the project it appealed. *Id*.

19           In this case, the inapplicability of the second standing factor is even clearer given that

20  there was simply *no* public comment period, and there was *no* solicitation of any public

21  involvement.  The lack of public participation is underscored by the fact that the Army Corps of

22  Engineers did not submit its right-of-way application on behalf of DHS until August 10, 2007,

23  and yet BLM signed its Finding of No Significant Impact a mere three weeks later, on August

24  31.  In their obvious haste to expedite the decision, BLM, the Army Corps, and DHS clearly did

25  not provide for or contemplate public disclosure or participation.

26           Moreover, appellant Defenders of Wildlife *did* provide extensive public comment on the

27  2003 Environmental Assessment prepared by DHS, the *Supplemental Environmental*

28  *Assessment for Infrastructure within U.S. Border Patrol Naco-Douglas Corridor, Cochise*

1   *County, Arizona*, to which the BLM's right-of-way Environmental Assessment is ostensibly

2   "tiered.". Exн 8. Like the appellant in *Southern Utah Wilderness Alliance*, BLM should have

3   thus been on notice that Defenders of Wildlife has actively sought participation in actions

4   affecting the San Pedro Riparian National Conservation Area, and provided for such

5   participation. *See* 140 IBLA at 344, 347. Had Defenders of Wildlife been properly permitted an

6   opportunity to participate and comment, it would have also engaged the participation of its co-

7   appellant Sierra Club. Appellants thus have standing to pursue this appeal.

8   **II.    IMMEDIATE AND IRREPARABLE HARM WILL RESULT IF THE STAY IS
        NOT GRANTED**

9

10      Without a stay, the BLM's decision will result in two different types of irreparable harm.

11   First, the proposed construction will cause irreparable adverse impacts on the environmental

12   resources within the San Pedro Riparian National Conservation Area, significantly and

13   immediately harming appellants' interests in the protection and conservation of those resources.

14   Second, implementation of the BLM's decision will cause irreparable harm to the decision-

15   making process and the consultation rights of the public, including the two appellants to this

16   action, non-profit conservation organizations that collectively represent more than 1.7 million

17   members. A stay should thus be granted until such time as the IBLA can make a decision on the

18   merits of this case.

19      A.    Border Fence and Road Construction Will Cause Irreparable Adverse Impacts to
            the San Pedro River, Wildlife Habitat and Other Natural Resources of the San
20            Pedro Riparian National Conservation Area

21      The BLM's authorization of a perpetual right-of-way to DHS, through the Army Corps

22   of Engineers, to implement Alternative 2 as described in the EA, will cause irreparable harm to

23   the San Pedro River and its larger watershed, as well as wildlife and other natural resources

24   within the San Pedro Riparian National Conservation Area.   Under its decision, the Army Corps

25   intends to take the following actions within the granted right-of-way: (1) clearing and grading of

26   a 60-foot wide strip of land along the entire southern boundary of the NCA; (2) new road

27   construction involving grading and leveling of proposed roadbeds, filling areas with existing

28   materials or engineered fill, lifting and bedding stretches of road, and installing of drainage

1  structures; (3) construction of "pedestrian fencing" utilizing either "Bollard" or "Sandia" design.

2   Under the Bollard design, offsetting double rows of 14' to 17' high steel pipe poles,

3  approximately 6" in diameter are set in the 8.5" centers, and the pipes are then filled with

4  concrete.  This construction requires trenching 5' deep and 2' wide along the entire fence length.

5   Under the Sandia design, vertical secure metal mesh panels are attached to 16' steel poles, and

6  then additional 6' panels are secured to the top of these panels at an angle of 45 degrees.  The

7  poles are anchored by a 12" wide by 4' deep concrete footing along the length of the fence.  In

8  this case, the Army Corps proposes to utilize a "modified" Sandia design with steel pipes

9  arranged horizontally to a height of 3', and the remaining height consisting of mesh; (4)

10  construction of permanent vehicle barriers, comprised of old railroad ties.  These barriers require

11  the drilling of a 1' by 3' hole for each steel post; (5) temporary vehicle barriers that will installed

12  and removed by crane.

13         The proposed fencing, permanent vehicle barriers, and temporary vehicle barriers will

14  cross the San Pedro River and its floodplain, as well as 30 ephemeral drainages to the east of the

15  River, and 36 ephemeral drainages to the west of the River.  Border Fence EA at p. 6.  "Field

16  observation of pedestrian fence built through ephemeral drainages" in adjacent areas of the

17  Arizona border "indicated excessive deposition above crossings and channel entrenchment

18  below" to a maximum depth of six feet.  *Id*.; *see also* Carlson Declaration and Photographs.

19  EXH. 7F.  The expected increased erosion from these tributary ephemeral drainages "will increase

20  deposition of sediment in the San Pedro River," resulting in bank erosion and channel incision, in

21  turn "alter[ing] stream channel morphologic stability."  Border Fence EA at p. 7.  "Potentially, if

22  enough sedimentation occurs, then the river may adjust laterally, which will cause bank failure

23  and loss of riparian vegetation."  *Id*. at p. 9.  Even under the BLM's decision to place temporary

24  vehicle barriers rather than pedestrian fencing in the San Pedro River and its floodplain, the

25  impacts on the River's hydrology, stability, and overall integrity will be significantly and

26  irreparably harmed.  *Id*. at p. 8 ("Environmental impacts to permanence of perennial surface

27  water in [a]ffected reaches of the San Pedro River will be the same as in Alternative 1.").

28

1    Wildlife will also be irreparably harmed if the BLM's decision is not stayed and

2    construction of fencing and roads commences.  For example, many subtropical mammal species

3    "reach the northern extent of their ranges in this area, including jaguars, ocelots, white-nosed

4    coatis, hooded skunks, Mexican fox squirrels, Merriam's deermice, Coue's deer, white-sided

5    jackrabbits, [and the] Sonoran subspecies of the Virginia opossum," as well as "a large variety of

6    birds and reptiles," and "a diverse flora."  *See* Haas Declaration at ¶ 5.  "In addition, some

7    mammals, such as the American black bear, have their core areas in the U.S., but have small

8    populations in northern Mexico."  *Id*.  Notably, the "biological integrity" of this region "relies on

9    genetic interchange . . . by both plants and animals."  *Id*. at ¶ 13.  As "barriers to this genetic

10   interchange may influence the long-term viability of populations, especially north of the border,"

11   construction of border fencing and roads thus presents "serious threats to long-term survival of

12   wildlife on the border."  *Id*. at ¶ 13.

13       As described in appellants' standing declarations, the expected environmental harm from

14   border fence and road construction will adversely affect their interests at the San Pedro Riparian

15   NCA.  The harm to these legally protected interests will be immediate and irreparable if a stay is

16   not granted.  In light of the serious and irreparable impacts of proposed border road and fence

17   construction on the San Pedro River, its wildlife, and other natural resources of the San Pedro

18   Riparian National Conservation Area, a stay should be granted.  *Sierra Club v. U.S. Forest

19   Serv.*, 843 F.2d 1190, 1195 (9th Cir. 1988) (noting that "when environmental injury is

20   'sufficiently likely . . . the balance of harms will usually favor the issuance of an injunction to

21   protect the environment'") (*citing Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531

22   (1987)); *Save Our Sonoran, Inc. v. Flowers*, 408 F.3d 1113, 1124 (9th Cir. 2005).

23

24

25

26       B.    Implementation of the BLM's Decision Will Cause Irreparable Harm to the
               Decision-Making Process and Consultation Rights of the Affected Public
27

28

1    A stay of the BLM decision in this case is imperative, not only because of the harm that

2    will be caused by construction of the wall and all-weather road, but because of the immediate

3    and irreparable harm to the *decision-making process* that will result if BLM, Army Corps, and

4    DHS are allowed to begin implementing an unlawful decision.  The claims in this appeal are

5    largely  based on the procedural mandates of NEPA, which in turn help provide substantive

6    protections to the natural resources under the BLM's care.  NEPA's mandates are intended to

7    ensure that the decision-making process is based on full disclosure and objective analysis of all

8    relevant impacts and alternatives, as well as consultation with important stakeholders, such as

9    environmental advocacy organizations.  The BLM's lawful compliance with NEPA's mandates

10   will be irreparably impaired once the road has been built and the wall constructed.

11   For example, in *Commonwealth of Massachusetts v. Watt*, 716 F.2d 946 (1st Cir. 1983),

12   the plaintiffs raised NEPA challenges to the sale of offshore oil drilling rights near George's

13   Bank.  The Secretary of the Interior argued that no irreparable harm would occur because

14   additional federal approval was required before the buyers of the offshore oil rights would be

15   entitled to start drilling.  In rejecting this argument, Justice Stephen Breyer, during his tenure on

16   the U.S. Court of Appeals for the First Circuit, stated:

17   [W]hen a decision to which NEPA obligations attach is made without the
     informed environmental consideration that NEPA requires, the harm that

18   NEPA intends to prevent has been suffered. . . .  Moreover, to set aside the
     agency's action at a later date will not necessarily undo the harm.  The

19   agency as well as private parties may well have become committed to the
     previously chosen course of action, and new information—a new EIS—

20   may bring about a *new* decision, but it is that much less likely to bring
     about a *different* one.

21

22   *Id*. at 952 (emphasis in original).  Similarly, the BLM's decision in this case—even if a contract

23   has not yet been issued for the approved construction—has set in motion the construction of an

24   impermeable border fence which will permanently preclude wildlife movements and alter the

25   overall hydrology of the San Pedro River, the core resource of the San Pedro Riparian National

26   Conservation Area.  Moreover, appellants' contention that this decision is unlawful represents

27   the first time they have been permitted to raise objections, to the project as the BLM failed to

28   provide any opportunity for public comment or participation before making its decision.  As a

1  practical matter, if a stay is not granted, the momentum fueled by this commitment of resources

2  will make objective reconsideration by BLM virtually impossible.  Further, appellants will be

3  forced to seek injunctive relief in federal district court, stripping the IBLA of its ability to make

4  a decision on the merits of appellants' case.  In this case, the irreparable harm to the San Pedro

5  Riparian NCA and appellants' interests weighs heavily in favor of granting a stay.

6

7  **III.    APPELLANTS ARE LIKELY TO PREVAIL ON THE MERITS**

8         A.    <u>THE BLM'S DECISION VIOLATES NEPA</u>

9             1.    **A Regional Environmental Impact Statement
                    Is Required for the Proposed Arizona Border Fence**

10         The proposed pedestrian fence and road construction is not an isolated project, but part

11  of a larger, regional plan by the federal government to wall off the vast majority of Arizona's

12  common border with Mexico.  Numerous federal agencies are involved in the planning,

13  permitting, and construction of this proposal, including BLM; other federal land management

14  agencies such as the U.S. Forest Service and National Park Service; the U.S. Fish and Wildlife

15  Service, as both a land manager of the National Wildlife Refuge System and administrator of the

16  Endangered Species Act; Army Corps of Engineers, which is serving as both a construction

17  consultant and is responsible for administering aspects of the Clean Water Act relating to the

18  dredge and fill of waters of the U.S.; the Environmental Protection Agency, which has oversight

19  authority under the Clean Water Act and other responsibilities in the borderlands area, including

20  implementation of the U.S.-Mexico Border 2012 Program and the Good Neighbor

21  Environmental Board; and DHS and its component agencies, which have primary responsibility

22  for border security and construction of border security infrastructure projects.  Under NEPA,

23  the existence of this type of multi-agency, integrated program is required to be analyzed in a

24  regional or comprehensive Environmental Impact Statement produced cooperatively by all the

25  involved federal agencies, yet the only NEPA analysis conducted to date on Arizona fence

26  construction has been a series of isolated and piecemealed Environmental Assessments.  *See* 42

27  U.S.C. § 4332(2)(C); 40 C.F.R. § 1502.3 (requiring EISs for "proposals" and "other major

28  Federal actions significantly affecting the quality of the human environment.").  IBLA precedent

1  recognizes that preparation of these types of regional and comprehensive EISs are required in

2  "two and only two instances: (1) when there is a comprehensive federal plan for the

3  development of a region, and (2) when various federal actions in a region have cumulative or

4  synergistic environmental impacts on a region." *Southwest Resource Council*, 96 IBLA 105,

5  116-117 (1987) (*citing Kleppe v. Sierra Club*, 427 U.S. 390 (1976)).  As the pending border

6  fence construction in Arizona meets both of these criteria, a regional or comprehensive EIS on

7  such construction must be prepared before the San Pedro fence project may be undertaken.

8         a.    There Is a Comprehensive Federal Plan for the
              Development of the Arizona Border Fence

9

10        The August 31, 2007 BLM EA and FONSI approving a right-of-way for border fencing

11  and road construction provides little indication that the authorized construction is part of a well-

12  defined federal proposal to construct border fences along the vast majority of the U.S.-Mexico

13  border within the state of Arizona.  As defined by the Supreme Court in *Kleppe*, a "proposal"

14  exists for purposes of NEPA when there is "a regional plan of development . . . [which]

15  define[s] fairly precisely the scope and limits of the proposed development of the region."  427

16  U.S. at 401-02.  Similarly, NEPA's implementing regulations direct that when "[p]roposals or

17  parts of proposals which are related to each other closely enough to be, in effect, a single course

18  of action shall be evaluated in a single impact statement."  40 C.F.R. § 1502.4(a).  In this

19  instance, several factors demonstrate that a border fence construction "proposal" for the state of

20  Arizona exists, including: (1) Congressional direction in the *Secure Fence Act*; (2) an incomplete

21  DHS NEPA process addressing USBP border enforcement actions within Arizona, and

22  proposing to fence large portions of the State's southern border; (3) DHS's recent initiation of

23  an EIS process for a similar border fence proposal in southern Texas; and (4) the simultaneous

24  planning and development of several individual and segmented fence construction projects in

25  different areas of the State.  The existence of a comprehensive fence construction plan with

26  significant environmental impacts within Arizona thus requires the preparation of a regional EIS

27  before construction of individual fence segments may lawfully proceed.

28

1    In *Kleppe*, conservation organizations alleged that the actions of the Departments of the

2    Interior, Agriculture, and Army, as well as the Bureau of Reclamation, U.S. Geological Survey,

3    U.S. Forest Service, Army Corps of Engineers, and BLM in permitting and authorizing

4    development of coal reserves in the "Northern Great Plains Region" constituted a federal

5    program demanding the preparation of a regional, comprehensive EIS.  In rejecting plaintiffs'

6    arguments, the Supreme Court found that there was "no evidence in the record of an action or

7    proposal for an action of regional scope . . .[and] no evidence that the individual coal

8    development projects undertaken or proposed by private industry and public utilities in that part

9    of the country are integrated into a plan or otherwise related." *Kleppe*, 427 U.S. at 400.  The

10   Court thus concluded that "[a]bsent an overall plan for regional development, it is impossible to

11   predict the level of coal-related activity that will occur in the region identified by respondents,

12   and thus impossible to analyze the environmental consequences and the resource commitments

13   involved in, and the alternatives to, such activity." *Id.* at 402; *see also Southwest Resource*

14   *Council*, 96 IBLA at 117 ("Clearly, there is no comprehensive Federal plan for the development

15   of the uranium resources located on the Arizona strip.").

16    In contrast, the BLM's approval of a right-of-way for border fence construction within

17   the San Pedro Riparian National Conservation Area is clearly part of a well-defined larger

18   federal proposal for fence construction along most of the Arizona border.  The existence of such

19   a proposal is most plainly illustrated by provisions of the *Secure Fence Act*, which authorizes

20   DHS to construct border fencing along a 370 mile-long corridor running eastward from

21   Calexico, California to just east of Douglas, Arizona.  P.L. 109-367, Section 3(2)(1)(A)(ii); *see*

22   Exh. 1A and 1b.  While the Act provides discretion to DHS on the manner of construction to

23   utilize within areas where the topography is greater than a 10 percent grade, and does not affect

24   the duty and discretion of federal land management agencies to conserve the lands under their

25   administration (as illustrated by BLM's refusal to allow pedestrian fence construction within the

26   river corridor and 100-year flood plain of the San Pedro River), it nonetheless establishes with

27   considerable precision the geographical areas in which border fences will likely be constructed.

28   *See City of Tenakee Springs v. Clough*, 915 F.2d 1308, 1312 (9th Cir. 1990) ("Where there are

1  large scale plans for regional development, NEPA requires both a programmatic and site-specific

2  EIS.").

3         Additionally, the agency responsible for fence construction under immigration law

4  generally and the *Secure Fence Act* specifically, DHS, has itself defined its border security

5  activities within the Arizona borderlands region as a "program" for purposes of NEPA analysis.

6  In November 2002, the agency released a draft *Programmatic Environmental Impact Statement*

7  *for Office of Border Patrol Operational Activities within the Border Areas of the Tucson and*

8  *Yuma Sectors in Arizona*, under which the agency's preferred alternative proposed

9  approximately 250 miles of pedestrian fencing, 880 miles of border roads, and 410 stadium style

10 or portable lighting systems along the Arizona border.  Although DHS has never issued a final

11 EIS or Record of Decision (and the DEIS is now woefully outdated due to the presence of

12 significant new information and changed circumstances), during the intervening years the agency

13 has continued to construct—and federal land management agencies such as BLM have

14 continued to permit and authorize—border fencing and other border infrastructure in a

15 piecemeal fashion in disparate areas of the Arizona border.

16        Moreover, DHS recently announced its intention to prepare an EIS on a similar proposal

17 in southern Texas, within the USBP's Rio Grande Valley Sector.  Notably, in the *Federal*

18 *Register* notice announcing the initiation of this NEPA process, DHS explained that it "is

19 proposing to install and operate tactical infrastructure consisting of pedestrian fences, supporting

20 patrol roads, lights, and other infrastructure along approximately 70 miles of the U.S/Mexico

21 international border."  72 Fed. Reg. 54,726 (Sept. 24, 2007).  Exн. 8в.  DHS further noted that

22 the proposal "includes the installation of tactical infrastructure in *21 segments*" in the vicinity of

23 several Texas communities, and that "[i]ndividual segments might range from approximately 1

24 mile to more than 13 miles."  *Id*. (emphasis added).  DHS's recognition of a larger fencing

25 proposal and need for an EIS in the Texas region highlights the urgency of conducting a similar

26 analysis in Arizona, which may involve DHS acting as lead agency, but which must also include

27 all other federal agencies that administer federal land or otherwise have permitting authority or

28 involvement in the construction of the Arizona border fence.  *See* 40 C.F.R. § 1501.5(a) ("A

1  lead agency shall supervise the preparation of an environmental impact statement if more than

2  one Federal agency either: (1) Proposes or is involved in the same action; or (2) Is involved in a

3  group of actions directly related to each other because of their functional interdependence or

4  geographical proximity.").

5        Vividly illustrating the plain existence of an Arizona border fencing program, and the

6  clear need to conduct an EIS on that program *now*, before further construction goes forward,

7  the scope and extent of fence construction within the Arizona borderlands has rapidly

8  accelerated in the late summer and fall of 2007.  Indeed, there are currently at least *six* distinct

9  areas of fence construction that have been separately approved or proposed thus far this

10 calendar year.  *See Map of five proposed fence segments in relation to existing fence segments*

11 *in south-central and southeastern Arizona* (EXH. 1C) (this map does not depict the fifth and

12 sixth segments, which are located in western Arizona):

13        (1) Six miles west and nine miles east from where the Naco Port of Entry
14        fence ends. The western segment stretches across much of the southern
          boundary of the San Pedro Riparian National Conservation Area;

15        (2) 7 miles west from where the Douglas Port of Entry fence ends.  This
16        fence will meet with the construction moving east from Naco and form one
          contiguous fence segment of approximately 40 miles;

17        (3) 2.5 miles west from the Mariposa Point of Entry fence near Nogales.
18        This fence segment moves the Nogales section of the fence much closer to
          the primary known cross-border migration route for the northern jaguar;

19        (4) 2.5 miles west and 4.5 miles east of the Sasabe Port of Entry.  This
20        fence includes the southern boundary of the Buenos Aires National Wildlife
          Refuge (currently under construction);

21        (5) 37 miles across the southern boundary of the Barry M. Goldwater
22        Range (currently under construction); and

23        (6) 5.2 miles of fence along the southern boundary of Organ Pipe Cactus
          National Monument.

24 The simultaneous construction of these fence segments together total approximately 74 miles, or

25 approximately 21% of Arizona's total shared border with Mexico.  The fact that more than a

26 fifth of the Arizona border would be walled under individual fence segments proposed in a

27 period of less than nine months provides further compelling evidence of a "program" which will

28 have a significant impact on the environment, and thus requires the preparation of a regional

1  EIS. While BLM's approval of the right-of-way for border fence construction within the San

2  Pedro Riparian National Conservation Area is only one portion of this larger program, it shares

3  the legal responsibility for recognizing the need for a regional EIS—and taking steps to initiate

4  that process—to the same degree as any other federal agency involved in that program. *Spiller*

5  *v. Walker*, 1998 U.S. Dist. LEXIS 18341, * 51-52 (Aug. 25, 1998) ("Any one agency's decision

6  not to conduct an EIS based on its own actions in isolation may or may not be arbitrary and

7  capricious, but it is clearly arbitrary and capricious for none of the federal agencies to recognize

8  that major Federal action requiring an EIS has occurred in this case.").

9  
10  
     b.  <u>Individual Fence Projects within Arizona Will Have</u>
<u>Significant Synergistic and Cumulative *Direct* Environmental</u>
<u>Impacts on Wildlife and Landscape Connectivity</u>

11       As discussed above, because the proposed border fence construction along Arizona's

12  southern border constitutes a federal proposal with significant environmental impacts, a regional

13  EIS must be prepared before further individual segments of fence may lawfully be approved and

14  constructed. However, even if the IBLA determines that such a proposal does not exist, the

15  cumulative effects of past, present, and reasonably foreseeable fence projects within the State

16  also require the preparation of a comprehensive or regional EIS in order to accurately and

17  lawfully assess the overall impacts of their construction. As the Supreme Court noted in *Kleppe*,

18  cumulative environmental impacts "must be considered together [because] [o]nly through

19  comprehensive consideration of pending proposals can the agenc[ies] evaluate different courses

20  of action." 427 U.S. at 410.

21       The purpose of NEPA's cumulative effects requirement "is to prevent agencies from

22  dividing one project into multiple individual actions each of which individually has an

23  insignificant environmental impact, but which collectively have a substantial impact." *Natural*

24  *Res. Def. Council v. Hodel*, 865 F.2d 288, 297 (D.C. Cir. 1988) (internal quotations and

25  citations omitted). The need to prepare a regional and cumulative EIS is further heightened

26  when the actions being considered by different agencies, like those involved in the Arizona

27  border fence project, "have similarities that provide a basis for evaluating their environmental

28  consequences together, such as common timing or geography." 40 C.F.R. § 1508.25. In this

1  case, because the "individual" fence projects being constructed and planned throughout the

2  Arizona border region will have significant and cumulative adverse environmental consequences

3  and are similar in terms of construction, timing, and geography, BLM, other federal land

4  management agencies, DHS, and all other federal agencies involved in permitting or otherwise

5  approving such construction must prepare a comprehensive EIS.

6       In particular, there is substantial scientific evidence that the six fence projects currently

7  being constructed or planned *will have significant cumulative effects on the Arizona border*

8  *region's wildlife, and the landscape habitat connectivity* needed to sustain viable populations of

9  those species.  *See*, *e.g.*, Hass Decl. at ¶ 13; Declaration of Aaron Flesch at ¶ 9 (EXH. 7E);

10  Declaration of Sergio Avila at ¶ 22 (EXH. 7D).  Moreover, these effects will be further

11  exacerbated by the reasonably foreseeable fence construction along the large majority of

12  Arizona's southern border, as authorized by the *Secure Fence Act*.  Because the BLM's

13  Environmental Assessment for the right-of-way on the San Pedro Riparian National

14  Conservation Area—like all of the other individual but segmented NEPA analysis conducted on

15  this year's fence proposals thus far—have only considered potential cumulative impacts within

16  *the specific project areas*, there has been absolutely no NEPA analysis conducted on the overall

17  impacts of fence construction on wildlife within the Arizona borderlands region.

18       Such analysis is especially imperative given the unique situating of the borderlands region

19  at the convergence of several major ecosystems.  For example, the Haas Declaration describes

20  the Sky Island ecosystem that predominates in the southeastern portion of Arizona as follows:

21       Southeastern Arizona is one of the most biologically diverse areas in the
United States.  Four biomes intersect in this region: Sonoran desert,
22  Chihuahuan desert, Rocky Mountains and Sierra Madre.  It is also
topographically diverse, with elevations ranging from 2500-9500 feet.  This
23  creates a rich variety of habitats ranging from pine and fir on the mountain
tops to desert scrub and grasslands in the valleys.  This unique area,
24  referred to as the sky island region or Madrean Archipelago, occupies the
southeastern corner of Arizona, the southwestern corner of New Mexico,
25  and northern Sonora.

26  Hass Decl. at ¶ 4.  Similarly, the Avila Declaration states of the Sonoran desert ecosystem that

27  predominates in the southwestern portion of Arizona:

28       The Sonoran Desert is one of the four major deserts in North America, and
covers approximately 100,000 square miles, within the border states of

1
2

Arizona and California in the U.S. and Sonora and Baja California, in Mexico. Elevation goes from the sea level in the Sea of Cortez, (Sonora, Mexico) to mountain tops more than 2000 meters above sea level, adding a layer of climatic complexity.

3
4
5

There are over 2000 species of plants, more than 550 species of vertebrates, and countless species of invertebrates. Life forms, such as columnar cacti and legume trees are the distinguishing plant elements, and their diversity and adaptability, in addition to its mild winters, add to this ecosystem's biodiversity.

6    Avila Decl. at ¶¶ 7-8.  Consequently, the Arizona borderlands region contains many species of

7    plants and wildlife that have otherwise limited distributions within the United States, and in

8    some circumstances, provide a species' *only* habitat in the country.  *See* Haas Decl. at ¶ 5

9    ("Many subtropical species reach the northern extent of their ranges in this area, including

10   jaguars, ocelots, white-nosed coatis, hooded skunks, Mexican fox squirrels, Merriam's

11   deermice, Coue's deer, white-sided jackrabbits, [and the] Sonoran subspecies of the Virginia

12   opossum," as well as "a large variety of birds and reptiles," and "a diverse flora"); Avila Decl. at

13   ¶ 3 (discussing jaguar and ocelot); Flesch Decl. at ¶ 11 (discussing pygmy-owl).  For these

14   species, which have larger core habitats within Mexico and countries further south, the

15   construction of significant fencing along the San Pedro Riparian NCA and the majority of

16   Arizona's border will result in fragmentation of habitat, genetic isolation, and high risk of

17   extinction within the U.S.  *See* Haas Decl. at ¶ 13 ("The biological integrity of the whole

18   Madrean Archipelago region relies on genetic interchange through the region—by both plants

19   and animals.  Barriers to this genetic interchange may influence the long-term viability of

20   populations, especially north of the border.").

