IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| DEFENDERS OF WILDLIFE and SIERRA CLUB; | ) ) ) ) ) | Case No. 1: 07-CV-01801 (ESH) |
| Plaintiffs | ) ) ) | |
| v. | ) ) | |
| U.S. DEPARTMENT OF THE INTERIOR; U.S. BUREAU OF LAND MANAGEMENT; UNITED STATES ARMY CORPS OF ENGINEERS; AND U.S. DEPARTMENT OF HOMELAND SECURITY | ) ) ) ) ) ) | |
| Defendants. | ) ) ) ) | |

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER IN RELATION TO BORDER WALL AND ROAD CONSTRUCTION ON THE SAN PEDRO RIPARIAN NATIONAL CONSERVATION AREA**

TABLE OF CONTENTS

PAGE

I.      INTRODUCTION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.     REGULATORY BACKGROUND  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

        A.      CHALLENGED ENVIRONMENTAL DOCUMENTS . . . . . . . . . . . . . . . 2

        B.      CHALLENGED AGENCY ACTION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

III.    STATUTORY BACKGROUND  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

        A.      THE BORDER FENCE ACT  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

        B.      NEPA  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

IV.     ARGUMENT  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

                PLAINTIFFS HAVE NOT MET AN INJUNCTION'S
                EQUITABLE PREREQUISITES... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .8

                A.      PLAINTIFFS CANNOT PREVAIL UNDER NEPA  . . . . . . . . . . 9

                        1.  NEPA Does Not Require a Programmatic or "Regional
                            EIS Here. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .9

                        2.  The 2007 EA Properly Considered Potential Erosion,
                            Sedimentation, and Other Hydrologic Effects. . . . . . . . . . . . .12

                        3.  Interior Properly Considered the San Pedro Area's Distinct
                            Ecological Characteristics. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .19

                        4.  Plaintiffs' Cumulative Impact Claims Are Defective on
                            Their Face. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .20

                        5.  Neither NEPA Nor its Regulations Required Interior to
                            Distribute the Draft 2007 EA for Public Comment. . . . . . . . . .22

6.   Interior Complied With the Arizona-Idaho
Conservation Act..........................................................................23

B.   AN INJUNCTION SHOULD NOT BE ENTERED BECAUSE
IT WOULD DISPROPORTIONATELY HARM THE PUBLIC
INTEREST WITHOUT ABATING IRREPARABLE
ENVIRONMENTAL INJURY   ......................... 24

V.   CONCLUSION  ............................................... 28

## I. INTRODUCTION

Citing alleged procedural violations of the National Environmental Policy Act of 1969, 42 U.S.C. § 4321 et seq. ("NEPA"), plaintiffs ask this Court to second-guess Congress' statutory direction to the Department of Homeland Security that it must "promptly acquire such easements" as necessary to "commence construction of [border] fences immediately." P.L 109-367, Sec. 3, codified at 8 U.S.C. § 1103 note ("Border Fence Act"). Congress enacted the Border Fence Act to abate both undisputed border security threats and undisputed harm to public lands occasioned by an influx of undocumented aliens ("UDA").

Plaintiffs ask this Court to immediately block a border fence section's ongoing construction on a "60-foot wide strip" of both the U.S.--Mexico international border and the border of the San Pedro Riparian National Conservation Area ("San Pedro area") until federal defendants ("Interior" or "Homeland Security") complete a new environmental impact statement ("EIS"), in lieu of the environmental assessment ("EA") and finding of no significant impact ("FONSI") by which federal defendants previously studied the San Pedro area. See 31 August 2007 Environmental Assessment and Finding of No Significant Impact ("2007 EA") at 5, attached hereto as Exhibit A.

For two fundamental reasons, this Court must reject plaintiffs' requested injunctive relief. First, plaintiffs' mere showing that they vigorously disagree with the 2007 EA's findings and analysis is not enough under NEPA. Instead, plaintiffs must identify an environmental factor or factors applicable to NEPA for which Interior's analysis in the 2007

EA was "arbitrary and capricious." Because Interior considered every environmental factor identified in plaintiffs' papers with reasoned, sensible analysis, plaintiffs cannot make a prima facie NEPA case and, therefore, cannot prevail on the merits. See Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 349-350 (1989); Baltimore Gas & Electric Co. v. NRDC, 462 U.S. 87, 105 (1983); see also Dep't of Transp. v. Public Citizen, 541 U.S. 752, 763 (2004); City of Alexandria v. Slater, 198 F.3d 862, 874 (D.C. Cir. 2000); Sierra Club v. U.S. Dep't of Transportation, 753 F.2d 120, 126 (D.C. Cir. 1985) (EA and FONSI may be overturned only if they are "arbitrary, capricious, or an abuse of discretion").

Second, plaintiffs cannot meet the equitable threshold necessary for obtaining emergency injunctive relief because (1) they have not established the irreparable environmental injury necessary for any injunction and (2) an injunction of the San Pedro border fence construction would contravene the public interest by delaying federal defendants' urgent responses to: documented border security risks; related national security risks; and serious environmental risks occasioned by illegal road construction and widespread encroachment by UDA's on both protected wildlife habitat and other federal lands.

## II. REGULATORY BACKGROUND

### A. CHALLENGED ENVIRONMENTAL DOCUMENTS

In the 2007 EA, Interior studied the environmental effects of commencing the "construction of fences immediately" in the San Pedro area, pursuant to the Border Fence Act and other statutes. See Border Fence Act, P.L 109-367, Sec. 3, codified at 8 U.S.C. § 1103;

2007 EA at 5.[1]/  This fencing would be within a "60-foot wide strip" along both the U.S–Mexico border and the border of the San Pedro Riparian National Conservation Area ("San Pedro area").  2007 EA at 1 (FONSI),  3, 5 (EA).

