IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| DEFENDERS OF WILDLIFE and SIERRA CLUB; | ) ) ) ) Case No. 1: 07-CV-01801 (ESH) |
| Plaintiffs | ) ) ) ) |
| v. | ) ) |
| U.S. DEPARTMENT OF THE INTERIOR; U.S. BUREAU OF LAND  MANAGEMENT; UNITED STATES ARMY CORPS OF ENGINEERS; AND U.S. DEPARTMENT OF HOMELAND SECURITY | ) ) ) ) ) ) |
| Defendants. | ) ) ) ) |

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER IN RELATION TO BORDER WALL AND ROAD CONSTRUCTION ON THE SAN PEDRO RIPARIAN NATIONAL CONSERVATION AREA**

TABLE OF CONTENTS

PAGE

I.    INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.   REGULATORY BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

      A.    CHALLENGED ENVIRONMENTAL DOCUMENTS . . . . . . . . . . . . . . . 2

      B.    CHALLENGED AGENCY ACTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

III.  STATUTORY BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

      A.    THE BORDER FENCE ACT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

      B.    NEPA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

IV.   ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

            PLAINTIFFS HAVE NOT MET AN INJUNCTION'S
            EQUITABLE PREREQUISITES... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .8

            A.    PLAINTIFFS CANNOT PREVAIL UNDER NEPA . . . . . . . . . . 9

                  1.   NEPA Does Not Require a Programmatic or "Regional
                       EIS Here.......................................................................9

                  2.   The 2007 EA Properly Considered Potential Erosion,
                       Sedimentation, and Other Hydrologic Effects...........................12

                  3.   Interior Properly Considered the San Pedro Area's Distinct
                       Ecological Characteristics.........................................................19

                  4.   Plaintiffs' Cumulative Impact Claims Are Defective on
                       Their Face.................................................................................20

                  5.   Neither NEPA Nor its Regulations Required Interior to
                       Distribute the Draft 2007 EA for Public Comment...................22

        6.   Interior Complied With the Arizona-Idaho
           Conservation Act........................................................................23

     B.    AN INJUNCTION SHOULD NOT BE ENTERED BECAUSE
         IT WOULD DISPROPORTIONATELY HARM THE PUBLIC
         INTEREST WITHOUT ABATING IRREPARABLE
         ENVIRONMENTAL INJURY   . . . . . . . . . . . . . . . . . . . . . . . . 24

V.    CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

## I. INTRODUCTION

Citing alleged procedural violations of the National Environmental Policy Act of 1969, 42 U.S.C. § 4321 et seq. ("NEPA"), plaintiffs ask this Court to second-guess Congress' statutory direction to the Department of Homeland Security that it must "promptly acquire such easements" as necessary to "commence construction of [border] fences immediately." P.L 109-367, Sec. 3, codified at 8 U.S.C. § 1103 note ("Border Fence Act"). Congress enacted the Border Fence Act to abate both undisputed border security threats and undisputed harm to public lands occasioned by an influx of undocumented aliens ("UDA").

Plaintiffs ask this Court to immediately block a border fence section's ongoing construction on a "60-foot wide strip" of both the U.S.--Mexico international border and the border of the San Pedro Riparian National Conservation Area ("San Pedro area") until federal defendants ("Interior" or "Homeland Security") complete a new environmental impact statement ("EIS"), in lieu of the environmental assessment ("EA") and finding of no significant impact ("FONSI") by which federal defendants previously studied the San Pedro area. See 31 August 2007 Environmental Assessment and Finding of No Significant Impact ("2007 EA") at 5, attached hereto as Exhibit A.

For two fundamental reasons, this Court must reject plaintiffs' requested injunctive relief. First, plaintiffs' mere showing that they vigorously disagree with the 2007 EA's findings and analysis is not enough under NEPA. Instead, plaintiffs must identify an environmental factor or factors applicable to NEPA for which Interior's analysis in the 2007

Page 1

EA was "arbitrary and capricious."  Because Interior considered every environmental factor identified in plaintiffs' papers with reasoned, sensible analysis, plaintiffs cannot make a prima facie NEPA case and, therefore, cannot prevail on the merits.  See Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 349-350 (1989); Baltimore Gas & Electric Co. v. NRDC, 462 U.S. 87, 105 (1983); see also Dep't of Transp. v. Public Citizen, 541 U.S. 752, 763 (2004); City of Alexandria v. Slater, 198 F.3d 862, 874 (D.C. Cir. 2000); Sierra Club v. U.S. Dep't of Transportation, 753 F.2d 120, 126 (D.C. Cir. 1985) (EA and FONSI may be overturned only if they are "arbitrary, capricious, or an abuse of discretion").

Second, plaintiffs cannot meet the equitable threshold necessary for obtaining emergency injunctive relief because (1) they have not established the irreparable environmental injury necessary for any injunction and (2) an injunction of the San Pedro border fence construction would contravene the public interest by delaying federal defendants' urgent responses to: documented border security risks; related national security risks; and serious environmental risks occasioned by illegal road construction and widespread encroachment by UDA's on both protected wildlife habitat and other federal lands.

## II.  REGULATORY BACKGROUND

### A. CHALLENGED ENVIRONMENTAL DOCUMENTS

In the 2007 EA, Interior studied the environmental effects of commencing the "construction of fences immediately" in the San Pedro area, pursuant to the Border Fence Act and other statutes.  See Border Fence Act, P.L 109-367, Sec. 3, codified at 8 U.S.C. § 1103;

2007 EA at 5.[1]/  This fencing would be within a "60-foot wide strip" along both the U.S–Mexico border and the border of the San Pedro Riparian National Conservation Area ("San Pedro area").  2007 EA at 1 (FONSI),  3, 5 (EA).

### B.  CHALLENGED AGENCY ACTION

This border fencing would require construction or excavation on up to 225 acres in the San Pedro area.  29 August 2007 U.S. Fish and Wildlife Service Biological Opinion ("Biological Opinion") at 8, attached hereto as Exhibit B.  By comparison, the entire San Pedro Riparian National Conservation Area occupies over 58,000 acres of federal land.  Declaration of Jayson P. Ahern ("Ahern Decl.") at ¶ 10, attached hereto Exhibit C.

Interior's Bureau of Land Management ("BLM") manages the San Pedro area.  Pursuant to the Border Fence Act and other statutes, Homeland Security requested a right of way ("ROW") from BLM, BLM granted that ROW, and the U.S. Army Corps of Engineers commenced the construction and excavation necessary to build the San Pedro border fence.  2007 EA at 2.

## III.  STATUTORY BACKGROUND

### A.  THE BORDER FENCE ACT

The Border Fence Act reflects Congress' decision to improve border security and abate environmental risks occasioned by widespread illegal immigration.  Section 102(a) requires Homeland Security "[to] take such actions as may be necessary to install additional

---

[1]/        All documents cited in this memorandum are in the 2007 EA's administrative record that has not yet been filed.

physical barriers and roads (including the removal of obstacles to detection of illegal entrants) in the vicinity of the United States border to deter illegal crossings in areas of high illegal entry into the United States." P.L 109-367, Sec. 3, codified at 8 U.S.C. § 1103.

The Border Fence Act also authorizes Homeland Security to "waive all legal requirements" of federal laws conflicting with it, where Homeland Security determines such waiver is "necessary to ensure expeditious construction of the barriers and roads under this section." Id. § 102. Federal defendants have not yet decided to invoke or not invoke this waiver section. Congress transferred responsibility for constructing border barriers from the Attorney General to Homeland Security by enacting the Homeland Security Act of 2002, Pub. L. No. 107-296; see also Pub. L. No. 108-7, Division L, § 105 ("the Act"). The Act essentially created Homeland Security from other departments, abolished the Immigration and Naturalization Service, and transferred Border Patrol functions to the Under Secretary for Border and Transportation Security at Homeland Security. See 6 U.S.C. §§ 251, 291. The Act also amended the Border Fence Act to state that Homeland Security has the power and duty to control and guard U.S. borders against illegal entry. 8 U.S.C. §1103(a)(5).

### B. **NEPA**

NEPA generally requires a federal agency to prepare an environmental impact statement ("EIS") when a proposed governmental action significantly affects "the quality of the human environment." However, where the proposed action would not significantly affect the environment, NEPA does not require an EIS. See 43 U.S.C. 4332(2); 40 C.F.R. § 1508.9; see also Marsh v. Oregon Natural Resources Council, 490 U.S. 360, 372, 375-376,

377 n. 23, 378 (1989); Kleppe v. Sierra Club, 427 U.S. 390, 394 (1976).

The Council on Environmental Quality ("CEQ") has issued regulations governing agency compliance with NEPA. 40 C.F.R. § 1500.1. The CEQ regulations provide that, in determining whether to prepare an EIS, a federal agency must first determine whether its proposed action either normally requires the preparation of an EIS or is categorically excluded. If the proposed action falls into neither category of actions, which is the case here, then the agency should prepare an environmental assessment ("EA") to determine whether its proposed action would precipitate a significant impact on the environment necessitating an EIS. 40 C.F.R. § 1501.4.

CEQ regulations define an EA as "a **concise** public document ... that serves to [**b**]**riefly** provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact."[2]/ 40 C.F.R. § 1508.9(a)(emphasis supplied). Under this standard, an agency need not prepare an EIS if, on the basis of "sufficient evidence" and related analysis, it concludes in an EA and corresponding finding of no significant impact ("FONSI") that its proposed action would not significantly affect the environment. Id.; 40 C.F.R. § 1508.13.

These provisions of NEPA impose procedural, not substantive, constraints on the government. Thus, NEPA does not dictate a federal agency's particular programmatic

---

[2]/    An EIS, on the other hand, is "a detailed written statement" that requires an in-depth analysis of all potential impacts. See 40 C.F.R. §§ 1502 and 1508.11; Lower Alloways Creek Tp. v. Public Service Elec., 687 F.2d 732, 741 (3rd Cir. 1982).

objectives or otherwise mandate a particular level of environmental protection or economic development per se. Instead, NEPA governs the manner in which an agency reaches its decisions. Its dominant purpose is to ensure that federal agencies consider the environmental consequences of their proposed actions in advance of a final decision to proceed. Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 349-350 (1989).

> The Supreme Court has emphasized NEPA's purpose.
>
> [NEPA's] mandate to the agencies is essentially procedural....It is to insure a fully informed and well-considered decision, not necessarily a decision the judges of the Court of Appeals or of this Court would have reached had they been members of the decisionmaking unit of the agency. Administrative decisions should be set aside in this context, as in every other, only for substantial procedural or substantive reasons as mandated by statute, ... not simply because the court is unhappy with the result reached.

Vermont Yankee Nuclear Power Corp. v. NRDC, 435 U.S. 519, 558 (1978).

Judicial review of NEPA decisions is the same as judicial review of other informal agency decisions under the Administrative Procedure Act ("APA"): this Court must decide whether Interior's determination in the 2007 EA and FONSI that the San Pedro fencing project would not have significant environmental consequences was arbitrary and capricious. Dep't of Transp. v. Public Citizen, 541 U.S. 752, 763 (2004); Marsh v. Oregon Natural Resources Council, 490 U.S. 360, 375-376, 377 n. 23, 378; City of Alexandria v. Slater, 198 F.3d 862, 874; Greenpeace Action v. Franklin, 14 F.3d 1324, 1331-1333, 1335 (9th Cir. 1992); Sierra Club v. U.S. Dep't of Transportation, 753 F.2d 120, 126 (D.C. Cir. 1985).

The Supreme Court has defined the type of reasoning that reviewing courts must uphold under NEPA. The Court has concluded that NEPA documents must be upheld if an

agency conducts a "reasoned evaluation" of environmental factors in them. <u>Marsh v. Oregon Natural Resources Council</u>, 490 U.S. 360, 377, 385. The Supreme Court defines a "reasoned evaluation" under NEPA as having two components: an agency must (1) consider "the relevant factors" and (2) articulate "a rational connection between the facts found and the choice made." <u>Baltimore Gas & Electric Co. v. NRDC</u>, 462 U.S. 87, 105 (1983)("<u>Baltimore Gas</u>"); <u>see also</u> <u>Nat'l Comm. for the New River v. FERC</u>, 373 F.3d 1323, 1327 (D.C. Cir. 2004)(applying <u>Baltimore Gas</u>).

Under this standard, once an agency adequately identifies and evaluates the relevant environmental factors, it "is not constrained by NEPA from deciding that other values outweigh the environmental costs." <u>Robertson v. Methow Valley Citizens Council</u>, 490 U.S. 332, 350. Under the same standard, plaintiffs cannot prevail unless they provide conclusive evidence to meet their burden of showing that BLM acted arbitrarily. To meet this burden, plaintiff must supply detailed evidence, not speculation or conjecture, to clearly controvert the analysis underlying an agency's NEPA document. <u>See</u> <u>Kleppe v. Sierra Club</u>, 427 U.S. at 412-414; <u>see also</u> <u>Enos v. Marsh</u>, 769 F.2d 1363, 1367, 1373 (9th Cir. 1985); <u>Lower Alloways Creek Tp. v. Public Service Elec.</u>, 687 F.2d 732, 740-741, 743, 747-748 (3rd Cir. 1982)(plaintiffs cannot submit arguments under NEPA, allegedly resting on "common sense" only, without substantiating them with detailed evidence); <u>Sierra Club v. U.S. Dep't of Transportation</u>, 753 F.2d 120, 126, 129

Where agencies proceed with a proposed action in light of conflicting or uncertain scientific data within their areas of special expertise, reviewing courts are at their most

deferential.  <u>Baltimore Gas</u>, 462 U.S. at 93, 101, 103; <u>Sierra Club</u>, 753 F.2d 120, 126, 129.

## IV.  ARGUMENT

### PLAINTIFFS HAVE NOT MET AN INJUNCTION'S EQUITABLE PREREQUISITES

To obtain the "extraordinary relief of a preliminary injunction," plaintiffs must satisfy

four strict requirements.  <u>Fund for Animals v. Frizzell</u>, 530 F.2d 982, 986 (D.C. Cir. 1975).

Plaintiffs must show (1) that they have a substantial likelihood of success on the merits in

this litigation; (2) that there is a substantial threat that they will suffer irreparable injury if the

injunction is not granted; (3) that the threatened irreparable injury to them outweighs the

threatened harm that the injunction may do to defendants or third parties; and (4) that the

granting of a preliminary injunction is in the public interest.  <u>See</u> <u>e.g.</u>,  <u>Washington</u>

<u>Metropolitan Area Transit Comm'n v. Holiday Tours, Inc.</u>, 559 F.2d 841 (D.C. Cir. 1977);

<u>Fund for Animals v. Clark</u>, 27 F. Supp. 2d 8, 14 (D.D.C. 1998); <u>Sierra Club v. Watkins</u>, 808

F. Supp. 852, 875 (D.D.C. 1991).

In establishing that these four factors justify equitable relief, plaintiffs have the burden

of proving they are entitled to the extraordinary and drastic remedy of an injunction;

defendants bear no burden to defeat the motion.  <u>Mazurek v. Armstrong</u>, 520 U.S. 968, 972

(1997); <u>Granny Goose Foods, Inc. v. Teamsters</u>, 415 U.S. 423, 442-43 (1974).  Under these

traditional standards, the Court must deny plaintiffs' requested emergency relief because (1)

unable to show an applicable environmental factor for which Interior's analysis in the 2007

EA was arbitrary and capricious, plaintiffs cannot prevail on the merits; (2) plaintiffs have

failed to show the irreparable environmental injury necessary for any injunction; and (3) an injunction would harm the public interest by allowing border security risks, related national security risks, and acknowledged environmental risks either to continue unabated or possibly to worsen.

## A.  PLAINTIFFS CANNOT PREVAIL UNDER NEPA

Plaintiffs' NEPA claims necessarily fail because, for each environmental factor identified by plaintiffs,  Interior established "a rational connection between the facts found and the choice made" in the 2007 EA.  Baltimore Gas, 462 U.S. at 105; Nat'l Comm. for the New River v. FERC, 373 F.3d 1323, 1327 (applying Baltimore Gas).

### 1.  NEPA Does Not Require a Programmatic or "Regional" EIS Here.

Plaintiffs devote the first eight pages of the memorandum in support of their Motion for a Temporary Restraining Order ("Pl. Mem.") to a NEPA proposition for which there is no statutory or case authority: they posit that, where plaintiffs adduce affiants willing to state that the San Pedro area's ecosystems or potential "cumulative impacts" either are or might be similar to those of other regional areas or regions, then NEPA requires a "regional," programmatic, or other EIS.  Pl. Mem. at 7-15.

This unprecedented proposition has at least two fatal defects.  First, plaintiffs attempt to establish alleged "cumulative" or "synergistic" impacts with declarations not in the administrative record ("extra-record declarations").  This is impermissible.  Florida Power & Light Co. v. Lorion, 470 U.S. 729, 733-734, quoting Camp v. Pitts, 411 U.S. 138, 142 ("[t]he focal point for judicial review should be the administrative record already in

existence, not some new record made initially in the reviewing court.  The task of the

reviewing court is to apply the appropriate APA standard of review...to the agency decision

**based on the record the agency presents to the reviewing court**")(emphasis supplied);

Environmental Defense Fund, Inc. v. Costle, 657 F.2d 275, 284 (D.C. Cir. 1981); see also

Animal Defense Council v. Hodel, 840 F.2d 1432, 1435-1438 (9th Cir. 1988)(extra-record

evidence excluded where plaintiffs have "not **demonstrated that it falls within any of the**

**exceptions to the general rule**" limiting judicial review to the record)(emphasis supplied).[3]/

Thus, under traditional NEPA precedent, plaintiffs may not merely disagree with the

challenged agency action or its administrative record by using extra-record materials to either

change or manipulate the quantum of evidence.  Id.; see also Citizens to Preserve Overton

Park, Inc. v. Volpe, 401 U.S. 402, 416, 420 (1971)(record must "disclose the factors"

required by federal law, not amount of evidence preferred by plaintiffs); First National Bank

& Trust v. Department of the Treasury, 63 F.3d 894, 898 (9th Cir. 1995); National Audubon

Society v. U.S. Forest Service, 46 F.3d 1437, 1447 n. 9 (9th Cir. 1992); Northwest Coalition

for Alternatives to Pesticides v. Lyng, 844 F.2d 588, 590-591 (9th Cir. 1988).

Second, even if arguendo plaintiffs' proffered declarations were admissible to

---

[3]/    In cases where plaintiffs seek a preliminary injunction, a court may consider extra-record
declarations only insofar as they are necessary for the court's assessment of injury.  See, e.g.,
Born Free USA v. Norton, 278 F. Supp. 2d 5, 11 (D.D.C. 2003) ("The Court notes . . . that its
review of the merits is confined to the administrative record. . . ."  Accordingly, "[t]he Court will
not consider the extra-record declarations and other materials submitted by the parties except to
the extent that those materials bear upon the balance of harms."), vacated as moot, 2004 WL
180263 (D.C. Cir. Jan 21, 2004); Am. Bioscience, Inc. v. Thompson, 243 F.3d 579, 582 (D.C.
Cir. 2001).

establish other fencing projects' alleged "cumulative" effects,"[4]/ plaintiffs fail to establish a mandatory NEPA requirement mandating a regional EIS, national EIS, or programmatic EIS here instead of an EA and FONSI.  Instead, the EIS analyzing a broader category of ongoing or future agency actions that plaintiffs prefer is a discretionary NEPA decision, not a NEPA mandate.  40 C.F.R. § 1502.4(b)("[e]nvironmental impact statements **may** be prepared [for] broad actions so that they are **relevant to policy** and are timed to coincide with meaningful points in agency **planning and decisionmaking**")(emphasis supplied).

Thus, plaintiffs' claim that federal defendants erred by not preparing a regional or programmatic EIS necessarily fails because they have not adduced a scintilla of authority that requires Interior to consider either the San Pedro fencing project's cumulative or other environmental effects in an EIS, as opposed to the 2007 EA.  The Supreme Court has observed that an agency's decision under NEPA to prepare or not prepare a programmatic EIS both deserves considerable deference and is highly discretionary because it requires

> the weighing of a number of factors, including the extent of the interrelationship among proposed actions and practical considerations of feasibility.  Resolving this issue requires a high level of technical expertise and is properly left to the informed discretion of the responsible federal agencies.

Kleppe, 427 U.S. at 412.

### 2. The 2007 EA Properly Considered Potential Erosion, Sedimentation, and Other Hydrologic Effects.

---

[4]/    Interior and Homeland Security will also show, infra at 20-22, that plaintiffs have not identified a single cumulative impact that federal defendants did not properly consider in the 2007 EA.

On four independent grounds, plaintiffs cannot controvert Interior's determination that the San Pedro fencing project's potential erosion, sedimentation, and other hydrologic effects would not be environmentally significant. First, plaintiffs erroneously presume that potential erosion and sedimentation by themselves are environmentally significant under NEPA, without showing how or why this supposedly is so. See Pl. Mem. at 16. Notably, no case or statute cited by the parties states or even hints that construction-induced erosion or sedimentation in a riparian area by itself would be environmentally "significant." See e.g., Pl. Mem. at 16-17

Instead, the salient NEPA issue is whether these environmental effects would have significant impacts in view of an objective water quality standard, such as those set by federal or state law, or a known natural or environmental resource, such as the marine or terrestrial animals and plants depending on the San Pedro area's river corridor or riparian areas. Notably, one searches plaintiffs' papers in vain for even an allegation, let alone evidence, that the San Pedro fencing project would adversely or significantly affect a particular water quality standard, a known plant population, or a known animal population. Therefore, plaintiffs cannot meet their burden, elementary to NEPA, of controverting Interior's determination that potential erosion and sedimentation effects would "not have a significant effect on the human environment." 40 C.F.R. §§ 1508.13, 1508.27(9) and (10)(effect of challenged agency action on both threatened plant or animal species and federal or state environmental standards relevant to NEPA meaning of "significant" or "significantly"); see also Marsh v. Oregon Natural Resources Council, 490 U.S. 360, 377-

Page 12

378 (EIS not required unless environmental impacts are "significant"); <u>Kleppe v. Sierra Club</u>, 427 U.S. at 412-414.

Second, plaintiffs erroneously attempt to show that the San Pedro project would have significant sedimentation or erosion effects with analysis from the 2007 EA that is specific to construction Alternative 1, which Interior never adopted, not Alternative 2 Combination, which Interior did adopt. <u>Compare</u> Pl. Mem. at 17 (relying exclusively on "p. 6, 9" of the 2007 EA, taken verbatim from Alternative 1 section) <u>with</u> 2007 EA at "Decision Record (initial unnumbered page dated 31 August 2007)(Interior specifically adopts "Alternative Two 'Combination'"); 2007 EA at 4-5 (describing material differences between Alternative 1, on which plaintiffs rely, and the Alternative 2 Combination actually adopted by Interior).

Third, Alternative 2 Combination ("Alternative 2")  is materially different from Alternative 1 because the former adopts additional mitigation measures designed to forestall the very sedimentation and erosion effects of which plaintiffs complain.  For example, plaintiffs rest their sedimentation and erosion claims on the effects of "fence and road construction," crossing between 60 and 66 "ephemeral washes," that allegedly would cause "bank failure and loss of riparian vegetation."  Pl. Mem. at 16.  However, as a preliminary matter, Alternative 1 and Alternative 2 each adopt a mitigation measure that minimizes any riparian vegetation loss by requiring that

> [a]ny temporarily disturbed soils will be stabilized and re-vegetated with native tree and shrub species, including cottonwood and willow saplings at washes/arroyos. Disturbed areas will also be sprayed with a hydroseed mixture to establish an herbaceous cover more rapidly.  Post-construction stabilization of eroding areas will be required where fencing and ground disturbance [result] in accelerated erosion.

This may include reseeding, water bars, or other treatment as necessary (adaptive management).

2007 EA at 3.

Further, in erroneously relying on excerpted language from Alternative 1 to predict that Alternative 2 would precipitate "bank failure," plaintiffs do not include language from the next paragraph. This language shows Alternative 2 would be even more effective in forestalling or minimizing bank failure. Interior determined that potential bank failure or other "watershed impacts"

> may be reduced... if the [**temporary vehicle barrier or] TVB option is selected for all drainages and the flood prone areas of the San Pedro River**...Potentially, impacts will be reduced further by proposed mitigation and implementation of best management practices to control **erosion during and following construction**.

2007 EA at 10 (emphasis supplied); see also Pl. Mem. at 16 (quoting preceding page only).

In Alternative 2, Interior adopted these recommended mitigation measures almost verbatim. Thus, Interior placed temporary vehicle barriers ("TVB's") "in the San Pedro River, within the floodplain [,] in the historic 'corral' area" and in the San Pedro River's "riparian corridor." These barriers, made of old railroad rails, "do not require "ground excavation" and can "be removed as necessary." 2007 EA at "Decision Record (unnumbered) and pp. 3-5 (detailed description of TVB design parameters), 10.

Further, just as recommended in the 2007 EA, Interior decided to adopt a series of detailed anti-erosion mitigation measures that would be used both during and after construction. For all of the riparian areas in which Interior placed TVB's, "no construction or ground disturbances are ever to occur in these areas." 2007 EA at 24. These TVB's must

be installed "after the flood season and be removed before the flood season."  Id.

Interior also determined that, although the additional placement of TVB's in "5 dry wash areas will allow these drainages not to be impeded," placing pedestrian fencing outside of both these dry washes and the other riparian areas also limited to TVB's could cause "bank failure" during "high flow events" and rains, unless Interior adopted additional mitigation measures "to lessen the severity" of this possible impact.  2007 EA at 22.

In response, Interior (1) prohibited the construction of pedestrian fencing, TVB's, and other structures "during the rainy seasons when the soil conditions are muddy and unmanageable;" (2) specified that pedestrian fencing would be placed "at the edge of the entire flood prone area" and also reduced the length of Alternative 2's pedestrian fencing by 275 feet from Alternative 1's length; and (3) required the new pedestrian fencing to be placed within "**the existing archeological trench excavated in July 2007 that is located 3-6 feet north of the barbed wire fence currently representing the international border**."  2007 EA at 3-5 (comparing pedestrian fence lengths for Alternatives 1 and 2), 9, 23-24 (emphasis in original).

Without referring to either the administrative record or their own extra-record declarations, plaintiffs simply speculate that the detailed mitigation measures described above might not work and that both plaintiffs and BLM have "little confidence" in them.  Pl. Mem. at 16.  However, because Congress has conferred specialized jurisdiction on Interior to resolve complex technical and environmental issues, Interior

must have discretion to rely on the reasonable opinions of its own qualified experts

Page 15

even if, as an original matter, a court might find contrary views more persuasive.

Marsh, 490 U.S. at 378; see also Native Ecosystems Council v. Forest Service, 428 F.3d

1233, 1239-1241, 1244 (where NEPA decision implicates agency's specialized expertise,

courts will not "take sides in a battle of experts").

Finally, relying exclusively on Ninth Circuit authority, plaintiffs assert that Interior

erred in adopting these mitigation measures because their effectiveness was uncertain, in

part, because the measures mitigated uncertain environmental effects.  Pl. Mem. at 17.

However, even if arguendo plaintiffs had properly construed their preferred Ninth Circuit

cases, other Ninth Circuit panel decisions contradict plaintiffs.  In two similar decisions, the

Ninth Circuit held that agencies may properly rely on reasonable mitigation measures even

where (1) their effectiveness is uncertain and (2) mitigation measures may not eliminate all

possible adverse effects.  Id; see also Greenpeace Action v. Franklin, 14 F.3d 1324, 1331-

1333-1134, 1334 n. 11, 1335 ("Greenpeace").

Greenpeace's analysis of uncertain environmental effects is consistent with numerous

Supreme Court and other Circuit decisions.  Under these decisions, the salient NEPA issue

is not whether the effects of the challenged agency action would or might be uncertain, as

plaintiffs urge, but whether agencies analyzed uncertain effects rationally by (1) considering

all applicable environmental factors "relevant" to uncertainty and (2) evaluating both

uncertain effects and related environmental factors with "reasoned" analysis that, therefore,

is "not 'arbitrary or capricious'."  Marsh, 490 U.S. 360, 373, 376-378, 385 (where agency

predicates NEPA document on reasoned analysis of scientific uncertainty, requiring another

NEPA document "would render agency decisionmaking intractable, always awaiting updated information only to find the new information outdated by the time a decision is made"); Robertson, 490 U.S. 332, 350-351; Baltimore Gas, 462 U.S. 87, 96, 105-106 (agencies must not respond "arbitrarily and capriciously" to uncertainty but instead must "consider and disclose" uncertain impacts rationally); Vermont Yankee Nuclear Power Corp. v. NRDC, 435 U.S. 519, 553, 555 (1978)(because all "administrative consideration of evidence creates gaps between the time that the record is closed and the decision is made," the correct standard of judicial review evaluates agency action "by the information then available to it"); Native Ecosystems Council, 428 F.3d at 1240-1241 (agencies may comply with their NEPA duty to disclose uncertain effects "without automatically triggering the 'substantial questions' threshold" necessary to establish significant environmental impacts); Isaak Walton League v. Marsh, 655 F.2d., 346, 369, 377 (D.C. Cir. 1981)(Wright, J.)(proper quantum of evidence under NEPA is record before the agency at the time of its decision, provided agency adequately "identifies areas of uncertainty"); City of Des Plaines, 552 F.2d 736, 738-739(7th Cir. 1976)(new monitoring and research plans in the future do not "vitiate the adequacy" of NEPA documents where "the present state of scientific knowledge does not permit a fuller assessment than was undertaken").

Traditionally, courts (1) review mitigation measures under NEPA's arbitrary and capricious standard and (2) do not require reasonable mitigation measures to eliminate all potential adverse effects.  Preserve Endangered Areas of Cobb v. U.S. Army Corps of Engineers, 87 F3d 1242, 1248-1249 (11th Cir. 1996)(mitigation measures proper unless they

are "arbitrary and capricious"); <u>Friends of the Payette v. Horseshoe Bend Hydroelectric Co.</u>,

988 F.2d 989, 993 (9th Cir. 1993)(even where adverse impacts are known, appropriate

mitigation measures "may not compensate completely for adverse impacts"); <u>Friends of</u>

<u>Endangered Species v. Jantzen</u>, 760 F.2d 976, 987 (9th Cir. 1985)(where agency adopts

significant mitigation measures that "mitigate the project's effects, they need not completely

compensate for adverse environmental impacts"); <u>Steamboaters v. FERC</u>, 759 F.2d 1382,

1394 (9th Cir 1985)(to adopt permissible mitigation measures, agencies must "explain

specifically how [these measures] would mitigate the impact of the project"); <u>Sierra Club v.</u>

<u>Department of Transportation</u>, 753 F.2d 120, 122, 126, 129 (D.C. Cir. 1985)(mitigation

measures in response to uncertain effects of airplane noise and disturbance on wildlife of

Grand Teton National Park are not arbitrary or capricious where agency "has acted

responsibly to minimize the impact on the environment").

In sum, plaintiffs have not shown that Interior's analysis of potential sedimentation

effects, potential erosion effects, and numerous mitigation measures designed to forestall or

minimize these effects is arbitrary and capricious.  Therefore, their claim that Interior erred

in the 2007 EA by not properly considering possible erosion and sedimentation fails under

traditional case law.

### 3. Interior Properly Considered the San Pedro Area's Distinct Ecological Characteristics.

Relying on a solitary Ninth Circuit case, plaintiffs contend that the San Pedro Riparian

National Conservation Area has unique ecological characteristics and that, therefore, this

environmental factor by itself means the San Pedro fencing project would have significant environmental impacts.  See Pl. Mem. at 15, quoting National Parks and Conservation Association v. Babbitt, 241 F.3d 722, 731 (9th Cir. 2001)("Babbitt").  However, Babbitt does nothing to detract from the NEPA tenet that unique ecological or cultural characteristics constitute one environmental factor, among many, that agencies must responsibly analyze and balance in determining that a given agency action either is or is not environmentally "significant."  Compare id. with 40 C.F.R. § 1508.27 (NEPA regulations delineate eleven environmental factors that agencies must analyze to evaluate environmental significance or the lack thereof).

Here, Interior carefully complied with these NEPA regulations by predicating its analysis of the San Pedro area's distinct characteristics, among other relevant environmental factors, on reasoned analysis.  Interior's analysis has three parts.  First, Interior considered the San Pedro area's distinctive characteristics in detail.  2007 EA at 2, 5, 10-17 (analyzing this conservation area's environmental, cultural, and historic characteristics).  Second, Interior determined that the San Pedro fencing would be placed in the same part of the conservation area that has been historically reserved for structures deemed necessary for border security measures, including (1) "an existing 4-strand barbed wire fence and primitive road along the U.S. Mexico International Border within [the conservation area]" and (2) a previously excavated "archeological test trench," in which the entire "pedestrian fence" will be placed.  2007 EA at 5, 24.

Third, in the context of the numerous environmental mitigation and protection

measures summarized above, <u>supra</u> at 12-19, Interior determined that the San Pedro project would not significantly affect the San Pedro conservation area. Because plaintiffs do not show this Court how or why Interior's analysis of the San Pedro area's ecological and historic characteristics is arbitrary and capricious, their claim that these characteristics by themselves render the San Pedro project environmentally significant necessarily fails.

### 4. Plaintiffs' Cumulative Impact Claims Are Defective On Their Face.

Plaintiffs fail to make a prima facie case about cumulative impacts because they do not meet NEPA's elementary burden of controverting Interior's determination that these impacts would not be environmentally significant. To meet this burden, plaintiffs must controvert Interior's specialized analysis of cumulative impacts with convincing evidence, not speculation or conjecture. <u>Kleppe v. Sierra Club</u>, 427 U.S. at 412-414. Thus, at the minimum, plaintiffs must establish that Interior erred by not properly considering a particular environmental impact or impacts that would be "cumulatively **significant**," either alone or in conjunction with other foreseeable impacts. 40 C.F.R. § 1508.25(a)(2) (emphasis added); <u>see also</u> 40 C.F.R. § 1508.7.

Plaintiffs simply ignore this burden because they do not adduce evidence or even speculation to show why Interior's detailed analysis of cumulative impacts supposedly is wrong. For example, they posit that Interior did not consider the "potential cumulative impacts of simultaneous **fence construction** [in] different areas of the Arizona border." Pl. Mem. at 14 (emphasis in original). On the contrary, Interior considered these cumulative

impacts in detail.  2007 EA at 20-23 (specifically analyzing foreseeable environmental effects "[a]s the border fence project proceeds in other areas of the watershed").

Without referring to a paper in the record or even to their own extra-record declarations, plaintiffs also speculate that "**any** additive adverse impact to the [San Pedro] River is arguably 'significant'," in light of "all the other actions" that plaintiffs eloquently neglect to identify.  Pl. Mem. at 17 (emphasis in original).  In contrast, on the basis of the numerous mitigation measures discussed above, Interior specifically determined that any

> watershed degradation and resulting river channel instability is anticipated to be lessened considerably with the implementation of mitigation for erosion (excess sediment  discharge) and flood plain alteration.  The residual impacts to riparian function, aquatic habitat, and limited loss of [species habitat] patches in the project area are likely to be relatively modest over the life of the project.

2007 EA at 21.

Failing to controvert these specialized determinations, plaintiffs' cumulative impact claims must fail because they never show this Court (1) why Interior's analysis of cumulative impacts supposedly is arbitrary and capricious and (2) a single cumulative impact, not considered by Interior, that would or even could have "significant" environmental impacts.  See Coalition on Sensible Transp., Inc. v. Dole, 826 F.2d. 60, 70-71 (D.C. Cir. 1987); see also Kleppe, 427 U.S. at 406, 410 n.20, 412-415, 414 n.26 (1976)(determination of both the scope and effect of cumulative impacts "is a task assigned to the special competency of the appropriate agencies").

### 5.  Neither NEPA Nor its Regulations Required Interior To Distribute the Draft 2007 EA for Public Comment.

Plaintiffs claim there is a mandatory NEPA requirement to distribute a draft EA for public comment. Pl. Mem. at 18-19. However, no such requirement exists in either NEPA's statutory text or its regulations. Plainly, NEPA's regulations only require agencies to "involve" the public "to the extent practicable," in preparing or distributing an EA. 40 C.F.R. § 1501.4. As shown below, infra at 24-28, it was more than reasonable for Interior and Homeland Security to determine that a public comment period was impractical because of urgent border and related national security risks. Therefore, plaintiffs' public comment claims must fail. Id.; TOMAC, Taxpayers of Michigan Against Casinos v. Norton, 433 F.3d 852, 861 (D.C. Cir. 2006)("public input during the EA process is not required"); Fund For Animals, Inc. v. Rice, 85 F.3d 535, 549 (11th Cir. 1996) ("there is no legal requirement that an Environmental Assessment be circulated publicly and, in fact, they rarely are").

