UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| DEFENDERS OF WILDLIFE and SIERRA CLUB; | ) ) ) | Case No: 07-1801 (ESH) |
| Plaintiffs, | ) ) | **PLAINTIFFS' REPLY IN SUPPORT OF** |
| vs. | ) ) ) | **MOTION FOR TEMPORARY RESTRAINING ORDER IN RELATION TO BORDER WALL AND ROAD** |
| BUREAU OF LAND MANAGEMENT; U.S. DEPARTMENT OF THE INTERIOR; U.S. ARMY CORPS OF ENGINEERS; and U.S. DEPARTMENT OF HOMELAND SECURITY | ) ) ) ) ) | **CONSTRUCTION ON THE SAN PEDRO RIPARIAN NATIONAL CONSERVATION AREA** |
| Defendants. | ) ) ) ) | |

## TABLE OF CONTENTS

INTRODUCTION .................................................................................................................. 1

ARGUMENT ......................................................................................................................... 2

    I.    The Balance of Harms Favors Plaintiffs................................................................ 2

        A.    Irreparable Harm Will Occur Without a Temporary Restraining Order.. 2

        B.    The Public Interest Favors a Temporary Restraining Order .................. 6

    II.    Plaintiffs Are Likely to Succeed on the Merits.................................................. 7

        A.    Defendants Are Violating NEPA.......................................................... 7

        B.    Defendants Are Violating the Arizona-Idaho Conservation Act.......... 13

REQUESTED RELIEF ........................................................................................................ 13

## INTRODUCTION

In their response to plaintiffs' motion for a temporary restraining order, defendants ask this Court to permit them to continue in their rush to build a border wall and road within the San Pedro Riparian National Conservation Area ("San Pedro NCA") without complying with fundamental procedures and statutes designed to insure that agencies carefully consider the environmental consequences of their actions.  See, e.g., Baltimore Gas & Elec. Co. v. Natural Res. Def. Council, 462 U.S. 87, 97 (1983).  While defendants claim that their actions on the San Pedro NCA—which contains only 2 miles of the U.S. Mexico border—should be allowed to proceed, they fail to justify why such construction must be completed now, rather than awaiting the resolution of a temporary restraining order, preliminary injunction, or even until the Court can resolve the case on the merits.  As plaintiffs have demonstrated that the construction will cause irreparable environmental injury and runs counter to the public interest, and defendants have failed to articulate a compelling countervailing interest that would outweigh these harms, a temporary restraining order should be granted to plaintiffs in this case.

Moreover, defendants' response further highlights the serious legal issues plaintiffs have raised concerning defendants' compliance with the National Environmental Policy Act ("NEPA") and the Arizona-Idaho Conservation Act of 1998.  Indeed, as we will explain, the Biological Opinion defendants have submitted, see Def. Ex. 3, only serves to confirm plaintiffs' contention that a meaningful environmental analysis of this project must include consideration of the other, nearby fence projects that, taken together, will have critical cumulative impacts on the flora and fauna in the Arizona borderlands.  See, e.g., Defenders of Wildlife v. Babbitt, 130 F. Supp. 2d 121, 135-139 (D.D.C. 2001).  Similarly, defendants' brief entirely fails to respond to plaintiffs' arguments that an Environmental Impact Statement ("EIS") is required because

several of the CEQ's "significance" factors are triggered, TRO Memo. at p. 15-18, and also fails to justify defendants' utter failure, even in the "Border Fence EA", to meaningfully <u>analyze</u> the environmental impacts of the fence, rather than making conclusory statements characterizing the <u>kind</u> of impacts that are likely.  <u>See</u>, <u>e.g.</u>, <u>Sierra Club v. Mainella</u>, 459 F. Supp. 2d 76 (D.D.C. 2006).

Accordingly, until defendants comply with NEPA, this Court should issue an injunction to prevent the agencies from continuing to destroy this sensitive area blind to environmental concerns.  <u>Sierra Club v. Marsh</u>, 872 F.2d 497, 504 (1st Cir. 1989) (Breyer, J.) ("the risk implied by a violation of NEPA is that real environmental harm will occur through inadequate foresight and deliberation. The difficulty of stopping a bureaucratic steam roller, once started, still seems to us . . . a perfectly proper factor for a district court to take into account in assessing that risk, on a motion for a preliminary injunction").

## ARGUMENT

## I.    THE BALANCE OF HARMS FAVORS PLAINTIFFS

A.    Irreparable Harm Will Occur Without a Temporary
      Restraining Order

In its opposition, the government alleges that plaintiffs have not established irreparable environmental injury because they "have not shown that the San Pedro project would precipitate significant environmental impacts."  Gov't Opp. at p. 24.  An inquiry into the significance of impacts, however, is appropriate in deciding the merits of plaintiffs' NEPA claims on summary judgment, not as a standard for a temporary restraining order.  By conflating these two standards, the government would turn the definition of irreparable injury on its head for, as the Supreme Court has recognized, "environmental injury, by its nature, can seldom be adequately remedied

by money damages and is often . . . irreparable." <u>Amoco Production Co. v. Village of Gambell</u>, 480 U.S. 531, 545 (1987).