21       Thus, a leading jaguar biologist predicts that the proposed fences in the San Pedro

22   Riparian NCA and elsewhere, if constructed, will simply preclude jaguar recovery within the

23   United States.  As stated in the Avila Declaration, infrastructure projects such as border fencing

24   "threaten the survival of jaguars in the United States, endanger the establishment of individuals

25   and/or a viable breeding population and block passages the jaguars, as well as other big,

26   medium, and small sized mammals use to reach the habitats where they naturally occur."  Avila

27   Decl. at ¶ 13.  This is because "proposed infrastructure will disrupt, segment and isolate wildlife

28   populations in both sides of the border."  *Id*. at ¶ 22.  These effects are merely part of larger

1    regional impacts, and "[a]ffecting wildlife populations at this level could potentially impact the

2    border region ecosystems as a whole, causing a detriment [to] native species, their habitats,

3    abundance, [and] diversity." *Id.* at ¶ 25.  Nonetheless, despite the fact that the jaguar, listed as

4    endangered since the ESA was passed in 1973, will be likely driven extinct in our country by the

5    fences, *no federal action agency has considered or analyzed this likely impact in a regional or*

6    *comprehensive fashion*.

7           The ongoing and proposed fence construction will also have significant impacts on the

8    cactus ferruginous pygmy-owl, which is highly endangered in the United States but was

9    removed from the ESA list based on a technicality. As addressed in the Flesch declaration,

10   because pygmy-owls "tend to fly near the ground, virtually never fly above the height of canopy

11   vegetation and tend to stay in areas with moderate to high vegetation cover," border

12   development "including fences and large clearings may reduce landscape connectivity for

13   pygmy-owls," which will "result in some degree of physical and perhaps genetic isolation from

14   populations in Mexico." Flesch Decl. at ¶ 10.  Flesch thus concludes that "[l]ess invasive

15   techniques that do not rely on physical barriers such as walls are more likely to promote natural

16   movements of wildlife across the international boundary." *Id.* at ¶ 16.

17          The need to prepare a comprehensive EIS based on cumulative and regional effects on

18   wildlife has been specifically embraced by the D.C. Circuit.  For example, in *Natural Resources*

19   *Defense Council v. Hodel*, 865 F.2d 288 (D.C. Cir. 1988), conservation organizations alleged

20   that the Department of the Interior failed to adequately consider the cumulative effects of

21   simultaneous offshore oil and gas leasing and development in the Pacific and Atlantic Oceans on

22   migratory species including endangered cetaceans, marine mammals, salmon, and marine and

23   coastal birds.  The D.C. Circuit agreed with plaintiffs, finding that the EIS "for the most part

24   considers only the impact *within each area*" of leasing. *Id.* at 298 (emphasis in original).  The

25   Court thus held that the analysis did "not address the issue ... which NEPA requires the

26   Secretary to consider: the cumulative impacts of [oil and gas leasing] development in *different*

27   areas," and that "allowing the Secretary's 'analysis' to pass muster here would eviscerate

28   NEPA." *Id.* at 298-99 (quotations and emphasis in original).

1       Similarly, in this instance the BLM's EA contains a brief discussion of cumulative

2  impacts within the San Pedro River watershed but does not address or acknowledge the

3  potential cumulative impacts of simultaneous *fence construction* being undertaken or planned

4  within *different* areas of the Arizona border on natural resources adversely affected by fence

5  construction within the San Pedro Riparian NCA, including the wildlife species discussed in

6  detail above.  In fact, the NEPA analysis here is even more deficient than *Natural Resources*

7  *Defense Council*, because in that case Department of the Interior had at least *attempted* to

8  provide a regional and comprehensive analysis, but the Court found it insufficient.  *See id*. at 299

9  (The EIS "merely announces that migratory species may be exposed to oil spills and other

10  impacts … These perfunctory analysis do not constitute analysis useful to a decisionmaker in

11  deciding whether, or how, to alter the program to lessen cumulative environmental impacts.").

12       The need for such analysis here is plainly evident.  Substantial fence construction has

13  already been completed, and more than 70 additional miles—approximately 20% of the Arizona

14  border—is already under construction or has been proposed for construction since the beginning

15  of 2007.  As described above, the impacts of such construction will be devastating for a wide

16  variety of wildlife species, including many endangered species.  Despite this fact, no federal

17  agency involved in the larger border fence proposal has even *considered* or *disclosed* such

18  impacts, let alone provided a lawful analysis pursuant to NEPA.

19         c.   <u>Individual Fence Projects within Arizona Will Have</u>

20               <u>Significant Synergistic and Cumulative *Indirect* Environmental</u>
                   <u>Impacts on Wildlife and Landscape Connectivity</u>

21       The border fence construction program not only has significant direct and cumulative

22  effects, but pronounced and well-documented cumulative *indirect* effects on the Arizona border

23  region.  Under NEPA's implementing regulations, "indirect effects" are defined as those effects

24  "caused by the action and are later in time or farther removed in distance, but are still reasonably

25  foreseeable."  40 C.F.R. § 1508.8(b).  In interpreting NEPA's indirect effects mandate, courts

26  have "emphasized that NEPA does not recognize any distinction between primary and secondary

27  effects."  *Border Power Plant Working Group v. Dep't of Energy*, 260 F. Supp. 2d 997, 1014-

28  15 (S.D. Cal. 2003) (*citing Methow Valley Citizens Council v. Reg'l Forester*, 833 F.2d 810,

816 (9th Cir. 1987), *rev'd on other grounds*, *Robertson v. Methow Valley Citizens Council*, 490

U.S. 332 (1989)).  As the Ninth Circuit stated in *Methow Valley*:

> This court would not require the government to speculate on impacts in order to foresee the unseeeable.  However, it must be remembered that the thrust of an agency's responsibilities under NEPA is to predict the environmental effects of proposed action before the action is taken and those effects fully known.  *Reasonable forecasting and speculation is implicit in NEPA, and we must reject any attempt by agencies to shirk their responsibilities under NEPA by labeling any and all discussion of future environmental effects as crystal ball inquiry.*

833 F.2d at 816-17 (internal quotations and citations omitted) (emphasis added).   Because the

regional indirect effects of individual and segmented border fence construction on wildlife and

protected federal lands in Arizona are reasonably foreseeable and significant, these indirect

effects provide another compelling reason why a regional EIS on the Arizona border fence

construction program must be initiated.

　　　　Since the early 1990s, when USBP first began implementing its "prevention through

deterrence" *Southwest Strategy* within the urban border areas of San Diego and El Paso, its

fence construction and associated infrastructure development of roads, lighting systems, remote

camps, and other enforcement efforts have had overwhelming indirect effects on more remote

and less populated areas of the southern border, particularly protected federal lands such as the

San Pedro Riparian National Conservation Area, by *shifting*, rather than *decreasing*, overall

levels of illegal immigration.  *See* Exh. 1A and 3b.  Importantly, this strategy of shifting

immigrant flows was *intended*, although USBP initially believed that migrants would be deterred

from crossing the often inhospitable desert and mountainous regions that predominate most of

the southern border, causing levels of undocumented immigration to fall and enforcement efforts

to be more successful.

　　　　The expected decrease in undocumented immigration has not materialized, causing

border security efforts to instead be like "squeezing a balloon."  These shifting patterns of illegal

immigrations in response to enforcement efforts, and their environmental effects, have been

extensively documented.  For example, a 2004 study by the Government Accountability Office

(GAO) noted that while apprehensions of undocumented migrants in urban areas such as San

1  Diego and El Paso fell by a combined 64 percent since 1993, apprehensions on lands

2  administered by Department of the Interior rose dramatically.  *Border Security: Agencies Need*

3  *to Better Coordinate Their Strategies and Operations on Federal Lands*.  GAO Report 04-590.

4  EXH. 2A.  This rise has been particularly pronounced in Arizona.  According to the GAO study,

5  between 1997 and 2000 the number of undocumented migrants apprehended on DOI lands rose

6  from only 512 to more than 113,000.  Similarly, the National Park Service estimates that

7  200,000 undocumented migrants entered the Organ Pipe Cactus National Monument alone in

8  2001.  *Id.*

9        The consequent regional indirect effects on these lands and their wildlife habitat have not

10  been considered or analyzed by the various federal agencies—including BLM—involved in

11  border security efforts.  Yet the federal land management and wildlife agencies acknowledge

12  that these impacts are perfectly predictable.  For example, in a Biological Opinion prepared

13  under the Endangered Species Act on three of the fence segments currently being planned and

14  constructed (including the segment crossing the San Pedro Riparian NCA), FWS states:

15  On the larger scale, border security programs have both localized and
16  regional consequences.  Increased border security infrastructure and patrol
   operations in one location result in movement of undocumented aliens
17  (UDAs) to other areas where the chance to cross into the United States is
   greater.  Environmental damage to natural resources from UDA traffic is
18  considerable and affects large areas of many sensitive species habitats, and
   likely individuals of those species.  *Individual project planning on one*
19  *location has not generally considered the effects of moving the UDA*
   *traffic to another portion of the border.  The piecemeal approach to*
20  *border security facility construction and intensity of patrol activity has*
   *affected isolated and sensitive areas not formerly utilized to any extent by*
21  *UDAs.*  On a more local level, placement and design of fences and
   surveillance activities may also direct UDA traffic away from the current
22  project.  Protections for species undertaken at the new infrastructure
   location protect and benefit those species while contributing to adverse
23  effects elsewhere.  It is difficult to precisely predict future movement
   patterns of UDAs when passage through one corridor becomes difficult;
24  *however, a reasonable estimate of those future routes can be hypothesized*
   *for the purposes of effects analysis.*

25  August 29, 2007 Fence Biological Opinion at 24 (emphasis added) (EXH. 4C).

26        This statement underscores the fact that BLM, other federal land management agencies,

27  and USBP have had more than ten years of experience with the "squeezing balloon" effect of

28  border security efforts, in which increased enforcement efforts within one area predictably lead

1  to increased illegal immigration and associated increased enforcement efforts within adjoining

2  areas.  For example, the proposed fencing within the San Pedro Riparian NCA, approved by

3  BLM through its right-of-way, will have predictable indirect effects in adjoining areas such as

4  the Huachuca Mountains, and in conjunction with the other segmented fence segments being

5  constructed or planned within Arizona, will have a similar predictable indirect and cumulative

6  effects at a regional and landscape level.  Nonetheless, like previous NEPA analyses, the Border

7  Fence EA does not assess these *regional* impacts, or the impacts of subsequent enforcement

8  efforts that will predictably follow the shift in patterns of illegal immigration.  Until a

9  comprehensive and regional EIS is prepared that addresses and analyzes such effects, further

10  fence construction in the San Pedro Riparian NCA and other protected federal lands should not

11  commence.

12             **2.     An Individual EIS Must be Prepared for the San Pedro Fence**
                      **Project**
13

14             In addition to the responsibilities of BLM, other federal land management agencies, and

15  DHS to prepare a regional EIS on the border fence construction program within Arizona, the

16  BLM is independently responsible for preparing an individual EIS on the significant

17  environmental effects of its grant of a right-of-way to DHS for border fence construction within

18  the San Pedro Riparian National Conservation Area.  In determining whether a federal action

19  requires an EIS because it may significantly affect the environment, an action agency must

20  consider ten factors, including the unique characteristics of the area, proximity to ecologically

21  sensitive areas, whether the action is related to other actions with cumulatively significant

22  impacts, and to what degree the action involves unique or unknown risks.  40 C.F.R. §

23  1508.27(b)(3), (5), (7); *Nat'l Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722, 731 (9th

24  Cir. 2001).  As demonstrated below, BLM's action directly implicates several of the significance

25  factors under NEPA's implementing regulations, and the agency's failure to take a "hard look"

26  at these impacts renders its FONSI arbitrary and capricious.  Because the existence of only *one*

27  factor has been held sufficient to establish significance, an EIS on the San Pedro border fence

28  project must be prepared.  *Nat'l Parks & Conservation Ass'n*, 241 F.3d at 731.

a.    The Proposed Border Fence Will Significantly Impact the San Pedro River and Watershed, a Unique and Ecologically Critical Area

One factor for determining significance under NEPA is "the [u]nique characteristics of the geographic area such as proximity to historic or cultural resources, park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas."  40 C.F.R. § 1508.27(b)(3).  The San Pedro River, San Pedro Riparian National Conservation Area, and its larger watershed implicate nearly *all* of these criteria.  Specifically, the San Pedro is: (1) one of the last free-flowing rivers in the Southwest, protected within the park land of the San Pedro Riparian NCA, Border Fence EA at p. 5; (2) an area of incredible biological diversity, Haas Decl. at ¶¶ 5-6; *see also* Exh. 5b; (3) an area of *global* importance to avian diversity, as demonstrated by the National Audubon Society's designation of it as the first Globally Important Bird area, and its designation as a United Nations World Heritage Site, Border Fence EA at p. 5; (4) eligible for Wild and Scenic River designation, *id.* at p. 10; and; (5) one of only two National Riparian Conservation areas in the nation.  Just as the Ninth Circuit in *National Parks & Conservation Association* noted that the "unique characteristics of Glacier Bay [National Park and Preserve] are undisputed and of overwhelming importance," 241 F.3d at 731, so too are the unique characteristics of the San Pedro, and thus an EIS on the effects of border fence and road construction on this irreplaceable treasure must be conducted.

b.    The Proposed Border Fencing Involves Highly Uncertain, Unique, and Unknown Risks to the San Pedro River That Are Not Adequately Addressed by the Proposed Mitigation

Another factor for determining significance pursuant to NEPA is the "degree to which the possible effects on the  . . . environment are highly uncertain or involve unique or unknown risks."  40 C.F.R. § 1508.27(b)(5).  In this instance, BLM presents very troubling predictions concerning the potential effects of fence and road construction on the overall hydrology of the San Pedro River, its wetlands, and even the course of the River itself—predictions that are supported by the effects of border fence construction that have already occurred in Arizona.  *See* Carlson Decl. Exh. 7f.  Under all of the alternatives considered by BLM in the EA, "the proposed pedestrian fence will tie in with the pedestrian fence being constructed, which will

1    effectively bisect the entire San Pedro River Basin at the U.S./Mexico border."  Border Fence

2    EA at p. 6.  In total, the fence will cross more than 30 unnamed ephemeral drainages east of the

3    San Pedro River and 36 named or unnamed ephemeral drainages west of the river.  Through

4    field observations of fences built in ephemeral washes in adjacent areas of the Arizona border,

5    the BLM predicts that these drainages will be "significantly altered and rapidly de-stabilized,"

6    resulting in increased erosion and sedimentation into the San Pedro River, channel incision,

7    dewatering of existing floodplains, degraded channel function, and reduced riparian vigor.  *Id.*

8    Indeed, BLM predicts that "if enough sedimentation occurs," then the *entire* San Pedro River

9    may "adjust laterally", causing mass "bank failure and loss of riparian vegetation until the river

10   reaches a new dynamic equilibrium with increased [] sediment and water supplied from the area

11   of disturbance."  *Id.* at p. 9.  These unique potential impacts to the hydrology, wetlands

12   function, and riparian vegetation of the San Pedro River—in short, the overall environmental

13   integrity and health of the River and its larger watershed—demands the preparation of an EIS.

14   *Ocean Advocates v. U.S. Army Corps of Engineers*, 402 F.3d 846, 870 (9th Cir. 2005) ("Where

15   the environmental effects of a proposed action are highly uncertain or involve unique or

16   unknown risks, an agency must prepare an EIS.") (*citing* 40 C.F.R. § 1508.27(b)(5)); *Nat'l*

17   *Parks & Conservation Ass'n*, 241 F.3d at 732.

18          Despite these potentially enormous impacts, BLM issued a FONSI for the project,

19   stating that proposed mitigation is a "substantive reason for finding no significant impact."

20   FONSI at p. 1.  In some circumstances, mitigation measures can arguably justify a finding of no

21   significant impact.  *Davis v. Mineta*, 302 F.3d 1104, 1225 (10th Cir. 2002) (*citing* Forty Most

22   Asked Questions Concerning CEQ's National Environmental Policy Act Regulations, 46 Fed.

23   Reg. 18,026, 18,038 (Mar. 23, 1981)).  However, such measures must be "more than a

24   possibility, and must be either required by statute or regulation or so integrated into the initial

25   proposal that it is impossible to define the proposed project without them."  *Id.*; *Nat'l Parks &*

26   *Conservation Ass'n*, 241 F.3d at 734 (holding a "perfunctory description" or "mere listing" of

27   mitigation, without supporting analytical data, is insufficient to support finding of no significant

28   impact).

1    In this instance, BLM states that "the installation of permanent or temporary vehicle

2    barriers in the river corridor, floodplain, drainages, and the historic corral site . . . will serve to

3    adequately mitigate impacts from interruption of water flow into the San Pedro River." To the

4    contrary, statements throughout the Border Fence EA demonstrate that: (1) the construction of

5    pedestrian fencing across 66 ephemeral washes, common to all alternatives, is a primary

6    contributor to the predicted effects to the San Pedro, and thus will not be mitigated by the use

7    of vehicle barriers in limited areas; (2) BLM has little confidence in the proposed mitigation

8    measures, and no data or experience to demonstrate their effectiveness; and (3) mitigation

9    measures have not even been identified in some circumstances.

10    For example, in relation to floodplain and hydrology impacts, the EA notes that

11    "potential environmental impacts associated with the construction of the pedestrian fence in the

12    uplands" will be the same under the chosen alternative as it would be under the complete

13    fencing alternative. Border Fence EA at p. 8. These upland impacts, resulting from the

14    construction of fencing across 66 washes and tributaries to the San Pedro River, are described

15    as follows:

16    Increased erosion from tributary drainages will increase deposition of
       sediment in the San Pedro River. Increased deposition in the San Pedro
17    River at these locations will effectively increase the width to depth ratio
       (wider, shallower, channel development). As the width to depth ratio
18    increases, stability thresholds are exceeded, hydraulic stress against banks
       increases and bank erosion is accelerated. Increases in the sediment supply
19    to the channel develop from bank erosion, reducing the systems' capability
       to transport sediment. As a result, deposition occurs, further accelerating
20    bank erosion, and the cycle continues.

21    *Id*. at p. 7. With these significant effects and risks to the San Pedro unchecked, the BLM's

22    conclusion that impacts from "interruption from water flow" will be adequately mitigated is

23    simply unsupportable. Although the agency attempts to claim that "the severity of potential

24    impacts may be reduced as erosion in ephemeral drainages is anticipated to be lower," it is

25    unclear why such impacts may be reduced given that pedestrian fencing will be built across

26    these ephemeral drainages under all alternatives, including the chosen action.

27

28

1    Similarly, in relation to wetlands, riparian zones, and vegetation impacts, the EA states

2    that the impacts "to riparian function and vegetation will be similar" under the chosen

3    alternative as compared to the complete fencing alternative.  As stated by BLM:

4        Construction of pedestrian fence and 60' of cleared ROW will likely result
         in excess sediment and drainages from storm runoff.  Bollard pedestrian
5        fencing in washes will likely result in head cutting and under-scour
         footings.  *The bollard pedestrian fence will collect sedimentation, debris,*
6        *and slow flood flows causing them to rise and spill out along the fence*
         *line, leading to lateral erosion.*  The head cutting at bollards in washes will
7        run once the depth of the downstream scour hole reaches 4' to 6'.  The
         excess sediment will reach the San Pedro River where it may cover existing
8        herbaceous vegetation and create point bars and sand bars that promote
         tree seeding germination.  Potentially, *if enough sedimentation occurs, then*
9        *the river may adjust laterally (lateral migration), which will cause bank*
         *failure and loss of riparian vegetation until the river reaches a new*
10       *dynamic equilibrium* with increased [] sediment and water supplied from
         the areas of disturbance.  This will have minor to large negative impact to
11       riparian function that will diminish downstream of tributary washes.

12
     Border Fence EA at p. 9 (emphasis added).  Therefore, there is again no support for the BLM's
13
     contention that its mitigation will meaningfully reduce these devastating impacts to riparian
14
     function and wetlands.  While appellants strongly support the agency's decision not to allow
15
     DHS to build pedestrian fencing within the San Pedro River and its floodplain, there is simply
16
     no evidence that this relatively small gap in pedestrian fencing will reduce the potential effects
17
     of the proposed action to insignificance.
18
         Moreover, the Border Fence EA demonstrates that the BLM has little evidence that its
19
     proposed mitigation will be effective, and in many circumstances such mitigation measures do
20
     not even appear to have been identified.  As the agency states, potential watershed impacts
21
     "may" be reduced if the pedestrian fencing is "designed to pass flood flows and sediment
22
     . . . for all drainages in the basin."  The agency further notes that "best management practices"
23
     could also help control erosion, but that "*there is a large degree of uncertainty* concerning the
24
     effectiveness of the some [sic] proposed mitigation for erosion *as many of the details have not*
25
     *been determined.*"  *Id.* at p. 22 (emphasis added).  Similar statements are found throughout the
26
     Border Fence EA.  *See id.* at 7 ("maintenance activities associated with the pedestrian fence will
27
     likely include removal of dirt and debris from the fence in drainages.  However, *it is unclear as*
28
     *to the method or location of disposal* for the material recovered from the fence.  *Thus, potential*

1    *environmental impacts associated with maintenance are uncertain.*") (emphasis added); *id.*

2    ("[T]here is a *large degree of uncertainty* concerning the effectiveness of the some [sic] of the

3    proposed mitigation as *many of the details have not been determined.*") (emphasis added).

4        The Border Fence EA, however, does not address why "details" such as effective

5    mitigation measures and alternative construction methods are not being identified *now*,

6    especially in light of the overwhelming risks to the San Pedro River and watershed.  An

7    agency's failure to gather additional data, or to explain why it cannot do so, provides additional

8    grounds for finding its NEPA analysis unlawful.  *Blue Mountains Biodiversity Project v.*

9    *Blackwood*, 161 F.3d 1208, 1213 (9th Cir. 1999) (remanding EA where agency failed to

10   provide "justification regarding why more definitive information could not be provided.").  In

11   circumstances such as these, the BLM's "lack of knowledge does not excuse the preparation of

12   an EIS; rather it requires [the BLM] to do the necessary work to obtain it."  *Nat'l Parks &*

13   *Conservation Ass'n*, 241 F.3d at 733.

14       c.    The Proposed Border Fence, In Conjunction With Other Actions,
                Will Have a Significant Cumulative Impact on the San Pedro River and
15              National Conservation Area

16       Not only would the construction of a border fence affect an ecologically critical area and

17   pose enormous risks to the hydrology of the San Pedro River, but the impacts of the

18   construction in conjunction with the current degradation of the river from other actions would

19   cause cumulatively significant impacts, another factor to consider when determining significance.

20   *See* 40 C.F.R. § 1508.27(b)(7).  The CEQ regulations define "cumulative effect" as:

21       the impact on the environment which results from the incremental impact
         of the action when added to other past, present, and reasonably foreseeable
22       future actions regardless of which agency (Federal or non-Federal) or
         person undertakes such other actions.  Cumulative impacts can result from
23       individually minor but collectively significant actions taking place over a
         period of time.

24   40 C.F.R. § 1508.7.  In light of all the other actions already degrading and severely threatening

25   the San Pedro River currently—most notably its dewatering from surrounding groundwater

26   development and potential effects of global warming—*any* additive adverse impact to the River

27   is arguably "significant."  Such a conclusion is inescapable in this case given the potentially

28   devastating risks to the River from the proposed pedestrian fencing described above.

Appeal and Petition for Stay Before the IBLA
Border Fence Right-of-Way: San Pedro Riparian NCA          Page 35

1   For example, according to the FWS's recent June 17, 2007 Biological Opinion

2   addressing the operations of Fort Huachuca, the San Pedro River has suffered a long-term

3   decline in peak and overall water flows. As a result, the River is already experiencing an

4   increasing number of no-flow days, and any additional decline in the flows of the San Pedro will

5   threaten various endangered and threatened plant species, including the Huachuca water umbel.

6    Biological Opinion at p. 81-86.

7   Given the extreme stress already affecting the San Pedro River from dewatering, the

8   potential effects of global warming, and other activities degrading the River and its watershed, it

9   is clear that the construction of pedestrian fencing and roads will only exacerbate the already

10  precarious ecological situation of the river.  As described in detail above, the list of

11  environmental impacts resulting from border fence construction on the San Pedro River is long

12  and extensive, and the cumulative effects of these impacts in conjunction with dewatering and

13  other activities that are already literally threatening the survival of the San Pedro River make it

14  clear that an EIS must be prepared.

15          3.      **The BLM's Failure to Provide Opportunity for Public Participation
16                  on the Environmental Assessment Violates NEPA**

17  One of NEPA's primary purposes is to provide the public with information and an

18  opportunity to participate in gathering information.  40 C.F.R. § 1500.1(b); *Baltimore Gas &*

19  *Elec. Co. v. Nat'l. Res. Defense Council*, 462 U.S. 87, 97-100 (1978).  To this end, NEPA and

20  its implementing regulations provide for significant public involvement in the drafting of both

21  Environmental Assessments and Environmental Impact Statements.  The CEQ regulations, for

22  example, state that "[f]ederal agencies shall to the fullest extent possible  . . . implement

23  procedures to . . . encourage and facilitate public involvement in decisions which affect the

24  quality of the human environment."  40 C.F.R. § 1500.2; *see also* 40 C.F.R. § 1500.1(b)

25  ("NEPA procedures must insure that environmental information is available to public officials

26  and citizens before decisions are made and before actions are taken.").  With regard to the

27  preparation of Environmental Assessments, the CEQ regulations direct federal agencies to

28  "involve environmental agencies, applicants, and the public, to the extent practicable."  *Id*. §

1  1501.4(b).  Finally, 40 C.F.R. § 1506.6(b) requires that federal agencies "provide public notice

2  of . . . the availability of environmental documents so as to inform those persons and agencies

3  who may be interested or affected."   Despite the central importance of public participation

4  under NEPA, and the myriad ways that the CEQ regulations emphasize that importance, the

5  BLM has simply provided *no* notice of its proposed action to the public before approving the

6  right-of-way on the San Pedro Riparian National Conservation Area, and no opportunity for

7  public comment.