### B.  CHALLENGED AGENCY ACTION

This border fencing would require construction or excavation on up to 225 acres in the San Pedro area.  29 August 2007 U.S. Fish and Wildlife Service Biological Opinion ("Biological Opinion") at 8, attached hereto as Exhibit B.  By comparison, the entire San Pedro Riparian National Conservation Area occupies over 58,000 acres of federal land. Declaration of Jayson P. Ahern ("Ahern Decl.") at ¶ 10, attached hereto Exhibit C.

Interior's Bureau of Land Management ("BLM") manages the San Pedro area. Pursuant to the Border Fence Act and other statutes, Homeland Security requested a right of way ("ROW") from BLM, BLM granted that ROW, and the U.S. Army Corps of Engineers commenced the construction and excavation necessary to build the San Pedro border fence. 2007 EA at 2.

## III.  STATUTORY BACKGROUND

### A.  THE BORDER FENCE ACT

The Border Fence Act reflects Congress' decision to improve border security and abate environmental risks occasioned by widespread illegal immigration.  Section 102(a) requires Homeland Security "[to] take such actions as may be necessary to install additional

---

[1]/        All documents cited in this memorandum are in the 2007 EA's administrative record that has not yet been filed.

physical barriers and roads (including the removal of obstacles to detection of illegal entrants) in the vicinity of the United States border to deter illegal crossings in areas of high illegal entry into the United States." P.L 109-367, Sec. 3, codified at 8 U.S.C. § 1103.

The Border Fence Act also authorizes Homeland Security to "waive all legal requirements" of federal laws conflicting with it, where Homeland Security determines such waiver is "necessary to ensure expeditious construction of the barriers and roads under this section." Id. § 102.  Federal defendants have not yet decided to invoke or not invoke this waiver section.  Congress transferred responsibility for constructing border barriers from the Attorney General to Homeland Security by enacting the Homeland Security Act of 2002, Pub. L. No. 107-296; see also Pub. L. No. 108-7, Division L, § 105 ("the Act").  The Act essentially created Homeland Security from other departments, abolished the Immigration and Naturalization Service, and transferred Border Patrol functions to the Under Secretary for Border and Transportation Security at Homeland Security.  See 6 U.S.C. §§ 251, 291. The Act also amended the Border Fence Act to state that Homeland Security has the power and duty to control and guard U.S. borders against illegal entry.  8 U.S.C. §1103(a)(5).

**B.  NEPA**

NEPA generally requires a federal agency to prepare an environmental impact statement ("EIS") when a proposed governmental action significantly affects "the quality of the human environment."  However, where the proposed action would  not significantly affect the environment, NEPA does not require an EIS.  See 43 U.S.C. 4332(2); 40 C.F.R. § 1508.9; see also Marsh v. Oregon Natural Resources Council, 490 U.S. 360, 372, 375-376,

377 n. 23, 378 (1989); Kleppe v. Sierra Club, 427 U.S. 390, 394 (1976).

The Council on Environmental Quality ("CEQ") has issued regulations governing agency compliance with NEPA. 40 C.F.R. § 1500.1. The CEQ regulations provide that, in determining whether to prepare an EIS, a federal agency must first determine whether its proposed action either normally requires the preparation of an EIS or is categorically excluded. If the proposed action falls into neither category of actions, which is the case here, then the agency should prepare an environmental assessment ("EA") to determine whether its proposed action would precipitate a significant impact on the environment necessitating an EIS. 40 C.F.R. § 1501.4.

CEQ regulations define an EA as "a **concise** public document ... that serves to [**b**]**riefly** provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact."[2]/ 40 C.F.R. § 1508.9(a)(emphasis supplied). Under this standard, an agency need not prepare an EIS if, on the basis of "sufficient evidence" and related analysis, it concludes in an EA and corresponding finding of no significant impact ("FONSI") that its proposed action would not significantly affect the environment. Id.; 40 C.F.R. § 1508.13.

These provisions of NEPA impose procedural, not substantive, constraints on the government. Thus, NEPA does not dictate a federal agency's particular programmatic

---

[2]/    An EIS, on the other hand, is "a detailed written statement" that requires an in-depth analysis of all potential impacts. See 40 C.F.R. §§ 1502 and 1508.11; Lower Alloways Creek Tp. v. Public Service Elec., 687 F.2d 732, 741 (3rd Cir. 1982).

objectives or otherwise mandate a particular level of environmental protection or economic development per se. Instead, NEPA governs the manner in which an agency reaches its decisions. Its dominant purpose is to ensure that federal agencies consider the environmental consequences of their proposed actions in advance of a final decision to proceed. Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 349-350 (1989).

> The Supreme Court has emphasized NEPA's purpose.
>
> [NEPA's] mandate to the agencies is essentially procedural....It is to insure a fully informed and well-considered decision, not necessarily a decision the judges of the Court of Appeals or of this Court would have reached had they been members of the decisionmaking unit of the agency. Administrative decisions should be set aside in this context, as in every other, only for substantial procedural or substantive reasons as mandated by statute, ... not simply because the court is unhappy with the result reached.

Vermont Yankee Nuclear Power Corp. v. NRDC, 435 U.S. 519, 558 (1978).

Judicial review of NEPA decisions is the same as judicial review of other informal agency decisions under the Administrative Procedure Act ("APA"): this Court must decide whether Interior's determination in the 2007 EA and FONSI that the San Pedro fencing project would not have significant environmental consequences was arbitrary and capricious. Dep't of Transp. v. Public Citizen, 541 U.S. 752, 763 (2004); Marsh v. Oregon Natural Resources Council, 490 U.S. 360, 375-376, 377 n. 23, 378; City of Alexandria v. Slater, 198 F.3d 862, 874; Greenpeace Action v. Franklin, 14 F.3d 1324, 1331-1333, 1335 (9th Cir. 1992); Sierra Club v. U.S. Dep't of Transportation, 753 F.2d 120, 126 (D.C. Cir. 1985).