### 6. Interior Complied With the Arizona-Idaho Conservation Act.

Under the Arizona-Idaho Conservation Act (the "Act"), Congress granted Interior significant discretion to both manage and protect the San Pedro area. Thus, the only uses permitted on the San Pedro area are those that Interior finds will "further the primary purposes" for which the area was established. 16 U.S.C. § 460xx-1(b). Notably, where necessary for the protection of the resources of this area, Congress also gave Interior authority to impose "reasonable limits to visitation and use," require permits for public use, close portions of the area, and authorize motorized access where he deems it necessary for

administrative or "emergency" purposes.  Id.

Under this statute, Interior thoroughly reviewed whether the proposed ROW would further the primary purpose for which the San Pedro area was established.  2007 EA at 2. Interior also examined whether granting the ROW was consistent with the San Pedro Riparian Resource Management Plan ("RMP"), 43 C.F.R. § 1610.5.  It did so by examining the environmental consequences of the various alternatives for border barrier construction as well as the potential impacts of continuing to manage the area without enhanced border enforcement capabilities, i.e., the No Action Alternative.

Interior determined that failing to construct a border barrier would allow serious environmental impact to continue unabated.  See e.g., 2007 EA at 8 (under the No Action Alternative "damage caused by unauthorized vehicle...use damaging upland and riparian vegetation, altering natural drainage patterns, accelerated erosion . . .) would continue to accumulate"); see also 2007 EA at 23, (under No Action Alternative, "unauthorized vehicle travel may continue to alter drainage patterns, destroy vegetation, and modify channel morphologic conditions ").

After conducting this thorough analysis, Interior granted the ROW.  In so doing, Interior deemed the proposed action one that would "further the primary purposes" for which the San Pedro area was established.  Interior also determined in its Decision Record that the "proposed action is specifically provided for" in the Resource Management Plan.  See 2007 EA (Decision Record at 1).  Because plaintiffs do not show why this determination is arbitrary and capricious, this Court should uphold it.  Norton v. Southern Utah Wilderness Alliance,

Page 23

542 U.S. 55, 66 (2004).

**B.  AN INJUNCTION SHOULD NOT BE ENTERED BECAUSE IT
WOULD DISPROPORTIONATELY HARM THE PUBLIC INTEREST
WITHOUT ABATING IRREPARABLE ENVIRONMENTAL INJURY**

On two separate grounds, plaintiffs' requested injunction must fail.  First, as shown above, plaintiffs have not shown that the San Pedro project would precipitate significant environmental impacts.  Therefore, plaintiffs cannot establish irreparable environmental injury that, by definition, could not be restored or renewed.  For example, plaintiffs have not shown or even alleged that the San Pedro fencing project would harm a rare or threatened plant or animal population at all, let alone harm these species beyond renewal.  Pl. Mem.

Instead, plaintiffs (1) speculate that this project would cause serious erosion, sedimentation, and vegetation effects (including harm to the vegetation needed by the "pygmy owl") and (2) simply hint that these possible effects might be irreparable.  See Pl. Mem. at 20-22.  However, these alleged effects would be minimized or averted by Interior's numerous mitigation measures that plaintiffs never controvert.  Among these measures, Interior provided for (1) restoring the very native vegetation that plaintiffs hint might be irreparably harmed (and thereby taken from the pygmy owl) and (2) reconfiguring with "[p]ost-construction stabilization" a bank or channel impaired by any "accelerated erosion."  2007 EA at  3.

Relying on extra-record declarations, plaintiffs also speculate that the San Pedro project might harm the endangered jaguar by acting as "barriers to...genetic interchange."  Pl. Mem. at 22.  However, the specialized agency that Congress has entrusted with the mission of protecting jaguars and other listed species, the U.S. Fish and Wildlife Service ("FWS"),

Page 24

disagrees.  The FWS has determined that the San Pedro project "would not jeopardize the continued existence of the jaguar" because, among other things, it would reduce the harm to potential jaguar foraging areas caused by undocumented aliens ("UDA's").

> Environmental damage to natural resources from UDA traffic is considerable and affects large areas of many sensitive species habitats... Trails and other soil disturbances [from UDA's] can increase erosion, promote the spread of invasive species, and increase the potential for fires.  Fires can exacerbate the impacts from UDAs, with more erosion, invasion of exotic species, and a cascade of effects to watershed functioning. [Further, the] direct impacts [of the San Pedro project] are at the international border[;] thus, they are limited to a relatively small area...The construction period should be short (1-3 months), thereby reducing the potential impacts from human disturbance.

2007 Biological Opinion at 24, 28-29.  These specialized findings, uncontroverted by plaintiffs, deserve substantial judicial deference.  Marsh, 490 U.S. at 378.

Therefore, because the record does not establish irreparable environmental injury separate from an alleged procedural NEPA violation, an injunction is impermissible here. Amoco Production Co. v. Village of Gambell, 480 U.S. 531, 542-545; Weinberger v. Romero-Barcelo, 456 U.S. 305, 317-320.  Traditionally, even "significant" harm uncovered in a NEPA analysis or document is not the same as "irreparable" harm for purposes of injunctive relief, and courts do not presume irreparable environmental or other harm in NEPA cases.  Forest Conservation Council, 66 F.3d 1489, 1496 (9th Cir.1995)("injunction sought by plaintiffs will not automatically issue" where reviewing court finds agency "violated NEPA"); see also Fund for Animals v. Frizzell, 530 F.2d 982, 986; Fund for Animals v. Clark, 27 F. Supp. 2d 8, 14; Sierra Club v. Watkins, 808 F. Supp. 852, 875.

Finally, this Court should deny plaintiffs' requested injunction on another independent

ground: plaintiffs cannot controvert compelling evidence that an injunction would severely and disproportionately harm the public interest. Homeland Security has determined that delaying the completion of the San Pedro border fence would impair important border and related national security interests because (1) the San Pedro area is a high-traffic UDA corridor of "high illegal entry" and substantial UDA encroachment on public lands; (2) for Fiscal Year 2007 alone, U.S. Customs and Border Protection ("CBP") has documented "over 21,000 illegal entries" and "over 19,000 apprehensions" of UDA's in the San Pedro area; and (3) equivalent fencing in the San Diego sector has reduced the annual number of UDA's apprehended after violating our border from 19,615 individuals to 4,545. Ahern Decl. at ¶¶ 8, 11.

Further, as mentioned above, the FWS has confirmed that the San Pedro border fencing project could effectively abate the serious environmental harm occasioned by UDA trespass on public lands. 2007 Biological Opinion at 24, 29. In its Report to Congressional Requesters, the U.S. General Accounting Office ("GAO") agreed with the FWS.

> Illegal aliens and smugglers have created hundreds of new trails and roads while crossing borderlands [and] have destroyed cactus and other sensitive vegetation that can take decades to recover, including habitat for endangered species...Tons of trash and human waste are left behind each year, affecting wildlife, vegetation, and water quality...[I]llegal border crossers left behind close to 4,500 abandoned vehicles in fiscal year 2002 and an estimated 4 million pounds of trash each year as they crossed over the lands. [A tribal police department] removed over 7,000 [abandoned UDA] vehicles in 2003.

Def. Exh. D at 16; Ahern Decl. at ¶ 16.

Finally, CBP's Deputy Commissioner has determined that the 60-foot wide easement

underlying that road "has already been scraped."  Ahern Decl. at ¶¶ 14, 22.  Therefore, CBP

has determined that enjoining the project now would increase the risk of an adverse "erosion

problem" because it would prevent CBP from ensuring that the new road is "properly

contoured and some sort of aggregate base is put down."  Id.  Similarly, CBP has determined

that an injunction preventing it from filling and modifying the "open trench" created by this

new construction would elongate

> a safety hazard for both wildlife and anyone who is walking in the area.  Water can
> also flow into the trench and away from its intended washes since the water flows
> north in that area.

Id.

In sum, this Court must reject plaintiffs' requested injunction because it would not

abate irreparably environmental injury but would disproportionately harm the public.  See

Fund for Animals v. Frizzell, 530 F.2d 982, 986; Natural Resources Defense Counsel v. Pena,

972 F.Supp. 9 (D.D.C. 1997)(courts "have accorded great weight to considerations of national

security when balancing the interests and equities of the parties"); see also Natural Resources

Defense Counsel v. Winter, 2007 WL 2481465 (9th Cir. 2007)(where plaintiffs request

injunction, courts must weigh environmental interests against the public "interest in national

defense") .

## IV.  CONCLUSION

This Court should not enter an injunction because (1) unable to identify an

environmental factor that federal defendants did not consider with reasoned analysis in the

2007 EA, plaintiffs cannot make a prima facie case under NEPA; (2) an injunction would not

abate irreparable environmental injury; and (3) enjoining the San Pedro border fencing project would disproportionately harm the public.

Respectfully submitted,

_____
GREGORY D. PAGE, DC Bar 398121
Environment and Natural Resources
   Division
U.S. Department of Justice
P.O. Box 663
Washington, D.C. 20044-0663
Telephone: (202) 305-0446
Attorney for the Federal Defendants

## CERTIFICATE OF SERVICE

I certify that true and correct copies of the foregoing Defendants' Opposition to Plaintiffs' Motion for a Temporary Restraining Order in Relation to Border Wall and Road Construction on the San Pedro Riparian National Conservation Area were served on 9 October 2007 by electronic filing or hand delivery to:

Robert G. Dreher
Brian Segee
Defenders of Wildlife
1130 17th Street, N.W.
Washington, D.C. 20036

_____
Gregory D. Page

# EXHIBIT A



**DEPARTMENT OF THE INTERIOR**
**OFFICE OF THE FIELD SOLICITOR**
**SANDRA DAY O'CONNOR US COURTHOUSE, SUITE 404**
**401 WEST WASHINGTON STREET, SPC 44**
**PHOENIX, ARIZONA 85003-2151**
**Phone: (602) 364-7880**
**Fax:   (602) 364-7885**

| | SENDER | PHONE NUMBER | SENDER | PHONE |
|---|---|---|---|---|
| | Jackie S. Balaga | 602-364-7893 | Shari C. Mauney | 602 364-7884 |
| | Linda Garrison | 602-364-7896 | Hoke MacMillan | 602-364-7890 |
| X | John L. Gaudio | 602-364-7892 | William W. Quinn | 602 364-7886 |
| | Richard R. Greenfield | 602-364-7888 | Robert A. Zurick | 602-364-7894 |
| | Daniel L. Jackson | 602-364-7891 | | |

| RECIPIENT(S) | FAX NUMBER | PHONE NUMBER |
|---|---|---|
| Spinner Findlay | (202) 305-0506 | |
| | | |
| | | |

Comments:  See attached FONSI, DR, and EA in the San Pedro Riparian National Conservation Area border fence matter.

This transmission, including the cover sheet, totals _____36_____ pages.

# FINDING OF NO SIGNIFICANT IMPACT

**EA Number:** AZ-420-2007-051
**Lease/Serial/Case File No.** AZA 33680
**BLM Office:** Tucson Field Office

### Finding of No Significant Impact:

I have reviewed the environmental assessment, **San Pedro Riparian National Conservation Area Border Fence** (#AZ-420-2007-051), including the explanation and resolution of any potentially significant environmental impacts. The proposed action is a perpetual right-of-way for a combination of barriers, including a pedestrian fence, vehicle barriers (temporary and permanent), an all-weather road and drainage structures placed along the international border with Mexico the entire southern boundary of the San Pedro Riparian National Conservation Area (SPRNCA). I have determined that the proposed action, with the prescribed mitigation measures, will not have any significant impacts on the human environment. Therefore, an Environmental Impact Statement is not required. I have determined that the proposed action is in conformance with the San Pedro Riparian Management Plan, an Activity Level Plan, dated June 1989, tiered from the Safford District Resource Management Plan, approved in Record of Decision August 1991, and amended July 21, 1994.

Cumulative impacts to the watershed of the San Pedro River were considered during this analysis. The potential impacts to hydrologic flow, wildlife migration, human traffic and other factors contributing to the health of the riparian system extend beyond the limits of this proposed action, as well as beyond the boundary of the SPRNCA itself. It is important to note that the public lands on the SPRNCA actually affected by this action are very small compared to the full extent of pedestrian fence and vehicle barriers proposed for construction.

**Below are the substantive reasons for finding no significant impact:**

- A Biological Opinion (consultation number 22410-2007-F-0416 ) dated August 29, 2007, was issued by the U.S. Fish and Wildlife Service which stated that no Threatened or Endangered species would be adversely affected by the construction of the border fence east of the river.
- The installation of permanent or temporary vehicle barriers in the river corridor, floodplain, drainages and the historic corral site will serve to adequately mitigate impacts from interruption of water flow into the San Pedro River.

- Impacts to two cultural sites within the project area are being addressed through a thorough treatment plan for data recovery and use of temporary barriers, where appropriate, to minimize the impacts.
- The installation of permanent or temporary vehicle barriers in the river corridor, floodplain and drainages also provides adequate mitigation for impacts to large mammal population and migration routes that occurs naturally in dry washes.

**Attachments:** EA No. AZ-420-2007-051

_____/s/ Patrick Madigan_____     8-31-07_____
Field Manager                                                            Date

# DECISION RECORD

**EA Number:** AZ-420-2007-051
**Serial/Case File No.** AZA 33680
**BLM Office:** Tucson Field Office

**Decision:** It is my decision to select Alternative Two "Combination". The Combination Alternative consists of authorizing a ROW to use a combination of vehicle barriers, pedestrian fence, an all-weather road, and drainage structures on public lands along the southern border of the San Pedro Riparian National Conservation Area (SPRNCA). Temporary Vehicle Barriers will be placed in the San Pedro River, within the floodplain, and in the historic "corral" area. Permanent Vehicle Barriers will be installed in dry wash areas along the SPRNCA boundary. Bollard style pedestrian fence will be installed in all other areas. This action will be authorized under a BLM right-of-way grant for public lands located within SPRNCA. (Refer to Map 2 in the supporting environmental assessment)

**Alternatives Considered:** Three other alternatives, along with Alternative Two, were considered in the environmental assessment. Alternative One was not selected because the impacts associated with a "solid" pedestrian fence in the project area would significantly affect the natural hydrologic flow into the San Pedro River. Field observations of past and current fence construction projects in other nearby border areas indicate that the pedestrian fence currently in place (bollard and mesh designs) does not adequately allow passage of sediment and debris through ephemeral drainage paths during seasonal flood flows. Debris accumulation behind the pedestrian fence starves run-off water of sediment subsequently resulting in channel incision and increased erosion immediately below the fence. In addition, Alternative One could have a significant impact on the migration of large mammals, including threatened and endangered species. Alternative Three for vehicle barriers only, and Alternative Four, the No Action Alternative, were not selected because they do not meet the project's objectives.

**Rational for Decision:** The proposed action is specifically provided for in the San Pedro Riparian Management Plan, an Activity Level Plan, dated June 1989, tiered from the Safford District Resource Management Plan, approved in Record of Decision August 1991, and amended July 21, 1994 to issue rights-of-way on a case-by-case basis. The environmental assessment analyzed the potential impacts to the environment and the public should the application be granted. A Biological Opinion was issued by the U. S. Fish and Wildlife Service (USFWS 08/29/07) on the impacts of the pedestrian fence (public lands located east of the San Pedro River). Additional consultation with USFWS is currently in progress for lands west of the San Pedro River.

A Finding of No Significant Impact has been signed stating that there are no significant impacts to the environment that would require an environmental impact statement. By selecting the proposed action, the Tucson Field Office is implementing this portion of the

San Pedro Riparian Management Plan, an Activity Level Plan, and the Safford RMP to issue rights-of-way on a case-by-case basis.

**Mitigation Measures/ Terms / Conditions / Stipulations:** per 43CFR 10.4(g):

1. No construction is to occur in dry wash drainages areas until the BLM has been coordinated with, allowed to comment on, and approves the type of fence modifications or barriers ACOE's desires to be constructed within these areas. The dry wash drainages areas and the river active channel are identified on Map A, along with BLM's recommended types of infrastructures.

2. A preconstruction meeting will be required between BLM, Border Patrol, ACOE and the project contractor.

3. All approved construction activities shall be contained within the authorized 60-foot strip.

4. The ACOE and Border Patrol shall comply with all conditions and stipulations set forth in the U.S. Fish and Wildlife Biological Opinion dated August 29, 2007.

5. Prior to the placement and removal of the temporary vehicle barriers in the river corridor and banks, the area will be surveyed and cleared for the Huachuca Water Umbel(HWU) by a qualified biologist. Should the HWU occur in the area the BLM and USFWS will be notified and appropriate mitigation measures will be determined and made.

6. There shall be no ground disturbances or vegetation removal outside of the authorized 60-foot strip.

7. There shall be no modifications or repairs to the existing road that meanders outside of the 60-foot authorized area. If any road maintenance is needed outside of the 60-foot authorized strip, the Border Patrol's authorized officer will communicate with the Manager of the San Pedro Riparian National Conservation Area, or the Tucson Field Manager on the needs for the required road maintenance.

8. All construction equipment and associated vehicles brought into the SPRNCA are to be washed every time prior to entering the SPRNCA for the prevention of spreading invasive weeds. Vehicle washing will consist of the under carriage, exterior, and tires.

9. All vehicular use shall be confined to existing roads.

10. The construction of the pedestrian fence and road will be permitted only upon the completion of the site treatment, and clearance from the BLM Archaeologist. The pedestrian fence shall be placed in the existing archaeological test trench excavated in July 2007 that is located 3-6 feet north of the barbed wire fence currently representing the international border.

11. For roads inside of the 60-foot strip, new road construction would involve grading and leveling proposed roadbeds, filling areas with existing materials (existing on roadways) or engineered fill, aggregate materials, dust suppressant agents, lifting and bedding stretches of road, and installing drainage structures to aid with water drainage.

12. Temporary barriers are to be placed inside the historic corrals, the river and the floodplain, no construction or ground disturbances are ever to occur in these areas.

13. The temporary barriers inside the river are to be placed after the flood season and be removed before the flood season. The Border Patrol and BLM will coordinate on time frames for these activities.

14. A BLM approved onsite monitor will be required during the construction period to monitor all construction activities and archaeological matters. A biological monitor would be required if construction occurs during birding breeding/migration seasons of February 1st thru August 31st.

15. Construction will not be permitted during the rainy seasons when the soil conditions are muddy and unmanageable.

16. All equipment will be inspected for leaks to prevent any contamination from petroleum, oil, and lubricant spills that could occur.

17. The ACOE will consult with and obtain BLM's and the USFWS's approval on the proposed bank stabilization techniques on the east and west banks of the San Pedro River, and the construction lane within the floodplain. It is recommended that the fence would end approximately 50 feet east of the eastside river embankment to avoid subsequent erosion.

18. The Border Patrol will monitor and remove all debris and sediment buildup within all permanent structures. Removal of the debris and sediment shall be preformed prior to and after high water events. All trash debris is to be disposed of and removed from the San Pedro Riparian National Conservation Area boundaries.

19. BLM will be provided with a copy of ACOE's Storm Water Pollution Prevention Plan prior to be beginning of construction.

20. The BLM retains the right to occupy and use the right-of-way.


_____/s/ Patrick Madigan_____    __8-31-07___
Field Manager                                                Date


**Attachments:**    Finding of No Significant Impact dated    __8-31-07__
                    Environmental Assessment: AZ-420-2007-051

**PROGRAM CONSULTATION & COORDINATION**
**BUREAU OF LAND MANAGEMENT**
**TUCSON FIELD OFFICE**

ENVIRONMENTAL REVIEW

NEPA #: AZ-420-2007-051

ASSIGNMENT AND REVIEW

Subactivity: 422-1430-ER
Case/Project No.: AZA33680

Project Name: San Pedro RNCA Border Fence
Location: T. 24 S., R.22 E., section 19, lots 1-3; section 20, lots 1-4
Quad Name: Bob Thompson Peak 7.5'
Project Lead: Susan Bernal

Project Reviewed:
Unit Manager/Supervisor: /s/ Cindy Alvarez          Date: 8/10/07
Technical Review:

| Will Be Impacted Yes No | Can Be Mitigated Yes No | Attach Mitigation? Yes No | NAME | CRITICAL ELEMENTS | SIGNATURE | DATE |
|---|---|---|---|---|---|---|
| ( ) ( ) | ( ) ( ) | ( ) ( ) | Dan Moore | Air Quality | C. Alvarez | 8/31/07 |
| ( ) ( ) | ( ) ( ) | ( ) ( ) | Francisco Mendoza | Areas of Critical Env. Concern | F. Mendoza | 8/31/07 |
| ( ) ( ) | ( ) ( ) | ( ) ( ) | Jane Childress | Cultural Resources/Paleo | J. Childress | 8/31/07 |
| ( ) ( ) | ( ) ( ) | ( ) ( ) | Linda Marianito | Environmental Justice | L.Marianito | 8/31/07 |
| ( ) ( ) | ( ) ( ) | ( ) ( ) | Dan Moore | Farm Lands (Prime or Unique) | C. Alvarez | 8/31/07 |
| ( ) ( ) | ( ) ( ) | ( ) ( ) | Nathan Dieterich | Floodplain/Hydrology | C. Alvarez | 8/31/07 |
| ( ) ( ) | ( ) ( ) | ( ) ( ) | Jane Childress | Native American Religious Concerns | J. Childress | 8/31/07 |
| ( ) ( ) | ( ) ( ) | ( ) ( ) | Darrell Tersey | Threatened or Endangered Species | D. Tersey | 8/31/07 |
| ( ) ( ) | ( ) ( ) | ( ) ( ) | Bill Auby | Wastes, Hazardous or Solid | B. Auby | 8/31/07 |
| ( ) ( ) | ( ) ( ) | ( ) ( ) | Dan Moore | Water Quality, Drinking or Ground | C. Alvarez | 8/31/07 |
| ( ) ( ) | ( ) ( ) | ( ) ( ) | Jeff Simms | Wetlands/Riparian Zones | J. Simms | 8/31/07 |
| ( ) ( ) | ( ) ( ) | ( ) ( ) | Francisco Mendoza | Wild and Scenic Rivers | F. Mendoza | 8/31/07 |
| ( ) ( ) | ( ) ( ) | ( ) ( ) | Francisco Mendoza | Wilderness | F. Mendoza | 8/31/07 |
| ( ) ( ) | ( ) ( ) | ( ) ( ) | Darrell Tersey | Invasive & Non Native Weeds | D. Tersey | 8/31/07 |
| ( ) ( ) | ( ) ( ) | ( ) ( ) | Bill Auby | National Energy Policy | B. Auby | 8/31/07 |

Additional Specialists Review:

| SPECIALTY | NAME | COMMENTS | SIGNATURE | DATE |
|---|---|---|---|---|
| Visual Resources | Jim Mahoney | None | F. Mendoza | 8/31/07 |
| Migratory Bird Treaty Act | Keith Hughes | None | K. Hughes | 8/31/07 |
| | | | | |

Final Review:

Unit Manager/Supervisor: /s/ Cindy Alvarez          Date: 8/31/07

Environmental Coordinator: /s/ Linda Marianito          Date: 8/31/07

**UNITED STATES DEPARTMENT OF THE INTERIOR**
**BUREAU OF LAND MANAGEMENT**
**ARIZONA**
**TUCSON FIELD OFFICE**

**EA #:**                      AZ-420-2007-051
**Project Name:**              San Pedro RNCA Border Fencing
**BLM Contact Person:** Susan Bernal

**Legal Description and Map Name:** Public land administered by the BLM in the San Pedro Riparian National Conservation Area (SPRNCA), within the 60-foot strip along the U.S.-Mexico international boundary southeast of the city of Sierra Vista, Cochise County, Arizona. The general location is T. 24 S., R.22 E., section 19, lots 1-3; section 20, lots 1-4 of the Gila and Salt River Principal Meridian. The area is covered by the Bob Thompson Peak 7.5' quadrangle, shown on Map 1.

## I. INTRODUCTION

**A. Background:** In September 2006, the Department of Homeland Security (DHS) through the Army Corps of Engineers (ACOE), and the U.S. Customs and Border Patrol (CBP) requested a perpetual right-of-way (ROW) for permanent and temporary vehicle barriers along the U.S. – Mexico international border within the SPRNCA. As a response to this request, BLM conducted an independent review of the *"Final Supplemental Environmental Assessment for Infrastructure within U.S. Border patrol Naco-Douglas Corridor, Cochise County, Arizona, November 2003" (2003 EA)*. The review was to verify that it adequately addressed impacts for this request. BLM concluded that it was adequate and proceeded with preparing a Determination of NEPA Adequacy (DNA) and Decision Record (DR) to authorize the use of temporary and permanent vehicle barriers. This was never finalized due to the submission of an amended application.

The ACOE submitted an amended ROW application on August 10, 2007. The amended application changed the request to add the installation of a combination of pedestrian fence and vehicle barriers along this project area. Once again, BLM conducted an independent review for NEPA adequacy of the 2003 EA. The BLM concluded the 2003 EA did not adequately address the impacts of installing a pedestrian fence along the 60-foot strip within the SPRNCA. In order for BLM to respond to the amended ROW application, an analysis of impacts of installing the pedestrian fence was needed. Therefore, BLM is analyzing four different alternatives in this EA, which meets the BLM standards and regulations.

**B. The Need for the Proposal:** The federal action being evaluated in the EA is the granting a ROW to ACOE/CBP from the BLM for the proposed construction, maintenance, and operation of vehicle barriers, pedestrian fence, drainage structures, and roads along the U.S. – Mexico border within the SPRNCA boundary.

**C. Conformance with Land Use Plan:** The proposed action is subject to the San Pedro Riparian Management Plan; an Activity Level Plan tiered from the Safford District Resource Management Plan (RMP), approved in 1992 and amended in July 1994. This proposed action has been reviewed to determine if it conforms to the RMP terms and conditions as required by 43 CFR 1610.5, BLM MS 1617.3. According to page 22 of the RMP, "Rights-of-way, leases and permits will be considered on a case-by-case basis, in accordance with the decisions of this Resource Management Plan."

**D. Relationship to Statutes, Regulations or Other Plans or Policies:** The application for ROW is consistent with requirements of 43 CFR 2800, and the Federal Land Policy Management Act (FLPMA) Title V. The BLM Decision authorizes use of BLM land only. Use of non-BLM land (National Forest, State Trust land, private land) is subject to the agency or private landowners' permission. Public lands in the area are subject to the Endangered Species Act protocol for listed species in the project area and the Migratory Bird Treaty Act. The application for ROW is subject to the SPRNCA Proclamation (P.L. 100-696) which states under 102. (b) USES. – "The Secretary shall only allow such uses of the conservation area as he finds will further purposes of which the conservation area is established. Except where needed for

administrative or emergency purposes." The action is also subject to the "Memorandum of Understanding Among US Department of Homeland Security and US Department of the Interior and US Department of Agriculture Regarding Cooperative national Security and Counterterrorism Efforts on Federal lands along the United States' Borders", signed by the Secretary of the Interior on 3/31/06.

**II. THE ACTION ALTERNATIVES and No Action:** This document analyzes four (4) Alternatives. Each action Alternative proposes the installation of a mix of the following design components:

**A. Design Components:**
1. Temporary Vehicle Barriers (TVB): are placed on ground level and are made of old railroad rail. They will be installed using a small crane to lift and place the barrier onto the ground with no ground excavation. They are designed as temporary because they will be able to be removed as necessary. The barriers will stand at a height of approximately 4' to 6' from the ground surface (diagram a).

2. Permanent Vehicle Barriers (PVB): are constructed using old railroad rails. They will require the drilling of a 1' x 3' hole in the ground for each steel post and filled with concrete. The height of PVBs is approximately 4' to 6' from ground surface (diagram b).

3. Pedestrian Fence using "Bollard" design: this design consists of a double row of 14' to 17' high steel pipe poles, approximately 6" in diameter, placed on 8.5" centers. The pipes will be filled with concrete for added strength and security. The two rows are offset, such that the gaps between the poles will be filled by the poles of the other row. The construction of the fence involves trenching 5' deep and 2' wide along the entire length (diagram c).

4. Pedestrian Fence using "Sandia" design: this consists of vertical secure metal mesh panels attached to 16' steel poles. Additional 6' panels are secured to the top panels at an angle of 45 degrees toward the south. The poles will be anchored to a 12" wide by 4' deep concrete footing that runs the length of the proposed fence line (diagram d).

5. Pedestrian Fence using a "modified Sandia/mesh" design: this design is a combination of steel pipes arranged horizontally at the bottom approximately 3' high, with 6" spacing and the remaining height of the fence consisting of mesh (diagram e).

**B. The following proposed actions are common among Alternatives 1-3:**
1. Construction of the fence will require clearing and grading the area within a 60-foot wide strip along the U.S.-Mexico international border. The road that traverses outside of this 60-foot strip will not be improved or upgraded without BLM approval.

2. For roads inside the 60-foot strip, new road construction will involve grading and leveling proposed roadbeds, filling areas with existing materials (existing on roadways) or engineered fill, lifting and bedding stretches of road, and installing drainage structures to aid with water drainage. Installation of primary fences and vehicle barriers generally requires the construction of a road (approximately 10' wide) immediately adjacent to construction activities. To allow future maintenance on fences, these construction roads are considered a permanent infrastructure component. In order to minimize cut and fill activities, these roads follow the contour of the land and will be used infrequently. Therefore, all weather surfaces along the construction roads are not required because ACOE or CBP traffic can access these areas from adjacent patrolled roads.

3. Any temporarily disturbed soils will be stabilized and re-vegetated with native tree and shrub species, including cottonwood and willow saplings at washes/arroyos, to provide erosion and sedimentation control. Disturbed areas will also be sprayed with a hydroseed mixture to establish an herbaceous cover more rapidly. Post-construction stabilization of eroding areas will be required where fencing and ground disturbance results in accelerated erosion. This may include reseeding, water bars or other treatment as necessary (adaptive management).

4. Work will be conducted in the daylight hours to the extent practicable. Nighttime construction activities will be conducted only when absolutely necessary for adequate concrete pours or in the case of an accelerated construction schedule to meet Congressional mandates. Portable lights with generators will be used during nighttime construction. However, lights will be equipped with shields to focus the illumination on the work area and reduce light trespass into other areas.

5. The ACOE/CBP will conduct a survey for Huachuca Water Umbel (HWU) annually to identify the presence of the species in the portion of the San Pedro River where TVBs are to be placed. Should HWU occur in the area the BLM and U.S. Fish and Wildlife Service (USFWS) will be notified. An Alternative location will be used until the USFWS can be consulted for appropriate guidance.

6. No invasive weeds will be introduced to the area by construction equipment. All construction equipment will be pressure washed prior to entering the project area.

7. All conservation measures from all Biological Opinions (BO) from the USFWS will be adhered to. See Final BO, signed August 29, 2007.

8. All pedestrian fences and vehicle barriers in dry washes will be designed and constructed to ensure proper conveyance of floodwaters and to lessen the potential to cause backwater flooding on either side of the border.

9. The disposal of solid and/or hazardous wastes is not authorized as part of any of the four Alternatives. The applicant is responsible for developing and implementing a plan for the safe use and storage of hazardous materials required for the proposed action. The storage of fuels or other hazardous materials is not authorized on the SPRNCA. Fuel tenders are not to enter the floodplain or channel of the San Pedro River. Any hazardous materials releases must be reported to BLM and appropriate responders. No painting is authorized within the floodplain or channel of the San Pedro River. Pressurized gas cylinders and acetylene tanks be properly secured and will not be left unattended within the SPRNCA.    ⸻

**C. Description of Alternative 1 ACOE Proposed:** The ACOE requests a ROW to construct 1.6 mi. of pedestrian fence and 490' of TVBs. The pedestrian fence will be installed within 2-8-feet north of and along the U.S. – Mexico border, see attached Map 1. Either Bollard or "modified Sandia/mesh" fence design will be used. The TVBs will be installed in two segments, one segment in the San Pedro River, approximately 250 feet long. The second segment will be installed within the area known as "corrals", approximately 240 feet long.

Summary table – Alternative 1:

| Feature | Length | Location |
|---|---|---|
| Temporary Vehicle Barriers | 490 ft | Two segments - Within the river corridor and the corrals. |
| Bollard or "modified Sandia/mesh" style Pedestrian Fence | 8448 ft | Three segments – from western SPRNCA boundary to west bank of San Pedro River; from east bank San Pedro River to Corrals; from corrals to the east SRPNCA boundary |
| Permanent or temporary vehicle barrier | 1000 ft | OPTIONAL: One segment west of the San Pedro River to western SPRNCA boundary. No proposal has been submitted by ACOE however this option is analyzed in this EA. |

**D. Description of Alternative 2 Combination:** The Combination Alternative consists of authorizing a ROW to use a combination of vehicle barriers and pedestrian fence. TVBs will be placed in the San Pedro River, within the floodplain, and in the historic "corral" area, see Map 2. PVBs will be installed in dry wash areas along the SPRNCA boundary. Bollard style pedestrian fence will be installed in all other areas.

Summary table – Alternative 2:

| Feature | Length | Location |
|---------|--------|----------|
| Temporary Vehicle Barriers | 1,490 ft | Three segments – Within the river corridor, within the floodplain and the corrals area. |
| Permanent Vehicle Barriers | 275 ft | In five (5) dry washes along the project area. |
| Bollard style Pedestrian Fence | 8173 ft | In all other areas along the Border not covered by TVB or PVB. |

**E. Alternative 3 vehicle barriers only:** The proposed infrastructure consist of the Installation of permanent and temporary 6" steel rail or pipe vehicle barriers along the international border on public lands within the SPRNCA see attached Map 3. The vehicle barriers are designed to impede illegal vehicle entry, and will not preclude pedestrian or wildlife movement and will be placed within 60' from the international boundary. The PVBs will be placed outside of the river corridor, and the TVBs will be placed inside of the river floodplain.

Summary table – Alternative 3:

| Feature | Length | Location |
|---------|--------|----------|
| Temporary Vehicle Barriers | 250 ft | One segment - Within the river corridor |
| Permanent Vehicle Barriers | 9688 ft | Outside river corridor on each side of the river. |

**F. Alternative 4 No Action Alternative:** BLM will not issue a ROW for construction and installation of the vehicle barriers and pedestrian fence within SPRNCA.

## III. AFFECTED ENVIRONMENT AND ENVIRONMENTAL CONSEQUENCES:

The SPRNCA is located in southeastern Arizona, stretching south of Benson to the U.S. – Mexico border. The SPRNCA, containing about 40 miles of the upper San Pedro River, was designated by Congress as a National Conservation Area on November 18, 1988, to protect and enhance the riparian ecosystem and related resources. Recognized by the National Audubon Society as the first Globally Important Bird Area, it attracts birders from all over the world. The area also contains significant cultural resources dating back approximately 11,000 years to the Clovis people, the first known human occupants in the upper San Pedro River Valley. The San Pedro River enters Arizona from Sonora, Mexico, flows north between the Huachuca and Mule Mountain ranges, and joins the Gila River 100 miles downstream near the town of Winkelman, Arizona. The San Pedro's perennial flow, though sometimes a trickle, is now a rare occurrence in the Southwest. In addition, a number of springs occur within the SPRNCA. Water is the critical element in a riparian ecosystem. Without an adequate supply, this rare ecosystem will vanish. There is currently an existing 4-strand barbed wire fence and primitive road along the U.S. – Mexico International Border within SPRNCA.

**Critical Elements:** The following critical elements are not affected by the proposed action or Alternatives because they do not occur in the proposed use area, or because of the nature of the proposed action:

- Area of Critical Environmental Concern: There is no designated ACEC within the project boundary.
- Wilderness: There is no designated wilderness in the project boundary.
- National Energy Policy: This project is not an energy related project.
- Prime and Unique Farmlands: The terraces of the San Pedro River were historically used for irrigated agriculture. With the incorporation of these lands into the SPRNCA, agricultural use of the lands has ceased. Therefore, no prime or unique farmlands will be affected by any of the Alternatives.
- Environmental Justice: there will be no impacts anticipated to specific groups of the population due to the remoteness of the project area.