Thus, for example, the District of Columbia District Court has consistently found that harm to wildlife constitutes irreparable injury. <u>See</u>, <u>e.g.</u>, <u>Fund for Animals v. Clark</u>, 27 F. Supp. 2d 8 (D.D.C. 1998) (enjoining bison hunt that would kill approximately 8 percent of the wild population pending NEPA compliance); <u>Fund for Animals v. Norton</u>, 281 F. Supp. 2d 209 (D.D.C. 2003) (enjoining the state of Maryland from acting on the mute swan depredation permit issued by the Fish and Wildlife Service); <u>Greater Yellowstone Coalition v. Bosworth</u>, 209 F. Supp. 2d 156, 164 (D.D.C. 2002) (enjoining livestock grazing for harm to bison, as well as destruction of wetlands and accompanying deterioration in water quality). Plaintiffs have presented substantial evidence of irreparable harm to wildlife populations, and the environment generally, within the San Pedro NCA from border fence and road construction, and thus their motion for a temporary restraining order should be granted.

For example, plaintiffs provided substantial photographic evidence of construction that has already occurred on the San Pedro NCA, including significant clearing of native vegetation in preparation for road construction, as well as trenching in preparation for erection of border fencing. <u>See</u> Clark Decl. figures 3-6. Furthermore, plaintiffs' expert declarations demonstrate that this vegetation clearing will have irreparable effects on wildlife. [1] As stated by Avila:

> Habitat fragmentation and destruction are serious threats to wild felines, such as jaguars, mountain lions, bobcats, and ocelots . . .

---

[1] Notably, the Ninth Circuit Court of Appeals has held that simple clearing of native vegetation <u>itself</u> constitutes irreparable harm. <u>S.E. Ak. Conservation Council v. Army Corps of Eng'nrs.</u>, 472 F.3d 1097, 1100 ("SEACC has demonstrated that construction of a permanent dam . . . will adversely affect the environment by destroying trees and other vegetation, and by killing aquatic life.") (9th Cir. 2006); <u>see also</u> <u>W. Watersheds Project v. BLM</u>, 2006 U.S. Dist. LEXIS 76717 *6 (D. Nev. Oct. 20, 2006) (finding irreparable harm where project would "destroy native vegetation and result in the displacement and/or direct mortality of small mammals and birds.").

> Felines prefer <u>well-covered, dense vegetation</u> for protection of their litters, ambushing prey, feeding, and migrating corridors. Activities of construction of a barrier, such as DHS' proposed pedestrian fence, <u>clearing of vast areas, destruction of vegetation cover</u>, change in topographic features, such as land-filling of canyons, or water streams, will affect cat populations in the border region, <u>even before the fence is in place</u>, regardless of what side of the border they are in.

Avila Decl. ¶ 21 (emphasis added). Plaintiffs' declarations further establish not only the presence of wild felines and many other wildlife species generally, but the Clark Declaration contains direct evidence of contemporaneous usage of the San Pedro NCA within proposed construction areas by bobcat and mountain lion. Clark Decl. ¶ 2, p. 9 & figure 2.

Moreover, since the filing of plaintiffs' complaint and motion last Friday, defendants DHS and Army Corps have conducted extensive additional construction, resulting in further irreparable environmental harm. See Ahren Decl.¶ 14, 22 (DHS official noting 80 percent of road completed and 60-foot easement completed); Odle Decl. (Plf. Exh. 3). The rapid pace of construction within the San Pedro NCA underscores a simple fact: if a temporary restraining order is not granted, construction of the border fence and road within this protected area will be completed long before the merits of plaintiffs' claims are heard and ruled upon—likely within a matter of days. Thus, for purposes of assessing irreparable harm, the Court should focus its inquiry not only on the actions that defendants are taking right now—although these actions alone are more than sufficient to establish such harm—but the effects of the completed project.