8          In assessing the legality of public involvement under Environmental Assessments, the

9  IBLA and federal courts have generally analyzed challenges of agency procedures on a case-by-

10  case basis.  *See*, *e.g.*, *Lynn Canal Conservation, Inc.*, 169 IBLA 1 (2006).  However, within this

11  context one bright line rule does emerge: a federal agency's patent failure to involve the public

12  violates NEPA.  *Lynn Canal Conservation, Inc.*, 167 IBLA 136, 139 (2005); *c.f. Klamath-*

13  *Siskiyou Wildlands Center*, 153 IBLA 110, 122 (2000) (finding that BLM had fulfilled its duty

14  under NEPA to involve the public by soliciting comments during the scoping period).  For

15  example, in *Citizens for Better Forestry v. U.S. Dep't of Agric.*, 341 F.3d 961, 970 (9th Cir.

16  2003), the Ninth Circuit considered a complete lack of opportunity for public participation in the

17  context of standing.  In doing so, the Court shied from precisely defining the agency's duties

18  while strongly affirming that *some* level of participation must be provided for:

19 |      Although we have not established a minimum level of public comment and
       participation required by the regulations governing the EA and FONSI
20       process, we clearly have held that these regulations must mean *something*.

21  *Id.; see also Sierra Nevada Forest Prot. Campaign v. U.S. Forest Serv.*, 376 F. Supp. 2d 984

22  (E.D. Cal. 2005) (holding that agency must involve public *prior* to final decision in some

23  fashion).  In this case, BLM has simply failed to provide for *any* public participation or notice

24  under NEPA, and thus has violated both the letter and spirit of the law.  Accordingly, its

25  approval of the right-of-way should be set aside and remanded to the agency to conduct a lawful

26  NEPA process with ample opportunity for public notification, involvement, and comment.

27          B.    BLM'S DECISION VIOLATES THE ARIZONA-IDAHO CONSERVATION
                 ACT OF 1988
28

The San Pedro Riparian National Riparian Conservation Area was created pursuant to the Arizona-Idaho Conservation Act of 1988.  100 P.L. 696, 102 Stat. 4571.  Under this designation, the BLM is charged with managing the area "in a manner that conserves, protects, and enhances the riparian area and the aquatic, wildlife, archeological, paleontological, scientific, cultural, educational, and recreational resources of the conservation area."  16 U.S.C. § 460xx-1(a).  The BLM is specifically directed to "only allow such uses of the conservation area as [it] finds will further [these] primary purposes."  *Id.*  § 460xx-1(b).

As detailed in this appeal, the proposed border fence and road construction permitted under the BLM's August 31 decision will have pronounced negative impacts on the area's wildlife, the San Pedro River's riparian area, and the River itself.  Indeed, the agency's analysis suggests that fence and road construction will cause significant erosion and sedimentation, as well as the risk that these effects will be so pronounced that the entire river area will suffer a lateral shift.  Despite these risks, there is no evidence in the EA and associated decision documents that BLM has addressed its duties to  "conserve, protect, and enhance" the natural and cultural resources of the San Pedro Riparian National Conservation Area.  As this mandatory duty has not been addressed or met, BLM's decision should be set aside and remanded.

## IV.    THE RISK OF IRREPARABLE HARM IF THE STAY IS DENIED OUTWEIGHS ANY HARM THAT MIGHT RESULT IF THE STAY IS GRANTED

The risk of harm to the BLM if the Board were to grant a stay in this case is not identifiable.  BLM has no protectable interest in its discretionary grant of a right-of-way to Army Corps of Engineers and DHS for construction of a border fence and roads within the San Pedro Riparian National Conservation Area.  Indeed, as detailed at length in this appeal, this decision has been made without lawful environmental analysis and in violation of its duty to protect the natural resources of this protected area.

## V.    A STAY OF THE BLM DECISION WOULD SERVE THE PUBLIC INTEREST

Preserving the San Pedro River and San Pedro Riparian National Conservation Area, one of the last free-flowing rivers in the Southwest and an area of incredible beauty, ecological

1    importance, and biological diversity, is absolutely in the public interest.  Possible

2    "[e]nvironmental injury, by its nature, can seldom be adequately remedied by money damages

3    and is often permanent or at least of long duration, i.e., irreparable."  *Amoco Prod. Co.*, 480

4    U.S. at 545.  When the "proposed project may significantly degrade some human environmental

5    factor," injunctive relief is appropriate.  *Nat'l Parks & Conservation Ass'n.*, 241 F.3d at 735;

6    *Save the Yaak v. Block*, 840 F.2d 714, 722 (9th Cir. 1988).

7    　　　　Moreover, the Ninth Circuit and other courts have repeatedly recognized that injunctive

8    relief is usually appropriate for noncompliance with environmental laws.  *See Thomas v.*

9    *Peterson*, 753 F.2d 754, 764 (9th Cir. 1985) ("absent unusual circumstances, an injunction is the

10   appropriate remedy for a violation of NEPA's procedural requirements.").  And in this case,

11   Congress itself has articulated the strong public interest in protecting the San Pedro River and its

12   rich natural heritage, by creating the San Pedro Riparian National Conservation Area and

13   directing the BLM to protect its irreplaceable natural resources.  A stay of the BLM decision in

14   this matter would strongly serve the public interest by protecting this unparalleled area.

15   　　　　　　　　　　　　　　　**<u>REQUESTED RELIEF</u>**

16   　　　　In order to remedy the violations outlined in this appeal and accompanying Petition for

17   Stay, appellants respectfully request that the BLM undertake the following actions before the

18   construction of pedestrian fencing and an all-weather road commences within the San Pedro

19   Riparian National Conservation Area: (1) in conjunction with other federal land management

20   agencies, the Army Corps of Engineers, Environmental Protection Agency, and the Department

21   of Homeland Security, prepare a regional, comprehensive Environmental Impact Statement

22   (EIS) on the Arizona border fence program; (2) prepare an EIS on the environmental effects of

23   the individual proposal to build pedestrian fencing and an all-weather road within the San Pedro

24   Riparian National Conservation Area; and (3) make the requisite finding that the chosen action

25   will further the purposes for which the San Pedro Riparian National  Conservation Area was

26   established.  *Finally, appellants respectfully request that the BLM exercise its discretion to stay*

27   *implementation of this project during the 45-day period under which the IBLA is obligated to*

28   *respond to appellants' Petition for Stay.*

Respectfully Submitted this 28th day of September, 2007

_____

Brian Segee, Staff Attorney (D.C. Bar. 492098)
Defenders of Wildlife
1130 Seventeenth Street, N.W.
Washington, D.C. 20036
(202) 682-9400

Attorney for Appellants Defenders of Wildlife and Sierra Club

**APPELLANTS' LIST OF EXHIBITS TO PETITION FOR STAY**

Maps

Exhibit 1a    Map of proposed border fencing pursuant to *Secure Fence Act*, approximate jaguar movement corridors, and ranges of bighorn sheep, black bear, jaguarundi, ocelot, cactus ferruginous pygmy-owl, and antelope jack rabbit (prepared by Defenders of Wildlife)

Exhibit 1b    Map of proposed border fencing pursuant to *Secure Fence Act* within California, Arizona, and New Mexico, and approximate jaguar movement corridors (prepared by Defenders of Wildlife)

Exhibit 1c    Map of five proposed fence segments in relation to existing fence segments in south-central and southeastern Arizona (prepared by Gulf South Research Corporation)

Exhibit 1d    Map of proposed border fencing and vehicle barrier construction within the San Pedro Riparian National Conservation Area (prepared by BLM)

Government Publications

Exhibit 2a    General Accountability Office. *Border Security: Agencies Need to Better Coordinate Their Strategies and Operations on Federal Lands*. GAO Report 04-590 (June 2004).

Exhibit 2b    General Accountability Office. *INS' Southwest Border Strategy: Resource and Impact Issues Remain After Seven Years*. GAO Report 01-842 (August 2001).

Exhibit 2c    General Accountability Office. *Illegal Immigration: Status of Southwest Border Strategy Implementation*. GAO Report 99-44 (May 1999)

Non-Governmental Organization Publications

Exhibit 3a    Pew Hispanic Center. *Unauthorized Migrants: Numbers and Characteristics*. (June 14, 2005).

Exhibit 3b    Defenders of Wildlife. *On the Line: The Impacts of Immigration Policy on Wildlife and Habitat in the Arizona Borderlands*. (2006).

Exhibit 3c    Defenders of Wildlife. *Addressing the Impacts of Border Security Activities on Wildlife and Habitat in Southern Arizona: Stakeholder Recommendations* (2007).

Agency Documents

Exhibit 4a    Memorandum of Understanding Between U.S. Department of Homeland Security and U.S. Department of the Interior and U.S. Department of Agriculture Regarding Cooperative National Security and Counterterrorism Efforts on Federal Lands Along the United States' Borders.

Exhibit 4b    U.S. Fish and Wildlife Service. Biological and Conference Opinion for U.S. Border Patrol Activities in the Yuma Sector. September 5, 2000

Exhibit 4c    U.S. Fish and Wildlife Service.  Biological Opinion on Three Border Fence Segments.  August 29, 2007

Scientific Publications

Exhibit 5a    E. Emma Marris. *Wildlife caught in crossfire of US immigration battle*.  Nature, Vol. 442, at 338-39 (July 2006)

Exhibit 5b    Christine C. Hass.  *Landscape fragmentation and connectivity for carnivores in the Upper San Pedro Basin*.  Fort Huachuca Wildlife Office, Fort Huachuca, AZ.

Media Stories

Exhibit 6a    Guillot. *U.S.-Mexico barrier spurring more foot traffic, enviro damage*. National Geographic News, June 22, 2007.

Exhibit 6b    Clarke. *The battered border: Immigration policy sacrifices Arizona's wilderness*.  Earth Island Journal, Jan. 1, 2007.

Exhibit 6c    LoManaco. *Dazzling border lights worrying astronomers: Needs for darkness, security clash at Yuma*. Tucson Citizen, July 2, 2007.

Exhibit 6d    Reese.  *Land managers push for critter-friendly border fence*.  Land Letter, Nov. 2, 2006.

Exhibit 6e    Blakeslee. *Gone for decades, jaguars steal back to the Southwest*.  New York Times, Oct. 10, 2006

Declarations

Exhibit 7a    Declaration of Christine C. Haas, PhD

Exhibit 7b    Declaration of Craig Miller

Exhibit 7c    Declaration of Jenny Neeley

Exhibit 7d    Declaration of Sergio Avila

Exhibit 7e    Declaration of Aaron Flesch

Exhibit 7f    Declaration of Thomas G. Carlson and 7 accompanying pictures

Exhibit 7g    Declaration of John L. Leonard, PhD

Exhibit 7h    Declaration of Sandra Bahr

Miscellaneous

Exhibit 8a    Defenders of Wildlife comments on Draft Supplemental Environmental Assessment for Infrastructure within the USBP Naco-Douglas Corridor, Cochise County, Arizona

Exhibit 8b    Notice of Intent to Prepare an Environmental Impact Statement and Request for Public Comments Concerning Proposed Construction and Operation and Construction of Tactical Infrastructure for the U.S. Customs and Border Protection, Office of Border Patrol Rio Grande (Texas) Sector.  72 Fed. Reg. 54,276 (Sept. 24, 2007).

# CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing Notice of Appeal and Petition for Stay Pending Appeal have been served by Federal Express, Overnight Mail, on the following:

Field Solicitor, U.S. Department of the Interior
One Renaissance Square, Two North Central, Suite 1130
Phoenix, AZ 85004-2383

Board of Land Appeals
Office of Hearings and Appeals
801 North Quincy Street
Arlington, VA 22203

Mr. Patrick Madigan
Field Manager, Tucson Field Office
Bureau of Land Management
12661 E. Broadway
Tucson, AZ 85748

Dated: September 28, 2007

_____
Brian Segee
Staff Attorney
DEFENDERS OF WILDLIFE
1130 Seventeenth Street, N.W.
Washington, D.C. 20036
(202) 682-9400

EXHIBIT 3



# Landscape fragmentation and connectivity for carnivores in the Upper San Pedro Basin



*Looking across the San Pedro River to the Huachuca Mountains*     *Photo courtesy of Fort Huachuca Wildlife Office*

Christine C. Hass, Ph.D.
3330 W. Hopi Place
Benson, AZ 85602

Funded by The Nature Conservancy and
The Fort Huachuca Wildlife Office

March 5, 2001

*Suggested citation:* Hass, C.C. 2000. Landscape fragmentation and connectivity for carnivores in the Upper San Pedro Basin. Fort Huachuca Wildlife Office, Fort Huachuca, AZ.

Chapter 1: Introduction.................................................................................................................3

    Landscape fragmentation and the importance of corridors.................................................3

    Effects of roads.................................................................................................................4

    The Upper San Pedro River Basin.....................................................................................5

    Objectives.........................................................................................................................7

Chapter 2: The tracking study.......................................................................................................8

    Methods...........................................................................................................................8

        Tracking Routes.............................................................................................................8

        Sign Identification and habitat variables........................................................................9

        Data Analysis................................................................................................................9

    Results............................................................................................................................10

        Species Detection.........................................................................................................10

        Use of Habitats............................................................................................................11

        Carnivore Diversity......................................................................................................16

        Species Summaries.......................................................................................................16

    Discussion......................................................................................................................29

Chapter 3: Wildlife movement potential between the Huachuca Mountains and San Pedro River ...............31

    Methods.........................................................................................................................31

        Identifying suitable washes...........................................................................................31

        GIS layers used for analysis.........................................................................................31

    Results...........................................................................................................................32

    Discussion......................................................................................................................34

        Proposed Ecological Linkages......................................................................................36

    Acknowledgments..........................................................................................................37

    Literature Cited..............................................................................................................39

    Appendix: Common and scientific names of species presented in the text.........................43

# Chapter 1:  Introduction

## Landscape fragmentation and the importance of corridors

Landscape fragmentation, the reduction of native habitats into smaller and more isolated parcels, is one of the leading causes of wildlife endangerment today (Soulé, 1991; Noss, 1990).  Agriculture, urbanization, mining, and desertification all cause significant losses in the habitat necessary to sustain long-term viable populations of organisms.  Early habitat preservation efforts focused on preserving biologically rich or unique tracts of land ("hot spots").  More currently, an emphasis is placed on preserving and restoring the functionality of ecosystems by identifying, preserving and restoring important community components and processes necessary to maintain ecosystems (Harris and Atkins, 1991; Noss, 1990; Poiani et al., 2000).

Key to the latter strategy is defining the scale of concern, determining the functionality of the system, and identifying key components and processes.  One key component of many ecosystems that has received considerable attention lately is connectivity (Harris and Atkins, 1991; Hoctor et al., 2000).  Isolated populations, of all taxa, are vulnerable to stochastic events and the deleterious effects of inbreeding (Frankham, 1996; Soulé, 1991).  In addition, some animals need huge tracts of land to fulfill forage and shelter needs, find mates, and participate in social interactions (Bennett, 1991; Rosenberg et al., 1997).  Recognizing the hazards that accompany population isolation, numerous government agencies and private conservation groups have sought to reduce population isolation through the identification, preservation, and restoration of wildlife movement corridors and landscape linkages.  Although sometimes used interchangeably, here I follow Csuti (1991) and Soulé (1991) in differentiating the terms:

> "A **conservation corridor** is a linear landscape feature that facilitates the biologically effective transport of animals between larger patches of habitat dedicated to conservation functions…A corridor is a *transitional* habitat; it need only provide those ecological services and resources required when individuals are moving between patches."  (Soulé, 1991: 91-92).

> "A **landscape linkage** differs from a movement corridor in that the complex range of community and ecosystem processes continues to operate within it through time, thus enabling plants and smaller animals to move between larger landscapes over a period of generations."  (Csuti, 1991: 83-84).

Obviously, the difference between a landscape linkage and movement corridor is one of scale.  A highway underpass, complete with fencing to funnel animals through it, may function as a corridor for Florida panther, bobcat, and white-tailed deer (Foster and Humphrey, 1995), but may act as a landscape linkage for plants, small mammals and reptiles.

The idea of movement corridors has its detractors, with concern that such corridors may foster the spread of pathogens and exotic species, and that resources devoted to identification and preservation (or restoration) of corridors may be better used for other conservation efforts (Hobbs, 1992; Mann and Plummer, 1995; Simberloff et al., 1992).  Two major problems with movement corridors are defining what constitutes a corridor, and determining if what appears to be a corridor actually functions as one (Harris and Atkins, 1991; Hobbs, 1992; Rosenberg et al., 1997).

Serious detractors aside, there is a general agreement that corridors can theoretically reduce landscape fragmentation by allowing movement (at some ecological scale) between fragments (Beier and Noss, 1998; Csuti, 1991; Harris and Atkins, 1991; Merriam and Catterall, 1991). However, what constitutes a corridor, in terms of width, length, and structure, remains unresolved (Beier and Noss, 1998; Friend, 1991; Rosenberg et al., 1997; Saunders and Hobbs, 1991). Numerous attempts have been made recently to identify potential corridors or landscape linkages using Geographic Information Systems (GIS), habitat models, and, in some cases, detailed knowledge of species life history (Brooker et al, 1999; Norton and Nix, 1991; Pace, 1991; Sorrell, 1999; The Conservation Fund, 1998; Walker and Craighead, 1997).

Previous studies have documented the presence of animals in corridors, which has been taken as an indication of their efficacy for animal movement (Bennett, 1990; Downes et al., 1997; Shkedy and Saltz, 2000). However, presence of an animal within a suspected corridor does not necessarily indicate that the corridor is being used for movement, or that the movement is successful (Rosenberg et al., 1997). Actually testing the efficacy of corridors is a formidable task, due to the necessity for large landscape areas and suitable experimental designs to reduce the problems of lack of independence, confounding variables, and the need for replicates (Inglis and Underwood; 1992; Nicholls and Margules, 1991). It is one thing to test the effectiveness of corridors of various widths and lengths for small mammals (Andreassen et al, 1996), for which corridors will seldom be designed (Soulé, 1991); but to design similar experiments for a puma or even a bobcat is beyond practical limits. Beier and Noss (1998) suggest using demographic parameters to compare untreated and treated (potential corridor removed) areas, before and after the corridor is removed. They, and Saunders and Hobbs (1991), suggest that more studies of actual dispersal of individuals will provide much needed information on actual corridor use and the types of animals dispersing. Only a few such studies have been published to date (e.g., Beier, 1993; Brooker et al., 1999).

As previously mentioned, what constitutes a movement corridor for one species may constitute a year-round habitat within a landscape linkage for another. The design and preservation of movement corridors needs to take into account the dispersal capabilities of the species of interest (Beier and Noss, 1998; Harrison, 1992; Rosenberg et al., 1997; Soulé, 1991; Van Vuren, 1998). This includes both the speed at which it can move through the corridor (which is influenced by corridor length) and the animals' sensitivity to habitat type (which may be influenced by corridor width). Width is an important factor due to the recognized effects of edges (Andren and Anglestrom, 1988; Friend, 1991; Oehler and Litvaitis, 1996; Yahner, 1988). Edge effects may permeate far into a corridor; indeed the entire corridor may be composed of edge habitat (Bueno et al., 1995). Rosenberg et al. (1997) point out that "…many edge species have high birth and survival rates in disturbed areas, and providing habitat for these species will not maintain regional biodiversity" (p. 684). Less attention has been paid to corridor length, but it is generally recognized that the shorter the better (Lindenmayer and Nix, 1993; Newmark, 1993; Soulé, 1991).

For birds, Merriam and Caterall (1991) suggested corridors may need to be > 500 m wide, to minimize edge effects. Harrison (1992) proposed that corridor width should be based on average home range size (in effect, a landscape linkage); circa 2.5 km wide for bobcats, up to 5 km wide for pumas. In linking wilderness areas in Oregon, Pace (1991) suggested corridors up to 400 m wide along streams, and up to 6 km wide along ridges. Closer to home, Harris Environmental Group (1997) suggested a 100 m corridor with an additional 100 m buffer to accommodate mule deer movements between the Tucson Mountains and Desert Biological Laboratory.

## Effects of roads

Roads have major impacts on wildlife demographics and movements (Bennett, 1991; Forman, 2000; Noss, 1995; Trombulak and Frissell, 2000). Direct effects include road kill (estimates of up to 1 million animals killed each day – Noss (1995)), mortality from road construction, changes in animal behavior, loss of habitat, air, soil, and water pollution, spread of exotic and native species, and changes in aquatic regimes (Bennett, 1991; Brody and Pelton, 1989; Forman, 2000; Noss, 1995; Trombulak and Frissell, 2000). Indirect effects include increased human access into areas, which further exacerbates the effects of the roads

themselves (Noss, 1995). In some habitats, roadside vegetation may act as landscape linkages for small mammals and birds (Bennett, 1991), but, in general, roads have detrimental effects on large mammals, through road kill and avoidance behavior that effectively fragments populations (Brody and Pelton, 1989; Noss, 1995; Trombulak and Frissell, 2000). Underpasses and overpasses facilitate movement through this barrier, but their efficacy depends on structure, landscape features, and human activity, with different species responding to these variables differently (Clevenger and Waltho, 2000; Foster and Humphrey, 1995). Roads, therefore, need to be considered as a factor when examining landscape fragmentation and corridor design.

## The Upper San Pedro River Basin

The San Pedro River represents one of the last free-flowing rivers in the southwest, as it makes its way from its headwaters near Cananea, Sonora, 240 km (145 miles) north to its junction with the Gila River near Winkleman, Arizona. It flows through an area called the Madrean archipelago, with forested mountains ("sky islands") surrounded by grasslands. The Upper San Pedro River basin extends from its headwaters 37 km south of the Mexican boundary to the narrows, 19 km north of Benson, Arizona (Bureau of Land Management, 1998). The upper basin is bounded by Sierras San José, Los Ajos, and La Mariquita in Mexico, and in Arizona, by the Mule and Dragoon Mountains to the east and the Huachuca, Mustang, and Whetstone Mountains to the west.

The San Pedro River Valley has felt the impact of humans for > 10,000 years. Prehistoric Clovis points associated with remains of mammoths have been found not far from the River's banks (MacGregor, 1974). Hohokam, Sobaipuri, and Apache occupied the area at various times (Hastings and Turner, 1980). The Sobaipuri (Piman) cultivated maize in the valley > 4,000 years ago (Altschul, 1997; Vanderpot, 1997). During 1540, Francisco Vasquez de Coronado led an expedition north along the San Pedro searching for the seven cities of gold. They encountered the agricultural fields of the Sobaipuri, irrigated by an extensive network of canals from the San Pedro (Dobyns, 1994). During the 1820s, large-scale Mexican cattle ranching began in the area. By the mid-1800s, the character of the San Pedro River began to change, with mesquite bosques, cienegas, and lush grassland replaced by steep arroyos, narrow cottonwood-willow forests, and replacement of native grasses with non-natives (Hastings and Turner, 1980). The United States acquired the territory from Mexico during 1854; shortly thereafter, the U.S. Army established installations in the area to protect settlers from raids by Apaches (Hastings and Turner, 1980; Wilson, 1995). Removal of Apaches from the area by 1886 opened it up for large-scale settlement including extensive cattle ranching, farming, logging, and mining (Hastings and Turner, 1980; Dobyns, 1994; Wilson, 1995). Changes also occurred in the surrounding mountains. Grazing, mining, timber cutting, fire suppression, market hunting, and overzealous predator control have changed the composition of the forests and wildlife within (Wilson, 1995).

Rapid urbanization is presently occurring between the foot of the Huachuca Mountains and the lush riparian corridor associated with the San Pedro River. Sierra Vista, the largest municipality in the area, has experienced a considerable growth rate in recent years. The amount of urban area increased by > 400% between 1973 and 1997, at the expense of grassland and desert scrub (Kepner et al., 1999). For the period 2000-2040, the overall expected growth for the region is ≥ 15% (Southeastern Arizona Government Organizations, 1995). The Sierra Vista-Huachuca City area is expected to see most of the growth. The rapid subdivision of former cattle ranches now threatens to sever potential wildlife corridors between the San Pedro River and the Huachuca Mountains (Fig. 1.1).

Currently, management of the Upper San Pedro River basin in the United States is the responsibility of the Bureau of Land Management, private landholders, and Arizona Department of Lands (state trust lands). During 1988, the San Pedro Riparian National Conservation Area (Bureau of Land Management) was established to protect the natural and cultural resources along a 50-km stretch near the Mexican border. The Arizona Chapter of The Nature Conservancy established the Upper San Pedro Ecosystem Program in 1996 to broaden the scope of conservation efforts in the area, and to address landscape-scale conservation issues in the larger Huachuca Mountain ecosystem, and the nearby San Pedro River.



• Figure 1.1. Location of study area.  Inset shows location of the upper San Pedro River basin.

The Huachuca Mountains flank the western side of the Upper San Pedro basin just north of the Mexican border.  Rising to 9,445 feet at Miller Peak, and encompassing approximately 100 mi$^2$, the northward and eastward drainages are within the San Pedro River basin.  Vegetation types in the mountains include Madrean evergreen forest and woodland, montane conifer forest, with riparian deciduous forest lining wetter stream courses, and plains and desert grasslands at lower elevations (Shaw, 1999).  Management of lands within the Huachuca Mountains is primarily by the U.S. Forest Service (Coronado National Forest), the Department of Defense (Fort Huachuca), and the National Park Service (Coronado National Memorial).  Additional landowners include The Nature Conservancy, Bureau of Land Management, Arizona State Lands Department, and private landowners.  Some of the development of Sierra Vista and surrounding communities has been within the foothills of the Huachuca Mountains.

Despite all of the changes along the San Pedro River and surrounding mountains, it remains one of the most biologically diverse areas of the United States (Simpson, 1964).  The San Pedro River acts as a biological link among the Sierra Madre, Rocky Mountains, and Sonoran and Chihuahuan deserts.  It contains floristic and faunal components of all four ecosystems.  The San Pedro River and surrounding mountains were once the home of the Mexican grizzly, Mexican wolf, jaguar, and ocelot.  Carnivores currently found in the area include three species of procyonids (raccoons, coatis, and ringtails), four species of mephitids (hooded skunks, hog-nosed skunks, spotted skunks, and striped skunks), two species of mustelids (badgers, and long-tailed weasels), three species of canids (coyotes, gray foxes, and kit foxes), two cats (bobcat and puma), and one bear (black bear; Hoffmeister and Goodpastor, 1954; Hoffmeister, 1986).

It could be argued that none of the 15 species of carnivores above is a keystone species (Mills et al., 1993; Paine, 1995; Power et al., 1996).  However, the variety of habitats they occupy and range of foods they

consume suggest that their presence is an indication of ecological integrity (Fig. 1.2). Many of these carnivores are near the northern extent of their range (e.g., coatis, hooded skunks, hog-nosed skunks, plus the Mexican grizzly, Mexican wolf, jaguar, and ocelot). The San Pedro River may represent an important conduit for genetic exchange between source populations in Mexico and populations north of the border. The forested expanses of the sky islands may also serve this function. Animals normally found in the forested areas of the sky islands may use the San Pedro River as an oasis while dispersing between isolated forests. For animals whose large home ranges may extend between two or more mountain ranges, this oasis may represent a critical movement corridor between portions of their home ranges, or while looking for mates. Other animals with wider ecological tolerances, such as gray fox and bobcat, may not only use the river as a dispersal corridor, but may be long-term residents of the surrounding riparian forests and grasslands. Retention of linkages between the river and surrounding mountains may be critical for genetic exchange over a long time scale.