The Supreme Court has defined the type of reasoning that reviewing courts must uphold under NEPA. The Court has concluded that NEPA documents must be upheld if an

agency conducts a "reasoned evaluation" of environmental factors in them.  Marsh v. Oregon Natural Resources Council, 490 U.S. 360, 377, 385.  The Supreme Court defines a "reasoned evaluation" under NEPA as having two components: an agency must (1) consider "the relevant factors" and (2) articulate "a rational connection between the facts found and the choice made."  Baltimore Gas & Electric Co. v. NRDC, 462 U.S. 87, 105 (1983)("Baltimore Gas"); see also Nat'l Comm. for the New River v. FERC, 373 F.3d 1323, 1327 (D.C. Cir. 2004)(applying Baltimore Gas).

Under this standard, once an agency adequately identifies and evaluates the relevant environmental factors, it "is not constrained by NEPA from deciding that other values outweigh the environmental costs."  Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 350.  Under the same standard, plaintiffs cannot prevail unless they provide conclusive evidence to meet their burden of showing that BLM acted arbitrarily.  To meet this burden, plaintiff must supply detailed evidence, not speculation or conjecture, to clearly controvert the analysis underlying an agency's NEPA document.  See Kleppe v. Sierra Club, 427 U.S. at 412-414; see also Enos v. Marsh, 769 F.2d 1363, 1367, 1373 (9th Cir. 1985); Lower Alloways Creek Tp. v. Public Service Elec., 687 F.2d 732, 740-741, 743, 747-748 (3rd Cir. 1982)(plaintiffs cannot submit arguments under NEPA, allegedly resting on "common sense" only, without substantiating them with detailed evidence); Sierra Club v. U.S. Dep't of Transportation, 753 F.2d 120, 126, 129

Where agencies proceed with a proposed action in light of conflicting or uncertain scientific data within their areas of special expertise, reviewing courts are at their most

deferential.  <u>Baltimore Gas</u>, 462 U.S. at 93, 101, 103; <u>Sierra Club</u>, 753 F.2d 120, 126, 129.

## IV.  ARGUMENT

### PLAINTIFFS HAVE NOT MET AN INJUNCTION'S EQUITABLE PREREQUISITES

To obtain the "extraordinary relief of a preliminary injunction," plaintiffs must satisfy four strict requirements.  <u>Fund for Animals v. Frizzell</u>, 530 F.2d 982, 986 (D.C. Cir. 1975). Plaintiffs must show (1) that they have a substantial likelihood of success on the merits in this litigation; (2) that there is a substantial threat that they will suffer irreparable injury if the injunction is not granted; (3) that the threatened irreparable injury to them outweighs the threatened harm that the injunction may do to defendants or third parties; and (4) that the granting of a preliminary injunction is in the public interest.  <u>See e.g.</u>, <u>Washington Metropolitan Area Transit Comm'n v. Holiday Tours, Inc.</u>, 559 F.2d 841 (D.C. Cir. 1977); <u>Fund for Animals v. Clark</u>, 27 F. Supp. 2d 8, 14 (D.D.C. 1998); <u>Sierra Club v. Watkins</u>, 808 F. Supp. 852, 875 (D.D.C. 1991).

In establishing that these four factors justify equitable relief, plaintiffs have the burden of proving they are entitled to the extraordinary and drastic remedy of an injunction; defendants bear no burden to defeat the motion.  <u>Mazurek v. Armstrong</u>, 520 U.S. 968, 972 (1997); <u>Granny Goose Foods, Inc. v. Teamsters</u>, 415 U.S. 423, 442-43 (1974).  Under these traditional standards, the Court must deny plaintiffs' requested emergency relief because (1) unable to show an applicable environmental factor for which Interior's analysis in the 2007 EA was arbitrary and capricious, plaintiffs cannot prevail on the merits; (2) plaintiffs have

failed to show the irreparable environmental injury necessary for any injunction; and (3) an injunction would harm the public interest by allowing border security risks, related national security risks, and acknowledged environmental risks either to continue unabated or possibly to worsen.

## A.  PLAINTIFFS CANNOT PREVAIL UNDER NEPA

Plaintiffs' NEPA claims necessarily fail because, for each environmental factor identified by plaintiffs,  Interior established "a rational connection between the facts found and the choice made" in the 2007 EA.  Baltimore Gas, 462 U.S. at 105; Nat'l Comm. for the New River v. FERC, 373 F.3d 1323, 1327 (applying Baltimore Gas).

### 1.  NEPA Does Not Require a Programmatic or "Regional" EIS Here.

Plaintiffs devote the first eight pages of the memorandum in support of their Motion for a Temporary Restraining Order ("Pl. Mem.") to a NEPA proposition for which there is no statutory or case authority: they posit that, where plaintiffs adduce affiants willing to state that the San Pedro area's ecosystems or potential "cumulative impacts" either are or might be similar to those of other regional areas or regions, then NEPA requires a "regional," programmatic, or other EIS.  Pl. Mem. at 7-15.

This unprecedented proposition has at least two fatal defects.  First, plaintiffs attempt to establish alleged "cumulative" or "synergistic" impacts with declarations not in the administrative record ("extra-record declarations").  This is impermissible.  Florida Power & Light Co. v. Lorion, 470 U.S. 729, 733-734, quoting Camp v. Pitts, 411 U.S. 138, 142 ("[t]he focal point for judicial review should be the administrative record already in

existence, not some new record made initially in the reviewing court. The task of the

reviewing court is to apply the appropriate APA standard of review...to the agency decision

**based on the record the agency presents to the reviewing court**")(emphasis supplied);

Environmental Defense Fund, Inc. v. Costle, 657 F.2d 275, 284 (D.C. Cir. 1981); see also

Animal Defense Council v. Hodel, 840 F.2d 1432, 1435-1438 (9th Cir. 1988)(extra-record

evidence excluded where plaintiffs have "not **demonstrated that it falls within any of the**

**exceptions to the general rule**" limiting judicial review to the record)(emphasis supplied).[3]/

Thus, under traditional NEPA precedent, plaintiffs may not merely disagree with the

challenged agency action or its administrative record by using extra-record materials to either

change or manipulate the quantum of evidence. Id.; see also Citizens to Preserve Overton

Park, Inc. v. Volpe, 401 U.S. 402, 416, 420 (1971)(record must "disclose the factors"

required by federal law, not amount of evidence preferred by plaintiffs); First National Bank

& Trust v. Department of the Treasury, 63 F.3d 894, 898 (9th Cir. 1995); National Audubon

Society v. U.S. Forest Service, 46 F.3d 1437, 1447 n. 9 (9th Cir. 1992); Northwest Coalition

for Alternatives to Pesticides v. Lyng, 844 F.2d 588, 590-591 (9th Cir. 1988).