**A. Floodplain/Hydrology:** A complex sub-surface geology creates a surface hydrology of perennial and intermittent reaches along the upper San Pedro River. Shallow bedrock helps to maintain perennial flows, i.e. reaches that have surface flow throughout the year. Intermittent reaches typically lack surface flow during periods of drought and dry summer months.

### 1. Impacts of Alternative 1, ACOE/CBP Proposed:

Under Alternative 1, a permanent bollard or mesh pedestrian fence will be constructed throughout all upland areas (including dry washes) and throughout the flood prone width of the San Pedro River. TVBs will be positioned within the active channel of the San Pedro River. Once complete, the proposed pedestrian fence will tie in with the pedestrian fence currently being constructed, which together will effectively bisect the entire San Pedro River Basin (HUC 15050202) at the U.S./Mexico border. Once completed, the proposed pedestrian fence combined with existing pedestrian fence and segments currently under construction will cross more than 30 unnamed ephemeral drainages east of the San Pedro River and 36 named and unnamed ephemeral drainages west of the river. All effected drainages are tributary to the San Pedro River or Green Bush Draw (tributary to the San Pedro River).

*Surface Water/Groundwater/Morphology:*

An on-site evaluation of newly constructed pedestrian fence and the proposed project area was conducted on 8/21/07 by BLM. The design and construction techniques employed on the existing pedestrian fence appear to be similar to design and construction methods outlined in the proposed action. Field observation of pedestrian fence built through ephemeral drainages (permanent bollard and mesh design) indicated excessive deposition above crossings and channel entrenchment below. Deposition above structures (at drainage crossings) reached a maximum depth of ~6 ft. while entrenchment below crossings approached similar depths. Evaluation of the existing pedestrian fence in upland settings indicated lower potential for debris build up.

Field observations indicate that the pedestrian fence currently in place (bollard and mesh designs) does not adequately allow passage of sediment and debris through ephemeral drainage paths during seasonal flood flows. Debris accumulation behind the pedestrian fence starves run-off water of sediment subsequently resulting in channel incision and increased erosion immediately below the fence. Because Alternative 1 proposes the installation of pedestrian fence within the floodplain of the San Pedro River, it is reasonable to assume sediment and debris accumulation behind the fence at this location will occur at a scale significantly larger than was observed in ephemeral washes much higher in the watershed. It should be noted that U. S. Geological Service stream flow gage 09470500 (San Pedro River at Palominas, AZ) located ~ 4 miles downstream has a 69-year record of peak stream flow for the San Pedro River (see Table 1). Over the 69 year period of record this gage has recorded maximum peak stream flows of 5,000 cubic feet per second (cfs) or greater in 40 of those 69-years. Maximum peak stream flow occurred in 1940 and was recorded at 22,000 cfs. Minimum peak stream flow occurred in 1987 and was recorded at 978 cfs. Average peak stream flow since 2000 has been measured at ~8,400 cfs (USGS 2007). ). Flood flows of this magnitude have high velocities and shear stresses that can remove riparian vegetation and eroded banks. Changes in floodplain function can lead to degradation of channel function through the redirection of flood energies (Rosgen 1996).

Remote analysis of the project area (aerial photographs and topographic map) indicate ephemeral drainages directly effected by the proposed action have low to moderate sinuosity (>1.2) and slopes ranging from ~2 to ~4 %. Stream channels possessing these characteristics can be loosely defined as "G-type" or Gullied channels. It is documented that "G" stream types typically have very high bank erosion rates and high sediment supply (Rosgen, 1996). Field and remote observation of the San Pedro River at the U.S./Mexico International border characterized this particular reach as having a broad floodplain (flood prone width was measured to be ~1,490 ft on 8/21/07 by BLM), the presence of point bars, high width to depth ratio, gentle slope (~1-2%), and sinuosity greater that 1.4 (~1.5 measured remotely). Based on these characteristics, this reach of the San Pedro River can be generally defined as a "C-type" channel. The channel aggradation/degradation and lateral extension processes, notably active in "C-type" channels, are inherently dependent on the natural stability of stream banks, the existing upstream watershed

conditions and flow and sediment regime. It is documented that "C-type" channels can be significantly altered and rapidly de-stabilized when the effects of imposed changes in bank stability, watershed condition, or flow regime are combined to cause an exceedance of a channel stability threshold (Rosgen, 1996).

Increased erosion from tributary drainages will increase deposition of sediment in the San Pedro River. Increased deposition in the San Pedro River at these locations will effectively increase the width to depth ratio (wider, shallower, channel development). As the width to depth ratio increases, stability thresholds are exceeded, hydraulic stress against banks increases and bank erosion is accelerated. Increases in the sediment supply to the channel develop from bank erosion, reducing the systems capability to transport sediment. As a result, deposition occurs, further accelerating bank erosion, and the cycle continues (Rosgen, 1996).

Construction of the proposed pedestrian fence in the uplands could to some degree alter natural drainage patterns during wet periods. Sheet flows associated with intense monsoonal precipitation could carry debris into the fence, restricting natural flow paths and increasing erosive potential. However, the extent and significance of such impacts will depend on the timing and intensity of rainfall, hill slope, soil type, soil saturation, and vegetation. Additionally, disturbed surfaces associated with construction activities will also likely elevate erosive potential as vegetation is removed and soils are compacted. Furthermore, maintenance activities associated with the pedestrian fence will likely include removal of dirt and debris from the fence in drainages. However, it is unclear as to the method or location of disposal for the material recovered from the fence. Thus, potential environmental impacts associated with maintenance are uncertain.

Channel incision associated with debris build up above the pedestrian fence within the floodplain of the San Pedro River will alter stream channel morphologic stability. Channel incision will disconnect and dewater existing floodplains as a new hydrologic balance between stream channel and water table is created. Accelerated erosion immediately below the pedestrian fence will be coupled with measurable downstream deposition. Excessive erosion and deposition associated with vertical/lateral morphologic instability, alterations to stream sinuosity, width to depth ratio, and gradient (outside of what would normally be expected) combined with reduced riparian vigor and density will likely degrade channel function.

In addition to impacts from surface flow, there could be impacts from funneling vehicle and foot traffic into the San Pedro River corridor. Trampling of the river bank by vehicle and foot traffic could also lead to associated erosion problems.

Construction of a "hanging bollard" fence or other designs may help mitigate this issue of debris build-up behind the structure and erosion below. However, no formal designs have been presented by the applicant in this alternative and success of these structures in the project area is uncertain. Sediment production and alteration of natural drainage function occurring as a result of existing road conditions would persist under the alternative 1.

Potential watershed impacts may be reduced under alternative 1 if the TVB option is selected for all drainages and the flood prone area of the San Pedro River (as measured by BLM). Potentially, impacts will be reduced further by proposed mitigation and implementation of best management practices to control erosion during and following construction. However, there is a large degree of uncertainty concerning the effectiveness of the some of the proposed mitigation for erosion as many of the details have not been determined.

**2. Impacts of Alternative 2, Combination:** Alternative 2 is identical to Alternative 1 with the exception being that PVBs will be installed in ephemeral drainages (dry washes) and TVBs will be installed throughout the flood prone area of the San Pedro River.

*Surface Water/Groundwater/Morphology:*

Installation of PVBs in dry washes and TVB;s throughout the flood-prone area of the San Pedro River will be far less likely to catch sediment/debris during flood flows than the pedestrian fence requested in Alternative 1. Because the vehicle barriers will trap less sediment, it is anticipated that environmental impacts associated with downstream channel incision and erosion will be less severe than under Alternative 1. Potential environmental impacts associated with construction of the pedestrian fence in the uplands will be the same as under Alternative 1. Environmental impacts to permanence of perennial surface water in effected reaches of the San Pedro River will be the same as in Alternative 1. However, the severity of potential impacts may be reduced as erosion in ephemeral drainages is anticipated to be lower. Depth to groundwater in monitoring wells adjacent to ephemeral washes may increase as under Alternative 1. However, evidence indicating depth to ground water in monitoring wells is occurring as a result of Alternative 2 will be difficult to quantify. Foot traffic would be confined to ephemeral stream crossings and riparian areas. Erosion rates due to foot traffic in ephemeral drainages and riparian areas would be greater than under current conditions until law enforcement deterrents stem the flow of illegal foot traffic. Sediment production and alteration of natural drainage occurring as a result of existing road conditions would persist similar to alternative 1.

### 3. Impacts of Alternative 3, Vehicle Barriers Only:

Under Alternative three, PVBs will be installed in place of pedestrian fence in upland settings while TVBs will be installed through ephemeral drainages. TVBs will be installed within the floodplain of the San Pedro River.

*Surface Water/Groundwater/Morphology:*

Because TVBs will be removed from washes during periods of seasonal flooding, accumulation of sediment and debris behind as a result of the structures will be less than under either Alternative 1 or 3. As a result, potential adverse environmental impacts associated with downstream channel incision and erosion could be significantly reduced in comparison to impacts associated with Alternative 1 and 2. Additionally, construction of vehicle barriers as opposed to pedestrian fence will require less surface disturbance and maintenance, reducing erosion from the ROW. Furthermore, vehicle barriers will not significantly alter natural drainage patterns in the uplands, which will additionally reduce environmental impacts associated with erosion (in comparison to Alternative 1 and 3). Under Alternative 3 it is anticipated that erosion from ephemeral drainages will persist at near natural rates as will deposition of sediments in the San Pedro River. As a result, no alteration of the permanence of perennial surface water flow in the San Pedro River is expected under this Alternative. Depth to groundwater in monitoring wells will be unaffected by Alternative 3. Under this Alternative, damage caused by unauthorized vehicle use within the watershed will be nearly eliminated. Impacts to the floodplain of the San Pedro River resulting from seasonal installation and removal of TVBs will be the same in Alternative 3 as in Alternative 2.

Foot traffic will not be confined to ephemeral drainages or riparian areas. Thus impacts associated with foot travel will be dispersed over a greater area. No substantial increase in erosion rates would be expected. Sediment production and alteration of natural drainage occurring as a result of existing road conditions would persist similar to alternative 1.

### 4. Impacts of Alternative 4, No Action Alternative:

No fence would be built in The SPRNCA and thus, no impacts associated with fence design or construction methods would occur. The impacts of the border fence are largely cumulative from activities outside the San Pedro RNCA (see Cumulative impacts below). Damage caused by unauthorized vehicles use (damaging upland and riparian vegetation, altering natural drainage patterns, accelerated erosion...) would continue to accumulate.

**B. Wetlands/Riparian Zones and Vegetation:** The SPRNCA, known for its extensive riparian corridor, is a composite of several vegetation communities. Fremont cottonwood and Goodding willow dominate the riparian corridor. Lesser amounts of Arizona ash and walnut, netleaf hackberry, and soapberry occur as well. Chihuahan desert-scrub, typified by thorny species such as tarbush, creosote and acacia, characterize the uplands bordering both sides of the river, while mesquite and native and exotic grass dominate the bottomland adjacent to the riparian corridor.

    **1. Impacts of Alternative 1, ACOE/CBP Proposed:** In the Floodplains/hydrology section, the impacts include increased sedimentation with the potential for accelerated channel migration and shifts in channel function. Bollard or Sandia fencing on the floodplain down to the active channel will likely impound water during floods, leading to increased energies and shear stresses (erosion energies) on downstream riparian habitat and vegetation. Vertical scouring may lead to head cutting that may impact riparian function upstream in Mexico. Back water effects or head cutting could negatively impact this upstream vegetation and channel function leading to destabilization of riparian habitat. If the flood plain is constrained by pedestrian fencing, large negative impacts to riparian function and vegetation can be anticipated. Excessive erosion and deposition associated with Vertical/lateral morphologic instability, alterations to stream sinuosity, width to depth ratio, and gradient (outside of what would normally be expected) combined with reduced riparian density and wide spread bank alteration, would likely degrade riparian function to a of classification of Functional at Risk (FAR). (BLM 1998).However, these impacts would be largely mitigated by constructing pedestrian fencing to the edge of the entire flood prone area as determined by BLM hydrologists (includes 100 year floodplain) and placing TVBs across the floodplain and river as prescribed in ACOE 2003 EA.

    The placement and removal of TVBs with a crane in the active channel will likely result in vegetation and soil loss on the flood plain and river banks. Impacts associated with installation and removal of TVB's within the flood prone area of the San Pedro River could develop if noxious and invasive riparian plant species are introduced to the riparian area. Once established, these species could compete with the native vegetation which is essential for maintaining stream bank stability and riparian function. This damage is anticipated to be localized as long as the same route is used annually, avoided when soils are saturated and route is appropriately placed on the floodplain (perpendicular to flow). Weed prevention procedures are anticipated to minimize the risk of the introduction of invasive plants

    The disturbance of land along the 60-foot-wide ROW with its varied slopes, some steep, is anticipated to result in localized accelerated erosion and increased runoff rates on 11 acre of BLM on the eastern portion of the basin and up to 4.3 acres on BLM to the west. The erosion and runoff rates are anticipated to increase as a result of the continuous cement footings under the "modified Sandia/mesh" and closely spaced bollard fencing. The fences will likely redirect overland flow down fence lines over time. Surfacing the all-weather road with stabilizing material and reseeding will assist in stabilizing the 60-foot-wide footprint, but will not prevent the erosion process alone. The use of all mitigation measures proposed will reduce impacts of construction activities and monitoring the ROW will help reduce erosion over the life of the project.

    Construction of pedestrian fence and 60' of cleared ROW will likely result in excess sediment in drainages from storm runoff. Bollard pedestrian fencing in washes will likely result in head cutting and under-scour footings. The bollard pedestrian fence will collect sedimentation, debris and slow flood flows causing them rise and spill out along the fence line, leading to lateral erosion. The head cutting at bollards in washes will run once the depth of the downstream scour hole reaches 4' to 6'. This excess sediment will reach the San Pedro River where it may cover existing herbaceous vegetation and create point bars and sand bars that promote tree seedling germination. Potentially, if enough sedimentation occurs, then the river may adjust laterally (lateral migration) which will cause bank failure and loss of riparian vegetation until the river reaches a new dynamic equilibrium with increased the sediment and water supplied from the areas of disturbance. This will have a minor to large negative impact to riparian function that will diminish down stream of tributary washes. Only with improved construction methods for PVBs over washes that allow flood flows to pass largely unimpeded will sedimentation and erosion be reduced at washes that flow to the river. Preventing excess sediment discharge through PVB design improvements at washes will offset these negative impacts to riparian function to a large degree, depending on the level of success.

*Page 9*

Potential watershed Impacts may be reduced under Alt 1 if the TVB option is selected for all crainages and the flood prone area of the San Pedro River (as measured by BLM). Potentially, impacts will be reduced further by proposed mitigation and implementation of best management practices to control erosion during and following construction. However, there is a large degree of uncertainty concerning the effectiveness of the some of the proposed mitigation for erosion as many of the details have not been determined.

**2. Impacts of Alternative 2, Combination:** The impacts to riparian function and vegetation will be similar to alternative 1, assuming that designs for PBs at wash crossings are as effective as PVBs in passing sediment and water discharge. Routine monitoring and Maintenance of wash crossings for debris accumulation would help preserve current functionability of washes.

**3. Impacts of Alternative 3, Vehicle Barriers only:** The impacts to riparian function and vegetation will be largely the same as in Alternative 1 and 2. However, potential erosion impacts will be lessened by using VBs only, as overland flows will not be redirected by footers that hold up a pedestrian fence. . Barb-wire fencing would be required to restrict livestock movements that could negatively impact riparian function.

Foot traffic will Increase with related impacts to the watershed, washes and the river bottom. This may result in damage to riparian vegetation and increases in erosion on the watershed and bank damage to the river.

**4. Impacts of the No Action Alternative:** No fence would be built in The SPRNCA and thus, no impacts associated with fence design or construction methods would occur. The impacts of the border fence would be largely cumulative from activities outside the San Pedro RNCA (see Cumulative impacts below). Damage caused by unauthorized vehicles use (damaging upland and riparian vegetation, altering natural drainage patterns, accelerated erosion...) would continue to accumulate.

**C. Wild and Scenic Rivers:** The San Pedro River in the SPRNCA, including the three-mile segment in the area being evaluated in this proposed federal action, was determined to be eligible for Inclusion in the Wild and Scenic Rivers System by the BLM because the river is free flowing, and has outstandingly remarkable scenic, recreation, fish and wildlife habitat, hydrologic, paleontologic, and cultural/historic values. The San Pedro River is recommended for inclusion in the National Wild and Scenic Rivers System, in the 1994 – Final Arizona Statewide Wild and Scenic Rivers Legislative Environmental Impact Statement would require certain management actions to be initiated and carried forward.

### 1. Impacts of Alternative 1 ACOE/CBP Proposed:
Alternative 1 calls for the seasonal placement and removal of temporary vehicle barriers In the riparian corridor of the San Pedro River and the construction of bollard-style pedestrian fences at wash crossings and mesh fences at other locations within the uplands. This Alternative will diminish outstanding scenic and recreation values due to the visual impact of the project. This alternative would not impair the suitability of the river for consideration of its inclusion to the W&SR system.

### 2. Impacts of Alternative 2 Combination:
Alternative 2, calling for the seasonal placement and removal of temporary vehicle barriers in the riparian corridor of the San Pedro River, the construction of permanent vehicle barriers at wash crossings and bollard style fences on the uplands, would diminish outstandingly scenic and recreation values due to the visual impact of the project. This alternative would not impair the suitability of the river for consideration of its inclusion to the W&SR system

### 3. Alternative 3 vehicle barriers only:
The proposed infrastructures consist of the installation of permanent and temporary 6" steel rail or pipe vehicle barriers along the international border on public lands within the SPRNCA. This Alternative will not likely affect outstanding remarkable scenic values. This alternative would not impair the suitability of the river for consideration of its inclusion to the W&SR system

**4. Impacts of the No Action Alternative:**
This Alternative will not likely affect outstanding remarkable scenic values. This alternative would not impair the suitability of the river for consideration of its inclusion to the W&SR system

**D. Wildlife and Aquatic Habitat:** Wildlife abounds in the SPRNCA because of the abundant food, water and cover within and surrounding the riparian zone. The SPRNCA supports more than 400 species of birds, more than 80 species of mammals, two native species and several introduced species of fish and more than 40 species of amphibians and reptiles. More than 150 species of breeding-birds and more than 250 species of migrant and wintering birds can be found in the area, representing roughly half of the number of known breeding species in North America. Mammals are abundant throughout the area, although some are mostly nocturnal and therefore rarely seen. Included in this group are many species of rodents, several bats, mountain lions and bobcats. Other mammals like the white-tailed deer, mule deer, javelina, desert cottontail and black-tailed jackrabbit are commonly observed. Historically, the San Pedro River contained 14 species of native fish. Today, these have been largely replaced by introduced species such as common carp, yellow bullhead and mosquito fish. Only the long fin dace and desert sucker remain from the original populations.

The Arizona Game and Fish Department's Heritage Data Management System was accessed and the species list for Cochise County was reviewed. The only species that was on either the state Wildlife of Special Concern (WSC) list or the BLM's Special Status Species list that may be impacted by the project is the Northern Mexican Garter Snake. Any activities that produce sediment into the San Pedro River Channel or have heavy equipment driving within the stream channel has the potential to harm the snake, although the latest available information is that there have not been any recent sightings of the Mexican Garter Snake in the San Pedro river for many years due to the presence of bullfrogs *(Rana spp.)* that prey on the garter snakes.

**1. Impacts of Alternative 1, ACOE/CBP Proposed:** The proposed action may have a short term effect of disturbance of local wildlife due to construction activities. This disturbance will end once the construction is complete. There will be wildlife mortality from vehicles using the border road, however this is not expected to be that much higher than current levels, as the fencing is expected to reduce the amount of undocumented alien traffic in the area requiring a CBP response by vehicle. The border fence has the potential to separate portions of wildlife populations from existing watering points, which will potentially change wildlife distributions and population levels if species are effectively separated from currently used water sources. In addition, the border fence has the potential to "funnel" animal movements to areas were undocumented alien traffic is also funneled. Continuous disruptions of wildlife movements may result both from the physical barrier of the fence and also from increased contact between wildlife and humans.

**2. Impacts of Alternative 2, Combination:** Same as Alternative 1

**3. Impacts of Alternative 3, Vehicle Barriers only:** Same as Alternative 1

**4. Impacts of Alternative 4, No Action:** There will not be any change in impacts as the fence will not be constructed.

<u>Aquatic Habitat</u>

**1. Impacts of Alternative 1 ACOE/CBP Proposed:** The fishes, frogs and turtles that occupy the San Pedro River require a variety of habitats (i.e., pools, runs, riffles) for feeding, reproduction, shelter and escape cover. Perennial aquatic habitat occurs one-half mile (approx.) downstream.

Few measurable negative effects to aquatic habitat are likely to occur from the crane moving TVBs in the San Pedro River. Minor amounts of sediment and limited bank alteration is not anticipated to effect habitat quality to aquatic habitat located downstream. With the proposed mitigation, HWU habitat is expected to be impacted because proper identification and handling will prevent HWU to be harmed.

In the "Wetlands/Riparian Zone and Vegetation" and "Floodplains/Hydrology" sections the impacts include increased upland erosion and river sedimentation, resulting in the potential for accelerated channel

migration (destabilization) and shifts in channel function. Vertical scouring in the San Pedro River may lead to head cutting that may impact aquatic habitats in Mexico by channelizing river habitat. This "gully" effect would result in poor habitat development (e.g. few poorly developed pools, runs and riffles). Cut banks and mass wasting are anticipated to occur to an unknown extent in the project area and beyond from channel destabilization resulting from alteration of flood plain function. In areas of excess sediment supply from bank collapse or upstream head cutting and drainage inputs beyond the channel conveyance capability could result in the "smothering" of habitats important to fish, turtles and frogs. This type of channel function is likely to result in a substantial loss of habitat quality from the formation of multiple threads; and poorly developed pools, runs and riffles.

Potential watershed impacts may be reduced under Alt 1 if the TVB option is selected for all drainages and the flood prone area of the San Pedro River (as measured by BLM). Potentially, impacts will be reduced further by proposed mitigation and implementation of best management practices to control erosion during and following construction. However, there is a large degree of uncertainty concerning the effectiveness of the some of the proposed mitigation for erosion as many of the details have not been determined.

**2. Impacts of Alternative 2, Combination:** Because the TVBs will be placed in the floodplain and PVBs will be placed in washes, there will be no impacts to HWU. The use of TVBs in the San Pedro River and floodplain will eliminate drastic changes in channel stability that would degrade aquatic habitat quality and limit the ability of the HWU to establish; the natural hydraulics in the location will be maintained to a large degree in Alternative 2. The use of PVBs in washes will allow for the normal flow of sediment and water, which will reduce the likelihood of head cutting resulting from "damming" behind bollard fences. By inspecting wash crossings for accumulated debris and clearing it, the function of washes will remain relatively unaffected leading to less sedimentation that could result in changes in channel function that effect HWU habitat.

**3. Impacts of Alternative 3, Vehicle Barriers Only:** The impacts to riparian function and vegetation will be largely the same as in Alternative 1 and 2. However, potential erosion impacts will be lessened by using vehicle barriers only, as overland flows will not be redirected by concrete footers that hold up a pedestrian fence. Foot traffic and related actions will continue to impact not only the aquatic habitat but upland habitat as well.

**4. Impacts of the No Action Alternative:** No fence would be built in The SPRNCA and thus, no impacts associated with fence design or construction methods would occur. The impacts of the border fence would be largely cumulative from activities outside the San Pedro RNCA (see Cumulative Impacts below). Damage caused by unauthorized vehicles use (damaging upland and riparian vegetation, altering natural drainage patterns, accelerated erosion...) would continue to accumulate.

## E. Threatened and Endangered Species:

**1. Impacts of Alternative 1, ACOE/CBP Proposed:** impacts of this Alternative were analyzed in the 2007 ACOE Biological Assessment (attached) and offered the following determinations:

Jaguar *(Panthera onca)*, Lesser Long-nosed Bat *(Leptonycteris curasoae yerbabuenae)*: Both of these species could realize beneficial effects with the reduction of illegal traffic and consequent CBP pursuit within the areas north of the fence. The installation of fence will hinder jaguar migration and could indirectly result in increased illegal alien traffic and consequent CBP enforcement actions in higher quality habitat away from the fence locations. The direct impediments and the potential increased human activity in the normal travel corridors "may effect, will likely adversely effect" the jaguar. Conservation measures are incorporated into the proposed action to mitigate these effects.

The loss of foraging habitat for the lesser long-nose bat "may effect" the bat, but "will not adversely effect" the U.S. populations, provided conservation measures are incorporated to this Alternative.

Ocelot *(Felis pardalis)*: This species was not evaluated in the ACOE documents. Because of the lack of recent evidence that Ocelots occur in or near the project area, it is likely that during the life of the project, that ocelots will not reoccupy habitat along the San Pedro River, therefore there will be no effects to the Ocelot.

Southwestern (SW) Willow Flycatcher *(Empidonax trailllii extimus)* and Yellow billed Cuckoo *(Coccyzus americanus occidentalis)*: In the Biological Assessment for the Proposed San Pedro river crossing (Biological Assessment 2007), the CBP determined that there was a "may effect, not likely to adversely effect" for the SW Willow Flycatcher within the project area because of the mitigation measures included in the consultation. This has been confirmed by the USFWS. (Doug Duncan, Personal Communication).

Huachuca Water Umbel (HWU) *(Lilaeopsis schaffneriana ssp. Recurva)*: This species was not evaluated in the ACOE documents. Due to the presence of perennial water in the reach and adjacent populations, it is likely that during the life of the project, that HWU will occupy habitat within the project area, therefore, there may be adverse effects to the water umbel. The HWU is known to be damaged by trampling. Past illegal alien traffic has been heavy in some areas along the San Pedro River. More recently this traffic has diminished along the river. Short term trampling effects may increase as the pedestrian fence funnel foot traffic down to the river and CBP apprehensions increase. Over time, trampling effects will be greatly diminished and vehicle traffic from illegal activities will cease. This will provide a beneficial impact to the HWU.

The placement and removal of TVBs with a crane in the active channel is anticipated to result in HWU mortality should they colonize the project location in the future. This species is a colonizer of previously unoccupied habitats under the right conditions (USFWS 2003) and may colonize this reach, especially since the species is present upstream and patches of permanent water can be found in this river reach (BLM files, wet-dry run data). The crane will cause vegetation and soil loss on the flood plain and river banks. This damage will be localized as long as placement is carefully selected to avoid redirecting flood flows down the crane travel lane.

In the "Wetlands/Riparian Zone and Vegetation" and "Floodplains/Hydrology" sections the impacts include increased upland erosion and river sedimentation, resulting in the potential for radical channel migration and shifts in channel function. Bollard or Sandia fencing on the floodplain down to the active channel will likely impound water during floods, leading to increased energies and shear stresses (erosion energies) on downstream habitat currently suitable for HWU. Vertical scouring may lead to head cutting that may impact the HWU upstream in Mexico. Haas and Frye (1997) documented the species on the San Pedro River approximately 0.5 mile south of the international boundary. The entire SPRNCA is considered potential habitat for the HWU. It is the largest contiguous potential habitat of the HWU, and as such is considered the most important site for recovery. Back water effects or head cutting could negatively impact this upstream population and suitability of habitat for re-colonization.

After a flood, it can rapidly expand its population and occupy disturbed habitat until inter-specific competition exceeds its tolerance. The expansion and contraction of the HWU populations appear to depend on the presence of refugia where the species can escape the effects of scouring floods, a watershed that has an unaltered hydrograph, and a healthy riparian community that stabilizes the channel (USFWS 2003). This healthy dynamic of moderate flood scour and deposition will likely be disrupted, leaving doubt about the habitat suitability for this species downstream of the pedestrian fence. Cut banks and mass wasting of the San Pedro River will likely occur to an unknown extent in the project area and beyond. These impacts may extend downstream 9.5 river miles to designated critical habitat, ultimately leading to habitat alteration in this reach as well.

Should down-cutting occur in the San Pedro River, the species will only be able to colonize relatively small patches of habitat and will be subjected to increased scour during flood events. The upstream and downstream extent of these affects is difficult to estimate.

Potential watershed impacts that affect HWU habitat may be reduced under Alt 1 if the TVB option is selected for all drainages and the flood prone area of the San Pedro River (as measured by BLM). Potentially, impacts will be reduced further by proposed mitigation and implementation of best management practices to control erosion during and following construction, monitoring for the presence of HWA, and proper location of crane access. With proposed mitigation in place, the impacts to HWU from the heavy equipment, increased watershed instability, increased river channel instability is anticipated to be lessened considerably. The residual impacts to HWU are likely to be relatively small over the life of the project. However, there is a large degree of uncertainty concerning the effectiveness of the some of the proposed mitigation for erosion as many of the details have not been determined.

**2. Alternative 2 Combination:** Since this Alternative allows for spaces or breaks in the continuity along the project area, more opportunities will exist for large animals, including the jaguar, to move across the border.

HWU Impacts: Because the TVBs will be placed in the floodplain and PVBs will be placed in washes, the impacts to the HWU will be much less than those for Alternative 1. The use of TVBs in the San Pedro River and flood prone area will eliminate drastic changes in channel stability that will limit the ability of the HWU from establishing; the natural hydraulics in the location will be maintained to a large degree in Alternative 2. The use of PVBs in washes will allow for the normal flow of sediment and water which will reduce the likelihood of head cutting resulting from "damming" behind bollard fences. By inspecting wash crossings for accumulated debris and clearing it, the function of washes will remain relatively unaffected leading to less sedimentation reaching the river that could result in changes in channel function that effect the HWU habitat.

**3. Alternative 3 vehicle barriers only:** The impacts of Alternative 3 will be the same as Alternative 4, the No Action Alternative because the PVBs do not hinder movement of wildlife or water flows across the international border.

HWU Impacts: Since the impacts to channel function and vegetation will be largely the same as in Alternative 2, impacts to HWU will lessen negative impacts to the HWU. However, potential erosion impacts will be lessened by using vehicle barriers only, as overland flows will not be redirected. Foot traffic may increase leading to trails that result in gullies and other watershed problems that lead to increased sediment loads and flood peaks in the San Pedro River. However, this impact is likely to be limited in scope and negligible

**4. Alternative 4 No Action Alternative:** The No Action Alternative will not have any effects on the Threatened or Endangered species within the project area.

HWU Impacts: No fence would be built in The SPRNCA and thus, no impacts to HWU associated with fence design or construction methods would occur. The impacts of the border fence would be largely cumulative from activities outside the San Pedro RNCA (see Cumulative impacts below). Damage to HWU and habitat caused by unauthorized vehicles use and foot traffic would result in negative impacts such as degradation of upland and riparian vegetation, increased sedimentation from accelerated erosion, and direct damage to HWU from trampling.

**F. Cultural Resources:** The San Pedro River Valley has been continuously occupied by humans for at least the past 13,000 years. The oldest known archaeological sites, of the Clovis Culture, are among the best examples of the late Ice Age mega-fauna hunting complex ever found in the U.S. The traces left by later Archaic people (circa 9,000 B.C – A.D. 300) are also found buried in the rich deposits of the valley.

The Formative Period (A.D. 300- 1450) was an especially highly populated period along the San Pedro valley and hundreds of archaeological sites of this time period have been recorded, though few have been excavated or fully investigated. Many cultural influences were present during this time, including the well-known and extensively investigated cultural complexes of the Hohokam (Gila-Salt-Santa Cruz Rivers), the Mogollon (northern Arizona and New Mexico-Mogollon Rim) and the Anasazi (Four Corners area), as well as influences from the Casas Grandes

area in Mexico. Architectural styles, mortuary practices and material culture (especially ceramics) show clear ties to all of these cultures, either as a result of colonization, or trade, or both.

After a collapse in population and social organization, possibly caused by extended droughts, of all three major cultural complexes around A.D.1450, the area was inhabited by people of a variety of cultural groups, the most well-known being the Sobaipuri and the Apache. Often called the Protohistoric, this period experienced the first contact with Europeans, particularly the Spanish who came to colonize the American Southwest.

Eventually, the Apache dominated the landscape, driving away the Piman, or O'odham-related Sobaipuri and the Spanish when the Presidio Santa Cruz de Terrenate was abandoned in 1780. This period saw the San Pedro at possibly its least populated, until the 1870s when silver was discovered in Tombstone.

In the Historic Period, Fort Huachuca was established, the mines in Tombstones rose, the milling communities sprung up along the river, transportation routes were established (railroads, stage lines, and freight lines), cattle ranchers arrived, and farmers grew crops. The area was flooded with Europeans, Mexicans, and Indian groups who came here to make a living, and quite often, seeking fame and fortune.

A class III, intensive cultural resources inventory was conducted in the project area in 2002 by Aztlan Archaeology, Inc.. Two historic properties, AZ EE:12:60 and EE:12:61 (ASM), were recorded during the inventory. AZ EE:12:60 (ASM) is a prehistoric village site with a Mogollon/Hohokam cultural affiliation dating to approximately A.D. 900-1400. The border road, a dirt two-track, and the present border fence, a three-strand barbed wire, go through the site. This site has been determined "eligible" for the National Register of Historic Places (NRHP) under criterion "d" (36 CFR 60.4) for its ability and likelihood to yield information important to understanding the prehistory of the San Pedro River, and southern Arizona.

AZ EE:12:61 (ASM) is a historic corral and cattle processing site. The site was built by the Green Cattle Company, owned by William Cornell (Colonel) Greene, a very influential partner of the Canenea Mine (Mexico) and cattle baron of the late 19th and early 20th century. His large ranching complex straddled the International Border. The hacienda and related structures are in Mexico, and the corrals and related features lay on both sides of the border. Aztlan recommended this site "eligible" for the NRHP under criteria "a" and "c", "within the context of U.S.-Mexico commercial relations (the cooperative cross-border infrastructure of the Sonora-Arizona cattle industry)" (Reider and Slawson 2002). This site has been determined "eligible" under criterion "a" for its contribution to the broad pattern of history concerning the developing cattle ranching industry and cross-border interactions during the late 19th to early 20th century. The site may also be eligible under criterion "c", based on the workmanship and design of the structure. The workmanship displayed by the wooden corrals is probably typical of the time period, but is becoming increasingly rare to find, especially along the U.S.-Mexican border. More research will be needed in order to determine the site's eligibility under "c".

   1. **Impacts of Alternative 1 ACOE/CBP Proposed:** The proposed pedestrian fence will be placed within the boundaries of site EE:12:60, and a TVB will be placed within the boundaries of EE:12:61. A portion of the site (60' wide, 760' long, and 6' deep) will be destroyed by the excavation for the concrete footers, and the construction activity itself. On site EE:12:61 (known as Greene's corral), a TVB will be placed within the site features. It will be a permanent, physical and modern addition to the site. The barrier will be a visual element which will diminish the integrity of the property's significant historic features. The bollard or mesh fence will be built directly adjacent to the historic corrals, further diminishing its integrity. In applying the criteria of effect, from 36 CFR 800.5, the proposed project will result in an "adverse effect" determination. Eligibility and effect determinations have been made by the BLM under the National Programmatic Agreement with the Advisory Council on Historic Preservation and the Arizona Protocol with the Arizona State Historic Preservation Office.

   A treatment plan has been developed to minimize and mitigate the adverse effects that the project activities may have on these National Register of Historic Places-eligible sites (Hutira 2007). The BLM has determined that these adverse effects can be satisfactorily minimized and/or mitigated through an effective treatment plan. In anticipation of this project, an excavation permit was issued to Northland Research, Inc., to implement the treatment measures. In early July, 2007, a single backhoe trench was dug through most

of the length of EE:12:60 (ASM) (as recorded). The trench measured 230 meters long, 61 centimeters wide, dug to a depth of 4' and was offset from the barbed-wire border fence by about 4'. The trench depth was determined based on an initial proposal for a vehicle barrier. Twenty-three prehistoric features were discovered as a result, 7 of them being possible pithouses, and the rest described as ashy pits or thermal features. After the features were recorded in profile and mapped, the trench was backfilled. A sampling strategy is being developed by Northland as well as a plan to deepen the trench and strip the excavation areas, due to the proposal of a larger, deeper, pedestrian fence. Due to Occupational Health and Safety Agency regulations, a deeper trench will require stepping back of excavation areas, requiring additional ground disturbance.

The treatment for EE:12:61 (ASM) was carried out in late June 2007. All field mapping and photo-documentation was completed. A report is in preparation.