As established by plaintiffs' declarations and the BLM's own analysis in the Border Fence EA, the completed border fence and road will have significant and far-reaching negative consequences on cross-border wildlife movements, as well as the San Pedro River and its native vegetation. Contrary to defendants' assertions that "plaintiffs have not shown or even alleged that the San Pedro fencing project would harm a rare or threatened plant or animal population at

all, let alone harm those species beyond renewal," Gov't Opp. at p. 24, plaintiffs have established

that the fence and road will significantly and irreparably harm a wide diversity of mammalian

species, including imperiled species such as jaguar.  For example, the Hass declaration notes that

many "subtropical species reach the northern extent of their ranges in this area, including

jaguars, ocelots, white-nosed coatis, hooded skunks, Mexican fox squirrels, Merriam's deermice,

Coue's deer, white-sided jackrabbits, Sonoran subspecies of the Virginia opossum, a large

variety of birds and reptiles [and] a diverse flora."  Hass is clear that the proposed fence and road

construction will likely have negative and even profound effects on this unique assemblage of

biological diversity:

> The biological integrity of the whole Madrean Archipelago region
> relies on genetic interchange throughout the region—by both plants
> and animals.  Barriers to this genetic interchange may influence the
> long-term viability of populations, especially north of the border.
> Construction of border fencing and barriers presents three serious
> threats to long-term survival of wildlife on the border: fences that are
> impermeable to wildlife, thus allowing no gene flow at all; increased
> human foot traffic into areas with vehicle barriers; and roads that bring
> in more recreational users and illegal vehicle traffic close to the
> border.

Hass Decl. ¶ 13; see also Avila Decl. ¶ 22 (border infrastructure "threaten[s] the survival of

jaguars in the United States, endanger[s] the establishment of individuals and/or a viable

breeding population and block the passages that jaguars, as well as other big, medium, and small

sized mammals use to reach the habitats where they naturally occur.  Proposed infrastructure will

disrupt, segment and isolate wildlife populations in both sides of the border.").  Because

plaintiffs have established irreparable harm, a temporary restraining order should be granted.

See, e.g., Cuomo v. United States Nuclear Regulatory Comm'n, 772 F.2d 972, 974 (D.C. Cir.

1985) (the injunction test "is not a wooden one, and relief may be afforded with either a high

probability of success and some injury, or vice versa.")(internal citations omitted).[2]

>B.    The Public Interest Favors a Temporary Restraining
>Order

The government's reply asserts that the public interest counsels against a temporary

restraining order because "delaying the completion of the San Pedro border fence would impair

important border and related national security interests," specifically high levels of illegal entry

into the United States and consequent environmental harm.  Gov't Opp. at p. 26.

Plaintiffs readily acknowledge that significant environmental harm has arisen from high

levels of undocumented immigration and other illegal activities.  However, it is important to note

that this harm is the direct result of government border security efforts undertaken in urban areas

such as San Diego, California and El Paso, Texas, shifting immigration flows to Arizona without

comprehensive planning or prior consultation with federal land managers.  See Def. Exh. D at 12

("Land management and Border Patrol officials attribute the increased illegal activity on federal

lands to the Border Patrol's strategy of concentrating resources primarily in populated areas, thus

shifting much of the illegal traffic to less patrolled federal lands."); id. at 23 ("According to land

management agency officials . . .the Border Patrol did not coordinate with them when it began

implementing its strategy.").  Moreover, in this case, the BLM predicts that construction of

fencing will have an adverse environmental effect by shifting traffic into the San Pedro River

---

[2] In marked contrast to the irreparable harm demonstrated by plaintiffs, defendants argue that because they have rushed to complete approximately 80 percent of the proposed road and "already . . . scraped" the 60-foot easement, enjoining the project will cause environmental harm by causing an "erosion problem" and a "safety hazard."  Gov't Opp. at p. 27.  Here, defendants engage in the worst kind of bootstrapping, arguing that their attempt to moot plaintiffs' suit, and the clear irreparable environmental harm of their construction, should essentially be rewarded by the Court.  Moreover, defendants fail to acknowledge that their stated concerns are easily remedied by far less drastic measures that completing the border fence and road, such as simply covering the trenches.

corridor.  Border Fence EA at p. 22-23 (noting that "there is expected to be an increase [sic] pedestrian traffic being funneled into the river corridor," although under the chosen Alternative, "there will be more openings," and thus "the funneling . . . will be spread out to more areas.").

Additionally, the government does not address how the undisputed irreparable harm to this protected area is outweighed by the <u>temporary</u> suspension of construction activities, and preservation of the <u>status quo</u>, until the Court can hear and rule upon the merits of plaintiffs' request for a preliminary injunction.  Especially in light of the border fence construction being undertaken all along the Arizona border, as well as several other areas of the U.S.-Mexico border, the government has provided no reasonable argument that the <u>immediate</u> walling off of this small, 2-mile section of the border serves an essential public interest.[3]

## II.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS

### A.    Defendants Are Violating NEPA

In their opening brief, plaintiffs argued that the San Pedro fence and road project is part of a larger effort to wall much of the Arizona border, and that BLM, other land management agencies, and DHS were improperly segmenting their NEPA analysis for these projects and thus not considering their larger cumulative effects.  In response, the government argues that plaintiffs' arguments have "at least two fatal defects":  (1) an alleged improper reliance on "declarations not in the administrative record"; and (2) a failure to establish a "mandatory NEPA

---

[3] If DHS truly believes that wall and road construction on the San Pedro NCA is a national emergency, then it has the authority to invoke section 102 of the REAL ID Act, 8 U.S.C. § 1103, note, to waive laws pertaining to it that it determines necessary to ensure such expeditious construction.  However, unless and until it does so, it cannot use its claim of urgency as an excuse to skirt the nation's environmental laws, which remain in effect.

requirement mandating a regional EIS." Gov't Opp. at p. 9-11. For the reasons below, defendants' arguments are misplaced.