• Figure 1.2. Food habits of carnivores possibly present in the Upper San Pedro River basin.



Detailed measurement of animals' use of landscape usually requires radio telemetry, which can be very expensive and time-consuming (White and Garrott, 1990). Viable alternatives are track and sign counts, which can be done at a much lower expenditure of time and money (Kutilek et al., 1983; Linnell et al., 1998; Schaller and Crawshaw, 1980; Stander et al., 1997; Thompson et al., 1989; Van Dyke et al., 1986; Wemmer et al., 1996; Zielinski and Kucera, 1995). This study used track and sign counts to detect use of different landscape features by a diverse group of carnivores inhabiting the Upper San Pedro Ecosystem, including the Huachuca Mountains and the San Pedro Riparian National Conservation Area. Carnivores, as a group, are ideal for this type of study. They occupy a wide range of habitats, consume a variety of foods, and some require huge expanses of territory to survive.

## Objectives

The objectives of this study were twofold. The first objective, documented in Chapter 2, was to use track surveys to inventory the San Pedro Riparian National Conservation Area and Fort Huachuca for carnivore presence and diversity, and identify habitat components that different carnivores appear to use for travel. The second objective, described in Chapter 3, was to take the results of the tracking study, and using the pattern of development in Sierra Vista and surrounding communities, identify what areas may be suitable for wildlife movement corridors or landscape linkages.

# Chapter 2: The tracking study

## Methods

<u>Tracking Routes</u>

Tracking routes were established at two sites: Fort Huachuca Military Reservation and the San Pedro Riparian National Conservation Area. Ten routes were established at each site. Fort Huachuca was chosen because it includes an extensive portion of the Huachuca Mountains and tributaries that drain into the mainstem of the San Pedro River. It also includes a large network of dirt roads, firebreaks, and trails that provide good tracking surfaces that traverse and intersect ridges and washes. Routes on Fort Huachuca were selected to include woodland (5 routes, 16 km) and grassland/scrub (5 routes; 21 km). Routes included ridges, washes, and flats, and ranged from 2.6 to 6.7 km long (Fig. 2.1). Transects were not chosen randomly, but were subjectively located based on trackable surfaces and proximity to certain landscape features.

With the exception of state and county roads that cross the San Pedro River and a couple of dirt roads used for administrative purposes, most of the NCA is closed to motorized vehicles. However, the NCA includes an extensive set of trails and abandoned dirt roads that parallel the riverbed. Ten routes were chosen within the NCA that encompassed most of the river from Willow Wash (north of Fairbank) to the Mexican border (Fig. 2.1). Most routes consisted of loops that included a road or trail in the scrub/grassland next to the river and a return route within the riparian gallery of the riverbed. Routes ranged from 1.9 to 11.8 km long. Each route was surveyed at least three times between October 1998 and January 2000; four routes were surveyed four times. At least 2 months separated surveys on any individual route. Surveys were conducted at least 2 weeks after any precipitation, except for three routes on Fort Huachuca that were conducted after fresh snowfalls.

• Figure 2.1. Locations of tracking routes on Fort Huachuca and the San Pedro Riparian National Conservation Area.



## Sign Identification and habitat variables

Field cards were developed that included details of track structure and measurements from published sources (Aranda, 1981; Halfpenney, 1986; Murie, 1975; Orloff et al., 1993; Rezendes, 1992), and foot measurements from live-trapped and road-killed animals. As routes were surveyed, each time sign was encountered, it was identified to genus (hooded or striped skunks) or species (everything else). The location was determined using a Garmin[®] 45 GPS receiver in conjunction with a USGS 7.5 minute topographic map. During each survey, data were recorded for the sign location only if it was > 1 km from previously recorded sign for that species, or it was in a different habitat type. Topography (ridge, wash, side hill, flat) and vegetation type (grassland, desert scrub, oak-pine woodland, riparian forest)[1] within a 10-m circle were recorded. The distance to the nearest source of water was estimated categorically (< 10 m, 11-20 m, 21-50 m, > 50 m). Whether the animal was following or crossing the path was recorded, if it could be determined. During surveys conducted from October 1998 to March 1999, distance to the nearest wash (< 10 m, 11-20 m, 21-50 m, > 50m) and percent canopy cover > 3 m high within a 10 m circle (< 25%, 26-50%, 51-75%, 76-100%) were estimated ocularly and recorded. These latter two variables were replaced during surveys conducted from May 1999 though January 2000 by variables for path width (1-3m, 4-6 m, 7-9 m, ≥ 10 m) and the location in the path (center or side). These latter variables replaced percent canopy cover because I thought they might better reflect how animals use paths of various widths. The path was the area available for movement, bordered by vegetation or stream banks. A path could be a trail, dirt road, or wash.

Measurements were taken of puma and black bear tracks to differentiate among some individuals. For puma, the width of the rear plantar pad was measured within the track (minimum outline measurement, Fjelline and Mansfield (1989)); for bears the width of the metacarpal pad was measured. Whenever possible, multiple measurements were taken from a track set (continuous line of tracks) and the mode recorded. For pumas, measurements of tracks within a track set usually fell within a 3 mm range. Following Fjelline and Mansfield (1989), rear plantar pad measurements of ≥ 50 mm were considered to be from an adult male; measurement of 39-50 mm were considered from adult females or subadult males.

## Data Analysis

Variation among categories was tested using log-likelihood ratio tests (Sokal and Rohlf, 1981). For topography, vegetation types, and travel surfaces, expected values were calculated using a GIS to determine the km of route within each category. Expected values for other categorical variables were calculated by dividing the number of sign units by the number of categories. Experiment-wise error rate was balanced against statistical power by using an α of 0.05 (Sokal and Rohlf, 1981; Bart et al., 1998), however, exact p-values (to 4 digits) are also reported.

The relationship of urbanization to the track surveys was examined by calculating two indices of urbanization. For urban code, a 1:50,000 topographic map of the area produced by the Defense Mapping Agency in 1994 was used to classify the number of dwellings within a 5 km radius circle to the center of the transect as low (<2 houses/km$^2$), moderate (3-10 houses/km$^2$) or high (>10 houses/km$^2$). Routes were also classified as moderate or high if they were within 5 km of a busy highway or congested area such as an airport. The second index was an estimate of the distance from the center of the transect to the nearest occupied buildings.

Carnivore diversity was calculated for each route as the number of total carnivore species for which sign was detected divided by the total number of kilometers covered for that transect during the study. Analysis of Variance was used to test carnivore diversity by habitat type, urbanization and distance to the Mexican border.

---

[1] Vegetation type was classified according to the predominant type within a 10-m circle surrounding the track. Riparian forest included cottonwood/willow/ash gallery forests > 5 m high. Mesquite bosques were categorized as desert scrub.

Spatial analyses were conducted using Manifold® Geographic Information System (CDA International, 1999), using layers for hydrology and roads from USGS, and vegetation (classification according to Brown, Lowe, and Pase (1974)) and land ownership from Arizona State Lands Department.

# Results

## Species Detection

The 20 routes were surveyed 65 times, totaling 386 km.  Tracks of 13 species were detected (Table 2.1). No sign was detected of long-tailed weasels, jaguar, or ocelot.  It was not possible to distinguish between tracks of hooded and striped skunks, and they are hereafter referred to as *Mephitis* skunks.  A total of 601 sign units was recorded, including tracks, scat, dens, carcasses, scrapes, and diggings.  All but one species, black bears, were recorded at both Fort Huachuca and the NCA.  The maximum number of species detected on any route was 11, with the average of 7.9 species per route.  *Mephitis* skunks were detected on all 20 routes. Bobcats were detected on 19 routes; coyotes, gray fox, and hog-nosed skunks all followed with 18 routes, but they were not all the same routes (Table 2.1).  Maps documenting sign of each species on each route appear later in this chapter.

- Table 2.1.  Species detected on routes surveyed from Oct. 1998-Jan. 2000, all kinds of sign included.  X indicates that sign was recorded for the species at least once.  Habitat type is majority habitat by km of route, from GIS vegetation layer.

| Route | Predominant Habitat | Badger | Bear | Bobcat | Coati | Coyote | Gray fox | Hog-nosed skunk | Kit fox | *Mephitis* skunk | Puma | Raccoon | Ringtail | Spotted skunk | Total species |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Ft. Huachuca:** | | | | | | | | | | | | | | | |
| Antelope Pond | Grassland | | | X | | X | X | X | X | X | X | X | | | 8 |
| Lower Garden | Grassland | X | | X | | X | X | X | X | X | X | X | | | 9 |
| Sewage Ponds | Grassland | | | X | | X | | X | X | X | | X | | | 6 |
| Slaughterhouse | Grassland | | | X | | X | X | X | X | X | X | X | | | 8 |
| E. Boundary | Scrub | | | X | | X | X | X | | X | | | | X | 6 |
| Blacktail | Woodland | | X | X | X | X | X | | | X | | | | X | 8 |
| Bravo Break | Woodland | | X | X | X | X | X | | | X | X | | | | 8 |
| Sawmill Crest | Woodland | | X | X | X | | X | | | X | X | | X | | 8 |
| Split Rock | Woodland | | | X | X | X | X | | | X | X | X | X | | 9 |
| Upper Huachuca | Woodland | | X | X | X | | X | | | X | X | X | | | 8 |
| **San Pedro River:** | | | | | | | | | | | | | | | |
| Hereford S | Grassland | X | | X | | X | | | | X | | X | | | 5 |
| Big Wash | Riparian | X | | X | | X | X | X | X | X | X | X | | | 9 |
| Boquillas | Riparian | | | X | X | X | X | X | X | X | X | X | X | X | 11 |
| Charleston | Riparian | | | | | X | X | X | | X | X | X | | | 6 |
| Palominas | Riparian | X | | X | | X | X | X | | X | | X | | | 7 |
| San Pedro N | Riparian | X | | X | | X | X | | X | X | X | X | | | 8 |
| Fairbank | Scrub | | | X | X | X | X | | | X | X | X | | | 8 |
| Hereford N | Scrub | X | | X | | X | X | X | | X | X | X | | | 8 |
| Murray Springs | Scrub | | | X | | X | X | X | | X | | X | | | 7 |
| San Pedro S | Scrub | X | | X | | X | X | X | X | X | X | X | X | X | 11 |
| **Total Routes** | | 7 | 4 | 19 | 7 | 18 | 18 | 18 | 9 | 20 | 14 | 16 | 4 | 4 | |

The number of species detected increased with total route length (route length x number of surveys; $F_{1,18}$ = 10.38, P = .0047; Fig. 2.2) and number of surveys (Fig. 2.3). The average number of new species added declined after each survey, to almost zero by the fourth survey (Fig. 2.3).

- Figure 2.2. The number of species detected on routes of various lengths. See methods for calculations.



- Figure 2.3. The total number of species, and number of new species detected with each subsequent survey conducted on Fort Huachuca and the San Pedro Riparian NCA, October 1998-January 2000. Symbols represent means of all routes, and vertical bars represent standard deviations.



Use of Habitats

Of 10 species with large enough sample sizes to test, the sign of four species was distributed among vegetation types in proportion to availability, the remaining six differed among vegetation types (Table 2.2). In general, sign of badgers was detected more in grassland; coyotes in grassland and scrub; gray fox and hog-nosed skunks in scrub and woodland; coatis in woodland and raccoons in riparian more than expected based on availability of these habitat types. Sign of bobcat, kit fox, puma, and *Mephitis* skunks was detected in proportion to availability of habitat.

- Table 2.2. Proportional detectability of sign of different species in various vegetation types, October 1998-January 2000. Numbers represent proportion of total sign units; N = the total number of sign units; G = log-likelihood statistic for test of proportions against availability. Shaded cells indicate values greater than expected based on availability. See methods for description of vegetation types and calculations. Too few sign units from black bear, ringtails, and spotted skunks were detected for analysis.

| Vegetation Type | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Species** | **Grass** | **Scrub** | **Woodland** | **Riparian** | **N** | **G** | **P** |
| Badger | .40 | .40 | .13 | .07 | 15 | 12.53 | .0058 |
| Bobcat | .17 | .38 | .14 | .31 | 81 | 0.52 | .9146 |
| Coati | 0 | .11 | .78 | .11 | 18 | 43.25 | .0000 |
| Coyote | .30 | .51 | .11 | .09 | 93 | 33.96 | .0000 |
| Gray fox | .15 | .39 | .32 | .14 | 74 | 29.39 | .0000 |
| Hog-nosed skunk | .19 | .47 | .23 | .12 | 43 | 12.71 | .0053 |
| Kit fox | .21 | .50 | .07 | .21 | 14 | 1.692 | .6386 |
| *Mephitis* skunk | .17 | .39 | .17 | .27 | 109 | 3.60 | .3085 |
| Puma | .16 | .29 | .21 | .34 | 68 | 4.62 | .2015 |
| Raccoon | .20 | .29 | .04 | .47 | 70 | 9.55 | .0228 |
| Average | .19 | .38 | .19 | .24 | | | |
| **Availability** | **.19** | **.36** | **.12** | **.33** | | | |

Of the same 10 species, six used topographic classes in proportion to their availability; the remaining four showed significant differences among categories (Table 2.3). Coati sign was detected more often than expected on ridges and side hills, and less often on flats. Gray fox sign was detected less often in washes and more often on sidehills than expected. Puma and raccoon sign was detected more often in washes and less often on flats than expected.

- Table 2.3. Proportional detectability of sign of different species in various topographic situations, October 1998-January 2000. Numbers represent proportion of total sign units; N = the total number of sign units; G = log-likelihood statistic for test of proportions against availability. Shaded cells indicate values greater than expected based on availability. Too few sign units from black bear, ringtails, and spotted skunks were detected for analysis.

| Topography | | | | | | |
|---|---|---|---|---|---|---|
| **Species** | **Ridge** | **Wash** | **Sidehill** | **Flat** | **N** | **G** | **P** |
| Badger | .07 | .13 | .13 | .67 | 15 | 7.12 | .0682 |
| Bobcat | .05 | .48 | .06 | .41 | 81 | 1.79 | .6180 |
| Coati | .22 | .50 | .22 | .06 | 18 | 14.70 | .0021 |
| Coyote | .06 | .31 | .11 | .50 | 93 | 5.65 | .1297 |
| Gray fox | .15 | .34 | .16 | .32 | 74 | 10.41 | .0154 |
| Hog-nosed skunk | .04 | .40 | .12 | .42 | 43 | 1.41 | .7026 |
| Kit fox | .07 | .50 | .14 | .29 | 14 | 1.19 | .7553 |
| *Mephitis* skunk | .05 | .50 | .07 | .38 | 109 | 3.08 | .3789 |
| Puma | .09 | .59 | .07 | .24 | 68 | 9.19 | .0269 |
| Raccoon | .03 | .57 | .06 | .31 | 70 | 8.63 | .0346 |
| Average | .08 | .45 | .10 | .37 | | | |
| **Availability** | **.08** | **.44** | **.08** | **.40** | | | |

Of seven species with large enough sample sizes, most sign was detected < 50 m from washes (Table 2.4). Approximately half of the sign of each species was detected within 10 m of washes, and about a quarter > 50 m away from washes.

• Table 2.4. Proportional detectability of sign of different species at various distances from washes October 1998-March 1999. Numbers represent proportion of total sign units; N = the total number of sign units; G = log-likelihood statistic for test of equal proportions among classes. Shaded cells indicate values greater than expected based on availability. Too few sign units from badger, black bear, coati, kit fox, ringtails, and spotted skunks were detected for analysis.

| Distance to wash | | | | | | |
|---|---|---|---|---|---|---|
| **Species** | **< 10 m** | **11-20 m** | **21-50 m** | **> 50 m** | **N** | **G** | **P** |
| Bobcat | .54 | .11 | .03 | .32 | 37 | 25.94 | .0000 |
| Coyote | .45 | .12 | .10 | .35 | 52 | 19.13 | .0001 |
| Gray fox | .43 | .06 | .20 | .31 | 35 | 12.18 | .0068 |
| Hog-nosed skunk | .50 | .18 | .09 | .23 | 22 | 7.70 | .0213 |
| *Mephitis* skunk | .52 | .06 | .19 | .23 | 52 | 23.50 | .0000 |
| Puma | .67 | .06 | .06 | .22 | 36 | 33.16 | .0000 |
| Raccoon | .71 | .03 | .03 | .24 | 38 | 46.43 | .0000 |
| Average | .54 | .08 | .11 | .27 | | | |
| **Expected** | **.25** | **.25** | **.25** | **.25** | | | |

Of seven species with adequate sample sizes, all were located > 50 m from water more often than expected (Table 2.5). Sign was detected > 50 m from water least often in raccoons, and most often for coyotes and hog-nosed skunks.

• Table 2.5. Proportional detectability of sign of different species at various distances from surface water, October 1998-January 2000. Numbers represent proportion of total sign units; N = the total number of sign units; G = log-likelihood statistic for test of equal proportion among classes. Shaded cells indicate values greater than expected based on availability. Too few sign units from badger, black bear, coati, kit fox, ringtails, and spotted skunks were detected for analysis.

| Distance to water | | | | | | |
|---|---|---|---|---|---|---|
| **Species** | **< 10 m** | **11-20 m** | **21-50 m** | **> 50 m** | **N** | **G** | **P** |
| Bobcat | .19 | .07 | .09 | .65 | 81 | 63.52 | .0000 |
| Coyote | .09 | .02 | .03 | .85 | 93 | 154.07 | .0000 |
| Gray fox | .09 | .05 | .09 | .76 | 74 | 84.59 | .0000 |
| Hog-nosed skunk | .07 | .02 | .05 | .86 | 43 | 72.33 | .0000 |
| *Mephitis* skunk | .20 | .08 | .08 | .62 | 109 | 76.68 | .0000 |
| Puma | .24 | .09 | .13 | .54 | 68 | 31.66 | .0000 |
| Raccoon | .36 | .09 | .10 | .46 | 70 | 30.79 | .0000 |
| Average | .17 | .06 | .07 | .69 | | | |
| **Expected** | **.25** | **.25** | **.25** | **.25** | | | |

Of 7 species with enough data to test, all were detected at < 25% canopy cover more than expected (Table 2.6).

• Table 2.6. Proportional detectability of sign of different species at various levels of canopy cover, October 1998-March 1999. Numbers represent proportion of total sign units; N = the total number of sign units; G = log-likelihood statistic for test of equal proportions among classes. Shaded cells indicate values greater than expected based on availability. No sign was detected at canopy cover values >75%. Too few sign units from badger, black bear, coati, kit fox, ringtails, and spotted skunks were detected for analysis.

| Percent Canopy Cover | | | | | | |
|---|---|---|---|---|---|---|
| **Species** | **< 25%** | **26-50%** | **51-75%** | **N** | **G** | **P** |
| Bobcat | .68 | .19 | .14 | 37 | 18.37 | .0001 |
| Coyote | .67 | .25 | .08 | 52 | 29.98 | .0000 |
| Gray fox | .66 | .23 | .11 | 35 | 16.62 | .0002 |
| Hog-nosed skunk | .82 | .14 | .14 | 22 | 22.98 | .0000 |
| *Mephitis* skunk | .73 | .15 | .12 | 52 | 34.56 | .0000 |
| Puma | .57 | .27 | .16 | 37 | 9.52 | .0086 |
| Raccoon | .74 | .18 | .08 | 38 | 27.48 | .0000 |
| Average | .67 | .21 | .12 | | | |
| **Expected** | **.33** | **.33** | **.34** | | | |

Of seven species with enough data to test, all chose paths of narrower width, with almost 50% of sign recorded on paths ≤ 3 m wide (Table 2.7).

• Table 2.7. Proportional detectability of sign of different species on paths of various widths, May 1999-January 2000. Numbers represents proportion of total sign units; N = the total number of sign units; G = log-likelihood statistic for test of equal proportions among classes. Shaded cells indicate values greater than expected based on availability. Too few sign units were detected from badger, black bear, coati, kit fox, ringtails, and spotted skunks for analysis.

| Path Width | | | | | | |
|---|---|---|---|---|---|---|
| **Species** | **1-3 m** | **4-6 m** | **7-9 m** | **> 10 m** | **N** | **G** | **P** |
| Bobcat | .54 | .25 | .05 | .16 | 44 | 24.30 | .0000 |
| Coyote | .54 | .20 | .12 | .15 | 41 | 16.04 | .0003 |
| Gray fox | .42 | .29 | .21 | .08 | 38 | 10.24 | .0059 |
| Hog-nosed skunk | .40 | .35 | .20 | .05 | 20 | 7.23 | .0270 |
| *Mephitis* skunk | .46 | .23 | .16 | .16 | 57 | 12.34 | .0021 |
| Puma | .47 | .23 | .17 | .13 | 30 | 7.43 | .0244 |
| Raccoon | .51 | .26 | 0 | .23 | 31 | 22.28 | .0001 |
| Average | .48 | .26 | .12 | .13 | | | |
| **Expected** | **.25** | **.25** | **.25** | **.25** | | | |

There was a tendency to leave sign on the side, rather than in the center, of wider paths (Fig. 2.4). Tracks detected along wider paths were more likely to be crossing the path than on narrower paths (Fig. 2.5).

• Figure 2.4. The proportion of sign left on the center or side of paths of various widths. All sign types and all species combined. N = 255.



• Figure 2.5. The proportion of tracks crossing or following along paths of various widths. Tracks of all species combined. N = 258.



For most species, sign was not detected on different surfaces in proportion to their availability. Sign of coyotes, coatis, gray fox, and kit fox appeared on surfaces in proportion to their abundance, sign of most other species was detected more on washes and trails than their proportional abundance (Table 2.8).

• Table 2.8. Proportional detectability of sign of different species on different surfaces, October 1998-January 2000. Numbers represents proportion of total sign units; N = the total number of sign units; G = log-likelihood statistic for test of proportions against availability. Shaded cells indicate values greater than expected based on availability. Roads were currently or formerly used by vehicles, and at least 2 m wide. Trails were not used by vehicles, and generally < 2m wide. Too few sign units were detected from black bear, ringtails, and spotted skunks for analysis.

| | Surface | | | | | |
|---|---|---|---|---|---|---|
| **Species** | **Road** | **Wash** | **Trail** | **N** | **G** | **P** |
| Badger | .40 | .13 | .47 | 15 | 17.69 | .0001 |
| Bobcat | .44 | .38 | .17 | 81 | 19.73 | .0000 |
| Coati | .78 | .17 | .06 | 18 | 1.05 | .5927 |
| Coyote | .57 | .27 | .16 | 93 | 4.062 | .1312 |
| Gray fox | .58 | .27 | .15 | 74 | 5.87 | .0531 |
| Hog-nosed skunk | .56 | .26 | .19 | 43 | 6.52 | .0385 |
| Kit fox | .36 | .50 | .14 | 14 | 5.72 | .0574 |
| *Mephitis* skunk | .47 | .36 | .17 | 109 | 22.95 | .0000 |
| Puma | .31 | .50 | .19 | 68 | 38.06 | .0000 |
| Raccoon | .31 | .53 | .16 | 70 | 36.99 | .0000 |
| Average | .47 | .36 | .17 | | | |
| **Availability** | **.67** | **.26** | **.07** | | | |

The overall difference persisted even when roads regularly used by vehicles (Blacktail, Boquillas, Palominas, and Sewage Ponds) were removed from the sample (N = 485, G = 85.34, P = .0000).  On less traveled roads, only sign of hog-nosed skunk changed to being detected on surfaces in proportion to their availability.

<u>Carnivore Diversity</u>

Carnivore diversity was highest on woodland routes (mean=0.88 species/km), lowest on scrub/grassland routes (mean=0.46 species/km), and in between on riparian routes (mean = 0.52 species/km; $F_{2,17}$ = 4.89, P = 0.0210).  Carnivore diversity did not differ with either index of urbanization (urban code: $F_{2,17}$ = 1.51, P = 0.2483; distance to dwellings: $F_{1,18}$ = 0.12, P = 0.7340).  Carnivore diversity also did not differ with distance from the international border ($F_{1,19}$ = 0.07, p = .8023).

<u>Species Summaries</u>

*Badger* – Badger sign was relatively uncommon and included 2 track sets, 11 areas of dens, 1 set of diggings, and 1 carcass.  Sign was detected primarily in grassland/scrub habitats, in areas of low relief.  Sign of badger usually consisted of dens, or setts, often located in cut banks or berms along the former agricultural fields along the San Pedro.

- Figure 2.6.  Locations of badger sign detected from Oct 1998-Jan 2000.



*Black bear* – Sign of black bear was very uncommon, with only 6 track sets and 1 scat recorded. Based on measurements, these track sets were made by at least 4 different bears. All sign was found on Fort Huachuca, in woodland habitat.

- Figure 2.7. Locations of black bear sign detected from Oct 1998-Jan 2000.



*Bobcat* – Sign of bobcat was very common, consisting of 75 track sets and 6 scats. Sign was detected on all but 1 route. Bobcat sign was found in vegetation types and topographic classes in proportion to their availability. Sign appeared more often in washes and on trails than on roads. Overall, bobcats appeared to be common habitat generalists, at least at the scale of this study.

- Figure 2.8. Locations of bobcat sign detected from Oct. 1998-Jan 2000.



*Coati* – Coati sign was relatively rare, with 15 sets of tracks and nose circles, 1 set of diggings, and 2 observations of single animals.  Coatis were primarily detected in woodland in the Huachucas, but 3 track sets and 1 observation came from the NCA.  All sign and observations in the NCA were of solos; as was most of the sign in the Huachucas.  Coati sign was detected most often on ridges and side hills, and most frequently on roads.  During a 4-year study of coatis in the Huachucas, coati groups were seldom seen following roads, and generally crossed them quickly (pers. obs.).  Adult males, on the other hand, often followed roads for ≥ 0.5 km, and thus were more likely to be detected in this type of study.

- Figure 2.9.  Locations of coati sign detected from Oct 1998-Jan 2000.



*Coyote* – Coyote sign was common, with 73 track sets and 20 scats detected during the study. Sign was detected on all routes, except for two routes along the crest of the Huachucas. Coyote sign was most frequently detected in grassland and scrub, with light canopy cover, and they appeared to use topographic classes in proportion to their availability. Sign was found in washes, roads, and trails in proportion to their availability, and sign was frequently detected > 50 m from water.

- Figure 2.10. Locations of coyote sign detected from Oct 1998-Jan 2000.