Second, even if arguendo plaintiffs' proffered declarations were admissible to

---

[3]/    In cases where plaintiffs seek a preliminary injunction, a court may consider extra-record
declarations only insofar as they are necessary for the court's assessment of injury. See, e.g.,
Born Free USA v. Norton, 278 F. Supp. 2d 5, 11 (D.D.C. 2003) ("The Court notes . . . that its
review of the merits is confined to the administrative record. . . ." Accordingly, "[t]he Court will
not consider the extra-record declarations and other materials submitted by the parties except to
the extent that those materials bear upon the balance of harms."), vacated as moot, 2004 WL
180263 (D.C. Cir. Jan 21, 2004); Am. Bioscience, Inc. v. Thompson, 243 F.3d 579, 582 (D.C.
Cir. 2001).

establish other fencing projects' alleged "cumulative" effects,"[4]/ plaintiffs fail to establish a mandatory NEPA requirement mandating a regional EIS, national EIS, or programmatic EIS here instead of an EA and FONSI.  Instead, the EIS analyzing a broader category of ongoing or future agency actions that plaintiffs prefer is a discretionary NEPA decision, not a NEPA mandate.  40 C.F.R. § 1502.4(b)("[e]nvironmental impact statements **may** be prepared [for] broad actions so that they are **relevant to policy** and are timed to coincide with meaningful points in agency **planning and decisionmaking**")(emphasis supplied).

Thus, plaintiffs' claim that federal defendants erred by not preparing a regional or programmatic EIS necessarily fails because they have not adduced a scintilla of authority that requires Interior to consider either the San Pedro fencing project's cumulative or other environmental effects in an EIS, as opposed to the 2007 EA.  The Supreme Court has observed that an agency's decision under NEPA to prepare or not prepare a programmatic EIS both deserves considerable deference and is highly discretionary because it requires

> the weighing of a number of factors, including the extent of the interrelationship among proposed actions and practical considerations of feasibility.  Resolving this issue requires a high level of technical expertise and is properly left to the informed discretion of the responsible federal agencies.

Kleppe, 427 U.S. at 412.

### 2. The 2007 EA Properly Considered Potential Erosion, Sedimentation, and Other Hydrologic Effects.

---

[4]/     Interior and Homeland Security will also show, infra at 20-22, that plaintiffs have not identified a single cumulative impact that federal defendants did not properly consider in the 2007 EA.

On four independent grounds, plaintiffs cannot controvert Interior's determination that the San Pedro fencing project's potential erosion, sedimentation, and other hydrologic effects would not be environmentally significant. First, plaintiffs erroneously presume that potential erosion and sedimentation by themselves are environmentally significant under NEPA, without showing how or why this supposedly is so. See Pl. Mem. at 16. Notably, no case or statute cited by the parties states or even hints that construction-induced erosion or sedimentation in a riparian area by itself would be environmentally "significant." See e.g., Pl. Mem. at 16-17

Instead, the salient NEPA issue is whether these environmental effects would have significant impacts in view of an objective water quality standard, such as those set by federal or state law, or a known natural or environmental resource, such as the marine or terrestrial animals and plants depending on the San Pedro area's river corridor or riparian areas. Notably, one searches plaintiffs' papers in vain for even an allegation, let alone evidence, that the San Pedro fencing project would adversely or significantly affect a particular water quality standard, a known plant population, or a known animal population. Therefore, plaintiffs cannot meet their burden, elementary to NEPA, of controverting Interior's determination that potential erosion and sedimentation effects would "not have a significant effect on the human environment." 40 C.F.R. §§ 1508.13, 1508.27(9) and (10)(effect of challenged agency action on both threatened plant or animal species and federal or state environmental standards relevant to NEPA meaning of "significant" or "significantly"); see also Marsh v. Oregon Natural Resources Council, 490 U.S. 360, 377-

Page 12

378 (EIS not required unless environmental impacts are "significant"); Kleppe v. Sierra Club, 427 U.S. at 412-414.

Second, plaintiffs erroneously attempt to show that the San Pedro project would have significant sedimentation or erosion effects with analysis from the 2007 EA that is specific to construction Alternative 1, which Interior never adopted, not Alternative 2 Combination, which Interior did adopt. Compare Pl. Mem. at 17 (relying exclusively on "p. 6, 9" of the 2007 EA, taken verbatim from Alternative 1 section) with 2007 EA at "Decision Record (initial unnumbered page dated 31 August 2007)(Interior specifically adopts "Alternative Two 'Combination'"); 2007 EA at 4-5 (describing material differences between Alternative 1, on which plaintiffs rely, and the Alternative 2 Combination actually adopted by Interior).

Third, Alternative 2 Combination ("Alternative 2")  is materially different from Alternative 1 because the former adopts additional mitigation measures designed to forestall the very sedimentation and erosion effects of which plaintiffs complain.  For example, plaintiffs rest their sedimentation and erosion claims on the effects of "fence and road construction," crossing between 60 and 66 "ephemeral washes," that allegedly would cause "bank failure and loss of riparian vegetation."  Pl. Mem. at 16.  However, as a preliminary matter, Alternative 1 and Alternative 2 each adopt a mitigation measure that minimizes any riparian vegetation loss by requiring that

> [a]ny temporarily disturbed soils will be stabilized and re-vegetated with native tree and shrub species, including cottonwood and willow saplings at washes/arroyos. Disturbed areas will also be sprayed with a hydroseed mixture to establish an herbaceous cover more rapidly.  Post-construction stabilization of eroding areas will be required where fencing and ground disturbance [result] in accelerated erosion.