**2. Impacts of Alternative 2 Combination:** Same impacts as Alternative 1.

**3. Impacts of Alternative 3 Vehicle Barriers only:** In this alternative, PVBs will be placed within the boundaries of EE:12:60. A portion of the site (60' wide, 760' long, and 3' deep) will be destroyed by the excavation for the concrete footers, and the construction activity itself. On site EE:12:61 (known as Greene's corral), a TVB will be placed within the site features. It will be a permanent, physical and modern addition to the site. The barrier will be a visual element which could diminish the integrity of the property's significant historic features. In applying the criteria of effect (36 CFR 800.5), the proposed project will result in an "adverse effect" determination. Eligibility and effect determinations have been made by the BLM under the National Programmatic Agreement with the Advisory Council on Historic Preservation and the Arizona Protocol with the Arizona State Historic Preservation Office.

A treatment plan has been developed to minimize and mitigate the adverse effects that the project activities may have on these National Register of Historic Places-eligible sites (Hutira 2007). The BLM has determined that these adverse effects can be satisfactorily minimized and/or mitigated through an effective treatment plan. In anticipation of this project, an excavation permit was issued to Northland Research, Inc., to implement the treatment measures. In early July 2007, a single backhoe trench was dug through most of the length of EE:12:60 (ASM) (as recorded). The trench measured 230 meters long dug to a depth of 4 feet and was offset from the barbed-wire border fence by about 4 feet. The trench depth was determined based on an initial proposal for a vehicle barrier. Twenty-three prehistoric features were discovered as a result, 7 of them being possible pithouses, and the rest described as ashy pits or thermal features. After the features were recorded in profile and mapped, the trench was backfilled. A sampling strategy is being developed by Northland, as well as a plan to strip the excavation area. Under this Alternative, the existing trench will not have to be deepened and fewer features will have to be excavated due to the less-impacting proposal of a vehicle barrier.

The treatment for EE:12:61 (ASM) was carried out in late June 2007. All field mapping and photo-documentation was completed. A report is in preparation.

**4. Impacts of Alternative 4 No Action:** If the proposed fence is not built, then the adverse effects to site EE:12:60 will be greatly minimized. In anticipation of this action, a test trench was already excavated through a portion of the site (230 meters long, 61 cm wide and 4 feet deep) in July 2007. The numerous features discovered during this phase of the data recovery were only minimally mapped and recorded, with the expectation that further work will be done in the near future once a sampling strategy was developed and the full data recovery excavations were completed. If the "no action" Alternative is chosen, then the data recovery will not be completed, resulting in reduced damage to the site (caused by further excavations) but the data that was expected to be recovered will not be recovered. In this case, the "adverse effect" will not be mitigated through data recovery. In this case, the BLM will not be in compliance with the National Historic Preservation Act of 1966. For site EE:12:61 (ASM), the mitigation strategy of mapping and intensive recording has been completed.

**G. Native American Religious Concerns** Tribal consultation was initiated for the ACOE's initial ROW application (which only requested vehicle barriers) with the Tohono O'odham Nation on April 17, 2007, through a letter to the tribal chair and copied to the tribal archaeologist, Peter Steere. A copy of the draft treatment plan was provided to Mr. Steere on June 15, 2007. His comments were provided via email the same day. These comments were incorporated into the final treatment plan (Hutira 2007). Their concerns regarded the possible disturbance of human remains during data recovery, their handling and disposition, and protection of the site during construction. A Plan of Action, per the Native American Graves Protection and Repatriation Act (NAGPRA) was incorporated into the treatment plan, and additional monitoring requirements were added to address these concerns.

    **1. Impacts of Alternative 1 ACOE/CBP Proposed:** The proposed data recovery will likely result in the disturbance of one or more interred or cremated individuals, whom the Tohono O'odham (and the other Four Southern Tribes) claim as their ancestors. Proper handling and eventual repatriation of the individuals and any burial-related objects will lessen this impact, but the tribe considers the disturbance and unearthing of relatives to be unacceptable.

    **2. Impacts of Alternative 2 Combination:** Same as Alternative 1.

    **3. Impacts of Alternative 3 Vehicle Barriers only:** Same as Alternative 1.

    **4. Impacts of Alternative 4 No Action:** No additional data recovery or construction will eliminate the possibility of disturbing human remains, which will greatly lessen the impact to Native American Religious Concerns.

**H. Visual Resources:** The BLM is responsible for ensuring that the scenic values of public lands are considered before allowing uses that may have visual impacts. The BLM accomplishes this through its Visual Resource Management (VRM) system, which involves inventorying scenic values and establishing management objectives for those values through the resource management planning process, and then evaluating proposed activities to determine whether they conform to the management objectives. A visual resources management inventory was completed for lands within the SPRNCA. The project area being evaluated in this EA, is managed as VRM Class I and II, thereby protecting the scenic quality and visual character of this area.

The riparian forest along the San Pedro River, adjacent grasslands, and desert upland vegetation are the most recognizable features of the SPRNCA. Most of the landscape to the east and west of the riparian forest is dominated by gently sloping valley terraces with many small to several major drainages. As well as these visual values mentioned, the long-distance views available from the area being evaluated in this EA are dramatic, including the Mule and Dragoon Mountains to the northeast, the Huachuca and Whetstone Mountains to the northwest, and to the south the San Jose, Ajos-Bavispe, Santa Elena, and Mariquitez Mountains in Sonora, México. Vistas both near and far are important because of the associated sightseeing values.

Though generally natural in appearance, the area has been modified over the past 100 years. These changes include several miles of dirt approximately one lane wide road, a historic livestock corral, and rangeland fences. On the Mexican side of the international border, there are several adobe ranch houses and ranch facilities. A single human feature added in the past three years to the SPRNCA in the area being evaluated, is a U. S. Border Patrol camera tower located 1 ½ mile from the Border.

    **1. Impacts of Alternative 1 ACOE/CBP Proposed:** Alternative 1, calling for the seasonal placement and removal of temporary vehicle barriers in the riparian corridor of the San Pedro River, the construction of bollard style pedestrian fences at wash crossings and mesh fences at other locations within the uplands, would be highly noticeable and attract attention from locations within at least one mile where the public commonly views the project area. Visual impacts under this Alternative did exceed VRM Class II objectives in views within one mile of the project due to the visual contrast of the proposed design components.

    **2. Impacts of Alternative 2 Combination:**
The design components from implementing this alternative will be noticeable and attract attention from locations within at least one mile where the public commonly views the project area. Based upon Visual

Contrast Rating criterion conducted for this Alternative, the implementation of this Alternative does not meet visual resource management objectives due to the visual contrast of the design components.

### 3. Alternative 3 vehicle barriers only:

Visual impacts under this alternative will be noticeable and attract attention from locations within 100 yards where the public commonly views the project area. The height of the permanent barriers would correspond to the height of the current and historic barbed wire fence.

Based upon Visual Contrast Rating criterion conducted for this Alternative, the implementation of this Alternative would meet visual resource management objectives within the foreground and middle ground views, due to the open/see-through character of the project.

### 4. Impacts of the No Action Alternative:

The character of the existing landscape will generally remain the same as they are now.

**I. Air Quality:** The project area is outside of any U.S. Environmental Protection Agency designated non-attainment area.

### 1. Impacts of Alternative 1, ACOE/CBP Proposed:

Heavy equipment, vehicles, and generators will produce exhaust during the construction phase. Ongoing vehicle patrols and maintenance activities along the border road will also produce exhaust. Exhaust is expected to dissipate quickly. Construction activities within the SPRNCA will result in the clearing of a swath 1.75 miles long along the border and up to 60 ft in width, disturbing up to 12.7 acres of soils. Dust is expected to be generated during construction. Dust is also expected to be generated by vehicle passage during ongoing patrols and maintenance activities.

### 2. Impacts of Alternative 2, Combination:

Effects on air quality for this Alternative will be substantially the same as those for the Alternative 1, with slightly fewer impacted acres at wash crossings.

### 3. Impacts of Alternative 3, Vehicle Barriers Only

Heavy equipment, vehicles, and generators will produce exhaust during the construction phase. Ongoing vehicle patrols and maintenance activities along the border road will also produce exhaust. Exhaust is expected to dissipate quickly. The fabrication and placement of vehicle barriers will result in less soil disturbance than the Alternative 1 as trenching and the pouring of footers is not required.

### 4. Impacts of Alternative 4, No Action Alternative

Ongoing vehicle patrols and maintenance activities along the existing border fence will produce exhaust. Exhaust is expected to dissipate quickly. Dust will be generated by vehicle passage during ongoing patrols and maintenance activities along the existing border fence.

**J. Wastes, Hazardous or Solid:** There are no existing hazardous waste sites in the project area. The disposal of solid and/or hazardous wastes is not authorized as part of any of the four Alternatives. Incidental releases of hazardous materials could result in the contamination of soils, groundwater, or surface water.

### K. Water Quality, Drinking or Ground:

**1. Impacts of Alternative 1 ACOE/CBP Proposal:** The proposed action calls for the seasonal placement and removal of TVBs in the channel of the San Pedro River. This activity will require the use of heavy equipment within the channel and floodplain. Some disturbance of soils, river banks, and riparian vegetation can be expected each time the barriers are moved. This may result in increased water turbidity, thereby reducing water quality.

The proposed action calls for the clearing of up to 12.7 acres of soils which can be expected to result in increased sediment runoff to tributary washes and eventual increased sediment loading and turbidity in the San Pedro River.

Hanging bollards may be used in lieu of fixed bollard fencing at ephemeral wash crossings. Hanging bollards have the potential of avoiding the sediment trapping expected from the use of fixed bollards though there is a high degree of uncertainty in the effectiveness of this design as sediments trapped by the bollards during relatively low flow events may immobilize the bollards during high flow events, preventing them from swinging.

The proposed action calls for the placement of TVBs within the channel of the San Pedro River and pedestrian barriers across most of the San Pedro Valley. This may result in a concentration of pedestrian use along the channel of the San Pedro. Expected affects include an increase in human and solid wastes left in the floodplain and channel of the river, potentially degrading water quality in the river. Funneling pedestrian traffic into the river channel also increases the likelihood that pedestrians will come in contact with potentially contaminated water.

Vehicle barriers are expected to reduce the number of vehicles crossing the border in the floodplain, potentially decreasing the opportunities for hazardous materials spills and leaks effecting water quality in the river. Ongoing road maintenance activities are expected to continue as described in the No Action Alternative.

**2. Impacts of Alternative 2, Combination:** The affects of periodically removing and replacing TVBs in the San Pedro River would be the same as in Alternative 1. The placement of PVBs is expected to have the same impacts as TVBs for water quality.

Project design resulting in impacts described previously in the Surface Water/Groundwater/Morphology section would result in increased sediment loading in the San Pedro River, increasing water turbidity and reducing water quality.

Project design is expected to concentrate pedestrian use along the river, resulting in an increase in human and solid wastes left in the floodplain of the river and in ephemeral washes, potentially degrading water quality in the river.

Vehicle barriers are expected to reduce the number of vehicles crossing the border in the floodplain, potentially decreasing the opportunities for hazardous materials spills and leaks effecting water quality in the river.

**3. Impacts of Alternative 3, Vehicle Barriers Only:** Vehicle barriers are expected to reduce the number of vehicles crossing the border in the SPRNCA during the seasons the barriers are in place, potentially decreasing the opportunities for hazardous materials spills and leaks effecting water quality in the river. Cross-border pedestrian traffic patterns will not be altered by vehicle barriers.

**4. Impacts of Alternative 4, No Action:** There will be no impact to water quality under this alternative.

**L. Socioeconomics:** The current conditions are "incorporated by reference" from pages 3-57 through 3-60 in the 2003 EA. The population in Cochise County rose 15 percent in one year, from 1999 to 2000. The racial diversity of Cochise County is comprised mainly of Caucasians (76.7 percent) and African-American (4.5percent). The remaining 18.8 percent is split between Asian and Pacific Islanders, Native American and other races. The total number of jobs in Cochise County was 50,041 in 2000. The annual average unemployment rate for Cochise County was 4.6 percent in 2001. When compared to a steady statewide unemployment rate, data suggest that Cochise County has experienced a significant drop in the unemployment rate since the early 1990s. The average annual growth rate for total personal income in the past 10 years was lower than growth rates for the state and nation. The per capita personal income for Cochise County is lower than the state and national average. Twenty one percent of the population in the county lives below the poverty level. The density of housing units in Cochise County is 8.3 units per square mile. There are no houses within the SPRNCA. There are approximately 55,000 visitors to the SPRNCA each year. These visitors contribute to the local economy by renting hotel rooms, eating in restaurants and purchasing goods in Sierra Vista.

**1. Impacts of the Alternatives 1, 2, and 3:** Negative effects to the aesthetics and/or quality of life will be incurred in SPRNCA due to the new construction actions, the increase in patrolling activities, and the funneling effect of foot traffic through areas where illegal aliens get through. Approximately 30% of the total cost of construction of the proposed action will be spent in the local communities. The long term economic benefits will be beneficial due to the improvement in effective enforcement corridor across the project area.

**2. Impacts of the No Action Alternative:** The socioeconomics will generally remain the same as they are now. However, not building the pedestrian fence will benefit the aesthetics of SPRNCA. Numbers of illegal aliens crossing the international border within the SPRNCA is estimated to be less than 50 per day. This number could fluctuate, and an increase could diminish the aesthetic quality to visitor, because the negative impacts of undocumented immigration, e.g., trash, trampling vegetation, heightened law enforcement presence

## IV.   Cumulative Impacts

Cumulative impacts are the impacts on the environment which result from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time. (40 CFR 1508.7) The cumulative impacts for the EA are organized by alternative. The geographic scope of the analysis is the San Pedro River watershed and the reasonable foreseeable future timeframe for impacts to the San Pedro river corridor and the watershed.

## A. Cumulative Impact of Alternative 1: Installing pedestrian fencing along the international border except within the San Pedro River and within the historic corrals area.

Upland and Watershed Cumulative Impacts:

Upland and watershed cumulative impacts expected from installing pedestrian fence is likely to be both beneficial and negative. The upland habitat will likely see an improvement adjacent to the pedestrian fence because the fence will stop vehicle and foot traffic impacts. However, the pedestrian fence is likely to create diversions of flow due to the build up of debris on the upstream side of the fence and diverting flows along the fence to the San Pedro River. As a result, negative cumulative impacts to stream channel morphology, surface water quality, and groundwater resources in the San Pedro watershed may occur under Alternative 1. However, with the proposed mitigation measures these negative impacts will decrease over time.

The pedestrian and vehicle barriers, and related construction access roads, and operational roads, will have cumulative, long term visual impacts that will be noticeable and attract attention in foreground views within a mile of the project. The visual impact of the project will be partly screened by vegetation cover on landform features from some viewing locations. The views most affected will be those from the immediate project vicinity in the NCA due to the scale of the fencing, and from elevated viewing locations outside the NCA, primarily on lands in the bajada slopes west of the NCA in the foreground middle-ground distance. The project will also affect views from nearby mountains in the background distance zone, areas over 1.5 miles from the project, mainly due to the visual contrast of the exposed ground surface of the roads and drag beds against the surrounding vegetation. Visual impacts of the project will increase the influence of manmade modifications on the landscape from other existing and potential land use in the vicinity of the border.

Implementing the conservation measures of the Final Biological Opinion (August 29, 2007) will lessen the severity of the impact to large mammals, such as jaguar.

River Corridor Cumulative Impacts:

The construction of a pedestrian fence and placement of TVB's is expected to reduce cross-border vehicle traffic within the SPRNCA. However, as the border fence project proceeds in other areas of the watershed,

funneling of cross-border traffic into the channel of the San Pedro can be expected to negatively impact the entire river system, including water quality, riparian habitat, HWU habitat, and hydrology impacts.

Under this Alternative, there is expected to be an increase pedestrian traffic being funneled into the river corridor. Impact to water quality will be a result from increased amounts of human and solid wastes deposited in the floodplain and channel of the San Pedro River. As mentioned above, the pedestrian fence diverts flows and is expected to increased erosion in the vicinity of the fence due to flow concentration along the fence. This erosion could ultimately lead to sediment loading in the San Pedro River.

Cumulative impacts to the river corridor associated with seasonal installation and removal of TVB's could develop if noxious and invasive riparian plant species are introduced to the riparian area if the proposed mitigation is not followed. The washing of all equipment during construction will help control the spread of noxious and invasive plant species. Once established these species could out-compete the native vegetation which is essential for maintaining stream bank stability and proper functioning riparian conditions. Once established these species could out-compete the Huachuca water umbel which is listed as endangered and is essential for maintaining stream bank stability and proper functioning riparian conditions.

As the border fence project proceeds in other areas of the watershed, it will restrict and funnel wildlife movement corridors into the channel of the San Pedro and can be expected to block movement of larger mammals using the San Pedro valley as a travel corridor. This could have negative impacts on genetic interchange between populations required to prevent extirpation of small populations of Threatened or Endangered species. However, the mitigation to conduct jaguar survey and monitoring should provide basic information on jaguar locations and movements, and may also answer management questions. The conservation and recovery actions are expected to improve the conservation status of the jaguar.

Once completed, the proposed pedestrian fence combined with existing pedestrian fence and segments currently under construction will cross more than 30 unnamed ephemeral drainages east of the San Pedro River and 36 named and unnamed ephemeral drainages west of the river. All impacted drainages are tributary to the San Pedro River or Green Bush Draw (tributary to the San Pedro River). Like the proposed action, if impacts are left unmitigated, the disturbance of land will result in accelerated erosion on 123 acres (approx) of fence line outside the SPRNCA and 66 washes that drain into the San Pedro River. Potentially, if enough sedimentation occurs watershed disturbance, then the river may become laterally unstable, which would cause bank failure and loss of water umbel habitat and, potentially, HWU plants. This channel instability will continue until the river reaches a new dynamic equilibrium with increased the sediment and water supplied from the disturbance of the right of way.

The precarious nature of the San Pedro River and the HWU increase the risk from additional alteration of riparian function and aquatic habitat. The most acute threat to riparian areas in the basin is ground water overdraft (USFWS 2003, 2007). The population continues to grow at a rate of 2 % annually, increasing the threat of wetland and riparian loss with time. Decreasing trends in base flow have already been noted in the upper reaches of the San Pedro River within the United States (USFWS 2007). Limited numbers of populations and the small size of populations make the water umbel vulnerable to extinction as a result of random events that are often exacerbated by habitat disturbance. For instance, the restriction of this species to a relatively small area in southeastern Arizona and adjacent Sonora increases the chance that a single environmental catastrophe, such as a severe tropical storm or drought, could eliminate populations or cause extinction (USFWS 2003).

The impacts to HWU from watershed degradation and resulting river channel instability is anticipated to be lessened considerably with the implementation of mitigation for erosion (excess sediment discharge) and flood plain alteration. The residual impacts to riparian function, aquatic habitat and limited loss of HWU patches in the project area are likely to be relatively modest over the life of the project.

Potential watershed impacts may be reduced under alternative 1 if the pedestrian fencing or vehicle barriers are designed to pass flood flows and sediment (e.g. TVB option) for all drainages in the basin regardless of ownership. Potentially, impacts will be reduced further across the entire watershed by the proposed mitigation and implementation of best management practices to control erosion during and following construction. However, there is a large degree of uncertainty concerning the effectiveness of the some of the proposed mitigation for erosion as many of the details have not been determined.

Construction activities within the San Pedro watershed will result in the clearing of a swath 34 miles long along the border and up to 60 ft in width, disturbing up to 247 acres of soils. Exhaust and dust is expected to be generated during construction. Exhaust and dust is also expected to be generated by vehicle passage during ongoing patrols and maintenance activities.

**B. Cumulative Impact of Alternative 2: Installation of a combination of vehicle barriers and pedestrian fences along the SPRNCA border.**

River Corridor Cumulative Impacts
Cumulative impacts from installing vehicle barriers within 5 dry washes and in the San Pedro River will be far less prone to impede sediment and debris during flood flows than Alternative 1. It can also be expected that cumulative impacts associated with downstream channel incision and erosion will be less much less severe than a solid pedestrian fence across the entire width of the SPRNCA.

Placing TVBs within 5 dry wash areas will allow these drainages to not be impeded. However areas outside the dry wash areas could still create debris jams and divert high flow events along the bollard fence, creating erosion and contributing sediment and high flows into the San Pedro River. This potentially could result in the river becoming laterally unstable, which will cause bank failure and loss of riparian areas, soil and more importantly loss of HWU habitat/individuals. Following the Storm Water Pollution Prevention Plan and all mitigation of keeping the bollard fence clear of flood water debris will lessen the severity of this impact.

Upland Habitat and Watershed Cumulative Impacts
As the border fence project proceeds in other areas of the watershed, large mammal movement will be funneled to the SPRCA where there will be openings scattered throughout the international border within the SPRNCA. Since there will be more openings along the border under this Alternative, the funneling of pedestrians, vehicles and wildlife will be spread out to more areas, thereby decreasing the impacts to the river corridor. Implementing the conservation measures of the Final Biological Opinion (August 29, 2007) will lessen the severity of the impact to large mammals, such as jaguar.

The impacts from the seasonal installation of TVBs are the same as Alternative 1. Effects of this alternative on Air Quality are expected to be substantially the same as those described for the Alternative 1, with slightly fewer acres of soil disturbance. Cumulative visual impacts under this alternative will be similar to those under Alternative 1, except the visual contrast of the pedestrian fence will be reduced in extent due to the shorter length of this type of structure.

**C. Cumulative Impact of Alternative 3: Installation of vehicle barriers only**

River Corridor Cumulative Impacts
The cumulative impacts to water quality from Alternative 3 are expected to be similar to impacts associated with Alternative 1. However, because Alternative 3 serves to control vehicular traffic, but does not direct pedestrian traffic to the arroyos or river channel itself, the impacts to water quality from pedestrian traffic will be less concentrated in nature.

Cumulative impacts to the riparian area are the same as Alternative 1 and 2. The length of border abutting the SPRNCA is approximately 5% of the total border in the San Pedro watershed. Selecting this alternative

would have little effect on the total amount of dust generated by the border fence project within the watershed.

Upland Habitat and Watershed Cumulative Impacts
The placement of TVB's and PVB's is expected to reduce cross-border vehicle traffic but not pedestrian traffic within the SPRNCA. As the border fence project proceeds in other areas of the watershed, funneling of cross-border pedestrian traffic into the SPRNCA can be expected to affect habitat of the river corridor and the upland habitat. Including increased amounts of human and solid wastes deposited in the SPRNCA Cumulative visual impacts under this alternative will be similar to those under Alternative 2, except the visual contrast of the pedestrian fence will be eliminated. Vehicle barriers will be screened more effectively by vegetation cover and landform features, and they will only be noticeable and attract attention in views under ¼ to ½ mile from the project. This alternative presents the least visual impact

## D. Cumulative Impact of Alternative 4: No action

River Corridor Cumulative Impacts
Unauthorized vehicle travel may continue to alter drainage patterns, destroy vegetation, and modify channel morphologic conditions. If the problem persists, individually minor watershed impacts could collectively result in cumulative impacts detrimental to channel morphology, surface water and groundwater resources within the San Pedro River Basin.

Vehicle patrols within the SPRNCA can be expected to increase as the border fence project proceeds in other areas of the watershed, funneling cross-border traffic into the SPRNCA. Increased dust generation can be expected in the SPRNCA as a result.

Cumulative visual impacts under this alternative will be less than those under the other alternatives. Visual impact related to the existing roads and fencing outside the SPRNCA boundary, and border patrol  -
operations will remain, and will only be noticeable and attract attention from the immediate vicinity

## V.    Description of Mitigation Measures: per 43CFR 10.4(g):

1.  No construction is to occur in dry wash drainages areas until the BLM has been coordinated with, allowed to comment on, and approves the type of fence modifications or barriers ACOE's desires to be constructed within these areas. The dry wash drainages areas and the river active channel are identified on Map A, along with BLM's recommended types of infrastructures.
2.  A preconstruction meeting will be required between BLM, Border Patrol, ACOE and the project contractor.
3.  All approved construction activities shall be contained within the authorized 60-foot strip.
4.  The ACOE and Border Patrol shall comply with all conditions and stipulations set forth in the U.S. Fish and Wildlife Biological Opinion dated August 29, 2007.
5.  Prior to the placement and removal of the temporary vehicle barriers in the river corridor and banks, the area will be surveyed and cleared for the Huachuca Water Umbel(HWU) by a qualified biologist. Should the HWU occur in the area the BLM and USFWS will be notified and appropriate mitigation measures will be determined and made.
6.  There shall be no ground disturbances or vegetation removal outside of the authorized 60-foot strip.
7.  There shall be no modifications or repairs to the existing road that meanders outside of the 60-foot authorized area. If any road maintenance is needed outside of the 60-foot authorized strip, the Border Patrol's authorized officer will communicate with the Manager of the San Pedro Riparian National Conservation Area, or the Tucson Field Manager on the needs for the required road maintenance.
8.  All construction equipment and associated vehicles brought into the SPRNCA are to be washed every time prior to entering the SPRNCA for the prevention of spreading invasive weeds. Vehicle washing will consist of the under carriage, exterior, and tires.
9.  All vehicular use shall be confined to existing roads.

10. The construction of the pedestrian fence and road will be permitted only upon the completion of the site treatment, and clearance from the BLM Archaeologist. The pedestrian fence shall be placed in the existing archaeological test trench excavated in July 2007 that is located 3-6 feet north of the barbed wire fence currently representing the International border.

11. For roads inside of the 60-foot strip, new road construction would involve grading and leveling proposed roadbeds, filling areas with existing materials (existing on roadways) or engineered fill, aggregate materials, dust suppressant agents, lifting and bedding stretches of road, and installing drainage structures to aid with water drainage.

12. Temporary barriers are to be placed inside the historic corrals, the river and the floodplain, no construction or ground disturbances are ever to occur in these areas.

13. The temporary barriers inside the river are to be placed after the flood season and be removed before the flood season. The Border Patrol and BLM will coordinate on time frames for these activities.

14. A BLM approved onsite monitor will be required during the construction period to monitor all construction activities and archaeological matters. A biological monitor would be required if construction occurs during birding breeding/migration seasons of February 1st thru August 31st.

15. Construction will not be permitted during the rainy seasons when the soil conditions are muddy and unmanageable.

16. All equipment will be inspected for leaks to prevent any contamination from petroleum, oil, and lubricant spills that could occur.

17. The ACOE will consult with and obtain BLM's and the USFWS's approval on the proposed bank stabilization techniques on the east and west banks of the San Pedro River, and the construction lane within the floodplain. It is recommended that the fence would end approximately 50 feet east of the eastside river embankment to avoid subsequent erosion.

18. The Border Patrol will monitor and remove all debris and sediment buildup within all permanent structures. Removal of the debris and sediment shall be preformed prior to and after high water events. All trash debris is to be disposed of and removed from the San Pedro Riparian National Conservation Area boundaries.

19. BLM will be provided with a copy of ACOE's Storm Water Pollution Prevention Plan prior to be beginning of construction.

20. The BLM retains the right to occupy and use the right-of-way.

## Compliance and Area Monitoring:
All compliance and monitoring will be completed by Tucson BLM personnel.

## Preparers
Linda Marianito, NEPA Coordinator
Susan Bernal, Realty Specialist
Darrell Tersey, Natural Resource Specialist
Keith Hughes, Natural Resource Specialist
Jeff Simms, Fishery Biologist
Dan Moore, Hydrologist
Nathan Dieterich, Hydrologist
Jane Childress, Archeologist
Jim Mahoney, Outdoor Recreation Planner
Francisco Mendoza, Outdoor Recreation Planner

## Persons and Agencies Consulted:
Bill Childress, Manager, SPRNCA
Cindy Alvarez, Assistant Field Manager
Chris Horyza, State Program Lead for Planning
Lorraine Buck, Public Affairs Specialist

**Literature Cited:**

ACOE Final Biological Assessment 2007

Arizona Department of Water Resources (ADWR). 1994. Upper San Pedro River case study. Pages 147-208 in Arizona riparian protection program, legislative report, July 1994.

Anderson, G. 2006. Huachuca water umbel in the Upper San Pedro watershed of Sonora, Mexico. Unpublished report for the U.S. Fish and Wildlife Service, Arizona Ecological Services State Office, Phoenix, Arizona. 37 pp.

Arizona Game and Fish Department (AGFD). 2004. Heritage management data system. Arizona Game and Fish Dept., Nongame Branch, Phoenix.

Bahre, C.J. 1991. A legacy of change: Historic human impact on vegetation of the Arizona borderlands. University of Arizona Press, Tucson, Arizona. 231pp.

Belnap, J. 1992. Potential role of cryptobiotic soil crusts in semiarid rangelands. Paper presented at the Symposium on Ecology, Management, and Restoration of Intermountain Annual Rangelands, Boise, Idaho, May 18-22, 1992.

Belsky, A.J., and D.M. Blumenthal. 1997. Effects of livestock grazing on stand dynamics and soils in upland forests of the interior west. Conservation Biology 11(2):315-327. Bryan, K. 1925. Date of channel trenching (arroyo cutting) in the arid southwest. Science 62:338-344.

Bent, A. C. 1960. Life histories of North American flycatchers, larks, swallows and their allies. Dover Press, New York, New York. 555pp.

Blackburn, W.H. 1984. Impacts of grazing intensity and specialized grazing systems on watershed characteristics and responses. Pp. 927-983. In: Developing strategies for rangeland management. National Research Council/National Academy of Sciences. Westview Press. Boulder, CO.

Brown, B. T. 1988. Breeding Ecology of a Willow Flycatcher Population in Grand Canyon, Arizona. Western Birds 19:25-33.

Browning, M. R. 1993. Comments on the taxonomy of *Empidonax traillii* (willow flycatcher). Western Birds 24:241-257.

Bryan, K. 1925. Date of channel trenching (arroyo cutting) in the arid southwest. Science 62:338-344.

Bureau of Land Management (BLM). 1989. San Pedro River riparian management plan and environmental impact statement. Final. Safford, AZ: US Department of the Interior, BLM. 381 p.

Bureau of Land Management (BLM). 1998. The upper San Pedro River Basin of the United States and Mexico, A resource directory and an overview of natural resource issues confronting decision-makers and natural resource managers. Arizona State Office, Bureau of Land Management, Report No. BLM/AZ/PT-98/021. 110 pp.

Busby, F.E., and G.F. Gifford. 1981. Effects of livestock grazing on infiltration and erosion rates measured on chained and unchained pinyon-juniper sites in southeastern Utah. Journal of Range Management 34:400-405.

Busch, J. D., M. P. Miller, E. H. Paxton, M. K. Sogge, and P. Keim. 2000. Genetic variation in the endangered southwestern willow flycatcher. The Auk: 117 (3): 586-595.

Cardinal S.N., and E.H. Paxton. 2005. Home range, movement, and habitat use of the southwestern willow flycatcher at Roosevelt Lake, AZ – 2004. U.S. Geological Survey report to the U.S. Bureau of Reclamation, Phoenix, AZ.

DeBano, L.F., and L.J. Schmidt. 1989. Interrelationship between watershed condition and riparian health. Pages 45–52 in: Practical approaches to riparian resource management. US Bureau of Land Management, Billings, MT.

DeLoach, C. J. 1991. Saltcedar, an exotic weed of western North American riparian areas: a review of its taxonomy, biology, harmful and beneficial values, and its potential for biological control. Report to the Bureau of Reclamation, Boulder City, NV, Contract No. 7-AG-30-04930.

Dobyns, H. F. 1981. From fire to flood: historic human destruction of Sonoran Desert riverine oases. Ballena Press, Socorro, New Mexico. 222pp.

DuBois, S.M., and A.W. Smith. 1980. The 1887 earthquake in the San Bernardino Valley, Sonora: historic accounts and intensity patterns in Arizona. Bureau of Geology and Mineral Technology, University of Arizona Special Paper 3:1-112.

Doug Duncan, Personal Communication

Durst, S. L. 2004. Southwestern willow flycatcher potential prey base and diet in native and exotic habitat. Masters Thesis. Northern Arizona University, Flagstaff, AZ.

EEC 2001a. Final Report Huachuca Water Umbel Surveys, Cienega Creek Preserve, Bingham Cienega Preserve, La Cebadilla Property, Pima County, Arizona. Prepared for Pima County Flood Control District, Tucson, Arizona.

EEC 2001b. Final 2001 Huachuca Water Umbel Fort Huachuca Monitoring and San Pedro Riparian NCA Inventory Reports. Prepared for Directorate of Installation Support, US Army Garrison, Fort Huachuca, Arizona. ----- ·
EEC 2001c. Southwestern Willow Flycatcher 2001 Surveys of the San Pedro Riparian National Conservation Area. Prepared for US Army Garrison, Fort Huachuca, Arizona.

EEC 2004. Year 2004 Huachuca Water Umbel (*Lilaeopsis schaffneriana recurva*) Fort Huachuca Monitoring and San Pedro Riparian National Conservation Area Inventory. Prepared for Directorate of Installation Support, US Army Garrison, Fort Huachuca, Arizona.

English, Heather C., A.E. Graber, S.D. Stump, H.E. Telle, and L.A. Ellis. 2006. Southwestern Willow Flycatcher 2005 Survey and Nest Monitoring Report. Research Branch, Wildlife Management Division, Arizona Game and Fish Department. Technical Report 248. March 2006. 82 pp.

Falk, D. and P.L. Warren. 1994. Rare plants of the Coronado National Forest: Population studies and monitoring recommendations. Report to the Coronado National Forest, Tucson, Arizona.

Geraghty and Miller, Inc. 1995. Historical flows and conditions in the San Pedro River. Report to the Water Action Task Force, Sierra Vista Economic Development Foundation, Project No. AZ0473.001. 33pp +figures.

Gifford, G.F., and R.H. Hawkins. 1978. Hydrologic impact of grazing on infiltration: a critical review. Water Resources Research. 14:305-313.

Gori, D.F., P.L. Warren, and L.S. Anderson. 1990. Population studies of sensitive plants of the Huachuca, Patagonia, and Atascosa Mountains, Arizona. Unpublished report. Coronado National Forest, Tucson, Arizona. 114 pp.

Graber, A.E., D.M. Weddle, H.C. English, S.D. Stump, H.E. Telle, and L.A. Ellis. 2007. Southwestern willow flycatcher 2006 survey and nest monitoring report. Nongame and Endangered Wildlife Program. Technical Report 249. Arizona Game and Fish Department, Phoenix, Arizona. 96pp.

Haas, S.K, and R.J. Frye. 1997. Hydrology and water quality effects on *Lilaeopsis schafffneriana* ssp. *recurva*. Report to Arizona Department of Agriculture and Fort Huachuca.

Hanna, W. C. 1928. Notes on the dwarf cowbird in southern California. Condor 30:161-162.

Harrison, H. H. 1979. A field guide to western birds' nests of 520 species found breeding in the United States west of the Mississippi River. Houghton Mifflin Co., Boston. 279pp.

Hastings, J.R. and R.M. Turner. 1980. The Changing Mile. University of Arizona Press, Tucson. 317 pp.

Hendrickson, D.A., and W.L. Minckley. 1984. Cienegas - vanishing climax communities of the American Southwest. Desert Plants 6(3):131-175.

Hereford R. 1993. Entrenchment and widening of the upper San Pedro River, Arizona. Boulder, CO: Geological Society of America. Special Paper 282. 46 p.

Howell. S. N. G., and S. Webb. 1995. A guide to the birds of Mexico and northern Central America. Oxford University Press, New York, New York. 851pp.

Hutira, J. and D. Hart "Proposed Archaeological Investigations at AZ ee:12:60 (ASM) and AZ EE:12:61(ASM) Located Along the U.S./Mexico Border, Cochise County, Arizona." Northland Research, Inc., Tempe.

Kenwood, K. E., and E. H. Paxton. 2001. Survivorship and movements of southwestern willow flycatchers at Roosevelt Lake, Arizona - 2001. US Geologic Survey report to the US Bureau of Reclamation, Phoenix.

King, J. R. 1955. Notes on the life history of Traill's flycatcher (*Empidonax traillii*) in southeastern Washington. The Auk 72:148-173.

Koronkiewicz, T. J,. and M. K. Sogge. 2001. Southwestern willow flycatchers recaptured at wintering sites in Costa Rica. North American Bird Bander 26:161-162.

Krueper, D. J. 1993. Effects of land use practices on western riparian ecosystems. In Status and Management of Neotropical Migratory Birds, General Tech. Rep. RM-229, U. S. Forest Service, Rocky Mountain Forest and Range Experiment Station, Fort Collins, Colorado.