First, plaintiffs here have filed their case and immediately moved for a temporary restraining order, and thus the government has not yet produced an administrative record. Moreover, the government's criticism of plaintiffs for their reliance on expert affiants to bolster their arguments that the San Pedro project and other proposed and ongoing wall construction will have cumulative effects on wildlife on natural resources is clearly groundless. As defendants provided the public with no notice or opportunity for public comment or other involvement in the Border Fence EA (itself a violation of NEPA), plaintiffs cannot now be faulted for going outside of the "administrative record." Indeed, it is well-recognized both that a court may consider extra-record evidence (1) where plaintiffs claim an agency ignored environmental impacts under NEPA; and (2) in considering the equities in support of a request for an injunction. Esch v. Yeutter, 876 F.2d 976, 991 (D.C. Cir. 1989); see also Carlton v. Babbitt, 26 F. Supp.2d 102, 107 (D.D.C. 1998) (same).

Second, defendants' arguments against a regional EIS entirely fail to address plaintiffs' arguments that (a) an EIS is required for this project and (b) the Border Fence EA is patently deficient under NEPA.[4] As to the EIS, the BLM's Finding of No Significant Impact ("FONSI") fails to make the required "convincing case" that no EIS is required. Indeed, it fails to even discuss the "significance" factors, let alone meaningfully explain why no EIS is necessary. 40 C.F.R. § 1508.13 ("'Finding of no significant impact' means a document by a Federal agency

---

[4]    Defendants' argument that the agency is not required to prepare a "Programmatic EIS," Gov't Opp. at p. 9, is particularly irrelevant at this early stage of this proceeding. Regardless of whether the Court ultimately determines that the broader EIS is required, at this point all the Court needs to consider is whether an EIS may be necessary for this specific project, and whether in the EA and FONSI plaintiffs are challenging, the agency took a "hard look" at the cumulative impacts of this particular fence segment. Grand Canyon Trust, 290 F.3d 333, 340 (D.C. Cir. 2002). Plainly, it did not.

briefly presenting the reasons why an action, not otherwise excluded, will not have a significant effect on the human environment and for which an environmental impact statement therefore will not be prepared.") (emphasis added); Grand Canyon Trust, 290 F.3d at 340 (EA must make a "convincing case for its finding" that no EIS is required).

    With regards to the Border Fence EA, even if the Court does not agree with plaintiffs' argument that a regional EIS must be prepared, defendants' brief certainly fails to demonstrate that it meets the D.C. Circuit's four-part test for a sufficient Environmental Assessment—i.e., whether the agency has (a) "accurately identified the relevant environmental concern"; (b) "taken a 'hard look' at the problem"; (c) made a "convincing case for its finding" that no EIS is required; and (d) demonstrated that any necessary mitigation will "sufficiently reduce the impact to a minimum" so as to support a FONSI. Id. Indeed, the agency has soundly failed the first prong of the test by limiting its analysis to "the San Pedro River watershed," Border Fence EA at 20, rather than including the larger area that includes other segments of the fence which, taken together, will have demonstrable, cumulative impacts on desert wildlife and vegetation. TRO memo. at p. 11-14.

    Thus, while defendants argue that BLM sufficiently considered cumulative impacts, Gov't Opp. at 21, even a cursory review of the Border Fence EA pages (p. 20-23) to which defendants cite reveals that the Border Fence EA does not even begin to address the cumulative impacts of this fence project with the other fence projects in the area.[5] Moreover, defendants own Exhibit B—a Biological Opinion ("Bi-Op") from the U.S. Fish and Wildlife Service

---

[5] See e.g., Sept. 17, 2007 Environmental Assessment for the Proposed Installation of 5.2 Miles of Primary Fence Near Lukeville, Arizona (Organ Pipe Cactus National Monument); Sept. 11, 2007 Environmental Assessment for Construction and Maintenance of 2.4 Miles of Primary Fence Along the U.S.-Mexico Border Near Nogales, Arizona; July 2007 Environmental Assessment for Pedestrian Fence Near Sasabe, Arizona (Buenos Aires National Wildlife Refuge) (documents available at: http://ecso.swf.usace.army.mil/).