*Gray fox* – Sign of gray fox was common, with 60 track sets and 14 scats detected.  Sign was found on nearly all routes, in predominantly scrub and woodland habitats.  Gray fox sign was found most often on ridges and side hills, and less often in washes and flats.  Sign was found in washes, roads, and trails in proportion to their availability, and sign was frequently detected > 50 m from water.

• Figure 2.11.  Locations of gray fox sign detected during surveys from Oct 1998-Jan 2000.



*Hog-nosed skunk* – Hog-nosed skunk sign was common, with 43 track sets detected.  Tracks were detected most commonly in scrub and woodland habitats, and were detected among topographic classes in proportion to their availability.  Tracks were most often detected < 10 m from washes, and in areas with sparse canopy cover.  Sign was detected more often on trails than expected when all routes were analyzed, but when roads that receive regular vehicle traffic were removed, sign was detected in proportion to availability.  This may indicate that hog-nosed skunks avoid roads with regular traffic, or that sign is less detectable there.

- Figure 2.12 Locations of hog-nosed skunk sign detected from Oct 1998-Jan 2000.



*Kit fox* – Kit fox sign was rare, with only 14 track sets detected.  Tracks were found on 9 different routes; 4 on Fort Huachuca, and 5 in the NCA.  Based on this small sample size, kit fox sign did not show significant differences among classes of vegetation or topography, but power for these tests was low.

- Figure 2.13. Locations of kit fox sign detected from Oct 1998-Jan 2000.



*Mephitis skunks* – skunks of the genus *Mephitis* were commonly detected, with 107 track sets detected, plus carcasses of 1 striped and 1 hooded skunk.  Both carcasses were found in the NCA; one was a road kill, and the other was too decomposed and scavenged to determine cause of death.  As a collective genus, sign was found among vegetation and topographic classes in proportion to their availability.  Sign was frequently found < 10 m from washes, and in areas of sparse canopy cover.  Sign was detected on paths of all width classes, but overall, sign was found more often in washes and trails than expected based on availability.  Little is known about the resource partitioning between these two species.

- Figure 2.14.  Locations of *Mephitis* skunk sign detected from Oct 1998-Jan 2000.



*Puma* – Puma sign was common, with 62 track sets, 5 scats, and 1 scrape recorded.  Puma sign was detected on 14 routes, and was noticeably scarce on the southernmost routes in the NCA (Table 2.1).  Sign was found in vegetation types in proportion to their availability, and more often < 10 m from washes and < 25% canopy cover.  Sign was detected more frequently on washes and trails than roads.  Based on track measurements, at least 4 different individuals were detected (Table 2.9).  One individual, whose track was only found once, had a deformed toe, and was individually identifiable (Fig. 2.6).

- Figure 2.15.  Locations of puma sign detected from Oct 1998-Jan 2000.



- Figure 2.16.  Photograph of a track from a puma with a deformed toe.  Track is from the left rear foot.



• Table 2.9. Rear foot plantar pad widths (mm) for puma tracks detected on Fort Huachuca and the San Pedro River during October 1998-January 2000.  The first 5 routes are on Fort Huachuca, the remainder on along the San Pedro River.  Measurements ± 1 mm may belong to the same individual, with the exception of *, which had a deformed foot and was thus uniquely identifiable.

| | Survey | | | |
|---|---|---|---|---|
| Route | 1 | 2 | 3 | 4 |
| Antelope Pond | | 52 | 41 | |
| Lower Garden | | | 48 | 48, 52 |
| Sawmill Crest | 38 | 51 | | |
| Split Rock | 50 | | 47 | |
| Upper Huachuca | | 42 | 42 | |
| Big Wash | 41 | 41, 46 | 41, 46 | |
| Boquillas | 43 | 42 | | 41, 52 |
| Charleston | 43 | 42 | 41, 39 | |
| Fairbank | 41 | 41*, 47 | 42 | |
| Hereford N | | | 41, 46 | |
| San Pedro N | | 41, 51 | 42 | 47 |
| San Pedro S | 42, 50 | 41, 42, 52 | 46 | 41 |

Frequency analysis of plantar pad widths revealed four clusters of measurements (Fig. 2.17).  With the exception of the puma with the deformed toe, which was only detected in the NCA, it could not be determined if individuals in the Huachucas were the same as those in the NCA.  Overall, pumas appeared to be common habitat generalists, at least at the scale of this study.

• Figure 2.17.  Frequency analysis of puma plantar pad measurements from Table 2.9.  Measurements ± 1mm may belong to the same individual.



*Raccoon* – Raccoon sign was relatively common, with 69 track sets and 1 carcass detected. Not surprisingly, most raccoon sign was detected in riparian habitat and in washes, with 89% of sign found in the NCA. Almost half of the raccoon sign was > 50 m from water, with 92% of sign detected with < 50% canopy cover. As with many of the other carnivores, sign was detected with higher frequency on washes and trails than roads. Of the species detected in this study, raccoons appear most limited by habitat type.

- Figure 2.18. Locations of raccoon sign detected from Oct 1998-Jan 2000.



*Ringtail* – Ringtail sign was rare, with only 4 track sets and 1 scat found.  Sign was found on both Fort Huachuca and the NCA.  The number of sign units detected was too few to analyze.  Due to their small size and possible desire for more cover or rockier habitats, I believe the lack of sign to be due to low detectability, and not due to rarity of the species.

• Figure 2.18.  Locations of ringtail sign detected from Oct 1998-Jan 2000.



*Spotted skunk* – Sign of spotted skunks was rarest of all, with only 4 track sets discovered. Sign was found on both Fort Huachuca and the San Pedro River. As with ringtails, I believe the lack of sign to be due to poor detectability, rather than rarity of the species.

• Figure 2.19. Locations of spotted skunk sign detected from Oct 1998-Jan 2000.



## Discussion

The track surveys detected all of the carnivore species known to currently inhabit Fort Huachuca and the San Pedro River area. The number of species detected increased with the number of surveys, indicating that >4 surveys may have been necessary to document all of the species using each route. Distribution patterns of sign, relative to vegetation type and topography, mirror patterns from specimen collections and observations presented in Hoffmeister (1986). Three species sought, but not detected, included jaguar, ocelot, and long-tailed weasel. Jaguars have been sighted recently in nearby mountain ranges, but no confirmed sightings have come from the Huachuca Mountains (Rabinowitz, 1999). Few records of ocelot are available; the most recent listing in Hoffmeister (1986) is of an ocelot taken by a hunter near Patagonia in 1960. Although Hoffmeister (1986) and Hoffmeister and Goodpastor (1954) document a few specimens of long-tailed weasels in the area, no sign was detected during this study, nor during 4 years of carnivore studies on Fort Huachuca (pers. obs.). They appear to be very rare in the area, and efforts should be made to learn more about their distribution and abundance in southeastern Arizona.

During 1987, a furbearer study consisting of live-trapping, scent-stations, and foot surveys along the San Pedro River had similar results to those here, relative to abundance of carnivore species. Ringtails, spotted skunks, and coatis were considered rare along the San Pedro River, whereas badgers, coyotes, gray fox, raccoons, striped and hog-nosed skunks and bobcats were quite common (Duncan, 1988; Woolsey, 1987). Woolsey (1987) reported more sign of kit fox and black bear, and less of puma than detected during this study. No sign of long-tailed weasel, jaguar, or ocelot were found (Woolsey, 1987).

No sign of black bear was detected along the San Pedro River during this study, although recent sign has been detected near the Babocomari confluence (H. Shaw, pers. comm.), and near Palominas (unnamed Palominas resident, pers. comm.). Sign of puma was very common in both the Huachucas and along the San Pedro River. It could not be determined if there was movement between the two areas by puma; most puma sign was relatively close to the river, and no sign was found > 1 mile from the river. Based on repeated observations of similar-sized tracks, it appear as if an adult male and an adult female regularly used the San Pedro as part of their home ranges, and at least one subadult moved through the area. Sign of raccoon, javelina and deer were plentiful along the river, in addition to cattle that occasionally wandered through cut fences, indicating that abundant food was available to the pumas. In early April 2000, Border Patrol officers on horseback observed a puma with "brand new" kittens on the San Pedro River near Fairbank (unnamed Border Patrol agent, pers. comm.), possibly indicating active reproduction within the NCA. During a study of three radio-collared pumas in the Huachuca Mountains, none moved from the mountains to the San Pedro River during 2 years of monitoring (Germaine and Bristow, 1997; Germaine, in litt.).

Given the proximity to the mountains and the lack of paved roads, the absence of several species on the Palominas route was surprising. No sign of black bear, coati, or puma were detected; however, biologists observed three young coatis near Palominas during June 2000 (D. Crawford, pers. comm.). Residents of the area report observations of all three species in past years. The influence of large amount of illegal immigrant traffic was noticeable, accompanied by large amounts of trash and human waste. The BLM estimates that as many as 500 immigrants a day are moving north along the San Pedro River (Ibarra, 2000). As much of this traffic occurs at night (pers. obs.), the potential exists for significant impact on nocturnal carnivores. In contrast, the hundreds of people visiting the San Pedro House area during peak birding season apparently had little impact on carnivores – that route had among the highest number of species recorded. This visitation is limited to daytime use only. Other studies have found that amount and timing of human activity influence distribution and behavior of wildlife (Griffiths and van Schaik, 1993; Clevenger and Waltho, 2000).

With a few exceptions, the tracking study appeared to be a very cost effective way to monitor distribution and habitat use of carnivores in this area. Exceptions included ringtails and spotted skunks, and possibly coatis. Although the study was able to determine the presence of these species, no information on distribution or abundance could be obtained. Other methods, such as live-trapping or photographic bait stations may be more useful to monitor these species. If the patterns in sign detection reflect patterns of habitat use, then the study identified species-specific patterns of habitat use. In terms of travel surfaces, all species used roads, trails, and washes, however, trails and washes were preferred to roads.

It was not possible with the tracking study to identify movement corridors between the Huachuca Mountains and the San Pedro River. The carnivore populations in both areas were abundant and diverse. From the data presented here, it appears as if the NCA provides considerable year-round habitat for most of the carnivore species, and may act as a corridor or an oasis for black bears and coatis. As discussed in the next chapter, few access opportunities exist for large carnivores to move between the Huachucas and the San Pedro River. It is possible that carnivores move to the San Pedro River from other areas, or that some may be relict populations.

# Chapter 3: Wildlife movement potential between the Huachuca Mountains and San Pedro River

## Methods

The tracking study revealed that most species use washes for travel, and that some species, such as coatis and black bears, are found predominantly in woodland. Because corridors should be species-specific (Harrison, 1992; Soulé, 1991), I focused on three species: puma because of their large area requirements; black bears because of their large area requirements and their woodland affinities; and coatis because of their woodland affinities and limited dispersal abilities (Gompper et al., 1992; Hass, 1997). I focused on washes as potential travel corridors, and limited my analysis to those washes that originated within woodland habitat in the Huachucas, and terminated at or within 1 km of the San Pedro River.

Identifying suitable washes

A numerical model was developed to rank individual washes for their suitability as potential wildlife corridors. Three assumptions went into the model:

- Linear habitats with cover provide the best movement potential between sites (Soulé, 1991);

- Roads and housing areas pose significant barriers to movement, through avoidance behavior by some species, road-related mortality, and negative interaction with humans (Bennett, 1991; Forman, 2000; Noss, 1995; Trombulak and Frissell, 2000);

- Shorter paths are better, to reduce travel- and dispersal-related mortality (Lindenmayer and Nix, 1993; Newmark, 1993; Soulé, 1991).

GIS layers used for analysis

The primary layers used for analysis included 1:100K DLG data for roads and streams from USGS (1994 or earlier), and vegetation (1980) and land ownership (1997) from Arizona State Lands Department (ALRIS). Derived layers included a road reclassification according to road width and traffic levels, and a layer of 100 m buffers placed along washes that fit the criteria of connectivity between the Huachucas and the San Pedro River. Buffers of 100 m were chosen to include the entire wash with some surrounding cover (Harris Environmental Group, 1997). A 300 m x 300 m grid was created, and cells within the grid were assigned values of housing density based on a map generated by the Defense Mapping Agency in 1994, on digital orthophotos taken in 1995 (from TerraServer®), and by placing a dot at each county 911 address in the non-incorporated area (layer from Scott Bassett of the Harvard Graduate School of Design).

A road score was calculated as the weighted total of the number of roads in each category intersecting the 100 m buffer along each wash. Road classification included: dirt connecting roads; 2-lane paved roads with little nighttime traffic; 4-lane or 2-lane paved roads with high day or nighttime traffic and stream crossings consisting of bridges; and 4-lane or 2-laned paved roads with high traffic and stream crossings consisting of box culverts. Hiking and jeep trails were also classified, but they were believed to have little impact on wildlife movements, and so were excluded from analysis. Weights appear in Table 3.1.

An urban score was calculated as the weighted total of the number of cells in each category within the buffer zone. Categories included:

Low: 1 house/4+ acres
Moderate: 1 house/2-4 acres
High: 1-4 houses/acre
Very high: > 5 houses/acre.

Weights appear in Table 3.1. An impedance score was calculated for each wash as follows:

$$I_k = \sum r_i w_i + \sum u_j w_j + d_k$$

Where $I_k$ is the impedance score for the $k^{th}$ wash; $r_i$ is the count of cells in each roads category $i$; $w_i$ is the category-specific weight; $u_j$ is the count of cells in each urban category $j$; and $d_k$ is the distance in km from 1 km inside the woodland interface to the San Pedro River along the midline of the wash. Although road scores and urban scores were not completely independent (urban areas tended to have many roads), both scores were entered into the model because of the additional effects of road-related mortality. The program Manifold® (CDA International, 1999) was used for GIS analysis, and the model was developed in Microsoft® Excel.

## Results

Twelve washes fit the criteria of connectivity from the Huachuca Mountains to the San Pedro River (Fig. 3.1). Washes draining Ash and Stump Canyons were not included because they terminate > 1 km from the river. Washes, listed in order of their potential suitability (inverse of impedance) are presented in Table 3.1. The most suitable potential corridor, according to this model, was a wash draining the east slope of Coronado National Memorial (wash unnamed, referred to here as Memorial Wash). The only impediments on this wash were a dirt road and the 2-lane highway leading from Sierra Vista to the Memorial. The wash drains the mountains at about their closest point to the San Pedro River, and thus provides the shortest distance to travel between the sites. The next most suitable washes were Hunter, Carr, Miller, and Ramsey Canyons, all located south of Sierra Vista. Animals traveling along these washes have to cross State Route 92, which is a 4-lane highway over Ramsey, Carr, and Miller washes, and a 2-lane highway over Hunter wash. All crossings are box culverts. In addition, all four washes run through extensive areas of low to moderate density housing northwest of Hereford or south of Sierra Vista. The next most suitable washes are those draining Fort Huachuca to the north, where they meet the Babocomari River, which then joins the San Pedro River near Fairbank. The long distance an animal would have to travel along these washes to get to the San Pedro River (>30 km) was viewed as an impediment. Other impediments on these washes included numerous dirt roads and low and moderate density housing along the Babocomari.

The least suitable washes for potential wildlife corridors included Huachuca Canyon, Soldier's Wash and Woodcutter's Wash. All three move through high density housing on Post or in Sierra Vista. Huachuca and Soldier's Washes drain into the Babocomari, and have some of the same impediments as Babocomari and Slaughterhouse washes. Woodcutter's Wash flows under Buffalo Soldier's Trail, and then through some of the most densely urbanized areas of Sierra Vista. It lies adjacent to a 4-lane bypass currently being constructed near Veterans Memorial Park and Apache Middle School, and adjacent to the ball fields of the park, where lighted activities at night may act as an additional impediment. It then flows under State Route 90, another busy 4-lane highway. It is unlikely many large carnivores use Woodcutter's Wash for travel.

- Table 3.1. Washes that may act as potential wildlife corridors between the Huachuca Mountains and San Pedro River, listed in order of suitability based on the total impedance score. Numbers within the columns represent the total number of cells within a 300 m x 300 m grid that touched a 100 m buffer placed along each wash. Distance is from 1 km inside the woodland interface to the San Pedro River. Values for Babocomari Wash were calculated from the Turkey Creek drainage. Cell values are multiplied by weights at the bottom of the column, and summed for the Total Urban and Total Road cells. Total Impedance is the sum of Distance, Total Urban, and Total Road columns for each row. Using Carr Wash as an example: Distance + Total Urban + Total Road = (18.2) + (24x2 + 5x4 + 0x8 + 0x16) + (28x1 + 4x3 + 0x5 + 1x6) = 18.2 + 68 + 46 = 132.2.

| | | Urban cells | | | | | Road cells | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Wash | Distance Km | Low | Mod | High | Very High | Total Urban | Dirt | 2-lane | 4-lane bridge | 4-lane box | Total Road | Total Impedance |
| Memorial | 11.8 | 0 | 0 | 0 | 0 | 0 | 8 | 1 | 0 | 0 | 11 | 22.6 |
| Hunter | 15.1 | 18 | 1 | 0 | 0 | 40 | 14 | 3 | 0 | 1 | 29 | 84.1 |
| Carr | 18.2 | 24 | 5 | 0 | 0 | 68 | 28 | 4 | 0 | 1 | 46 | 132.2 |
| Miller | 15.8 | 28 | 10 | 2 | 0 | 112 | 18 | 8 | 0 | 1 | 48 | 175.8 |
| Ramsey | 17.9 | 25 | 9 | 8 | 1 | 166 | 12 | 24 | 0 | 1 | 90 | 273.9 |
| Slaughterhouse | 32.3 | 0 | 27 | 2 | 5 | 204 | 26 | 7 | 1 | 0 | 52 | 288.3 |
| Blacktail | 32.4 | 0 | 27 | 2 | 5 | 204 | 26 | 7 | 1 | 0 | 52 | 288.4 |
| Babocomari | 43.9 | 0 | 25 | 2 | 5 | 196 | 26 | 6 | 1 | 0 | 49 | 288.9 |
| Garden | 22.8 | 2 | 0 | 1 | 14 | 236 | 7 | 12 | 0 | 1 | 49 | 307.8 |
| Huachuca | 34.2 | 0 | 25 | 6 | 7 | 260 | 9 | 6 | 1 | 0 | 32 | 326.2 |
| Soldier's | 35.8 | 0 | 0 | 6 | 16 | 304 | 9 | 18 | 0 | 2 | 75 | 414.8 |
| Woodcutter's | 25.4 | 0 | 0 | 0 | 28 | 448 | 0 | 13 | 0 | 3 | 57 | 530.4 |
| **Weights** | | **2** | **4** | **8** | **16** | | **1** | **3** | **5** | **6** | | |



• Figure 3.1. Potential wash corridors relative to vegetation and housing density between the Huachuca Mountains and San Pedro River.  Housing density from land cover maps and county 911 addresses.

The five most suitable washes for potential wildlife corridors lie mostly on private and state trust land, and are thus highly susceptible to development (Figure 3.2).  Although Blacktail, Slaughterhouse, Huachuca and Soldier's washes lie primarily on Fort Huachuca, and are thus protected, they all flow into the Babocomari drainage, which is mostly private and state trust land.

## Discussion

The corridor model provided an objective way to rank washes for their potential value as wildlife corridors; similar methods were used to identify linkages for grizzlies in Montana (Walker and Craighead, 1997) and statewide wildlife linkages in Florida (Hoctor et al., 2000).  However, weights assigned here to urban and road categories were arbitrary, and rankings were quite sensitive to weights.  Ideally, a model such as this would be field tested to develop and qualify the weightings.  Caveats aside, it may be possible to relate total impedance scores to species-specific thresholds.  For example, pumas, known to be somewhat tolerant of humans, may move through corridors with impedance values of up to 300, whereas a black bear may not tolerate anything above 200.  This concept may allow development of species-specific movement models, and identification of critical habitat linkages.  Likewise, examination of urban, road, and distance scores for each



• Figure 3.2. Potential wash corridors relative to land ownership. Land ownership layer from 1997 (ALRIS).

potential corridor may reveal where potential problems lie. For example, a moderate to high urban score due to a large tract of moderate density housing may reflect a corridor that could result in substantial wildlife-human conflicts.

Washes draining Ash and Stump Canyons were not identified as potential corridors, due to the constraint that washes terminate within 1 km of the San Pedro River. Both of these washes move through an extensive tract of undeveloped grassland before terminating > 2 km from the river. Housing and road densities are low in this area, although the area along Palominas Road is currently under development. This may create a situation where animals following washes from the Huachucas to the San Pedro River essentially find themselves in a cul de sac, with a path that ends and the remaining distance to the river blocked by houses. This creates a very undesirable situation, with a high potential for negative wildlife-human conflict, as bears, pumas, bobcats, or coatis try to negotiate human neighborhoods to get to the river.

Previous attempts to identify corridors or linkages identified large patches of habitats connected by remnants of the same habitat (Brooker et al., 1999; Walker and Craighead, 1997; Sorrell, 1999). The sky islands, including the Huachuca Mountains, are naturally isolated. Animals leaving the Huachuca Mountains to the south, east, or north leave the woodland to travel through grassland and desert scrub. The cottonwood-willow gallery forests along the San Pedro also differ from the woodland of the sky islands; it is probable that the San Pedro represents an oasis for most pumas, black bears and coatis moving between nearby mountain

areas. Animals with strong affinities for woodland habitats may want to minimize travel in more open habitats, or choose routes with more cover (Soulé, 1991). It was not possible to incorporate cover as a variable in the model due to lack of fine-enough data. Attempts to validate the model by field testing should also include measurements of cover.

Studies of mammalian dispersal have found that, in general, males are the primary dispersers, whereas females seldom disperse far from their natal ranges (Harrison, 1992; Van Vuren, 1998). Median dispersal distances for black bears are 26 km, and pumas 66 km (Van Vuren, 1998), indicating that the distance between the San Pedro River and the Huachuca Mountains is within dispersal distances for these species. Little has been published about dispersal distances in coatis; indeed one study suggested that coatis do not disperse > 1 home range away from their natal range (Gompper et al., 1998). For animals moving long distances between areas of suitable habitat, the presence of oases may greatly extend their possible dispersal distances.

The results of the tracking study (Chapter 2) provide some support for the model. No tracks of pumas, black bears, or coatis were found on the Palominas route, which lies at the bottom of Memorial Wash. However, residents report observations of all three species in recent years and coatis were observed there in June 2000. For the stretch of river between Hereford and San Pedro House, where Hunter, Carr, Miller, and Ramsey Washes meet the San Pedro River, puma tracks were recorded, but no signs of coati or black bear were found. However, both puma and coati tracks were found near Fairbank, near the confluence of the Babocomari and the San Pedro Rivers. Black bear sign was observed near Fairbank a couple of years ago (H. Shaw, pers. comm.). Puma tracks found on the north boundary of Fort Huachuca near Antelope Pond may represent animal(s) moving between the Huachucas and the Babocomari River. However, several potentially confounding factors should be considered:

- Once these species arrive at the San Pedro River, they quickly move up or downstream, or out of the area;

- Related to above, the increased number of illegal immigrants between the international border and San Pedro House may displace the animals to other parts of the river;

- Little or no movement is actually occurring between the Huachuca Mountains and the San Pedro River. Sign detected may have come from relict populations or animals that originated from other places.

Harris and Ruther (2000) studied ecological characteristics of washes connecting the Huachuca Mountains to the San Pedro River. They ranked washes based on vegetation types and surface water. Garden, Woodcutter's, and Ramsey Canyon ranked high in their measure of ecological value, although they identified anthropogenic disturbance in each wash. Washes with surface water and vegetation complexity may be valuable attributes for birds, herpetofauna, small mammals, and invertebrates, and may act as genetic plant corridors, but not necessarily as movement corridors for larger mammals. Comparison of the results of this study to the one conducted by Harris and Ruther (2000) highlights the need to ask specific questions when considering identifying and implementing corridors and linkages for wildlife (Soulé, 1991).

The wash draining the east slope of Coronado National Memorial represents the best potential conduit for wildlife, although residents along the San Pedro River south of Palominas occasionally report conflicts with bears. All other washes have the potential for significant human-wildlife conflict, which will only increase as housing density increases in the unincorporated areas of Sierra Vista, Huachuca City, and Whetstone. The west slope of the Huachucas is less developed and has more wooded cover, and presents better opportunities for wildlife movements to the Patagonia and Santa Rita Mountains. Likewise, movement between the San Pedro and the Mule and Dragoon Mountains in the U.S. and the Sierra San José in Mexico is less impeded than that between the Huachucas and the San Pedro River.

Proposed Ecological Linkages

The corridor model identified three areas suitable for consideration as ecological linkages: Memorial Wash, Hunter Wash and the Babocomari River (Fig. 3.3). I refer to them as ecological, rather than biological, linkages, because their added width is meant to help preserve ecological processes, including hydrology and

vegetation dynamics in addition to acting as a movement corridor. I propose linkages along these washes with the following design:

- A 200 m core area along each wash. The width is necessary to preserve long-term integrity of the wash, and reduce human-wildlife conflicts. Within this core area, the washes should be preserved as wildlife habitat, with no new housing or industrial developments, no new roads, and the only vegetation changes to include possible restoration. Recreational use, such as foot, bike, or horse trails, or picnic areas, should be limited to daytime use only. Emphasis should be on maintaining cover (mesquite, cottonwood-willow) along the washes.

- Surrounding the core area is a 1000 m buffer (bringing the width of the linkage to 1200 m). Minimal anthropogenic changes, such as low-density housing, can occur within the buffer, but heavy industry, commercial activity, or dense housing areas should be avoided. Some restrictions on vegetation clearing and alteration may be necessary. Where possible, box culverts should be replaced by highway overpasses. This buffer serves to minimize edge effects, disturbance to wildlife, and wildlife-human conflicts. The additional width also incorporates some adjacent washes (e.g., portions of Miller Wash are included in the proposed Hunter Wash linkage).

In this case, the proposed linkages will help preserve some ecosystem processes, while providing a movement corridor for large mammals. Because development is slated for all three areas, they all should be considered high priority for protection efforts. Both the proposed Hunter Wash linkage and the Babocomari linkage already have substantial housing developments within the core and buffer areas. The proposed Palominas linkage has the least impedance, and should receive highest priority. In addition, the area south of the border, encompassing Montezuma Wash to the San Pedro River, may also be important for wildlife moving between the Huachucas and San Pedro. This area should be protected as well, including minimizing disturbance due to Border enforcement activities.

The linkages are vulnerable to natural disturbance, such as fire or flood, which may affect their suitability as corridors in the short- or long-term. The vulnerability of the linkages to stochastic events could be reduced by greater redundancy, that is, designating more corridors or linkages for protection. However, the lack of other suitable areas, which do not bring wildlife into close human contact, emphasizes the importance of protecting the proposed Babocomari, Hunter Wash, and Palominas linkages for wildlife movement.