This may include reseeding, water bars, or other treatment as necessary (adaptive management).

2007 EA at 3.

Further, in erroneously relying on excerpted language from Alternative 1 to predict that Alternative 2 would precipitate "bank failure," plaintiffs do not include language from the next paragraph. This language shows Alternative 2 would be even more effective in forestalling or minimizing bank failure. Interior determined that potential bank failure or other "watershed impacts"

> may be reduced... if the [**temporary vehicle barrier or] TVB option is selected for all drainages and the flood prone areas of the San Pedro River**...Potentially, impacts will be reduced further by proposed mitigation and implementation of best management practices to control **erosion during and following construction**.

2007 EA at 10 (emphasis supplied); see also Pl. Mem. at 16 (quoting preceding page only).

In Alternative 2, Interior adopted these recommended mitigation measures almost verbatim. Thus, Interior placed temporary vehicle barriers ("TVB's") "in the San Pedro River, within the floodplain [,] in the historic 'corral' area" and in the San Pedro River's "riparian corridor." These barriers, made of old railroad rails, "do not require "ground excavation" and can "be removed as necessary." 2007 EA at "Decision Record (unnumbered) and pp. 3-5 (detailed description of TVB design parameters), 10.

Further, just as recommended in the 2007 EA, Interior decided to adopt a series of detailed anti-erosion mitigation measures that would be used both during and after construction. For all of the riparian areas in which Interior placed TVB's, "no construction or ground disturbances are ever to occur in these areas." 2007 EA at 24. These TVB's must

be installed "after the flood season and be removed before the flood season." Id.

Interior also determined that, although the additional placement of TVB's in "5 dry wash areas will allow these drainages not to be impeded," placing pedestrian fencing outside of both these dry washes and the other riparian areas also limited to TVB's could cause "bank failure" during "high flow events" and rains, unless Interior adopted additional mitigation measures "to lessen the severity" of this possible impact. 2007 EA at 22.

In response, Interior (1) prohibited the construction of pedestrian fencing, TVB's, and other structures "during the rainy seasons when the soil conditions are muddy and unmanageable;" (2) specified that pedestrian fencing would be placed "at the edge of the entire flood prone area" and also reduced the length of Alternative 2's pedestrian fencing by 275 feet from Alternative 1's length; and (3) required the new pedestrian fencing to be placed within **the existing archeological trench excavated in July 2007 that is located 3-6 feet north of the barbed wire fence currently representing the international border**." 2007 EA at 3-5 (comparing pedestrian fence lengths for Alternatives 1 and 2), 9, 23-24 (emphasis in original).

Without referring to either the administrative record or their own extra-record declarations, plaintiffs simply speculate that the detailed mitigation measures described above might not work and that both plaintiffs and BLM have "little confidence" in them. Pl. Mem. at 16. However, because Congress has conferred specialized jurisdiction on Interior to resolve complex technical and environmental issues, Interior

must have discretion to rely on the reasonable opinions of its own qualified experts

Page 15

even if, as an original matter, a court might find contrary views more persuasive.

Marsh, 490 U.S. at 378; see also Native Ecosystems Council v. Forest Service, 428 F.3d

1233, 1239-1241, 1244 (where NEPA decision implicates agency's specialized expertise,

courts will not "take sides in a battle of experts").

Finally, relying exclusively on Ninth Circuit authority, plaintiffs assert that Interior

erred in adopting these mitigation measures because their effectiveness was uncertain, in

part, because the measures mitigated uncertain environmental effects.  Pl. Mem. at 17.

However, even if arguendo plaintiffs had properly construed their preferred Ninth Circuit

cases, other Ninth Circuit panel decisions contradict plaintiffs.  In two similar decisions, the

Ninth Circuit held that agencies may properly rely on reasonable mitigation measures even

where (1) their effectiveness is uncertain and (2) mitigation measures may not eliminate all

possible adverse effects.  Id; see also Greenpeace Action v. Franklin, 14 F.3d 1324, 1331-

1333-1134, 1334 n. 11, 1335 ("Greenpeace").

Greenpeace's analysis of uncertain environmental effects is consistent with numerous

Supreme Court and other Circuit decisions.  Under these decisions, the salient NEPA issue

is not whether the effects of the challenged agency action would or might be uncertain, as

plaintiffs urge, but whether agencies analyzed uncertain effects rationally by (1) considering

all applicable environmental factors "relevant" to uncertainty and (2) evaluating both

uncertain effects and related environmental factors with "reasoned" analysis that, therefore,

is "not 'arbitrary or capricious'."  Marsh, 490 U.S. 360, 373, 376-378, 385 (where agency

predicates NEPA document on reasoned analysis of scientific uncertainty, requiring another

NEPA document "would render agency decisionmaking intractable, always awaiting updated information only to find the new information outdated by the time a decision is made"); Robertson, 490 U.S. 332, 350-351; Baltimore Gas, 462 U.S. 87, 96, 105-106 (agencies must not respond "arbitrarily and capriciously" to uncertainty but instead must "consider and disclose" uncertain impacts rationally); Vermont Yankee Nuclear Power Corp. v. NRDC, 435 U.S. 519, 553, 555 (1978)(because all "administrative consideration of evidence creates gaps between the time that the record is closed and the decision is made," the correct standard of judicial review evaluates agency action "by the information then available to it"); Native Ecosystems Council, 428 F.3d at 1240-1241 (agencies may comply with their NEPA duty to disclose uncertain effects "without automatically triggering the 'substantial questions' threshold" necessary to establish significant environmental impacts); Isaak Walton League v. Marsh, 655 F.2d., 346, 369, 377 (D.C. Cir. 1981)(Wright, J.)(proper quantum of evidence under NEPA is record before the agency at the time of its decision, provided agency adequately "identifies areas of uncertainty"); City of Des Plaines, 552 F.2d 736, 738-739(7th Cir. 1976)(new monitoring and research plans in the future do not "vitiate the adequacy" of NEPA documents where "the present state of scientific knowledge does not permit a fuller assessment than was undertaken").