Ligon, J. S. 1961. New Mexico Birds and where to find them. The University of New Mexico Press, Albuquerque, New Mexico. 360pp.

Martin, S.C. 1975. Ecology and management of southwestern semidesert grass-shrub ranges: The status of our knowledge. US Forest Service, Rocky Mountain Forest and Range Experiment Station, Fort Collins, CO. 39 pp.

Mayfield, H. F. 1977. Brown-headed cowbird: agent of extermination? American Birds 31:107-113.

Maynard, W. R. 1995. Summary of 1994 survey efforts in New Mexico for southwestern willow flycatcher (*Empidonax traillii extimus*). Contract # 94-516-69, New Mexico Department of Game and Fish, Sante Fe, New Mexico. 48pp.

McCabe, R. A. 1991. The little green bird: ecology of the willow flycatcher. Palmer Publications, Inc., Amherst, Wisconsin. 171pp.

McCarthey, T.D., C.E. Paradzick, J.W. Rourke, M.W. Sumner, and R.F. Davidson. 1998. Arizona partners in flight southwestern willow flycatcher 1997 survey and nest monitoring report. Report to the Bureau of Reclamation, Phoenix, AZ.

McKernan R. L., and G. Braden. 2001. Status, distribution, and habitat affinities of the southwestern willow flycatcher along the lower Colorado River: year 5 -2000. Report submitted to the U.S. Bureau of Reclamation, Boulder City, Nevada.

McLeod, M. A., T. J. Koronkiewicz, B. T. Brown, and S. W. Carothers. 2005. Southwestern willow flycatcher surveys, demography, and ecology along the lower Colorado River and tributaries. Annual report submitted U.S. Bureau of Reclamation, Boulder City, Nevada, by SWCA Environmental Consultants, Flagstaff, AZ.

Muiznieks, B. D., S. J. Sferra, T. E. Corman, M. K. Sogge, and T. J. Tibbitts. 1994. Arizona Partners In Flight southwestern willow flycatcher survey, 1993. Draft report: Nongame and Endangered Wildlife Program, Arizona Game and Fish Department, Phoenix, Arizona. Draft of April 1994. 28pp.

Owen, J. C., and M. K. Sogge. 2002. Physiological condition of southwestern willow flycatchers in native and saltcedar habitats. US Geological Survey report to the Arizona Department of Transportation.

Paradzick, C. E., R. F. Davidson, J. W. Rourke, M. W. Sumner, A. D. Wartell, T. D. McCarthey. 2000. Southwestern willow flycatcher 1999 survey and nest monitoring report. Tech. Rept. 151, Nongame & Endangered Wildl. Progr., Arizona Game & Fish Dept., Phoenix.

Paradzick, C.E., R.F. Davidson, J.W. Rourke, M.W. Sumner, and T.D. McCarthey. 1999. Southwestern willow flycatcher 1998 survey and nest monitoring report. Nongame and Endangered Wildlife Program, Arizona Game and Fish Department, Phoenix, AZ, Technical Report 141.

Paxton, E., J. Owen, and M. K. Sogge. 1996. Southwestern willow flycatcher response to catastrophic habitat loss. U.S. Geological Survey Biological Resources Division, Colorado Plateau Research Station, Northern Arizona University, Flagstaff. 12pp.

Peterson, R.T. 1990. A field guide to western birds. 3rd ed. Houghton Mifflin Company, Boston, Massachusetts. 432 pp.

Phillips, A. R. 1948. Geographic variation in *Empidonax traillii*. The Auk 65:507-514; Phillips, A. R., J. Marshall, and G. Monson. 1964. The Birds of Arizona. University of Arizona Press, Tucson, Arizona. 212pp.

Rieder, M. and L.V. Slawson 2002 "Cultural Resources Inventory of 57.7 Miles Along the United States-Mexico International Border in the Vicinity of Naco and Douglas, Cochise County, Arizona," DRAFT; Atzlan Archaeology, Inc., Tucson.

Rogers, W.M. 1965. Historical land occupance of the upper San Pedro River valley since 1870. Unpublished Masters Thesis, University of Arizona, Tucson, AZ.

Rosgen, Dave. 1996. Applied River Morphology. Wildland Hydrology, Pagosa Springs, Colorado: 4-10, 5-22 pp.

Science Application International Corporation (SAIC). 1998a. Programmatic biological assessment for Fort Huachuca, Arizona. Report to Directorate of Engineering and Housing, Environmental and Natural Resources Division, US Army Garrison, Fort Huachuca, AZ.

Science Application International Corporation (SAIC). 1998b. 29 January 1998 letter to Jackie Record, US Fish and Wildlife Service, Phoenix, AZ. A report of southwestern willow flycatcher surveys on the San Pedro River in 1997.

San Diego Natural History Museum. 1995. *Empidonax traillii extimus* in California. The willow flycatcher workshop. 17 November 1995. 66pp.

San Pedro Expert Study Team. 1999. Sustaining and enhancing riparian migratory bird habitat on the upper San Pedro River. Report to the Secretariat of the Commission for Environmental Cooperation.

Saucedo Monarque, E. 1990. Proyecto: Prospeccion de plantas raras en el Norte de Sonora. Centro Ecologico de Sonora, Subdireccion de Investigacion, Area de Ecologia Terrestre,Hermosillo, Sonora, Mexico. 65pp.

Sferra, S.J., Corman, T.E., C.E. Paradzick, J.W. Rourke, J.A. Spencer, and M.W. Sumner. 1997. Arizona Partners in Flight, southwestern willow flycatcher survey 1993-1996 summary report. Technical Report. Nongame and Endangered Wildlife Program. Arizona Game and Fish Department, Phoenix, AZ. 97 pp.

Shafer, C.L. 1990. Nature Reserves, Island Theory and Conservation Practice. Smithsonian Institution Press, Washington DC 189 pp.

Skagen, S. 1995. The importance of riparian corridors and oases to migrating birds: a research, inventory, and monitoring project. Report to the Arizona Game and Fish Heritage Fund and National Fish and Wildlife Foundation. 35pp + figures and appendices.

Smith, Alexander B, Charles E. Paradzick, April A Woodward, Patrick E.T. Dockens, Tracy D. McCarthey. 2002. Southwestern Willow Flycatcher 2001 Survey and Nest Monitoring Report. Nongame and Endangered Wildlife Program, Arizona Game and Fish
Department, Phoenix, AZ, Technical Report 191.

Sogge, M. K, and T. J. Tibbitts. 1992. Southwestern willow flycatcher (*Empidonax traillii extimus*) surveys along the Colorado River in Grand Canyon National Park and Glen Canyon National Recreation Area. NPS CPSU/N. Arizona University, Flagstaff, Arizona. 43pp.

Sogge, M. K, and T. J. Tibbitts. 1994. Distribution and status of the southwestern willow flycatcher along the Colorado river in the Grand Canyon - 1994. Summary Report. Natl. Biol. Serv., Colorado Plateau Res. Stn./N. Arizona Univ., Flagstaff, Arizona. 37pp.

Sogge, M. K, T. J. Tibbitts, and S. J. Sferra. 1993. Status of the southwestern willow flycatcher along the CO River between Glen Canyon Dam and Lake Mead - 1993. Summary Report. Natl. Park Serv. Coop. Park Studies Unit/N. Ariz. University, U.S. Fish and Wildlife Service, and AZ Game and Fish Department, Flagstaff, Arizona. 69pp.

Sogge, M. K., R. M. Marshall. S. J. Sferra, and T. J. Tibbitts. 1997. A southwestern willow flycatcher natural history summary and survey protocol. Tech. Rep.
NPS/NAUCPRS/NRTR-97/12, USGS Colorado Plateau Research Station/Northern Arizona State University. 39 pp.

Spencer, J. A., S. J. Sferra, T. E. Corman, J. W. Rourke, and M. W. Sumner. 1996. Arizona Partners in Flight 1995 southwestern willow flycatcher survey. Technical Report 97, Arizona Game and Fish Department, Phoenix. 69pp.

Stromberg, J.C., and M.K. Chew. 1997. Herbaceous exotics in Arizona's riparian ecosystems. Desert Plants 1997(2):11-17.

Stromberg, J.C., R. Tiller, and B. Richter. 1996. Effects of ground water decline on riparian vegetation of semiarid regions: the San Pedro River, Arizona. Ecological Applications 6(1):113-131.

Tibbitts, T.J., M.K. Sogge, and S.J. Sferra. 1994. A survey protocol for the southwestern willow flycatcher (*Empidonax traillii extimus*). National Park Service, Colorado Plateau Research Station, Technical Report NPS/NAUCPRS/NRTR-94/04.

Turner, R.M., Webb, R.H., Bowers, J.E., and Hastings, J.R.. 2003. The changing mile revisited: Tucson, University of Arizona Press, 334 p.

U.S. Fish and Wildlife Service (FWS). 1995. Final rule determining endangered status for the southwestern willow flycatcher. Federal Register 60:10694-10715.

U.S. Fish and Wildlife Service (FWS). 1997a. Endangered and threatened wildlife and plants; determination of endangered status for three wetland species found in southern Arizona and Northern Sonora, Mexico. Federal Register 62(3):665-689.

U.S. Fish and Wildlife Service (FWS). 1997a. Final determination of critical habitat for the southwestern willow flycatcher. Federal Register 62(140):39129-39146.

U.S. Fish and Wildlife Service (FWS). 1997b. Correction; final determination of critical habitat for the southwestern willow flycatcher. Federal Register 62 (161):44228.

U.S. Fish and Wildlife Service (FWS). 1997b. Endangered and threatened wildlife and plants, final determination of critical habitat for the southwestern willow flycatcher. Federal Register 62(140):39129-39146.

U.S. Fish and Wildlife Service (FWS). 1999b. Endangered and threatened wildlife plants; Designation of Critical Habitat for Huachuca Water Umbel. A plant. Final rule. 50 CFR Part 17. July 12, 1999. Federal Register 64 (132); 37441-37453.

U.S. Fish and Wildlife Service (FWS). 2002a. Southwestern Willow Flycatcher Recovery Plan, Region 2, Albuquerque, NM.

U.S. Fish and Wildlife Service (FWS). 2005. Designation of critical habitat for the southwestern willow flycatcher: final rule. Federal Register 70 (201):60886.

USFWS Final Biological Opinion 2007. Transmittal letter from USFWS to Mr. George Hutchinson, U.S. Department of Homeland Security, Customs and Border Protection, dated August 29, 2007.

USGS 2007

Unitt, P. 1987. *Empidonax traillii extimus*: An endangered subspecies. Western Birds 18:137-162.

Walkinshaw, L.H. 1966. Summer biology of Traill's Flycatcher. *Wilson Bulletin* 78:31- 46.

Warren, P.L., and F.R. Reichenbacher. 1991b. Sensitive plant survey of Fort Huachuca, Arizona. Unpublished report for the US Army, Fort Huachuca, Arizona.

Warren, P.L., D.F. Gori, L.S. Anderson, and B.S. Gebow. 1991. Status report for *Lilaeopsis schaffneriana* ssp. *recurva*. US Fish and Wildlife Service, Arizona Ecological Services State Office, Phoenix, Arizona. 30 pp.

Warren, P.L., L.S. Anderson, and P.B. Shaffroth. 1989. Population studies of sensitive plants of the Huachuca and Patagonia Mountains, Arizona. Unpublished report. Coronado National Forest, Tucson, Arizona. 99 pp.

Webb, R. H., and J. L. Betancourt. 1992. Climatic variability and flood frequency of the Santa Cruz River, Pima County, Arizona. US Geological Survey, Water-supply Paper 2379.

Whitfield, M.J. 1990. Willow flycatcher reproductive response to brown-headed cowbird parasitism. Masters Thesis, California State University, Chico, California. 25pp.

Whitfield, M.J., and C. M. Strong. 1995. A brown-headed cowbird control program and monitoring for the southwestern willow flycatcher, South Fork Kern River, California. Calif. Dept. Fish and Game, Bird and Mammal Cons. Program Report 95-4, Sacramento, California. 17pp.

Wilcox, B.A., and D.D. Murphy. 1985. Conservation strategy: the effects of fragmentation on extinction. American Naturalist 125:879-887.

Willard, F. C. 1912. A week a field in southern Arizona. The Condor 14:53-63.

# EXHIBIT B

# United States Department of the Interior

**U.S. Fish and Wildlife Service**
**2321 West Royal Palm Road, Suite 103**
**Phoenix, Arizona 85021-4951**
**Telephone: (602) 242-0210 FAX: (602) 242-2513**

In Reply Refer To:
AESO/SE
22410-2007-F-0416                         August 29, 2007
22410-2004-I-0270
22410-2003-I-0235
22410-2002-I-0156

Mr. George Hutchinson
U.S. Department of Homeland Security
Customs and Border Protection
1300 Pennsylvania Avenue NW
Room 3.4-D
Washington, D.C. 20229

Dear Mr. Hutchinson:

Thank you for your request for formal consultation with the U.S. Fish and Wildlife Service
(USFWS) pursuant to section 7 of the Endangered Species Act of 1973 (16 U.S.C. 1531-1544),
as amended (Act). Your request was dated August 23, 2007, and received by us electronically
on August 24, 2007. Your proposed action includes pedestrian fence proposed along the U.S.
and Mexico border near Sasabe, Pima County; Nogales, Santa Cruz County; and near Naco and
Douglas, Cochise County. You requested formal consultation on the endangered jaguar
(*Panthera onca*) and the endangered lesser long-nosed bat (*Leptonycteris curasoae
yerbabuenae*). You did not want to receive a draft biological opinion.

You also requested our concurrence the proposed action may affect, but is not likely to adversely
affect the endangered Kearney blue star (*Amsonia kerneyana*). We concur with your
determination, based on the rationale in Appendix A.

This biological opinion is based on information provided in your letter, an August 2007
biological assessment (BA) for the project (USCBP 2007b), the Naco-Douglas Supplemental
Environmental Assessment (EA) (USCBP 2003), the Final EA for Nogales (USCBP 2003), the
Final EA for Tucson, Nogales, and Sonoita Stations (USCBP 2004), and the Final Sasabe Fence
EA (USCBP 2007), field investigations, our files, and other sources of information. References
cited in this opinion are not a complete bibliography of all references available on the listed
species evaluated, effects of the proposed action, or on other subjects considered in this opinion.
A complete administrative record of this consultation is on file at this office.

Mr. George Hutchinson                                                                         2

**Consultation history**

- August 9, 2007:  Teleconference among USFWS, Office of Border Patrol (OBP), and U.S. Army Corps of Engineers (USACE) to discuss the potential for adverse effects to the jaguar.  Major concerns included the need to address potential direct and indirect effects to jaguar of all the fence projects that are proposed within or near jaguar movement corridors.

- August 14, 2007:  Meeting among USFWS, Custons and Border Protection (CBP), Sundt Construction, OBP, USACE, and Gulf South Research Corporation (GSRC) to discuss the impacts of the Sasabe fence on jaguars, and if the Naco/Douglas fence should be included in consultation.

- August 15, 2007:  Teleconference among USFWS, CBP, OBP, USACE, and GSRC to discuss why formal consultation is necessary and to discuss conservation measures for the jaguar.

- August 17, 2007:  We received a preliminary draft BA to review, and sent comments on August 19 to USACE and GSRC.

- August 21, 2007:  We received another preliminary draft BA to review and sent comments on August 22 to USACE and GSRC.

- August 23, 2007:  You sent the request for formal consultation via electronic mail.

- August 24, 2007:  We received the final BA via electronic mail.

## BIOLOGICAL OPINION

## DESCRIPTION OF PROPOSED ACTION

The project is divided into three separate corridors (Figure 1).  The western most corridor is near the Sasabe Port of Entry (POE) within the Tucson Station's Area of Operation (AO).  Proposed pedestrian fence in this section starts at the POE and extends 2.5 miles to the west and 4.5 miles to the east (7 miles total) (Figure 2).  The second section extends 2.4 miles west of Mariposa POE in Nogales, beginning about 0.5 mile west of the Mariposa POE (Figure 3).  The third corridor is located in the Naco and Douglas stations' AOs and encompasses a total of 22 miles from Douglas to the San Pedro River (but does not cross the San Pedro River). These areas of fence extend primarily 6 miles west of the Naco POE, 9 miles east of the Naco POE, and 7 miles west of the Douglas POE (Figures 4 and 5).

Mr. George Hutchinson

3



Figure 1. Proposed Fences

Mr. George Hutchinson



Figure 2: Proposed Fence at Sasabe

Mr. George Hutchinson

5



Figure 3: Proposed Fence at Nogales

Mr. George Hutchinson

6



Figure 4: Proposed Fence at Naco

Mr. George Hutchinson



Figure 5: Proposed Fence at Douglas

Mr. George Hutchinson                                                                                        8

The pedestrian barrier would be placed about three feet north of the U.S.-Mexico border, within the 60-foot-wide Roosevelt Reservation. The exact fence design is not yet known; however, preliminary design performance measures dictate that the fence must:

- extend 15 to 18 feet above ground and 3 to 6 feet below ground;

- be capable of withstanding a crash of a 6,000 to 10,000-pound (gross weight) vehicle traveling at 40 miles per hour;

- be semi-transparent, as dictated by operational need;

- be vandal resistant;

- be designed to survive the extreme climate changes of a desert environment;

- not impede the natural flow of water and have minimal impacts on small animal movement; and

- not impede maintenance access to border monuments required by the U.S. Section, International Boundary and Water Commission (USIBWC).

The final design and construction of the fence will be developed by the design and build contractor. Upon completion, the entire length of fence in all three sections will be approximately 31 miles. No primary fence would be constructed within the 100-year floodplain of the San Pedro River. Furthermore, in washes or arroyos, fences would be designed and constructed, as appropriate, to ensure proper conveyance of floodwaters and to eliminate the potential to cause backwater flooding on either side of the border. There are not likely to be gaps greater then four inches in the fence, even in washes.

Construction of the fence would require clearing and grading approximately 225 acres, including about 215 acres of agaves, to construct an access road that fully encompasses the 60-foot-wide Roosevelt Reservation. This road would be used for fence maintenance in the future. No additional improvements (e.g. all-weather surfacing) would be implemented as part of the Proposed Action in the Sasabe and Nogales AOs; however, roads in the Naco-Douglas area will be improved to an all-weather surface road with parallel drainage ditches and drag road. Maintenance of the pedestrian barrier is part of the proposed action.

These all-weather roads would be surfaced with an aggregate surface and treated with a soil stabilizer. On completion of the road improvements, only a top shot (i.e., small quantity applied to the surface) of the soil stabilizer would be required at a frequency anticipated not to exceed more than once per year for maintenance purposes to ensure the longevity of the roadways. The OBP would maintain the improved roads upon completion of the construction activities. This top shot would not require any ground disturbing activities, and careful application of the stabilizer would ensure no material is spread outside of the road right-of-way (ROW). Surfacing is required to reduce maintenance costs and improve driving conditions during inclement

Mr. George Hutchinson                                                                                          9

weather.  Surfacing would also reduce fugitive air particles created by OBP and private vehicles while traveling on unimproved roads.  These types of road surfacing materials are approved by the U.S. Environmental Protection Agency (EPA) and are non-toxic to fish and wildlife.

Construction is expected to be completed in 60 days or less, though it may take longer. Equipment required for the construction activities would not be staged or maintained in or near any surface water resources to prevent any contamination from petroleum, oil, and lubricant spills that could occur.

Work will be done during daylight hours to the extent practicable.  Nighttime construction activities would be conducted only when absolutely necessary for adequate concrete pours or in the case of an accelerated construction schedule to meet Congressional mandates.  No nighttime construction will be conducted in vegetated washes.  Portable lights with generators would be used during nighttime construction.  However, lights would be equipped with shields to focus the illumination on the work area and reduce light trespass into other areas.

**Conservation Measures**

- Work within drainages will be limited to dry periods to reduce downstream water quality effects.

- If the migratory bird nesting season (February 1 – August 31) can not be avoided, bird nests will be located and identified immediately before grubbing and clearing activities. Active nests will be avoided to the extent practicable.

- CBP/OBP will attempt to avoid disturbance to agave and other plant species that are used by lesser long-nosed bats for forage, to the extent practicable.  Such specimens will be avoided, salvaged, or replaced at a ratio of 2:1 from local nursery stock.

- Any temporarily disturbed soils would be stabilized and revegetated with native species, including cottonwood and willow saplings at washes and arroyos, to provide erosion and sedimentation control.  Disturbed areas would also be sprayed with a hydroseed mixture to establish an herbaceous cover more rapidly.

- Engineering solutions (e.g., box culverts) would be developed and implemented in arroyos and washes.  The solutions will be designed to prevent illegal traffic; such traffic would adversely affect habitat and disturb jaguars that might be using the wash. Additionally, vegetation should be maintained in these washes and no lights should be placed near such washes.

- CBP will support USFWS in jaguar survey and monitoring efforts and conservation and recovery measures.  Survey and monitoring methods and conservation and recovery measures will be developed through coordination with USFWS, Arizona Game and Fish Department (AGFD), and the Tohono O'odham Nation within four months following the release of the Biological Opinion.  Details and schedules regarding those methods and measures will be identified by the end of the four months.  Monitoring of jaguars may

include a combination of satellite telemetry and camera survey techniques. Multiple techniques may be used to monitor jaguar habitat; however, one component of monitoring would likely include an assessment of indirect effects to jaguar movements and habitat from border traffic in areas where no fence is installed.

- CBP will install additional technology (cameras, sensors, etc.) to the east and west of the fence segments and near other gaps where higher quality habitat exists to deter the entry of illegal pedestrians, particularly into the mountainous regions and larger riparian areas (Baboquivari Mountains, San Pedro River). OBP will provide information to the USFWS on jaguar and other felid (i.e., mountain lion, ocelot, and bobcat) sightings obtained through remote video surveillance (or any other means like direct observation) along the border.

## STATUS OF THE SPECIES

### Jaguar

The jaguar was listed as endangered from the United States and Mexico border southward to include Mexico and Central and South America (37 FR 6476). The species was originally listed as endangered under the Endangered Species Conservation Act of 1969 (ESCA). Under the ESCA, two separate lists of endangered wildlife were maintained, one for foreign species and one for the United States. The jaguar appeared only on the foreign list. In 1973, the Endangered Species Act (Act) replaced the ESCA. The foreign and native lists were replaced by a single "List of Endangered and Threatened Wildlife," (USFWS 1975). In 1979, we published a notice (44 FR 43705) stating that, through an oversight in the listing of the jaguar, the United States populations of these species were not protected by the Act. The notice asserted that it was always our intent that all populations of the jaguar deserved to be listed as endangered, whether they occurred in the United States or in foreign countries. Endangered status was extended to the jaguar in the United States in 1997 (62 FR 39147). Designation of critical habitat was found to be not prudent because designation may increase the chance of direct taking. Critical habitat designation was again analyzed in 2006, and it was found to be not prudent because there would be no conservation benefit to the species (71 FR 39335).

The jaguar was addressed in Listed Cats of Texas and Arizona Recovery Plan (with Emphasis on the Ocelot) (USFWS 1990), but only general information and recommendations to assess jaguar status in the United States and Mexico, and protect and manage occupied and potential habitat in the United States were presented. No specific recovery recommendations or objectives for the jaguar were presented. AGFD published an assessment and strategy in 1997 for jaguars in Arizona and New Mexico (Johnson and Van Pelt 1997), which was accepted by the Jaguar Conservation Team (JAGCT). The AGFD and the New Mexico Department of Game and Fish (NMDGF) are currently developing an updated assessment and framework for jaguars in Arizona, New Mexico, and northwestern Mexico (AGFD and NMDGF 2006), along with a new Memorandum of Understanding for the JAGCT.

Rangewide, jaguars measure about five to eight feet from nose to tip of tail and weigh from 80 to 348 lb, although the 80 and 348 lb weights are exceptional (Nowak 1999, Seymour 1989). Males

are typically 10 to 25 percent larger than females (Emmons 1999, Wildlife Conservation Society 2007), or perhaps 20 to 30 percent larger (Sunquist and Sunquist 2007). In the southern part of the range, females tend toward 100 to 150 lb and males toward 170 to 220 lb. In Central America and southern Mexico, both sexes trend slightly larger than they do to the north or south. Leopold (1959) listed a weight range in Mexico of 140 to 250 lb for males and 100 to 180 lb for females. Jaguars have a relatively robust head, compact but muscular body, short limbs and tail, and powerfully built chest and forelegs (Leopold 1959, Nowak 1999, Seymour 1989, Tewes and Schmidly 1987, Wildlife Conservation Society 2007). They have the strongest teeth and jaws of any American cat, and their skulls are more massive than those of mountain lions (Brown and López-González 2001). Their canines are well developed (Seymour 1989) and effectively deployed. The overall coat of a jaguar is typically pale yellow, tan, or reddish yellow above, and generally whitish on the throat, belly, insides of the limbs, and underside of the tail, with prominent dark spots or blotches throughout (Seymour 1989).

The life history of the jaguar has been summarized by Seymour (1989), among others. Jaguars breed year-round range-wide, but at the southern and northern ends of their range there is evidence for a spring breeding season. Gestation is about 100 days; litters range from one to four cubs (usually two). Cubs remain with their mother for nearly two years. Females begin sexual activity at three years of age, males at four. Studies have documented few wild jaguars more than 11 years old.

Like most large carnivores, jaguars have relatively large home ranges. According to Brown and Lopez-Gonzalez (2001), their home ranges are highly variable and depend on topography, available prey, and population dynamics. However, little information is available on this subject outside tropical America, where several studies of jaguar ecology have been conducted. Quigley and Crawshaw (1992) estimated a minimum of 772 to 1160 mi$^2$ is needed to support 30 to 50 adult jaguars; the actual area depends on prey density, habitat composition, and the amount of human exploitation. Individual jaguar home ranges vary from 11 to 16 mi$^2$ in Belize (Rabinowitz and Nottingham 1986) and from 10 to 25 mi$^2$ for females in the dry and wets seasons, respectively, in Jalisco, Mexico (Nuñez et al. 2002). The average home range of radio-collared male jaguars in Venezuela was 19 to 30 square miles (49 and 78 sq km) (Brown and Lopez-Gonzalez 2001:60).

The list of prey taken by jaguars range-wide includes more than 85 species (Seymour 1989). Known prey include peccaries (javelina), capybara, paca, armadillos, caimans, turtles, livestock, and various birds and fish. Although it is thought that javelina and deer are mainstays in the diet of jaguars in the U.S.-Mexico borderlands, other available prey, including livestock, are probably taken as well.

Jaguars are known from a variety of vegetation communities (Seymour 1989), including those found in the arid Southwest (Nowak 1994). Toward and at middle latitudes, they show a high affinity for lowland wet communities, typically swampy savannas or tropical rain forests. However, they also occur in upland vegetation communities in warmer regions of North and South America. For example, jaguars occur in dry tropical forest in Jalisco (Nuñez et al. 2000) and southern Sonora (Alamos region) (E. Rojero Diaz, pers. comm.). Swank and Teer (1989) stated that jaguars prefer a warm, tropical climate, usually associated with water, and are rarely found in extensive arid areas. However, jaguars occur in arid areas, including thornscrub, desertscrub, and grassland communities, of northwestern Mexico (Boydston and López-Gónzalez 2005, McCain and Childs in review).

López-Gónzalez and Brown (2002) and southwestern United States (Johnson et al. 2007). Recently, several studies have helped refine general understanding of habitats that have been or might be used by jaguars in Arizona and New Mexico, including studies by the Sierra Institute Field Studies Program (2000), Hatten et al. (2002 and 2005), Menke and Hayes (2003), Boydston and López-Gónzalez (2005), and Robinson et al. (2006).

Sanderson et al. (2002) found that the jaguar is known to be extant in about 3.4 million mi$^2$, which represents 46% of its historical range. Jaguars are known to be extirpated in 37% of their historical range, and their status in another 18% is unknown. The probability of long-term survival of the jaguar is considered high in 70% of the currently occupied range (over 2.3 million mi$^2$). Abundance and population trends for the species are still not well known, though research, inventories, and monitoring programs are being implemented in some parts of the jaguar range (IUCN 2007, Wildlife Conservation Society 2007).

Numerous sightings of jaguars have been recorded in northern Mexico and southwestern United States since the 1997 listing (Brown and López-Gónzalez 2001, AGFD and NMDGF 2006), either because of increased efforts in detecting individuals or increased movements of individuals across the border, or both. Jaguars in the United States are part of a population, or populations, that occur largely in Mexico. As the listing rule (62 FR 39147) discusses, jaguars in the United States historically occurred in California, Arizona, New Mexico, Texas, and possibly Louisiana. The last jaguar sightings in California, Texas, and Louisiana were documented in the late 1800s or early 1900s. While jaguars have been documented as far north as the Grand Canyon, sightings in the late 20th century to the present have occurred mainly along the international boundary of the United States and Mexico. Further, only three records of a female with kittens have been documented in the United States, the last in 1910 (Lange 1960, Nowak 1975, Brown 1989), and no females have been confirmed in the United States since 1963 (Brown and Lopez-Gonzalez 2000). Based on documented sightings in the late 20th century, occurrences in the United States at the time of listing (62 FR 39147) were limited to southeastern Arizona and southwestern New Mexico. Recently (1996 through 2007), four male jaguars have been documented in the United States.

Swank and Teer (1989) described the distribution of the jaguar in Mexico as a broad belt from central Mexico to Central America. However, Brown (1991) suggested that there may be more jaguars in northern Mexico than are officially reported. He mentioned reports of two jaguars, which were killed in central Sonora around 1970. He also discussed assertions by the local Indians that both male and female jaguars still occurred in the Sierra Bacatete about 200 miles (323 kilometers) south of Arizona. Brown speculated that if a reproducing population of jaguars is still present in these mountains, it may be the source of individuals that travel northward through the Sierra Libre and Sierra de Madera and the possible source of the males that have been documented in the United States. Brown and Lopez-Gonzalez (2001) summarize reports of jaguars killed or captured in the Mexican states of Sonora and Chihuahua from 1900 to 2000. These authors also discuss an extant population of jaguars in Sonora. They describe an extant population in the rugged barrancas connecting northern Sinaloa and Sonora and another population in the Sierra Bacatete area in southern Sonora. However, the most northern population of jaguars reported by Brown and Lopez-Gonzalez (2001) is near the towns of Huasabas and Sahuaripa 130 miles (210 kilometers) south of the United States-Mexico border.

Rabinowitz (1997, 1999) suggested that there is a lack of evidence to support the presence of a significant United States population and stated that the southwestern United States has been "never more than marginal habitat at the extreme northern limit of the jaguar's range." He stated that several points stand out: (1) The low number of confirmed or credible sightings in the last century imply that there was no more than small, short-lived populations in the United States over the last century; (2) 74 percent of the sightings being male may be indicative of dispersal movements from south of the border; (3) the likelihood of jaguars coming across the border from Mexico points to a strong possibility for jaguar populations in northern Mexico; (4) only three sightings of females with young in the early 1900s is not indicative of a long-term breeding population; and (5) the lack of references by Native Americans and early Europeans suggests a lack of permanent presence within the last several hundred years. He further concluded that there is no area in the United States that is critical for the survival of any northern jaguar population that may occur in Mexico, or for the species as a whole.

Throughout their range, jaguars are at risk due to over hunting of jaguar prey animals and killing of jaguars due to perceived livestock depredation and for sport hunting. Increased illegal and law enforcement actions along the Mexico-United States border may be limiting jaguar movement across the border, but it is uncertain if and how much this is affecting that movement. Loss, fragmentation, and modification of jaguar habitat have contributed to population declines throughout much of the species' range, including northern Mexico (Medellin et al. 2002). These changes in jaguar habitat have affected not only habitat for breeding and foraging, but also movement corridors.

According to the 1997 federal listing, the primary threat to jaguars in the United States is illegal shooting. The most recent known killing of a jaguar in Arizona was in 1986, (Brown and Lopez-Gonzalez 2001). Although the demand for jaguar pelts apparently has diminished, it still exists, along with the business of illegal hunting of jaguars in Mexico.

### Lesser long-nosed bat

The lesser long-nosed bat was listed (originally, as *Leptonycteris sanborni*; Sanborn's long-nosed bat) as endangered in 1988 (USFWS 1988). No critical habitat has been designated for this species. A recovery plan was completed in 1997 (USFWS 1997a). Loss of roost and foraging habitat, as well as direct taking of individual bats during animal control programs, particularly in Mexico, have contributed to the current endangered status of the species. The recovery plan states that the species will be considered for delisting when three major maternity roosts and two post-maternity roosts in the United States, and three maternity roosts in Mexico have remained stable or increased in size for at least five years, following the approval of the recovery plan.

The lesser long-nosed bat's habitat is desert grassland and shrubland up to oak transition (AGFD 2003a). According to the AGFD, this species' preferred plant communities are palo verde/ saguaro, semidesert grassland, and oak woodland. The lesser long-nosed bat is migratory and found throughout its historical range, from southern Arizona and extreme southwestern New Mexico, through western Mexico, and south to El Salvador. In southern Arizona, lesser long-nosed bat roosts have been found from the Picacho Mountains (Pinal County) southwest to the

Agua Dulce Mountains (Pima County), southeast to the Chiricahua Mountains (Cochise County), and south to the international boundary. Individuals have also been observed near the Pinaleño Mountains (Graham County) and as far north as Phoenix and Glendale (Maricopa County) (AGFD Heritage Data Management System). This bat is also known from far southwestern New Mexico in the Animas and Peloncillo mountains (Hidalgo County).

Roosts in Arizona are occupied from April to as late as early November (Cockrum and Petryszyn 1991, Slauson 1999, 2000); although the species has been recorded in winter at hummingbird feeders in Tucson (Sidner and Houser 1990). In spring, adult females, most of which are pregnant, arrive in Arizona and gather into maternity colonies in southwestern Arizona. These roosts are typically at low elevations near concentrations of flowering columnar cacti. After the young are weaned, maternity colonies disband in July and August; some females and young move to higher elevations, ranging up to more than 6,000 ft, primarily in southeastern Arizona near concentrations of blooming paniculate agaves. Dates of these seasonal movements by lesser long-nosed bats are rather variable from one year to the next (Cockrum and Petryszyn 1991, Fleming et al. 1993). Adult males typically occupy separate roosts, forming bachelor colonies. Males are known mostly from the Chiricahua Mountains, but also occur with adult females and young of the year at maternity roosts (USFWS 1997a). Throughout the night, between foraging bouts, both sexes will rest in temporary night roosts (Hoffmeister 1986).

The lesser long-nosed bat consumes nectar and pollen of paniculate agave flowers and the nectar, pollen, and fruit produced by a variety of columnar cacti. In Arizona, four species of agave and two cacti are the main food plants (Hayward and Cockrum 1971, Wilson 1985). The agaves include Palmer's agave (*Agave palmeri*), Parry's agave (*A. parryi*), desert agave (*A. deserti*), and amole (*A. schotti*). Amole is considered to be an incidental food source. The cacti include saguaro and organ pipe cactus. Nectar of these cacti and agaves are high energy foods. Concentrations of food resources are patchily distributed, and the nectar of each plant species is only seasonally available. Cacti flowers and fruit are available during the spring and early summer; blooming agaves are available through the summer, primarily from July through early October, though Parry's agave and amole bloom earlier. Columnar cacti occur in lower elevation areas of the Sonoran Desert region, and paniculate agaves are found primarily in higher elevation desert scrub areas, desert grasslands and shrublands, and into the mountains. Parry's agave is usually found at higher elevations than Palmer's agave (Gentry 1982).

The lesser long-nosed bat is known to fly long distances from roost sites to foraging sites. Night flights from maternity colonies to flowering columnar cacti have been documented in Arizona at 24 km (15 mi), and in Mexico at 40 km (25 mi) and 61 km (38 mi) (one way)(Dalton et al. 1994; V. Dalton, Tucson, pers. comm., 1997; Y. Petryszyn, University of Arizona, pers. comm., 1997). A substantial portion of the lesser long-nosed bats at the Pinacate Cave in northwestern Sonora (a maternity colony) fly 40 to 50 km (25-31 mi) each night to foraging areas in Organ Pipe Cactus National Monument (USFWS 1997a). Horner et al. (1990) found that lesser long-nosed bats commuted 48 to 58 km (30-36 mi) round trip between an island maternity roost and the mainland in Sonora; the authors suggested these bats regularly flew at least 75 km (47 mi) each night. Lesser long-nosed bats have been observed feeding at hummingbird feeders many miles from the closest potential roost site (Petryszyn, pers. comm., 1997). Because these bats can fly

long distances to forage, the entire project area is within foraging distance of many known roosts.