("FWS") addressing impacts of this fence in conjunction with other fence segments in this area—further demonstrates that the "relevant environmental concern" here, Grand Canyon Trust, 290 F.3d at 340, is not solely limited to the San Pedro River, but to the flora and fauna that are being impacted by this fence segment in conjunction with the other nearby fence segments also being constructed. Thus, in stark contrast to the Border Fence EA, which only considered less than 2 miles of this overall fencing system, the Bi-Op considered three sections of fence that will total 31 miles, Def. Ex. B at p. 8, recognizing that the overall fence will have common impacts on protected species. Id. at p. 16 (defining the "action area"). See Natural Res. Def. Council v. Hodel, 865 F. 2d 288, 297 (D.C. Cir. 1988) (purpose of NEPA's cumulative effects requirement "is to prevent agencies from dividing one project into multiple individual actions.").

Unless and until the defendants consider the environmental impacts of these fence areas together, it will have not fulfilled its basic obligations under NEPA. See, e.g., Defenders of Wildlife v. Babbitt, 130 F. Supp. 2d 121, 135-139 (D.D.C. 2001). In Defenders, this Court concluded that various agencies had violated NEPA by considering the impacts of their own activities on the endangered Sonoran Pronghorn, but refusing to consider the impacts of nearby agency actions on the species. Id. Similarly, here, irrespective of whether BLM is required to prepare an EIS, at bare minimum its EA must address the cumulative impacts of this fence, together with other segments of the overall fence being constructed, to the extent that these segments, taken together, will have "cumulative or synergistic environmental impact[s]" on the environment. Friends of the Earth v. U.S. Army Corps of Eng'rs., 109 F. Supp. 2d 30, 41 (D.D.C. 2000) (citations omitted).

The agency also plainly failed to take the "hard look" that NEPA requires for an EA. See, e.g., Sierra Club v. Mainella, 459 F. Supp. 2d 76 (D.D.C. 2006). Thus, as Judge Bates

explained in reviewing three Park Service EAs, an agency has failed the "hard look" requirement when the EA lacks "explanations supporting its conclusions" and describes impacts "using conclusory labels . . . without explanation." Id. at 108. Here, for example, with regard to impacts of the fence on wildlife, the agency recognizes that "[t]he proposed action may have a short term effect of disturbance of local wildlife due to construction activities"; "[t]here will be wildlife mortality"; and the fence "has the potential to separate portions of wildlife populations from existing watering points, which will potentially change wildlife distributions and population levels," Border Fence EA at 11, but the agency nowhere analyzes the extent of those impacts, and the long-term effect they may have on the wildlife itself, the ecosystem of which that wildlife is a part, or impact on the visiting public who travel to this area to view wildlife in its natural habitat, see Bahr Decl, Miller Decl., Neeley Decl.; see also Border Fence EA at 5 (acknowledging the area "attracts birders from all over the world"). Mainella, 459 F. Supp. 2d at 100 ("An unbounded term cannot suffice to support an agency's decision because it provides no objective standard for determining what kind of differential makes one impact more or less significant than another.").[6]

    For those environmental impacts and issues that are acknowledged by the Border Fence EA, there is no "full and fair discussion" of the mitigation measures claimed by BLM to offset these impact, to say nothing of the required "concise, clear, and to the point" analysis "supported by evidence" with "reference . . . to the scientific or other sources relied upon for the [agency's] conclusions." 40 C.F.R. §§ 1502.1; 1502.24. Rather, the Border Fence EA simply provides a list of various mitigation measures—which may or may not reduce the environmental impact of

---

[6]    The same problem is present in the agency's other impact analysis sections. See, e.g. EA at 9 (discussing unquantified "increased erosion" on "downstream vegetation"; other impacts that "could negatively impact this upstream vegetation" and lead "to destabilization to riparian habitat"; and the likelihood of "excess sediment in drainages from storm runoff").

the project—to support the conclusion that an EIS is not required. Border Fence EA at p. 23-24; Gov't Opp. at p.14-15; see also Robertson v. Methow Valley, 490 U.S. 332, 351-52 (1989) ("mitigation [must] be discussed in sufficient detail to ensure that environmental consequences have been fairly evaluated"); Neighbors of Cuddy Mountain v. U.S. Forest Service, 137 F.3d 1372, 1380 (9th Cir. 1998) ("an EIS 'shall include discussions of . . . means to mitigate adverse environmental impacts'") (quoting 40 C.F.R. § 1502.16(h)).