The San Pedro River provides high quality habitat for many species of carnivores, and likely acts as an oasis for others. Although exact movement corridors between the Huachuca Mountains and San Pedro River could not be identified, the model identified potential corridors. Further study is needed to validate or test the model. Regarding Florida's Ecological Network plan, Hoctor et al., (2000) stated:

> There will always be the option to sever linkages in the future if necessary, but the opportunity to protect existing landscape linkages or to restore them will diminish rapidly as Florida's human population continues to grow." (P, 998).

This comment applies to Arizona as well.

## Acknowledgments

This project was funded by The Nature Conservancy, through a Rodney Johnson/Katherine Ordway Stewardship Endowment, and the Fort Huachuca Wildlife Office. My sincere thanks to Holly Richter and Sheridan Stone for their interest and support for the project, assistance in obtaining funding, and comments on the manuscript. I thank also Harley Shaw for inspiring the tracking study; Marty Tuegel for field assistance, help in obtaining GIS layers, and creative discussions; John DiBari for GIS advice, and Scott Barrett at the Harvard Graduate School of Design for providing GIS layers and advice.



• Figure 3.3.  Proposed ecological linkages between the Huachuca Mountains and San Pedro River.  Linkages are designed to promote the long-term integrity of potential movement corridors for wildlife and include a 200 m core area and 1000 m buffer.

# Literature Cited

Altschul, J. H. 1997. From north to south: shifting sociopolitical alliances during the formative period in the San Pedro Valley. Pp. 57-69 *in* Prehistory of the borderlands. Ed. by J. Carpenter and G. Sanchez. Arizona State Museum and University of Arizona, Tucson, AZ.

Andreassen, H. P., S. Halle, and R. A. Ims. 1996. Optimal width of movement corridors for root voles: not too narrow, not too wide. Journal of Applied Ecology, 33:63-70.

Andren, H., and P. Angelstam. 1988. Elevated predation rates as an edge effect in habitat islands: experimental evidence. Ecology, 69:544-547.

Aranda Sanchez, J. M. 1981. Rastros de los mamiferos silvestres de Mexico. Instituto National de Investigaciones sobre Recursos Bioticos, Xalapa, Veracruz.

Arias Rojo, H., J. Bredehoeft, R. Lacewell, J. Price, J. Stromberg, and G. A. Thomas. 1998. Sustaining and enhancing riparian migratory bird habitat on the Upper San Pedro River. Public review draft prepared for the Commission for Environmental Cooperation.

Bart, J., M. A. Fligner, and W. I. Notz. 1998. Sampling and statistical methods for behavioral ecologists. Cambridge University Press, New York.

Beier, P. 1993. Determining minimum habitat areas and habitat corridors for cougars. Conservation Biology, 7:94-108.

Beier, P., and R. F. Noss. 1998. Do habitat corridors provide connectivity? Conservation Biology, 12:1241-1252.

Bennett, A. F. 1990. Habitat corridors and the conservation of small mammals in a fragmented forest landscape. Landscape Ecology, 4:109-122.

Bennett, A. F. 1991. Roads, roadsides and wildlife conservation: a review. Pp. 99-118, *in* Nature Conservation 2: the role of corridors (D. A. Saunders and R. J. Hobbs, eds.). Surrey, Beatty and Sons, Ltd., Chipping Norton, New South Wales.

Brody, A. J., and M. R. Pelton. 1989. Effects of roads on black bear movements in western North Carolina. Wildlife Society Bulletin, 17:5-10.

Brooker, L., M. Brooker, and P. Cale. 1999. Animal dispersal in fragmented habitat: measuring habitat connectivity, corridor use, and dispersal mortality. Conservation Ecology 3: URL: http://www.consecol.org/vol3/iss1/art4.

Brown, D. E., C. H. Lowe, and C. H. Pase. 1979. A digitized classification system for the biotic communities of North America and community (series) and association examples for the Southwest. Journal of the Arizona-Nevada Academy of Science, 14:1-16.

Bueno, A. J., V. A. Tsihrintzis, and L. Alvarez. 1995. South Florida greenways: a conceptual framework for the ecological reconnectivity of the region. Landscape and Urban Planning, 33:247-266.

Bureau of Land Management. 1998. The upper San Pedro River Basin of the United States and Mexico. A resource directory and an overview of natural resource issues confronting decision-makers and natural resource managers. BLM/AZ/PT-98/021.

CDA International. 1999. Manifold system, release 4.50. CDA International, Ltd. Carson City, NV.

Clevenger, A. P., and N. Waltho. 2000. Factors influencing the effectiveness of wildlife underpasses in Banff National Park, Alberta, Canada. Conservation Biology, 14:47-56.

Csuti, B. 1991. Introduction. Pp. 81-90, *in* Landscape linkages and biodiversity (W. E. Hudson, ed.). Island Press, Washington, D.C.

Dobyns, H. F. 1994. The San Pedro River. Records of conditions and changes. Pinon Press, Tucson, AZ.

Downes, S. J., K. A. Handasyde, and M. A. Elgar. 1997. The use of corridors by mammals in fragmented Australian eucalypt forests. Conservation Biology, 11:718-726.

Duncan, D. K. 1989. Mammal inventory of the San Pedro Riparian National Conservation Area, Cochise County, Arizona: Final report. Prepared for the San Pedro Project Office, BLM.

Fjelline, D. P., and T. M. Mansfield. 1989. Method to standardize the procedure for measuring mountain lion tracks. Pp. 49-51, *in* Proceedings Third Mountain Lion Workshop, 6-8 December (R. H. Smith, ed.). Arizona Game and Fish Department, Prescott, AZ.

Forman, R. T. T. 2000. Estimate of the area affected ecologically by the road system in the United States. Conservation Biology, 14:31-35.

Foster, M. L., and S. R. Humphrey. 1995. Use of highway underpasses by Florida panthers and other wildlife. Wildlife Society Bulletin, 23:95-100.

Frankham, R. 1996. Relationship of genetic variation to population size in wildlife. Conservation Biology, 10:1500-1508.

Friend, G. R. 1991. Does corridor width or composition affect movement? Pp. 404-405, *in* Nature Conservation 2: the role of corridors (D. A. Saunders and R. J. Hobbs, eds.). Surrey, Beatty and Sons, Ltd., Chipping Norton, New South Wales.

Germaine, S. S., and K. D. Bristow. 1997. Mountain lion kill rates, habitat use and feeding behavior in southern Arizona. Final report F8R-1738, Arizona Game & Fish Department, Phoenix.

Gompper, M. E. , J. R. Gittleman, and R. K. Wayne. 1998. Dispersal, philopatry, and genetic relatedness in a social carnivore: comparing males and females. Molecular Ecology, 7:157-163.

Griffiths, M., and C. P. van Schaik. 1993. The impact of human traffic on the abundance and activity periods of Sumatran rain forest wildlife. Conservation Biology, 7: 623-626.

Halfpenny, J. 1986. A field guide to mammal tracking in North America. 2nd ed. Johnson Books, Boulder, CO.

Harris Environmental Group. 1997. Desert Laboratory proposed biological linkage. Harris Environmental Group, Inc. Tucson, AZ.

Harris, L. D., and K. Atkins. 1991. Faunal movement corridors in Florida. Pp. 117-134, *in* Landscape linkages and biodiversity (W. E. Hudson, ed.). Island Press, Washington, D.C.

Harris, L. K. and S. Ruther. 2000. Ecological characteristics of some riparian washes in southeastern Arizona. Natural Areas Journal, 20:221-226.

Harrison, R. L. 1992. Toward a theory of inter-refuge corridor design. Conservation Biology, 6:293-295.

Hass, C. C. 1997. Ecology of white-nosed coatis in the Huachuca Mountains, Arizona. Heritage report I95028, Arizona Game & Fish Dept., Phoenix.

Hastings, J. R. and R. M. Turner, 1980. The changing mile. University of Arizona Press, Tucson, AZ.

Hoctor, T. S., M. H. Carr, and P. D. Zwick. 2000. Identifying a linked reserve system using a regional landscape approach: the Florida Ecological network. Conservation Biology, 14:984-1000.

Hobbs, R. J. 1992. The role of corridors in conservation: solution or bandwagon? Trends in Ecology and Evolution, 7:389-392.

Hoffmeister, D. F. 1986. Mammals of Arizona. Arizona Game & Fish Department and The University of Arizona Press, Tucson, AZ.

Hoffmeister, D. F., and W. W. Goodpaster. 1954. The mammals of the Huachuca Mountains, southeastern Arizona. Illinois Biological Monographs, 24:1-152.

Ibarra, I. 2000. Trampled, trashed ecosystems. Illegal entrants devastating fragile habitats. The Arizona Daily Star, March 26, 2000:1,7.

Inglis, G., and A. J. Underwood. 1992. Comments on some designs proposed for experiments on the biological importance of corridors. Conservation Biology, 6:581-586.

Kepner, W., C. Watts, C. Edmonds, H. Richter, W. Childress, B. Alberti, R. Blanchard, S. Stone, J. Guerra, R. Koehler, G. Luna, and D. Goodrich. 1999. A landscape approach to monitoring and assessing environmental condition in the Upper San Pedro Basin. Presented at the San Pedro bi-national conference on cooperative research and management, Cananea, Sonora and Bisbee, AZ, November 7-10, 1999.

Kutilek, M. J., R. A. Hopkins, E. W. Clinite, and T. E. Smith. 1983. Monitoring population trends of large carnivores using track transects. Pp. 104-106, *in* Renewable resource inventories for monitoring changes and trends (J. F. Bell and T. Atterbury, eds.). Corvallis, OR.

Lindenmayer, D. B., and H. A. Nix. 1993. Ecological principles for the design of wildlife corridors. Conservation Biology, 7:627-630.

Linnell, J. D. C., J. E. Swenson, A. Landa, T. Kvam. 1998. Methods for monitoring European large carnivores – a worldwide review of relevant experience. NINA Oppdragsmelding 549:1-38.

Mann, C. C., and M. L. Plummer. 1995. Are wildlife corridors the right path? Science, 270:1428-1430.

McGregor, J.C. 1974. Southwestern archaeology, second ed.  University of  Illinois Press, Chicago, IL.

Merriam, G., and C. Catterall. 1991. Are corridors necessary for the movement of biota?  Pp. 406-407, *in* Nature Conservation 2: the role of corridors (D. A. Saunders and R. J. Hobbs, eds.). Surrey, Beatty and Sons, Ltd., Chipping Norton, New South Wales.

Mills, L. S., M. E. Soule, and D. F. Doak. 1993. The keystone-species concept in ecology and conservation. BioScience 43:219-224.

Murie, O. J. 1975. A field guide to mammal tracks. 2nd ed. Houghton Mifflin Company, Boston, MA.

Newmark, W. D. 1993. The role and design of wildlife corridors with examples from Tanzania. Ambio, 22:500-504.

Nicholls, A. O., and C. R. Margules. 1991. The design of studies to demonstrate the biological importance of corridors. Pp. 49-61, *in* Nature Conservation 2: the role of corridors (D. A. Saunders and R. J. Hobbs, eds.). Surrey, Beatty and Sons, Ltd., Chipping Norton, New South Wales.

Norton, T. W., and H. A. Nix. 1991. Application of biological modeling and GIS to identify regional wildlife corridors. Pp. 19-26, *in* Nature Conservation 2: the role of corridors (D. A. Saunders and R. J. Hobbs, eds.). Surrey, Beatty and Sons, Ltd., Chipping Norton, New South Wales.

Noss, R. 1995. The ecological effects of roads or the road to destruction. unpub. report, URL:http://www.wildrockies.org/WildCPR/reports/ECO-EFFECTS-ROADS.html.

Noss, R. F. 1990. Indicators for monitoring biodiversity: a hierarchical approach. Conservation Biology, 4:355-364.

Oehler, J. D. and J. A. Litvaitis. 1996. The role of spatial scale in understanding responses of medium-sized carnivores to forest fragmentation. Canadian Journal of Zoology, 74: 2070-2079.

Orloff, S. G., A. W. Flannery, and K. C. Belt. 1993. Identification of San Joaquin kit fox (*Vulpes macrotis mutica*) tracks on aluminum tracking plates. California Fish and Game, 79:45-53.

Pace, F. 1991. The Klamath corridors: preserving biodiversity in the Klamath National Forest. Pp. 105-116, *in* Landscape linkages and biodiversity (W. E. Hudson, ed.). Island Press, Washington, D.C.

Paine, R.T. 1995. A conversation on refining the concept of keystone species. Conservation Biology 9:962-964.

Poiani, K., B. Richter, M. G. Anderson, and H. E. Richter. 2000. Biodiversity conservation at multiple scales: functional sites, landscapes, and networks. BioScience, 50:133-146.

Power, M. E., D. Tilman, J. A. Estes, B. A. Menge, W. J. Bond, L. S. Mills, G. Daily, J. C. Castilla, J. Lubchenco, and R. T. Paine. 1996. Challenges in the quest for keystones.  BioScience 46:609-620.

Rabinowitz, A. R. 1999. The present status of jaguar (*Panthera onca*) in the southwestern United States. The Southwestern Naturalist, 44:96-100.

Rezendes, P. 1992. Tracking and the art of seeing. How to read animal tracks and sign. Camden House Publishing, Inc, Charlotte, VT.

Rosenberg, D. K., B. R. Noon, and E. C. Meslow. 1997. Biological corridors: form, function, and efficacy. BioScience, 47:677-687.

Saunders, D. A., and R. J. Hobbs. 1991. The role of corridors in conservation: what do we know and where do we go? Pp. 421-427, *in* Nature Conservation 2: the role of corridors (D. A. Saunders and R. J. Hobbs, eds.). Surrey, Beatty and Sons, Ltd., Chipping Norton, New South Wales.

Schaller, G. B., and P. G. Crawshaw Jr. 1980. Movement patterns of jaguar. Biotropica, 12:161-168.

Southeastern Arizona Government Organization. 1995. Overall economic development plan, Arizona State Planning District VI. Bisbee, AZ.

Shaw, H. G. 1999. Garden Canyon watershed. A vision and a mission. The Juniper Institute, Chino Valley, AZ.

Shkedy, Y., and D. Saltz. 2000. Characterizing core and corridor use by Nubian ibex in the Negev Desert, Israel. Conservation Biology, 14:200-206.

Simberloff, D. J. A. Farr, J. Cos, and D. W. Mehlman. 1992. Movement corridors: conservation bargains or poor investments? Conservation Biology 6:493-504.

Simpson, G. G. 1964. Species density of North American recent mammals. Systematic Zoology, 13:411-429.

Sokal, R. R., and F. J. Rohlf. 1981. Biometry. The principles and practice of statistics in biological research. Second ed. W.H. Freeman and Company, San Francisco, CA.

Sorrell, J. 1999. Using Geographic Information Systems to evaluate forest fragmentation and identify wildlife corridor opportunities in the Cataraqui Watershed. Unpub. report, URL: http://www.terra-plex.com/epub/pubsor.html.

Soulé, M. 1991. Theory and strategy. Pp. 91-104, in Landscape linkages and biodiversity (W. E. Hudson, ed.). Island Press, Washington, D.C.

Stander, P. E., I. I. Ghau, D. Tsisaba, I. I. Oma, and I. I. Ui. 1997. Tracking and interpretation of spoor: a scientifically sound method in ecology. Journal of Zoology, London, 242:329-341.

The Conservation Fund. 1998. Chattooga Watershed Conservation Plan. Unpub. report, URL: http://www.conservationfund.org/conservation/sustain/chattooga.html.

Thompson, I. D., I. J. Davidson, S. O'Donnell, and F. Brazeau. 1989. Use of track transects to measure the relative occurrence of some boreal mammals in uncut and regeneration stands. Canadian Journal of Zoology, 67:1816-1823.

Trombulak, S. C., and C. A. Frissell. 2000. Review of ecological effects of roads on terrestrial and aquatic communities. Conservation Biology, 14:18-30.

Van Dyke, F. G., R. H. Brocke, and H. G. Shaw. 1986. Use of road track counts as indices of mountain lion presence. The Journal of Wildlife Management, 50:102-109.

Van Vuren, D. 1998. Mammalian dispersal and reserve design. Pp. 369-393, in Behavioral ecology and conservation biology (T. Caro, ed.). Oxford University Press, New York.

Vanderpot, R. 1997. From foraging to farming: prehistoric settlement and subsistence dynamics in the San Pedro Valley. Pp. 33-45 in Prehistory of the borderlands. Ed. by J. Carpenter and G. Sanchez. Arizona State Museum and University of Arizona, Tucson, AZ.

Walker, R., and L. Craighead. 1997. Analyzing wildlife movement corridors in Montana using GIS. ESRI Users Conference, 1997. URL: http://www.esri.com/library/userconf/proc97/to150/pap116/p116.htm.

Wemmer, C., T. H. Kunz, G. Lundie-Jenkins, and W. J. McShea. 1996. Mammalian sign. Pp. 157-176, in Measuring and monitoring biological diversity. Standard methods for mammals (D. E. Wilson, F. R. Cole, J. D. Nichols, R. Rudran and M. S. Foster, eds.). Smithsonian Institution Press, Washington, D.C.

White, G. C., and R. A. Garrott. 1990. Analysis of wildlife radio-tracking data. Academic Press, New York.

Wilson, J. P. 1995. Islands in the desert. A history of the uplands of southeastern Arizona. University of New Mexico Press, Albuquerque, NM.

Woolsey, N. 1987. Furbearing animals of the San Pedro Preserve. Unpub. report for the San Pedro Project Office, BLM.

Yahner, R. H. 1988. Changes in wildlife communities near edges. Conservation Biology, 4:333-339.

Zielinski, W. J., and T. E. Kucera. 1995. American marten, fisher, lynx, and wolverine: survey methods for their detection. General Technical Report PSW-GTR-157.

## Appendix: Common and scientific names of species presented in the text.

| Common Name | Scientific Name | Mexican Name |
| --- | --- | --- |
| Coyote | *Canis latrans* | Coyote |
| Kit fox | *Vulpes macrotis* | Zorrito norteño |
| Grey fox | *Urocyon cinereoargenteus* | Zorro gris |
| Mexican wolf | *Canis lupus baileyi* | Lobo |
| Coati | *Nasua narica* | Coatí |
| Raccoon | *Procyon lotor* | Mapeche |
| Ringtail | *Bassariscus astutus* | Cacomixtle |
| Puma | *Puma concolor* | Puma |
| Bobcat | *Lynx rufus* | Gato montés |
| Jaguar | *Panthera onca* | Tigré |
| Ocelot | *Leopardus pardalis* | Ocelote |
| Hooded skunk | *Mephitis macroura* | Zorillo rayado |
| Striped skunk | *Mephitis mephitis* | Zorillo listado |
| Spotted skunk | *Spilogale gracilis* | Zorillo pinto |
| Hog-nosed skunk | *Conepatus mesoleucus* | Zorillo cadeno |
| Badger | *Taxidea taxus* | Tejón |
| Long-tailed weasel | *Mustela frenata* | Comadreja |
| Black bear | *Ursus americanus* | Oso negro |
| Mexican grizzly | *Ursus arctos* | Oso gris |
| Javelina | *Pecari tajacu* | Jabalí |
| Deer | *Odocoileus hemionus & O. virginianus* | Venado buro y venado cola blanca |
| Cattle | *Bos taurus* | Ganado |







Figure 1: Proposed Fences

UNITED STATES DEPARTMENT OF THE INTERIOR
OFFICE OF HEARINGS AND APPEALS
BOARD OF LAND APPEALS

_____
                                                        )
Defenders of Wildlife and Sierra Club,          )
                                                        )
                                                        )
                                                        )
                            Appellants,          )        IBLA Docket No.
                                                        )
                                                        )
                                                        )
*San Pedro Riparian National Conservation*      )
*Area Border Fence*                              )
EA Number AZ-420-2007-051                        )
Serial/Case File No. AZA 33680                   )
                                                        )
                                                        )
                                                        )
                                                        )
                                                        )
                                                        )
_____

DECLARATION OF CHRISTINE C. HASS

I, Christine C. Hass, declare the following to be true and correct, and to reflect my

professional opinion and my best judgment on the matter based on the body of scientific

evidence.

1.      I am trained as a wildlife ecologist, with Bachelors' and Masters' degrees in

Zoology from the University of Montana and a Ph.D. in Biology from the University of

North Dakota.  My Ph.D. dissertation (1993) was a study of reproductive ecology of

bighorn sheep in alpine and desert environments in the southwestern U.S.

2.      From 1995-2003, I worked as a contract biologist studying carnivores in

southeastern Arizona.  I worked as a principal research specialist at the University of

Arizona from 2003-2006.  In 2006 I began working for the National Audubon Society as

Assistant Director of the Appleton-Whittell Research Ranch, which lies 15 miles north of

the U.S.-Mexican border.

3.      I studied white-nosed coatis in the Huachuca Mountains from 1995-2000, and

hooded and striped skunks in the Huachuca Mountains, Las Cienegas National

Conservation Area, and Appleton-Whittell Research Ranch from 2000-2003.  I also

conducted a study of carnivore movements between the Huachuca Mountains and San

Pedro River, and developed a GIS model to identify and rank wildlife movement

corridors between the two areas.  I began using wildlife trail cameras to document

wildlife presence and activity at several sites in southeastern Arizona during 2001, and

have operated cameras almost continuously since then.  My current research involves

distribution patterns, social behavior and disease ecology of a variety of mesocarnivores

in southeastern Arizona.

4.      Southeastern Arizona is one of the most biologically diverse areas in the United

States.  Four biomes intersect in this region:  Sonoran desert, Chihuahuan desert, Rocky

Mountains and Sierra Madre.  It is also topographically diverse, with elevations ranging

from 2500-9500 feet.  This creates a rich variety of habitats ranging from pine and fir on

the mountain tops to desert scrub and grasslands in the valleys.  Mid-elevations are

dominated by a variety of evergreen oaks and shrubs.  This unique area, referred to as the

sky island region or Madrean Archipelago, occupies the southeastern corner of Arizona, the southwestern corner of New Mexico, and northern Sonora.

5.      The international boundary bisects the area.  Many subtropical mammal species reach the northern extent of their ranges in this area, including jaguars, ocelots, white-nosed coatis, hooded skunks, Mexican fox squirrels, Merriam's deermice, Coue's deer, white-sided jackrabbits, Sonoran subspecies of the Virginia opossum, a large variety of birds and reptiles, as well as a diverse flora.  Most of these species have their core areas in Mexico.  In addition, some mammals, such as the American black bear, have their core areas in the U.S., but have small populations in northern Mexico.

6.      Running north through the middle of the Madrean Archipelago is the San Pedro River – one of the last free-flowing rivers in the United States.  Its origins lie more than 20 miles south of the border in the Sierra San Jose.  It is internationally recognized for its biological diversity and as a corridor for migrating birds.  During my studies of corridor use in the area, I documented 14 species of carnivores using the San Pedro Riparian National Conservation Area.  These carnivores were detected using track and sign surveys on transects that extended from the International boundary to Willow Wash, almost 40 miles north of the border.  Each transect was surveyed at least 3 times between October 1998 and January 2000 (Hass, 2000).

7.      During this study, up to 500 undocumented aliens (UDAs) were estimated to cross the border along the San Pedro River each day (Ibarra, 2000).  The impact of their

trespass was noticeable in the trampled vegetation, trash and human waste.  The impact was also noticeable in the low amount of wildlife sign between Palominas and the border. Most of the immigrant traffic occurred at night, and appeared to have significant impact on nocturnal carnivores, as evidenced by the lack of sign.  I detected only seven species here, and at low frequencies compared to the other transects.  In contrast, the hundreds of people visiting San Pedro House during peak birding season had relatively little impact – that area had the greatest number of carnivore species detected (12) and sign was common.  Human visitation at San Pedro House is limited to daytime use only.  Other studies, including the Borderlands Jaguar Detection Project, have also found that the amount and timing of human activity influences distribution and behavior of wildlife (Griffiths and Van Shaik 1993, Clevenger and Waltho 2000, J. Childs, pers. com.), with nighttime activity having the most detrimental effect.

8.     GIS modeling identified the area between Coronado National Memorial and the San Pedro River south of Palominas as the best potential wildlife corridor, based on the distance from the mountains and lack of housing developments (Hass 2000).  This section of the river, between Palominas and the border likely represents an important transition area between the Huachuca and Mule Mountains and the Sierras south of the border.

9.     The high amount of immigrant traffic through the San Pedro River was the result of increased border security in more urban areas beginning in the mid-1990's.  This increased security pushed traffic into more remote areas, including along the spines of several mountain ranges (pers. obs.).

10.     Immigrant traffic has increased, in spite of increased border security and the increase difficulty of passage.  Barriers to pedestrian traffic, in addition to being barriers to wildlife movement, have the potential to relocate significant amounts of human traffic by funneling it into areas blocked only by vehicle barriers, greatly affecting wildlife activity and movements.

11.     Vehicle barriers, which are theoretically permeable to wildlife, need to be accompanied by wildlife-friendly fences or no fences at all.  Current stretches of vehicle barriers constructed across the San Rafael Valley in southeastern Arizona are backed by chain link or barbed wire fences that are about 3 feet from the vehicle barrier (making jumping over the fence hazardous for deer), and have a barbed bottom wire that is not conducive to pronghorn and other wildlife crawling under the fence.  The barbed wire fences may belong to Mexican rancheros, and thus may be beyond control of U.S. border activities.  In this case, barriers should be constructed at least 10 feet from a barbed wire fence to allow deer to safely negotiate the fences and barriers.

12.     Roads used for construction and maintenance of fences and barriers have great potential to bring significant off-road (OHV) traffic into new areas, which may significantly alter wildlife behavior and habitat, and result in increased mortality from roadkill and poaching.

13.     The biological integrity of the whole Madrean Archipelago region relies on genetic interchange throughout the region – by both plants and animals.  Barriers to this genetic interchange may influence the long-term viability of populations, especially north of the border.  Construction of border fencing and barriers presents three serious threats to long-term survival of wildlife on the border: fences that are impermeable to wildlife, thus allowing no gene flow at all; increased human foot traffic into areas with vehicle barriers; and roads that bring in more recreational users and illegal vehicle traffic close to the border.

Pursuant to 28 U.S.C. Section 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief, and that this declaration was executed on ___Sept. 21____, 2007 in Elgin, Arizona.

Dated: _____9/21/07_____

_____/s/_____

Christine C. Hass, Ph.D.