Traditionally, courts (1) review mitigation measures under NEPA's arbitrary and capricious standard and (2) do not require reasonable mitigation measures to eliminate all potential adverse effects. Preserve Endangered Areas of Cobb v. U.S. Army Corps of Engineers, 87 F3d 1242, 1248-1249 (11th Cir. 1996)(mitigation measures proper unless they

Page 17

are "arbitrary and capricious"); <u>Friends of the Payette v. Horseshoe Bend Hydroelectric Co.</u>, 988 F.2d 989, 993 (9th Cir. 1993)(even where adverse impacts are known, appropriate mitigation measures "may not compensate completely for adverse impacts"); <u>Friends of Endangered Species v. Jantzen</u>, 760 F.2d 976, 987 (9th Cir. 1985)(where agency adopts significant mitigation measures that "mitigate the project's effects, they need not completely compensate for adverse environmental impacts"); <u>Steamboaters v. FERC</u>, 759 F.2d 1382, 1394 (9th Cir 1985)(to adopt permissible mitigation measures, agencies must "explain specifically how [these measures] would mitigate the impact of the project"); <u>Sierra Club v. Department of Transportation</u>, 753 F.2d 120, 122, 126, 129 (D.C. Cir. 1985)(mitigation measures in response to uncertain effects of airplane noise and disturbance on wildlife of Grand Teton National Park are not arbitrary or capricious where agency "has acted responsibly to minimize the impact on the environment").

In sum, plaintiffs have not shown that Interior's analysis of potential sedimentation effects, potential erosion effects, and numerous mitigation measures designed to forestall or minimize these effects is arbitrary and capricious. Therefore, their claim that Interior erred in the 2007 EA by not properly considering possible erosion and sedimentation fails under traditional case law.

### 3. Interior Properly Considered the San Pedro Area's Distinct Ecological Characteristics.

Relying on a solitary Ninth Circuit case, plaintiffs contend that the San Pedro Riparian National Conservation Area has unique ecological characteristics and that, therefore, this

environmental factor by itself means the San Pedro fencing project would have significant environmental impacts.  See Pl. Mem. at 15, quoting National Parks and Conservation Association v. Babbitt, 241 F.3d 722, 731 (9th Cir. 2001)("Babbitt").  However, Babbitt does nothing to detract from the NEPA tenet that unique ecological or cultural characteristics constitute one environmental factor, among many, that agencies must responsibly analyze and balance in determining that a given agency action either is or is not environmentally "significant."  Compare id. with 40 C.F.R. § 1508.27 (NEPA regulations delineate eleven environmental factors that agencies must analyze to evaluate environmental significance or the lack thereof).

Here, Interior carefully complied with these NEPA regulations by predicating its analysis of the San Pedro area's distinct characteristics, among other relevant environmental factors, on reasoned analysis.  Interior's analysis has three parts.  First, Interior considered the San Pedro area's distinctive characteristics in detail.  2007 EA at 2, 5, 10-17 (analyzing this conservation area's environmental, cultural, and historic characteristics).  Second, Interior determined that the San Pedro fencing would be placed in the same part of the conservation area that has been historically reserved for structures deemed necessary for border security measures, including (1) "an existing 4-strand barbed wire fence and primitive road along the U.S. Mexico International Border within [the conservation area]" and (2) a previously excavated "archeological test trench," in which the entire "pedestrian fence" will be placed.  2007 EA at 5, 24.

Third, in the context of the numerous environmental mitigation and protection

measures summarized above, <u>supra</u> at 12-19, Interior determined that the San Pedro project would not significantly affect the San Pedro conservation area.  Because plaintiffs do not show this Court how or why Interior's analysis of the San Pedro area's ecological and historic characteristics is arbitrary and capricious, their claim that these characteristics by themselves render the San Pedro project environmentally significant necessarily fails.

### 4. Plaintiffs' Cumulative Impact Claims Are Defective On Their Face.

Plaintiffs fail to make a prima facie case about cumulative impacts because they do not meet NEPA's elementary burden of controverting Interior's determination that these impacts would not be environmentally significant.  To meet this burden, plaintiffs must controvert Interior's specialized analysis of cumulative impacts with convincing evidence, not speculation or conjecture.  <u>Kleppe v. Sierra Club</u>, 427 U.S. at 412-414.  Thus, at the minimum, plaintiffs must establish that Interior erred by not properly considering a particular environmental impact or impacts that would be "cumulatively **significant**," either alone or in conjunction with other foreseeable impacts. 40 C.F.R. § 1508.25(a)(2) (emphasis added); <u>see also</u> 40 C.F.R. § 1508.7.

Plaintiffs simply ignore this burden because they do not adduce evidence or even speculation to show why Interior's detailed analysis of cumulative impacts supposedly is wrong.  For example, they posit that Interior did not consider the "potential cumulative impacts of simultaneous **fence construction** [in] different areas of the Arizona border."  Pl. Mem. at 14 (emphasis in original).  On the contrary, Interior considered these cumulative

impacts in detail.  2007 EA at 20-23 (specifically analyzing foreseeable environmental effects "[a]s the border fence project proceeds in other areas of the watershed").