Considerable evidence exists suggesting a dependence of *Leptonycteris* on certain agaves and cacti. Activities that adversely affect the density and productivity of columnar cacti and paniculate agaves may adversely affect populations of lesser long-nosed bats (Abouhalder 1992, USFWS 1997a). Excess harvest of agaves in Mexico, collection of cacti in the United States, and conversion of habitat due to urban expansion, agricultural uses, livestock grazing, and other development may contribute to the decline of long-nosed bat populations (USFWS 1988). Activities that directly or indirectly promote invasions or increased density of nonnative grasses, particularly Lehmann lovegrass (*Eragrostis lehmanniana*), species of *Bromus*, and Mediterranean grass (*Schismus barbatus*), may result in increased fire frequency and intensity (Minnich 1994). Sonoran Desert scrub is not adapted to fire.

Suitable day roosts and concentrations of food plants are the two resources that are crucial for the lesser long-nosed bat (USFWS 1997a). Caves and mines are used as day roosts. The factors that make roost sites useable have not yet been identified. Whatever determines roost suitability, the species is sensitive to human disturbance. Instances are known where a single brief human visit to an occupied roost caused a high proportion of lesser long-nosed bats to temporarily abandon their day roost and move to another. This sensitivity suggests that the presence of alternate roost sites may be critical when disturbance occurs.

Food requirements of the lesser long-nosed bat are very specific. Adequate numbers of flowers or fruits are required within foraging range of day roosts and along migration routes to support large numbers of this bat. Locations of good feeding sites play an important role in determining availability of potential roosting sites, and roost and food requirements must be considered jointly when discussing the habitat requirements of this bat. A suitable day roost is probably the most important habitat requirement, but potentially suitable roosts must be within reasonable foraging distances of sufficient amounts of required foods before this bat will use them. It seems evident that the lesser long-nosed bat forages over wide areas and that large roosts require extensive stands of cacti or agaves for food. Therefore, destruction of food plants many miles from a roost could have a negative impact on this bat (USFWS 1997a).

The lesser long-nosed bat recovery plan identifies the need to protect foraging areas and food plants. The lesser long-nosed bat recovery plan provides specific discussion and guidance for management and information needs regarding bat forage resources (USFWS 1997a).

Known major roost sites include 17 large roosts in Arizona and Mexico (USFWS 1997a, USFWS files). According to surveys conducted in 1992 and 1993, the number of bats estimated to occupy 16 of the 17 sites was greater than 200,000. A recently discovered roost in Cochise County may support an additional 25,000 bats. Twelve major maternity roost sites are known from Arizona and Mexico. According to the same surveys, the maternity roosts are occupied by a total of more than 150,000 lesser long-nosed bats. The numbers above indicate that, although many of these bats are known to exist, the relative number of known large roosts is small. Disturbance of these roosts and the food plants associated with them could lead to the loss of the

roosts. Limited numbers of maternity roosts may be the critical factor in the survival of this species.

The lesser long-nosed bat recovery plan (USFWS 1997a), listing document (USFWS 1988), the biological opinion of the proposed ongoing and future military operations and activities at Fort Huachuca (22410-2007-F-0132) (USFWS 2007a), and the biological opinion on effects of continued livestock grazing for four allotments in the Chiricahua Ecosystem Management Area (22410-2007-F-0313-R1 and 02-21-98-F-0399) (USFWS 2007b), all discuss the status of the species, and threats, and are incorporated by reference.

## ENVIRONMENTAL BASELINE

The environmental baseline includes past and present impacts of all Federal, State, or private actions in the action area, the anticipated impacts of all proposed Federal actions in the action area that have undergone formal or early section 7 consultation, and the impact of State and private actions which are contemporaneous with the consultation process. The environmental baseline defines the current status of the species and its habitat in the action area to provide a platform to assess the effects of the action now under consultation.

### Action Area

The "action area" means all areas to be affected directly or indirectly by the Federal action and not merely the immediate area involved in the action. Jaguars in Arizona and New Mexico are likely part of a jaguar population that occurs in Sonora and eastern Chihuahua, Mexico. Activities that significantly affect jaguars in any portion of the aforementioned states may affect the size, structure, or distribution of this northern jaguar population. The action area for this biological opinion therefore includes the range of the jaguar in Sonora, eastern Chihuahua, Mexico and southern Arizona and New Mexico, U.S. The USFWS has determined that the action area for the lesser long-nosed bat includes the areas directly impacted by the barriers (including construction, maintenance, and access roads) and an area around the project defined by a circle with a radius of 36 miles (the maximum documented one-way foraging distance of the lesser long-nosed bat). The action area represents only a small portion of the lesser long-nosed bat's range.

Europeans have influenced Southern Arizona for hundreds of years, and Native Americans have done so for much longer (Hastings and Turner 1965, Bahre and Hutchinson 1985, Bahre 1991, Tellman et al. 1997). Often cited human impacts in the area include vegetation type conversion, dewatering surface waters and aquifers, erosion and channel downcutting, loss or reduction of native species, introduction and spread of nonnative species, and habitat loss.

The existing conditions of the Sasabe corridor were discussed in detail in the 2007 EA and are incorporated by reference. The corridor area is comprised of Sonoran desertscrub with smaller desert scrub-grassland communities interspersed. The grassland communities are more prevalent on the eastern side of the Sasabe POE, primarily within the Buenos Aires National Wildlife Refuge (BANWR). Within the 60-foot wide Roosevelt Reservation (i.e., the project corridor) the vegetation communities have been disturbed by previous road construction, legal and illegal

grazing, illegal vehicle and pedestrian traffic, fires, temporary vehicle barriers (TVB), and OBR enforcement actions. The washes and arroyos support more dense vegetation communities comprised of mulefat (*Baccharis salicifolia*), catclaw acacia (*Acacia greggii*), catclaw mimosa (*Mimosa aculeaticarpa dysocarpa*), graythorn (*Ziziphus obtusifolia*), and desert honeysuckle (*Anisacanthus thurberi*).

The native bunch-grasses in the grassland community have suffered from overgrazing and fire suppression that have permitted or benefited the proliferation of invasive shrubs and cacti (Hastings and Turner 1980). The grasslands on the Mexican side of the border have been extensively overgrazed (Hastings and Turner 1980).

The Nogales corridor consists primarily of semidesert grassland, encinal oak woodlands, and riparian corridors. The grassland community is the most widely distributed community in the project corridor. This community is made up of grassy landscapes broken up by widely scattered scrub trees.

The encinal oak woodland community exists along slopes and is dominated by mature Emory oaks (*Quercus emoryi*) with an occasional gray oak (*Q. grisea*), and manzanita (*Arctostaphylos pungens*). Thin ribbons of mature netleaf hackberry (*Celtis reticulata*) are found along the banks of washes at the bottom of these slopes. Mature netleaf hackberry forms a closed canopy while younger netleaf hackberry forms a loose mid-canopy. Heavy cattle grazing was evident in each of the communities during past surveys (see BA).

The existing environmental conditions within the Naco-Douglas corridor were described in the 2003 Supplemental EA and those descriptions are incorporated by reference. The majority of the corridor consists of Chihuahuan desertscrub. However, the San Pedro Riparian National Conservation Area is on the western part of the project corridor, about 11 miles west of the Naco POE. The San Pedro River is a low-gradient, alluvial desert river that flows uninterrupted by dams or major surface water diversions from its headwaters 23 miles south of the U.S.-Mexico border north into Arizona where it joins the Gila River at Winkelman, Arizona (Rojo et al. 1998). The area surrounding the San Pedro River forms part of an ecotone, or intergrading of ecosystems, between Sonoran and Chihuahuan deserts and Plains grassland. Conditions contributing to the exceptional diversity and importance of the area to migratory birds include the San Pedro River's position along an ecotone (where species from two ecosystems contribute to the overall diversity), the highly productive and structurally diverse riparian habitat, the presence of water in a desert ecosystem, and the relatively unaltered hydrologic regime (Naiman et al. 1993, Rojo et al. 1998, Commission for Environmental Cooperation 1999).

### Jaguar

In northwestern Mexico, jaguars occur from the rugged barrancas connecting northern Sinaloa and Sonora north, including eastern Chihuahua, to the border with the U.S. The most northern population of jaguars reported by Brown and Lopez-Gonzalez (2001) is in the area of the towns of Huasabas and Sahuaripa, about 130 miles (210 kilometers) south of the United States-Mexico border.

Recently (1996 through 2007), four individual male jaguars have been documented in the United States. One was observed and photographed on March 7, 1996, in the Peloncillo Mountains in New Mexico near the Arizona border (Glenn 1996, Brown and Lopez Gonzalez 2001). The Peloncillo Mountains run north-south to the Mexican border, where they join the foothills of the Sierra San Luis and other mountain ranges connecting to the Sierra Madre Occidental. Another was observed and photographed on August 31, 1996 in the Baboquivari Mountains of southern Arizona (Childs 1998, Brown and Lopez Gonzalez 2001). In February 2006, another jaguar was observed and photographed in the Animas Mountains in Hidalgo County, New Mexico.

From 2001 to 2007, two jaguars have also been repeatedly photographed using infra-red camera traps in south-central Arizona, near the Mexico border, including repeat occurrences of two individuals, one of which, "Macho B" was the male observed and photographed in 1996 in the Baboquivari Mountains. More specifically, these jaguars were documented in three different mountain range complexes in southeastern Arizona, over an area extending from the U.S./Mexico border north 47 mi and 39 mi east to west (McCain and Childs, in review). Jaguars were found using areas from rugged mountains at 1,577 m (5,174 ft) to flat lowland desert floor at 877 m (2,877 ft.) (McCain and Childs, in review). Most jaguar detections occurred in Madrean oak woodland communities; however, jaguars were also documented in open mesquite grasslands and desert scrub/grasslands on the desert valley floor. McCain and Childs (In review) were not able to use camera trapping techniques in open valley bottoms due the open expanses and lack of landscape features to direct or funnel wildlife movements and consequently could not determine the extent open areas are used by jaguars in Arizona. They report, however, the jaguars must at least cross the open valleys between mountain ranges, approximately 37 miles apart. Though more information on movement and distribution patterns needs to be gathered on jaguars in the borderlands region of Arizona, New Mexico, Sonora, and Chihuahua, it is believed that the males recently documented in Arizona and New Mexico likely interact with or are part of a jaguar population in northwestern Mexico.

Though maintenance of jaguar populations in Arizona may not be critical to the continued survival of jaguars throughout their range (71 FR 39335), loss of all potential jaguar habitat in Arizona (through severing jaguar movement corridors between Sonora and Arizona) could adversely affect northern jaguar population, one of eight high priority regions for the conservation of jaguars in Mexico (Chavez and Ceballos 2006). Hatten et al. (2002) identified 21 to 30 percent of Arizona (62,000-88,580 km$^2$ / 23,940-34,200 mi$^2$) as potentially suitable jaguar habitat. Based on a Genetic Algorithm for Rule-Set Production (GARP) model, Chavez and Ceballos (2006) reported that jaguars are likely currently distributed throughout about half of Sonora (or about 92,000 km$^2$ 35,520 mi$^2$). The Wildlands Project identified about 1/3 of Sonora (55,480 km$^2$ / 21,420 mi$^2$) as either an area where a jaguar base population or jaguar corridors occur. Sanderson et al. (2002) reported the size of the Jaguar Conservation Unit in the Sierra Madre Occidental of Sonora and Chihuahua (the most northern unit identified as being important for conservation of the species) as 5,200 mi$^2$ (13,859 km$^2$). These four maps were created using different criteria and thus cannot be directly compared; however, it is clear that the amount of potential jaguar habitat in Arizona represents about as much or more of the area where jaguars are currently distributed in Sonora. This area in Arizona could become increasingly important to the survival of the jaguar as threats (i.e., poaching, land conversion, etc.) continue in Sonora and throughout the range of the jaguar.

Furthermore, conservation of species at the periphery of their historical geographical range may be more important than previously believed (Lomolino and Channell 1995, Channell and Lomolino 2000). Miller et al. (1996; as cited in Johnson et al. 2007) established the value of peripheral populations in recovery of the black-footed ferret, as did Schaller (1993 as cited in Johnson et al. 2007) for the giant panda. Ehrlich and Ehrlich (1992 as cited in Johnson et al. 2007), Garcia-Ramos and Kirkpatrick (1997 as cited in Johnson et al. 2007) affirmed the conservation value of populations at the fringe of the range in a more general sense. Taking these reports into consideration, conservation of jaguars in their northern-most portion of their range (i.e., the northern population), though perhaps not critical, may be important to the long-term survival of jaguars, particularly the northern jaguar.

Abundance and population trends for the jaguar are still not well known, however, populations throughout their range continue to be at risk from hunting, over harvesting of potential jaguar prey, and habitat loss, fragmentation, and modification. Chávez and Ceballos (2006) estimated that: 60 percent of the jaguar's historical range in Mexico had been lost; the nationwide population was less than 5,000 individuals; and a variety of threats suggested that, absent effective conservation efforts, jaguar imperilment in Mexico would only worsen.

Life history of the jaguar is described above in the Status of the Species. Some life history elements, such as diet, vary throughout the jaguar range; however, generally, they are similar.

In 1997 AGFD and NMDGF entered into the Jaguar Conservation Agreement with other state, local, and Federal cooperators, with voluntary participation by many private individuals and thereby formed the Jaguar Conservation Team (JAGCT), to contribute to conserving the jaguar of Arizona and New Mexico and to encourage parallel efforts in Mexico. The Jaguar Conservation Agreement provides opportunities and incentives for interested parties to become involved with conservation activities. These activities include collection of biological information (to provide a sound scientific basis for decisions); consideration of relevant cultural, economic, and political factors; design and implementation of a comprehensive approach to conservation (including public education); and monitoring, evaluation, and feedback. In addition to an over-arching Memorandum of Agreement among the signatories, the Conservation Agreement embraces two main components. The first is a Conservation Assessment, which describes the status of the jaguar in the United States and identifies threats to the jaguar in Arizona and New Mexico. The assessment focuses the second component, the Conservation Strategy, on reducing or eliminating threats in Arizona and New Mexico that might prevent expansion of the current range and distribution of the jaguar, and thus contribute to recovery of the species (Van Pelt 2006).

The Jaguar Conservation Team has made several conservation-related accomplishments, including: (a) collaboration with Mexico on jaguar conservation; (b) a jaguar-based educational curriculum (in Spanish and English) that meets State and National standards and is in use in area schools; (c) enhanced public awareness of jaguar presence and conservation needs; (d) increased penalties under state law for unlawful killing of jaguars (in AZ these increased penalties apply only if the jaguar is delisted federally); (e) a jaguar detection project (using still and video "camera traps"); (f) a system for evaluating and archiving sighting reports; (g) GIS-based

evaluations of areas and habitats of historical and recent jaguar occurrence in Arizona and New Mexico for delineation of primary emphasis areas in both states for this conservation effort; (h) delineation of research recommendations intended to guide studies and provide JAGCT with information requisite to science-based conservation efforts; (i) a rural outreach program (see: Rinkevitch and Bashum 2002, Warshall and Bless 2003 as cited by Johnson et al. 2007); and (j) regular public forums in Arizona and New Mexico for discussion of jaguar-related issues (Johnson et al. 2007)

Mexico considers the jaguar a national priority species for conservation (DOF 1999, INE 2000 as cited in Johnson et al. 2007). In 2005, Mexico, under direction of CONANP (Comisión Nacional de Áreas Naturales Protegidas, the National Commission for Protected Natural Areas) and auspices of SEMARNAT, sponsored its first national symposium on jaguar conservation, El Jaguar Mexicano en el Siglo XXI: Situación Actual y Manejo (Chávez and Ceballos 2006). CONANP recognizes the value of conservation strategies, known in Mexico as PREPs (Proyectos de Recuperación de Especies Prioritarias), for diverse species and the need to identify threats to species and prioritize consensus actions, set specific dates, and establish clear goals, indicators of success, responsible parties, resources, and follow-up to implement actions for conservation. CONANP's *National Technical Consultants Subcommittee for Conservation and Management of the Jaguar* completed a PREP for jaguars in Mexico in 2006 (Ceballos et al. 2006 as cited by the Johnson et al. 2007). Direct actions would include protection, management, and restoration of the species and its habitat. Indirect actions would include information dissemination, integrating jaguar conservation into the existing fabric of local cultures, and administration, all in an Action Plan for jaguar conservation over a five-year period.

State-specific jaguar conservation strategies have been produced for Jalisco, Michoacán, and Oaxaca, but not for Sonora or Chihuahua. In 2006, a workshop was conducted by the National Institute of Ecology with the goal of developing a plan that will lead to recovery of the jaguar in Mexico. Key objectives were to evaluate the current status of the jaguar in Mexico; determine threats to jaguar existence; and determine priority conservation actions at the local, regional, and national scale. Subcommittees were established to work at the local level, including one for the northern jaguar population in Chihuahua and Sonora (Johnson et al. 2007).

Also in 2006, Mexico hosted a jaguar population and habitat viability analysis (PHVA) workshop, in Cuernavaca, Mexico. The workshop was the second element of the Simposio El Jaguar Mexicano en el Siglo XXI, and more workshops are anticipated. The overall process is intended to generate extinction risk assessments based on information on life history, population dynamics, ecology, and history of the populations. The PHVA 2006 workshop underscored the need to develop regional jaguar management (conservation) plans, including one for the Sonora-Sinaloa region (Johnson et al. 2007).

The Wildlife Conservation Society held a workshop in 1999 during which 51 Jaguar Conservation Units (throughout the entire range of the jaguar) were identified as being important for conservation of the species (Sanderson et al. 2002). The most northern of these units occurs in the Sierra Madre Occidental of Sonora and Chihuahua. Chávez and Ceballos (2006) report that at least eight high-priority regions for the conservation of jaguar exist in Mexico; the most northern of these regions is northwest Sonora. All regions, with the exception of two (one in

Nayarit and the other Jalisco) are generally large enough to maintain populations of 100 or more animals.

In addition to the above jaguar conservation planning efforts in Mexico, some reserves have been established to conserve habitat for jaguars and other species. For example, in 2004 Naturalia and the Northern Jaguar Project (NJP) purchased a 10,000-acre ranch, Rancho Los Pavos, in northern Sonora for the conservation of jaguars and other species. Additionally, Naturalia and NJP are in the process of purchasing a 35,000-acre ranch, Rancho Zetasora, located adjacent to the existing jaguar reserve, for the purpose of jaguar conservation (Northern Jaguar Project 2007).

A number of threats contributed to or continue to affect the status of northern jaguar populations, including illegal shooting; over hunting of jaguar prey species; and habitat loss, fragmentation, and modification. Most loss of occupied range has occurred in the southern United States, northern Mexico, northern Brazil, and southern Argentina (Sanderson et al. 2002).

Medellin et al. (2002) report that loss, fragmentation, and modification of jaguar habitat have contributed to population declines throughout much of the species' range, including northern Mexico. These changes in jaguar habitat have affected not only habitat for breeding and foraging, but also movement corridors. Rosas Rosas (2006) reported that jaguar habitats were degraded and conflicts between jaguars and human interests were common in Sonora. Furthermore, he reported illegal hunting of jaguars and their potential prey species and habitat fragmentation are probably the main threats to long-term conservation of jaguars in their northernmost western range.

Some threats (i.e., legal or illegal killing of jaguars) that contributed to the historical decline of the jaguar in the U.S. have been reduced or eliminated, however, other threats exist. For example, development of infrastructure projects (i.e., vehicle barriers, pedestrian fences, etc.) along the U.S. border may impede movement of jaguars across the border. Because jaguars in Arizona are believed to be part of a population in northern Mexico, preventing jaguar movement and exchange between the U.S. and Mexico would likely have deleterious effects on jaguars, particularly those in Arizona and New Mexico. Fences designed to prevent the passage of humans would also prevent passage of jaguars. However, the effect of permeable barriers, such as vehicle barriers, on jaguar movements is not known, though information suggests that they may also affect jaguars. The jaguar known as "Macho B" has not has not been documented near the border since temporary vehicles barriers were installed (E. McCain, Borderlands Detection Project, pers. comm., August 2007). It is not known if this avoidance is due to increased human presence, the vehicle barriers, or some other reason. Increased illegal and law enforcement actions along the Mexico-United States border may limit jaguar movement across the border and affect jaguar behavior, but the extent is not known.

No consultation has been completed for any Department of Homeland Security/Customs and Border Protection/Office of the Border Patrol actions that affect jaguars. Within the action area, DHS/CBP has constructed pedestrian fences on the U.S.-Mexico border in Nogales (about 4 miles), Naco (about 10 miles), and Douglas (about 10 miles). The December 2004, "Final Environmental Assessment for Temporary Vehicle Barriers, Tueson Sector" proposed the

Mr. George Hutchinson                                                                22

installation of 37 miles of temporary vehicle barriers along the international border within the Tucson Sector (about from the Pozo Verde Mountains east, in a non-contiguous fashion, to just east of the Pima-Santa Cruz County line). However, the amount of temporary vehicles barriers that have been installed is unknown. Additionally, DHS/CBP has constructed an unknown amount of permanent vehicle barriers within the action area.

Two non-jeopardy opinions have been issued for actions that may affect jaguars. A biological opinion, issued September 26, 1997, addressed effects of the Bureau of Land Management Safford and Tucson Field Offices' Livestock Grazing Program in southeastern Arizona on the jaguar. Adverse effects to jaguars were expected to occur from the project by means of habitat loss and predator control activities. The anticipated level of take was considered to be exceeded if: 1) any predator control activities associated with the project are directed at, or ultimately result in death or injury of a jaguar; 2) the injury or mortality of any jaguar that occurs as a result of any activities associated with the project; and 3) jaguar habitat is not maintained in riparian corridors of the project area. Several conservation recommendations were also provided. Another biological opinion, issued June 22, 1999, addressed effects of the Nationwide Wildlife Services Program on the jaguar. Adverse effects to jaguars could occur from certain animal damage control methods, including the use of leg-hold and box traps, snares, M-44s, etc. The anticipated level of take was considered to be exceeded if animal damage control activities are directed at jaguars, or if one jaguar is unintentionally trapped, injured, or killed. We are not aware of any incidental take attributable to activities associated with either of the aforementioned programs.

### Lesser long-nosed bat

All of the Tucson Sector's stations have vegetation communities that are considered lesser long-nosed bat foraging habitat, and many known day roost sites are located within the action area. Confirmed observations of lesser long-nosed bats have occurred in the Tucson, Nogales, Naco, and Douglas stations' AOs. In the Tucson Station's AO, lesser long-nosed bats have been documented roosting in the Baboquivari and Pozo Verde mountains along the western boundary of the station's AO. Several known roost sites, (including the Cave of the Bells), are located within the Nogales Station's AO in or near the Santa Rita, Pajarito, and Patagonia mountains. The State of Texas Mine is one known lesser long-nosed bat roost site located within the Naco Station's AO; this mine is not considered a maternity roost site. Roost sites in the Naco Station AO are also documented in the Dragoon Mountains, and along the San Pedro River. Lesser long-nosed bats have been documented roosting in the Chiricahua Mountains and south of the Peloncillo Mountains in the Douglas Stations AO. No maternity roosts are located within the action area.

Although no record of such activity exists, it is possible that OBP agents could track UDAs into a roost site during foot pursuits. Such activities could cause disturbances to lesser long-nosed bats and disrupt normal behavior activities. The magnitude of these effects would depend upon the proximity of these activities to roost sites, and the time (day/night and season) of the disturbance. Agents entering known roost sites during the day from April through October would be expected to disturb, and most likely affect, this species. OBP agents would only enter these areas when UDAs have been observed or tracked to the mine or cave and, in which case,

Mr. George Hutchinson                                                                23

human disturbance has most likely already occurred. However, additional disturbance could cause additional effects.

**EFFECTS OF THE PROPOSED ACTION**

"Effects of the action" refer to the direct and indirect effects of an action on the species or critical habitat, together with the effects of other activities that are interrelated or interdependent with that action (50 CFR §402.02). Indirect effects occur later in time but are reasonably certain to occur. "Interrelated actions" are those that are part of a larger action and depend on the larger action for their justification. Interdependent actions are those that have no independent utility apart from the action under consideration (50 CFR §402.02).

### Direct Effects

The proposed action described in this BA would result in direct impacts to 225 acres of vegetation and wildlife habitat within the three-county area. In addition to habitat-related effects described above, all CBP actions have the potential for disturbance to individuals of many of the animal and plant species that can include behavioral changes, interference with habitat use, and actual mortality of individuals. Construction, maintenance, or operations in or next to occupied (seasonally or permanently) habitats can displace individual animals from suitable habitat due to disturbances from human presence, noise, and changes in the amount of artificial light present during the normally dark hours.

Construction of new tactical infrastructure has effects related to ground or surface disturbance for the infrastructure and the construction operations. The direct footprint for the infrastructure results in ground disturbances, vegetation removal, soil compaction, interruption of washes or conveyance of sheetflow across open landscapes that can contribute to erosion in the footprint and surrounding areas, and it may create a barrier to wildlife movement. Construction of infrastructure in areas without existing access roads also opens up that area to additional access, including that from subsequent maintenance and law enforcement operations, access by the public, and illegal use. Areas with denser vegetation, particularly riparian areas, would require removal of vegetation for the placement and operation of facilities, including provisions for line-of-sight observations from sensor or surveillance posts.

Mr. George Hutchinson                                                                                  24

### Indirect Effects

On the larger scale, border security programs have both localized and regional consequences. Increased border security infrastructure and patrol operations in one location result in the movement of undocumented aliens (UDAs) to other areas where the chance to cross into the United States is greater. Environmental damage to natural resources from UDA traffic is considerable and affects large areas of many sensitive species habitats, and likely individuals of those species. Individual project planning on one location has not generally considered the effects of moving the UDA traffic to another portion of the border. The piecemeal approach to border security facility construction and intensity of patrol activity has affected isolated and sensitive areas not formerly utilized to any extent by UDAs. On a more local level, placement and design of fences and surveillance activities may also direct UDA traffic away from the current project. Protections for species undertaken at the new infrastructure location protect and benefit those species while contributing to adverse effects elsewhere. It is difficult to precisely predict future movement patterns of UDAs when passage through one corridor becomes difficult; however, a reasonable estimate of those future routes can be hypothesized for the purposes of effects analysis.

### Jaguar

#### Direct Effects

The proposed action would permanently remove 225 acres of desert scrub and desert grassland communities. In addition, some riparian vegetation would be removed at the major washes. Washes and riparian vegetation provides value as movement corridors for the jaguar. Human activity and elevated noise levels would disturb any jaguar in the immediate area during the construction period, and possibly hinder or impede jaguar movement into the U.S.

#### Indirect Effects

Pedestrian fences that are designed to prevent illegal pedestrians from entering the U.S., will inherently restrict jaguar movement across the border. Maintaining connectivity between Arizona and Sonora is critical to the continued persistence of jaguars in Arizona. Should all jaguar movement corridors be compromised, it is possible that the jaguar will become extirpated from Arizona, as it is believed the existence of jaguars in Arizona relies on interchange with jaguars in Sonora.

The fence will block jaguar movements across the border in the areas it is constructed, as jaguars are unlikely to jump over the 15 to 18-foot fence; and because the fence will be impermeable to humans, jaguars will also be prevented from going through the fence. There are not likely to be any gaps in the fence. However, at either end of the proposed fence corridors (Sasabe east and west, west of Nogales fence, at the San Pedro River), jaguars could continue to move around the ends of the fence, although the extent to which they will do so is unknown.

This additional travel time would require jaguars to expend additional energy and increase the potential for encounters with humans, vehicles, and other stresses. The ends of the Sasabe fence

are in an open landscape that jaguars could move through. The western end of the Nogales fence is on the Coronado National Forest, and a jaguar could move through that area. The western end of the fence in the Naco AO ends at the San Pedro River, which a jaguar could use. However, because of the human use and exurbanization there, the likelihood that a jaguar would move through the San Pedro is low. The other fence segments in the Naco and Douglas AOs tie into existing pedestrian fence.

Installation of the fence may cause an increase in illegal traffic and subsequent law enforcement activities to the east and west of the Sasabe fence; both of which are important jaguar habitats where the species has been documented recently. Increased illegal and law enforcement activities in these areas may impede jaguar movement across the border and result in general disturbance to jaguars and degradation of their habitat. The increased law enforcement presence is likely to reduce illegal traffic at some later time.

Vehicle traffic, foot traffic, litter, and presence of illegal entrants can affect habitat by altering composition, structure, and function of wildlife habitats. Vehicle and foot traffic can lead to the destruction of vegetation and degradation of riparian, wetland, and other sensitive habitats. This habitat alteration can lead to alteration of erosion patterns and changes in habitat conditions such as light, temperature, and humidity. Litter and the presence of UDAs can alter the behavior (i.e., foraging, predatory, and plant dispersal behaviors) of sensitive wildlife, such as jaguars. Accidental wildfires caused by UDAs have had devastating effects in native habitats not adapted to a regular fire regime and can encourage the invasion of invasive species that reduce habitat quality.

In the long-term, however, the jaguar could incur some indirect beneficial effects from the proposed action by the reduction of illegal traffic and OBP enforcement actions. By reducing or eliminating these activities, the jaguar could use the Parilla, Huachuca, Mule, and Peloncillo mountain ranges and the Santa Cruz, San Rafael, and San Pedro River riparian areas as travel corridors.

The proposed conservation measures are designed to minimize and mitigate the effects of the action. The survey and monitoring component may provide basic information on jaguar locations and movements, and it may also answer management questions: 1) does UDA traffic impact jaguar habitat utilization and movement and 2) what types of effects do different kinds of border barriers, roads, and other infrastructure have on jaguar habitat use and movement? The conservation and recovery actions will improve the conservation status of the jaguar.

**Conclusion**

Pedestrian fences designed to prevent UDAs from entering the U.S. will inherently restrict jaguar movement across the border. Maintaining connectivity between Arizona and Sonora is critical to the continued persistence of jaguars into Arizona. Should all jaguar movement corridors be compromised, it is possible that the jaguar will become extirpated from Arizona, as it believed the Arizona population relies on interchange with jaguars in Sonora for its continued survival.

As discussed above, the proposed fences would preclude jaguar movement into the U.S., especially the Sasabe fence. Jaguars could circumvent the ends of the fence; however, this additional travel time would require jaguars to expend additional energy and increase the potential for encounters with humans, vehicles, and other stresses.

Installation of the fence may cause an increase in illegal traffic and additional law enforcement activities to the east and west of the Sasabe fence; both of which are important jaguar habitats where the species has been recently documented. Increased UDA and law enforcement activities in these areas may impede jaguar movement across the border and result in general disturbance to jaguars and degradation of their habitat. The increased law enforcement presence is likely to reduce illegal traffic at some later time.

Though maintenance of jaguar populations in Mexico is likely essential for the continued survival of jaguars in the U.S., the opposite case is not likely valid. We reported in our critical habitat finding (71 FR 39335) that the areas where jaguars are occasionally seen in the U.S. are at the extreme northern limits of the range of the species, and the best available scientific information suggests that no area within the United States is currently critical for the survival of the species (Rabinowitz 1997, 1999). The area in the United States that is sporadically used by jaguars is only a small part of the range of the northernmost population(s), which is based in Mexico, and appears to be less than one percent of the current range of the species (Wildlife Conservation Society 2006). Because the area used by jaguars in the United States is such a small part of the overall range of the species and because of nomadic use by jaguars, the range of the jaguar in the United States is not enough area to provide for the conservation (i.e., recovery) of the jaguar or even make a significant contribution to the conservation of the jaguar, and it cannot be defined as essential to the conservation of the species. However, maintenance of existing jaguar habitat and movement corridors in the southwest U.S. and northwestern Mexico would facilitate the conservation of the northern jaguar population, as well as jaguars throughout their range. Any conservation actions for the jaguar that may bring the species to the point that the measures of the Act are no longer necessary will need to be implemented in Mexico and Central and South America. Thus, recovery of the species as a whole depends on conservation efforts in Mexico and Central and South America (71 FR 39225).

Although the construction of the pedestrian fence will adversely affect the jaguar, based on information provided in the status of the species, baseline, and effects, would not appreciably reduce the likelihood of both the survival and recovery of the jaguar because there is no known breeding in the United States. Also, only four jaguars have been documented in the U.S. since 1996; and the U.S. is a small portion of the overall range of the species.

The conservation measures proposed by CBP will help in minimizing impacts to jaguars and their habitat, and assist in improving the species' status. The survey and monitoring conservation measure not only provides basic information on jaguar locations and movements, it also answers management questions: 1) does UDA traffic impact jaguar habitat utilization and movement and 2) what types of effects do different kinds of border barriers, roads, and other infrastructure have on jaguar habitat use and movement? The conservation and recovery actions will improve the conservation status of the jaguar on the northern population. These conservation measures would partially implement the recommendations of the Jaguar Conservation

Assessment (Johnson et al. 2007).

### Lesser long-nosed bat

### Direct Effects

According to USACE, the proposed project would result in the disturbance of about 215 acres of potential lesser long-nosed bat foraging habitat, nearly all of which is immediately adjacent to the international border. The 215 acres of disturbed ground will be susceptible to colonization by invasive exotic plants such as buffelgrass. Exotic species may prevent the recruitment of lesser long-nosed bat forage species (columnar cacti and agaves) and may also carry fire that could also impact lesser long-nosed bat forage species. Most Sonoran Desert trees, shrubs, and cacti are very fire intolerant. Disturbance to vegetation will be minimized to the extent practicable. The disturbance will occur within areas that have mostly been previously disturbed.

The proposed action would permanently alter vegetation communities in the late-summer range of the lesser long-nosed bat. Agaves, the primary forage species during late summer, are not common within the project corridor, but do occur in unknown numbers. Saguaros are also not common in the project corridor. Agaves flower during the late summer when the lesser long-nosed bat migrates into areas near the project corridor. The proposed project will result in destruction of lesser long-nosed bat food plants; however, as stated in the proposed action, agaves will be salvaged (removed and replanted outside the project corridor) at a 2:1 ratio.

Destruction of and damage to lesser long-nosed bat forage plants and disturbance of potential bat foraging habitat will reduce food available to the lesser long-nosed bat; especially in drought when forage availability is already impaired. It is difficult to evaluate the significance of the loss of foraging habitat; however, this loss is small compared to the large amount of potentially suitable foraging habitat available to the lesser long-nosed bat throughout the action area.

### Indirect Effects

Impacts to vegetation communities resulting from UDAs circumventing the pedestrian fence would also indirectly affect the lesser long-nosed bat by impacting forage plants. The preferred foraging communities of the lesser long-nosed bats in the action area are more common at the higher elevations where agaves occur, which is also where these impacts are more likely to occur. Trails and other soil disturbances can increase erosion, promote the spread of invasive species, and increase the potential for fires. The proposed action would reduce the current level of impacts resulting from illegal traffic in these vegetation communities immediately north of the pedestrian fence. Impacts to larger roosts sites resulting from shifts in UDA activity would be minimal. There would be beneficial indirect impacts expected to roost sites, if UDA traffic and law enforcement activities are reduced.

Known maternity roosts are west of the range of potential impacts and would not be affected. The nearest known roosts of lesser long-nosed bats are near Patagonia, and on the Coronado National Memorial, about 24 miles northwest and 8 miles west of construction activities, respectively. There is evidence that UDAs have used the State of Texas Mine roost on the

Coronado National Memorial (USFWS files). UDAs also used the Bluebird Mine roost on Cabeza Prieta National Wildlife Refuge before it was fenced.

**Conclusion**

According to USACE, the proposed project would result in the disturbance of about 215 acres of potential lesser long-nosed bat foraging habitat, nearly all of which is immediately adjacent to the international border. The proposed action will permanently alter vegetation communities in the late-summer range of the lesser long-nosed bat. Though potentially all forage plants in the 60-foot construction corridor will be lost, they represent a small fraction of the forage plant within the action, and an even smaller fraction within the species' range.

The indirect effects to vegetation communities and lesser long-nosed bat forage plants resulting from UDAs circumventing the primary fence may also affect forage plants, though at an unknown, but probably minimal, level. Though the direct effects of construction will result in the destruction of lesser long-nosed bat food plants; CBP proposes to salvage (remove, replant, and replace outside the project corridor) at a 2:1 ratio.