Under District of Columbia Circuit Court precedent, "if the agency does find an impact of true significance, preparation of an EIS can be avoided only if the agency finds that the changes or safeguards in the project sufficiently reduce the impact to a minimum." Grand Canyon Trust, 290 F.3d at 341 (quoting Sierra Club v. United States Dep't of Transportation, 753 F.2d 120, 126, 127 (D.C. Cir. 1985)); see also Maryland-Nat'l Capital Park and Planning Comm'n v. U.S. Postal Serv., 487 F.2d 1029, 1040 (D.C. Cir. 1973) ("changes in the project are not legally adequate to avoid an impact statement unless they permit a determination that such impact as remains, after the change, is not 'significant.'"). Here, BLM has not demonstrated, with any certainty, that its list of mitigation measures will render the enumerated environmental impacts insignificant. For example, the Border Fence EA specifically acknowledges that with respect to the impact of the project on the wetlands, riparian zones and vegetation "there is a large degree of uncertainty concerning the effectiveness of the some [sic] of the proposed mitigation for erosion as many of the details have not been determined." Border Fence EA at p.10. Moreover, the measures that are included in the Border Fence EA are voluntary and may not be fully implemented by the agency. See Corinne Purtill, Border fence stirs wildlife worries, The Arizona Republic, Oct. 6, 2007 ("The right-of-way permit included several such requests to protect the riparian area, . . . [b]ut the recommendations are not binding under the permit's terms,

said Lorraine Buck, spokeswoman for the BLM's Tucson office.")(Plf. Exh. 1); April Reese,

Groups appeal BLM decision to allow border fence through Ariz. conservation area, Land Letter,

Oct., 4, 2007 ("While DHS and the corps do not have a legal obligation to adhere to BLM's

recommendations, they have been 'very cooperative.'")(Plf. Exh. 2).

 Finally, the government failed to adequately respond to plaintiffs' arguments that the lack

of any public involvement in the Border Fence EA constitutes a violation of NEPA.  For the

reasons set forth in plaintiffs' initial memo, defendants' failure is unlawful.

 B. Defendants Have Violated the Arizona-Idaho Conservation Act of 1988

 Pursuant to the Arizona-Idaho Conservation Act of 1988, 16 U.S.C. § 460xx, BLM is

charged with managing the San Pedro NCA "in a manner that conserves, protects, and enhances

the riparian area and the aquatic, wildlife, archeological, paleontological, scientific, cultural,

educational, and recreational resources of the conservation area," id. § 460xx-1(a), and may

"only allow such uses of the conservation area as [it] finds will further [these] primary

purposes." Id. § 460xx-1(b).  Yet, despite this clear mandate, and notwithstanding the

government's implication that the "emergency" provisions of the Act apply, and the tortured

extension of the Border Fence EA to include such an analysis, see Gov't Opp. at 22-23, BLM has

issued the right of way without specific consideration being given to the negative impact of the

action on the NCA, its resources or values.  See Def. Exh. D at 3 (noting that federal land

managers "view constructing barriers primarily in keeping with the Border Patrol's border

security mission and generally not consistent with land management agencies' missions of

protected people and resources.").

## REQUESTED RELIEF

 For the foregoing reasons, the Motion for a Temporary Restraining Order should be

granted.

Respectfully Submitted this 9th day of October, 2007.


_____/s/_____
Brian Segee (D.C. Bar. 492098)
Defenders of Wildlife
1130 Seventeenth Street, N.W.
Washington, D.C. 20036
(202) 682-9400
(202) 682-1331 (fax)


_____/s/_____

Howard M. Crystal (D.C. Bar. No. 446189)
Meyer Glitzenstein & Crystal
1601 Connecticut Avenue, N.W., Suite 700
Washington, D.C.  20009
(202) 588-5206
(202) 588-5049 (fax)


Counsel for Plaintiffs

14

CERTIFICATE OF SERVICE

I HEREBY that service of the foregoing plaintiffs' Reply in Support of Temporary Restraining

Order has been made through the Court's electronic transmission facilities on this 9th day of

October, 2007.

/s/
_____

Brian Segee, D.C. Bar No. 492098
Defenders of Wildlife
1130 Seventeenth Street, N.W.
Washington, D.C. 20036
(202) 682-9400

# Border fence stirs wildlife worries

**Corinne Purtill**
The Arizona Republic
Oct. 6, 2007 12:00 AM

Conservationists are railing against the federal government for approving a fence along Arizona's border that would cut through the San Pedro Riparian National Conservation Area, a move that environmentalists and land managers say could endanger wildlife and possibly one of the state's last free-flowing rivers.

The Sierra Club and Washington-based Defenders of Wildlife filed for a temporary restraining order Friday in D.C. Circuit Court to halt fence construction in the riparian area.

The filing follows an appeal the groups filed earlier in the week against the Bureau of Land Management and the U.S. Department of the Interior asking for a halt on all border-fence construction in Arizona until a thorough environmental study is done.

A judge will rule on the latest request early next week, said Sean Sullivan, a Sierra Club executive committee member.

Construction is under way on the 10,000-foot fence segment crossing the San Pedro area. The fence is part of an 8-mile extension of the Naco border wall that would eventually be among 370 miles of fencing built along the U.S. border with Mexico by the end of 2008. Sixty to 90 miles will be in Arizona, U.S. Department of Homeland Security officials said.