UNITED STATES DEPARTMENT OF THE INTERIOR
OFFICE OF HEARINGS AND APPEALS
BOARD OF LAND APPEALS

_____

|  |  |  |
|---|---|---|
| Defenders of Wildlife and Sierra Club | ) | |
| | ) | |
| | ) | |
| Appellants, | ) | IBLA Docket No. |
| | ) | |
| | ) | |
| | ) | |
| *San Pedro Riparian National Conservation* | ) | |
| *Area Border Fence* | ) | |
| EA Number AZ-420-2007-051 | ) | |
| Serial/Case File No. AZA 33680 | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |

_____

**DECLARATION OF AARON D. FLESCH**

I, Aaron D. Flesch, declare the following to be true and correct, and to reflect my

professional opinion and my best judgment on the matter based on the body of scientific

evidence.

1.      I currently reside in Tucson, Arizona where I am employed as a Senior Research

Specialist in the School of Natural Resources at University of Arizona.


2.      I am trained as a wildlife biologist.  I earned my Bachelors of Arts in

Environmental Studies from Prescott College in 1995 and my Masters of Science in

Wildlife Science from the University of Arizona, School of Natural Resources in 2003.  I

have also studied biology at the State University of New York at Buffalo and pursued

graduate studies in ecology and statistics at Northern Arizona University. After earning

my Masters I continued to take classes in the School of Natural Resources and the

Department of Ecology and Evolutionary Biology

3.      I have 12 years of professional experience in Arizona and northern Mexico.

During that time I have worked as biologist for both public natural resource agencies

(U.S. National Park Service, U.S. Geological Survey), as an independent consultant for

both public and private entities, and for the University of Arizona.

4.      Recently, I served as consulting biologist with RECON Environmental, Inc. and

designed Phase I of an ecological monitoring program for Pima County's Sonoran Desert

Conservation Plan. I also recently designed a monitoring program for landbirds for the

U.S. National Park Service's Sonoran Desert Network and am assessing population

trends of vertebrates in relation to spatial and environmental factors using a large data set

spanning almost 20 years from Organ Pipe Cactus National Monument.

5.      My experience working as a biologist in Sonora, Mexico spans 8 years. Between

2000 and 2003 as a graduate research assistant at University of Arizona, I designed and

implemented a 2-year study to assess distribution, abundance, and habitat of ferruginous

pygmy-owls in Sonora, Mexico. During this research I surveyed over 1000 km of

transects in Sonora in a wide range of environments throughout the state and documented

a large population of pygmy-owls. By exploring patterns of distribution and abundance

of pygmy-owls in relations to environmental factors, I was able to reflect on the ecological process that produced these patterns and gain a broad understanding of factors that determine animal distribution. Between 2002 and 2004, I completed a 4-year study aimed at understanding the impacts of roadways on the ecology and behavior of pygmy-owls in northern Sonora. During this study I completed extensive observations of radio-marked adult and juvenile pygmy-owls to assess movement and dispersal behaviors and the potential for roadways to degrade landscape connectivity for owls. Each year since 2000, I have completed population and demographic monitoring of pygmy-owls in northern Sonora. I have also described the distribution of birds and plants throughout northern Sonora.

6. I have worked at several locations in southern Arizona. In 1996 and 1999, I lived within 35 km of Mexico on the Buenos Aires National Wildlife Refuge. In 1998, I lived along the San Pedro River on the San Pedro Riparian National Conservation Area and worked in the Sonoita Plains and San Rafael Valley.

7.      Through my experiences in northern Sonora, Mexico and southern Arizona, I have gained an extensive breadth of knowledge of plant and animal communities in the U.S. - Mexico borderlands. Further, because I have visited most of mountain ranges and valleys in northern Sonora, I am considered to know this remote region better than any living American or Mexican biologist by my peers.

8.      Habitat provides conditions that trigger animals to settle and allows them to survive and reproduce.  Like many other plant and animal species in the Arizona – Sonora borderlands, habitat of ferruginous pygmy-owls is arranged in small patches imbedded in a much larger matrix of unsuitable non-habitat.  For pygmy-owls, habitat patches range in size from that sufficient to support a single pair (e.g. 9 to 50 ha) to areas that can collectively support as many as perhaps 10 pairs.  Because habitat patches in the borderlands tend to be small and non-uniformly distributed across the landscape, animals produced by nesting territorial pairs of owls are often required to disperse across large areas of non-habitat to find an unoccupied patch in which to settle.  Based on monitoring of 24 radio-marked juvenile pygmy-owls in northern Sonora that survived to dispersal age (>53 days), this was clearly evident as only 2 animals (8%) settled in adjacent unoccupied areas and all others dispersed across non-breeding habitat.  If a barrier prevented movements into unoccupied habitat patches, these patches would tend to be unoccupied in the future until the barrier was removed or animals were translocated across the barrier.  Further, in Sonora, patches of owl habitat that are small and far from other occupied patches tend to have lower probabilities of occupancy.  These basic examples illustrate why movement ability is an important determinant of distribution, abundance, extinction and colonization dynamics, and gene flow.

9.      Landscape connectivity is the degree to which an environment facilitates movement among habitat patches and is function of both landscape structure and a species' movement ability.  Landscapes that facilitate adequate connectivity will promote greater exchange of individuals among habitat patches, higher rates of dispersal success,

greater probability of occupancy within individual habitat patches, and at a scale, greater probability of population persistence across time.

10.     My observations of radio-marked pygmy-owls in the Arizona – Sonora borderlands suggest that certain types of development along the international boundary will limit the number of owls able to cross the border and may prevent colonization of unoccupied habitat in Arizona.  Flight behavior of pygmy-owls suggests that owls may not readily cross a tall (>3 m) border fence with solid impermeable walls that are disassociated with vegetation cover.  This is because pygmy-owls tend to fly near the ground, virtually never fly above the height of canopy vegetation, and tend to stay in areas with moderate to high vegetation cover.  Further, large open corridors with little vegetation will reduce the likelihood of owls crossing these environments.  During dispersal for example, owls that encountered areas with vegetation openings >200 m wide changed dispersal direction between movement periods an average of 1.7 ± 0.7 (± standard error) times more than movements in landscapes with smaller vegetation openings.  These movements often resulted in owls changing dispersal direction.  Further, owls that dispersed across landscape with greater amounts of vegetation disturbance had significantly lower probability of locating and settling in unoccupied patches of habitat within an average of 35 days after initially leaving their natal areas.  Therefore border developments including fences and large clearings may reduce landscape connectivity for pygmy-owls.  Loss of landscape connectivity for pygmy-owls will result in some degree of physical and perhaps genetic isolation from populations in Mexico.

11.     Landscape connectivity across the international boundary is important to conservation and recovery of the Arizona population of pygmy-owls. This is because pygmy-owls are more common in northern Sonora, Mexico than in Arizona and as such movement of individuals into Arizona will likely be required to augment populations. In the absence of natural movements into Arizona, managers will have to rely on either captive breeding or facilitated dispersal.

12.     Areas along the Arizona – Sonora border that are close to existing populations of pygmy-owls in Sonora and that provide either breeding habitat or large contiguous tracts of vegetation with similar structure to breeding habitat will be most easily permeated by dispersing owls. Excluding areas south of the Tohono O'odham Nation, 3 areas with populations of pygmy-owls in close proximity to Arizona are likely to provide a source of immigrants to Arizona. The most important of these areas is near Sasabe, Sonora, which contains the largest known population of owls within dispersal distance of Arizona with few topographic or habitat-related barriers to dispersal. In 2001 and 2002, I located 32 nests that produced 77 young within 10 km of Sasabe. The upper Río Altar Valley north of Saríc also contains a fairly large population of pygmy-owls, but it is farther from Arizona and areas of high elevation (>1,200 m) with little breeding habitat may limit connectivity. Lastly, the area near Sonoyta is also important, however pygmy-owl populations here are smaller, more dispersed, and intensive woodcutting and agriculture along the Río Sonoyta seems to have reduced connectivity.

13.     Given the importance of landscape connectivity for pygmy-owls near Sasabe and movement behaviors of pygmy-owls, a security fence along international boundary near Sasabe may preclude dispersing pygmy-owls from crossing into the U.S.

14.     The need to maintain some degree of landscape connectivity along the U.S.-Mexico border is by no means limited to the pygmy-owl.  In landscapes where habitat patches are naturally fragmented, movement among patches will help foster long-term population persistence.  The risk of extinction to any one population will depend on movement rates among patches, the size and spatial arrangement of the patches, patch-specific demographic rates, and other factors.

15.     More study is required to determine the influence of border development on wildlife movements.

16.     Less invasive techniques that do not rely on physical barriers such as walls are more likely to promote natural movements of wildlife across the international boundary.

Pursuant to 28 U.S.C. Section 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief, and that this declaration was executed on _____Sept. 27_____, 2007 in Tucson, Arizona.

Dated: _____9/27/07_____

_____/s/_____

Aaron D. Flesch

**UNITED STATES DEPARTMENT OF THE INTERIOR**
**OFFICE OF HEARINGS AND APPEALS**
**BOARD OF LAND APPEALS**

_____
)
Defenders of Wildlife and Sierra Club        )
)
)
                                Appellants,        )        IBLA Docket No.
)
)
)
*San Pedro Riparian National Conservation*    )
*Area Border Fence*                           )
EA Number AZ-420-2007-051                     )
Serial/Case File No. AZA 33680                )
)
)
)
)
)
)
_____

## DECLARATION OF SERGIO AVILA

I, Sergio Avila, declare the following to be true and correct, and to reflect my

professional opinion and my best judgment on the matter based on the body of scientific

evidence.

1.        I am trained as a wildlife biologist, with a Bachelors' degree in Biology from

Universidad Autonoma de Aguascalientes (University of Aguascalientes), and a Masters'

degree in Arid Lands Ecosystem Management from Universidad Autonoma de Baja

California (University of Baja California), both in Mexico. My M.S. dissertation was a

study of the ecology and impacts of mountain lion predation on cattle in desert, oak-woodlands and sub-alpine environments in northwestern Mexico.

2.      In 2003 I worked as a field biologist for the Northern Jaguar Project in east-central Sonora, the border state with Arizona. During this time, I tracked and identified evidence of wild felines such as jaguars, mountain lions and ocelots; also, I trapped, radio-collared and located, through telemetry, two jaguars and five mountain lions. In 2004 I worked for the Borderland Jaguars Detection Project, maintaining remote camera traps in southeastern Arizona in order to identify jaguar presence along the border region. The same year, I also worked for the University of Arizona as a field biologist on a Cactus Ferruginous Pygmy-owl research project in northern Sonora. Since 2005, I have worked as a wildlife biologist and outreach specialist with Sky Island Alliance on different wildlife related projects, workshops and trainings, mostly on carnivores and landscape connectivity in southeastern Arizona.

3.      In 2005 I initiated a study on cross-border permeability in northern Sonora, with the goal to identify important wildlife corridors (passages, linkages) that connect the northernmost breeding population of jaguars in Sonora and the resident jaguars currently in Arizona. As a result of this study, another species of tropical feline, the ocelot, was recorded as close as twenty-five miles south of the US-Mexico border. Additional ocelot photos taken from the study this summer have confirmed the presence of this cat within short distances of the United States, and suggest that ocelots may be traveling northward or currently residing in southern Arizona.

Sky Island Region

4.    The Sky Island region in the Southwestern United States and Northwestern

Mexico is situated at the confluence of four major ecosystems - the Rocky Mountains, the

Sierra Madre Occidental and the Sonoran and Chihuahuan deserts (Marshall, 1957;

Warshall, 1995).

5.    This vast area of mountains, deserts and grasslands is known for its unique

biodiversity and natural beauty, and has become an important study area for research.

Numerous biologic, geographic and geologic factors have combined to create the unique

setting of the Sky Islands' biodiversity (Coblentz, 2004).

6.    The Sky Islands are isolated mountain ranges surrounded by valleys of desert and

grassland that connect the subtropics of the Sierra Madre Occidental to the temperate

region of the Colorado Plateau.  Because they connect North America's two largest

deserts and two largest mountain complexes, the region is incredibly important for its

continentally connective characteristics. Madrean montane forests (oak woodlands, pine-

oak, and pine forests) are found at different mid-level elevations and long sinuous

tongues of deciduous riparian forest exist wherever drainages provide predictable

subsurface flow in the winter and spring (Brown and Lopez-Gonzalez, 2001). Desert and

grassland "seas" – comprised of elements from the Sonoran and/or Chihuahuan deserts –

surround and geographically isolate the Sky Islands.

Sonoran Desert

7.    The Sonoran Desert is one of the four major deserts in North America, and covers approximately 100,000 square miles, within the border states of Arizona and California in the U.S. and Sonora and Baja California, in Mexico. Elevation goes from the sea level in the Sea of Cortez, (Sonora, Mexico) to mountain tops more than 2000 meters above sea level, adding a layer of climatic complexity (Turner, R. et al, 1995).

8.    There are over 2000 species of plants, more than 550 species of vertebrates, and countless species of invertebrates (Arizona-Sonora Desert Museum, 2000). Life forms, such as columnar cacti and legume trees are the distinguishing plant elements, and their diversity and adaptability, in addition to its mild winters, add to this ecosystem's biodiversity.

9.    The Lower Colorado River Valley and the Arizona Upland, are the two sub-regions in the Sonoran Desert that are located in both sides of the international border. Highly drought-tolerant species of plants and animals live in the Lower Colorado River Valley, making them significantly important due to their adaptations, specific requirements and genetic variability. Many species and subspecies of plants and animals are found nowhere else in the World but the Sonoran Desert, and form part of a unique interconnected network of species and ecological interactions. The Arizona Upland hosts up to 630 species of plants (Arizona-Sonora Desert Museum, 2000).

10.    As a limiting factor in deserts, water plays a very important role in the survival of species in the Sonoran Desert. If, by construction of infrastructure, water streams are blocked, diverged or affected on their natural flows, this could be of catastrophic results for the long-term survival of plants and animals – seed germination, available plants like grasses and seeds as food, reproduction, and natural food chains could be interrupted (without seeds, very few herbivores could survive, and predators, raptors and scavengers would suffer a loss in their populations). Limiting water streams could also change the degrees of moisture, potentially affecting the natural fire regimes and threatening with the destruction of vast areas, where natural restoration of the existing biodiversity would take dozens of years.

11.    The Sonoran Desert provides a wide variety of habitats and conditions. Many species of vertebrates, especially reptiles and amphibians, have evolved and adapted to live in them. The mountain ranges found within the Sonoran Desert, which are forested islands surrounded by that desert and grasslands, have allowed still other forms to evolve in isolation from each other. Some of the most important reptile species are the Desert tortoise, Flat-tailed lizard, Tarahumara frog, Chiricahua Leopard frog and Gila monster. Highly-adapted species, such as the endangered Cactus ferruginous pygmy-owl find specific habitat requirements in the Sonoran Desert. The Sonoran Desert is also home to a sub-species of North American antelope, the endangered Sonoran proghorn, the fastest moving land mammal in the world.

12.    Isolation and division of the Sonoran Desert ecosystem by a physical barrier, such as the proposed pedestrian fence, will block the natural movements of species whose

distribution ranges are already limited, confining them to isolation and potential

extinction. In an altitudinal gradient, limiting wildlife migration movements from the

lower desert regions to higher elevations, could be devastating for the species survival in

specific seasons of the year or part of their life-cycles. This would not only affect those

populations, but also other interconnected-species that depend on them for food,

reproduction, vegetation cover, and any other complementing part of their life cycles.


Jaguar


13.    The jaguar (Panthera onca) is the largest cat in the Western Hemisphere and is a

species of conservation concern throughout its range (Novack et al., 2005). Historically,

jaguars roamed in Arizona and the southwest U.S. Brown and Lopez-Gonzalez (2001)

identified the "Huasabas-Sahuaripa" area, approximately 150 km south of the border, as

the northernmost breeding population of jaguars in their Continental distribution range

and this breeding population is almost certainly the source of jaguars that recently found

their way into Arizona (Brown and Lopez-Gonzalez, 2001). This secretive species finds

its way through mountains, canyons and valleys (wildlife corridors), within the Sky

Island region. Jaguars' current presence in southern Arizona is a sign of a healthy habitat

that provides territories to colonize, hunt, breed, and disperse to. Similarly, the presence

of large carnivores is also an indicator of healthy wildlife populations that they interact

with, such as prey and the resources they require to survive such as vegetation for food,

cover, refugia, water and open spaces. Other species of carnivores present in the region

are mountain lions, black bears and coyotes, and Mexican-gray wolves, grizzly bears and ocelots historically occupied territories as well.

14.     During the last 11 years, almost 100 photos of wild jaguars have been taken in the Sky Islands of southeastern Arizona and southwestern New Mexico. At least 5 male individuals have been recorded since 1996 in the border region, and one of these animals has been documented every year since. This data elucidates the fact that a male adult jaguar, living in an established territory within – wholly or partially – the United States and is potentially mating and producing litters in this trans-border bioregion.

15.     Jaguars make rounds, following a rough circuit, as they check on productive habitat patches (Polisar et al. 2003); this has been observed in a jaguar study in Sonora and it seems to be the case in southern Arizona, where one jaguar moves in a monitored area of 1350 km$^2$ (Emil McCain pers. comm.).

16.     Several studies have used information from jaguar sightings or kills (classified in different categories) and used those records to model potential jaguar habitat in the borderlands (Boydston and Lopez-Gonzalez, 2005; Grigione et al., unpublished; Hatten et al., 2003; Menke and Hayes, 2003; Menke, 2004). Though each study used a different methodology, results from these studies include the Sky Island region and the borderlands as the highest potential jaguar habitat. Two of these studies focused on potential habitat in Arizona (Hatten et al., 2003) and New Mexico (Menke and Hayes, 2003), and the other two focused on the borderlands region, presenting wider distribution

maps that include both sides of the U.S.-Mexico border and strongly suggest this region

as potential jaguar and ocelot habitat (Boydston and Lopez-Gonzalez, 2005; Grigione et

al., unpublished; Menke 2004).

Jaguar legal status

17.    The jaguar was first officially recognized as a vulnerable species under the 1969

Endangered Species Conservation Act, although protections afforded to the animal did

not apply to the interior of the United States.  After the passage of the 1973 Endangered

Species Act, the U.S. Fish and Wildlife Service recognized that the jaguar did occur in

the United States, and therefore began an additional listing process so that protections

would be afforded to the animal inside the country.  This final listing as Endangered on

July 27th, 1997 was supported by the recent documentation of two different jaguars in the

Peloncillo (Glenn, 1996) and Baboquivari (Childs, 1996) Mountains.

18.    The Convention on International Trade in Endangered Species (CITES) places the

jaguar within Appendix I (species threatened with extinction that are or may be affected

by trade). The IUCN Red List 2004 considers the jaguar Near Threatened; and the U.S.

Fish & Wildlife Service: Endangered. In Mexico, according to the Norma Oficial

Mexicana NOM-059-ECOL-2001 of the SEMARNAT, the jaguar is listed as

"endangered" (source: Instituto Nacional de Ecología, www.ine.gob.mx). The jaguar is

fully protected at the national level across most of its range, with hunting prohibited in

Argentina, Brazil, Colombia, French Guiana, Honduras, Nicaragua, Panama, Paraguay,

Suriname, United States, Uruguay and Venezuela, and hunting restrictions in place in Brazil, Costa Rica, Guatemala, Mexico and Peru. The species also occurs within protected areas in some of its range.

Ocelot status

19.    Ocelots are small to medium-sized tropical felines that require dense vegetation for cover and live in a variety of habitats, from dense thorn scrub in their northern range to tropical forests of the Amazon Basin, and the mountainous regions of Central America and the Andes. They prey upon small to medium-sized mammals (rabbits, rodents, young deer or peccaries) birds, reptiles (iguanas, lizards, small turtles) frogs, fish, and crabs.

20.    Ocelots are listed as endangered in the Endangered Species List.  One of the highest threats is habitat fragmentation by roads throughout some of their range, such as Texas, where collisions with vehicles have declined their population. In the United States, the Recovery Plan also protects the ocelot for the Listed Cats of Arizona and Texas.

21.    Habitat fragmentation and destruction are serious threats to wild felines, such as jaguars, mountain lions, bobcats and ocelots – felines present in the border region of Arizona-Sonora. Felines prefer well-covered, dense vegetation for protection of their litters, ambushing prey, feeding and migrating corridors. Activities of construction of a barrier, such as DHS' proposed pedestrian fence, clearing of vast areas, destruction of

vegetation cover, changes in topographic features, such as land-filling of canyons, or water streams, will affect cat populations in the border region, even before the fence is in place, regardless of what side of the border they are in.

Border Projects

22.    Current infrastructure and law enforcement projects proposed by DHS along/within jaguar habitat in the border region of Sonora and Arizona, threaten the survival of jaguars in the United States, endanger the establishment of individuals and/or a viable breeding population and block the passages that jaguars, as well as other big, medium and small sized mammals use to reach the habitats where they naturally occur. Proposed infrastructure will disrupt, segment and isolate wildlife populations in both sides of the border.

23.    The lack of permeability in the border also threatens ecological processes like gene flow and genetic variability, control of prey populations by predators, seed dispersal, and pollination, among others, affecting intra- and inter-specific interactions (breeding and natural colonization of habitats, dispersal, predator-prey, grazing).

24.    Of special concern is the lower/lack of genetic flow that allows populations to adapt, survive and live in desert environments, potentially generating susceptible individuals whose survival would be at risk due to diseases, isolation or human pressure, otherwise naturally regulated by animal movements.

25.     Affecting wildlife populations at this level could potentially impact the border region ecosystems as a whole, causing a detriment in native species, their habitats, abundance, diversity, and the promoting a potential invasion of non-native species – altering the natural flow of energy through natural processes, and incidentally the ecological equilibrium, balance, interactions of which these species are part.

26.     DHS' infrastructure projects and law enforcement activities are a threat for the establishment of a jaguar population in the border areas. The jaguar sightings in southern Arizona's border are in inhospitable, remote, rugged areas, not highly affected by human migration. Predictably, illegal activity could increase as the Border Patrol increases its efforts in other parts of Arizona, shifting activity to less used areas. In addition, fencing and road projects recently proposed by the Border Patrol threaten to cut off the migratory corridors between the United States and Mexico that are used by jaguars and many other migratory or resident species (Vacariu and Neeley, 2005; Segee and Neeley, 2006).

27.     The construction of infrastructure such as border walls, dirt roads, temporary and permanent outposts and/or check points; the use of generators, off-road vehicles, high-powered lights, helicopters; and land-use changes, destruction of vegetation, blockage of water streams, use of heavy machinery and other law enforcement activities, currently have and could exacerbate the long-term impacts on the land and the species that live in the region, otherwise endangered or not.

Pursuant to 28 U.S.C. Section 1746, I declare under penalty of perjury that the foregoing

is true and correct to the best of my knowledge, information, and belief, and that this

declaration was executed on ___Sept. 27____, 2007 in Tucson, Arizona.


Dated: _____9/27/07_____


_____/s/_____

Sergio Avila


Literature Cited

Boydston, E. and C. Lopez-Gonzalez. 2005. Sexual differentiation in the distribution potential of the northern Jaguars (*Panthera onca*). USDA Forest Service Proceedings RMRS-P-36.

Brown, D. and C. Lopez-Gonzalez. 2001. Borderland Jaguars: tigres de la frontera. The University of Utah Press. 170 p.

Chavez, C., and G. Ceballos. 2006. *Memorias del Primer Simposio. El Jaguar Mexicano en el Siglo XXI: Situación Actual y Manejo*". CONABIO-Alianza WWF Telcel-Universidad Nacional Autónoma de México. México, D.F.

Grigione, M.M., Menke, K., Lopez-Gonzalez, C., List, R., Banda, A., Carrera, J., Carrera, R., Morrison, J., Sternberg, M., Thomas, R., and B. Van Pelt. (Unpublished). Identifying priority conservation areas in the U.S.-Mexico border region for Neotropical cats, the jaguar, jaguarundi and ocelot. Dept of Env Science & Policy, University of South Florida, Tampa, FL.

Hatten, J. R., Averill-Murray, A., and Van Pelt, W. E. Characterizing and mapping potential jaguar habitat in Arizona. 203, 1-28. 2003. Phoenix, AZ, Non-game and Endangered Wildlife Program, Arizona Game and Fish Department.

Marshall, J. 1957. The birds of the Pine Oak Woodland in Southern Arizona and adjacent Mexico. Pacific Coast Avifauna. No. 32.

## DECLARATION OF THOMAS G. CARLSON

I, Thomas G. Carlson, declare as follows:

1.     The facts set forth in this declaration are based upon my personal knowledge.  If called as a witness, I could and would testify to these facts.  As to those matters which reflect an opinion, they reflect my personal opinion and judgment on the matter.

2.     I am an adult citizen of the United States and reside in Bisbee, Arizona.

3.     I am submitting this declaration on behalf of myself.

4.     I have provided photos, taken by me, to Defenders of Wildlife in support of their appeal of the Decision to build a pedestrian fence on the U.S.-Mexico border within the San Pedro Riparian National Conservation Area.

5.     The photos were taken on August 1, 2007

6.     The photos were taken on the border road of Sonora, Mexico between the city of Naco, Sonora and the Rio San Pedro.

7.     I have submitted these photos because I believe that they fairly represent the effect of the pedestrian fence on the xeric washes of the San Pedro River watershed, by showing the accumulation of debris on the south side of the wall and the subsequent interruption of hydrologic flows into the cross-border washes. This causes extensive damage to the roadway on the Mexican roadways, which is likely to cause accelerated erosion and soil instability.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this 19th day of September, 2007.

**EXHIBIT** 10

*Thomas G. Carlson*

[Full name]

Declaration of Tom Carlson















**UNITED STATES DEPARTMENT OF THE INTERIOR**
**OFFICE OF HEARINGS AND APPEALS**
**BOARD OF LAND APPEALS**

_____
                                                        )
Defenders of Wildlife and Sierra Club,          )
                                                        )
                                                        )
                                                        )
                             Appellants,           )          IBLA Docket No.
                                                        )
                                                        )
                                                        )
*San Pedro Riparian National Conservation*      )
*Area Border Fence*                                 )
EA Number AZ-420-2007-051                   )
Serial/Case File No. AZA 33680              )
                                                        )
                                                        )
                                                        )
                                                        )
                                                        )
                                                        )
_____


**DECLARATION OF CRAIG MILLER**

1.      I have personal knowledge of the statements in this declaration and am

competent to testify to these matters in a judicial or administrative forum.


2.      I reside at 6020 S. Camino de la Tierra; Tucson, Arizona  85746


3.      For the past 15 years, I have worked at Defenders of Wildlife.  I am currently

the Southwest Representative at Defenders.  My work at Defenders has

focused on threatened and endangered species recovery.  I have a broad

interest in the conservation of wildlife with an emphasis on the conservation

of large carnivores, and the preservation of the habitat necessary to sustain

and recover those populations.  I have been a member of Defenders of

Wildlife during my entire term of employment there.