Without referring to a paper in the record or even to their own extra-record declarations, plaintiffs also speculate that "**any** additive adverse impact to the [San Pedro] River is arguably 'significant'," in light of "all the other actions" that plaintiffs eloquently neglect to identify.  Pl. Mem. at 17 (emphasis in original).  In contrast, on the basis of the numerous mitigation measures discussed above, Interior specifically determined that any

> watershed degradation and resulting river channel instability is anticipated to be lessened considerably with the implementation of mitigation for erosion (excess sediment  discharge) and flood plain alteration.  The residual impacts to riparian function, aquatic habitat, and limited loss of [species habitat] patches in the project area are likely to be relatively modest over the life of the project.

2007 EA at 21.

Failing to controvert these specialized determinations, plaintiffs' cumulative impact claims must fail because they never show this Court (1) why Interior's analysis of cumulative impacts supposedly is arbitrary and capricious and (2) a single cumulative impact, not considered by Interior, that would or even could have "significant" environmental impacts. See Coalition on Sensible Transp., Inc. v. Dole, 826 F.2d. 60, 70-71 (D.C. Cir. 1987); see also Kleppe, 427 U.S. at 406, 410 n.20, 412-415, 414 n.26 (1976)(determination of both the scope and effect of cumulative impacts "is a task assigned to the special competency of the appropriate agencies").

### 5.  Neither NEPA Nor its Regulations Required Interior To Distribute the Draft 2007 EA for Public Comment.

Plaintiffs claim there is a mandatory NEPA requirement to distribute a draft EA for public comment. Pl. Mem. at 18-19. However, no such requirement exists in either NEPA's statutory text or its regulations. Plainly, NEPA's regulations only require agencies to "involve" the public "to the extent practicable," in preparing or distributing an EA. 40 C.F.R. § 1501.4. As shown below, infra at 24-28, it was more than reasonable for Interior and Homeland Security to determine that a public comment period was impractical because of urgent border and related national security risks. Therefore, plaintiffs' public comment claims must fail. Id.; TOMAC, Taxpayers of Michigan Against Casinos v. Norton, 433 F.3d 852, 861 (D.C. Cir. 2006)("public input during the EA process is not required"); Fund For Animals, Inc. v. Rice, 85 F.3d 535, 549 (11th Cir. 1996) ("there is no legal requirement that an Environmental Assessment be circulated publicly and, in fact, they rarely are").

### 6. Interior Complied With the Arizona-Idaho Conservation Act.

Under the Arizona-Idaho Conservation Act (the "Act"), Congress granted Interior significant discretion to both manage and protect the San Pedro area. Thus, the only uses permitted on the San Pedro area are those that Interior finds will "further the primary purposes" for which the area was established. 16 U.S.C. § 460xx-1(b). Notably, where necessary for the protection of the resources of this area, Congress also gave Interior authority to impose "reasonable limits to visitation and use," require permits for public use, close portions of the area, and authorize motorized access where he deems it necessary for

administrative or "emergency" purposes.  Id.

Under this statute, Interior thoroughly reviewed whether the proposed ROW would further the primary purpose for which the San Pedro area was established.  2007 EA at 2. Interior also examined whether granting the ROW was consistent with the San Pedro Riparian Resource Management Plan ("RMP"), 43 C.F.R. § 1610.5.  It did so by examining the environmental consequences of the various alternatives for border barrier construction as well as the potential impacts of continuing to manage the area without enhanced border enforcement capabilities, i.e., the No Action Alternative.

Interior determined that failing to construct a border barrier would allow serious environmental impact to continue unabated.  See e.g., 2007 EA at 8 (under the No Action Alternative "damage caused by unauthorized vehicle...use damaging upland and riparian vegetation, altering natural drainage patterns, accelerated erosion . . .) would continue to accumulate"); see also 2007 EA at 23, (under No Action Alternative, "unauthorized vehicle travel may continue to alter drainage patterns, destroy vegetation, and modify channel morphologic conditions ").

After conducting this thorough analysis, Interior granted the ROW.  In so doing, Interior deemed the proposed action one that would "further the primary purposes" for which the San Pedro area was established.  Interior also determined in its Decision Record that the "proposed action is specifically provided for" in the Resource Management Plan.  See 2007 EA (Decision Record at 1).  Because plaintiffs do not show why this determination is arbitrary and capricious, this Court should uphold it.  Norton v. Southern Utah Wilderness Alliance,

Page 23

542 U.S. 55, 66 (2004).

## B.  AN INJUNCTION SHOULD NOT BE ENTERED BECAUSE IT WOULD DISPROPORTIONATELY HARM THE PUBLIC INTEREST WITHOUT ABATING IRREPARABLE ENVIRONMENTAL INJURY

On two separate grounds, plaintiffs' requested injunction must fail.  First, as shown above, plaintiffs have not shown that the San Pedro project would precipitate significant environmental impacts.  Therefore, plaintiffs cannot establish irreparable environmental injury that, by definition, could not be restored or renewed.  For example, plaintiffs have not shown or even alleged that the San Pedro fencing project would harm a rare or threatened plant or animal population at all, let alone harm these species beyond renewal.  Pl. Mem.

Instead, plaintiffs (1) speculate that this project would cause serious erosion, sedimentation, and vegetation effects (including harm to the vegetation needed by the "pygmy owl") and (2) simply hint that these possible effects might be irreparable.  See Pl. Mem. at 20-22.  However, these alleged effects would be protected, restored, or averted by Interior's numerous mitigation measures that plaintiffs never controvert.   Among these measures, Interior provided for (1) restoring the very native vegetation that plaintiffs hint might be irreparably harmed (and thereby taken from the pygmy owl) and (2) reconfiguring with "[p]ost-construction stabilization" a bank or channel impaired by any "accelerated erosion." 2007 EA at  3.

Relying on extra-record declarations, plaintiffs also speculate that the San Pedro project might harm the endangered jaguar by acting as "barriers to...genetic interchange."  Pl. Mem. at 22.  However, the specialized agency that Congress has entrusted with the mission

of protecting jaguars and other listed species, the U.S. Fish and Wildlife Service ("FWS"),

disagrees.  The FWS has determined that the San Pedro project "would not jeopardize the

continued existence of the jaguar" because, among other things, it would reduce the harm to

potential jaguar foraging areas caused by undocumented aliens ("UDA's").