**CUMULATIVE EFFECTS**

Cumulative effects include the effects of future State, local, or private actions that are reasonably certain to occur in the action area considered in this biological opinion. Future Federal actions that are unrelated to the proposed action are not considered in this section because they require separate consultation under section 7 of the Act.

The lands within the action area are primarily Federal and non-Federal ranchland. There are areas that are developed and used by people at varying intensities. The towns and cities of Sasabe, Nogales, Naco, and Douglas are in or very near the project corridor. In addition, other areas have exurban development, roads, and other infrastructure. The greatest area of exurban development is in the upper San Pedro valley.

Effects from future growth and expansion in Cochise County could also have adverse impacts on the jaguar movement corridors. Sierra Vista's population increased by 14.5 percent during the 1990s; and between 2000 and 2005, Sierra Vista's overall population growth of 15.7 percent outpaced that of Cochise County (City of Sierra Vista 2007). Sierra Vista's population in 2006 was estimated to be 44,870; an estimated growth of 2.7 percent from the year prior. The Cochise College Center for Economic Resources estimates that the population of Sierra Vista could reach 51,331 by 2011; a projected 5-year population growth of 14.4 percent. The current and projected growth of Sierra Vista and the expansion of housing and humans in rural and undeveloped areas could remove potential jaguar habitat; thus having additional effects on the jaguar. Also, continued growth in or near the project corridors will decrease their value as foraging habitat for the lesser long-nosed bat, and as movement corridors and habitat for the jaguar.

The activity of UDAs also causes cumulative effects. UDAs directly impact vegetation communities and the species that use them by creating tons of trash and hundreds of miles of illegal trails and roads. Trails and other soil disturbances can increase erosion, promote the

Mr. George Hutchinson                                                                    29

spread of invasive species, and increase the potential for fires. Fires can exacerbate the impacts from UDAs, with more erosion, invasion of exotic species, and a cascade of effects to watershed functioning.

## SUMMARY

The environmental baseline shows that most of the construction footprint is modified, mostly by previous legal and illegal border activities. Both the lesser long-nosed bat and the jaguar could realize beneficial effects with the reduction of illegal traffic and consequent OBP pursuit within the areas north of the fence. The installation and maintenance of 31 miles of fence would hinder jaguar movement and remove lesser long-nosed bat forage species. The proposed action is also likely to result in increased UDA traffic and consequent OBP enforcement actions in higher quality habitat away from the fence. The direct impediments and the potential increased human activity in the normal travel corridors would adversely affect the ability of the jaguar to continue to enter the U.S. from its core population in northern Mexico. However, this impedance should not have a significant effect on the survival and recovery of the species, as the U.S. is a small portion of the overall range of the species. The loss of 215 acres of foraging habitat for the lesser long-nosed bat would adversely affect the bat although the loss would be in insignificant compared to the availability of forage resources outside of the construction area. The conservation measures should minimize and mitigate the effects of the action on the bat and jaguar. The jaguar survey and monitoring component should provide basic information on jaguar locations and movements, and may also answer management questions. The conservation and recovery actions are expected to improve the conservation status of the jaguar. The conservation measure to replace lesser long-nosed bat foraging plants should minimize the impact from the loss of 215 acres of foraging habitat.

## CONCLUSION

After reviewing the current status of the jaguar and the lesser long-nosed bat, the environmental baseline for the action area, the effects of the proposed action, and the cumulative effects, it is our biological opinion that the project, as proposed, is not likely to jeopardize the continued existence of the jaguar or the lesser long-nosed bat. Critical habitat has not been designated for either species; thus no critical habitat will be affected by the proposed action. We base our conclusion on the following:

1) The direct impacts are at the international border, thus they are limited to a relatively small area;

2) The construction period should be short (1-3 months), thereby reducing the potential impacts from human disturbance;

3) The conservation measures will reduce the impacts to lesser long-nosed bat forage resources by salvaging and replacing agaves at a 2:1 ratio;

4) Jaguars will still be able to move through other areas of the border;

Mr. George Hutchinson                                                                        30

5) Jaguars in Arizona represent a small, apparently non-breeding portion of the occupied range of the species;

6) Increased Border Patrol enforcement in the areas on both ends of the Sasabe fence should help reduce the effects of increased UDA traffic in areas used by the jaguar and lesser long-nosed bat;

7) The conservation measures for the jaguar should offset the effects of the pedestrian fences by answering management questions about how jaguars move on the landscape, and which areas they use in response to various barriers. The conservation measures will also improve the conservation status of the jaguar through proactive management actions (this may include purchase of jaguar habitat and/or conservation easements, as well as providing private-landowner incentives to maintain jaguar populations).

## INCIDENTAL TAKE STATEMENT

Section 9 of the Act and Federal regulation pursuant to section 4(d) of the Act, prohibit take of endangered or threatened species, respectively, without special exemption. Take is defined as to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct. "Harm" is further defined to include significant habitat modification or degradation that results in death or injury to listed species by significantly impairing behavioral patterns, including breeding, feeding, or sheltering. "Harass" is defined as actions that create the likelihood of injury to listed species to such an extent as to significantly disrupt normal behavior patterns which include, but are not limited to, breeding, feeding or sheltering. Incidental take is defined as take that is incidental to, and not the purpose of, the carrying out an otherwise lawful activity. Under the terms of section 7(b)(4) and section 7(o)(2), taking that is incidental to and not intended as part of the proposed action is not considered to be prohibited taking under the Act provided such taking is in compliance with this Incidental Take Statement.

### Amount or Extent of Take

We do not anticipate the proposed action will incidentally take any lesser long-nosed bats or jaguars.

Mr. George Hutchinson                                                                31

## CONSERVATION RECOMMENDATIONS

Sections 2(c)(1) and 7(a)(1) of the Act direct Federal agencies to utilize their authorities to further the purposes of the Act by carrying out conservation programs for the benefit of endangered and threatened species. Conservation recommendations are discretionary agency activities to minimize or avoid adverse effects of a proposed action on listed species or critical habitat, to help implement recovery plans, or to develop information.

1) The Office of Border Patrol should assist with implementation of the lesser long-nosed bat recovery plan, where appropriate;

2) The Office of Border Patrol should assist with the implementation of the Jaguar Conservation Framework;

3) The Office of Border Patrol should participate on the Jaguar Conservation Team.

Mr. George Hutchinson                                                              32

### REINITIATION - CLOSING STATEMENT

This concludes formal consultation on the proposed pedestrian barriers near Sasabe, Nogales, Naco, and Douglas, and their effects on jaguar and lesser long-nosed bat. As provided in 50 CFR §402.16, reinitiation of formal consultation is required where discretionary Federal agency involvement or control over the action has been maintained (or is authorized by law) and if: (1) the amount or extent of incidental take is exceeded; (2) new information reveals effects of the agency action that may affect listed species or critical habitat in a manner or to an extent not considered in this opinion; (3) the agency action is later modified in a manner that causes an effect to the listed species or critical habitat that was not considered in this opinion; or (4) a new species is listed or critical habitat designated that may be affected by the action. In instances where the amount or extent of incidental take is exceeded, any operations causing such take must cease pending reinitiation.

If you have questions regarding this Biological Opinion, please call Doug Duncan (520) 670-6150 (x236) or Sherry Barrett (520) 670-6150 (x223) of my staff. Please refer to the consultation number 22410-2007-F-0416 in future correspondence concerning this project.


                        /s/        Steven L. Spangle
                                   Field Supervisor

cc: Habitat Branch, Arizona Game and Fish Department, Phoenix, AZ
    Nongame Branch, Arizona Game and Fish Department, Phoenix, AZ (Attn: Bill Van Pelt)
    Tohono O'odham Nation, Sells, AZ (Attn: Selso Villegas)
    Assistant Field Supervisor, Fish and Wildlife Service, Tucson, AZ
    Border Patrol, Tucson Sector, Tucson, AZ
    Gila District Manager, Bureau of Land Management, Sierra Vista, AZ
    Refuge Manager, Buenos Aires National Wildlife Refuge, Sasabe, AZ
    Planning, Environmental, and Regulatory Division, U.S. Army Corps of Engineers, Ft. Worth TX
    Gulf South Research Corporation, Baton Rouge, LA

W:\Doug Duncan\PF70 07-F-0416 BO.doc:cgg

Mr. George Hutchinson                                                                                          33

## REFERENCES CITED

Abouhalder, F. 1992. Influence of livestock grazing on saguaro seedling establishment. Pp. 57-61 *in* Stone, C. P., and E. S. Bellantoni, eds., Proceedings of the Symposium on Research in Saguaro National Monument, Tucson.

Arita, H. T., and S. R. Humphrey. 1988. Revision taxonimica de los murcielagos magueyeros del genero *Leptonycteris* (Chiroptera: Phyllostomidae). Acta Zool. Mexicana, n.s., 29:1-60.

Arizona Game and Fish Department. 1988. Threatened native wildlife in Arizona. Arizona Game and Fish Department Publication, Phoenix, Arizona.

___. 2003a. *Leptonycteris curasoae yerbabuenae*. Unpublished abstracts compiled and edited by the Heritage Data Management System, Arizona Game and Fish Department, Phoenix, Arizona. 8pp.

___. 2003b. *Amsonia kearneyana*. Unpublished abstract compiled and edited by the Heritage Data Management System, Arizona Game and Fish Department, Phoenix, Arizona. 8pp.

___ and New Mexico Department of Game and Fish. 2006. Draft jaguar conservation assessment and framework for Arizona, New Mexico, and Mexico. Public Review Draft May 31, 2006, Phoenix, Arizona. 22pp.

Associated Press. 2002. Photo gives biologists new evidence of jaguars in Arizona, February 6, 2002. Accessed 6 June 2002, http://azcentral.com/new/0206jag.html.

Bahre, C. J. 1991. A legacy of change: Historic human impact on vegetation of the Arizona borderlands. University of Arizona Press, Tucson. 231pp.

___, and C. F. Hutchinson. 1985. The impact of historic fuelwood cutting on the semidesert woodlands of southeastern Arizona. Journal of Forest History Oct:175-186.

Boydston, E. E., and C. A. López-González. 2005. Sexual differentiation in the distribution potential of northern jaguars (*Panthera onca*). Pp. 51-56 *in* Gottfried, G. J., B. S. Gebow, L. G. Eskew, and C. B. Edminster, comp., Connecting Mountain Islands and Desert Seas: Biodiversity and Management of the Madrean Archipelago II, RMRS-P-36, Rocky Mountain Research Station, Forest Service, Fort Collins, CO.

Brown, D. E. 1983. On the status of the jaguar in the Southwest. Southwestern Nat. 28:459-460.

___. 1989. Cat fever. Game Country (May/June 1989): 63-72.

___. 1991. Revival for el tigre? Defenders 66:27-35.

___, and C. A. Lopez-Gonzalez. 2000. Notes on the occurrences of jaguars in Arizona and New
    Mexico. Southwest. Nat. 45(4):537-546.

___ and C. L Gonzalez. 2001. Borderland jaguars. Tigres de la Frontera, University of Utah
    Press. 170pp.

Channell, R., and M. V. Lomolino. 2000. Trajectories to extinction: Spatial dynamics of the
    contraction of geographic ranges of endangered species. Journal of Biogeography.
    27:169-180.

Chávez, C., and G. Ceballos. 2006. Memorias del Primer Simposio. El Jaguar Mexicano en el
    Siglo XXI: Situación Actual y Manejo. CONABIO-Alianza WWF Telcel-Universidad
    Nacional Autónoma de México. México D.F.

Childs, J. L. 1998. Tracking the felids of the borderlands. Printing Corner Press, El Paso, TX.
    77 pp.

___. E. B. McCain, A. M. Childs, and J. Brun. n.d. Borderlands jaguar detection project. The
    Borderlands Jaguar Detection Project: A Report on the Jaguar in Southeastern Arizona,
    Wild Cat News - www.cougarnet.org

City of Sierra Vista. 2007. City of Sierra Vista facts and figures. http://www.ci.sierra-
    vista.az.us, Accessed August 20, 2007.

Cockrum, E. L., and Y. Petryszyn. 1991. The lesser long-nosed bat. *Leptonycteris*: An
    endangered species in the Southwest? Texas Tech Univ., Occas. Pap. Mus., Number 142.

Commission for Environmental Cooperation. 1999. Ribbon of life. An agenda for preserving
    transboundary migratory bird Habitat on the upper San Pedro. Communications and Public
    Outreach Department of the CEC Secretariat. 31pp.

Dalton, V. M., D. C. Dalton, and S. L. Schmidt. 1994. Roosting and foraging use of a proposed
    military training site by the long-nosed bat, *Leptonycteris curasoae*. Report to the Luke
    Air Force Natural Resources Program, Contract Nos. DACA65-94-M-0831 and DACA65-
    94-M-0753. 34pp.

Ehrlich, P. R., and A. H. Ehrlich. 1992. The value of biodiversity. Ambio 21:219-226.

Emmons, L. H. 1999. Jaguar, *Panthera onca*. Pp. 236-237 *in* Wilson D. E., and S. Ruff, eds.,
    The Smithsonian Book of North American Mammals, Smithsonian Institution Press,
    Washington D.C. xxvi +750pp.

Fleming, T. H., R. A. Nunez, and L. S. L. Sternberg. 1993. Seasonal changes in the diets of migrant and non-migrant nectivorous bats as revealed by carbon stable isotope analysis. Oecologia 94:72-74.

Garcia-Ramos, G., and M. Kirkpatrick. 1997. Genetic models of adaptation and gene flow in peripheral populations. Evolution 51(1):21-28.

Gentry, H. S. 1982. Agaves of continental North America. University of Arizona Press, Tucson, Arizona.

Glenn, W. 1996. Eyes of fire: Encounter with a borderlands jaguar. Printing Corner Press, El Paso, TX.

Goldman, E. A. 1932. The jaguars of North America. Proc. Biol. Soc. Washington 45:143-146.

Hastings, J. R., and R. M. Turner. 1965. The changing mile. Univ. of Arizona Press, Tucson.

___, and ___. 1980. The changing mile. University of Arizona Press, Tucson. 327pp.

Hatten, J. R., A. Averill-Murray, and W. E. Van Pelt. 2002. Characterizing and mapping potential jaguar habitat in Arizona. Technical Report 203, Nongame and Endangered Wildlife Program, Arizona Game and Fish Department, Phoenix. 32pp.

___, ___, and ___. 2005. A spatial model of potential jaguar habitat in Arizona. Journal of Wildlife Management 69(3):1024-1033.

Hayward, B., and E. L. Cockrum. 1971. The natural history of the western long-nosed bat, *Leptonycteris sanborni*. West. New Mexico Univ., Res. Sci. 1:75-123.

Hoffmeister, D. F. 1986. Mammals of Arizona. University of Arizona Press, Tucson.

Horner, M. A., T. H. Fleming, and M. D. Tuttle. 1990. Foraging and movement patterns of a nectar feeding bat: *Leptonycteris curasoae*. Bat Research News 31:81.

IUCN (International Union for Conservation of Nature and Natural Resources). 2007. Jaguar. http://lynx.uio.no/lynx/catsgportal/cat-website/20_cat-website/home/index_en.htm/, Accessed April, 2007.

Johnson, T. B., and W. E. Van Pelt. 1997. Conservation Assessment and Strategy for the Jaguar in Arizona and New Mexico. Technical Report 105, Nongame and Endangered Wildlife Program, Arizona Game and Fish Department, Phoenix. 24pp.

___, ___, and J. N. Stuart. 2007. July draft jaguar conservation assessment for Arizona, New Mexico, and Northern Mexico. Nongame and Endangered Wildlife Program, Arizona Game and Fish Department, Phoenix. 41pp.

Lange, K. I. 1960. The jaguar in Arizona. Transactions of the Kansas Academy of Sciences 63:96-101.

Leopold, A. S. 1959. Wildlife of Mexico. University of California Press, Berkeley. 568pp.

Lomolino, M. V., and R. Channell. 1995. Splendid isolation: Patterns of geographic range collapse in endangered mammals. Journal of Mammalogy 76(2):335-347.

Medellin, R. A., C. Equihua, C. L. B. Chetkiewicz, P. G. Crawshaw, Jr., A. Rabinowitz, K. H. Redord, J. G. Robinson, E. W. Sanderson, and A. B. Taber, comps. 2002. El jaguar en el nuevo millenio. Fondo de Cultura Económica, Universidad Nacional Autónoma de México, Wildlife Conservation Society, México. 647pp.

Menke, K. A., and C. L. Hayes. 2003. Evaluation of the relative suitability of potential jaguar habitat in New Mexico. Report to New Mexico Department of Game and Fish, Santa Fe, New Mexico. 31pp.

Miller, B., R. P. Reading, and S. Forrest. 1996. Prairie night: black-footed ferrets and the recovery of endangered species. Smithsonian Institution Press, Washington, D.C.

Minnich, R. A. 1994. Postfire succession in desertscrub communities of southern California. Pp. 93-112 in Fletcher-Jones, A., ed., Proc. of the Desert Tortoise Council Symposium.

Naiman, R. J., H. DeCamps, and M. Pollock. 1993. The role of riparian corridors in maintaining regional biodiversity. Ecological Applications 3:209-212.

NatureServe. 2004. NatureServe Explorer: An online encyclopedia of life {web application}. Version 3.0, NatureServe, Arlington, Virginia. http://www.natureserve.org/explorer, Accessed August 23, 2007.

Northern Jaguar Project. 2007. http://www.northernjaguarproject.org/contents/reserve/, Accessed August 24,

Nowak, R. M. 1975. Retreat of the jaguar. National Parks Conservation Magazine 49:10-13.

___. 1994. Jaguars in the United States. Endangered Species Technical Bulletin 19:5.

Mr. George Hutchinson                                                                          37

___. 1999. Walker's mammals of the World, 6th edition. The Johns Hopkins University Press, Baltimore, Maryland.

Quigley, H. B., and P. G. Crawshaw, Jr. 1992. A conservation plan for the jaguar *Panthera onca* in the Pantanal region of Brazil. Biological Conservation 61(3):149-157.

Rabinowitz, A. 1997. The status of jaguars (*Panthera onca*) in the United States: Trip report. Wildlife Conservation Soc., Internatl. Progs., Bronx, NY.

___. 1999. Present status of jaguars (*Panthera onca*) in the southwestern United States. Southwest. Nat. 44(1):96-100.

___, and B. G. Nottingham. 1986. Ecology and behaviour of the jaguar (*Panthera onca*) in Belize, Central America. J. Zool., London. 210:149-159.

Robinson, M. J., C. Bradley, and J. Boyd. 2006. Habitat for jaguars in New Mexico. Report to Arizona Game and Fish Department from Center for Biological Diversity, Silver City, New Mexico.

Rojo, H. A., J. Bredehoeft, R. Lacewell, J. Price, J. Stromberg, and G. A. Thomas. 1998. Sustaining and enhancing riparian migratory bird habitat on the upper San Pedro River. Public Review Draft. 144pp.

Rosas Rosas, O. C. 2006. Ecological status and conservation of jaguars (*Panthera onca*) in northeastern Sonora, Mexico. Ph.D. Dissertation, New Mexico State University, Las Cruces, New Mexico.

Sanderson, E. W., K. H. Redford, C. B. Chetkiewicz, R. A. Medellin, A. R. Rabinowitz, J. G. Robinson, and A. B. Taber. 2002. Planning to save a species: the jaguar as a model. Conservation Biology 16(1):58-71.

Schaller, G. B. 1993. The last panda. University of Chicago Press, Chicago.

Seymour, K. L. 1989. *Panthera onca*. Mammalian Species 340:1-9.

Sidner, R., and F. Houser. 1990. Lunar philia in nectar-feeding bats in Arizona. Bat Research News 31(4):15.

Sierra Institute Field Studies Program in Arizona. 2000. Jaguar habitat in southern Arizona and New Mexico. Unpublished report, University of California Extension, Santa Cruz.

Mr. George Hutchinson                                                                                           38

Slauson, L. 1999. Pollination biology of two chiropterophilous agaves in Arizona, Draft. Desert Botanical Garden, Phoenix.

___. 2000. Agave ecology: the agave-bat connection. The Sonoran Quarterly 54(1):4-7.

Sunquist, F. C., and M. E. Sunquist. 2007. Jaguar (animal). Microsoft Encarta Online Encyclopedia 2007. Accessed May 24, 2007, http://encarta.msn.com/encyclopedia_761554717/Jaguar_(animal).html

Swank, W. G., and J. G. Teer. 1989. Status of the jaguar. Oryx 23:14-21.

Tellman, B., R. Yarde, and M. G. Wallace. 1997. Arizona's changing rivers: how people have affected the rivers. University of Arizona, Tucson. 198pp.

Tewes, M. E., and D. J. Schmidly. 1987. The neotropical felids: jaguar, ocelot, margay, and jaguarundi. Pp. 696-712 in Novak, M., J. A. Baker, M. E. Obbard, and B. Malloch, eds., Wild Furbearer Management and Conservation in North America, Ontario Ministry of Natural Resources, Toronto, Ontario, Canada.

U.S. Customs and Border Protection (CBP). 2003a. Final Environmental Assessment for various infrastructure within the Nogales Station area of operation, Santa Cruz County, Arizona. October 2003.

___. 2003b. Final Supplemental Environmental Assessment for various infrastructure within the Naco-Douglas corridor, U.S. Border Patrol, Cochise County, Arizona. November 2003.

___. 2004. Final Environmental Assessment for temporary vehicle barriers, Tucson, Nogales, and Sonoita Stations, Santa Cruz and Pima Counties, Arizona. December 2004.

___. 2007a. Final Environmental Assessment for the construction of 7 miles of primary fence near Sasabe, Santa Cruz, Arizona. U.S. Customs and Border Protection, Washington, D.C.

___. 2007ba. Biological Assessment: Proposed border fence construction, Office of Border Patrol, Tucson Sector, Tucson, Nogales, Naco, and Douglas Stations, Santa Cruz, Pima, and Cochise Counties, Arizona. U.S. Customs and Border Protection, Washington, D.C.

USFWS. 1972. List of endangered foreign fish and wildlife. Federal Register 37(62):6476.

___. 1988. Endangered and threatened wildlife and plants; determination of endangered status for two long-nosed bats. Federal Register 53(190):38456-3860.

___. 1989. Endangered and threatened wildlife and plants; determination of Amsonia kearneyana to be an endangered species. Federal Register 54(12):2131-2134.

___. 1995. Listed cats of Texas and Arizona recovery plan (with emphasis on the ocelot). U.S. Fish and Wildlife Service, Region 2, Albuquerque, New Mexico. 131pp.

___. 1993. Kearney's blue star (*Amsonia kearneyana*) Recovery Plan. U.S. Fish and Wildlife Service, Region 2, Albuquerque, New Mexico. 25pp.

___. 1997a. Lesser long-nosed bat recovery plan. Albuquerque, New Mexico. 49pp

___. 1997b. Endangered and threatened wildlife and plants; final rule to extend endangered status for the jaguar in the United States. Federal Register 62(140):39147-39157.

___. 2006. Determination that designation of critical habitat is not prudent for the Jaguar. Federal Register 71(133):39335-39337.

___. 2007a. Biological opinion of the proposed ongoing and future military operations and activities at Fort Huachuca (22410-2007-F-0132). Arizona Ecological Services Field Office, Phoenix, AZ.

___. 2007b. Biological opinion on effects of continued livestock grazing for four allotments in the Chiricahua Ecosystem Management Area (22410-2007-F-0313-R1 and 02-21-98-F-0399). Arizona Ecological Services Field Office, Phoenix, AZ.

Van Pelt, W. E. 2005. Personal communication from William E. Van Pelt of Arizona Game and Fish Department to James E. Henderson of Gulf South Research Corporation on February 28, 2005 transmitted by email; cited in BA.

___. 2006. Potential jaguar habitat in Arizona and New Mexico: April 2006 Summary of work and recommendations of the jaguar habitat subcommittee for the jaguar conservation team. Nongame and Endangered Wildlife Program, Arizona Game and Fish Department, Phoenix. 9pp.

Wildlife Conservation Society. 2007. Save the jaguar. http://savethejaguar.com/, accessed April, 2007.

Wilcox, B. A., and D. D. Murphy. 1985. Conservation strategy: The effects of fragmentation on extinction. American Naturalist 125:879-887.

Wilkinson, G. S., and T. H. Fleming. 1995. Migration routes and evolution of lesser long-nosed bats, *Leptonycteris curasoae*, inferred from mitochondrial DNA. Molecular Ecology.

Wilson, D. E. 1985. Status report: *Leptonycteris curasoae* Hoffmeister, Sanborn's long-nosed bat. US Fish and Wildlife Service, Denver Wildlife Research Center, and Natural Museum of Natural History, Washington D.C.

Mr. George Hutchinson                                        40

York, J. C., and W. A. Dick-Peddie. 1969. Vegetation changes in southern New Mexico during
the past hundred years. Pp.157-166 *in* McGinnies, W. G., and B. J. Goldman, eds., Arid
Lands in Perspective, University of Arizona Press, Tucson.

# APPENDIX A

## KEARNEY BLUE STAR

### Status in Action Area

Kearney's blue star is known only from the Baboquivari Mountains in Pima County, Arizona. It occurs in South, Brown, and Thomas canyons. Kearney's bluestar in South Canyon on the Tohono O'odham Nation are thought by some to be extirpated, but we have no confirmation of this. In 1988, we contracted with Southwestern Field Biologists to conduct a transplant project for Kearney's bluestar in Brown Canyon. In 1988, 76 plants were transplanted, but high mortality necessitated another planting effort in 1989 with an additional 105 plants (AGFD 2003b). A large flood in June 1990 destroyed the plants and the habitat, with a loss of 75 percent of the transplants. The one native population consists of about 10 to 15 individuals (AGFD 2003b). The native population exists on the Tohono O'odham Nation, and the introduced sites exist on the Buenos Aires National Wildlife Refuge. The entire range of the species is in the project action area (USFWS 1989, 1993). The listing document (USFWS 1989) and recovery plan (USFWS 1993) are incorporated by reference.

### Analysis of Effects

The major threats to the species seem to be heavy insect predation and watershed degradation associated with improperly managed livestock grazing or post-fire effects. Trails and the spread of invasive species may also threaten known and unknown Kearney's blue star populations. No direct impacts to Kearney's blue star population would occur from the proposed action since construction is not proposed near where the species occurs. Impacts to Kearney's blue star resulting from UDAs circumventing the primary fence would be indirect, but not likely to be adverse. Additional UDA foot traffic may move into the Baboquivari Mountains, closer to known populations of Kearney's blue star. Some traffic already occurs.

### Conclusions

After reviewing the status of the Kearney's blue star, the environmental baseline for the action area, and the effects of the proposed action, the Service concurs that the proposed action may affect, but is not likely to adversely affect Kearney's blue star, based upon the following:

- The construction and direct effects covered in this consultation are not located in the area of these plants;
- Periodic monitoring occurs at the populations, allowing their status to be monitored;
- Decreases in UDA traffic may occur after the pedestrian barrier is constructed, since the fence should allow law enforcement to increase enforcement west of the barrier, and reduce UDA traffic there; and
- Conservation measures will be implemented to reduce adverse effects.

# EXHIBIT C

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

DEFENDERS OF WILDLIFE and )
SIERRA CLUB; )
                                  )   Case No. 1:04CV00822 (ESH)
                                  )
            Plaintiffs           )
                                  )
v.                                  )
                                  )
U.S. DEPARTMENT OF THE INTERIOR; )
U.S. BUREAU OF LAND MANAGEMENT; )
UNITED STATES ARMY CORPS OF )
ENGINEERS; AND U.S. DEPARTMENT )
OF HOMELAND SECURITY )
                                  )
                                  )
            Defendants.        )

## DECLARATION OF JAYSON P. AHERN

I, Jayson P. Ahern, declare as follows:

1.     I am the Deputy Commissioner of U.S. Customs and Border Protection ("CBP"),

the second-highest ranking position in the agency. I was named the Deputy

Commissioner in August 2007. Prior to that, I served as the Assistant Commissioner for

CBP's Office of Field Operations, a position I held with the former U.S. Customs Service

since June 2002. I am currently in my 31st year of public service, beginning my career

with the former U.S. Customs Service in San Ysidro, California. Throughout my career,

I have held numerous leadership positions, including Director of Field Operations in

Southern California, where I was in charge of all Customs activities at Southern

California ports of entry. I also served as the principal field manager of Customs ports

operations in Los Angeles and Miami, two of the nation's largest and busiest ports.

2.      I make this declaration based upon my personal knowledge and information obtained from agency records.

## BACKGROUND

3.      CBP is the federal agency within the Department of Homeland Security that acts as the guardian of our Nation's border. The priority mission of CBP is to prevent terrorists and terrorist weapons from entering the United States. Among other responsibilities in its mission, CBP also is charged with preventing illegal entry, human smuggling, and narcotics interdiction.

4.      Within CBP, the Office of Border Patrol has primary responsibility for monitoring and responding to illicit border intrusions across thousands of miles of border between U.S. ports of entry. The CBP Border Patrol's expertise in countering these threats is critical to ensuring the security of the United States.

5.      The Secure Border Initiative ("SBI") is a comprehensive multi-year plan established by the Department of Homeland Security (DHS) to secure America's borders and reduce illegal cross border activity. SBInet is the component of SBI charged with developing and installing technology and tactical infrastructure solutions to help U.S Customs and Border Protection (CBP) agents and officers gain effective control of our Nation's borders. The goal of SBInet is to field the most effective proven technology, infrastructure, staffing, and response platforms and integrate them into a single comprehensive border security solution for the Department. SBInet incorporates best practices and lessons learned from previous programs to provide the most operationally

effective solution that will enable the frontline agents and officers to gain effective control of the borders. CBP is the executive agent for SBI*net* — leading, managing and working with contractors to implement this important program.

6.      In Fiscal Year 2007, CBP Border Patrol apprehended 876,704 individuals seeking to illegally enter the United States. Of those apprehensions, 858,638 were in the Southwest Border area. The Tucson Sector, of which the SPRNCA is a part, accounted for 378,239 of these apprehensions.

7.      Illegal cross border traffic has created thousands of new trails and roads on Federal lands in southern Arizona. For example, according to a Defenders of Wildlife Report, 180 miles of illegal roads have been created in the Cabeza Prieta National Wildlife Refuge alone since 2002.

8.      One of the most effective forms of border infrastructure in areas of high activity or areas that can easily be exploited by smuggling organizations is fencing. Past experience has shown that border fencing leads to more effective border security, reduction in cross-border traffic, is a force multiplier for the Border Patrol, and has positive environmental effects. For example, in the CBP Border Patrol's San Diego Sector, after the completion of certain segments of fence, apprehensions decreased from 19,615 (in year 2000) to 4,545 (in 2003.) At the same time, the fence has resulted in the return of protected species that have not been reported in the area for many years.

9.    The project at issue in Plaintiffs' Motion for Temporary Restraining Order (the "Project"), which involves the construction of 1.54 miles of primary fencing and bollard fencing in the San Pedro Riparian National Conservation Area, is being implemented as a part of the SBI*net* Program.

## THE SAN PEDRO RIPARIAN NATIONAL CONSERVATION AREA

10.    Based on the effectiveness of fencing in other locations on the Southern Border of the United States, the San Pedro Riparian National Conservation Area and the areas that surround it (the "San Pedro Region"), was identified as an area of the border that would benefit from tactical infrastructure, to include fencing. The San Pedro Riparian National Conservation Area ("SPRNCA") covers over 58,000 acres.

11.    The SPRNCA has been an area of high illegal entry and activity. In Fiscal Year 2007, there were over 19,000 apprehensions of illegal entrants and over 21,000 illegal entries in the area, which figures represent a significant increase compared to Fiscal Year 2006. Also in Fiscal Year 2007, there were 17 so-called "drive throughs" in this area. (A drive through is any conveyance that illegally crosses the international boundary at a place not designated as a Port of Entry without inspection or admission.) Unfortunately, 14 illegal entrants died in the SPRNCA in Fiscal Year 2007, including one deceased individual located just yesterday. Further, enforcement in this area has proven difficult, as aliens and narcotic smugglers utilize the San Pedro River area because it offers cover, concealment, water, and a staging area in Mexico.

12.      Operationally, construction of tactical infrastructure will greatly increase CBP
Border Patrol's ability to gain and maintain operational control of this area. Namely, it
will impact illegal entrants by preventing vehicles from driving directly through the area
and create a pedestrian obstacle. It will allow CBP Border Patrol to more effectively
utilize its agents, as the presence of a physical barrier will allow CBP Border Patrol to
spread its patrols across a wider area. Further, it will give CBP Border Patrol agents
additional time to react to attempted illegal entries.

13.      The Project encompasses approximately 11 acres in a 60'-wide area along 1.54
miles of the border. In total, this project covers approximately 0.019% of the SPRNCA.
Construction work will clear approximately 5 acres of those acres involved in the Project.
This area consists of former farmland and was covered by tumbleweed, non-native
plantings and Johnson grass; this was not an area of pristine natural vegetation.
Additionally, a 20'-wide road along the border was already in place.

14.      As of close of operation on October 8, 2007, all of the clear and grub work for the
fencing has been completed, with the exception of an area of historic corrals and an
archeological site awaiting BLM clearance to proceed. Additionally, work has been
completed on the existing 20'-wide road which consisted of repairs for construction
traffic, grading and filling in wash-out ruts, also with the exception of the historic corrals
and archeological site. 49% of trenching is complete. No fencing has been completed,
although 9% of posts for primary fence are set in concrete, and 26% of the low water

crossing bollard has been excavated but not installed pending approval of the fence design at washes.

### THE PROJECT WILL IMPROVE THE ENVIRONMENT IN THE SPRNCA

15.     Although Plaintiffs claim that the Project will cause irreparable harm to the environment, the Bureau of Land Management ("BLM"), the federal agency charged with administering and protecting the SPRNCA, has already determined that the Project will not significantly impact the environment. Further, despite Plaintiffs' claims regarding the threats the Project poses to Threatened or Endangered species, it is my understanding that the U.S. Fish and Wildlife Service ("USFWS") stated in a Biological Opinion that no Threatened or Endangered Species would be adversely affected by the construction of fencing encompassed within this Project. Moreover, CBP is taking measures described in the 2007 Environmental Assessment (EA) and Finding of No Significant Impact (FONSI)—measures that were developed by both BLM and USFWS—to mitigate the environmental impacts associated with the Project. For example, low water crossing Bollard Fence is engineered to prevent erosion, sediment build-up, or downstream sedimentation.

16.     In fact, BLM and CBP believe that construction of this fencing will minimize the environmental impacts caused by illegal entry. Some of these documented harmful effects of illegal entrants include the following:

(a) Illegal roads divert the normal flow of water and rob native plant cover of the moisture it depends on to survive. The proliferation of trails and roads damages and destroys cactus and other sensitive vegetation, disrupts or prohibits re-vegetation, disturbs wildlife and their cover and travel routes, causes soil compaction and erosion and impacts stream bank stability.

(b) Furthermore, tons of trash and high concentrations of human waste are left behind by illegal entrants. This impacts wildlife, vegetation and water quality. This trash is also ingested by wildlife and livestock, sometimes resulting in illness and death.

(c) Vehicles used by illegal entrants are often damaged and abandoned, resulting in the emission of pollutants and spreading of hazardous debris, which soak into the ground and can reach water sources. Removal of these vehicles compounds the damage as tow trucks and other equipment navigate the lands to reach them.

(d) When illegal entrants fill water bottles in wetland locations, they can infest these protected Federal wetlands with invasive parasites and diseases which can doom native fish and wildlife. In fact, one Congressional report indicates that new tapeworms and funguses have already impacted populations of endangered fish and frogs.

(c) Additionally, hundreds of wildfires caused by campfires of illegal immigrants have caused a significant threat to human safety and the lands along the border, as well as increased impacts to soils, vegetation, cultural sites, and other sensitive resources.

17.     Although Plaintiffs claim that the Project may impair their use and enjoyment of the San Pedro River, the illegal cross border traffic is a real and well-documented detracting factor that fencing will address. For example, the trash and debris left behind by the thousands of illegal entrants both detracts from the scenic qualities of the area, but also can affect human and animal health through the spread of bacteria and disease. Additionally, fencing will aid in the protection of the historic corrals in the area from further damage and destruction for firewood, as well as the preservation of the other archaeological and cultural sites along the river.