"The Arizona border is being walled off right now, and it's being done without the government taking into consideration the impacts to wildlife," said Brian Segee, staff attorney for Defenders of Wildlife. "Border security can be done in a way that doesn't destroy the natural environment."

The San Pedro Riparian National Conservation Area is a 58,000-acre public preserve surrounding 40 miles of the San Pedro River. Cottonwood and willow forests on the banks host more than 80 types of mammals and more than 350 bird species.

Ecologists say construction could permanently damage the river and the wildlife it supports.

An environmental report prepared by the BLM notes that a barrier will reduce environmental damage from humans and vehicles crossing the border illegally.

However, it also states that barriers could disrupt or even shift the San Pedro River's flow as sediment builds, destroying surrounding vegetation and wildlife habitats.

The report noted that a fence could block wildlife from watering holes and kin across the border. It could also funnel animals to new routes outside the barrier's limits, just as it could with human migrants, according to the report.

Construction is also expected to disinter buried remains that members of the Tohono O'odham Tribe claims as their ancestors.

The report notes that the tribe finds this "unacceptable."

Homeland Security has not finalized the fence's exact location, said Brad Benson, spokesman for department's Secure Border Initiative. The BLM gave permission for temporary and permanent vehicle barriers and posts to block pedestrians.

Ecologists from the Nature Conservancy met with Border Patrol officials Friday to talk about the construction.

"It's a really complicated balance between national-security issues and habitat protection," said Holly Richter, Upper San Pedro Program director for the Nature Conservancy.

Trash and environmental damage from illegal-migration traffic has battered the riparian area. A barbed-wire fence has been the only partition between the countries.

Homeland Security asked the BLM for access through the conservation area for a fence in September 2006.

On Aug. 31, Patrick Madigan, manager of the BLM's Tucson office, signed a document stating that the planned wall, vehicle barriers and access road "will not have any significant impacts on the human environment" and, thus, would not require more extensive environmental study. On Sept. 10, the BLM signed over the right of way.

The wall won't run through the river itself. The BLM has asked that 1,250 feet of removable vehicle barriers be placed along the riverbed and floodplain.

The right-of-way permit included several such requests to protect the riparian area, including that soils be stabilized with native species and all trucks be power-washed before entering the area to avoid spreading invasive plants.

But the recommendations are not binding under the permit's terms, said Lorraine Buck, spokeswoman for the BLM's Tucson office.

A public-comment period on the BLM's decision was neither required nor held, Buck said.

The advocacy groups' appeal came at the end of a 30-day window for the public to file

appeals.

The government has not yet responded to that complaint. The effects of illegal immigration have been punishing to Arizona's public lands, which make up 85 percent of the border.

Trash, toxic waste and illegal foot and vehicle paths scar many once-pristine spaces. Safety concerns have led to closures in Organ Pipe Cactus National Monument and Buenos Aires National Wildlife Refuge. Yet many worry that border fences could be even more devastating to southern Arizona's environment.

Bill Odle, a 67-year-old Marine veteran, lives on 50 acres directly west of the conservation area. He worries the fence will destroy the natural environment that attracted him to that corner of southern Arizona.

"The darn thing is not effective for what it's supposed to do - in other words, stop people," Odle said. "It will stop vehicles, and my big (worry) is that it stops the wildlife."

**Republic reporter Sean Holstege contributed to this article.**

# 5. PUBLIC LANDS: Groups appeal BLM decision to allow border fence through Ariz. conservation area (10/04/2007)

**April Reese, *Land Letter* Western reporter**

Two environmental groups filed an administrative appeal Monday challenging a Bureau of Land Management decision to approve a right-of-way for a new security fence to be built in the San Pedro Riparian National Conservation Area, along the U.S.-Mexico border. The fence would be "disastrous" to native woodlands, restrict migration of wildlife to Mexico, and could alter the hydrology of the river, said Defenders of Wildlife and the Sierra Club.

Last month, BLM issued a right-of-way permit for the project, which would involve building about two miles of new security fencing and a patrol road through the San Pedro Riparian National Conservation Area. In its environmental assessment of the project, BLM decided there would be "no significant impact" on the conservation area.

Speaking on the issue this week, Department of Homeland Security chief Michael Chertoff said the fence will actually help reduce environmental damage, because it will stem the flow of illegal immigrants, who leave behind trash and drive through protected areas to avoid capture. "Illegal migrants really degrade the environment," Chertoff told the Associated Press on Monday. "I've seen pictures of human waste, garbage, discarded bottles and other human artifact in pristine areas. And believe me, that is the worst thing you can do to the environment."

The environmental groups disagreed with the federal assessment. They say the project will wipe out some native cottonwood-willow woodlands, isolate populations of jaguar, ocelot, kit fox, black bear and other animals, and could cause erosion of river banks, possibly leading to a shift in the river channel.