4.    I have principally devoted my life's work to the conservation and recovery of

endangered Mexican wolves and northern jaguars.  A primary emphasis of my

work involves developing and implementing conservation projects in both the

United States and Mexico aimed at maintaining habitat areas of adequate size

to support populations and functional corridors between those areas in order to

support the survival, recovery and persistence of these endangered species.

Mexican wolves currently have a core population in the Southwestern U.S.,

with several areas of suitable habitat remaining in Mexico, which may be

necessary for recovery.  Conversely, a wild population of northern jaguars

remains in Northern Sonora, and a few individual jaguars and large blocks of

habitat remain in the United States.  I have been involved in several processes

to identify habitat for both species in both countries.  Because of my

experience in aiding the conservation and recovery of these species I have

great appreciation for the need for wildlife conservation and habitat protection

in Mexico, as well as the United States, and the need to identify and preserve

viable wildlife corridors between our nations.  The proposed construction of

impermeable border fencing in vast areas of the Arizona border generally, and

the Southwest border in particular, will have significant negative impacts on

both my professional life and goals, and my personal interest in the

preservation of wildlife and our shared natural heritage with Mexico.

5.    Additionally, I've had an appreciation for beavers my entire life, and the San

Pedro is one of the few areas in the Southwest, which is accessible to me

where I can enjoy observing beavers in their natural habitat.  Since the

reintroduction of beaver (circa 1999), I have spent many enjoyable hours

tracking and viewing beaver along the San Pedro in an attempt to educate

myself on the influence of their activity on the area's vegetation and wildlife

communities.  I recently began sharing this activity with my two sons, an

experience which we all value dearly.

6.    A related professional interest of mine involves consulting with friend and

colleague Juan Carlos Bravo, Northwest Mexico Representative for the

Mexican non-profit conservation organization Naturalia, AC. on beaver

ecology and management implications.  Juan Carlos Bravo is responsible for

management of the Rancho Los Fresnos Preserve, which lies in the upper San

Pedro watershed on the Mexican side of the border.

7.    Finally, Juan Carlos Bravo and I also serve as co-managers of a large

conservation ranch further south in Sonora which hosts the northernmost

breeding population of wild jaguars in N. America.  Scientific studies have

identified critical wildlife corridors which exist between the jaguar population

in Sonora and suitable habitat in Arizona. One of the last remaining corridors encompasses the San Pedro River and adjacent ranges.

8.      With these general interests placed in context, I also will be personally affected by the Bureau of Land Management's grant of a right-of-way for proposed fence and pedestrian fence construction within the San Pedro Riparian National Conservation Area.

9.      I first visited the San Pedro River in 1989, just after the designation of the upper San Pedro as a National Conservation Area. During that time I was living near Elfrida, Arizona on the western slope of the Chiricahua Mountains. Immediately prior to this I had spent a year studying wildlife and ecology with the National Audubon Society Expedition Institute. I was drawn to the San Pedro River because of its lush vegetation, abundant surface water and unmatched wildlife viewing opportunities. Because of the uniqueness of the area, and because it was a relatively short distance from where I was living, the San Pedro River became a favorite location to spend my free time.

10.     In 1995, I spent two days and one night at the Grey Hawk Ranch, which is located along the San Pedro River. During this stay I enjoyed an outstanding birding experience by fellow naturalist Sandy Anderson, co-owner of the ranch. I enjoyed two full days birding, tracking wildlife and exploring the features of the San Pedro river environment, which I found to be exceptionally

unique for Arizona. This experience further deepened my appreciation for the San Pedro River environment.

11.     Since that time, I have visited the San Pedro River on at least 20 occasions. Because of the exceptional opportunities to experience nature afforded by the San Pedro, and because much of my work involves travel through rural southeastern Arizona in the vicinity of the San Pedro, visiting the area has become a valued part of my personal and professional experience. My visits typically range from a few hours to full days which I spend birding, tracking wildlife and making plaster casts of tracks in an attempt to improve my understanding and deepen my appreciation of the wildlife and ecology of this unique area.

12.     The construction of the proposed pedestrian fence and border road will significantly affect me and my interest in numerous ways. Impermeable fencing, combined with increased vehicle and human activity along the proposed border road threatens to impede or prevent the movement of mammals, such as mountain lions, jaguars, wolves, bobcats, coyotes, beaver etc., disallowing them to move freely through their habitat along the San Pedro River and adjacent environments. The ability to move between areas and to freely utilize habitat both north and south of the border is important for some species in order to perform basic, but essential activities such as hunting or foraging, mate selection, dispersal and establishment of new territories,

reproduction and recruitment, and seeking refuge from predators, disruptive activities and conflicts with humans. Such a significant disruption of normal activity has serious implications on the population ecology of resident wildlife.

13. The proposed fence will permanently sever the wildlife corridor which currently exists along the San Pedro River, preventing dispersal and recolonization of endangered jaguars and wolves as they attempt to move through and recolonize habitat in the region. Such dispersal and recolonization is essential for their recovery. Additionally, impermeable fencing also threatens to isolate other populations of borderland wildlife, forcing them into smaller groups and reducing the genetic diversity of affected populations.

14. The proposed fencing and road construction will create significant disturbance to wildlife during construction due to the increased human presence, construction equipment, noise and lighting and will result in a permanent net loss of available habitat. Additionally, fencing, construction and increased border patrol activities within the National Conservation Area will likely further diminish the value of habitat areas adjacent to the new developments and add stress to area wildlife which may ultimately reduce wildlife abundance and viewing opportunities.

15.     I have concrete plans to again visit the San Pedro Riparian National

        Conservation Area on Nov. 8-9, 2007, as part of an upcoming event which

        involves public presentations about wolf recovery in the region.


Pursuant to 28 U.S.C. Section 1746, I declare under penalty of perjury that the foregoing

is true and correct to the best of my knowledge, information, and belief, and that this

declaration was executed on ___Sept. 27____, 2007 in Tucson, Arizona.


Dated: _____9/27/07_____

                              _____/s/_____

                              Craig Miller

**UNITED STATES DEPARTMENT OF THE INTERIOR**
**OFFICE OF HEARINGS AND APPEALS**
**BOARD OF LAND APPEALS**

_____
                                        )
Defenders of Wildlife and Sierra Club   )
                                        )
                                        )
                                        )
                        Appellants,     )        IBLA Docket No.
                                        )
                                        )
                                        )
*San Pedro Riparian National Conservation*  )
*Area Border Fence*                     )
EA Number AZ-420-2007-051               )
Serial/Case File No. AZA 33680          )
                                        )
                                        )
                                        )
                                        )
                                        )
                                        )
_____

**DECLARATION OF JENNY NEELEY**

I, Jenny Neeley, declare as follows:

1.      I have been a resident of Tucson, Arizona since 1996.  I worked for Defenders of Wildlife for six years until this summer, when I left to attend law school. I maintained a membership with the organization during the time of my employment, and am still a member with Defenders of Wildlife.   I am also a member of the Sierra Club and regularly volunteer with the Sierra Club Rincon Group in Tucson.

2.    During my employment with Defenders of Wildlife my work focused primarily on the conservation of endangered species and protected lands in Sonoran desert bioregion.  Since 2003, much of my work was focused on efforts to conserve federally protected lands along the Arizona-Mexico borderlands and the imperiled species that occur there, including the cactus ferruginous pygmy-owl, jaguar, Sonoran pronghorn, and other wildlife.   As a result I became intimately familiar with the status of these species and the threats facing their habitat, found primarily in federally protected lands, including Organ Pipe Cactus National Monument, Buenos Aries National Wildlife Refuge, San Pedro Riparian National Conservation Area and San Bernardino National Wildlife Refuge. I am also familiar with available federal laws, regulations and other programs related to the conservation of borderland federal parks and imperiled species.

4.    Through my work it became evident that the greatest threat facing these lands and species is the dramatic buildup of border security infrastructure and activities in and around Arizona.   The threats include significant and irreparable impacts directly resulting from construction of infrastructure and increased Border Patrol activity in ecologically sensitive areas, as well as those indirect impacts to ecologically sensitive areas resulting from shifts in migration patterns which result from increased Border Patrol presence and infrastructure in other border areas, such as San Diego and Douglas. Impacts include habitat fragmentation and destruction, spread of invasive species, wildlife mortality and

displacement, interruptions in cross-border migration, modifications of wildlife behavior, and the introduction of air and water contaminants.

5.     While residing in southern Arizona I spend much of my free time recreating in the outdoors, including hiking, camping and birdwatching.  One of the places I have enjoyed visiting several times is the San Pedro Riparian National Conservation Area and other segments of the San Pedro River.  My first visit to the San Pedro River was in 1997 on a day hike and picnic with friends.  We were all unfamiliar with the area having just recently moved to Tucson from other areas of the country and all of us were impressed with the area.  It was quiet and remote; we felt very removed from the city, and were able to enjoy a very pleasurable nature experience far removed from the more typical Sonoran desert surroundings of Tucson, and all within just an hour's drive from home

6.     Since my first visit, I have returned to the area several more times to hike and enjoy the river, and observe the plant and animal species found there.  For example, in 1999 I went to the National Riparian Conservation Area with my parents, who were visiting from out of town.  We spent the day hiking along the river and bird-watching.  We were able to see numerous species of birds during our visit, including the Gila woodpecker, the phainopepla, pyrrhuloxia, and the northern flicker.  We also enjoyed the cool shade provided by the tall cottonwood trees and were able to dip our feet in the river.  I plan to visit the San Pedro River and San Pedro Riparian National Conservation Area on a periodic basis in the future, as it is a short drive from my home and a welcome respite from the

pressures of urban existence in Tucson.  In addition, I have specific plans to visit the San Pedro River and border area within the next month in order to inspect potential construction work there, as well as in surrounding areas near Naco and Douglas.

7.    I have also had opportunity to visit the river periodically for my work and to speak with land managers in the region about the impacts of increased border security on the San Pedro river and the associated natural resources. During this time I have observed an increase in both Border Patrol activities in and around the river area, as well as human migration redirected through this area from other nearby areas subjected to increased Border Patrol activities.  Over the past 4 years such activities have increased dramatically and have wrought significant damage to the river and the associated natural resources.

8.    Should a fence and other associated infrastructure be built in and around the San Pedro river, it will likely cause significant impacts to the San Pedro river and surrounding areas and will negatively impact the important wildlife habitat found there.  This will greatly impact my ability to enjoy the resources found in the San Pedro River and surrounding areas because the resultant habitat destruction will subsequently decrease the number of wildlife species available for viewing.  It will also negatively impact the associated vegetation and water flows of the river, diminishing the remote and quite nature of the outdoor experience currently found there.  Increased Border Patrol presence, including off-road vehicle use and infrastructure construction, will negatively

impact the wildlife and scenic values of the area and will detract from the visitor experience overall.

Pursuant to 28 U.S.C. Section 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief, and that this declaration was executed on _____Sept. 26_____, 2007 in Tucson, Arizona.

Dated: ___9/26/07_____

_____/s/_____

Jenny Neeley

**UNITED STATES DEPARTMENT OF THE INTERIOR**
**OFFICE OF HEARINGS AND APPEALS**
**BOARD OF LAND APPEALS**

_____
                                        )
Defenders of Wildlife and Sierra Club,  )
                                        )
                                        )
                                        )
                        Appellants,     )    IBLA Docket No.
                                        )
                                        )
                                        )
*San Pedro Riparian National Conservation*  )
*Area Border Fence*                     )
EA Number AZ-420-2007-051               )
Serial/Case File No. AZA 33680          )
                                        )
                                        )
                                        )
                                        )
                                        )
                                        )
_____

**DECLARATION OF JOHN L. LEONARD**

I, John L. Leonard, do declare:

1.      I have led hikes along the San Pedro River for both the Sierra Club and the

Southern Arizona Hiking Club. I have also participated in clean-up and tree planting

outings sponsored by the BLM in the San Pedro Riparian National Conservation Area. In

addition, I have enjoyed solo hikes along the free-flowing San Pedro River.


2.      The greatest attraction of the Riparian Area is the presence of flowing water- an

inestimable boon in our desert environment- and the attendant proliferation of wildlife,

both avian and mammalian. Birding experts tell us that the number of different species

that utilize the San Pedro corridor is unmatched anywhere else. Mammalian species depend on the corridor for their migrations; like we humans, they can't do without water.

3.      I believe that the present San Pedro Riparian National Conservation Area attracts many visitors, for the reasons mentioned above, and these visitors have a significant economic effect on the neighboring towns.

4.      The construction of an intrusive border fence, with the associated roads necessary for the actual building, and then maintenance, will have a very deleterious effect on the water, the animals, and the general serenity of the area.

Pursuant to 28 U.S.C. Section 1746, I declare under penalty of perjury, that the foregoing declaration is true and correct, to the best of my knowledge, information and belief, and that this declaration was executed in Tucson, Arizona, on September 27, 2007.

Dated: _____9/27/07_____

_____/s/_____

John L. Leonard, Ph.D.

**UNITED STATES DEPARTMENT OF THE INTERIOR**
**OFFICE OF HEARINGS AND APPEALS**
**BOARD OF LAND APPEALS**

_____
                                                    )
Defenders of Wildlife and Sierra Club               )
                                                    )
                                                    )
                            Appellants,             )        IBLA Docket No.
                                                    )
                                                    )
                                                    )
*San Pedro Riparian National Conservation*          )
*Area Border Fence*                                 )
EA Number AZ-420-2007-051                            )
Serial/Case File No. AZA 33680                       )
                                                    )
                                                    )
                                                    )
                                                    )
                                                    )
                                                    )
_____

## DECLARATION OF SANDRA L. BAHR

I, Sandy Bahr, declare as follows:

    1.    I have been a resident of Phoenix, Arizona since 1987. I have worked for the Sierra Club's Grand Canyon Chapter for ten years as its conservation outreach director/chapter director and I am also a lifetime member of the Sierra Club.

    2.    My work for the Sierra Club focuses on a variety of conservation issues including advocating for protection of public lands, wildlife, and rivers and streams, among others. I have worked on management plans and protection mechanisms for the border area's public lands including for the Cabeza Prieta

Wildlife Refuge, Organ Pipe Cactus National Monument, Buenos Aries National Wildlife Refuge, San Pedro Riparian National Conservation Area, and the Barry M. Goldwater Range, as well as the proposed Tumacacori Highland Wilderness in the Coronado National Forest. I am familiar with the federal laws, regulations and other programs related to the conservation of borderland public lands and wildlife species and the mechanisms for public involvement.

3.     Work in these areas has made it clear that one of the greatest threats to the border area's public lands is the increasing activities and buildup of border security infrastructure in the remote and sensitive lands. The threats include significant impacts resulting directly from construction of infrastructure and increased Border Patrol activity in these sensitive areas, as well as indirect impacts to ecologically sensitive areas resulting from shifts in migration patterns which result from increased Border Patrol presence and infrastructure in other border. Impacts include habitat fragmentation and destruction, spread of invasive plant species, wildlife mortality and displacement, interruptions in cross-border wildlife migration, modifications of wildlife behavior, and the introduction of air and water contaminants.

4.     As part of my job and also in my free time, I frequently visit – hiking, backpacking, camping, as well as assisting with service projects – many of Arizona's public lands. One of the places I have enjoyed visiting is the San Pedro Riparian National Conservation Area and other segments of the San Pedro River. My first visit to the San Pedro River was in the early 1990s. My husband and I

hiked along the river and viewed a variety of wildlife species including coatimundi, turkeys, and several kinds of hummingbirds.

5.      Since my first visit, I have returned to the river several more times in conjunction with my work and also for pleasure to hike, to enjoy the river, and to observe the plant and animal species found there. I plan to visit the San Pedro River and San Pedro Riparian National Conservation Area on a periodic basis in the future, as it is an amazing and beautiful area with a diversity of wildlife species.

6.      Construction of a fence and other associated infrastructure in and around the San Pedro River will likely cause significant negative impacts to the San Pedro River and surrounding areas and will negatively affect the wildlife habitat as well as the wildlife found there. This will affect my ability to enjoy the resources found in and around the San Pedro River because the associated loss of habitat and habitat destruction will affect the number and possibly the diversity of wildlife species available for viewing. It will also negatively impact the associated vegetation and water flows of the river, diminishing the remote and quiet nature of the outdoor experience currently found there. Increased Border Patrol presence, including off-road vehicle use and infrastructure construction, will negatively impact the wildlife and scenic values of the area and will detract from the visitor experience overall.

Pursuant to 28 U.S.C. Section 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief, and that this declaration was executed on _____September 26_____, 2007 in Phoenix, Arizona.

Dated: _____9/26/07_____

_____/s/_____

Sandra L. Bahr

## DECLARATION OF MATT CLARK

1.      I have personal knowledge of the statements in this declaration and am competent to

testify to these matters in a judicial or administrative forum.


2.      I reside at 6634 E. Bambino Rd., Tucson, Arizona  85701.


3.      I am a native of the Southwest.  For the past 10 years I have worked in the

environmental and conservation field in the southwestern United States.  I am

currently a Southwest Representative with the Defenders of Wildlife (Defenders).

My work at Defenders focuses on regional conservation planning in the Sonoran

Desert and Sky Island Ecoregions.  I have a vested interest in the conservation of

wildlands and wildlife in the Southwest, especially the protection and restoration of

trans-boundary and landscape-level habitat connectivity.  I have been a member of

Defenders of Wildlife during my whole term of employment.


4.      The primary emphasis of my career thus far has been in the fields of regional

conservation planning, Wilderness inventory and protection, Conservation Biology,

Restoration Ecology and Landscape Ecology.  I earned an M.S. in Forestry from

Northern Arizona University in 2005.  I have and continue to be involved in

numerous collaborative conservation initiatives that span the North American

Continent.  A large portion of my position's current focus is dedicated to

environmental issues facing the Borderlands of the Southwest.  This involves working

with public agencies, land owners and managers, as well as other organizations to

gather information, track public processes and procedures, identify conflict areas and

potential solutions, and to establish common ground amongst stakeholders.  The construction of impermeable border fencing across the wildlands of the US – MX border, affecting large tracts of both public and private lands and wildlife habitat, will have significant negative impacts upon my own psyche, and my personal interest in conserving the natural heritage of this diverse and ecologically-sensitive region.  I also enjoy outdoor recreation in the wide-open wildlands of Arizona.

5.      I have a particular interest in the conservation and restoration of threatened, endangered, sensitive, strongly interactive and wide-ranging species.  Among a myriad of other species, I am deeply concerned about the long-term negative impacts of border fencing on habitat and habitat connectivity for terrestrial species such as the jaguar, ocelot, Southwest willow flycatcher, Fort Huachuca water umbel, Cactus ferruginous pygmy owl, lesser long-nosed bat, mountain lion, black bear, bobcat, beaver, coyote, black-tailed jackrabbit, pronghorn, white-tailed deer, mule deer, coati, javelina, and the Pima pineapple cactus, among others.  As a conservation biologist by training, I am particularly concerned that the border wall will sever crucial habitat connectivity and wildlife corridors, isolate populations and prevent dispersal events that provide essential genetic exchange between wildlife populations extant both north and south of the US-MX border.

6.      I am committed to identifying and promoting solutions that will simultaneously allow for effective border security and trans-border habitat connectivity.  A perfect example of such a solution is "virtual fencing", or SBInet which is now being implemented and tested along the AZ – MX border near Sasabe (dubbed Project 28).  Such technological solutions are ready alternatives to ineffective walls, provide critical

"real time" information to Border Patrol officers on the ground, and do not create a physical barrier to wildlife movement. In addition, there is potential that SBInet could serve a dual purpose for documenting and monitoring trans-boundary movements of some of the larger wildlife species. Virtual fencing, along with vehicle barriers in appropriate areas, habitat restoration where appropriate, and doubling the resources to affected land and wildlife management agencies, are solutions I and Defenders are promoting.

7.    With these general interests in context, it is evident I will be personally affected by the Bureau of Land Management's grant of a right-of-way for proposed fence and pedestrian fence construction within the San Pedro Riparian National Conservation Area.

8.    I recently visited the San Pedro River National Conservation Area and adjacent lands to the east on the morning of October 4, 2007. I toured the area along the border to see for myself the construction that was underway. I documented earth moving and vegetation clearing, deep trenches prepared for future fencing, and border fence materials staging areas in the National Conservation Area itself (see map with photopoints, coordinates and captions). I was surprised by the rapid pace at which construction was proceeding, and with the magnitude of both ecological and visual impact of this new security infrastructure.



**Figure 1.** This map depicts the area of interest on the eastern flanks of the San Pedro River National Conservation Area. Photopoints SP2-SP7 correspond with captions 1-7, with comments in succession trending upward from west to east. Photos associated with these photopoints follow below. The bright red line approximates the eastern boundary line of the NCA.



**Figure 2.** Photopoint SP7 [N31 20.057 W110 08.827] Caption 1: SP7: Mountain lion scat identified 100 yards east of the San Pedro River riparian area along the access road.



**Figure 3:** Photopoint SP6 [N31 20.056 W110 08.572] Caption 2: Looking west. This photo shows the western-most extent of right of way expansion and improvement. Construction was apparently ceased due to the discovery of important archeological resources at this location.



**Figure 4:** Photopoint SP6 [N31 20.056 W110 08.572].  Caption 3: Looking west. A large pile of slash from land clearing on San Pedro NCA.



**Figure 5.** Photopoint SP5 [N31 20.059 W110 08.212]. Caption 4: Looking west/northwest. Crews work with bulldozers and dump trucks to clear and haul slash resulting from land clearing on the San Pedro NCA.



**Figure 6.** Near Photopoint SP5 [N31 20.059 W110 08.212].
Caption 5: Looking east. This trenching for the fence has been
completed on the San Pedro NCA.



**Figure 7.** Photopoint SP4 {N31 20.055 W110 07.609]. Caption 6: Looking west. Land clearing completed for right of way on San Pedro NCA.  Fence materials staging area can be seen to right.



**Figure 8.** Photopoint SP3 [N31 20.055 W110 06.604]. Caption 7: Looking west.  Active fence construction, approx. 1 mile east of NCA boundary.  San Pedro River Valley and Huachuca Mountains in the background.



**Figure 9.** Photopoint SP2 [N31 20.062 W110 06.125]. Caption 8: Looking south. A CAT climbs out of Gringo Wash, heading west toward the San Pedro NCA.

9.      While visiting the area, I spoke with a local land owner who was deeply disturbed by the negative impacts of the new border wall on the area's wildlife and hydrology, his ability to enjoy the area's open vistas, and the value of his own land. He also expressed concerns about invasion of privacy. I am very sympathetic with his plight, and recognize he must be one amongst many who face this very same dilemma in relation to the border wall.

10.      While walking the road approximately 100 yards east the San Pedro River at the border on the morning of October 4, 2007, I identified and documented a mountain lion scat (fecal matter; see Figure 2), and bobcat scat. These species would be among those that would be negatively impacted by the construction of a border wall across one of the last free flowing rivers in the Southwest. The San Pedro River is an

enormous public asset, and is one of our country's most biologically rich areas. The San Pedro River's hydrology may be detrimentally affected by the ongoing and planned wall construction, which is concerning for both ecological and socioeconomic reasons. My personal interest in the conservation of this national treasure and the diversity of life it supports prompted me to take on the assignment to personally witness and document the infliction of this ecological wound.

Pursuant to 28 U.S.C. Section 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief, and that this declaration was executed on Oct. 5, 2007 in Tucson, Arizona.

Dated: _____10/05/07_____

_____/s/

Matthew J. Clark

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| DEFENDERS OF WILDLIFE, and SIERRA CLUB | ) ) ) |
| Plaintiffs, | ) Civil Action No. ) |
| vs. | ) ) |
| BUREAU OF LAND MANAGEMENT; U.S. DEPARTMENT OF THE INTERIOR; U.S. ARMY CORPS OF ENGINEERS; and U.S. DEPARTMENT OF HOMELAND SECURITY | ) ) ) ) ) ) ) |
| Defendants. | ) ) |

## CERTIFICATE OF COUNSEL

Pursuant to local Rule 65.1, I hereby certify that Plaintiffs' counsel has taken all reasonable steps to provide the Defendants actual notice of Plaintiffs' motion for a Temporary Restraining Order, and to furnish Defendants with copies of all pleadings and papers to be filed in the action and to be presented to the court at the hearing. Specifically, on October 4, 2007, Plaintiffs' counsel called Michael Young, Department of Interior Assistant Solicitor for Wildlife and Parks, to inform him of Plaintiffs' intention to seek emergency injunctive relief on October 5, 2007, the following day. Subsequently, on October 4, Charles Findlay, a senior lawyer with the Department of Justice, contacted Plaintiffs' counsel in response to the earlier conversation with Mr. Young. Plaintiffs' counsel informed Mr. Findlay of the nature of the claims, advised him that Plaintiff would be seeking a Temporary Restraining Order on the following day, and

sent him a copy of Plaintiffs' Appeal and Petition for Stay submitted to the Interior Board

of Land Appeals, which described the facts and basis for the claims.  It was agreed that

Plaintiffs would messenger copies of the complaint and motion papers on the morning of

October 5, and would contact Mr. Findley if Plaintiffs obtained a hearing so that the

Department of Justice could attend.


Respectfully submitted,



_____

Brian Segee, D.C. Bar No. 492098
Staff Attorney
Defenders of Wildlife
1130 Seventeenth Street, N.W.
Washington, D.C. 20036
(202) 682-9400


Bob Dreher, D.C. Bar. No. 398722
Vice President for Conservation Law
and Litigation
Defenders of Wildlife
1130 Seventeenth Street, N.W.
Washington, D.C. 20036
(202) 682-9400


Dated:  October 5, 2007

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| DEFENDERS OF WILDLIFE, et al. | ) | |
| | ) | |
| Plaintiffs, | ) | Civil Action No. |
| | ) | |
| vs. | ) | |
| | ) | |
| BUREAU OF LAND MANAGEMENT, et al. | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |
| | ) | |

## **<u>ORDER</u>**

Upon consideration of plaintiffs' motion for a temporary restraining order, and the responses thereto, it is this _____ day of October, 2007

ORDERED that the motion for a temporary restraining order is granted; and it is further

ORDERED that the construction of, and the activities related to the construction of, all border walls, fences or roads within the San Pedro Riparian National Conservation Area be halted immediately pending further Order of this Court.

_____
United State District Judge

<u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that service of the foregoing plaintiff's Motion for Temporary Restraining

Order, accompanying  memorandum, plaintiffs' exhibits 1-15,  and a proposed Order has been

made directly to the Court on this 5th day of October, 2007.


_____

Brian Segee, D.C. Bar No. 492098
Staff Attorney
Defenders of Wildlife
1130 Seventeenth Street, N.W.
Washington, D.C. 20036
(202) 682-9400

27