> Environmental damage to natural resources from UDA traffic is considerable and
> affects large areas of many sensitive species habitats... Trails and other soil
> disturbances [from UDA's] can increase erosion, promote the spread of invasive
> species, and increase the potential for fires.  Fires can exacerbate the impacts from
> UDAs, with more erosion, invasion of exotic species, and a cascade of effects to
> watershed functioning. [Further, the] direct impacts [of the San Pedro project] are at
> the international border[;] thus, they are limited to a relatively small area...The
> construction period should be short (1-3 months), thereby reducing the potential
> impacts from human disturbance.

2007 Biological Opinion at 24, 28-29.  These specialized findings, uncontroverted by

plaintiffs, deserve substantial judicial deference.  Marsh, 490 U.S. at 378.

Therefore, because the record does not establish irreparable environmental injury

separate from an alleged procedural NEPA violation, an injunction is impermissible here.

Amoco Production Co. v. Village of Gambell, 480 U.S. 531, 542-545; Weinberger v. Romero-

Barcelo, 456 U.S. 305, 317-320.  Traditionally, even "significant" harm uncovered in a NEPA

analysis or document is not the same as "irreparable" harm for purposes of injunctive relief,

and courts do not presume irreparable environmental or other harm in NEPA cases.  Forest

Conservation Council, 66 F.3d 1489, 1496 (9th Cir.1995)("injunction sought by plaintiffs will

not automatically issue" where reviewing court finds agency "violated NEPA"); see also Fund

for Animals v. Frizzell, 530 F.2d 982, 986; Fund for Animals v. Clark, 27 F. Supp. 2d 8, 14;

Sierra Club v. Watkins, 808 F. Supp. 852, 875.

Page 25

Finally, this Court should deny plaintiffs' requested injunction on another independent ground: plaintiffs cannot controvert compelling evidence that an injunction would severely and disproportionately harm the public interest. Homeland Security has determined that delaying the completion of the San Pedro border fence would impair important border and related national security interests because (1) the San Pedro area is a high-traffic UDA corridor of "high illegal entry" and substantial UDA encroachment on public lands; (2) for Fiscal Year 2007 alone, U.S. Customs and Border Protection ("CBP") has documented "over 31,000 illegal entries" and "over 19,000 apprehensions" of UDA's in the San Pedro area; and (3) equivalent fencing in the San Diego sector has reduced the annual number of UDA's apprehended after violating our border from 19,615 individuals to 2,679. Ahern Decl. at ¶¶ 8, 11.

Further, as mentioned above, the FWS has confirmed that the San Pedro border fencing project could effectively abate the serious environmental harm occasioned by UDA trespass on public lands. 2007 Biological Opinion at 24, 29. In its Report to Congressional Requesters, the U.S. General Accounting Office ("GAO") agreed with the FWS.

> Illegal aliens and smugglers have created hundreds of new trails and roads while crossing borderlands [and] have destroyed cactus and other sensitive vegetation that can take decades to recover, including habitat for endangered species...Tons of trash and human waste are left behind each year, affecting wildlife, vegetation, and water quality...[I]llegal border crossers left behind close to 4,500 abandoned vehicles in fiscal year 2002 and an estimated 4 million pounds of trash each year as they crossed over the lands. [A tribal police department] removed over 7,000 [abandoned UDA] vehicles in 2003.

Def. Exh. D at 16; Ahern Decl. at ¶ 16.

Finally, CBP's Deputy Commissioner has determined that approximately "80 percent [of the San Pedro project's new] road is completed" and that the 60-foot wide easement underlying that road "has already been scraped." Ahern Decl. at ¶¶ 14, 22. Therefore, CBP has determined that enjoining the project now would increase the risk of an adverse "erosion problem" because it would prevent CBP from ensuring that the new road is "properly contoured and some sort of aggregate base is put down." Id. Similarly, CBP has determined that an injunction preventing it from filling and modifying the "open trench" created by this new construction would elongate

> a safety hazard for both wildlife and anyone who is walking in the area. Water can also flow into the trench and away from its intended washes since the water flows north in that area.

Id.

In sum, this Court must reject plaintiffs' requested injunction because it would not abate irreparably environmental injury but would disproportionately harm the public. See Fund for Animals v. Frizzell, 530 F.2d 982, 986; Natural Resources Defense Counsel v. Pena, 972 F.Supp. 9 (D.D.C. 1997)(courts "have accorded great weight to considerations of national security when balancing the interests and equities of the parties"); see also Natural Resources Defense Counsel v. Winter, 2007 WL 2481465 (9th Cir. 2007)(where plaintiffs request injunction, courts must weigh environmental interests against the public "interest in national defense") .

## IV. CONCLUSION

This Court should not enter an injunction because (1) unable to identify an

environmental factor that federal defendants did not consider with reasoned analysis in the

2007 EA, plaintiffs cannot make a prima facie case under NEPA; (2) an injunction would not

abate irreparable environmental injury; and (3) enjoining the San Pedro border fencing project

would disproportionately harm the public.


Respectfully submitted,


_____
GREGORY D. PAGE, DC Bar 398121
Environment and Natural Resources
    Division
U.S. Department of Justice
P.O. Box 663
Washington, D.C. 20044-0663
Telephone: (202) 305-0446
Attorney for the Federal Defendants

## CERTIFICATE OF SERVICE

I certify that true and correct copies of the foregoing Defendants' Opposition to Plaintiffs' Motion for a Temporary Restraining Order in Relation to Border Wall and Road Construction on the San Pedro Riparian National Conservation Area were served on 9 October 2007 by electronic filing or hand delivery to:

> Robert G. Dreher
> Brian Segee
> Defenders of Wildlife
> 1130 17th Street, N.W.
> Washington, D.C. 20036

_____
Gregory D. Page