18.     Furthermore, given the current level of illegal entry and the dangers it poses, BLM has placed restrictions against public recreation in this portion of the river. I have been advised that BLM has closed this area at night and actively discourages daytime use due to smuggling activity, vehicle thefts and assaults. Fencing and better enforcement may enable BLM to allow those who value recreational activities to use the area again.

## THE PROJECT IS VITAL TO NATIONAL SECURITY

19.     Due to the increasing number of illegal entrants in this area, construction of

fencing is also vital to protecting the Nation from threats. As stated above, fencing aids

apprehension, and apprehension is the only way to verify the nature of potentially deadly

cargo. In fact, the potential exists for a single individual or small group to cross the

border at the SPRNCA undetected with biological or chemical weapons, weapons of

mass effect, or other implements of terrorism.


20.     It is particularly relevant to note that 103 criminal aliens who crossed the border

at the SPRNCA have been apprehended and prosecuted since 2004.


## ANY DELAY IN CONSTRUCTION WILL CAUSE IRREPARABLE HARM

21.     Further, historical data indicates that gaps in the border infrastructure become

funneling points. Because CBP plans to construct tactical infrastructure on either side of

the San Pedro Riparian National Conservation Area, an injunction would force an

infrastructure gap in the conservation area and thus increase illegal entries as well as

patrol activity within that environment.


22.     Should construction be halted at this point, there is a potential for adverse

environmental impacts. Because the 60 foot easement along the 1.54 miles of border has

already been scraped, an erosion problem may result if the road is not contoured and

some sort of aggregate base put down. Furthermore, due to its depth, the open trench is a

safety hazard for both wildlife and anyone who is walking in the area. Water can also flow into the trench and away from its intended washes since the water flows north in that area.

23.    The urgent need to gain and maintain operational control of the border in this area is clearly evident. Because, as set forth above, this is an area of high illegal entry and activity, any delay, no matter how brief, is unwarranted. As I indicated above, during Fiscal Year 2007, there were over 19,000 apprehensions of illegal entrants in the SPRNCA, which translates to an average of *greater than 52 apprehensions every day*. Furthermore, agency records indicate that approximately 11% of these illegal entrants, on average *more than 5 individuals each day in this area alone*, have a criminal background. These individuals present an unacceptable risk of harm to the United States and its citizens. Aside from the obvious national security concerns, the environmental impacts of illegal entrants and activities in the area are pervasive and can be significantly mitigated by operational control of the border in that area.

24.    Should a TRO be entered, the resulting delay to the project will more than likely extend far beyond the length of the injunction. If the construction workers are laid off, there is a high likelihood that up to 100 new workers will need to be recruited, hired and trained before construction can continue. Welded wire mesh and steel is being delivered daily to the site; delay in construction will cause back up in the supply chain and likely cause future delays upon re-start.

25.    Additionally, delay will compound costs to the government. The worksite and the materials located therein will need to be guarded continuously to prevent damage from vandals and theft.

26.    For all of these reasons, any delay in the construction of tactical infrastructure in the San Pedro Riparian National Conservation Area presents a risk of irreparable harm to the Nation's security interest, its efforts to reduce illegal immigration, and the environment.

I declare under the penalty of perjury and the laws of the United States that the foregoing is true and correct to the best of my information and belief.

_____          10 - 9 - 0 7
Jayson P. Ahern                          Date
Deputy Commissioner
U.S. Customs and Border Protection

# EXHIBIT D

United States General Accounting Office

# GAO

## Report to Congressional Requesters

June 2004

# BORDER SECURITY

# Agencies Need to Better Coordinate Their Strategies and Operations on Federal Lands



**G A O**
Accountability * Integrity * Reliability

GAO-04-590



# G A O
Accountability · Integrity · Reliability

# Highlights

Highlights of GAO-04-590, a report to congressional requesters

June 2004

# BORDER SECURITY

# Agencies Need to Better Coordinate Their Strategies and Operations on Federal Lands

## Why GAO Did This Study

Since the mid 1990s—and especially since September 11—the government has focused attention and resources on preventing illegal aliens, drug smugglers, and potential terrorists from entering the United States across its land borders with Mexico and Canada. The Border Patrol is responsible for protecting the nation's borders. However, a significant portion of the borderlands are federal or tribal lands managed by the Bureau of Indian Affairs, Bureau of Land Management, Fish and Wildlife Service, National Park Service, and Forest Service

Realizing the importance of coordinating federal law enforcement efforts, GAO agreed to assess (1) border-related law enforcement challenges for land management agencies in Arizona and Washington, (2) resources land management agencies have received to address these challenges, and (3) how the Border Patrol and land management agencies coordinate border-related law enforcement efforts.

### What GAO Recommends

GAO is recommending that the Secretaries of Homeland Security, the Interior, and Agriculture coordinate strategic and funding plans with regard to federal borderlands. DHS, the Interior, Agriculture, Justice, and the Office of Management and Budget reviewed a draft of this report and generally agreed with its findings and recommendations.

www.gao.gov/cgi-bin/getrpt?GAO-04-590.

To view the full product, including the scope and methodology, click on the link above. For more information, contact Richard Stana at (202) 512-8777 or stanar@gao.gov.

## What GAO Found

Illegal border activities, including alien border crossings and drug smuggling, on federal and tribal lands in Arizona have been increasing since the mid- to late-1990s, creating law enforcement challenges for land management agencies. This situation poses dangers to law enforcement officers, visitors, and employees and damages fragile natural resources. Rising illegal activity on these federal lands results from the Border Patrol's strategy to deter illegal entry by concentrating resources in populated areas—thus shifting illegal traffic to more remote federal lands, where Border Patrol has placed fewer resources. Although the problem is less acute along the Canadian border, land management agency officials in Washington are concerned that as the Border Patrol increases resources in populated areas, more illegal traffic will shift to remote federal lands.

Officials from the five land management agencies believe their resource levels have not kept pace with increases in illegal border activities on their lands. Agencies have sought more federal funds to address these problems and have received varying levels of law enforcement staffing and resource increases. According to Office of Management and Budget representatives, agency funding is mission-driven. Thus, land management agencies' proposals for certain border projects have not been included in the administration's fiscal year 2005 budget because they were considered to be more in keeping with the border security mission of the Border Patrol.

At the national level, interagency coordination of strategic plans and activities among Border Patrol and land management agencies is minimal regarding the Mexican and Canadian borders. Thus, limited funds may not be used most efficiently, and the impact of one agency's actions on another agency may not be considered As of May 2004, the Border Patrol had not issued detailed plans to ensure that interagency coordination occurs, nor had it coordinated with land management officials regarding funding for infrastructure and technology improvements. Some coordination had occurred at the field level, as officials from the various agencies had begun meeting to improve operations and to share threat assessments in Arizona.

Border Fence on Federal Lands in Arizona does not Deter Illegal Border Crossings



Source: GAO.

# Contents

| Letter | | 1 |
|---|---|---|
| | Results in Brief | 2 |
| | Background | 4 |
| | Land Management Agencies Face Law Enforcement Challenges as a Result of the Border Patrol Strategy | 12 |
| | Land Management Agencies Say Law Enforcement Resources for Borderlands Have Not Kept Pace with Illegal Activity | 28 |
| | Border Strategies and Activities Are Not Well-Coordinated, but Efforts to Improve Are Underway | 35 |
| | Conclusions | 44 |
| | Recommendations for Executive Action | 45 |
| | Agency Comments and Our Evaluation | 45 |
| **Appendix I** | **Objectives, Scope, and Methodology** | **48** |
| **Appendix II** | **Comments from the Department of Agriculture** | **51** |
| **Appendix III** | **Comments from the Department of Homeland Security** | **52** |
| **Appendix IV** | **Comments from the Department of the Interior** | **55** |
| **Appendix V** | **GAO Contacts and Staff Acknowledgments** | **56** |
| | GAO Contacts | 56 |
| | Acknowledgments | 56 |
| **Tables** | | |
| | Table 1: Land Management Agencies' Amount of Federal and Tribal Lands, Types of Lands, and Primary Responsibilities | 9 |

# Figures

Figure 1: Percentage of Linear Miles of Federal and Tribal
Borderlands along the Mexican and Canadian Borders ... 6

Figure 2: Map of Arizona Identifying Federal Lands and Ports of
Entry along the Mexican Border ... 14

Figure 3: One of Hundreds of New Trails Created by Illegal Aliens
or Smugglers on Federal Lands in Arizona ... 17

Figure 4: Illegal Roads Created by Illegal Aliens or Smugglers
Crossing Federal Lands in Arizona ... 18

Figure 5: Vehicle Abandoned by Illegal Aliens or Smugglers on
Federal Land in Arizona ... 19

Figure 6: Accumulated Trash Left by Illegal Aliens or Smugglers on
Tohono O'odham Indian Reservation in Arizona ... 20

Figure 7: International Border Fence on Federal Land in Arizona,
Presumed Damaged by Illegal Aliens or Smugglers ... 22

Figure 8: Map of Washington Identifying Federal Lands and Ports
of Entry along the Canadian Border ... 25

Figure 9: Snowmobile Towing Boat with Marijuana Load over Ice
on Federal Land in Washington along the Canadian
Border ... 27

Figure 10: Locations for Vehicle Barriers Proposed and under
Construction along the Mexican Border in Arizona ... 39

## Abbreviations

| | |
|---|---|
| CBP | U.S. Customs and Border Protection |
| DHS | Department of Homeland Security |
| FBI | Federal Bureau of Investigation |
| IACP | International Association of Chiefs of Police |
| OMB | Office of Management and Budget |

This is a work of the U.S. government and is not subject to copyright protection in the United States. It may be reproduced and distributed in its entirety without further permission from GAO. However, because this work may contain copyrighted images or other material, permission from the copyright holder may be necessary if you wish to reproduce this material separately.



**United States General Accounting Office**
**Washington, DC 20548**

June 16, 2004

The Honorable Greg Walden
Chairman
Subcommittee on Forests and Forest Health
Committee on Resources
House of Representatives

The Honorable Scott McInnis
The Honorable Tom Tancredo
House of Representatives

Enhancing the security of the nation's borders with Mexico and Canada has emerged as a significant policy issue. Since the mid-1990s—and especially since the September 11 terrorist attacks—attention and resources directed at deterring and preventing illegal aliens, drug smugglers, potential terrorists, and other criminals seeking to enter the United States illegally across its land borders have risen. However, patrolling and protecting the borderlands pose challenges to federal law enforcement officers due, in part, to the vast stretches of land that comprise the border—approximately 1,900 miles of border with Mexico and approximately 4,000 miles of border with Canada. Roughly 50 percent of the land along the Mexican border and 25 percent of the land along the Canadian border are federal or tribal lands that encompass national parks, forests, and wildlife refuges—much of it rugged and remote terrain.

Federally owned borderlands are under the jurisdiction of the Bureau of Land Management, Fish and Wildlife Service, and the National Park Service within the Department of the Interior; and the Forest Service within the Department of Agriculture. In addition, the Bureau of Indian Affairs, within Interior, assists in the management of tribal lands. While these agencies employ law enforcement officers and investigators to protect agency personnel, visitors, and natural resources on their lands, they are not responsible for preventing the entry of illegal aliens into the United States. Rather, the U.S. Border Patrol, within the Department of Homeland Security (DHS), is responsible for detecting and deterring illegal entry of people into the country, including potential terrorists, and combating drug trafficking and other criminal activities at the nation's Mexican and Canadian borders.

Coordination among these federal agencies is important for effective law enforcement efforts, including those that address the possible entry into the United States by terrorists crossing federal borderlands. Thus, we agreed to identify and assess law enforcement efforts of federal land management agencies that protect assets along the Mexican and Canadian borders. Specifically, this report discusses: (1) law enforcement challenges land management agencies face along the international borders in Arizona and Washington, (2) the resources federal land management agencies and tribal nations have received to address border-related law enforcement challenges on federally managed lands, and (3) how the Border Patrol and federal land management agencies coordinate their law enforcement efforts along the Mexican and Canadian borders and steps taken to meet joint challenges.

To meet these objectives, among other things, we obtained and analyzed information about law enforcement programs along the Mexican and Canadian border areas as they relate to federal lands located along the border areas, excluding ports of entry. Specifically, we analyzed information provided by the Department of the Interior's Bureau of Indian Affairs, Bureau of Land Management, Fish and Wildlife Service, and National Park Service; the Department of Agriculture's Forest Service; and the Department of Homeland Security's Border Patrol. At headquarters, we interviewed law enforcement and budget officials from each agency, as well as representatives of the Office of Management and Budget. We conducted field visits to federal lands along the Mexican border in Arizona and the Canadian border in Washington, during which we interviewed land management agency and Border Patrol officials, and the United States Attorney for Arizona, and observed conditions on these federal lands. We conducted our work from July 2003 through March 2004 in accordance with generally accepted government auditing standards. Appendix I presents more details about our scope and methodology.

## Results in Brief

Increased illegal border activity, including drug and alien smuggling, has challenged land management agencies' ability to protect people and resources on federal lands in Arizona, and officials in Washington are concerned that illegal activity and related law enforcement challenges will increase on their lands, as well. Along the Arizona border, seizures of illegal narcotics on a tribal nation increased from more than 65,000 pounds in 2002 to over 100,000 pounds in 2003. Land management officials told us that the number of undocumented aliens crossing from Mexico into Arizona on federal lands has risen substantially since 1997 although comprehensive data are not available. The increase in illegal border-

related activities poses dangers to law enforcement officers, visitors and employees, and has also damaged fragile natural resources. Land management and Border Patrol officials told us that the increased illegal activity on federal and tribal lands is a result of the Border Patrol's strategy of deterring illegal entry. Since the strategy concentrates resources in or near populated areas, much of the illegal traffic has shifted to more remote federal lands, where the Border Patrol has fewer resources, such as agents and fencing, to deter illegal entry. The problem is less acute along the United States-Canadian border in Washington. However, land management agency officials are concerned that as the Border Patrol increases the number of agents and other resources in populated areas along the Canadian border, illegal border activity—including the possible entry of terrorists—will increase on remote federal lands and create additional law enforcement challenges.

Four of the five land management agencies we reviewed, excluding the Bureau of Indian Affairs, had about 200 full-time law enforcement officers for Mexican and Canadian borderlands, combined, as of September 2003. Between September 2001 and September 2003, land management agency officials estimated that their combined law enforcement staffing levels had increased by about 25 officers along the Mexican border and increased by about 6 officers along the Canadian border. Land management agency officials told us that in recent years, they requested and received funds, to varying degrees, to address illegal activities on their borderlands. Officials from all four land management agencies believe funding has been insufficient to address the full impact of the illegal border traffic. The National Park Service and the Fish and Wildlife Service have developed proposals to construct barriers to prevent vehicles from crossing the border illegally through their neighboring Arizona properties. The administration's budget for fiscal year 2005 requests funds for the Park Service to complete the vehicle barrier initially funded in fiscal year 2003 as specified in the conference report to the Department of the Interior appropriations act for 2003. According to representatives from the Office of Management and Budget, which is responsible for preparing the administration's budget, they view constructing barriers primarily in keeping with the Border Patrol's border security mission and generally not consistent with land management agencies' missions of protecting people and resources.

Although the strategic plans of the Departments of Homeland Security and the Interior call for coordination among agencies and tribal governments, broad strategic law enforcement coordination among Border Patrol and

land management agencies has been minimal at the national level, while some coordination has occurred at the field level.

Border Patrol officials said they did not coordinate with land management officials on threat assessments, funding proposals, or staff deployment plans. The three departments—DHS, Interior, and Agriculture—have yet to coordinate their strategies and develop broad interagency approaches to combat illegal activities on federal borderlands. As a result, threats may not be fully assessed, limited funds may not be efficiently used, and deployment of personnel and other resources may be inefficient or negatively affect other agencies, according to land management agency and Border Patrol officials. Border Patrol officials also told us they have drafted a revised border strategy and plan to develop a detailed implementation plan to ensure that coordination with land management agencies occurs in the future. As of May 2004, neither the strategy nor its implementation plan had been finalized. At the field level, land management agency and Border Patrol officials have begun meeting to improve coordination and identify issues of joint concern with respect to the Mexican border in Arizona, and they told us they plan to hold meetings at various Canadian border locations in the future.

We are recommending that the Secretaries of Homeland Security, the Interior and Agriculture coordinate their strategic and operational plans when federal and tribal lands are affected and include in those plans goals for developing joint threat assessments, coordinating funding proposals for infrastructure and technology, and sharing deployment plans.

# Background

## Federal Lands along the Mexican and Canadian Borders

A considerable amount of federally owned or managed land lies adjacent to the international borders with Mexico and Canada. As shown in figure 1, of the total 1,900-mile United States-Mexico border, about 43 percent, or 820 linear miles, are federally owned or managed lands.[1] Of that, the National Park Service has the largest percentage, 19 percent, or 365 linear miles, of federal land on the Mexican border. On the total 4,000 linear miles of United States-Canadian border, about 1,016 miles, or 25

---

[1] Linear miles of border could refer to both land boundaries and international waterway boundaries between Mexico-United States and Canada-United States international borders.

percent, border federal lands. The Forest Service is responsible for the largest percentage of miles along the Canadian borderlands—about 417 miles, or 10 percent. Of the 562 federally recognized Indian tribes, 36 tribes have lands that are close to, adjacent to, or crosses over international boundaries with Mexico or Canada.

Figure 1: Percentage of Linear Miles of Federal and Tribal Borderlands along the Mexican and Canadian Borders

Source: GAO analysis of Department of the Interior and Forest Service data

In total, the federal government owns or has significant responsibility for the management of about 711 million acres of approximately 2.3 billion acres of land in the United States. Of the 711 million acres, the federal government owns 655 million acres, which include forests, parks, grasslands, arctic tundra, and deserts. The four federal agencies responsible for administering the majority of these lands are the Bureau of Land Management, Fish and Wildlife Service, and National Park Service in the Department of the Interior, and the Forest Service in the Department of Agriculture.[2] The remaining 56 million acres is held in trust by the United States for American Indians, Indian tribes, and Alaska Natives. The Department of the Interior's Bureau of Indian Affairs is responsible for assisting in the administration and management of these tribal lands. For this report, we refer to these five agencies as land management agencies.

## Land Management Agencies' and Border Patrol's Missions in Border Areas

Each land management agency has a distinct mission and set of responsibilities. These missions involve managing the land for a variety of purposes relating to the conservation, preservation, and development of natural resources, as well as limited responsibility for land set aside for the use, occupancy, development, and governance by federally recognized tribes. Land management agencies employ different types of law enforcement officers to enforce their respective federal laws and regulations and to protect natural, cultural and historic resources; national icon parks; gas and oil pipelines; dams; and electric transmission lines. The land management agencies' law enforcement authority generally extends to the boundaries of their respective lands. To carry out their respective missions, the Bureau of Land Management and National Park Service employ law enforcement rangers and criminal investigative agents. The Fish and Wildlife Service employs refuge officers and criminal investigative agents, the Forest Service employs law enforcement officers and criminal investigative agents, and the Bureau of Indian Affairs and tribal nations primarily employ police officers and criminal investigative agents. For this report, we refer to all these types of federal land management agency law enforcement officers as law enforcement officers.

---

[2] These four agencies manage 628 million acres, or 96 percent, of 655 million acres of land owned by the United States. The remaining 27 million acres of federal land are managed by several other agencies, including the Department of Defense and General Services Administration.

The primary mission of the Border Patrol, within U.S. Customs and Border Protection (CBP) in the Department of Homeland Security, is to detect and prevent the entry of terrorists, terrorist weapons, contraband, and illegal aliens into the United States between designated ports of entry. Other units within CBP are responsible for inspecting persons presenting themselves for entry into the United States at designated ports of entry. The Border Patrol primarily employs Border Patrol agents, whose law enforcement authority extends along the entire boundaries of the United States on both federal and nonfederal lands. The Border Patrol is organized into 21 different sectors—9 of which are along the Mexican border, 8 along the Canadian border, and 4 along Pacific Ocean and Gulf of Mexico coastal areas and Puerto Rico. While the Border Patrol is the agency responsible for border security, its mission also calls for it to work with other law enforcement agencies to prevent illegal trafficking across the borders. DHS's U.S. Immigration and Customs Enforcement has responsibility for conducting criminal investigations of drug and alien smuggling cases, as well as processing, detaining and removing aliens apprehended by the Border Patrol.

While land management agencies' and Border Patrol's missions are separate and distinct on federal lands near the borders, some of the issues that their law enforcement officers address can be similar. When faced with illegal activities in areas adjacent to the borders, both the land management law enforcement officials and Border Patrol agents work to prevent these illegal activities from occurring. However, differences in their missions and responsibilities may dictate different approaches and different results on federal borderlands. Both land management law enforcement officers and Border Patrol agents have the authority to carry firearms and make arrests, perform duties related to criminal investigation, and enforce federal laws and regulations.

| Land Management Agencies' Responsibilities to Protect and Manage Federal Lands | As shown in table 1, each of these five federal agencies owns or manages differing amounts and types of land and has a variety of responsibilities in managing resources on the lands. |

**Table 1: Land Management Agencies' Amount of Federal and Tribal Lands, Types of Lands, and Primary Responsibilities**

| Agency | Amount of federal and tribal land (in acres) | Types of land | Primary responsibilities |
|---|---|---|---|
| **Department of the Interior** | | | |
| Bureau of Land Management | 264 million | Grasslands, forests, mountains, arctic tundra, and deserts. | Manages lands for multiple uses and programs, such as energy development, timber harvesting, recreation, grazing, wild horses and burros, cultural resources, and conservation of diverse plants and animal species. Also manages 700 million acres of federal subsurface mineral resources and supervises the mineral operations on about 56 million acres of Indian Trust lands. |
| Fish and Wildlife Service, National Wildlife Refuge System | 94 million | 542 refuges, 200 waterfowl production areas, and 50 wildlife coordination areas. | Responsible for conserving and protecting animals and plants on their lands. Also responsible for listing "endangered" or "threatened" plants and animals under the Endangered Species Act on both federal and nonfederal lands and designating critical habitat areas where the endangered or threatened species are found or which might provide additional habitat for the species recovery. |
| National Park Service | 78 million | 387 national parks and other land units, such as national monuments, battlefields, military parks, historical parks, historic sites, lakeshores, seashores, recreation areas, reserves, preserves, and scenic rivers and trails. | Responsible for twofold mission: to conserve, preserve, protect, and interpret the natural, cultural, and historic resources of the nation for the public and to provide for their enjoyment by the public |
| Bureau of Indian Affairs | 56 million | Land held in trust by the United States for American Indians, Indian tribes, and Alaska Natives. | Responsible for assisting in the administration and management of developing forestlands, leasing assets, directing agricultural programs, protecting water and land rights, developing and maintaining infrastructure, and providing for health and human services and economic development in cooperation with American Indians and Alaska Natives. There are 562 federally recognized tribes. |
| **Department of Agriculture** | | | |
| Forest Service | 192 million | 155 national forests, 20 national grasslands, and 80 other areas, such as research and experimental areas and land utilization projects. | Manages land for multiple uses and for sustained yields of various products and services, such as timber harvesting, recreation, grazing, watershed protection, and fish and wildlife habitats. |

Source: Congressional Research Service, Federal Land Management Agencies: Background on Land and Resource Management, RL 30867 (Washington, D.C.: February 27, 2001) pages 1-2, 18-19, 27, 39-41, 47-48, and 54-58; Bureau of Indian Affairs Web site: http://www.doio.nbc.gov/orientation/bia2.cfm, and agency officials.

| | |
|---|---|
| **Special Protection of Areas within Federal Lands** | Congress has designated areas within some federal lands as wilderness under the Wilderness Act of 1964[3] and subsequent legislation, while the Fish and Wildlife Service has designated certain areas as critical habitat for endangered and threatened species under the Endangered Species Act.[4] Federal law enforcement officers told us that these designations can hinder their efforts. For example, motorized vehicles must generally remain on designated roads in wilderness areas, and the Wilderness Act generally prohibits construction of permanent structures such as communications towers in wilderness areas.

Exemptions can be obtained from these restrictions imposed by wilderness or critical habitat designation. The National Environmental Policy Act[5] requires all federal agencies to analyze the potential environmental effects of major proposed federal actions that significantly affect environmental quality, including a detailed analysis of alternatives to the proposed actions. However, federal law enforcement officers told us obtaining these exemptions can be costly and time-consuming. |
| **Border Patrol Strategy** | In 1994, the Immigration and Naturalization Service, which at the time oversaw the Border Patrol, designed and implemented a national strategy to systematically regain control of our nation's borders—that is, to restrict illegal traffic and encourage legal entrance at designated ports of entry.[6] The strategy called for "prevention through deterrence" by raising the risk of apprehension to a level so high that prospective illegal entrants would consider it futile to attempt to enter the United States illegally. The strategy's objectives were to close off the routes most frequently used by smugglers and illegal aliens (generally through urban areas near ports of entry) and shift traffic either to ports of entry, where travelers are inspected, or to areas that are more remote and difficult to cross. With the traditional crossing routes disrupted, the Border Patrol expected that illegal alien traffic would either be deterred or forced over terrain less |

---

[3]Wilderness Act, 16 U.S.C. §1131, *et seq.*

[4]Endangered Species Act of 1973, 16 U.S.C. 1531, *et seq.*

[5]National Environmental Policy Act of 1969, 42 U.S.C. §4321, 4332(2)(C).

[6]Prior to the creation of DHS, the Border Patrol was part of the Department of Justice's Immigration and Naturalization Service. Since March 1, 2003, the Border Patrol has been part of the DHS's Bureau of Customs and Border Protection.

suited for crossing, where the Border Patrol believed its agents would have a tactical advantage.

The strategy called for the Border Patrol to concentrate personnel and technology in a four-phased approach, starting first with the sectors with the highest levels of illegal immigration activity (as measured by the number of illegal aliens apprehended) and later moving to areas with the least activity. The strategy's four phases called for allocating additional Border Patrol resources to sectors along the borders in the following order, beginning in 1994, with no established timeframes for subsequent phases.[7]

- Phase I—the San Diego sector in California and El Paso sector in Texas.

- Phase II—the Tucson sector in Arizona and three sectors in south Texas—Del Rio, Laredo, and McAllen.

- Phase III—the remaining three sectors along the southwest border.

- Phase IV—the northern border, gulf coast, and coastal waterways.

Since the beginning of the strategy, the number of authorized positions for Border Patrol agents has increased significantly for the Mexican border. By the beginning of fiscal year 2004, these positions had risen to about 9,700 on the Mexican border, compared with about 3,400 in fiscal year 1993. The Border Patrol has completed phase I and is currently in phase II of the strategy, during which time it has been deploying resources such as agents, technology, and infrastructure into the Tucson sector. Phase II is not complete. Border Patrol officials told us that areas remain where they have not deployed significant levels of resources because of limited resources.

The September 11 terrorist attacks and continued threats of future attacks have directed congressional attention to security-related issues on the Canadian border and accelerated the implementation of the Border Patrol's strategy. The USA PATRIOT Act of 2001, passed within weeks of the September 11 attacks, authorized appropriations to triple the number of inspectors at ports of entry and Border Patrol agents along the

---

[7]This strategy has not precluded the Border Patrol from allocating additional agents to a location before it has officially targeted that area.

Canadian border and to improve monitoring technology on that border.[8]
Accordingly, the Border Patrol began increasing its presence on the
Canadian border. Prior to September 11, 368 Border Patrol agents were
stationed along the nation's border with Canada. By the end of fiscal year
2002, a total of 613 agents were stationed there, and by the end of
December 2003, a total of 1,000 agents.

## Land Management Agencies Face Law Enforcement Challenges as a Result of the Border Patrol Strategy

Illegal aliens and drug smugglers have increasingly been entering the
United States from Mexico through federal borderlands in Arizona,
according to land management agency and Border Patrol officials. This
situation creates challenges for land management law enforcement
officers responsible for protecting employees, visitors, and natural
resources—all of which face dangers from illegal border traffic. Land
management and Border Patrol officials attribute the increased illegal
activity on federal lands to the Border Patrol's strategy of concentrating its
resources primarily in populated areas, thus shifting much of the illegal
traffic to less patrolled federal lands. The Border Patrol is beginning to
address some of the effects of its strategy in Arizona by increasing
resources on federal lands. In Washington, federal lands have been less
affected by Border Patrol's strategy, but officials are concerned they will
continue to see increases in illegal activity as the Border Patrol
concentrates more resources on more populated areas of Canadian
Border.

### Increased Illegal Activity on Federal Lands in Arizona

Officials from the five land management agencies and the Border Patrol
told us that illegal border traffic, including drug smuggling and illegal alien
crossings, on federal borderlands in Arizona has been increasing by some
measures since the mid to late 1990s. Comprehensive data on drug
seizures are not readily available, in part because law enforcement officers
from multiple agencies, including land management agencies and the
Border Patrol, make seizures on federal lands. Nevertheless, information
we obtained regarding drug seizures indicates a significant level of illegal
activity. For example:

- More than 100,000 pounds of marijuana, 144 grams of cocaine, and 6,600
grams of methamphetamine were seized on the Tohono O'odham Nation in

---

[8]USA PATRIOT Act of 2001, P.L. 107-56,18 U.S.C 1 note

2003, according to its police department; whereas in the previous year, more than 65,000 pounds of narcotics were confiscated.

- About 19,000 pounds of marijuana were seized by the Bureau of Land Management on Bureau properties in Arizona—primarily Ironwood Forest National Monument—in fiscal year 2003, according to a Bureau official, up from about 2,600 pounds the year before.

- About 4.6 tons of marijuana were seized in the National Park Service's Coronado National Memorial in 2002 and an estimated 35 tons of marijuana pass through this property annually, according to a National Park Service report.

- Nearly 400,000 pounds of marijuana were seized from 2000 to 2003 in National Forests on the southwest border, primarily in Arizona, according to information the Forest Service provided to Congress regarding border issues.

The number of illegal aliens crossing federal borderlands appears to be increasing as well. According to the Department of the Interior, the number of illegal aliens apprehended on its lands in Arizona within 100 miles of the border increased substantially between 1997 and 2000—from 512 to 113,480—and agency officials told us the number of illegal crossers continues to increase.[9] Because it is difficult to know the number of illegal aliens who crossed federal borderlands without being apprehended, agencies have estimated the extent of such crossings on their border properties in Arizona. For example:

- An estimated 1,500 undocumented aliens cross the Tohono O'odham Indian Reservation each day, according to the Tohono O'odham Police Department. Total apprehensions from October 2001 to November 2002 were 65,000—representing a 172 percent increase from the previous year.

- An estimated 200,000 undocumented aliens illegally entered the United States through the National Park Service's Organ Pipe Cactus National Monument in 2001, according to the Park Service.

---

[9]*Report to the House of Representatives Committee on Appropriations on Impacts Caused by Undocumented Aliens Crossing Federal Lands in Southeast Arizona,* (April 2002).

- An estimated 1,000 undocumented aliens cross the Fish and Wildlife Service's Cabeza Prieta National Wildlife Refuge each week, according to refuge officials.

Figure 2 identifies federal lands along the Arizona's international border with Mexico, as well as the official land border ports of entry.

**Figure 2: Map of Arizona Identifying Federal Lands and Ports of Entry along the Mexican Border**



Source GAO

**Land Management Law Enforcement Officers in Arizona Face Challenges in Protecting People and Resources**

This illegal border-related activity poses dangers to law enforcement officers, other agency employees, residents, and visitors to national parks, forests, wildlife refuges, and tribal nations. For example, in August 2002, a National Park Service officer was shot and killed on national parkland while helping Border Patrol agents pursue two men suspected in a drug-related murder. A review board examining the incident found that "illegal smuggling activities . . . are threatening the existence of the park and the fundamental agency mission to protect its employees, visitors and resources."[10] In addition, law enforcement officers have been attacked on federal borderlands in Arizona, and officers and their families have been the subject of threats. In some cases, smugglers are escorted across federal lands by heavily armed scouts who are equipped with automatic assault weapons, encrypted radios, and night vision optics. Due to potential dangers, land management agencies require their law enforcement officers to wear bulletproof vests and carry assault weapons while on duty.

Incidents reported on federal borderlands in Arizona include break-ins at employees' homes, visitor carjacking, assaults, and robberies. Employees and visitors have been run off the road by smugglers traveling at high speeds. Certain federal lands can no longer be used safely by the public or federal employees, according to a 2002 report on the impacts of undocumented aliens crossing federal lands in Arizona, due to the significance of smuggling illegal aliens and controlled substances in the United States.[11] The Forest Service reported in 1999 that it designated over 400,000 acres on one property as a "constrained area"—not safe to use or occupy because of high levels of illegal activity.

People seeking to enter the United States illegally, whether on their own or accompanied by alien smugglers, also face danger. In fiscal year 2003, about 150 undocumented aliens died trying to cross Arizona borderlands— 139 within the Border Patrol's Tucson sector, alone, which is responsible for most of Arizona's border with Mexico. In the Tucson sector, the number of deaths associated with illegal crossings has been increasing annually since fiscal year 1999, when 29 such deaths were recorded. The

---

[10] *Report of Board of Review: Organ Pipe Cactus National Monument, Murder of Park Ranger Kris Eggle*, (Jan. 2003).

[11] *Report to the House of Representatives Committee on Appropriations on Impacts Caused by Undocumented Aliens Crossing Federal Lands in Southeast Arizona*, (April 2002).

majority of these immigrants succumbed to dehydration and heat exposure in remote stretches of Arizona's western desert, often during the harsh summer months.

Illegal border activity on federal lands not only threatens people, but endangered species and the land, itself. Illegal aliens and smugglers have created hundreds of new trails and roads while crossing borderlands (see figs. 3 and 4), and in doing so have destroyed cactus and other sensitive vegetation that can take decades to recover, including habitat for endangered species, according to a report on the impacts of undocumented aliens crossing federal lands [12] These roads and trails disturb wildlife, cause soil compaction and erosion, and can impact stream bank stability. According to the report, vehicles abandoned by smugglers are routinely found on federal lands and are not only expensive to remove, but towing them from remote areas can result in additional resource damage (see fig. 5). Tons of trash and human waste are left behind each year, affecting wildlife, vegetation, and water quality. According to the Tohono O'odham Nation, located along Arizona's Mexican border, illegal border crossers left behind close to 4,500 abandoned vehicles in fiscal year 2002 and an estimated 4 million pounds of trash each year as they crossed over the lands (see fig. 6). According to the Tohono O'odham Nation Police Department, it removed over 7,000 such vehicles in 2003. One land management official described another federal property on Arizona's border as so unsafe and with resources so destroyed that it is now primarily used for illegal activities and no longer visited by the legal public.

[12]*Report to the House of Representatives Committee on Appropriations on Impacts Caused by Undocumented Aliens Crossing Federal Lands in Southeast Arizona,* (April 2002)

Figure 3: One of Hundreds of New Trails Created by Illegal Aliens or Smugglers on Federal Lands in Arizona



Source: Department of the Interior.

Figure 4: Illegal Roads Created by Illegal Aliens or Smugglers Crossing Federal Lands in Arizona



Source: Department of the Interior.

Figure 5: Vehicle Abandoned by Illegal Aliens or Smugglers on Federal Land in Arizona



Source: Department of the Interior

Figure 6: Accumulated Trash Left by Illegal Aliens or Smugglers on Tohono O'odham Indian Reservation In Arizona



Source: GAO.

The volume of illegal activities on federal borderlands poses resource challenges in addition to risks. Land management law enforcement officials told us that responding to increasing levels of illegal drug smuggling and border crossings into Arizona have diverted their staff from more traditional law enforcement activities, such as routine patrols, traffic control, and wildlife enforcement activities.

Finally, illegal border activity is affecting federal lands beyond those immediately along the border and creating law enforcement challenges there. For example, a Bureau of Land Management property we visited in Arizona, Ironwood Forest National Monument, sits more than 60 miles north of the Mexican border, adjacent to the northeast boundary of the Tohono O'odham Indian Reservation, yet Bureau officials told us it shares many of the border-related problems of federal lands right on the border. (See fig. 2.) Bureau officials told us that as a result of one officer being nearly run over by illegal aliens in vehicles, as well as other assaults on officers, the Bureau requires that officers travel in patrol teams (two vehicles) to help ensure their safety. The monument's vulnerable ecosystem, with over 600 animal and plant species—some of them endangered—has been damaged by illegal border traffic. According to Bureau officials, smugglers and other illegal aliens in route from Mexico have established more than 50 illegal roads through the monument that