"There's no way that a 15-foot wall can be environmentally sensitive," said Sean Sullivan of the Sierra Club's southern Arizona chapter.

The 58,000-acre San Pedro Riparian National Conservation Area, which hosts about 250 species of migratory birds and is known for its biological diversity, has been designated as a World Heritage Natural Area by the United Nations.

The groups also take issue with the federal government's decision not to undertake a comprehensive environmental review of the cumulative effects of all the fence projects proposed for Arizona. The San Pedro fence is one of six segments proposed in the past few months along Arizona's border with Mexico. Others would run through Organ Pipe

Cactus National Monument and Buenos Aires National Wildlife Refuge. Parts of the fence are already under construction.

"They're really taking a piecemeal approach to this," Sullivan said. "About 80 percent of the Arizona border is slated to be walled off by the Secure Fence Act, so for them not to take a step back and take a look at the whole project is just not a good idea."

The Department of Homeland Security is looking at the cumulative effects of fence projects in Texas and should take a similarly comprehensive approach in Arizona, he said.

Brad Benson, a spokesman for the department's Secure Border Initiative, said the department is undertaking environmental reviews where they are needed, based on past projects. But that does not necessarily mean that a fence will be built, he added. "It's easier to do environmental reviews ahead of time, and there may be environmental reasons not to build something," he said. "It's better to determine that now."

## Damages could be limited

BLM's final environmental assessment of the proposed project acknowledged that building the fence across desert arroyos that drain into the San Pedro River could cause some damage but that those impacts could be limited through proper design of the fence.

"BLM believes that we have mitigated to the extent possible that we can for those issues," said Lorraine Buck, a spokeswoman for BLM's Tucson field office.

Buck said BLM has recommended to DHS and the Army Corps of Engineers, which will handle construction, that removable fencing should be used in arroyos during the spring flooding season so that natural flows will not be impeded. And the agency is in talks with DHS and the corps about the design of the fence, she added.

While DHS and the corps do not have a legal obligation to adhere to BLM's recommendations, they have been "very cooperative," she said.

Benson noted that DHS has worked with other agencies to modify fence projects in the past. On the Barry M. Goldwater Range, after talking with Department of Defense officials and federal biologists, DHS designed the new section of fence there to include small "gates" to allow the horned lizard, which moves back and forth across the border, to pass through.

DHS has more than doubled the number of miles of fencing in the past fiscal year, which ended Sept. 30, to more than 150 miles of new fence, he said.

Federal land managers agree that illegal immigration through federal lands has caused environmental damage, but they also worry about the effects of securing the border on wildlife. Some land mangers have urged DHS to use "virtual fencing" in sensitive areas,

along with other technology that would improve surveillance and security without requiring a solid barrier (_Land Letter_, Nov. 6, 2006).

Under the Secure Fence Act, **H.R. 6061**, passed by Congress and signed by President Bush last fall, Homeland Security plans to erect 370 miles of fence and 200 miles of vehicle barriers along the Southwest border by the end of 2008. About 40 percent of the Southwest border, which stretches from Texas to California, consists of federal lands.

While the act calls for up to 700 miles of new fence, whether the remaining 330 miles are built will likely be up to the next administration, Benson said.

Some members of Congress are pushing to amend the legislation to allow for greater scrutiny of the projects. In June, Arizona Rep. Raul Grijalva (D) introduced a bill that would require DHS to consult with federal land managers, tribes and local officials on border security decisions to reduce their environmental impact.

Benson said the agency has held more than 500 meetings with local stakeholders and is open to hearing local concerns as the projects continue -- but only up to a point.

"We can't give the locals veto power," he said. "We want to work with everybody, but at the same time, we have to accomplish our mission of securing the border."

Declaration of William J. Odle

1,     I have personal knowledge of the statements and enclosed photos in this declaration and am competent to testify to these matters in judicial or administrative form.

2.     I reside at 10445 East International Rd., Palominas, Arizona 85615.  I have lived here with my wife since September of 2000.  Our 50 acre property is adjacent to the international border with Mexico and is bordered by the San Pedro NCA on the west.

3.     I am disturbed by the border fence currently being constructed.    The wall will prevent wildlife migration-deer, mountain lion, javelina, bobcat, and others, are not able to go through or over this 12' high fence.

4.     The fence that has been in place for a couple of years has resulted in debris acting as an obstruction to the natural water flow due to rainfall.  As a result there is erosion that would not have occured otherwise.

5.     Fencing of any height will not and has not stopped people from crossing unlawfully.  It has stopped wildlife migration and has affected the hydrology of the area.

6.     The enclosed photos were taken by me on 9 Oct. 2007.  Statements made herein are true and this declaration was made on 9 Oct.2007 at my home in Cochise County, Arizona.


Date:   9 October,2007                          _____

                                                William J. Odle



