UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| DEFENDERS OF WILDLIFE and SIERRA CLUB; | ) ) ) | |
| Plaintiffs, | ) ) | Case No: 07-1801 (ESH) |
| vs. | ) ) ) | **PLAINTIFFS' OPPOSITION TO DEFENDANTS' RENEWED MOTION TO DISMISS** |
| Hon. Michael CHERTOFF, Secretary, Department of Homeland Security, <u>et al.</u>, | ) ) ) | |
| Defendants. | ) ) ) ) | |

TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

STATUTORY BACKGROUND....................................................................................... 4

    I.     THE ILLEGAL IMMIGRATION REFORM AND IMMIGRANT
           RESPONSIBILITY ACT OF 1996 .......................................................... 4

    II.    THE REAL ID ACT OF 2005................................................................... 5

ARGUMENT..................................................................................................................... 9

    I.     SECTION 102 OF THE REAL ID ACT UNCONSTITUTIONALLY
           GRANTS THE DHS SECRETARY THE POWER TO REPEAL OR
           AMEND LAWS WITHOUT COMPLIANCE WITH THE
           PROCEDURES OF ARTICLE I .............................................................. 9

    II.    SECTION 102 OF THE REAL ID ACT VIOLATES FUNDAMENTAL
           SEPARATION OF POWERS PRINCIPLES ......................................... 13

    III.   CONGRESS HAS NEVER ENACTED, AND THE COURTS HAVE
           NEVER SUSTAINED, A WAIVER AS BROAD AND UNFETTERED
           AS SECTION 102 OF THE REAL ID ACT.......................................... 21

    IV.   EVEN IF THE "INTELLIGIBLE PRINCIPLE" STANDARD
           APPLIES HERE, SECTION 102 OF THE REAL ID ACT IS AN
           UNCONSTITUTIONAL DELEGATION .............................................. 26

CONCLUSION................................................................................................................ 32

TABLE OF AUTHORITIES

Supreme Court Cases

*A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495 (1935).....................26, 29

*Am. Power & Light Co. v. SEC*, 329 U.S. 90 (1946)...........................................19, 30, 31

*Clinton v. City of New York*, 524 U.S. 417 (1998)................................................... passim

*Field v. Clark*, 143 U.S. 649 (1892)........................................................3, 21, 22, 23

*Freytag v. Comm'r,* 501 U.S. 868 (1991) ....................................................... 12

*Indus. Union Dep't, AFL-CIO v. Am. Petroleum Inst.*, 448 U.S. 607 (1980) ................. 30

*INS v. Chadha*, 462 U.S. 919 (1983) .................................................................. passim

*J.W. Hampton, Jr. & Co. v. United States*, 276 U.S. 394 (1928) ................................... 18

*Loving v. United States*, 517 U.S. 748 (1996) .....................................................14, 15, 26

*Mistretta v. United States*, 488 U.S. 361 (1989)........................................................ passim

*Metro. Washington Airports Auth. v. Citizens for the Abatement*
    *of Aircraft Noise, Inc.*, 501 U.S. 252 (1991)................................................. 13, 14

*Panama Refining Co. v. Ryan*, 293 U.S. 388 (1935) ....................................................... 26

*Robertson v. Seattle Audubon Soc'y*, 503 U.S. 429 (1992)................................................. 9

*Touby v. United States*, 500 U.S. 160 (1991) ....................................................26, 30, 31

*TVA v. Hill*, 437 U.S. 153, 195 (1978).......................................................... 14

*Whitman v. Am. Trucking Ass'n*, 531 U.S. 457 (2001) ........................................... passim

*Yakus v. United States*, 321 U.S. 414 (1944)........................................................... 32

*Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952)..................................... 33

District Court Cases

*Byrd v. Raines*, 956 F. Supp. 25 (D.D.C. 1997) .................................................17, 18, 20

*Sierra Club v. Ashcroft*, 2005 U.S. Dist. LEXIS 44244 (S.D. Cal. Dec. 13, 2005) ... 27, 28

*Synar v. United States*, 626 F. Supp. 1374 (D.D.C. 1986)............................................. 29

## CONSTITUTION

Art. I ........................................................................................................ 2
Art. I, § 1 ............................................................................................... 16
Art. I, § 7 .....................................................................................11, 16, 17
Art. II........................................................................................................ 2
Art. II, § 3 .............................................................................................. 16

## STATUTES

Pub. L. No. 109-13, 8 U.S.C. § 1103 Note.....................................1, 4, 5, 7, 30

Pub. L. No. 104-208, 8 U.S.C. § 1103 Note........................................... 4, 5, 30

Pub. L. No. 107-296............................................................................... 5

Pub. L. No. 109-367............................................................................... 6

16 U.S.C. § 1531 ................................................................................... 5

42 U.S.C. § 4321................................................................................... 5

## LEGISLATIVE HISTORY

151 Cong. Rec. H453 (daily ed. Feb. 9, 2005) (statement of Rep. Sensenbrenner)......... 28

151 Cong. Rec. H457 (daily ed. Feb. 9, 2005) (statement of Rep. Lungren).................. 28

151 Cong. Rec. H459 (daily ed. Feb. 9. 2005) (statement of Rep. Jackson-Lee) ........ 6, 28

151 Cong. Rec. H470 (daily ed. Feb. 9, 2005) (statement of Rep. Hoekstra)................. 28

151 Cong. Rec. H471 (daily ed. Feb. 9, 2005) (statement of Rep. Bono) ...................... 28

151 Cong. Rec. H536 (daily ed. Feb. 10, 2005) (statement of Rep. Sensenbrenner)....... 28

## FEDERAL REGISTER

70 Fed. Reg. 55,622 (Sept. 22, 2005).............................................................. 7

72 Fed. Reg. 2,535 (Jan, 19, 2007) ............................................................... 8

72 Fed. Reg. 60,870 (Oct. 26, 2007)..................................................1, 8, 25, 30

MISCELLANEOUS

The Federalist No. 47 .............................................................................. 13, 15

Congressional Research Service, Congressional Dist. Memo., Sec. 102 of
H.R. 418, Waiver of Laws Necessary for Improvement of Barriers
at Borders (Feb. 9, 2005) ...................................................................... 3, 21, 27

CRS Report for Congress, Border Security:  Barriers Along the U.S.
International Border (Dec. 12, 2006) ........................................................... 27

Gary Larson, Delegation and Original Meaning, 88 Va. L. Rev. 327, 332 (2002) .......... 26

R. Bolt, *A Man for All Seasons*, Act I, Three Plays, Heinemann ed. 1967 ..................... 14

**INTRODUCTION**

After insisting that they are "extremely serious about [their] NEPA compliance," Oct. 10, 2007 hearing transcript (Pls.' Ex. 1) at p. 10, federal defendants responded to this Court's October 10 Temporary Restraining Order ("TRO") stopping border wall and road construction within the San Pedro Riparian National Conservation Area by waiving application not only of the National Environmental Policy Act ("NEPA"), the Arizona-Idaho Conservation Act of 1988, and the Administrative Procedure Act, but of sixteen other laws intended to protect our Nation's natural resources and federal lands, its imperiled species of wildlife, plants, and birds, its water and air, and its cultural, historic and archeological resources. This "waiver," published in the *Federal Register* on October 26, 2007, 72 Fed. Reg. 60,870, was made pursuant to section 102 of the "REAL ID Act of 2005," which provides the Secretary of the Department of Homeland Security ("DHS") with sweeping authority to "waive all legal requirements" that he determines, in his "sole discretion," are "necessary to ensure expeditious construction" of border fences and roads. Pub. L. No. 109-13, 8 U.S.C. § 1103 Note.

The Secretary's action inescapably transformed this litigation from a simple case seeking protection for a special natural area, in compliance with established environmental laws, to one raising the highest possible constitutional issues. In legal and practical effect, the Secretary's "waiver" was unmistakably a partial repeal of the laws he cited. Yet in our system of government, the power to repeal the law – like the power to make it and to amend it – lies exclusively with Congress. The Constitution prescribes a particular procedure for the enactment of any legislation – bicameral passage and presentment to the President for signature – that unquestionably was not adhered to in

1

this case, making the Secretary's purported "waiver" void. *See INS v. Chadha*, 462 U.S. 919, 954 (1983) ("Amendment and repeal of statutes, no less than enactment, must conform with Art. I."); *Clinton v. City of New York*, 524 U.S. 417 (1998) (holding Line Item Veto Act unconstitutional because it attempted to authorize the President to repeal enacted statutes without compliance with Art. I's procedures).

The Secretary's action, moreover, violates the principle of separation of powers that lies at the heart of this nation's framework of democratic governance. *See, e.g., Mistretta v. United States*, 488 U.S. 361, 380 (1989) (re-affirming "the central judgment of the Framers of the Constitution that, within our political scheme, the separation of governmental powers into three coordinate Branches is essential to the preservation of liberty."). The power to enact, amend, and repeal the laws is the quintessential legislative power vested exclusively in Congress by Article I of the Constitution. By contrast, the fundamental constitutional role of the Executive Branch under Article II is to "faithfully execute" – not selectively void – the laws. The Secretary's attempt to repeal unilaterally nineteen laws that otherwise would have constrained his conduct, and the law that purports to authorize him in taking such improper action, thus squarely offend both Article I and Article II.

The Secretary's action, and the enactment of section 102 of the REAL ID Act, may both have been motivated by an interest in seeing construction of the border wall proceed "expeditiously." The Constitution's structure, however, "requires a stability which transcends the convenience of the moment." *Clinton,* 524 U.S. at 449 (Kennedy, J., concurring). *Accord, Chadha*, 462 U.S. at 959 ("[I]t is crystal clear … that the Framers ranked other values higher than efficiency. … With all the obvious flaws of

2

delay, untidiness, and potential for abuse, we have not yet found a better way to preserve freedom than by making the exercise of power subject to the carefully crafted restraints spelled out in the Constitution."). If Congress concludes that construction of the border wall is of such national moment that it should supersede existing laws, it can direct that result through legislation properly enacted in accordance with Article I (by including, for example, the familiar phrase "notwithstanding any other provision of law"). What Congress *cannot* do is abdicate to the Executive Branch the fundamental legislative responsibility for determining what laws shall apply to that Branch's own conduct.

There have, of course, been prior instances of legislative waivers. The scope of the REAL ID Act's waiver provision, however, is unprecedented in our history. *See* Congressional Research Service ("CRS") Congressional Dist. Memo., *Sec. 102 of H.R. 418, Waiver of Laws Necessary for Improvement of Barriers at Borders,* Stephen R. Viña and Todd Tatelman (Feb. 9, 2005) ("CRS REAL ID Act Memo") (Pls.' Ex. 2). Previous statutory "waivers" have almost without exception involved Congress itself directly waiving particular laws, or instructing the President or another officer to waive particular provisions (usually provisions of the same law containing the waiver) if certain circumstances occur. *See, e.g., Field v. Clark*, 143 U.S. 649 (1892). As the Court noted in *Clinton*, in these instances it is Congress itself, rather than the Executive Branch, that has made the determination to waive the application of particular provisions of law; the Executive Branch serves only as its agent to make the finding that the specified events have occurred. 524 U.S. at 445.

In contrast, section 102 of the REAL ID Act provides the DHS Secretary with a roving commission to repeal, in his sole discretion, *any law in all 50 titles of the United*

3

*States Code* that he concludes might impede construction of a border wall. It is only

happenchance that the Secretary's waiver in this case involved laws protecting the

environment and historic resources; he could equally have waived the requirements of the

Federal Labor Relations Act to halt a strike, or the provisions of the Occupational Safety

and Health Act in order to force workers to endure unsafe working conditions. Section

102 is thus not a mere delegation of broad policy responsibility that can be defended, as

defendants argue, by pointing to some "intelligible principle" guiding the Executive

Branch in its implementation. Rather, it is the transfer of an *inherently legislative power*

to the DHS Secretary – the power to repeal standing laws in his sole discretion – in

inescapable violation of both Article I and Article II of the Constitution. As Justice

Thomas has observed, "the Constitution does not speak of 'intelligible principles.'

Rather, it speaks in much simpler terms: 'All legislative Powers herein granted shall be

vested in a Congress.'" *Whitman v. Am. Trucking Ass'n*, 531 U.S. 457, 487 (2001)

(Thomas, J., concurring).

To preserve the Constitution's fundamental framework, this court must declare

the waiver authority conveyed in section 102 of the REAL ID Act, and the Secretary's

attempt to invoke that authority, unconstitutional and void.

## STATUTORY BACKGROUND

## I.    THE ILLEGAL IMMIGRATION REFORM AND IMMIGRANT RESPONSIBILITY ACT OF 1996

The Illegal Immigration Reform and Immigrant Responsibility Act of 1996

("IIRIRA") is notable as Congress's first substantive direction to the Executive Branch to

build physical barriers at the border in order to deter illegal immigration, stating that the

Attorney General "shall take such actions as may be necessary to install additional

barriers and roads . . . in the vicinity of the United States border to deter illegal crossings

in areas of high illegal entry into the United States." IIRIRA § 102(a); Pub. L. No. 104-

208, 8 U.S.C. § 1103 Note. The IIRIRA also included specific direction to construct a

14-mile, triple-layered fence in coastal San Diego. IIRIRA § 102(b)(1). Section 102(c)

of the IIRIRA further provided that the Endangered Species Act ("ESA"), 16 U.S.C. §

1531 *et seq.*, and NEPA, 42 U.S.C. § 4321 *et seq.*, were "waived to the extent the

Attorney General determine[s] necessary to ensure expeditious construction" of the San

Diego wall.[1] This authority was never invoked; in fact, the Department of Justice and

Immigration and Naturalization Service opposed the measure and established a policy not

to use its waiver provisions. *See* Mar. 6, 1997 Memorandum from Immigration and

Naturalization Service Assistant Commissioner David Yentzer (Pls.' Ex. 3).

## II.    THE REAL ID ACT OF 2005

Introduced in the House of Representatives by former Judiciary Committee

Chairman James Sensenbrenner on January 26, 2005, the REAL ID Act of 2005 (H.R.

418) was signed into law by President Bush on May 11, 2005. The REAL ID Act

established national standards for state-issued driver's licenses, increased restrictions on

asylum applications, and expanded deportation immigration laws. Relevant to this case,

section 102 of the REAL ID Act amended section 102 of the IIRIRA[2] to provide the DHS

---

[1] Responsibility for border security transferred from the Attorney General and
Immigration and Naturalization Service ("INS"), within the Department of Justice, to
DHS with passage of the Homeland Security Act of 2002, Pub. L. No. 107-296. The Act
created DHS from other departments, abolished INS, and transferred U.S. Border Patrol
functions to the Under Secretary for Border and Transportation Security at DHS.

[2] It is an unfortunate coincidence that section 102 of the REAL ID Act and section 102
of the IIRIRA are both at issue in this litigation, and the potential for confusion is
compounded by the fact that section 102 of the REAL ID Act amended, and is codified

5

Secretary authority to "waive all legal requirements" that he determines, in his "sole discretion," are "necessary to ensure expeditious construction" of the barriers and roads authorized under the IIRIRA.  *See* § 102(c)(1) of Pub. L. No. 109-13, 8 U.S.C. § 1103 Note.[3]

Despite significant controversy associated with the section 102 waiver provisions and other aspects of the legislation, the REAL ID Act was passed without any Committee consideration or hearings in either Chamber of Congress, and without having ever been introduced, considered, or debated by the Senate.  In the limited floor debate on the REAL ID Act in the House of Representatives, one member noted the breathtaking scope of the waiver authority provided to the DHS Secretary, and the lack of meaningful Congressional consideration of that provision:

> To my knowledge, a waiver this broad is unprecedented. It would waive all laws, including laws protecting civil rights; laws protecting the health and safety of workers; laws, such as the Davis-Bacon Act, which are intended to ensure that construction workers on federally-funded projects are paid the prevailing wage; environmental laws; and laws respecting sacred burial grounds. It is so broad that it would not just apply to the San Diego border fence that is the underlying reason for this provision. It would apply to any other barrier or fence that may come about in the future. At the very least, we should have a hearing to consider the consequences of such a drastic waiver.

151 Cong. Rec. H459 (daily ed. Feb. 9. 2005) (statement of Rep. Jackson-Lee).

---

at, section 102 of the IIRIRA.  For clarity's sake, any reference in this brief simply to "section 102" refers to section 102 of the REAL ID Act; when plaintiffs refer instead to IIRIRA, we will refer to "section 102 of IIRIRA."

[3] The IIRIRA was further amended by the Secure Fence Act, which identifies five specific areas where border fencing is authorized. Pub.L. No. 109-367 (Oct. 26, 2006).

Subsequent to its passage in the House as a stand-alone bill, and before any Senate Committees had considered or held hearings on its provisions, the House added H.R. 418 as an unrelated legislative "rider" to H.R. 1268, an emergency supplemental appropriations bill allocating $82 billion to the wars in Iraq and Afghanistan, tsunami relief in southeast Asia, and other purposes. Pub.L. No. 109-13.[4]  On May 10, 2005 the Senate cleared H.R. 1268 by a vote of 100-0.

On September 22, 2005, DHS Secretary Michael Chertoff invoked section 102 of the REAL ID Act to waive eight laws[5] in relation to the 14-mile San Diego border fence project identified in section 102(b) of IIRIRA.  70 Fed. Reg. 55,622, 55,622-23 (Sept. 22, 2005) (Pls.' Ex. 5).  Although the *Federal Register* notice did not expressly state why the waiver was being invoked, a five-mile section of secondary fencing, running east from the Pacific Ocean, had been delayed by the California Coastal Commission when it ruled that the project's design was not consistent with the California Coastal Act, and therefore violated the Coastal Zone Management Act.  Additionally, there was pending litigation against the project, although DHS had prepared an environmental impact statement purporting to analyze its potential impacts.  *See* Leslie Berestein, *Feds Override Laws, Give OK to Border Fence*, San Diego Union-Tribune (Sept. 15, 2005) (Pls.' Ex. 6).

---

[4] Some in the Senate believed that by attaching the REAL ID Act to H.R. 1268, the House leadership successfully gambled that even if Senate members were troubled by their lack of opportunity to consider the legislation, they would not let those concerns derail the Senate's approval of H.R. 1268, which as an emergency funding bill for war and humanitarian relief efforts, was considered a "must-pass" piece of legislation.  *See, e.g.,* Congressional Quarterly Press Releases, *Senator Feinstein Expresses Concern About REAL ID Act in Supplemental Appropriations Bill* (May 10, 2005) (Pls.' Ex. 4).

[5] NEPA, the ESA, the Coastal Zone Management Act, the Clean Water Act, the National Historic Preservation Act, the Migratory Bird Treaty Act, the Clean Air Act, and the Administrative Procedure Act.

On January 19, 2007, Secretary Chertoff for a second time invoked the waiver authority under section 102 of the REAL ID Act, this time to waive nine laws[6] in relation to border barriers and roads "in the vicinity of the United States border known as the Barry M. Goldwater Range." 72 Fed. Reg. 2,535, 2,535-36 (Jan. 19, 2007) (Pls.' Ex. 7). There was at the time no pending litigation against the Goldwater fence project.

The waiver at issue in this case thus involves the third time Secretary Chertoff has invoked his authority under section 102 of the REAL ID Act. In this instance, Secretary Chertoff waived "all federal, state, or other laws, regulations and legal requirements of, deriving from, or related to the subject of" a total of *nineteen laws:* NEPA, the ESA, the Clean Water Act, the National Historic Preservation Act, the Migratory Bird Treaty Act, the Clean Air Act, the Archeological Resources Protection Act, the Safe Drinking Water Act, the Noise Control Act, the Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act, the Comprehensive Environmental Response, Compensation, and Liability Act, the Federal Land Policy and Management Act, the Fish and Wildlife Coordination Act, the Archeological and Historic Preservation Act, the Antiquities Act, the Historic Sites, Buildings, and Antiquities Act, the Arizona-Idaho Conservation Act of 1988, the Wild and Scenic Rivers Act, the Farmland Protection Policy Act, and the Administrative Procedure Act. 72 Fed. Reg. 60870 (Oct. 26, 2007). The Secretary's notice states that the waiver applies to "the area starting approximately 4.75 miles west of the Naco, Arizona Port of Entry to the western boundary of the [San

---

[6] NEPA, the ESA, the Clean Water Act, the Wilderness Act, the National Historic Preservation Act, the National Wildlife Refuge System Administration Act, the Military Lands Withdrawal Act of 1999, the Sikes Act, and the Administrative Procedure Act.

Pedro Riparian National Conservation Area] and any and all land covered by the TRO."

*Id.*

## **ARGUMENT**

I.    **SECTION 102 OF THE REAL ID ACT UNCONSTITUTIONALLY GRANTS THE DHS SECRETARY THE POWER TO REPEAL OR AMEND LAWS WITHOUT COMPLIANCE WITH THE PROCEDURES OF ARTICLE I**

Under the "single, finely wrought, and exhaustively considered procedure" established in Article I of the Constitution, legislation can be enacted only through a detailed process that includes bicameral passage and presentment to the President. *Chadha*, 462 U.S. at 951. That procedure must be followed in full when Congress amends or repeals the law. *Id*. at 954 ("Amendment and repeal of statutes, no less than enactment, must conform with Art. I.").

The power granted by section 102 of the REAL ID Act to the Secretary of DHS to "waive" the applicability of any law that would otherwise apply to border wall and fence construction projects is unmistakably the power partially to repeal or amend such laws. *See, e.g., Robertson v. Seattle Audubon Soc'y*, 503 U.S. 429, 441 (1992) (holding that appropriations rider stating that compliance with its terms satisfied requirements of NEPA and other laws at issue in pending lawsuits did not violate separation of powers because Congress's action effectively amended those laws as they applied to the activities that were subject to the litigation). The legal and practical effects of the Secretary's waiver in this case – the court's vacation of a temporary injunction it had entered after finding that plaintiffs were likely to succeed on the merits of their claims under NEPA,

the Arizona-Idaho Conservation Act, and the Administrative Procedure Act,[7] followed by

defendants' immediate resumption of construction on the wall – demonstrate that it

constituted an effective repeal of the statutes on which plaintiffs rely.  Section 102 of the

REAL ID Act thus impermissibly allows an Executive Branch official to negate duly

enacted federal legislation without either bicameral presentment or Presidential signature,

in violation of Article I's explicit requirements.

      In this respect, the "waiver" authority conferred in section 102 of the REAL ID

Act is essentially identical to the "cancellation" provisions of the Line Item Veto Act

struck down in *Clinton*, and that decision squarely governs this case.  Under the Line

Item Veto Act, the President was granted the authority to "cancel in whole" certain types

of appropriations and tax provisions after he had signed bills containing those measures

into law.  *Clinton*, 524 U.S. at 436.  The Supreme Court in *Clinton* first noted that the

President's exercise of that cancellation authority plainly constituted the repeal or

amendment of existing law: "In both legal and practical effect, the President has amended

two Acts of Congress by repealing a portion of each."  *Id.* at 438.  The Court

acknowledged that both "Article I and Article II assign responsibilities to the President

---

[7] This Court found that plaintiffs had demonstrated a substantial likelihood of success on the merits under NEPA and the Arizona-Idaho Conservation Act of 1988, and that the equities favored plaintiffs.  Among other findings, the Court stated that defendants' "discussion of cumulative impacts [under NEPA] ... suffer[s] from both a factual and legal flaw," TRO Transcript at 91, and that plaintiffs had introduced "sufficient evidence ... to show that [border wall and road construction] could have effects on [wildlife migration]." *Id.* at 93.  The Court further concluded that defendants' "failure here to not even acknowledge the potential cumulative impacts of anything outside of the San Pedro watershed, including other border fencing areas, renders this EA inadequate under NEPA because the Agency cannot convincingly establish that they have adequately identified relevant areas of environmental concern."  *Id.* at 93-94.  Upon notification from defendants that the Secretary had waived the laws at issue in this case, the court vacated its injunction, allowing construction to resume.

that directly relate to the lawmaking process," but stated flatly: "*There is no provision in the Constitution that authorizes the President to enact, to amend, or to repeal statutes.*" *Id.* (emphasis added). *See also id.* at 439 ("Although the Constitution expressly authorizes the President to play a role in the process of enacting statutes, it is silent on the subject of unilateral Presidential action that either repeals or amends parts of duly enacted statutes.").

Concluding that "[t]here are powerful reasons for construing constitutional silence on this profoundly important issue as equivalent to an express prohibition," *id.*, the Court struck down the Line Item Veto Act on the basis that it "authorizes the President himself to effect the repeal of laws, for his own policy reasons, without observing the procedures set out in Article I, § 7." *Id.* at 445. The Court explicitly noted that "[t]he fact that Congress intended such a result is of no moment," because "Congress cannot alter the procedures set out in Article I, § 7, without amending the Constitution." *Id.* The Court concluded: "If there is to be a new procedure in which the President will play a different role in determining the final text of what may 'become a law,' such change must come not by legislation but through the amendment procedures set forth in Article V of the Constitution." *Id.* at 449.

The Court's rationale for invalidating the Line Item Veto Act in *Clinton* applies in full here. Like the Line Item Veto Act, section 102 of the REAL ID Act purports to authorize an Executive Branch official to repeal or amend, in his own discretion, duly-enacted provisions of law. The action by the Secretary here does not remotely comply with the bicameralism and presentment procedures of Article I, § 7. Indeed, if anything, the violation of the carefully-wrought balance of the Constitution in this case is even

more egregious.  Unlike the Line Item Veto Act, which was at least focused on the

process of enactment of legislation and simply tried, albeit improperly, to alter the

President's role in that process, section 102 of the REAL ID Act makes no pretense of

engaging the Secretary in some version of the legislative process, such as reporting to

Congress his view that provisions of an existing law were impeding wall construction – it

simply authorizes the Secretary to waive inconvenient provisions of law at his discretion,

without even a nod to the Constitutional procedure for enacting such repeals.  Moreover,

whereas the Line Item Veto Act's cancellation authority was narrowly restricted to tax

and appropriations measures, section 102 of the REAL ID Act allows the Secretary to

waive *any* law (potentially even state or local ordinances) in relation to border wall and

fence construction.  Finally, unlike the "precise procedures" the Line Item Veto Act

imposed on the President, the REAL ID Act prescribes no procedure at all for the DHS

Secretary to follow before waiving the laws (other than publication of his action in the

*Federal Register*).

     The fact that Congress may have intended this result, and indeed enacted

legislation purporting expressly to authorize it, is, as the Supreme Court noted in *Clinton*,

"of no moment."  *Id.* at 446.   As Justice Kennedy noted in his concurring opinion in

*Clinton*:

> It is no answer, of course, to say that Congress surrendered its authority by
> its own hand … That a congressional cession of power is voluntary does
> not make it innocuous.  The Constitution is a compact enduring for more
> than our time, and one Congress cannot yield up its own powers, much
> less those of other Congresses to follow.  *See Freytag v. Commissioner,*
> 501 U.S. 868, 880 (1991); *cf. Chadha, supra*, at 942, n. 13.  Abdication of
> responsibility is not part of the constitutional design.

524 U.S. at 451-52. Moreover, as the Court noted in *Metro. Washington Airports Auth. v. Citizens For the Abatement of Aircraft Noise, Inc.*, 501 U.S. 252, 277 (1991), to allow Congress to craft even seemingly innocuous shortcuts around the Constitution's procedures "provides a blueprint" for expansion of the legislative power beyond its constitutionally confined role. If Congress can authorize the Secretary here to waive laws he views as impeding construction of a border wall, it can empower other Executive Branch officials to waive laws that similarly appear to constrain their conduct, or conceivably go so far as to grant to the President the power to dispense with compliance with the laws altogether in the pursuit of his policy agenda.

Against this sobering canvas of potential abuses, *Clinton*'s lesson is very simple: if Congress wishes to convey authority to an Executive Branch official to repeal or amend the laws in this manner, it must do so through constitutional amendment. It cannot, as it has attempted here, simply enact unconstitutional legislation.

## II.    SECTION 102 OF THE REAL ID ACT VIOLATES FUNDAMENTAL SEPARATION OF POWERS PRINCIPLES

Separation of powers between the three coordinate branches of our federal government – legislative, executive, and judicial – is a fundamental cornerstone of our democratic system of governance. "Separation of powers was designed to implement a fundamental insight:  concentration of power in the hands of a single branch is a threat to liberty." *Clinton*, 524 U.S. at 450 (Kennedy, J., concurring). As Madison warned, "'when the legislative and executive powers are united in the same person or body … there can be no liberty, because apprehensions may arise lest the same monarch or senate

should enact tyrannical laws to execute them in a tyrannical manner.'" *The Federalist*

No. 47, at 303 (C. Rossiter ed., 1961) (*quoting* Montesquieu) (emphasis omitted).

    While the threat to liberty posed by the arbitrary enactment and execution of law

by one branch of government is obvious, the danger posed by empowering the Executive

Branch to revoke at its discretion the laws that restrain and govern its own conduct

should be equally clear.   An Executive Branch that can place itself above the law is the

epitome of despotic power that so deeply concerned the Framers, with their first-hand

experience with arbitrary rule under a monarchy.  *See Chadha*, 462 U.S. at 959; *Metro.*

*Washington Airports Auth.,* 501 U.S. at 273 ("The abuses by the monarch recounted in

the Declaration of Independence provide dramatic evidence of the threat to liberty posed

by a too powerful executive.").   The fact that such arbitrary power is granted – as it

predictably would be – to pursue matters of seemingly great public import does not lessen

the danger to liberty.  As the fictionalized Sir Thomas More famously warned his over-

zealous secretary, who was willing to "cut a great road through the law to get after the

Devil:"

> And when the last law was down, and the Devil turned round on you –
> where would you hide, Roper, the laws all being flat? …This country's
> planted thick with laws from coast to coast – man's laws, not God's – and
> if you cut them down … d'you really think you could stand upright in the
> winds that would blow then? …Yes, I'd give the Devil benefit of law, for
> my own safety's sake.

R. Bolt, *A Man for All Seasons*, Act I, p. 147 (Three Plays, Heinemann ed. 1967) (*quoted*

*in TVA v. Hill*, 437 U.S. 153, 195 (1978)).

    "Deterrence of arbitrary or tyrannical rule is not the sole reason for dispersing the

federal power among three branches, however."  *Loving v. United States*, 517 U.S. 748,

14

757 (1996).  Clear demarcation of each branch's responsibilities also ensures political

accountability, essential in a democratic system:

> By allocating specific powers and responsibilities to a branch fitted to the
> task, the Framers created a National Government that is both effective and
> accountable.  … *The clear assignment of power to a branch … allows the
> citizen to know who may be called to answer for making, or not making,
> those delicate and necessary decisions essential to governance.*

*Id.* (emphasis added).

For these vital reasons, the now-familiar framework of the Constitution divides

the powers of the federal government into three defined categories – Legislative,

Executive, and Judicial – with clearly defined responsibilities.  Although these branches

of government are not "hermetically sealed" from one another, "the powers delegated to

the three Branches are functionally identifiable," *Chadha*, 462 U.S. at 951, and the

Supreme Court continues to police their boundaries with care, cautioning that "[t]he

hydraulic pressure inherent within each of the separate Branches to exceed the outer

limits of its power, even to accomplish desirable objectives, must be resisted."  *Id.  See

also Loving*, 517 U.S. at 757 ("Although separation of powers 'd[oes] not mean that these

[three] departments ought to have no partial agency in, or no control over the acts of each

other,' … it remains a basic principle of our constitutional scheme that one branch of the

Government may not intrude upon the central prerogatives of another.") (*quoting The

Federalist* No. 47) (other internal citations omitted).

The Constitution by its text clearly distinguishes the power to make law from the

duty to execute the law.  Article I vests "[a]ll legislative Powers" in Congress, and

specifies very clear procedures – including bicameral passage and presentation to the

President – for enactment of legislation.  As the Supreme Court noted in *Chadha*, "the

prescription for legislative action in Art. I, §§ 1, 7, represents the Framers' decision that the legislative power of the Federal Government be exercised in accord with a single, finely wrought and exhaustively considered, procedure."  462 U.S. at 951.   Of particular importance to this case, *"[t]here is no provision allowing Congress to repeal or amend laws other than legislative means pursuant to Art. I*."  *Id.* at 954 n.18 (emphasis added).

By contrast, Article II, § 3 states that the President's constitutional role is to "take Care that the Laws be faithfully executed."  The President plays a critical, but limited role in the enactment of legislation: Article I, § 7 defines his power to sign legislation into law or to "return" it with his objections to Congress, and Article II, § 3 empowers him to recommend legislation and, in extraordinary circumstances, convene or adjourn Congress.  The Constitution does not grant the Executive Branch any other power to enact, amend, or repeal legislation.  *Clinton*, 524 U.S. at 438.

Measured against these clear Constitutional standards, the authority that section 102 of the REAL ID Act purports to convey to the Executive Branch to waive standing laws, and the Secretary's invocation of that authority in this case, flagrantly violate basic separation of powers principles.  The power to amend or repeal existing law is quintessentially legislative power; as the Supreme Court made clear in *Chadha*, "[a]mendment and repeal of statutes, no less than enactment, must conform with Art. I." 462 U.S. at 954.  While Congress itself can certainly repeal or amend standing law to expedite important public purposes, it cannot authorize the Executive Branch to repeal or amend the law in its own discretion, for such legislative powers are vested solely in Congress and must be exercised by that body.   Similarly, the Executive Branch cannot choose to void laws with which it disagrees (other than to veto proposed laws prior to

16

enactment in accordance with Art. I, § 7); its Constitutional charge is to "faithfully execute the Laws."

By granting the DHS Secretary the unilateral and inherently legislative power to repeal any law that might constrain his own actions in constructing border walls and roads, section 102 of the REAL ID Act thus directly violates both Article I, which limits legislative authority to the Congress, and Article II, which requires the President to execute, rather than selectively ignore, the law. The Secretary's action purporting to exercise this forbidden authority threatens our political freedom and the basis of our democratic government, for it effectively creates in the Executive Branch an all-powerful political despot beyond the restraint of our duly-enacted laws. *See Clinton*, 524 U.S. at 452 (Kennedy, J., concurring) ("By increasing the power of the President beyond what the Framers envisioned, the [Line Item Veto Act] compromises the political liberty of our citizens, liberty which the separation of powers seeks to ensure.").

Moreover, by passing to the Secretary the politically-charged policy decision to override any existing laws that protect important American values, like clean drinking water and reasoned consideration of environmental impacts, Congress evades accountability for the critical policy determination to elevate the importance of securing our borders from illegal immigration over all other societal values. Under the Constitution, that fundamental policy determination rightfully lies with Congress, and the voters should have the right to evaluate Congress's exercise of its judgment without obfuscation from a purported delegation of the critical decision to the Secretary. As Judge Jackson of this court noted in striking down the Line Item Veto Act in the case that was the precursor to *Clinton*, *Byrd v. Raines*, 956 F. Supp. 25, 37 (D.D.C. 1997), *vacated*

*on other grounds*, 521 U.S. 811 (1997):[8] "The Line Item Veto Act … hands off to the President authority over fundamental legislative choices.  Indeed, that is its reason for being.  It spares Congress the burden of making those vexing choices of which programs to preserve and which to cut."

Defendants argue that the REAL ID Act can nonetheless be sustained simply because it provides an "intelligible principle" to guide the Executive Branch's exercise of its unparalleled discretion to void standing law.  Plaintiffs argue below that the breathtaking scope of the waiver authority conveyed in the act fails even that permissive standard.  *See* Argument IV.  More fundamentally, however, the constitutional infirmity that lies at the center of section 102 of the REAL ID Act is so egregious, and so basic, that it cannot be cured by the mere detection of an "intelligible principle."

The Supreme Court has generally relied upon the "intelligible principle" standard to analyze whether an impermissible delegation of legislative power has occurred.  *See, e.g., J.W. Hampton, Jr. & Co. v. United States*, 276 U.S. 394, 409 (1928); *Am. Trucking Ass'n*, 531 U.S. at 474 (2001).  But that is because the delegation cases that have come to the Court have generally involved the problem of so-called "interstitial" law-making, in which the Court begins with the premise that in the modern administrative state Congress must be able to delegate authority to agencies to implement broad policy directives, and thus focuses only on whether Congress has given the agency sufficient guidance to constrain the agency's exercise of that power to ensure that it has stayed within bounds set by Congress.  *See, e.g., Mistretta*, 488 U.S. at 372 (the Court's "jurisprudence has

---

[8] *Byrd* was the first challenge to the Line Item Veto, brought by members of Congress. Judge Jackson's holding in *Byrd* that the act violated separation of powers was vacated by the Supreme Court on standing grounds.

been driven by a practical understanding that in our increasingly complex society, replete

with ever changing and more technical problems, Congress simply cannot do its job

absent an ability to delegate power under broad general directive."); *Am. Trucking Ass'n*,

531 U.S. at 474-75 ("In short, we have almost never felt qualified to second-guess

Congress regarding the permissible degree of policy judgment that can be left to those

executing or applying the law.") (internal citations omitted).  The Court has therefore

deemed laws "constitutionally sufficient if Congress clearly delineates the general policy,

the public agency which is to apply it, and the boundaries of the delegated authority."

*Mistretta*, 488 U.S. at 372-73 (*quoting Am. Power & Light Co. v. SEC*, 329 U.S. 90, 105

(1946)).

       This case, however, is at the opposite end of the spectrum.  The problem here is

not that Congress is authorizing an agency to engage in interstitial rule-making; the

problem is that Congress is authorizing the agency to exercise the power to *nullify* other

laws as it sees fit.  That is not "interstitial" law-making; it is law-making pure and simple,

and it far more directly offends separation of powers than any case involving the breadth

of agency discretion in *implementing* the law.  As Justice Thomas has observed, some

delegations are too dangerous to be sustained by any "intelligible principle:"

> Although this Court has treated the 'intelligible principle' requirement as
> the only constitutional limit on congressional grants of power to
> administrative agencies, the Constitution does not speak of 'intelligible
> principles.'  Rather, it speaks in much simpler terms: 'All legislative
> Powers herein granted shall be vested in a Congress.'  I am not convinced
> that the intelligible principle serves to prevent all cessions of legislative
> power.  *I believe that there are cases in which the principle is intelligible
> and yet the significance of the delegated decision is simply too great for
> the decision to be called anything other than 'legislative.'*

*Am. Trucking Ass'n*, 531 U.S. at 487 (Thomas, J., concurring) (emphasis added).  *See also Mistretta*, 488 U.S. at 420 (Scalia, J., dissenting) ("In the present case, however, a pure delegation of legislative power is precisely what we have before us.  It is irrelevant whether the standards are adequate, because they are not standards related to the exercise of executive or judicial powers; they are, plainly and simply, standards for further legislation.").

Judge Jackson confronted and recognized this type of "pure" legislative delegation in his 1997 decision in *Byrd* finding the Line Item Veto Act unconstitutional.  Judge Jackson rejected the government's argument that the Act, which allowed the President unilaterally to "cancel" portions of appropriations and tax benefits after signing them into law, should be analyzed under the intelligible principles standard.  956 F. Supp. at 34 ("Their analysis assumes that Congress conferred a delegable power.  It did not; it ceded basic legislative authority.").  Characterizing this power as "revolutionary" rather than "evolutionary," Judge Jackson noted that "[a]s expansive as its delegations of power may have been in the past, none has gone so far as to transfer the function of repealing a provision of statutory law," thus allowing the President to "become a co-maker of the Nation's laws."  *Id.* at 37.  He concluded with a prescient warning:

> Moreover, if cancellation power could constitutionally be delegated as to appropriations and limited tax benefits, defendants have yet to show a tenable constitutional distinction between appropriation and tax laws, on the one hand, and all other laws, on the other.  At oral argument they insisted that there is virtually no limit to the express Article I powers Congress may delegate if it chooses, so long as it articulates 'intelligible principles' by which its delegee is to be guided.  If that is so – if Congress can delegate to the President the power to reconfigure an appropriations or tax benefit bill – *why can he not also cancel provisions of an environmental protection or civil rights law he disfavors*, and upon exactly the same 'principles' as are to guide his exercise of cancellation authority under the Line Item Veto Act?

*Id.* (emphasis added).

The delegation at issue in section 102 of the REAL ID Act presents precisely the type of rare case in which – regardless of whether the law establishes an "intelligible principle" – the "significance of the delegated decision is simply too great" to be sustained. The REAL ID Act delegates to the DHS Secretary the most fundamental and "pure" of legislative powers: the ability to choose which laws shall remain in effect, and the extent to which they shall apply to his own actions. That delegation is plainly unconstitutional.

### III.    CONGRESS HAS NEVER ENACTED, AND THE COURTS HAVE NEVER SUSTAINED, A WAIVER AS BROAD AND UNFETTERED AS SECTION 102 OF THE REAL ID ACT

As plaintiffs have noted, Congress has previously enacted legislation that contained contingent waivers of particular provisions. *See, e.g., Field v. Clark*, 143 U.S. 649. The nature and scope of the power granted by section 102 of the REAL ID Act to the DHS Secretary to repeal duly-enacted laws is unprecedented, however, in our Nation's history. An independent study of the act by the Congressional Research Service concluded:

> After a review of federal law, primarily through electronic database searches and consultations with various CRS experts, *we were unable to locate a waiver provision identical to that of § 102 of H.R. 418—i.e.*, a provision that contains 'notwithstanding language,' provides a secretary of an executive agency the authority to waive all laws such secretary determines necessary, and directs the secretary to waive such laws. Much more common, it appears, are waiver provisions that (1) exempt an action from other requirements contained in the Act that authorizes the action, (2) specifically delineate the laws to be waived, or (3) waive a grouping similar laws.

CRS REAL ID Act Memo at 2-3 (Pls.' Ex. 2) (emphasis added).

The sweeping power to void existing law given to the Secretary by section 102 differs in fundamental ways from prior legally-valid Congressional waivers. In *Field*, for example, the Supreme Court upheld the Tariff Act of 1890, which exempted a range of commodities from tariff duties, but directed the President to suspend that statutory exemption upon a finding that any country producing and exporting those products imposed "reciprocally unequal and unreasonable" duties on American-made products. 143 U.S. at 692. The Court noted the "vital" principle that Congress cannot delegate legislative power to the President, but concluded that the Tariff Act "does not, in any real sense, invest the President with the power of legislation." *Id.* at 692. The Court reasoned:

> Congress itself determined that the provisions of the act . . . should be suspended . . . [upon a Presidential determination that the duties on American products were] reciprocally unequal and unreasonable . . . *Nothing involving the expediency or the just operation of such legislation was left to the determination of the President . . . As the suspension was absolutely required* when the President ascertained the existence of a particular fact, it cannot be said that in ascertaining that fact and in issuing his proclamation, in obedience to the legislative will, he exercised the function of making laws . . . It was a part of the law itself as it left the hands of Congress that the provisions, full and complete in themselves, permitting the free introduction of sugars, molasses, coffee, tea and hides, from particular countries, should be suspended, in a given contingency, and that in case of such suspensions certain duties should be imposed. … *What the President was required to do was simply in execution of the act of Congress.*

*Id.* at 692-93 (emphasis added).

In *Clinton*, the Supreme Court noted that this passage from *Field* identifies three "critical differences" between the power conferred in the Tariff Act of 1890 and "the power to cancel portions of a duly enacted statute," and concluded that *Field* and other cases in which the courts had upheld prior Congressional waivers provided no support for

22

the discretionary repeals at issue in the Line Item Veto Act. 524 U.S. at 443-444. First, "the exercise of the suspension power was contingent upon a condition that did not exist when the Tariff Act was passed: the imposition of 'reciprocally unequal and unreasonable' import duties by other countries." *Id.* at 443. By contrast, the power of cancellation conferred by the Line Item Veto Act "necessarily was based on the same conditions that Congress evaluated when it passed those statutes." *Id.* Second, under the Tariff Act, "when the President determined that the contingency had arisen, he had a duty to suspend." *Id.* The Line Item Veto Act, by contrast, gave the President discretion whether to cancel a particular appropriations provision. *Id*. at 443-44. Finally, "whenever the President suspended an exemption under the Tariff Act, he was executing the policy that Congress had embodied in the statute." *Id.* at 444. In contrast, "whenever the President cancels an item of new direct spending or a limited tax benefit he is rejecting the policy judgment made by Congress and relying on his own policy judgment." *Id.*

Based on these critical distinctions, the Court concluded that its prior finding that contingent waivers like that in *Field* did not involve delegations of legislative powers "does not undermine our opinion that cancellations pursuant to the Line Item Veto Act are the functional equivalent of partial repeals of Acts of Congress that fail to satisfy Article I." 524 U.S. at 444. The basic point, the Court noted, was that "when enacting the statutes discussed in *Field*, Congress itself made the decision to suspend or repeal the particular provisions at issue upon the occurrence of particular events subsequent to enactment, and it left only the determination of whether such events occurred up to the President." *Id.* at 445.

The "critical differences" relied upon by the Court in *Clinton* equally demonstrate how the even broader authority to repeal existing laws conferred on the Secretary by the REAL ID Act differs from, and cannot be supported by, prior Congressional waivers. Just as with the Line Item Veto Act, the waiver authority granted by section 102 of the REAL ID Act is not truly contingent upon a future event; the possibility that laws like NEPA that require careful assessment of environmental impacts might slow construction of a border fence was presumably as obvious to Congress when it enacted the REAL ID Act as it was for the Secretary when he invoked the waiver. Section 102 does not purport to limit its authority to a particular future state of affairs, such as entry of an injunction halting construction (and indeed when the Secretary invoked the waiver for the second time, at the Barry Goldwater Range, there was no pending or threatened litigation). Second, unlike the tariff waiver in *Field*, but like the unconstitutional cancellations in *Clinton*, the REAL ID Act does not contain any Congressional directive to the Secretary to take action upon a specified event; his invocation of his waiver authority is entirely discretionary, and thus reflects his own judgment, rather than that of Congress. Finally, unlike the tariff in *Field*, the authority given to the Secretary to repeal existing laws is not limited to provisions enacted in the same law as the waiver authority; instead, it extends to any provision of law, enacted at any time by any Congress. Thus, rather than executing the policy of Congress regarding the waiver of particular provisions within a bill that Congress itself identified as subject to suspension, the Secretary here is squarely rejecting the policy judgment made by Congress in enacting statutes like NEPA, the ESA, and the Safe Drinking Water Act. In this sense, the REAL ID Act is far more radical than the Line Item Veto Act, which limited the President's power of cancellation

to specified appropriations and tax provisions, and allowed him to exercise that power only within 5 days of their enactment.

These "critical differences" make it impossible to view the Secretary's action waiving nineteen separate laws in this case as simply an effectuation of Congress's own legislative judgment. Rather, his repeal of these laws was an exercise of his own essentially unfettered policy judgment regarding whether to comply with existing laws that would otherwise constrain his actions. This unfettered legislative power – and its consequent invitation for arbitrary and abusive action – is starkly illustrated by the Secretary's action in this case to waive nineteen laws, despite the fact that plaintiffs brought claims under only three laws. In his *Federal Register* notice announcing the waiver, the Secretary gives no explanation of the specific facts and circumstances that prompted him to waive particular laws, the particular regulations or specific requirements of those laws that were preventing such expeditious construction, or why the laws were waived in their entirely. 72 Fed. Reg. 60,870.[9]

Far from supporting the constitutionality of the REAL ID Act, prior Congressional waivers thus only demonstrate the extent to which the REAL ID Act's sweeping and discretionary legislative delegation goes far beyond any prior law, including the unconstitutional Line Item Veto Act.

---

[9]  *See* Nov. 7, 2007 Letter from Rep. John D. Dingell, Chairman, U.S. House of Representatives Committee on Energy and Commerce, to Hon. Michael Chertoff, Secretary, Department of Homeland Security (Pls.' Ex. 8) (asking for an explanation of the Secretary's decision to waive such laws as the Safe Drinking Water Act).

IV.    **EVEN IF THE "INTELLIGIBLE PRINCIPLE" STANDARD APPLIES HERE, SECTION 102 OF THE REAL ID ACT IS AN UNCONSTITUTIONAL DELEGATION**

Even if the Court concludes that the delegation at issue should be analyzed under the "intelligible principle" doctrine, that standard is not met in this case.  Although the Supreme Court has only twice relied upon the intelligible principle standard to invalidate statutes,[10] the doctrine continues to maintain vitality, and cases involving its outer boundaries continue to reach the Supreme Court on a periodic basis.  *See, e.g., Mistretta*, 488 U.S. 361 (1989); *Touby v. United States*, 500 U.S. 160 (1991); *Loving*, 517 U.S. 748; *Am. Trucking Ass'n*, 531 U.S. 457.  The reasons for this continued relevance are "not mysterious," as the nondelegation doctrine "raises fundamental questions about democracy, accountability, and the enterprise of American governance . . ..  [T]o abandon openly the nondelegation doctrine is to abandon openly a substantial portion of the foundation of American representative government."  Gary Larson, *Delegation and Original Meaning*, 88 VA. L. REV. 327, 332 (2002).   As Justice Scalia noted in *Mistretta*, "[i]t is difficult to imagine a principle more essential to democratic government than that upon which the doctrine of unconstitutional delegation is founded: Except in a few areas constitutionally committed to the Executive Branch, the basic policy decisions governing society are to be made by the Legislature."  488 U.S. at 415 (Scalia, J., dissenting).

Even under the permissive "intelligible principle" standard, section 102 of the REAL ID Act is startling in its breadth and almost complete absence of limiting standards.  A law that empowers the Secretary of DHS to waive any provision in all 50

---

[10] *Panama Ref. Co. v. Ryan*, 293 U.S. 388 (1935); *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495 (1935).

titles of the United States Code (and potentially state and local laws as well) for activities along the United States' 7,500 mile border with Mexico and Canada, without complying with any standards and without saying why, is about as broad a delegation as can be imagined. As noted in an independent analysis by the CRS, the REAL ID Act's waiver authority is extraordinary in at least three respects: (1) it "authorizes the waiver of *all* legal requirements determined necessary by the Secretary for the expeditious construction of authorized barriers"; (2) it "only allows judicial review for constitutional claims"; and (3) it "appears to apply to all the barriers that may be constructed under IIRIRA – that is, both to barriers constructed in the vicinity of the border in areas of high illegal entry and to the barrier that is to be constructed near the San Diego area." (emphasis in original). CRS Report for Congress, *Border Security: Barriers Along the U.S. International Border*, Blaz Nuñez-Neto and Stephen R. Viña (Dec. 12, 2006) ("CRS Barriers Report") at 7-8 (Pls.' Ex. 9). In a separate memo, the CRS concluded that the REAL ID Act waiver authority is in fact unprecedented, as it was "unable to locate [another] waiver provision . . . [that] provides a secretary of an executive agency the authority to waive all laws such secretary determines necessary." CRS REAL ID Act Memo at 2 (Pls.' Ex. 2).

    In its renewed motion to dismiss, the government relies on *Sierra Club v. Ashcroft*, 2005 U.S. Dist. LEXIS 44244 (S.D. Cal. Dec. 13, 2005), for the proposition that "a nondelegation challenge to the Waiver Legislation is without merit." Gov't Memo at 3. However, while the Court in *Ashcroft* did indeed reject plaintiffs' nondelegation claims, its decision rested on the false premise that the waiver authority applied solely to the San Diego fence project. For example, the Court characterized section 102 of the REAL ID Act as "simply broaden[ing] the scope of the waiver

authority of the pre-existing delegation [under IIRIRA] to 'all laws,' but again *only for the narrow purpose of expeditious completion of the Triple Fence authorized by the IIRIRA*." *Ashcroft*, 2005 U.S. Dist. LEXIS 44244 at *19-20 (emphasis added).  The Court went on to note that the "*boundaries* [of the delegated authority] are waiver of laws and regulations which the DHS Secretary determines impede completion of *this particular* 14-mile California border Triple Fence authorized by IIRIRA, and only upon the Secretary making a determination of necessity."  *Id.* at *20 (emphasis in original).  Thus, the Court's holding in *Ashcroft* is not only of no precedential value to the government in this case, but in fact highlights the fact that the REAL ID Act's waiver authority, applying to the construction of border fences and roads *anywhere along or in the vicinity of any U.S. border area*, is without any "boundaries."[11]

---

[11]  The lack of historic understanding and outright confusion concerning the scope of the REAL ID Act waiver authority is understandable give that its most vocal proponents consistently described the Secretary's powers as being limited to the San Diego border wall project.  *See, e.g.*, 151 Cong. Rec. H453-54 (daily ed. Feb. 9, 2005) (statement of Rep. Sensenbrenner) ("[T]he REAL ID Act will waive federal laws to the extent necessary to complete gaps in the San Diego border security fence which is still stymied 8 years after congressional authorization."); *id.* at H457 (statement of Rep. Lungren) ("H.R. 418 will remove the impediments to completing the fence along the San Diego corridor of our southern border."); *id.* at H470 (statement of Rep. Hoekstra) ("H.R. 418 provides the Secretary of Homeland Security with authority to waive environmental laws, so that the border fence running 14 miles east from the Pacific Ocean at San Diego may finally be completed."); *id.* at H471 (statement of Rep. Bono) ("This legislation puts those priorities front and center by granting the Secretary of Homeland Security the authority to waive all Federal laws in order to complete the [San Diego] fence. . . The time to act on the San Diego border fence is now"); 151 Cong. Rec. H536 (daily ed. Feb. 10, 2005) (statement of Rep. Sensenbrenner) ("Mr. Chairman, I rise in opposition to this amendment which continues to have endless litigation against plugging the hole in the fence south of San Diego.").  While the CRS and some bill opponents pointed out that, by its plain language, Section 102 would apply nationwide, its bill sponsors and supporters never acknowledged this fact during debate on the floor of the House of Representatives. *See, e.g.*, 151 Cong. Rec. H459 (daily ed. Feb. 9. 2005) (statement of Rep. Jackson-Lee); CRS REAL ID Act Memo (Pls.' Ex. 2).

The need for such boundaries is especially imperative for grants of authority as far-reaching as section 102 of the REAL ID Act.  The "intelligible principle" standard is not a rigid formulation, but instead operates on a sliding scale – the greater the power delegated to an agency under a statute, the more precision Congress must provide to guide the proper exercise of that authority.  *See Am. Trucking Ass'n*, 531 U.S. at 475 ("It is true enough that the degree of agency discretion that is acceptable varies according to the scope of the power congressionally conferred.  While Congress need not provide any direction to the EPA regarding the manner in which it is to define 'country elevators,' which are to be exempt from new-stationary-source regulations governing grain elevators, *it must provide substantial guidance on setting air standards that affect the entire national economy*") (emphasis added); c*f. Schechter*, 295 U.S. at 553 (characterizing challenged regulation as "as wide as the field of industrial regulation" and amounting to "delegation run[] riot") (Cardozo, J., concurring).[12]  In this case, the REAL ID Act waiver provides the DHS Secretary with the power to waive any law otherwise applicable to wall and fence projects along approximately 7,500 miles of land directly adjacent to the U.S.-Mexico and U.S.-Canada borders, as well as an additional indeterminate amount of land "in the vicinity of those borders."  The sweeping nature of these waiver powers, as well as their enormous geographical reach, demand a carefully-tailored standard defining the circumstances under which the DHS Secretary's unprecedented waiver powers may be exercised.

---

[12] *See also Synar v. United States*, 626 F. Supp. 1374, 1386 (D.D.C. 1986) ("[T]he ultimate judgment regarding the constitutionality of a delegation must be made not on the basis of the scope of power alone, but on the basis of its scope *plus* the specificity of the standards governing its exercise. When the scope increases to immense proportions (as in *Schecter*) the standards must be correspondingly more precise.") (emphasis in original).

Instead, section 102 of the REAL ID Act directs only that the DHS Secretary "shall have the authority to waive all legal requirements such Secretary, in such Secretary's sole discretion, determines necessary to ensure expeditious construction of the barriers and roads under this section." Pub. L. No. 109-13. Section 102 of the IIRIRA, in turn, directs DHS to "take such actions as may be necessary to install physical barriers and roads . . . in the vicinity of the United States border to deter illegal crossings in areas of high illegal entry into the United States." Pub. L. No. 104-208. Thus, the only constraint on the waiver authority is that the DHS Secretary must determine that it is "necessary" to construct expeditiously a barrier in an area with high illegal entry in order to deter such crossings.

Additionally, the type of detailed statutory and regulatory context that the Supreme Court in prior cases has relied upon "to breathe life into otherwise vague delegations of legislative power," *Indus. Union Dep't, AFL-CIO v. Am. Petroleum Inst.*, 448 U.S. 607, 682 (1980) (Rehnquist, J., concurring), are starkly absent from the REAL ID Act. *See Mistretta*, 488 U.S. at 376 n. 10 ("Congress' explicit requirement that the Commission consult with authorities in the field," in addition to other constraints, gives content to the statutory mandate); *Am. Power & Light Co.*, 329 U.S. at 105 (noting that Public Utility Holding Company Act provided "a veritable code of rules" to constrain delegation). Thus, while the Court has upheld delegations under "necessity" standards similar to section 102 of the REAL ID Act, the laws at issue in those cases had context and structure to constrain the agency's delegation that are simply not present in this case. In *Touby*, for example, the statute's authorization for the Attorney General to identify a substance as a controlled drug when "necessary to avoid an imminent hazard to the public

safety" required him to consider statutory factors, provide advance notice, and was limited to one year, ensuring that permanent listing would be based on the full procedures established by the Controlled Substances Act.  500 U.S. at 162-64.  In upholding its constitutionality, the Court noted that Congress had placed "multiple specific restrictions" on the Attorney General's use of his authority.  *Id*. at 167.

Unlike the statutory and regulatory provisions considered in *Touby*, the DHS Secretary does not have to do anything to invoke his waiver power under section 102 of the REAL ID Act beyond making his determination of "necessity."  He is not required to promulgate regulations, consider additional statutory criteria, provide for public notice and comment, consult with other federal agencies, committees or Secretarial authority, consider an objective scientific standard, or subject his decision to an independent review committee on a periodic basis before utilizing his authority to waive any law.  Instead, the statute expressly provides that the decision is in the Secretary's "sole discretion," subject to no constraints, temporal restrictions, regulatory provisions, consultation requirements or *any* other limiting factor beyond a determination that a waiver of laws is "necessary" to ensure the expeditious construction of border walls and roads and publication of that determination in the *Federal Register*.

The extremely limited judicial review provided under the REAL ID Act further illustrates why it fails to provide sufficient constraints on the Secretary's exercise of its authority to pass even the "intelligible principle" standard.  *See Am. Power & Light Co.*, 329 U.S. at 105 ("private rights are protected by access to the courts to test the application of policy in the light of the[] legislative declarations); *Touby*, 500 U.S. at 170 (Marshall, J. concurring) ("[J]udicial review perfects a delegated-lawmaking scheme by

assuring that the exercise of such power remains within statutory bounds."). Without such review, it is "impossible in a proper proceeding to ascertain whether the will of Congress has been obeyed." *Mistretta*, 488 U.S. at 379 (*quoting Yakus v. United States*, 321 U.S. 414, 425-26 (1944)). Because section 102(C)(2) of the REAL ID Act limits judicial review of the Secretary's exercise of his waiver authority to constitutional claims, plaintiffs in this case or others cannot question – and the Federal Courts are precluded from considering – whether the Secretary's waiver of specific laws conforms with Congressional intent.

The need for such review is evident in this case, where the Secretary has waived nineteen laws in their entirety. In the *Federal Register* notice, Secretary Chertoff states only that the lands at issue are an area of high illegal entry and it was "necessary" for him to waive the laws "[i]n order to ensure the expeditious construction" of the border wall and road. 72 Fed. Reg. 60,870 (Oct. 26, 2007). As noted above, the Secretary offered no explanation of the specific facts and circumstances that prompted him to waive particular laws, the particular regulations or specific requirements of those laws that were preventing such expeditious construction, or why the laws were waived in their entirely rather than only to the extent that they were constraining the Secretary's actions. The Secretary could with impunity have waived labor laws, workplace safety requirements, civil rights laws, or even Social Security taxes on workers' paychecks without explanation or accountability.

Finally, the REAL ID Act lacks any historic precedent that can help define, explain, or constrain Congress's decision to grant an unelected Executive Branch official the power to waive application of any law merely to help speed a border construction

project. *See Mistretta*, 488 U.S. at 401 ("'[T]raditional ways of conducting government . . . give meaning' to the Constitution.") (*quoting Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 610 (1952) (Frankfurter, J., concurring)). As noted above, REAL ID Act waiver power grew out of a much more limited waiver authority included in the original IIRIRA. Under this authority, the Attorney General was permitted to waive the requirements of NEPA and the ESA to the extent necessary "to ensure expeditious construction" of a 14-mile border wall and road project in San Diego. Notably, this waiver authority was never invoked, and the Department of Justice opposed the legal waiver provision. Consequently, at that time the "INS position [was] that we will not seek the AG's use of this waiver, and the INS will continue to abide by all environmental laws." Thus, the only "established practice" that existed prior to passage of the REAL ID Act waiver authority was an official government position against waiving environmental laws, lending no help to salvage an intelligible principle within the Act. *See* Pls.' Ex. 3.

Because this waiver authority provides unprecedented powers to an unelected Executive Branch official without providing an "intelligible principle" to guide the DHS Secretary's exercise of those powers, Section 102 of the REAL ID Act is unconstitutional and must be struck down.

## CONCLUSION

For the foregoing reasons, plaintiffs respectfully request that the Court deny defendants' motion to dismiss, and declare the Secretary's action purporting to waive the requirements of existing laws in this case to have been unconstitutional and void.

Respectfully submitted this 19th day of November, 2007.


_____/s/_____
Brian Segee (D.C. Bar. 492098)
Defenders of Wildlife
1130 Seventeenth Street, N.W.
Washington, D.C. 20036
(202) 682-9400
(202) 682-1331 (fax)


_____/s/_____
Robert G. Dreher (D.C. Bar. 398722)
Defenders of Wildlife
1130 Seventeenth Street, N.W.
Washington, D.C. 20036
(202) 682-9400
(202) 682-1331 (fax)


_____/s/_____

Howard M. Crystal (D.C. Bar. No. 446189)
Meyer Glitzenstein & Crystal
1601 Connecticut Avenue, N.W., Suite 700
Washington, D.C.  20009
(202) 588-5206
(202) 588-5049 (fax)



_____/s/_____

David C. Vladeck (D.C. Bar No. 945063)
Georgetown University Law Center
600 New Jersey Avenue, NW
Washington, DC 20001
(202) 662-6540

Counsel for Plaintiffs

34

CERTIFICATE OF SERVICE

I HEREBY certify that service of the foregoing plaintiffs' Opposition to Defendants'
Renewed Motion to Dismiss has been made through the Court's electronic transmission
facilities on this 19th day of November, 2007.

_____/s/_____
Brian Segee (D.C. Bar. 492098)
Defenders of Wildlife
1130 Seventeenth Street, N.W.
Washington, D.C. 20036
(202) 682-9400

Plaintiffs' Exhibit
1

```
1                    UNITED STATES DISTRICT COURT
2                   FOR THE DISTRICT OF COLUMBIA
     --------------------------X
3    DEFENDERS OF WILDLIFE and        Docket No. CA-07-1801
     SIERRA CLUB
4                 Plaintiffs,
5
               v.                    Washington, D.C.
6                                    October 10, 2007
                                     3:30 p.m.
7
     BUREAU OF LAND MANAGEMENT, ET AL
8                 Defendants.
9    --------------------------X
10             TEMPORARY RESTRAINING ORDER HEARING
          BEFORE THE HONORABLE JUDGE ELLEN SEGAL HUVELLE
11                 UNITED STATES DISTRICT JUDGE
12   APPEARANCES:
13   For the Plaintiffs:   Defenders of Wildlife
                           By:  Mr. Brian Segee
14                              Mr. Jason Rylander
                                Mr. Andrew Hawley
15                              Staff Attorneys
                           1130 Seventeenth Street, N.W.
16                         Washington, D.C.  20036-4604
                           202.682.1331
17
                           Meyer Glitzenstein & Crystal
18                         By:  Mr. Howard M. Crystal
                           1601 Connecticut Ave., N.W.
19                         Suite 700
                           Washington, D.C.  20009-1063
20                         202.588.5206
21   For the Defendants:   U.S. Department of Justice, Federal
                           By:  Mr. Gregory D. Page
22                         601 D. Street, N.W.
                           Washington, D.C.  20044
23                         202.305.0446
24
25
```

```
 1   FOR THE DEFENDANTS:   U.S. Department of Interior, Office of
                            the Solicitor
 2                        By:  Mr. Michael Hickey
                               Ms. Kristina Clark
 3                             Mr. Jayson P. Ahern
                               Ms. AnnMarie R. Highsmith
 4                         1300 Pennsylvania Avenue, N.W.
                           Suite 4.4A
 5                         Washington, D.C.  20229
                           202.344.1010
 6
     Court Reporter:       Catalina Kerr, RPR
 7                         U.S. District Courthouse
                           Room 6716
 8                         Washington, D.C.  20001
                           202.354.3258
 9
10
11   Proceedings recorded by mechanical stenography, transcript
     produced by computer.
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1                    P-R-O-C-E-E-D-I-N-G-S

 2              (3:30 P.M.; OPEN COURT.)

 3              THE DEPUTY CLERK:  Civil Action 07-1801, Defenders

 4    of Wildlife, et al versus The Bureau of Land Management, et

 5    al.  I'm going to ask counsel to please identify themselves

 6    for the record and identify the parties at their table.

 7              MR. SEGEE:  Your Honor, Brian Segee on behalf of the

 8    Plaintiffs.  With me at the table is Howard Crystal, Jason

 9    Rylander and Andrew Hawley.

10              THE COURT:  Okay.  Do you need them at the mike?

11              COURT REPORTER:  Yes, I would like them to come to

12    the mike.

13              THE COURT:  Okay, if you would.  The reporter would

14    like you to be at the mike.

15              MR. SEGEE:  Your Honor, Brian Segee with Defenders

16    of Wildlife for Plaintiffs.  At the Plaintiffs' table with me,

17    Howard Crystal, Meyer, Glitzenstein & Crystal; Jason Rylander,

18    Defenders of Wildlife; and Andrew Hawley, Defenders of

19    Wildlife.

20              THE COURT:  Okay.  Good afternoon.  And for the

21    Defendants.

22              MR. PAGE:  Your Honor, Gregory Page for the

23    federal --

24              THE COURT:  Can you do the same thing?

25              MR. PAGE:  Gregory Page, Your Honor, for the Federal
```

4

1    Defendants, and with me representing the Department of

2    Homeland Security is AnnMarie Highsmith and Deputy

3    Commissioner Jayson Ahern.

4            THE COURT:  All right.  The Deputy Commissioner is

5    the -- would you spell his last name?  I know, but for the

6    reporter.

7            MR. PAGE:  Deputy Commissioner.

8            MR. AHERN:  My name is Jayson, J-A-Y-S-O-N.  Last

9    name is Ahern, A-H-E-R-N.  I'm the Deputy Commissioner of the

10   United States Customs and Border Protection within the

11   Department of Homeland Security.

12           THE COURT:  Okay.  Good afternoon.  We are here on,

13   the Plaintiffs have filed -- Plaintiffs being the Defenders of

14   Wildlife and Sierra Club, have filed for a temporary

15   restraining order.  They are seeking to restrain the further

16   construction of the road, fence and vehicle barriers along

17   approximately a two-mile stretch of the Arizona/Mexican border

18   on the grounds that the environmental assessment that has been

19   prepared by the BLM is insufficient and therefore violates

20   NEPA as well as the Arizona-Idaho Conservation Act.

21           And the issue before the Court is limited at this

22   point to whether or not there should be a temporary

23   restraining order issued.  The Plaintiffs filed on Friday, I

24   believe, in the afternoon.  I was not in the courthouse.  The

25   Defendants responded yesterday, midday, and Plaintiffs filed a

1    reply late, I believe, last night.

2         So I think we're ready to begin.  Perhaps we could

3    benefit from a little update of some factual matters from the

4    Government, Mr. Page.  I have some questions, which we tried

5    to understand, as best we can, exactly what's going on.  In

6    the affidavit filed by Mr. Ahern, it talks about where we

7    stand as of the 8th in terms of the construction that's going

8    on in this San Pedro Conservation Area.

9         How long would it take to finish that stretch, if

10    all went according to what was planned?

11         MR. PAGE:  Your Honor, I do have client

12    representatives here, and I may ask, if I misstate, please

13    stand up.  But we met this morning and later in the -- into

14    the afternoon, and there is an estimate of mid October, Your

15    Honor, for the completion of everything.

16         However, I would refer the Court to paragraph 14 of

17    the declaration which confirms some facts related to the

18    Bench's question, one of which is the 20-foot wide road, which

19    is really the central aspect of Plaintiffs' theory, that there

20    are significant effects, in their view, has been completed.

21         THE COURT:  I thought it was 60-foot wide.  How did

22    it shrink?

23         MR. PAGE:  That's the corridor, Your Honor, within

24    which the road would be placed.

25         THE COURT:  Okay.  The corridor is 60-feet wide and

6

1    within that there is a 20-foot road.  But there was a road,

2    was there not?  It was in a different sort of shape than

3    perhaps what you have now, but it isn't as if there is nothing

4    there.  I have pictures of a fence that existed, as well as a

5    road.  It's different than what's being projected.

6              MR. PAGE:  The Bench is correct, Your Honor.  That

7    area, this road is actually placed in the same contours and

8    it's the same width as the primitive road that was there

9    before, has been there historically.  And this is also the

10   same area in which the barbed wire that would be used before

11   this new technology, has also been serving the country to

12   protect the borders.

13             THE COURT:  And -- but you do agree, I assume, that

14   the fact that you're galloping along and issued these

15   right-of-ways to the Army Corps sometime, I guess they were

16   issued about August 31 and construction started within the

17   month.  That can't be determined, can it?

18             MR. PAGE:  Your Honor, under NEPA, the answer is,

19   that is not a determinative basis to predicate your

20   environmental documents.  I think that it's accurate to say,

21   though, that equally the Homeland Security has a

22   responsibility to respond to Congress' deadlines, so they're

23   not specific, but they use words, and we quoted them in our

24   briefs, such as "immediately" and "promptly."

25             THE COURT:  What are we quoting from?

 1                 MR. PAGE:  That would be the Border Fence Act, Your

 2     Honor.

 3                 THE COURT:  But in looking at the Border Fence Act,

 4     which is, I take it, hasn't been subject to much litigation,

 5     correct?

 6                 MR. PAGE:  Your Honor, there have been several cases

 7     of which I know in the office, but we're talking about a

 8     handful.

 9                 THE COURT:  But they define in the Act, unless I'm

10     mistaken, certain priority areas, but this isn't one of them,

11     or unless I'm not reading them correctly.  Some areas, they

12     say, you must finish by "X "date or you have to do this kind

13     of a fence now here.  I don't see that San Pedro is one of

14     those specific areas.

15                 MR. PAGE:  The Bench is correct, that it wasn't --

16     it is not one of the areas that was specified in the statute,

17     but the language does also apply to the discretion of the

18     agency in determining what is important and what isn't, but of

19     course, the Court already knows that.

20                 THE COURT:  But the agency has a lot more discretion

21     and authority than I have in a lot of ways, don't they, under

22     this law?

23                 MR. PAGE:  Your Honor, they -- the border is a large

24     border, and as a specialist, they do have some discretion, but

25     it also -- one of issues in this case, is that this fencing

1    has been deemed by the specialized agency to be necessary to

2    localize a very significant national problem.

3            And to follow on with the Court's question about

4    NEPA, in a situation in which the programmatic mission is to

5    move quickly to obey an urgent national border security issue,

6    and in our opinion, Your Honor, four separate agencies of the

7    United States Government have also confirmed and are in

8    unanimous agreement that there is also an urgent environmental

9    problem that has been occasioned by a massive influx of

10   undocumented aliens' encroachment on federal lands, including

11   the conservation area that Plaintiffs believe they are trying

12   to protect.

13           And in a situation in which an agency, as this

14   agency is, must seriously and responsibly comply with NEPA,

15   the prudent mechanism for both accomplishing the mission of

16   evading an important national problem quickly and also being

17   responsible about your NEPA compliance is to use the shorter

18   document defined as an EA, which is defined as a brief and

19   concise document to see if there is a statutory trigger here.

20           And what the crux of the agency's environmental

21   analysis is, the significance threshold has not been met

22   because of a multiplicity of environmental mitigation measures

23   that it adopted in this EA to both comply with the border

24   security mission and the mission to abate unlawful

25   alien-caused environmental harm and also is to responsibly

1    comply with NEPA.

2              THE COURT:  I'm not sure.  Let's just hypothetically

3    say for a minute that the EA --

4              MR. PAGE:  Your Honor, if the Bench is interested in

5    elaboration on the issue of prioritized areas, my client would

6    be willing to answer questions about that because they have

7    informed me that indeed there is less discretion than I said

8    and that this is a priority area.

9              THE COURT:  Well, it's not in the statute.  I don't

10   know -- I mean, it's not in the EA and it's not in the

11   statute, we agree to that.

12             MR. PAGE:  Yes, we do.

13             THE COURT:  Okay.  That's fine.  I'm just

14   hypothetically trying to understand.  Somebody has recognized,

15   Congress, coupled with I guess you're talking about several --

16   several agencies, that this is a priority because of illegal

17   aliens, which I understand your argument, but there isn't

18   anything that says, "If you found that you needed a full EIS,

19   that we should be doing something different here," is there?

20             You can't -- can you cite anything to me that says

21   I'm supposed to respond to that if I were to find that this

22   were insufficient?

23             MR. PAGE:  Well, Your Honor, if -- the question, as

24   I take it, is if an EA discloses to the agency that there are

25   significant effects, of course, it would be required to

1   prepare an EIS, but I think it's also important for the Bench

2   to understand that when an agency is responding to a problem

3   as serious as this, the case law that we've cited in our

4   brief, and I think it sounds -- of course, the Court is

5   familiar with the case law, but I would refer the Court to

6   pages 16 through 18.

7           Those are cases, Your Honor, in which an agency

8   moved quickly on the basis of an EA and FONSI and on the basis

9   of substantial mitigation measures, so I think that we have to

10  be realists here.  And on the one hand, the agency is

11  extremely serious about its NEPA compliance.  And I know

12  yesterday the Bench, through her clerk, asked the question

13  about the waiver authority, and I think it's very, very

14  important to note that the reason why this waiver authority

15  has not been invoked as of yet is that this agency believes

16  the EA and FONSI has complied with every obligation they have

17  under the National Environmental Policy Act and that indeed

18  the critical issue, when an agency like Homeland Security is

19  deciding about the waiver, is the statutory language.

20          A waiver is only applicable when the project is

21  being delayed.  Here, the project has not been delayed, and as

22  the Bench has been informed today, much of the project,

23  including the road that Plaintiffs challenge, has been

24  completed.

25          THE COURT:  Has this waiver ever been invoked

1   before?

2               MR. PAGE:  Yes, Your Honor.

3               THE COURT:  In what circumstances, please.

4               MR. PAGE:  Your Honor, I would have to defer to my

5   client on that because I wasn't lion attorney, and because of

6   the weekend, I haven't studied them except to read some of the

7   old briefs, but they were situations I know in which the

8   Homeland Security used the waiver because of a delay issue.

9               THE COURT:  Do one of you want to just elaborate?

10              MR. PAGE:  Should I refer to -- Your Honor, if I may

11  approach, I can -- or submit to the clerk, here are the

12  Federal registered notices explaining the waiver.

13              THE COURT:  Its use or just explaining something

14  else?

15              MR. PAGE:  It's been used twice, Your Honor,

16  explaining the use, because it's important to note that the

17  Federal registered notice is an important part of the waiver

18  process.

19              THE COURT:  Yes.  So it was used for the California

20  border.

21              MR. PAGE:  Yes, Your Honor.

22              THE COURT:  Is that correct?

23              MR. PAGE:  Yes, Your Honor.

24              THE COURT:  And that was done -- so that wasn't the

25  same kind of project we're talking about.  This was done back

1    in September '05?

2             MR. PAGE:  Yes, Your Honor.

3             THE COURT:  There was another one from January '07.

4    So, it was done for an Arizona stretch, the Barry Goldwater

5    range.  Is this also the fence that's similar to the one we're

6    talking about?

7             MR. PAGE:  Yes, Your Honor.

8             THE COURT:  Okay.  Well, that brings me to the

9    question I have, which they allude to -- Plaintiffs allude to

10   and we've -- indeed found another example both in September

11   '07.  It appears that it was determined to prepare EIS for

12   some 70 miles on the Texas border and for some 20 miles on the

13   San Diego border, California border.

14            How do you -- how is one supposed to rationally

15   distinguish what went on there from here?

16            MR. PAGE:  Your Honor, I know that those decisions

17   have already been made, of course, and the Court is correct to

18   note that that is an example of NEPA compliance, but it's also

19   appropriate to refer the Court to the Supreme Court case of

20   the Kleppe case, which we use extensively, and the relevant

21   language is at 427 U.S. 412, and it's short, Your Honor, and I

22   think it's instructive.

23            The obligation to prepare a programmatic EIS for a

24   large area of the country is highly discretionary, the Supreme

25   Court says, because it requires the weighing of a number of

1    factors, including the extent of the interrelationship among

2    proposed actions and practical considerations of feasibility.

3    Resolving this issue requires a high level of technical

4    expertise and is properly left to the informed discretion of

5    the responsible federal agencies.

6            Your Honor, we are not in a trial setting.  I know

7    we're in an injunctive setting, but if we argued this case on

8    the merits, it's going to be based on the administrative

9    record.  So I don't -- I'm not prepared to, you know,

10   introduce testimony now about the differences between this EA

11   and the EIS, but I can draw upon, as an officer of the Court,

12   my experience of 19 years litigating at the Department of

13   Justice under NEPA.  And I will tell you that if you look at

14   the acreages that the Court started out with, the Court has

15   read the papers and knows it's a small project.

16           Frequently, Your Honor, if there was an intuitive

17   role that you would teach in a class, it would be that the

18   small amount of acreage is going to get you in the end and a

19   large amount is going to get you in the EIS.  So here, Your

20   Honor, I think it's also important to note, and this is in the

21   background section of the brief -- and Your Honor, it's a fact

22   that in the rush of papers, has perhaps been -- you know,

23   maybe missed a little bit by the Government.  The Government

24   gave you the raw fact, it's on page 3.  Is the San Pedro

25   Riparian National Conservation Area that Plaintiffs profess to

1    be concerned about is over 58,000 acres, Your Honor, and the

2    acreages that the Court correctly pointed out of a mile, and

3    you know, three square acres, they are specified in the

4    declaration, Your Honor, of Mr. Ahern.  We're talking about

5    clearing, for example, in paragraph 13, of approximately

6    5 acres out of 58,000.

7         So I think a NEPA theorist would say this is

8    probably a classic situation in which you use the smaller,

9    briefer and more concise environmental document.

10        THE COURT:  Well, the -- and often one does an EA

11   and determines you have to do an EIS.  You don't start out

12   saying small, EA; big, so let's go for the EIS, necessarily.

13        MR. PAGE:  The Court is absolutely right that you

14   don't start out necessarily, start at, you know, with the goal

15   of in the EIS or in EA, but it's important to note that in --

16   if you look at the President's Council of Environmental

17   Quality Regulations, which govern this decision, and that's,

18   Your Honor, on page 11 of the Government's brief and it's 40

19   C.F.R. -- 40 C.F.R. Section 1502.4, lower case b -- 40 C.F.R.

20   Section 1502.4, lower case b.

21        What this language states, Your Honor, is that the

22   larger environmental document is a discretionary issue, and so

23   that means, Your Honor, that before even going to the EA and

24   FONSI, if the policymakers realized that there were going to

25   be a lot of small projects that they might like to analyze

1    under a grandfather environmental analysis, they can choose to

2    prepare that EIS, and it happens all the time, as a matter of

3    policy, without going through the EA and FONSI process.

4            But the reason why I pointed out to the Court that

5    this agency has been entrusted with the congressional command

6    to take care of an urgent border security and environmental

7    problem is that in situations when Congress wants an agency to

8    move faster, it's more logical to start out with a briefer and

9    more concise document if -- especially if after that document

10   is prepared, the agency concludes that there are no

11   significant environmental effects based on mitigation

12   measures.

13           THE COURT:  Have you looked at the administrative

14   record?  What are we talking about in terms of size?

15           MR. PAGE:  Your Honor, I have looked at Plaintiffs'

16   exhibits and the exhibits from the record that we selected,

17   all of them are from the record except for, of course, of the

18   declaration of Deputy Commissioner Ahern, but I could consult

19   with my client and ask them the extent of the record.

20           THE COURT:  I'm curious.

21           (PAUSE.)

22           MR. PAGE:  Your Honor, I suppose because we're in an

23   injunctive setting, people do not -- my clients do not have a

24   precise idea of the scope of the record, but I will draw on

25   the 19 years and state that it will not be a large record

1    because we are talking about something that began in the early

2    summer.

3           THE COURT:  Why is it, if you know, that despite the

4    urgency, and et cetera, which was established at least by '06,

5    the agency was going forward with a vehicle barrier proposal

6    only for almost a year and then changed course?  Do you have

7    any idea what prompted that?

8           MR. PAGE:  Not now, but I could ask, Your Honor, if

9    I may.

10          (OFF-THE-RECORD DISCUSSION BETWEEN COUNSEL AND HIS

11   CLIENT.)

12          MR. PAGE:  Your Honor, it's a simple answer to your

13   question, and the answer is a change in traffic patterns, and

14   obviously, without, you know, merits briefing, I have -- I

15   will not be able now to identify all of the areas of the

16   record that chronical and analyze those traffic problems, but

17   from discussing this with my client and looking at the maps

18   over the weekend and this morning, I can tell Your Honor that

19   this is a mountainous area, and the reason why, again, there

20   are some environmental issues that the EA analyzed is that the

21   illegal immigrants, the undocumented aliens use the Riparian

22   corridor that is the basis for the San Pedro protection to

23   come into this country illegally.

24          And so the traffic patterns to which my client just

25   confirmed or -- seconds ago, they change, and so this project

1   changed as traffic patterns that had been observed in the past

2   also changed.

3           THE COURT:  Well, in your 19 years, have you ever

4   seen the EA be prepared in three weeks?

5           MR. PAGE:  In -- yes, Your Honor, and I'll just

6   refer -- I know it's anecdotal, but since this is informal, in

7   a similar national security situation, in which the Clinton

8   administration decided to purchase nuclear weapons to keep

9   them out of the hands of terrorists, and they were sent to the

10  country under congressional mandate, and the Department of

11  Energy had to prepare an EA quickly, and of course, if the EA

12  did identify significant effects, the shipment would have been

13  stopped and ceased, and indeed it was stopped temporarily

14  until the judge decided not to grant a TRO.

15          THE COURT:  And similarly, the -- I have never seen

16  biological opinions that was done in a couple of days almost.

17          MR. PAGE:  Your Honor, it --

18          THE COURT:  It was August 23rd and was done by the

19  29th.

20          MR. PAGE:  Your Honor, it's important to note that,

21  yes, if you look at the dates, it was -- the question was

22  answered in a couple of days, but as somebody that understands

23  how the Fish and Wildlife Service works, this is not a new

24  problem.  They have done biological opinions about the species

25  involved and for San Pedro, which has been around a long time,

1    but I will concede the Bench's implicit point, which is that

2    because the other two branches of the Government were

3    extraordinarily interested in getting this problem tackled

4    quickly and decisively, the Fish and Wildlife Service devoted

5    the staffing necessary to write a relatively detailed

6    biological opinion.

7              I mean, the Court does correctly note that it was a

8    couple of days, but in terms of its analysis, of course, the

9    Government has used it extensively in the brief.  I don't want

10   to be self-serving, but Your Honor, the reason why we quoted

11   the language is because we think it's very persuasive.

12             THE COURT:  Well, you say in the record decision

13   that there is still consultation going on.  Where did I read

14   that they analyzed east of the River to Douglas, but not west

15   of the River?  I assume that the area that we're concerned

16   with goes both on the east and the west of the River.  It

17   says, in the biological opinion, talking about the impacts of

18   pedestrian fence, public lands located east of the River,

19   additional consultation with U.S.F.W.S. is currently in

20   progress for lands west of the River, and that's confirmed by

21   looking at the BO's, so I can't tell whether they're finished.

22             MR. PAGE:  Oh, yes, Your Honor.  If you look at,

23   yes, page 8.

24             THE COURT:  8 of what?

25             MR. PAGE:  Of the biological opinion that the Bench

1    is reviewing.  That talks about acreage and you see some

2    larger numbers, 225.  The reason is, is that this is -- these

3    are three separate parts, and they call it three sections.

4    Those sections have been analyzed by environmental documents

5    and haven't been challenged and they aren't before the Court

6    now.

7            So, in other words, what we're talking about is what

8    Deputy Commissioner Ahern talked about in his declaration.

9    The configurations that are in the declaration represent one

10   of the three sections, okay.  The other two sections were

11   addressed by EA's, counsel believes.

12           THE COURT:  These are -- the other sections are part

13   of the -- there are six different segments of fence going

14   along the border in Arizona, correct?

15           MR. PAGE:  This particular section refers to three.

16           THE COURT:  Right, but that's part of six.  But I'm

17   only asking, my question is whether the segment that we're

18   focusing on, which is San Pedro, is more than east of the

19   River.  That's all I'm asking.

20           MR. PAGE:  Okay.  May I consult my client?

21           THE COURT:  Uh-huh.

22           (PAUSE.)

23           MR. PAGE:  Your Honor, it's 1.54 miles that's east

24   of the River.

25           THE COURT:  1.45 miles east.

```
 1              MR. PAGE:  Five-four.

 2              THE COURT:  Five-four goes east, and then so that

 3     must leave about a half-a-mile going west.

 4              MR. PAGE:  Your Honor, the client states that there

 5     is no -- no part of the project that goes west; am I correct?

 6     Yes.

 7              THE COURT:  Well, the project is two miles.  What am

 8     I missing?  I am just trying to understand the facts at the

 9     moment.

10              (PAUSE.)

11              MR. PAGE:  Your Honor, counsel for Homeland Security

12     suggests that one of our staff can answer the question by

13     coming to the lectern.

14              THE COURT:  Okay.  If you would give us your name,

15     and spell it, please.

16              MR. GIDDENS:  Good afternoon, Your Honor.  Greg

17     Giddens, G-R-E-G, G-I-D-D-E-N-S.

18              THE COURT:  Go ahead.

19              MR. GIDDENS:  Ma'am, this project, the 1.54 miles is

20     the westernmost end of approximately a 6.7-mile project, and

21     this is all east of the River.

22              THE COURT:  Say that -- I'm sorry, say that again.

23     1.54 miles what?

24              MR. GIDDENS:  Is part of a larger project that's

25     little less than seven miles.  This complete project is east
```

1    of the River.

2              THE COURT:  Okay.  So then we're all talking about

3    the San Pedro Riparian Conservation Area, that's a seven-mile

4    area -- that's much a bigger area, but your project where the

5    right-of-way is --

6              MR. GIDDENS:  Is 1.54 miles.

7              THE COURT:  When I look at the alternatives in the

8    environmental impact -- the environmental assessment, they got

9    more than 1.54 miles listed there.

10             MR. GIDDENS:  Yes, ma'am, that covers more projects

11   than just this particular 1.54 miles.

12             THE COURT:  Aren't I concerned with this particular

13   environmental assessment, which has to do with approximately

14   two miles, three quarters of which are permanent fence and the

15   rest are temporary or permanent vehicle barriers?

16             MR. GIDDENS:  The part of that EA that applies to

17   here would be the coverage that's on the San Riparian, that's

18   1.54 miles.

19             THE COURT:  Well, maybe somebody can help me out a

20   little later on this.  I don't read the -- it to be so small.

21   It's shrinking on me.  Mr. Page, how do I reconcile with what

22   I've just been told?  You look at Alternative 1, 2 and 3 and

23   they tell me how many feet, and it's going lengthwise.  It

24   isn't going up and down.  How do I -- how can I add it and

25   come up with 1.54?

1          MR. PAGE:  Your Honor, the client has addressed an

2     issue that is an issue of how much federal activity does this

3     environmental assessment govern.  I think what the client is

4     saying is that the part of the project that is ongoing now

5     represents that parameter, but that the EA certainly did

6     analyze the environmental effects of a future project.

7          And if I'm misstating, please stand up, but in an

8     informal setting before Judge Huvelle, we have to wing it a

9     little bit, but it's not extraordinary that a sister agency

10    Interior, even though an EA is defined as a concise document,

11    and agencies that prepare them don't like to just duplicate

12    their effort, and when they're studying environmental effects,

13    if they see the parameters of a project potentially larger,

14    they will target the EA to the larger acreage because that

15    will save them time and money.

16         So what the client is saying is, is that the

17    particular project before the Court, which has attracted

18    Plaintiffs' request for a temporary restraining order, is --

19    occupies the acreages that are described in the declaration,

20    but in the future, there may be another project within the

21    corridors that are analyzed by the Interior's environmental

22    assessment.

23         THE COURT:  Well, why do you -- when EA talks about

24    the San Pedro watershed, what's that talking about?

25         MR. PAGE:  Your Honor, that would be the watershed

1   that is unique to that 58,000-acre area that we were

2   discussing at the outset of my remarks and it is also relevant

3   to the Court's question about an EA versus an EIS because the

4   types of acreages that we're talking about represent an almost

5   de minimis percentage of this preserve, and indeed that is an

6   internal reason combined with the congressional exigencies of

7   choosing an environmental assessment.

8        THE COURT:  The congressional exigencies go back to

9   security, is that right, or is there something I'm supposed to

10  be looking at other than the Fence Act?

11       MR. PAGE:  Your Honor, the congressional statute

12  that we began analyzing talks about border security, but when

13  you look at the Government's Exhibit D, you will see Congress'

14  servant advising Congress about the reason for abating border

15  security threats, and I'm actually referring to --

16       THE COURT:  What paragraph?

17       MR. PAGE:  Well, Your Honor, it's Government Exhibit

18  D and it would be page 16 of that exhibit, but the exhibit is

19  summarized in the Government's brief, Your Honor, and the

20  exact quote is on page 26, and Your Honor, this is a --

21       THE COURT:  This is the GAO.

22       MR. PAGE:  This is the GAO report, and if the Court

23  will recognize that it is in the administrative record of this

24  case and it can give the Court a snapshot of what types of

25  national concerns precipitated this EA and FONSI.  The quote

1    that we believe is highly relevant to this case is that the

2    general accounting office agreed with the Fish and Wildlife

3    Service in this particular case.  The general accounting

4    office states, and this is Defendant's Exhibit D at 16,

5    "Illegal aliens and smugglers have created hundreds of new

6    trails and roads while crossing borderlands and have destroyed

7    cactus and other sensitive vegetation that can take decades to

8    recover, including habitat for endangered species.  Tons of

9    trash and human waste are left behind each year affecting

10    wildlife, vegetation and water quality.  Illegal border

11    crossers left behind close to 4,500 abandoned vehicles in

12    fiscal year 2002 and an estimated 4 million pounds of trash

13    each year as they crossed over the lands.

14          "A tribal police department removed over 7,000

15    abandoned undocumented alien vehicles in 2003 in this

16    southwestern area."

17          Your Honor, the reason why the government believes

18    that a unique part of this case is the action agency, Homeland

19    Security, and the environmental agencies which stand

20    independent of the action agency, including the Fish and

21    Wildlife Service, Interior and the congressional

22    representative, GAO, all agree that border security risk and

23    environmental risk come from the same problem and the same

24    source.

25          What's significant is, is if you go from the GAO

1   excerpt that I just read and go to the Fish and Wildlife

2   Service in the administrative record in this case, and that's

3   on page 25 of our brief, what the Fish and Wildlife Service

4   said, in concluding, that there was no jeopardy to any listed

5   species in the area of San Pedro, is this:  Very similar to

6   GAO, "Environmental damage to natural resources from UDA

7   traffic is considerable and affects large areas of many

8   sensitive species habitats.  Trails and other soil

9   disturbances from UDA's" --

10          THE COURT:  Slow down, slow down.  First of all, the

11  reporter has to take it down, but what page are you on now?

12          MR. PAGE:  Page 25, Your Honor.

13          THE COURT:  And what paragraph?

14          MR. PAGE:  It's the block paragraph on the top, and

15  Fish and Wildlife Service is basically saying that the trails

16  created and the illegal roads created by undocumented aliens,

17  the quote is, "can increase erosion, promote the spread of

18  invasive species and increase the potential for fires.  Fires

19  can exacerbate the impacts from UDA's with more erosion,

20  invasion of exotic species and a cascade of effects to

21  watershed functioning.  Further, the direct impacts of the San

22  Pedro project are at the international border, thus they are

23  limited to a relatively small area.  The construction period

24  should be short, one to three months, thereby reducing the

25  potential impacts from human disturbance."

1          That's the Endangered Species Act specialist, but of

2     course, in the environmental assessment, Interior also talks

3     about similar damage, mostly from illegal roads.  And then we

4     would like to also refer the Court to the action agency, the

5     declaration Exhibit D, the Government's Exhibit D, and that

6     would be the United States Customs and Border Protection's

7     deputy commissioner who is here today, Jayson Ahern.

8          And on paragraph, let's see, paragraph 16 --

9     paragraph 16 through 18, Your Honor, he gives you the glimpse,

10    from the border security prospective, of the environmental

11    damage that's being caused every day by illegal aliens.  But

12    of course, the significant part of this concerns the Court's

13    interest in weighing the equities, and I think where, Your

14    Honor, our position is, is these four agencies not only agree

15    about the environmental risk of stopping this project but also

16    agree about the border security risk.

17         And in Mr. Ahern's declaration, we've documented

18    that.  Approximately 19,000 illegal aliens were apprehended in

19    that area, and when you extrapolate the figures in this --

20    I'll give the Court the exact cites.  That would be Exhibit C,

21    Your Honor, paragraph 23, and in that paragraph the border --

22    the Homeland Security states, Localized to this area, Your

23    Honor, there were over 19,000 apprehensions, which averages to

24    52 apprehensions every day, and of that, Your Honor,

25    approximately 11 percent have criminal records.

1          So, if we start laying out the harm of a TRO from

2     these figures, from the specialists in this case, on the

3     border and environmental issues, we're talking about slightly

4     over five people a day coming over with criminal records.

5          THE COURT:  Well, again, I have to come back, so how

6     come Texas or California's borders didn't reach the same level

7     of urgency?  You don't know.

8          MR. PAGE:  Your Honor, what I do know --

9          THE COURT:  Basically, you're saying that because

10     this is -- there are people crossing at this border, that

11     this, in some fashion, is border security which in some ways

12     should be balanced in, and I don't understand how it is that

13     that didn't apply to Texas or San Diego.

14          MR. PAGE:  Well, Your Honor, and I did -- and we

15     don't want to go back too much, but I refer the Court to the

16     Kleppe case, and what the Kleppe case says --

17          THE COURT:  But that has to do with whether you're

18     doing big problematic -- I'm only asking you, the people, the

19     same agencies, the same people decided that an EIS was

20     appropriate, and I assume that people crossed the border at

21     other places, too.  And it may be that there has been changes

22     in who's crossing where or how great, but you made the point

23     that San Diego, at one point, had a high level of crossings,

24     too.

25          MR. PAGE:  Your Honor, you don't want to, you know,

1  refer too much to myself because that's not a humble thing,

2  but the Kleppe case is highly instructive because what it

3  gives the Court, is a Supreme Court statement that this issue

4  of an EIS versus an EA is highly discretionary.

5       Since I have not -- I'm not a party, I'm not privy

6  to the policy decisions that, as I said, the CEQ regulations

7  state that they are discretionary, that, indeed, Your Honor,

8  in those situations that the Bench talks about, the client --

9  nothing prevents the clients, nothing prevents the Government

10  from doing an EA and then concluding with a FONSI that an EIS

11  should be prepared.

12       What I'm stating is I don't know exactly what drove

13  the policy, but what we do know, it's highly discretionary and

14  it's discretionary for a reason.  A government agency can

15  choose to do it for economic efficiency knowing that they're

16  going to use this statement and it's called tiering.  The

17  Bench is probably familiar with this.  They decide that

18  because there is going to be a high profile, large area of the

19  country that is going to be subject to the same policy, that

20  they think, they decide that it would be more efficient to

21  create one big grandfather environmental analysis and then

22  refer back to it in smaller environmental analysis.

23       Well, that's certainly reasonable.  But it's also

24  more than reasonable to conclude that since this project only

25  concerns two -- up to two acres of a 58,000-acre preserve,

1      that it's more than rational for this agency to decide that

2      they would like to do the EA and determine whether to do an

3      EIS based on the data.  And the critical issue, in terms of

4      the Government is, is that the Government believes it has --

5      that the Plaintiffs have not even established a prima facie

6      case that this EA is defective because all they do, really, is

7      they use the EA extensively to document what they think is

8      serious environmental harm, significant environmental harm.

9              But as we pointed out in our brief, they don't even

10     quote the parts of the EA that govern the very alternative

11     that the Government selected, and that's in our brief, too,

12     Your Honor, and you've seen that.

13             THE COURT:  That's true sometimes, and it's not true

14     others.  Sometimes they say the impacts are the same, whether

15     it's Alternative 1 or 2.  You have discussions of four or five

16     things, some instances they are the same, some they're going

17     to be better under Alternative 2, so everybody can pick and

18     choose for that purpose.

19             MR. PAGE:  That's true.  Uh-huh.

20             THE COURT:  But what you're -- your argument is, if

21     you've got -- and the Supreme Court has talked about this,

22     too.  If you cut a project up in enough little pieces and only

23     analyze this piece and don't consider it vis-a-vis that piece,

24     then you can obviously, your principle will apply.  If you cut

25     it small enough, you don't do anything other than an EA.

1    That's really the nub of the problem here, I think.

2             MR. PAGE:  Your Honor is absolutely correct, and

3    that would be a legal issue if that was part of Plaintiffs'

4    complaint.  What that's called, Your Honor, is a segmentation

5    argument when you accuse the Government of trying to cut an

6    environmental issue up into small parts and determine it's

7    insignificant based on cutting the project up, a project that

8    is internally consistent and logical, cutting it up in small

9    parts that do not have any utility, unless the other part is

10    also adopted, and that's the test.  It's called the

11    independent utility test.

12             THE COURT:  No, I'm just looking at cumulative

13    impacts.  I've written on cumulative impacts before.

14             MR. PAGE:  Well, Your Honor --

15             THE COURT:  If you decide that you're going to just

16    look at the narrow issue and only look at the impacts there,

17    without considering what other federal actions are in the area

18    or close by, you arrive at a predetermined result.

19             MR. PAGE:  Your Honor, that is true in the abstract,

20    but it's not true in this case.

21             And we referred you, on pages 20 and 21, to the

22    parts of the administrative record in which Interior

23    specifically considered the environmental effects of other

24    border patrol projects and fencing, and that's an extensive

25    analysis.

1            THE COURT:  20 and 21.  Is this your -- when they

2    talk about cumulative impacts?

3            MR. PAGE:  Yes, ma'am.

4            THE COURT:  In the EA?

5            MR. PAGE:  That's correct, Your Honor.  It's EA 20

6    to 23.

7            THE COURT:  I'm having a little hard time

8    understanding this because nobody tells me what the watershed

9    is.  It sounds to me like you're talking about the 1.5 miles

10   or two miles that are at issue in the right-of-ways.  I don't

11   know.  When they talk about cumulative impacts, it's the same

12   discussion as impacts.  I don't know where you -- from whence

13   you conclude that they are talking about something beyond the

14   impacts that you talked about already?

15           MR. PAGE:  Your Honor, the quote is, in that

16   language, and I gave the Court the relevant pages and I know

17   the Court will seriously look at those pages because the

18   urgent national purposes at stake require us all to do our

19   best.  But the particular phrase is, is it's quoted on page

20   21.  The agency considered the environmental effects -- we're

21   at the top of the page -- as the border fence project proceeds

22   in other areas.

23           THE COURT:  I'm sorry, I'm going to catch up to you.

24   Page 20 or 21?

25           MR. PAGE:  21, and it's top of the page, and then

1    the relevant areas in which the agency considered cumulative

2    effects are pages 20 to 23.  And that -- in that language, the

3    Interior discloses the cumulative effects that it is

4    analyzing, and the quote is, "As the border fence project

5    proceeds in other areas of the watershed."

6         If you look at that language, "watershed" is a

7    specific ecological term for a Riparian corridor.  This is the

8    corridor that governs the 58,000-mile area, Your Honor.  And

9    when you look at what the agency is saying here, the agency is

10   saying that if you take these impacts that they have disclosed

11   and adopt mitigation measures to minimize them, the cumulative

12   effects are not significant.  And I know you're proceeding in

13   the setting of a temporary restraining order.  You're not as

14   concerned with the merits as you would be if you were ruling

15   on a summary judgment motion, but it's important to note that

16   Plaintiffs have a minimal obligation to show some cumulative

17   effect that would be significant to disprove the environmental

18   and border security specialists of this country.

19        And what's -- what's, I think, telling about the

20   weakness of their case is they haven't controverted any of the

21   mitigation measures, Your Honor.  To take just one, and the

22   Court will know the cases about mitigation measures because

23   they're on pages 14 to 17 of our brief, but just one, the

24   temporary vehicle barriers.  This agency decided that there

25   could be an erosion problem, so what did it decide to do to

1    mitigate it?  It adopted a strategy of keeping illegal aliens

2    out of areas in which they would drive through with their

3    vehicles and go as far as they could by using a measure that

4    does not even require construction.

5         A vehicle barrier that is constructed of old

6    railroad rails that -- and if you look at the other mitigation

7    measures, Your Honor, that would be picked up before rainy

8    season and then put back down after it has concluded.  And I

9    know that the -- that that -- you're going to be considering

10   likelihood of prevailing on the merits in this case as well as

11   the environmental and border security interests that are at

12   stake here.

13        But, Your Honor, truthfully, this TRO brief, the

14   exchange, it's going to telegraph to you how this case is

15   going.  We have given you all of our mitigation measure cases

16   that we'll be using on the merits, and quite frankly,

17   Plaintiffs haven't come close to disproving these mitigation

18   measures.  Instead, they use rhetoric like they're not

19   persuasive to us, they're not even persuasive to BLM.  I would

20   respectfully disagree.  This is an agency, in conjunction with

21   the Department of Homeland Security, that had a theoretical

22   authority to waive its compliance with environmental law, but

23   because it is being extraordinarily cognizant of its

24   obligation to do both, to both comply with NEPA and abate

25   these problems, it's adopted a series of mitigation measures

1    that deserve more than just a rhetorical attempt to say that

2    they're not serious.  And Your Honor --

3         THE COURT:  Well, no, but you do have in here, and

4    you can't fault the agency for being honest, about a large

5    degree of uncertainty concerning the effectiveness, they've

6    said, in terms of both Alternative 1 and 2 for various

7    factors.  They recognize the uncertainty and they say the

8    details have not been determined about the various mitigation

9    efforts.  So, I have to say that it's not just rhetoric.  It's

10   your EA that says it.

11        MR. PAGE:  Well, Your Honor, you know, obviously --

12        THE COURT:  And I would like to go back to these

13   cumulative impacts because it's important.  The -- when they

14   talk -- you're saying that they considered the cumulative

15   effects of the fence construction within the watershed.  Isn't

16   that basically the area that's coming down on the water and

17   not any other -- they're not considering any other federal

18   action like other segments of the fence or the -- although you

19   say the Plaintiffs didn't point to anything else, they do

20   point to a biological opinion involving a fort upstream,

21   right?  I mean, there are other federal actions going on

22   outside the San Pedro River watershed.

23        MR. PAGE:  Your Honor, you know, I am not a

24   hydrologist, but I have had hydrology cases.  Watershed means

25   the entire area that drains into a river, so what we're

1    talking about is, is that the agency went beyond the one mile

2    and looked at what is hydrologically linked to this tiny area

3    of the San Pedro Conservation Area.

4             So, Your Honor, that is the reason -- but beyond

5    that, Your Honor, there is an obligation, if you walk into

6    court and ask a court to stop a project that has such

7    significant national interests, such as border security and

8    protecting the undisputed environmental damage occasioned by

9    the illegal aliens that move up this riparian corridor, is the

10   same reason why, if you look at, Your Honor, the border

11   security and the environmental problems come from the same

12   source, individuals who are not interested in following the

13   laws.

14            Is there any interest in respecting the integrity of

15   the conservation area if you are fleeing for your life?  The

16   answer is no.  That's the reason why not an underling of the

17   government, but a sovereign, another sovereign government, the

18   tribal police have asked for relief in this area because they

19   have to remove -- and that's in a quote on page -- on page 24,

20   Your Honor, they have asked for relief from Congress because

21   they had to remove 7,000 vehicles.

22            So we're in a situation where there is more of an

23   obligation on the part of Plaintiffs to do something other

24   than ask the Court a series of rhetorical questions about what

25   could go wrong here.

1          Our response to Plaintiffs is, is the consequences

2     of stopping this project are -- have both a border security

3     and an undisputed environmental cost.

4          THE COURT:  You agree your client has the absolute

5     right to trump the environmental laws.  I find the argument

6     that I'm supposed to in some way weigh the national security

7     interest based on the fact that thousands of people have been

8     coming across the border, we accept that, and I'm supposed to

9     figure this out in the balancing when you have the trump card.

10          The law, under NEPA, doesn't give me that right, as

11     far as I can see, but it does give, under the REAL ID law

12     you're the executive of that right; that's the way Congress

13     saw it.  So that I have some difficulty understanding -- this

14     may not be true, but for the statute, I have some difficulty

15     understanding not your argument about illegal aliens cause

16     environmental problems, that's clear from what you say, but

17     the border security problem as a Homeland Security, they have

18     complete authority.  I don't think Congress in -- by passing

19     the law, expected that I would -- that's why they took the

20     power away from the courts when it came to Homeland Security.

21          But if Homeland Security chooses to not exercise the

22     power they have, I don't know that I'm supposed to be the

23     person that balances what you say is an interest but your

24     client hasn't stepped up yet.

25          MR. PAGE:  Well, Your Honor, I understand the

1    Court's question, but if you think about the consequences of

2    using a power that's extraordinary, the Bench knows it's

3    extraordinary, the consequences of using it precipitously of

4    an overbroad use of an authority like this, they are equally

5    pernicious, because what it does, Your Honor, is it undermines

6    the credibility of an agency that has asked for trust from

7    Congress and is willing to show results from as a result of

8    that trust.

9           So here, it's actually salutary, I think, Your

10   Honor, and we have argued this in our papers, that Homeland

11   Security had not invoked this power because they believe that

12   they have complied with the law.  And the Bench said that

13   there is something other than rhetoric here and it

14   specifically mentioned mitigation measures whose effect or

15   whose effectiveness is not entirely certain.

16          Your Honor, you will look at the pages on pages 16

17   and 18 of our brief.  When you finish, the Government

18   earnestly believes that you will recognize that the idea that

19   a mitigation measure that is adopted as a constructive

20   response to uncertain effects, by itself, discredits an EA and

21   FONSI is wrong.  That is a Ninth Circuit case.  Some of that

22   comes from one Ninth Circuit case that Plaintiffs use in their

23   papers called National Parks and Conservation Council.

24          What the Government has done, Your Honor, and this

25   begins on page 16, is to show you that, "Look, let's just

1    assume this is the Ninth Circuit and not the District of

2    Columbia Circuit."  That proposition is controversial even in

3    the Ninth Circuit.  If you look at the Greenpeace Action

4    versus Franklin case, and that's on page 16, it's 14 F.3d,

5    1324, 1331, and then the other case, Your Honor, is

6    application of Greenpeace.  It's Native Ecosystems Council

7    versus Forest Service, 428 F.3d, 1233, 1239, 1241, those cases

8    stand for the opposite proposition that in, in a context of EA

9    and FONSI, these courts have decided that it is highly

10   responsible, instead of throwing up your hands in an EA and

11   saying effects are uncertain, to say, "All right, we're going

12   to assume that these uncertain adverse effects have occurred,

13   even though we don't know, and we are going to adopt

14   mitigation measures as a constructive response to

15   uncertainty."

16           If you took Plaintiffs' argument and ran with it

17   logically, what it means, Your Honor, is every time there is

18   uncertain effects in the administrative record, under

19   Plaintiffs' theory, you have to do an EIS.  That's the reason

20   why the court -- the courts have primarily disagreed with

21   that.

22           And on page 17 of our brief, we have tried to show

23   the Court that in the District of Columbia Circuit, in the

24   Supreme Court, in the Seventh Circuit, this is a discredited

25   proposition unique to the Ninth Circuit, some panel decisions,

```
 1    not Greenpeace and not National Native Ecosystems Council, but
 2    definitely, when you look at page 17, Your Honor, look at
 3    Baltimore Gas.  It's 462 U.S. at 105, 106, "Agencies must not
 4    respond, quote, arbitrarily and capriciously to uncertainty
 5    but instead must consider and disclose uncertain impacts
 6    rationally."
 7             And then you go down, Your Honor, to a District of
 8    Columbia case, it's called Sierra --
 9             THE COURT:  I have read it.  Thank you.
10             MR. PAGE:  Thank you, Your Honor.
11             THE COURT:  I have two quick more matters.  I am
12    unclear.  I take it under leave of the factors of the law you
13    are supposed to consider this Arizona-Idaho Conservation Act.
14             MR. PAGE:  Yes, Your Honor.
15             THE COURT:  And when you look at the EA, would you
16    agree with me that they misread the act?
17             MR. PAGE:  Your Honor --
18             THE COURT:  There is no exemption for emergency, so
19    to speak, except where needed for administrative or emergency
20    purposes, they seem to be in-drafting an exception that's not
21    in the Act.
22             MR. PAGE:  Well, the Court correctly -- of course,
23    the Government didn't say -- the Government did not say that
24    entire reason for the Agency action was to declare an
25    emergency under this statute.  All it did was, of course, it
```

40

1    quoted you the statute and then pointed out to you that under

2    the authority giving Interior the right to issue permits for

3    public use, it can close portions of an area, authorized

4    motorized access or not, whether -- according to whether it

5    deems the action necessary for administrative or emergency

6    purposes.

7            But then we go on under that to show that this is

8    not -- that could have been -- that obviously, when you're

9    talking about unauthorized traffic coming in and abandoned

10   cars, that is an emergency.  We talk about it in the equity

11   part of the brief that we believe it occasions significant

12   environmental problems, but when you go on, under that, Your

13   Honor, Interior has documented and we've given you the cites

14   that this is an environmental problem in this area.

15           This, in a sense, Your Honor, especially when you

16   look at the GAO report on page 16 and -- that's Exhibit D on

17   16 and 15 and also the Fish and Wildlife Services analysis,

18   this is an example of a profound environmental problem here.

19   And the reason why we supplied the Court with the language

20   about permitted access of vehicles or not is to give the Court

21   the background necessary to understand why the Interior

22   documented in other sections of EA that we quote the

23   consequences of unlawful roads and trails and abandoned

24   vehicles.

25           So the argument, Your Honor, is that when you abate

```
 1   a border security problem that itself causes environmental

 2   problems, you are acting as a steward to the land.  I

 3   recently, Your Honor, before this case, tried to take a

 4   vacation, and I saw Yellowstone, okay.

 5          The dedication that you see in our national parks is

 6   not only limited to trying to harmonize recreational use of

 7   humans with the animals who live there year-round but it's

 8   also to protect the ecosystem from illegal acts.  And the

 9   reason, quite frankly, Your Honor, why the Government does not

10   believe this case is a stereotypical case at all, it's not the

11   Government on one side arguing national security or border

12   security and the environmentalists on the other side asking

13   this court to balance environmental protection and national

14   security.  It's the government coming, speaking with a

15   unanimous voice, the Fish and Wildlife Service, Interior, the

16   Border Patrol and the Corps of Engineers.

17          All of the involved agencies in this case from BLM,

18   Interior, Fish and Wildlife Service to GAO, they all agree

19   that this problem that is being abated by border fencing is

20   not only a problem of border security but of environmental

21   protection, and we're very serious about that.

22          THE COURT:  Why don't we hear from the other side.

23          MR. PAGE:  Thank you, Your Honor.

24          THE COURT:  I think you better start where he left

25   off, which is the thrust of his argument, which is when you
```

1    get to the balancing factors, environmental situation that

2    exists there even before construction...

3        MR. SEGEE:  Thank you, Your Honor.  First of all,

4    thank you for pulling this hearing so quickly.  As discussed

5    in our reply brief we filed last night, conservation

6    organizations, Defenders of Wildlife and Sierra club, we don't

7    dismiss and we don't trivialize and we don't deny the

8    environmental impacts of undocumented immigration and other

9    illegal activities.

10        However, it needs to be put in context, and from the

11    GAO report that the Government relies on so heavily, that GAO

12    report, I don't have the exhibit with me today.

13        THE COURT:  D.

14        MR. SEGEE:  Exhibit D.  I believe the title of that

15    is Federal Land Management Agencies Need to Coordinate Better,

16    and what that GAO report discusses, in addition to the

17    environmental harm being caused by immigration and other

18    illegal activities, is that the Government's border security

19    program was undertaken in the first place in areas such as San

20    Diego and El Paso without coordination with the federal land

21    managers and shifted this problem to the Arizona federal

22    lands, and there was no foresight.

23        And so that's part of the reason we're asking for a

24    more wholistic view of the entire border fencing proposal

25    because the effect, thus far, in the last 10years of our

1    Government's border security program and immigration policy,

2    has been -- and the analogy that's often used is like

3    squeezing a balloon, and it's nearly -- it's shifting the

4    problem from one place to another, and the biggest loser in

5    this phenomena has been the federal lands.

6            And so what will happen on --

7            THE COURT:  But doesn't that get us right into the

8    quote that Mr. Page brought up from Kleppe, K-L-E-P-P-E?  And

9    also, I forgot to ask, and I don't know if you can answer

10   this, the other five segments, they were all subject to an EA,

11   has construction begun down in the other parts of the Arizona

12   border?

13           MR. SEGEE:  Actually, I'm not aware that an EA has

14   been done on all the segments, Your Honor.  There has been

15   construction done.  One of those segments is, I believe, a

16   26-mile stretch on the Barry Goldwater range, and that section

17   was done pursuant to the REAL ID waiver, the second REAL ID

18   waiver that Secretary Chertoff has invoked.  And I believe

19   Government counsel said they don't want to use that authority

20   perniciously and I don't want to go too far afield, but there

21   was a pretty broad agreement on the Goldwater similar to the

22   San Pedro, before two months ago, the vehicle barriers rather

23   than this impermeable pedestrian fencing should be built.

24   There was no litigation, a NEPA process had been done on those

25   vehicle barriers and the waiver really came out of nowhere,

1    Your Honor.  Nobody -- there was no controversy around that.

2             THE COURT:  Yeah, there's no -- nothing in the

3    statute that sort of inhibits the use of the waiver, correct?

4             MR. SEGEE:  There is not.  It's very broad

5    discretion.  I believe the language is, the secretary, in his

6    discretion, determined it necessary for the expeditious

7    construction.

8             THE COURT:  But my question though is, has there

9    been construction started, completed in the other six segments

10   of the border?

11            MR. SEGEE:  The Barry Goldwater range, I believe,

12   and the Government may be able to speak to this better.  I

13   believe that's completed.  There is ongoing construction that

14   is done or nearly done at what's called the Sasabe fence which

15   is near the Buenos Aires National Wildlife Refuge and on the

16   Buenos Aires National Wildlife Refuge.

17            The section that is showing west from Naco and it's

18   shown on this exhibit, although not that -- not that well.  I

19   believe that construction is done or is almost done.  And --

20            THE COURT:  So your programmatic approach is a

21   little late if in fact portions of this are already done.  I

22   mean, you can make an argument, I understand, that the EA here

23   is insufficient because it doesn't consider the construction

24   that's ongoing or done other places.  That's your balloon

25   analogy.

1           MR. SEGEE:  Right.

2           THE COURT:  But there is no point undertaking a

3    whole programmatic analysis if certain other parts are a

4    foregone conclusion.

5           MR. SEGEE:  Not all of those parts are foregone,

6    Your Honor.

7           THE COURT:  No, but some of them are.

8           MR. SEGEE:  Some of them are done or nearly done.

9    And in addition to these segments, which I'll note, under

10   Kleppe, the Government spoke of Kleppe as purely in the

11   regional programmatic context, but there is another basis for

12   our arguments under that case.  And even if you assume,

13   arguendo, that the Government has broad discretion and they

14   don't need to do this type of regional impact statement,

15   Kleppe also says that if there is cumulative and synergistic

16   environmental effects, regardless of whether there's a

17   program, those should be analyzed.

18          THE COURT:  Well, what are they here?

19          MR. SEGEE:  Well, what we focussed on in our

20   briefing so far is that by segmenting these projects -- and

21   this exhibit is from the Fish and Wildlife Services Biological

22   opinion, and the Government was saying, "This is only a

23   1.5-mile project."  Well, this exhibit, which is the

24   Government's own document, shows that the San Pedro is

25   actually -- the part that is directly a part of the fence

1    segment is 6.3 miles, which will in turn link to a completed

2    segment around the time of Naco, and then going east from

3    Naco, there is another 9.3-mile segment that's being

4    constructed and another 7-point-mile segment, and together,

5    all of these segments are going to form one continuous fence

6    that I believe is approximately 30 or 40 miles long and so --

7                THE COURT:  Wait.  A lot of this is not so clear

8    from anybody's briefs.  You're saying that the two miles that

9    you want to stop now, is that right?

10               MR. SEGEE:  Right.

11               THE COURT:  Two miles.

12               MR. SEGEE:  Just right within the NCA.

13               THE COURT:  Okay.  The San Pedro --

14               MR. SEGEE:  Right, Your Honor.

15               THE COURT:  -- Conservation, is part of a

16    continuous -- I'm looking at 6.  What are you looking at?

17               MR. PAGE:  That's right, Your Honor, Plaintiff's

18    Exhibit No. 6 in our opening brief.

19               THE COURT:  You're saying if I look at Douglas,

20    seven miles plus nine miles, that the two miles is within

21    that?

22               MR. SEGEE:  The San Pedro NCA is part of that.  The

23    furthest west from that, the 6.3 miles, the San Pedro is the

24    westernmost two miles of that 6.3-mile segment.

25               THE COURT:  Oh, and so going east, it says 9.3 miles

1    and seven miles at Douglas, those are two more segments that

2    are unrelated.

3              MR. SEGEE:  That's right, Your Honor.

4              THE COURT:  And what is -- wait a minute.  EA talks

5    about the San Pedro watershed.  Are they talking about that

6    6.3-mile area or they talking about something else?

7              MR. SEGEE:  I'm not sure, to be honest, Your Honor.

8    I believe it's talking about the entire NCA, but even if --

9              THE COURT:  Well, does the NCA -- I understand that

10   it goes farther north.  Does he go beyond the 6.3 miles east

11   or west?

12             MR. SEGEE:  The NCA is just the two -- I'm not sure

13   I understand the question.  The NCA is just the two-mile

14   segment of border, but the fence, the two miles of fence that

15   will be constructed within the NCA is, according to the

16   Government's own documents, is part of this larger 6.3-mile

17   segment, and I'm not sure what the NEPA compliance is for the

18   4.3 miles that are outside of the NCA that's part of that

19   fence.

20             THE COURT:  All right.  I'm trying to understand

21   their argument that the EA considers cumulative impacts

22   because it includes the watershed.

23             MR. SEGEE:  Well, I think my reading of the EA is

24   that the Government attempted to look at the cumulative

25   impacts within the San Pedro NCA area, and what we've argued,

1    in addition to our arguments that are specific to the San

2    Pedro, NCA, is that under cases such as NRDC versus Hodel and

3    also analogous to this court's decision in Defenders of

4    Wildlife v. Babbitt, there's not only the duty to look at the

5    cumulative effects within the specific area, the fencing, the

6    dewatering of the River, the other impacts that are happening

7    to the San Pedro River and stressing that resource right now,

8    but that there is also a duty to look at the cumulative

9    effects of fence construction at a broader area, whether it be

10   this specific area, which is how the Fish and Wildlife Service

11   chose to conduct its Endangered Species Act analysis for the

12   purposes of these segments or --

13          THE COURT:  They looked at three of these segments,

14   the Fish and Wildlife?

15          MR. SEGEE:  It gets a little bit confusing to me,

16   Your Honor, as to how they're counting segments, but all the

17   red lines on this map are what were conducted in the -- or

18   what were analyzed in the Fish and Wildlife Services

19   biological opinion.

20          THE COURT:  All of them, all the way to California?

21          MR. SEGEE:  No, just these -- just these red lines,

22   and this goes -- just to, basically, the central part of the

23   Arizona.  Sasabe is just a little bit southwest of Tuscon, so

24   there's a large part of the Arizona border that's not included

25   in this, including the Barry Goldwater range.

```
1                THE COURT:  Okay.

2                MR. PAGE:  And also the fence construction at the

3  Organ Pipe Cactus National Monument, which is near Lukeville.

4                THE COURT:  I want you to address two arguments

5  raised by Mr. Page.  One is that you don't fairly consider

6  their efforts at mitigation so that even assuming some

7  environmental impact, they have defined mitigation; and two,

8  that as an equitable matter you shouldn't have a TRO because

9  the environmental effects of a no action, so to speak,

10  allowing the borders to be invaded by aliens who are causing

11  the environmental damage, is not such that stopping the fence

12  is unbalanced environmentally any, you know, that much

13  better --

14                MR. SEGEE:  Okay.

15                THE COURT:  -- than the existing situation.  Putting

16  aside the fact that there is already a trench out there,

17  but --

18                MR. SEGEE:  Yes, Your Honor, and we actually have

19  photographs from yesterday showing that the fence construction

20  has started, the lower part of the fence, which was attached

21  as -- to Exhibit 3 to our reply.

22                THE COURT:  Well, and also, the third thing, you've

23  given me affidavits that show, prior to anybody doing anything

24  there with respect to this fence, you've already got a road.

25  It may not be very well put together, and there is already a
```

1    fence of sorts.  You have an affidavit from a gentleman taking

2    pictures -- pictures taken at the beginning of August before

3    they started doing what you're objecting to.  So it's not like

4    we're dealing with a particular pristine area, to be frank.

5              MR. SEGEE:  Right.  It's not a wilderness area, Your

6    Honor.

7              THE COURT:  That's an understatement.

8              MR. SEGEE:  But just to go through your points in

9    order, under mitigation, as Your Honor pointed out, for a lot

10   of the impacts, Alternative 1 and Alternative 2 are the same

11   and we are very clear about this, I think, in our pleadings,

12   Your Honor.  We weren't trying to inflate the two.  And for

13   example, at page 9 and 10 of the EA, the BLM discusses the

14   impacts on wetlands/riparian zones and vegetation, and just to

15   start with, Alternative 2 on page 10, it says, "The impacts to

16   riparian function and vegetation will be similar to

17   Alternative 1."

18             The description of Alternative 1 that we express the

19   extreme concern about is -- and I'll just paraphrase some of

20   this from the EA.  It talks about construction of a pedestrian

21   fence, the right-of-way will --

22             THE COURT:  I'm sorry, what page did you read from?

23             MR. SEGEE:  I'm at the bottom of page 9. Your Honor.

24             THE COURT:  9?

25             MR. SEGEE:  9 of the EA.

1          THE COURT:  Go ahead.

2          MR. SEGEE:  Talks about the pedestrian fencing in

3    the washes, and this is a very important point, because

4    although the Government is taking the very laudable step, I

5    think, of not building the pedestrian fence within the River

6    and the River corridor, a lot of the impacts that are

7    described in the EA are based on the fence crossing the desert

8    washes on either side of the River, and just as the nature of

9    hydrology in this nature of the desert, the rain usually comes

10   down hard and it moves quickly, so these areas normally don't

11   have water.

12         But when it rains, they need to convey that, and so

13   what the BLM predicts, by looking at fences that have been

14   constructed in adjacent areas, is that the fence will

15   collect -- and the fence, with respect to the washes, will

16   collect sedimentation debris and slow flood flows that will

17   result in downward scour holes reaching four to six foot.

18   This excess sediment will reach the San Pedro River where it

19   may cover existing herbaceous vegetation and create point bars

20   and sand bars that promote tree seedling germination.

21         THE COURT:  Tree what?  Where are you?

22         MR. SEGEE:  Tree seedling germination.  I'm sorry,

23   Your Honor.  Still, I'm at the middle of the bottom paragraph

24   on page 9.

25         THE COURT:  Okay.

1          MR. SEGEE:  And then potentially, if new

2    sedimentation occurs, then the River may adjust to laterally,

3    which will cause bank failure and loss of riparian vegetation

4    until the River reaches a new dynamic equillibrium with

5    increased sediment and water supplied from the areas of

6    disturbance.

7          And again, this -- on the next page it says that

8    impacts in Alternative 2 are the same.

9          With respect to the mitigation that the Government

10   discusses, on page 9 of the EA, right in this same area and

11   I'm -- oh, right below the section I just quoted in the same

12   paragraph, "only with improved construction methods for the

13   barriers over washes that allow flood flows to pass largely

14   unimpeded will sedimentation and erosion be reduced at the

15   washes."

16         There is no identification of what those improved

17   construction methods are, and in fact, Your Honor, at page

18   7 -- and I don't have that page in front of me, so I'm not

19   sure exactly where in the page it is.  At page 7 in the third

20   to last paragraph, and this is -- this is -- it's within the

21   section describing Alternative 1 but I don't see anything

22   different about Alternative 2.  It says, "Similarly,

23   construction of a hanging bollard fence or other designs may

24   help mitigate this issue of debris buildup behind the

25   structure and erosion below; however, no formal designs have

1   been presented by the applicant in this alternative, and

2   success of these structures in the project area is uncertain."

3              So even, I think, Your Honor, accepting the cases

4   cited by the Government and the propositions about them with

5   respect to mitigation, I don't think that the BLM has met

6   those principles of law in this case because they simply

7   haven't identified them, the mitigation that's going to

8   ameliorate these impacts.

9              With respect to irreparable harm that the border

10  fence at EA -- the border fence EA at 2223 actually notes that

11  the un- -- the traffic of undocumented immigrants will

12  increase in the River corridor as a consequence of the fencing

13  that's being constructed.  So by building these fences in

14  other areas of the NCA, the Government is funneling that

15  traffic up the River corridor.

16             THE COURT:  Well, how do you know that?

17             MR. SEGEE:  That's what the --

18             THE COURT:  They say, sort of, this could happen

19  temporarily until they get the whole thing done.  I mean, they

20  cite me some statistics about California that show when they

21  put up the barriers that had the effect -- I mean, it may have

22  sent people to some other area...

23             MR. SEGEE:  Right.

24             THE COURT:  But the -- I mean, isn't this sort of --

25             MR. SEGEE:  Well, I think -- I think two points,

1   Your Honor.

2              THE COURT:  -- taking it out of context to some

3   extent?  Yes, there will be some places that are still open to

4   crossing and they will be more in the water areas than the not

5   water areas, but I don't -- the premise, which is not for the

6   Court to second-guess, is that the fence is going to stop,

7   slow down, decrease the number of aliens coming into the

8   country.  Then with each number, they claim there are

9   environmental consequences, the people going up into the

10  hills, they're hiding in the bushes, there is trash, there is

11  cars, so that that premise is not for the Court to question,

12  we all agree.

13             Whether I agree with that and whether I think fences

14  is the right way or whether or not I think there ought to be a

15  virtual fence is not my decision.  So the successfulness of an

16  endeavor is not necessarily going to, what you predict might

17  be successful or not, is not really the case, but I am

18  concerned about his argument, which we have a documented

19  environmental problem.  Assuming that their solution has some

20  relevance to it, where does that put us in equitable terms?

21             MR. SEGEE:  Right, Your Honor, and again, Plaintiffs

22  don't discount these impacts at all, but I don't think --

23  first of all, we're in a TRO context, so we are asking for a

24  very temporary remedy, but secondly --

25             THE COURT:  Well, let's get to that for a minute.

1    How temporary is temporary?  They didn't even have an

2    administrative record; I don't have an administrative record.

3    You can't decide a preliminary injunction in a case like this

4    without an administrative record, you agree?

5              MR. SEGEE:  Correct, Your Honor.

6              THE COURT:  So you're talking, to be honest, a

7    while.  It isn't temporary.  That's misleading.  It can't be

8    10 days because there is no way that you or the Government or

9    I could conceivably do the necessary work in 10 days.

10             MR. SEGEE:  Well, I think, Your Honor, if it's 10

11   days or 30 days or even a couple months, I do not think that

12   the Government has demonstrated how construction of this

13   fencing now in this two-mile section of the border in this

14   irreplaceable and unique area is an emergency that has to be

15   done in the next few months.  And I think that the evidence

16   that Plaintiffs have presented about the -- on the other side,

17   the type of harms that this fence will cause and to both the

18   River and to the wildlife, which is something that's not

19   documented in the BLM's EA, this unique assembly of species

20   that we submit know the extent of their range in this area and

21   at least literally, as our declarations show, the fence will

22   cut those species off and potentially result in their

23   extirpation.

24             Given those impacts, given that the BLM's EA states

25   that this construction, under the alternative they've chosen,

1    will actually increase the levels of undocumented immigrant

2    traffic into the River, I just think in terms of balancing the

3    merits or balancing the harms, that the harm that the

4    Government is presented -- and they not only talked about

5    these environmental impacts, I believe they also mentioned the

6    impacts of leaving the trench open and -- but the merits --

7              THE COURT:  You've addressed that, but I still

8    don't -- how do I balance what you're talking about with the

9    status quo, so to speak, put aside the trench?

10             MR. SEGEE:  Well, the --

11             THE COURT:  I mean, you're saying that there is

12    going to be foot traffic going through the River areas, based

13    on this, until the Government gets more fence up, I guess, is

14    the theory, or they get a better security down there.  That

15    may be true.

16             Right now, though, the status quo, at least before

17    they had fences down there, people were crossing and there

18    were environmental problems.  The difficulty the Court's

19    having is I don't know which is worse.  I don't have a basis

20    for determining that.

21             MR. SEGEE:  Well, again, I would go back to what I

22    would say to that, Your Honor, this problem has been happening

23    for awhile.  From what I understand, and I don't have the

24    evidence, but from what I understand, the traffic has actually

25    been reduced in the San Pedro area recently, and it's not as

1     intensive as it was say a year or two ago.

2               But also, given the irreparable harm of that fence,

3     there is no -- once it goes out, that's it, that's a permanent

4     thing and --

5               THE COURT:  In 30 days, your case will be moot, if

6     he's right about October.

7               MR. SEGEE:  I believe it will be before then.  I

8     mean, I believe the Government said mid October.

9               THE COURT:  And your case could become moot if I

10    rule in your favor tomorrow when the Department of Homeland

11    Security trumps me.

12              MR. SEGEE:  That's very true, Your Honor, and from

13    our prospective, and we do not take this lightly at all and

14    we -- my clients are working at much broader levels in an

15    effort to address these issues collaboratively and

16    constructively, but we look at what's happening here and what

17    the Government has done here in terms of turning around an EA

18    in three weeks, turning out a biological opinion in less than

19    a month, having no public comment, reacting to the filing of

20    our lawsuit by trying to construct the area as rapidly as

21    possible and then saying that they're committed to the rule of

22    these laws.

23              Well, to me, it suggests that the Government is not

24    committed to complying with the laws and they want to justify

25    their noncompliance with the law with a waiver hanging out

1    behind us.  Well, as he said, Your Honor, and you're exactly

2    right, Congress made the determination, if there is an

3    emergency, that the Department of Homeland Security can step

4    in and waive those laws, and we would hope, very strongly,

5    that it does not happen, especially at a place like the San

6    Pedro River.  But just looking at what we believe is the

7    egregiousness of the violations in this case, we decided to go

8    forward, even with that waiver.

9            THE COURT:  Is there some reason for picking this

10   particular EA, since I understand that there have been plenty

11   of other ones on the border?

12           MR. SEGEE:  Just because of the nature of the

13   resource.  There is -- in terms of -- not to wax too eloquent,

14   but in terms -- the San Pedro hosts half of the breeding

15   species in the United States.  It has, I believe, 80 species

16   of mammals.  It's probably the most biologically diverse area

17   in Arizona.  It's known not only in the state, not only

18   nationally, but internationally it's been designated by the

19   United Nations as a world heritage site.  I may be missing one

20   of the words in there.  National Audubon, it's recognized as a

21   first globally important great area, it's irreplaceable and

22   it's really unparalleled.

23           And it's subject, right now, to construction that

24   while it may -- there may be some beneficial short-term

25   impacts from the impacts of trash being left and other illegal

1    activities, pale in comparison to the overall impacts on the

2    wildlife that's within that area and the River itself.

3         So we -- we looked at it as just if -- frankly, if

4    the Government can't do it right here, then it won't be done

5    right anywhere.

6         THE COURT:  You don't know, from your involvement in

7    some fashion, why they did it differently, why there isn't the

8    same national urgency for the Texas border or the

9    California/San Diego border that caused them in September '07

10   to commit to doing an EIS?

11        MR. SEGEE:  I'm not sure about California, Your

12   Honor, but the Texans are certainly making a lot of noise.

13        THE COURT:  I mean --

14        MR. SEGEE:  In Texas, Your Honor, there is -- unlike

15   in Arizona, there is a lot more private property issues, and

16   given that it's Texas and -- private property is paramount

17   anywhere in this country, but especially in Texas, and I think

18   people in Texas just see the border fence as a boondoggle, and

19   so there is a lot of opposition to that.

20        THE COURT:  And could you explain the cumulative

21   impact argument to me, that -- since I'm not even clear on

22   what the EA is saying on watersheds but...

23        MR. SEGEE:  Well, we've got -- I think we

24   essentially have two cumulative effects, Your Honor.  We have

25   an argument that the cumulative effects in relation to the San

1   Pedro watershed, however that's defined, is inadequate and

2   that the Government hasn't taken a hard look at cumulative

3   impacts within that area, and so that necessitates preparation

4   of the EIS specific to San Pedro, but then in reliance upon --

5           THE COURT:  I'm sorry, I missed that.  Say that once

6   again.  You have two arguments.  What's the first again?

7           MR. SEGEE:  The first is specific to the cumulative

8   effects analysis within the San Pedro watershed.

9           THE COURT:  And they have not taken that into

10  account because?

11          MR. SEGEE:  Well, as we explained, and it's pretty

12  brief at this point in our pleadings, Your Honor, but the San

13  Pedro is highly threatened right now by a number of impacts,

14  and the most pronounced of those is the dewatering of the

15  River that's resulting from development and growth in

16  surrounding areas.

17          THE COURT:  Is that what you allude to as the

18  biological opinion regarding Fort Huachuca?

19          MR. SEGEE:  That's right, Your Honor, it's the Fort

20  Huachuca biological opinion.  And then the second part of our

21  cumulative effects argument is, whereas that part is, the

22  overall additive effects of not just fencing but different

23  activities within the San Pedro watershed.

24          The second part is that the fence segments in

25  different areas of the Arizona border, not just within the San

1    Pedro watershed, are being improperly segmented, and so the

2    Government is not taking the cumulative effects of the fence

3    at a broad level and so --

4              THE COURT:  But -- I accept that; I understand that.

5    But what would those be?  I mean, if you have, I don't know

6    how many miles between the segment, what conceivably, if one

7    were to look at it, what would -- what would the effect of

8    being -- I mean, you don't have to consider something that

9    doesn't impact it, even if it's similar, down the road at

10   least.

11             MR. SEGEE:  The resource that we focussed on in our

12   briefings, Your Honor, is wildlife and specifically the

13   subtropical species that are reaching the northern extent of

14   their range within southern Arizona and often occur nowhere

15   else in the United States, and those include not only the

16   jaguar as a listed species, but a number of other non-listed

17   species, wildlife that are still pretty unique to the Arizona

18   area but --

19             THE COURT:  I understand that, but I'm saying,

20   assuming we're going to consider the jaguar, what difference

21   would it make if you were to consider six segments in terms of

22   cumulative impacts?

23             MR. SEGEE:  Because, Your Honor, I think it's much

24   easier if you look at a project in isolation to conclude that,

25   just as the Government is saying, I believe Government's

1      counsel characterized this project as de minimis.  They

2      stated -- the Government stated that it's a 1.5-mile fence

3      segment, so it's very easy, in that context, to say it's de

4      minimis, it's only a one 1.5-mile fence segment, that's not

5      going to have a significant effect on these species.

6            But if you start looking at all of the construction

7      together and you start looking at large blocks of land

8      being -- large areas of land being blocked off, then those

9      impacts are going to appear a lot more pronounced and

10     significant.

11            THE COURT:  Impacts being that the animal can't

12     cross and genetic interchange?

13            MR. SEGEE:  Right.

14            THE COURT:  I'm trying to understand what impacts

15     you're referring to.

16            MR. SEGEE:  Well, the Hass Declaration, Your Honor,

17     which is Exhibit --

18            THE COURT:  Whatever, yeah.

19            MR. SEGEE:  Exhibit to our declaration, that

20     declaration especially talks about the loss of genetic

21     interchange, the isolation of the populations, the physical

22     division of those populations.  She also mentions impacts, I

23     believe, related from the fact that they upgrade -- the fact

24     that the Government upgrades the roads in conjunction with the

25     border fence, actually can facilitate illegal traffic in some

1    areas where there wasn't before because you have a nice smooth

2    road to drive down, and -- thank you.

3         So Hass -- Hass Declaration -- I'll just read these

4    quickly.  First of all, paragraph 5, she talks about the

5    subtropical mammal species.  At paragraph 13, the biological

6    integrity of the whole Medrean Archipelago, which is the area

7    within which the San Pedro is located, also known as Sky

8    Island Ecosystems, relies on genetic interchange throughout

9    the region by both plants and animals.  Barriers to this

10   genetic interchange may influence the long-term viability of

11   populations, especially north of the border.  Construction of

12   border fencing and barriers presents three serious threats to

13   long-term survival of wildlife on the --

14        THE COURT:  But that presupposes an attack on the

15   fence in general.  The most, your relief here, would be

16   ultimately an EIS, I would assume, if you were to prevail, you

17   would get an EIS for the particular area, or even if you had a

18   regional one, you wouldn't end up addressing the issue because

19   this, as Mr. Page puts it, is a sort of small part of -- there

20   are a lot of fences and you're not going to stop all those

21   other fences.  Some of them will even be finished by the time

22   this litigation winds its way up to the Court of Appeals,

23   unless there's a waiver.

24        So that argument -- I'm having trouble with

25   understanding the argument.  It would be -- the argument will

1    exist whether this fence goes up or not because you're going

2    to have five other segments.

3              MR. SEGEE:  Well, I think that's -- I mean, it's a

4    bit of a Catch-22, Your Honor.  I mean, you're right, a lot of

5    construction has happened and that more will continue to

6    happen, but each -- for each segment that we wait and don't

7    try to force this sort of analysis, it will be further down

8    the tracks and the courts will be more inclined to rule

9    against us.

10             But I think -- I mean, ultimately, Your Honor, if

11   you're asking what practically we're trying to do is that

12   we're hopeful that if lawful environmental analysis under NEPA

13   was conducted that looked in an objective way and

14   comprehensive way at the impacts on wildlife and the other

15   natural resources, that the Government would be more prone to

16   choose different alternatives, such as the Alternative 3 that

17   was considered in this case, which was just the vehicle

18   barriers rather than the fencing, and that other efforts to

19   secure the border, such as the virtual fencing technology or

20   simply more law enforcement presence would come to more bear

21   than simply building a fence and again rushing the NEPA

22   analysis.

23             And so, Your Honor, we're just -- we support

24   strongly these efforts for border security, but we are trying

25   to -- we believe the NEPA process is intended to help

1    facilitate a more -- more intelligent decision making.

2         THE COURT:  But my question is whether the more

3    intelligent, and even if one were to succeed, would only apply

4    to this small area and they'll be stupid as to other areas,

5    for lack of a better word.  This really can only be addressing

6    that San Pedro area, and they're building, ultimately,

7    700 miles of fence, and so in terms of blockage of potential

8    crossing of wildlife, it seems like there is sort of a

9    practical problem here by putting your thumb in the dam.

10         MR. SEGEE:  Right.  Your Honor, we're not

11    necessarily precluding ourselves from a broader challenge to

12    other projects.  We've just come in on an emergency basis on

13    this one particular area, and I don't know if the

14    characterization as a thumb in the dam is correct or not, but

15    again, coming back to the resources of this area and the

16    uniqueness of this area, the fact that the Government has done

17    this analysis without notice, without opportunity for comment,

18    without -- basically railroaded it through...

19         THE COURT:  Let me just ask Mr. Page about that

20    point.  Thank you.

21         MR. SEGEE:  Thank you.

22         THE COURT:  I haven't seen the Government ever offer

23    like this quickly.  Why is it not practicable to find out

24    about alternative means and to involve the public?  It may not

25    be mandatory, but three weeks is remarkable.  Two weeks or

1    seven days for a BO to me is unprecedented.  The border has

2    been there a lot longer than that.

3          The problem has existed for a lot longer than that.

4    You've had the authority to be moving since at least '06, and

5    in fact, you were moving with a different alternative from

6    '06, so when you changed the nature of the alternative, there

7    is a suggestion that you were doing it to ram it through in

8    three weeks and start the construction before anybody would

9    wake up.

10          MR. PAGE:  Your Honor, I just will analogize to

11    other situations in which the executive branch has moved to

12    protect the country from either the risk of nuclear

13    proliferation, which I've been involved in, or this case.  The

14    border patrol and Homeland Security have finite resources, and

15    an EIS is extraordinarily -- not only extraordinarily

16    expensive, but as we spoke before, it's coterminous with a

17    policy decision that it should govern a region or that it's

18    appropriate to study to embark on a larger study for a very,

19    very large ecologically important or simply a large ecological

20    area because you anticipate in the future that the same types

21    of product -- of projects will be commenced but this time

22    through EA's.  And so --

23          THE COURT:  I'm sorry.  Opposing counsel's point is

24    that this may be a smaller area but it's a really important

25    and unique.  You recognize that in your EA.  So that because

1    it's small, I don't see that you can actually derive from that

2    that there should be other kinds of environmental results.

3            MR. PAGE:  Well, Your Honor, I think that the

4    quickest answer to your question is this project would have

5    been stopped if the EA uncovered significant environmental

6    effects, but the agency had extraordinary discretion to

7    determine whether to prepare an EIS in advance or to prepare

8    an EA and then rely on the environmental analysis therein to

9    choose an EIS.  And if I may take your point a little bit

10   further, this agency had the choice of complying with NEPA

11   responsibly and preparing an EA.  Yes, the Court is correct,

12   that it was an EA that was --

13           THE COURT:  Quick.

14           MR. PAGE:  -- written in a short time, but it's also

15   an EA that is extraordinarily forthright in not only

16   documenting the effects that Plaintiffs use as the cornerstone

17   of their case, they refer to our EA, but what Plaintiffs don't

18   refer responsibly to is the mitigation measures that

19   demonstrate when you either list them or simply read them as

20   they're stated; they demonstrate an agency that was on top of

21   the problem and understand its dual purpose.

22           THE COURT:  Are you talking about the mitigation

23   meaning using barriers or you talking about the things that

24   are listed at the back there of the EA?  What are you --

25           MR. PAGE:  Well, Your Honor, that is a -- that's an

1     opportunity to respond to Plaintiffs' view that there are some

2     types of significant effects that weren't properly mitigated.

3           I'll begin, Your Honor, with this view that the

4     pedestrian fencing is something that the Government did not

5     responsibly mitigate, and it's a situation in which the

6     Government did exactly what Plaintiffs accuse it -- that the

7     Plaintiffs state the Government did not do.

8           For example, Your Honor, we have a view, the

9     Plaintiffs stated it, that riparian vegetation would be

10     impaired and that that could be a possible significant effect

11     here that would merit an EIS.

12           Well, on page 13 of the Government's brief, and Your

13     Honor, that's again page 13 of the Government's brief, and

14     it's EA at 13, the Government adopted a mitigation measure

15     that would forestall virtually all of the vegetation about

16     which Plaintiffs profess to worry.  The quote from the EA is

17     that the mitigation measure requires the Government, Homeland

18     Security and Interior, to ensure that any temporarily

19     disturbed soils will be stabilized and revegetated with native

20     tree and shrub species, including cottonwood and willow

21     saplings that washes arroyos.  Disturbed areas will also be

22     spread with a hydro-seed mixture to establish a herbaceous

23     cover more rapidly.  Post-construction stabilizing of eroding

24     areas will be required when fencing and ground disturbance

25     result in accelerated erosion.

1          And continuing on, Your Honor, this may include

2     reseeding, water bars or other treatment as necessary, but

3     Plaintiffs then state that this -- just assume, really, that

4     this mitigation measure will fail because although they

5     applaud the Government for the temporary vehicle barriers

6     here, we appreciate that, they claim that it's the pedestrian

7     fencing that they're most concerned about.

8          Well, Your Honor, if you look at page 15 of the

9     Government's brief, this agency, again, in the Government's

10    view, both accomplished their statutory mandate to abate

11    undisputed border security risk and also to adopt responsible

12    mitigation measures necessary to allow the project to proceed.

13    And so when you look at page 15 of the Government's brief,

14    Your Honor, the top part talks about how the temporary vehicle

15    barriers will avert -- because they're being placed in

16    riparian areas, will avert significant damage.

17         In fact, the Government concluded, without rebuttal

18    from Plaintiffs, that by placing them in dry wash areas, all

19    of these drainages will not be impeded, but the Government

20    also, again, referring to Alternative 1, or a reality in which

21    there was no mitigation measures, the Government talked about

22    the possibility of bank failure, unless it adopted additional

23    mitigation measures.

24         So you go on in the middle of that page, Interior

25    adopted mitigation measures targeted to the pedestrian

1    fencing.  It decided to adopt mandatory mitigation that

2    prohibited the construction of pedestrian fencing, temporary

3    vehicle barriers or other structures, and here's the quote,

4    "during the rainy season when the soil conditions are muddy

5    and unmanageable."

6              THE COURT:  Are you now looking at that list at the

7    end?

8              MR. PAGE:  No, actually, Your Honor, I'm at the

9    brief which quotes these sources.

10             THE COURT:  The description -- it's the same thing

11   as "description of mitigation"?

12             MR. PAGE:  Well, not entirely, Your Honor.  Your

13   cites are the EA at 3 to 5, that will show the Court that

14   indeed what the Government did in Alternative 2 is it reduced

15   the length of the pedestrian fences, and then the mitigation

16   measure language that the Bench is referring to, those are EA

17   pages 23 and 24, but there is also analysis at EA page 9.  So

18   it would be, Your Honor, EA 3 to 5, you can see that the

19   pedestrian fence link was reduced when the Government studied

20   the environmental issue of a pedestrian fence versus a

21   temporary vehicle barrier, and then if you move on, Your

22   Honor, pages 9 and then 22 through 24, that will address all

23   of the mitigation measures that the Government summarized on

24   page 15 of the brief.

25             So 9 is narrative, and analysis 23 and 24 is

1    summarizing the decision to adopt specific mitigation

2    measures.  And Your Honor, but in addition to reducing the

3    length of the pedestrian fence, the Government went one step

4    further and required the new pedestrian fencing, and this is

5    again on page 15 of the brief, to be placed within, quote, the

6    existing archeological trench excavated in July 2007 that is

7    located three to six feet north of the barbed wire fence

8    currently representing the international border.

9            Again, this addresses the Bench's point, which was

10   well taken that this is an area that's already been disturbed,

11   but if I may, also, I know the Court is concerned about

12   cumulative effects.  I think it's very telling what was

13   addressed in the remarks by my learned opposing counsel.

14           In the colloquy with the Court, the quote is, "We're

15   concerned with the riparian area," which they admit, Your

16   Honor in the cumulative effects section, the Plaintiffs opined

17   that that section is limited to the riparian corridor of the

18   entire 58,000-acre area.  So indeed, the Government agrees,

19   the cumulative effects analysis looked at what was

20   ecologically connected to this tiny project, an entire

21   riparian corridor of about 58,000 acres.

22           There is no requirement in the case law for the

23   Government to go outside what is ecologically connected to a

24   riparian area and consider, as Plaintiffs want us to

25   consider --

1          THE COURT:  Right.

2          MR. PAGE:  -- other areas that aren't ecologically

3    connected.

4          THE COURT:  Well, it's not just ecologically

5    connected.  If there is some federal action that will have an

6    impact in the area, you're supposed to consider it, right,

7    whether it exists in the area or next door or up the River?

8          MR. PAGE:  Well, Your Honor, that is true, but the

9    obligation under NEPA, and the reason why I say ecologically

10   connected, is the NEPA document is going to be limited by the

11   proposal.  And then it's limited by two other things, the

12   effects that are reasonably foreseeable, but the effects are

13   supposed to be environmental.

14         And the reason why I use the phrase "ecologically

15   connected" to this action is to -- is to point out that

16   because this is an environmental statute, what is foreseeable

17   is going to depend on ecological relationships.  So when

18   you're looking at a document like this, you're required to

19   look at foreseeable environmental effects that are linked to

20   the proposed action.

21         THE COURT:  Well, let's hypothetically, if you had

22   the fence going all the way across the border with only teeny

23   little breaks in the Arizona, you can't tell me that I'm --

24   you'd still limit it to the riparian areas of the San Pedro.

25         MR. PAGE:  No.  What I'm saying is, is that when you

1    decide to take a smaller environmental document and look at a

2    discreet area, what Plaintiffs would like to say, if they can

3    find a similar effect somewhere, the EA is discredited and you

4    should prepare an EIS instead.

5         Your Honor, the Government's counter to that is, for

6    this EA, the only requirement under NEPA is to look at what is

7    reasonably foreseeable as a consequence of the agency action.

8    That's what the NEPA document says.  The NEPA document, it

9    commences in the obligation to study with a NEPA document with

10   a major proposal for federal action.

11        Well, when you look at the proposal, when you go --

12   when you use an environmental document that is localized to a

13   particular project or a very small area of land, the CEQ

14   regulations require the Government to look at what is

15   reasonably foreseeable.  And what is reasonably foreseeable in

16   determining environmental effects is going to be ecological

17   relationships, like what is the given riparian corridor in

18   which this project is located.

19        So the important point, Your Honor, is that the

20   Government did what it was supposed to do in looking at the

21   riparian area and the fencing in this 58,000 acres.  That's

22   what makes this EA an act of --

23             THE COURT:  I guess you confused me, sir.

24             MR. PAGE:  Uh-huh.

25             THE COURT:  I didn't understand the cumulative

1    effects or impacts under the statute or under the regs are

2    limited in the way you're talking about.  I thought you would

3    just look at the impact within the area and decide if there is

4    any other major activity that will add to that.

5              MR. PAGE:  Right.  Your Honor, the --

6              THE COURT:  You keep on saying, "Well, if I look at

7    just the riparian area, then we're all home free, because I

8    don't have to look at anything else."  Now, I don't understand

9    that to be the law.  I mean, it could be that it's an eye on

10   someplace and there is nothing else to look at, but if, in

11   fact, you're looking at a River and figuring out what's

12   happening in the River but there is something way upstream

13   that's outside your project, by a long shot, but it's having a

14   big effect because you, the Government, are doing something

15   there, you're not telling me I'm supposed to ignore it because

16   you've defined the area not to include it?

17             MR. PAGE:  Your Honor, I know the Bench wants to be

18   practical with this case, and I think that probably it's

19   important to note that NEPA is a practical statute.  I think

20   there is two guidelines here.  There is no requirement under

21   NEPA to consider any environmental effect if it's not

22   foreseeable.  And then the question is, are you arbitrary and

23   capricious or did you rest your decision that a given effect

24   is foreseeable or not on recent analysis?  And what I'm

25   suggesting is, is that if you look at the CEQ regulations

1    definition of significance, one definition is ecologically

2    significant relationships so that when you are, for example,

3    considering cumulative effects, there is two environments.

4         The statute doesn't require an agency like this to

5    anticipate the possibility of a fence that may or may not be

6    constructed.  In Kleppe, that's called a contemplated action,

7    and that is deemed to be not foreseeable because nobody knows

8    whether it's going to occur or not.

9         THE COURT:  What do you mean now?  I'm sorry, you're

10   becoming quite abstract.  We know there is going to be six

11   segments.  That's all he's talking about.

12        MR. PAGE:  Well, in this particular case, Your

13   Honor, the --

14        THE COURT:  We know there's going to be a lot of

15   miles of fence in Arizona.

16        MR. PAGE:  Right.

17        THE COURT:  That's all he's talking about.

18        MR. PAGE:  But Your Honor, what's critical about the

19   biological opinion being in the administrative record, as the

20   Court will see, it's not only limited to the watershed but

21   it's limited to an area -- it addresses an area larger than --

22   I mean, larger than the 1.3 acres.  The biological opinion is

23   already looking at the ecological relationships that drive

24   this particular project.  And your point --

25        THE COURT:  That's his point.  His point is that the

1    biological opinion, which is only worried about endangered

2    species or potentially threatened species, does a better job

3    than your EA.  That's exactly their argument is that they look

4    in a broader way.

5         MR. PAGE:  Your Honor, what is significant is the

6    biological opinion is so consistent with the EA's analysis.

7    When I began my remarks today, I suggested that the unanimity

8    between the Fish and Wildlife Service and the action agency is

9    very significant here.

10         THE COURT:  They're looking at slightly different

11    things.  The EA is much broad broader than the BO.

12         MR. PAGE:  Right.  But because the BO -- the NEPA

13    obligation, Your Honor, is to consider potential compliance

14    with the Fish and Wildlife Service and with the -- with the

15    Fish and Wildlife Service's opinion and with the Endangered

16    Species Act.  So this biological opinion is significant, but

17    it's in the administrative record of the environmental

18    assessment, meaning that this broader look at the corridor was

19    before the federal officials, when they wrote the EA.

20         And to answer your question about what you call the

21    segments, I will call the parts, because segments is a

22    specific meaning under NEPA, meaning a project that has no

23    independent significance, is considered a segment from -- if

24    it's dependent on another project that has a NEPA document

25    that didn't consider the project that was segmented.  Look at

1    the two and they're considered segments if one can't exist

2    without the other.

3          But case laws says if there is independent

4    utility -- in other words, Your Honor, if this small border

5    area, one mile, two miles, if it would be affected within that

6    mile, keeping illegal aliens out and keeping the environmental

7    damage that they cause out of that particular area, it lasts,

8    on its own, it's deemed to have independent utility and the

9    Government is not required to consider it in even similar

10   projects --

11         THE COURT:  Mr. Page --

12         MR. PAGE:  -- in the same document.

13         THE COURT:  You know that the Government's policy

14   there to put up a border fence can't work if you just put up

15   the fence in San Pedro.  If that's what you're arguing, I

16   couldn't follow that all.  You're saying that this has an

17   independent effectiveness.  If you put a fence for two miles

18   and don't -- and ignore all the rest of the fences, that will

19   make no difference at all.

20         MR. PAGE:  No, Your Honor, what I am saying is, is

21   that the NEPA obligation to consider a particular agent --

22   more than one particular agency action in the same

23   environmental document --

24         THE COURT:  Right.

25         MR. PAGE:  -- depends on whether each action can't

1    exist without the other.  If each action, even if it's

2    impracticable, has some independent utility by itself, then

3    you may study the action in an environmental assessment, but

4    it's important also to point out to the Bench that the Agency

5    didn't just consider this one action.  It looked at the entire

6    riparian corridor.

7            And what we're suggesting, what we've shown, Your

8    Honor, is that there is no obligation in the same

9    environmental document to go on and talk about fences in other

10   ecological areas or in other riparian corridors if the

11   Government doesn't choose to.  It could choose an EIS and

12   consider everything or it can choose an EA and consider the

13   cumulative effects of that small project that are foreseeable

14   in the area.

15           And one method of determining what is foreseeable is

16   to look at the riparian corridor, because the excavation, Your

17   Honor, in this small area, is it going -- just pose a

18   rhetorical question.  The Plaintiffs are most concerned with

19   sedimentation and with erosion.  Well, if that is the case, is

20   there any kind of reputable theory that would cause

21   sedimentation or erosion in areas outside the riparian?

22           THE COURT:  No, I think it applies to the wildlife.

23   I don't understand their argument.

24           MR. PAGE:  Your Honor, then that is a good signal to

25   me to talk about how Plaintiffs have absolutely failed to show

1    any harm to wildlife.

2              I'd like to start with the jaguar.  On page --

3              THE COURT:  Okay.  Wrap it up, Mr. Page.  Thank you.

4              MR. PAGE:  All right.  Your Honor, you've been very

5    kind in giving us the time that you have.  Your Honor, on page

6    25, we have supplied the Court with the biological opinion of

7    the Fish and Wildlife Service.  They have concluded, on the

8    basis of a very detailed analysis, that in part, because of

9    the significant harm occasioned by illegal aliens in this

10   jaguar habitat area, this actually will not jeopardize the

11   jaguar.

12             And we also were speculating -- the Plaintiffs were

13   speculating about whether some of these other projects that

14   they say are segmented might affect the jaguar, but when the

15   Court reads the biological opinion, it will find out that

16   virtually all of the jaguar's population is not north of the

17   border but south, so that doesn't work.

18             Also, Your Honor, the Court was talking about the

19   biological opinion and its scope.  The biological opinion

20   shows that the Agency was well aware of the ecological

21   relationships not only in the riparian corridor and was

22   also -- had before it the view of the Fish and Wildlife

23   Service that no listed species population would be affected at

24   all and --

25             THE COURT:  Mr. Page, they should have had you write

1    the environmental assessment.  I know if you spent a little

2    time writing a better document, we wouldn't be here, I tell

3    you that.

4              MR. PAGE:  Your Honor, I really appreciate that

5    comment, because I've read so many of these over the years, it

6    also makes you want to try to organize them in your sleep.

7    But Your Honor, the only evidence that stands against the

8    biological opinion is this declaration of Christine Hass that

9    Plaintiffs were talking about, but we agree that paragraph 13

10   is highly relevant to harm.

11             You have a sentence -- here is the sentence,

12   "Barriers to this genetic interchange may interfere with the

13   long-term viability of a population, especially north of the

14   border."  Critical at issue here, Your Honor, is no specific

15   plant or animal and again that's --

16             THE COURT:  What exhibit are you looking at?

17             MR. PAGE:  That's -- Plaintiffs referred to the

18   declaration of Hass as supposedly showing significant harm to

19   a species, and that would be Plaintiff's Exhibit 7.  They

20   refer to it in their remarks a little earlier.  What's

21   fascinating about this exhibit is that in paragraph 13, the

22   Declarant, who obviously, you know, works with, works for the

23   Plaintiffs is not even saying whether it will happen.  It may

24   or may not happen, and he's also talking about long-term

25   viability of what he calls plants and animals that he doesn't

1    identify.

2            And Your Honor, think of all the layers of

3    speculation.  It would be, this requires a conclusion that the

4    fencing will block all the animals and that they will not be

5    able to breathe effectively and be viable north and south of

6    the fence.  But that, saying something may or may not happen,

7    is materially different from saying that it will happen.

8            Even if this Declarant said it would happen, under

9    the Marsh case and under the cases that we've addressed, that

10   we've referred the Court to in the District of Columbia

11   Circuit, the biological opinion trumped this declaration

12   because it is the opinion of biologists that represent the

13   entire country.  And Your Honor, the only other --

14           THE COURT:  May I ask you one other question?

15           MR. PAGE:  Yes.

16           THE COURT:  It's very troublesome, both to the

17   Plaintiffs and the Court, that this was rammed down in three

18   weeks, when a proposal was sitting out there for over a year.

19   And the law, while I agree it may not be mandatory to have

20   public participation, I don't see why in the world it was

21   impracticable.  I don't understand your argument at all on

22   that.

23           Why was it that three weeks became so critical

24   compared to the Government sitting from September '06 with

25   their proposal all the way to August, they change it.  I mean,

1    look at the facts a minute, Mr. Page.  There is -- the law

2    thinks that you should make your decision based on as much

3    information as you can possibly consider.  That's the notion

4    of NEPA that you have to think about things, consider it and

5    explain why or why not you accept it, and that gives you a --

6    pretty much of a carte blanche if you go through that

7    analysis.

8             When you stop the free flow of information and do

9    something in what I view is record time and a BO done between

10   August 23rd and August 27th and then this is signed off

11   on, raises a troublesome sign for the purpose of having this

12   be a process that is going to make you, the Government,

13   informed and make good decisions.  That -- I can't understand

14   the impracticality whatsoever.

15            MR. PAGE:  Well, Your Honor, you're absolutely right

16   that there would be no lawful or understandable reason for

17   moving as quickly if this EA and FONSI did not comply with

18   NEPA.  But I think it's important, and it's a basic point, but

19   the Agency was quite prepared to stop if it found significant

20   environmental effects.  There are none.  And I haven't

21   heard --

22            THE COURT:  But NEPA --

23            MR. PAGE:  -- Plaintiffs today, except they talk

24   about unidentified birds and animals and what might happen in

25   the future if this fencing occurs.  That cannot withstand the

1    contrary determination of the Fish and Wildlife Service and

2    Interior and the Border Patrol and GAO.

3         THE COURT:  But you're all the Government.  You

4    know, since when are you going to disagree among yourselves?

5    I'm not being cynical.

6         MR. PAGE:  Your Honor, I didn't want to go this way,

7    but I'm glad that we're having this informal talk about it.

8    Your Honor, I believe, in my 19 years, that the level of

9    unanimity about the environmental issues, I think that as

10   Americans we're going to be inclined to agree that this is an

11   urgent border problem that Congress was perfectly justified in

12   responding to the people's mandate.

13        THE COURT:  I don't disagree with that at all.

14        MR. PAGE:  In classic juris prudence, what

15   Plaintiffs do most of the time, Your Honor, is they mind

16   critical comments from the environmental specialists, the Fish

17   and Wildlife Service and EPA are by no stretch of the

18   imagination, because they were created under the Endangered

19   Species Act to be independent and they're viewed in the

20   federal family as highly independent.

21        Most of the time, Your Honor, I am explaining in

22   briefing before you or your colleagues that the fact that the

23   EPA or the Fish and Wildlife Service criticized the project in

24   an environmental document or wrote a critical letter is not

25   determinative because NEPA only requires the Agency to respond

1    with reasoned analysis to it.

2            What's fascinating here, Your Honor, is that all of

3    the action agencies, from the Fish and Wildlife Service to

4    Interior, are talking about the significant environmental harm

5    of letting this status quo continue.

6            And if I may finish with answering your question

7    about why the urgency, Plaintiffs talked about that they don't

8    discount the urgency, but they didn't find the urgency.

9            I would respectfully suggest --

10           THE COURT:  I think they said they don't discount

11   the need for border patrol.  They're not -- nobody is

12   disputing the necessity or the desire of stopping the flow of

13   illegal aliens.

14           MR. PAGE:  You're correct, Your Honor, they don't

15   discount the security issue, but the quote is, and I -- you

16   know, I was impressed, so I wrote it down, was they didn't see

17   the urgency of a 20- to 30-day stop.

18           May I refer the Court to what is the federal

19   official most responsible for border security and for looking

20   at the line on the ground consequences of this continued

21   environmental encroachment on public lands, and that is

22   Exhibit D and it's Deputy Commissioner Ahern.

23           And he writes, Your Honor, "The urgent need to gain

24   and maintain operational control of the border in this area is

25   clearly evident.  Because, as set forth, this is an area of

1   high illegal entry and activity.  Any delay, no matter how

2   brief, is unwarranted."

3            THE COURT:  Where is that?

4            MR. PAGE:  I'm at paragraph 23 of Exhibit D, Deputy

5   Commissioner Ahern's declaration, and it's again paragraph 23.

6   "As I indicated above, during fiscal year 2007, there were

7   19,000 apprehensions of illegal entrants in the San Pedro

8   Riparian National Conservation Area."

9            THE COURT:  How many were there in 19- -- in 2006?

10           MR. PAGE:  I could ask.

11           MR. AHERN:  We have to provide that.  We don't have

12   that now.

13           MR. PAGE:  Your Honor, but what's fascinating is

14   this gives you the data to perhaps question Plaintiffs'

15   confidence that there is no real harm from a TRO because the

16   20- to 30-day estimate by Plaintiffs was in response to the

17   Bench's question about an administrative record.

18           Well, Your Honor, what Commissioner Ahern points out

19   is this is an average of 52 illegal aliens crossing every day.

20   If you take that times Plaintiffs' preferred 20- to 30-day

21   briefing period, that comes down to approximately 1,040

22   illegal entrants in this country that would have been deterred

23   if this fence had been constructed.  And if you continue on,

24   Your Honor, in the same paragraph 23.

25           THE COURT:  Mr. Page --

```
1              MR. PAGE:  Page 1136 --

2              THE COURT:  Mr. Page, we've had this discussion

3    before.  I still tell you the Department of Homeland Security

4    can control that simply, so the -- it is not, I don't think,

5    your persuasive argument.

6              MR. PAGE:  Your Honor, I'm --

7              THE COURT:  I think the law allows you to trump it,

8    and therefore, you have all the power, all the power, sir, so

9    I don't actually find that persuasive.  I'm going to give the

10   Plaintiffs five seconds to respond and then we're going to

11   take a break.

12             MR. PAGE:  Thank you, Your Honor.

13             MR. SEGEE:  Thank you, Your Honor.  Just quickly.

14   Going back to a point we were discussing in detail before, in

15   terms of the other fence segments and whether they've been

16   constructed and what's coming forward, we think that the

17   existence of the other fence segments, the cumulative effects

18   then, highlights the need to do things correctly in this case

19   so the Government can potentially choose to take a different

20   path other than fencing, if they wanted.

21             And just lastly, Your Honor, I don't want to --

22   Plaintiffs do not wish to concede at this hearing that if the

23   REAL ID Act waiver is invoked that the case is simply moot.

24   So we would like to reserve to -- if that waiver is invoked,

25   to address that at a later date.
```

1          THE COURT:  Well, limits my review.  It seems to me

2     that the law is designed for this very situation, and I find

3     the Government's sort of explanation somewhat inexplicable

4     that I should be able to figure out the national security

5     interest here.  I'm not suited to do that.  I am not put in a

6     position of being able to address that.  That's why the law

7     says what it does, but if -- I'm not -- we're not there so you

8     don't have to concede.

9          All right.  The Court will take a 15-minute recess

10    for now.

11         THE DEPUTY CLERK:  All rise.

12         (A BRIEF RECESS WAS TAKEN.)

13         THE COURT:  Please be seated.  Counsel, this has

14    been an obviously a very, very expedited proceeding.  It's my

15    recollection the Plaintiffs filed on Friday, the Government

16    got their opposition in yesterday, the reply was filed late

17    last night.

18         The issue before the Court is whether to stop the

19    construction of approximately a mile-and-a-half or slightly

20    more of the construction at the border of a permanent

21    pedestrian fence and then a -- vehicle barriers, both

22    permanent and temporary.  This area is referred to as the San

23    Pedro Riparian National Conservation Area, and I think it

24    is -- appears to the Court that everybody agrees that this is

25    a unique area, and that's described fairly carefully in the

1    environmental assessment.

2          The standard for a TRO is obviously well known to

3    everyone.  It's extraordinary remedy and can only be granted

4    sparingly.  In considering such a motion, the Court must

5    examine whether there is a substantial likelihood that

6    Plaintiffs will succeed on their merits; second, whether

7    they'll be irreparably injured if the injunction is not

8    granted, whether the injunction will substantially injure

9    other parties and the public interest will be furthered by the

10    injunction.

11          These factors interrelate on a sliding scale, and

12    particularly showing on one, may compensate for a weak showing

13    on another.  The issue here is, under NEPA, whether or not the

14    environmental assessment was sufficient or whether a further

15    EIS needs to be done based on the EA that was conducted here.

16          NEPA requires federal agencies to prepare an EIS for

17    every major federal action significantly affecting the quality

18    of the human environment.  An environmental assessment is made

19    for the purpose of determining whether an EIS is required.  If

20    any significant environmental impacts might result from the

21    proposed Agency action, then an EIS must be prepared before

22    the Agency action is taken.  I am citing from the D.C. Circuit

23    law, Grand Canyon Trust at 290 F.3d, 339.

24          If a finding of no significant impact is made, the

25    Agency must be able to make a convincing case for its finding.

1    In this case, the BLM has made a finding based on the EA

2    regarding the San Pedro Conservation Area, which was prepared

3    over a three-week period in August '07.  In the mitigation

4    measures discussed therein, they, based on those mitigation

5    measures, they decided to grant a right-of-way to the Army

6    Corps of Engineers to construct what appears to be about a

7    mile-and-a-half of pedestrian fence that is somewhere between

8    14-, 15-, 16-feet high as well as about half-a-mile's worth of

9    temporary and permanent vehicle barriers.

10          I gather, from the Plaintiffs' position, it's the

11   permanent fence that is a far greater concern than the

12   barriers, and in fact, they would be in favor of Alternative 3

13   that was considered in the EA as opposed to Alternative 2,

14   which is the combination of fence and barriers that was

15   adopted in the EA.

16          FONSI, the finding of no significant impact was made

17   on the 31st of August 2007.  The Court has indicated it

18   finds it very significant that the proposal on the table by

19   the Government from September '06 until August '07 was to use

20   vehicle barriers only, not the fence.  I have been unable and

21   I do not have the administrative record.  Counsel has

22   represented that it was a result of traffic patterns changing.

23   No one is able to tell me what the difference is in terms of

24   illegal aliens coming in in '06 versus '07.

25          There may be, according to the papers given to me

1    that as they build fences along the border, more aliens come

2    in some place else, they adapt to the fences, but it is not

3    obviously, as part of the NEPA analysis, it is not for the

4    Court to determine whether fences are good or bad policy with

5    respect to addressing the problem of illegal aliens.

6         An Agency decision that an EIS is not required may

7    be overturned only if it's arbitrary, capricious or abuse of

8    discretion.  Specifically, the Court's review -- reviews an

9    Agency's FONSI, that's capital F-O-N-S-I, to determine, quote,

10   whether the agency took a hard look at the problem, whether

11   the agency identified the relevant areas of environmental

12   concern; three, as to the problems studied and identified,

13   whether the agency made a convincing case that the impact was

14   insignificant; and also, fourth, if there was an impact of

15   true significance, whether the agency convincingly established

16   changes in the project sufficiently to -- sufficiently reduce

17   it to a minimum.  That is a quote from Peterson at 717 F.2d at

18   1413.

19        Now, the government, as I should mention

20   preliminarily, has argued that I shouldn't rely, at least for

21   the merits, on the affidavits, but the Court finds that that

22   argument is unpersuasive for a couple of reasons.  First, we

23   don't have an administrative record.  They -- even the

24   Government admits it's -- those affidavits are relevant to the

25   question of injury with respect to the remaining factors, but

1    beyond that, given the fact that there was no public

2    participation here, the affidavits are important in terms of

3    trying to understand what or what was -- what was or what

4    wasn't considered by the Government.

5         The very fact that it may be public participation is

6    not required in an EA, but when there is none, then I -- the

7    public has no other way, other than relying on affidavits, to

8    at least bring to the Court's attention at this stage what are

9    the environmental harms or what are the deficiencies in the

10   environmental assessment, so the Court has considered these

11   declarations.

12        Now, in terms of the issue of substantial likelihood

13   of success on the merits, the Court obviously considers the

14   counsel on environmental quality factors listed at 40 C.F.R.

15   Section 1508.27, these provide guidance to me in determining

16   when a federal action meets NEPA's definition of significance.

17   As Judge Friedman noted in Friends of the Earth, case reported

18   at 109 F Supp. 2d 30, reported at D.C. -- I'm sorry, at --

19   reported in 2000, quote, While it is not a checklist, the list

20   of characteristics of a significant impact contains many of

21   the characteristics apparent in this case.

22        I think that I've made it clear to the Government, I

23   find their discussion of cumulative impacts to be -- suffer

24   from both a factual and legal flaw.  I think that it's clear,

25   under the law, 40 C.F.R. Section 1508.27, parenthesis, B,

1   parenthesis, 7, "In determining the severity of an action's
2   impact, an agency must consider whether the action is related
3   to other actions with individually insignificant but
4   cumulatively significant impacts.  Significance exists if it
5   is reasonable to anticipate a cumulatively significant impact
6   on the environment.  Significance cannot be avoided by terming
7   an action temporary or breaking it down into small component
8   parts.  End of quote.
9          Here it's clear from the page 20 of the
10  environmental assessment that they considered the cumulative
11  effects to the fence construction within the San Pedro River
12  Watershed.  Now, obviously, we know there are other segments
13  of fence under consideration under construction all along the
14  border, and there is -- has been sufficient evidence
15  introduced to show that this could have effects on migration.
16         Now, the Government, if they had considered this,
17  could rationally conclude that it wasn't a significant
18  environmental consideration, but I found Mr. Page persuasive
19  insofar as he's saying that maybe when you define it in a
20  small enough segment, then that usually results in an EA.
21  Well, that may be right, but in an area of unique
22  characteristics in an important area, if federal action in
23  other places has a impact, it's reasonable to think it would
24  have an impact, it has to be considered.  The process under
25  NEPA is that the Government must consider the possibilities.

1    They may well consider it and reject it, but here -- and I've

2    written about Defenders of Wildlife in a case involving the

3    same area of the country.

4            It appears to me that they have looked at this EA in

5    a way that has segmented the activities.  There has been

6    suggestion that they haven't considered federal action

7    involving a fort upstream, and we know that the fence, if you

8    are -- common sense tells you that it will affect -- has the

9    potential to affect habitat and migration and genetic

10   interchange if, in fact, there's sufficient amount of

11   blockage.

12           Now, it would -- it seems to me, under the law, the

13   Government's obligation to consider it before they reach their

14   conclusion when actions, quote, will have cumulative or

15   synergistic environmental impact upon a region and are pending

16   concurrently before an agency, their environmental

17   consequences must be considered together.  And that's the

18   Kleppe versus Sierra Club opinion.

19           One of NEPA's most important purposes is to prevent

20   agencies from dividing one project into multiple individual

21   actions, each of which individually has an insignificant

22   environmental impact, but which collectively have a

23   substantial impact as the D.C. Circuit's case in Hodel,

24   H-O-D-E-L.

25           The Court finds that their failure here to not even

1    acknowledge the potential cumulative impacts of anything

2    outside of the San Pedro watershed, including other border

3    fencing areas, renders this EA inadequate under NEPA because

4    the Agency cannot convincingly establish that they have

5    adequately identified relevant areas of environmental concern.

6             Another factor, which we've alluded to, is the

7    uniqueness of this area, and I think that Plaintiffs' counsel

8    has addressed that here today and it's addressed in the

9    environmental assessment at page 5.

10            Another factor under the CEQ regulations were to

11   consider whether or not there are risks or uncertainties.  And

12   there was, I think, in the EA, a recognition of these risks

13   and uncertainties and that they were quoted here today on

14   page -- and some of them are the uncertainties apply to both

15   Alternative 2, which was the one that was included or adopted,

16   and referring to page 10, the impacts on riparian function and

17   vegetation will be similar.

18            They talked extensively about erosion, about

19   problems with sedimentation, they talked about problems

20   regarding the uncertainty concerning the effectiveness of the

21   proposed mitigation for erosion as many of the details have

22   not been determined.  There is also reference to the fact that

23   the design yet hadn't been formulated so that it was difficult

24   to pinpoint, since the details have not been determined, so

25   that the harms that are recognized here are not exclusive to

1     Alternative 1.  The environmental assessment recognizes harms

2     having to do with wildlife, with riparian function,

3     vegetation, scenic beauty and more than just the hydraulic

4     flow of the River itself.

5          The -- as I indicated at page 10 of the

6     environmental assessment does discuss the potential impact of

7     mitigation measures of using temporary vehicle barriers and

8     drainage and floodplain areas, but they acknowledge the degree

9     of uncertainty concerning the effectiveness of some of the

10    proposed mitigation for erosion.

11         To me, throughout this, there is an apparent rush to

12    judgment by the BLM.  I have been desperately trying to

13    understand why something had to be done in three weeks.  In my

14    experience with biological opinions and environmental

15    assessments, there is no such thing as a thorough one being

16    done in three weeks.  We have a biological opinion here that

17    was done in, I believe, just about a week and incorporated

18    into this environmental assessment, which brings me to the

19    question of whether there has been a hard look in this case.

20         And I recognize and accept that there is not a

21    requirement here to involve the public in an environmental

22    assessment, but it is certainly relevant to the question of

23    whether or not the agency has considered the issues, informed

24    itself and made intelligent, rational decisions that are

25    consistent with the law, with NEPA and the APA.

1          We have several cases in this jurisdiction, Fund For

2     Animals versus Norton where a colleague here recognized that a

3     substantial case on the merits, or lack thereof, could well be

4     affected by whether or not there was public participation.

5     There continually is the Government's claim, which I have to

6     conclude, in my view, rings hollow that there was

7     impractical -- it was impractical -- I'm sorry, impracticable

8     to consult the public.

9          There has been environmental damage to this area

10     caused by aliens, threats to the border for years.  To say

11     that had to be done in three weeks to exclude public

12     participation so that there could be some opportunity for

13     debate, that a whole point of NEPA is really to allow the

14     Government to have the benefit of thinking from other people

15     and not just their internal consideration.  So I find,

16     actually, no support for the argument it was impracticable,

17     and the regulations provide, under 40 C.F.R., that the

18     Government is -- this is 40 C.F.R. Section 1500.2, that they

19     ought to make made diligent efforts to involve the public in

20     preparing and implementing their need for procedures and

21     provide public notice of the availability of environmental

22     documents.

23          Here, as I say, they -- the plan was dramatically

24     changed from a vehicle-barrier type plan to a fence plan,

25     basically, with some vehicle barriers on August 10th, and

1    the EA was issued at the end of August.  The ROW's,
2    right-of-ways, were given then and the construction started
3    almost immediately.  So the urgency, the reasons for the
4    urgencies -- urgency have not been sufficiently explained, at
5    least to the Court's satisfaction.
6          The -- and I note in that regard, I realize that
7    Mr. Page is not yet at this point, but the law requires
8    that -- administrative law requires that the review of the
9    reasonableness of administrative adjudication includes
10   consideration of consistency in deciding similar cases, and I
11   am troubled by the fact that EIS was found appropriate for
12   other border components for the same fence construction that's
13   going on in Arizona, so that I don't know why this
14   particularly unique environmentally precious area in some way,
15   just because it's small, should be relegated to an EA and
16   other areas are not along the Texas border and the Californian
17   border.
18         I realize we do not have the ability, at this
19   moment, to figure that out, but there is an inconsistency
20   because if there is an urgency, the urgency by -- as a matter
21   of common sense, has to apply to California and Texas.  There
22   cannot be the illegal aliens are an urgent problem only in
23   two miles of Texas -- I mean, two miles of Arizona but the
24   same nature of the problem doesn't exist in California or
25   Texas, and that causes the Court some concern.

1          The -- finally, if one looks at the EA, the Court,

2    under the APA, has to determine whether it's arbitrary,

3    capricious or otherwise contrary to the law, and the Court, I

4    think everybody agrees, that because of this area, has been

5    declared a conservation area, the Arizona-Idaho Conservation

6    Act applies and the EA basically misinterprets the Act.  They

7    seem to -- they cut off their quote in the middle of the

8    sentence.  If there is an exception for administrative or

9    emergency purposes, it actually is much more limited and it

10   only has to do with vehicles.

11         It has nothing to -- it doesn't allow carte blanche

12   here.  And the acknowledgment in the EA of this statute but

13   the misquoting of the language by trying to insinuate that

14   there is this administrative or emergency purpose that cuts

15   across the border is inaccurate.

16         Counsel for the Government has read this EA and

17   done, post hoc, a remarkable job, but I don't think you can

18   say that they've done -- that the EA accurately considers the

19   relevant laws, so that, too, informs the Court's opinion.

20         So the Court, at this moment, and I recognize I have

21   no administrative record, but I would venture to guess that

22   the administrative record here, given the time frame that went

23   by, may be somewhat limited, but I do find a substantial

24   likelihood of success on the merits.  I also find, given the

25   affidavits before me, that there is irreparable environmental

1    injury.

2              There is ample, in the declarations, ample evidence

3    that the fence could significantly alter the wildlife behavior

4    and habitat, that it could cause erosion, it could cause

5    increase of sedimentation.  No scientific information is

6    certain, and that's what the Government argues, too, but

7    before me, at the moment, I have fairly strong affidavits that

8    show that the -- that this fence will cause irreparable

9    environmental injury to both wildlife, vegetation and the

10   riverbed.

11             The EA itself recognizes that the disturbance of

12   land across the -- along the right-of-way will result in

13   localized accelerated erosion and increased run-off rates and

14   that's whether it be Alternative 1 or 2, that construction

15   activities will cause a short-term disturbance to wildlife,

16   including wildlife mortality from the use of border roads, and

17   it also recognizes the border fence has the potential to

18   separate portions of wildlife populations from existing

19   watering points which will potentially change wildlife

20   distributions and population levels if species are effectively

21   separated from currently used water sources.

22             The EA goes on to say the border fence has the

23   potential to funnel animal movements to areas where

24   undocumented alien traffic is also funneled.  Continuous

25   disruptions of wildlife movements may result both from the

1    physical barrier of the fence and from increased contact

2    between wildlife and humans.

3             It's obvious, based on both the EA and what the

4    Plaintiffs have provided, that the more fences you put up, the

5    more pressure and stress will be on the areas where the fence

6    isn't.  And so that, in a lot of ways, the Government's

7    argument that with time these fences will cure the problem of

8    illegal alien environmental harm, I mean, is not entirely

9    persuasive.  It may localize it and -- meaning that it happens

10   more frequently in some places than in others, but it doesn't

11   certainly get rid of environmental harm caused by the traffic

12   of illegal aliens.

13            Also, I point out that it appears that many of the

14   mitigation efforts, not the ones that are putting down

15   barriers, but are voluntary and not binding.  The Court has

16   also argued that I should consider the fact that the state of

17   affairs down there is such that it will be environmentally

18   harmful to leave the project as is.  Well, I think that the

19   project went forward quickly, and I think that Judge -- now

20   Justice Breyer's statement in the Sierra Club versus Marsh is

21   relevant, quote, the risk implied by violation of NEPA is that

22   real environmental harm will occur through inadequate

23   foresight and deliberation.  The difficulty of stopping a

24   bureaucratic steamroller, once started, still seems to us a

25   perfectly proper factor for a district court to take into

1    account in assessing that risk on a motion for preliminary

2    injunction.

3           I don't think that I can decide against the

4    Plaintiffs based on the fact the Government has moved so

5    quickly.  The Government makes much of two other factors.  One

6    is national security.

7           I believe the way that the REAL ID Act is

8    constructed, that I am not the proper party to be considering

9    how much deference goes to national security here.  I think

10   the law has been designed to give the executive that power.  I

11   don't have the information or the ability.  It is -- I would

12   defer to them, but more importantly, the statute says that the

13   power belongs to the Department of Homeland Security, and the

14   Court recognizes that and I understand full well that they

15   have a waiver ability.

16          I believe they're in the position, the executive is

17   in the position to exercise that waiver, to factor in the

18   national security and they have the ability to trump the

19   statute.  Under the law, I -- there is nothing that says I

20   should trump an environmental statute if I find that the NEPA

21   requirements have not been met, so that if there is a national

22   security issue and that the urgency of this construction is of

23   national importance, Congress has allowed your client to take

24   that into consideration.

25          The final issue has -- and Mr. Page is -- makes

1    eloquent argument, and I would say that it is the most

2    difficult of the arguments, which is that obviously -- well,

3    there is a fence there now, it is not a pristine area and

4    there is environmental damage being caused by the illegal

5    aliens.  There is -- I think that's undisputed, but I cannot

6    say that, that harm has existed for years, absolutely years,

7    and if anything, there are fewer undocumented aliens coming

8    across now than there were before because of the successful

9    efforts of the Government and Border Patrol, but I can't say

10    that the urgency presented by that is such that the

11    Plaintiffs' showing has been outweighed.

12              And so, using all the factors and balancing them, I

13    do find that the TRO is appropriate, and I will enter a TRO

14    stopping the border construction in that very small area of

15    the San Pedro National Conservation Area.  The Court's going

16    to enter the TRO.  As Mr. Page has said, it's a very small

17    area.  It represents a small part of what the Government's

18    doing down there, and I think that it will not impose an

19    enormous harm either on the public or the Government, but the

20    harm to the environment has been satisfactorily shown to the

21    Court.

22              I suggest that we have a conference call tomorrow to

23    see where we go from here.  I think the Government has --

24    obviously, will consider the Court's ruling and decide what to

25    do.

1            Are the parties available tomorrow afternoon?

2            MR. PAGE:  Yes, Your Honor.

3            MR. SEGEE:  Yes, Your Honor.

4            THE COURT:  I suggest we speak at around between

5    4:00 and 4:30.  The Court will enter the order forthwith, and

6    I expect you'll communicate and we'll speak tomorrow sometime

7    between 4:00 and 4:30.  Thank you for your patience.  Sorry

8    it's so late.

9            (PROCEEDINGS END AT 6:45 P.M.)

10                        *-*-*-*-*

11

12

13

14

15                  CERTIFICATE OF REPORTER

16            I, Catalina Kerr, certify that the foregoing is a

17    correct transcript from the record of proceedings in the

18    above-entitled matter.

19

20

21

22

23    _____ _____

      Catalina Kerr                         Date

24

25

Plaintiffs' Exhibit
2



**Congressional Research Service**

---

*Memorandum*                                                        February 9, 2005

**SUBJECT:**     **Sec. 102 of H.R. 418, Waiver of Laws Necessary for Improvement of Barriers at Borders**

**FROM:**        Stephen R. Viña and Todd B. Tatelman
                 Legislative Attorneys
                 American Law Division

---

Section 102 of H.R. 418, the REAL ID Act, captioned "Waiver of Laws Necessary for Improvement of Barriers at Borders," provides the Secretary of Homeland Security with authority to waive all laws he deems necessary for the expeditious construction of the barriers authorized to be constructed by §102 of the Illegal Immigration Reform and Immigration Responsibility Act of 1996 (IIRIRA) (P.L. 104-208, Div. C, codified at 8 U.S.C. §1103 note) and bars judicial review of such waiver decisions. This memorandum discusses the waiver provision in general; the extent to which Congress has passed laws that provide waivers comparable to §102 of H.R. 418; and the judicial review provisions. For background information on the border fence and §102 of IIRIRA please refer to CRS Report RS 22026, *Border Security: Fences Along the U.S. International Border*.

## H.R. 418, §102

Section 102 of H.R. 418 would amend §102(c) of IIRIRA to read as follows:

(c) Waiver-

(1) IN GENERAL- Notwithstanding any other provision of law, the Secretary of Homeland Security shall have the authority to waive, and shall waive, all laws such Secretary, in such Secretary's sole discretion, determines necessary to ensure expeditious construction of the barriers and roads under this section.

(2) NO JUDICIAL REVIEW- Notwithstanding any other provision of law (statutory or nonstatutory), no court shall have jurisdiction--

(A) to hear any cause or claim arising from any action undertaken, or any decision made, by the Secretary of Homeland Security pursuant to paragraph (1); or

(B) to order compensatory, declaratory, injunctive, equitable, or any other relief for damage alleged to arise from any such action or decision.

---

## Waiver Provisions

If enacted, the new §102 would provide the Secretary of Homeland Security with not only the authority to waive *all* laws he determines necessary to ensure the expeditious construction of the barriers and roads under §102 of IIRIRA, but the *requirement* that the Secretary do so. This provision could provide the Secretary with broader waiver authority than what is currently in §102(c) of IIRIRA. This authority would apparently include laws other than the Endangered Species Act and the National Environmental Policy Act, but may not include a waiver of protections established in the Constitution.[1] All laws waived, however, must be determined by the Secretary to be necessary to ensure expeditious construction of the barriers and roads. The waiver authority provided by this amendment would also seem to apply to all the barriers that may be constructed under the authority of §102 of IIRIRA—i.e., both to barriers constructed *in the vicinity of the border to deter illegal crossing in areas of high illegal entry*[2] and to the barrier that is to be constructed near the San Diego area.

Congress commonly waives preexisting laws, though the process necessary to complete the waiver and the number of laws waived vary considerably from provision to provision. Even more common is the use of the phrase, "notwithstanding any other provision of law." While the use of a broad "notwithstanding any other provision of law" rarely settles the interpretive question, such directives seem facially preclusive, and some courts have determined that "notwithstanding" language may serve to explicitly preempt the application of other laws.[3] Other courts, however, have held that such provisions are generally not dispositive in determining the preemptive effect of a statute.[4]

After a review of federal law, primarily through electronic database searches and consultations with various CRS experts, we were unable to locate a waiver provision identical to that of §102 of H.R. 418—i.e., a provision that contains "notwithstanding language," provides a secretary of an executive agency the authority to waive all laws such secretary determines necessary, and directs the secretary to waive such laws.[5] Much more

---

[1] See discussion *infra*. During debate of a similar exemption provision for the border fence in the 108th Congress, supporters argued that labor and other non-environmental laws would not be considered as included in the phrase "any other laws." 151 Cong. Rec. H8899-H8901 (debate of amendment to H.R. 10). It is also not clear if state laws would be included in this waiver provision.

[2] There does not appear to be any statutory or regulatory definition for "high illegal entry." Note however, that over the last seven years 97% of all illegal alien apprehensions were made along the Southwest border. *See* CRS Report RL32562, *Border Security: The Role of the U.S. Border Patrol*. Such a high percentage could be noted by those who might contend that the authority in §102(a) of IIRIRA is more applicable, at least for now, to our Southwest borders; ultimately, however, it is the Secretary of DHS who determines places of "high illegal entry" under the section.

[3] *See e.g., Puerto Rico v. M/V Emily S.*, 132 F.3d 818 (1st Cir. 1997). In instances where "notwithstanding" language has been deemed controlling, courts sometimes buttress such decisions with an analysis of the underlying directives or legislative history of a statute. *See e.g., Illinois Nat'l Guard v. Federal Labor Relations Authority*, 854 F.2d 1396, 1402 (D.C. Cir. 1998).

[4] *See e.g., E.P. Paup v. Director, OWCP*, 999 F.2d 1341, 1348 (9th Cir. 1993); *Oregon Natural Resources Council v. Thomas*, 92 F.3d 792, 796 (9th Cir. 1996).

[5] Our search did not include a review of annual appropriations language, which may include similar waiver provisions. It should be noted however, that as a general proposition, appropriations language

(continued...)

CRS-3

common, it appears, are waiver provisions that (1) exempt an action from other requirements contained in the Act that authorizes the action, (2) specifically delineate the laws to be waived, or (3) waive a grouping of similar laws. The most analogous provisions that we located appear to be, at least on their face, the following:[6]

- 43 U.S.C. §1652(c): Allows the Secretary of the Interior and other Federal officers and agencies the authority to waive any procedural requirements of law or regulation which they deem desirable for authorizations that are necessary for or related to the construction, operation, and maintenance of the Trans-Alaska oil pipeline system (e.g., rights-of-way, permits, and leases).[7]

- 25 U.S.C. §3406: Allows the Secretaries of the Interior, Labor, Health and Human Services, and Education, notwithstanding any other law, to waive any statutory requirement, regulation, policy, or procedure promulgated by their agency that is identified by a tribal government as necessary to implement a submitted tribal plan under the Indian Employment, Training and Related Services Demonstration Act of 1992, as amended.

- 20 U.S.C. §7426: Provides almost identical waiver language to that of 25 U.S.C. §3406, but for plans submitted by tribal governments for the integration of education and related services provided to Indian students.

There are also many other provisions that arguably grant broad waiver authority similar to that of §102, but contain qualifications or reporting requirements that seem to limit their breadth.[8] Some of these waiver provisions grant the President or the head of an Executive agency the authority to waive a law[s] if deemed necessary in the *national interest* or in the interest of *national defense*. We cite here, some examples of this type of waiver authority:[9]

- 43 U.S.C. §2008: Allows the President to waive provisions of federal law he deems necessary in the national interest to facilitate the construction or operation of crude oil transportation systems or the Long Beach-Midland project. The President must submit his waiver to Congress, and Congress must pass a joint resolution before the President can take such actions under the waivers.

---

[5] (...continued)
is limited to the year of the appropriation, which may limit the application of any waiver.

[6] Similarly, we found some provisions that exempt certain transactions or entities from all laws. *See e.g.,* 49 U.S.C. §11321 ("A rail carrier, corporation, or person participating in that approved or exempted transaction is exempt from the antitrust laws and from all other law, including State and municipal law, as necessary to let that rail carrier, corporation, or person carry out the transaction, hold, maintain, and operate property, and exercise control or franchises acquired through the transaction.").

[7] It is unclear how broadly a procedural requirement of law has been or could be interpreted.

[8] Examples of waiver authority with a congressional notification element include: 15 U.S.C. §719f; 22 U.S.C. §2378; 22 U.S.C. §2371; and 41 U.S.C. §413. Other examples of broad yet somewhat more limited waiver authority include: 10 U.S.C. §433; 22 U.S.C. §3861; 25 U.S.C. §1680h; 48 U.S.C. §1469d; and 50 U.S.C. §198.

[9] Other waiver authority in the national interest include: 10 U.S.C. §1107(a); 22 U.S.C. §2375(d); 29 U.S.C. §793; 42 U.S.C. §6212(b); 42 U.S.C. §6393(a)(2); 50 U.S.C. §2426(e).

CRS-4

- 15 U.S.C. 2621: Allows the Administrator of the EPA to waive compliance with the Toxic Substances Control Act upon a request and determination by the President that the requested waiver is necessary in the interest of national defense.

- 10 U.S.C. §433: Allows the Secretary of Defense, in connection with a "commercial activity," to waive federal laws pertaining to the "management and administration of Federal agencies," if compliance would create an unacceptable risk to an authorized intelligence activity. This provision further requires that the waiver be in writing and specifically describes the types of activities that pertain to the "management and administration of federal agencies," though it does not specify the actual laws.

As mentioned above and as the examples we have set forth arguably demonstrate, the breadth of waiver authority granted by §102 of H.R. 418 does not appear to be common in the federal law searched.

## Judicial Review Provisions

By including the language "no court," §102(c)(2) of H.R. 418 appears to preclude judicial review of a Secretary's decision to waive provisions of law by both federal and *state* courts. It is generally accepted that Article III of the United States Constitution grants Congress the authority to regulate the jurisdiction, procedures, and remedies available in federal courts.[10] However, what remains uncertain is whether Congress's authority, pursuant to Article III, extends to the jurisdiction, procedures, and remedies of state courts. In addition, it remains uncertain to what extent Congress has Article III authority to prevent courts, state or federal, from addressing and remedying issues arising under the United States Constitution.

With respect to Congress's ability to control the jurisdiction of state courts, the Supreme Court has ruled that subject to a congressional provision to the contrary, state courts have concurrent jurisdiction over all the classes of cases and controversies enumerated in Article III, except for suits between States, suits in which either the United States or a foreign state is a party, and those considered within the traditional jurisdiction of admiralty law.[11] Thus, it appears possible to argue that Congress has a plenary power to allocate jurisdiction between the state and federal courts. In other words, if, for example, Congress can make jurisdiction over an area of law exclusively federal,[12] thereby depriving state courts of any

---

[10] Article III of the Constitution provides that "[t]he judicial Power of the United States, shall be vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish." U.S. CONST. Article III.

[11] *See* 28 U.S.C. §§ 1251, 1331 *et seq*. (2004). In fact, the presumption is that state courts enjoy concurrent jurisdiction, and Congress must explicitly or implicitly confine jurisdiction to the federal courts to oust the state courts. *See Gulf Offshore Co. v. Mobil Oil Corp.*, 453 U.S. 473, 477-84 (1981); *see also Tafflin v. Levitt*, 493 U.S. 455 (1990); *Yellow Freight System, Inc. v. Donnelly*, 494 U.S. 820 (1990). For example, Justice Scalia has argued that, insomuch as state courts have jurisdiction generally because federal law *is* law for them, Congress can provide exclusive federal jurisdiction only by explicit and affirmative statement in the text of the statute, but as can be seen that is not now the rule. *See Tafflin v. Levitt*, 493 U.S. 455, 469 (1990).

[12] Perhaps the best example of an area of law that Congress has made exclusively federal is immigration. Federal Courts, however, also appear to have exclusive jurisdiction over the federal

(continued...)

ability to hear the claim, it appears that Congress may also be able to remove a cause of action from state courts without concurrently granting jurisdiction to the federal courts.

State courts, however, are often considered to be independent and autonomous from the federal court system. This independent status has led some scholars to argue that because the Constitution appears to reserve to the states the authority to control the jurisdiction of their own courts, Congress's "only means of allocating jurisdiction is through control of the federal court's jurisdiction."[13] The argument that state courts are autonomous can be derived, in part, from the Supreme Court's doctrine with respect to its ability to review decisions from state courts. While the Court has the authority to review a decision of a state's highest court, it has repeatedly held that it will not do so if the decision rests upon adequate and independent state grounds.[14] This rule is arguably designed to protect a state's interest in developing and applying its own laws. Thus, it would appear that an argument can be made that Congress does not possess the authority to regulate the jurisdiction of state courts directly. It may be the case, however, that Congress's ability to control the jurisdiction of the federal courts indirectly affects and alters the jurisdiction of the state courts, which would appear to preserve their autonomous status.[15]

Turning to Congress's ability to remove jurisdiction with respect to claims arising under the Constitution, it appears that Supreme Court precedent requires that at least some forum be provided for the redress of constitutional rights.[16] While it appears that the Supreme Court has not directly addressed whether there needs to be a judicial forum to vindicate all constitutional rights, it appears that the Court has taken to noting constitutional reservations about legislative denials of jurisdiction for judicial review of constitutional issues, as well as construction of statutes that purport to limit the Court's jurisdiction.[17] At least one justice,

---

[12] (...continued)
antitrust laws, despite the fact that Congress has never spoken either expressly or implicitly. *See General Investment Co. v. Lake Shore & Michigan Southern R.R. Co.*, 260 U.S. 261, 287 (1922).

[13] Joan Steinman, *Reverse Removal*, 78 Iowa L. Rev. 1029, 1080 (1992) (*citing Tafflin v. Levitt*, 493 U.S. 455, 458-59 (1990); *Gulf Oil Offshore Co. v. Mobil Oil Corp.*, 453 U.S. 473, 477-78 (1981); Henry M. Hart Jr., *The Relations Between State and Federal Law*, 54 Colum. L. Rev. 489, 508 (1954)).

[14] *See Colman v. Thompson*, 501 U.S. 722, 729 (1991) (stating that the Court will not review a state court decision "if the decision of the court rests on a state law ground that is independent of the federal question and adequate to support judgment").

[15] It should be noted, however, that a court may interpret this provision to be preclusive, which would appear to avoid any constitutional issues.

[16] *See Ex Parte McCardle*, 74 U.S. (7 Wall.) 506 (1869). For a much more complete discussion of this issue, *see* CRS Report RL31271, *Limiting Court Jurisdiction Over Federal Constitutional Issues: "Court-Stripping,"* by Kenneth R. Thomas, Jan. 24, 2005.

[17] *See Johnson v. Robinson*, 415 U.S. 361, 366-67 (1974); *see also Weniberger v. Salfi*, 422 U.S. 749, 762 (1975); *Bowen v. Michigan Academy of Family Physicians*, 476 U.S. 664, 681 n. 12 (1988); *Webster v. Doe*, 486 U.S. 592, 603 (1988); *McNary v. Haitian Refugee Center, Inc.*, 498 U.S. 479, 498 (1991); *Felker v Turpin*, 518 U.S. 651, 660-61 (1996); *INS v. St. Cyr*, 533 U.S. 289, 298, 314 (2001).

however, has indicated that there have been particular cases, such as political question cases, where all constitutional review is in effect precluded.[18]

Nevertheless, the Court has generally found a requirement that effective judicial remedies be present. For example, in cases involving particular rights, such as the availability of effective remedies for Fifth Amendment takings, the Court has held that "the compensation remedy is required by the Constitution."[19] In addition, lower federal courts appear to have held that, in most cases, some forum must be provided for the vindication of constitutional rights.[20] Cases such as these would seem to provide a basis for the Court to find that parties seeking to vindicate other particular rights must have a judicial forum for such challenges; therefore, the Court may construe the provisions of H.R. 418 in a manner that preserves this right.

---

[18] *See Webster v. Doe*, 486 U.S. 592, 612-13 (1988) (Scalia, J., dissenting) ("Even apart from the strict text of the Constitution, we have found some constitutional claims to be beyond judicial review because they involve "political questions." ... In sum, it is simply untenable that there must be a judicial remedy for every constitutional violation. Members of Congress and the supervising officers of the Executive Branch take the same oath to uphold the Constitution that we do, and sometimes they are left to perform that oath unreviewed, as we always are.").

[19] *See First English Evangelical Lutheran Church of Glendale v. Los Angeles County*, 482 U.S. 304, 316 (1987) (*citing Kirby Forest Industries, Inc. v. United States,* 467 U.S. 1, 5 (1984); *United States v. Causby,* 328 U.S. 256, 267 (1946); *Seaboard Air Line R. Co. v. United States,* 261 U.S. 299, 304-306 (1923); *Monongahela Navigation v. United States*, 148 U.S. 312, 327 (1893)).

[20] *See Battaglia v. General Motors Corp.*, 169 F.2d 254, 257 (2d. Cir. 1948) (stating that "while Congress has the undoubted power to give, withhold, or restrict the jurisdiction of courts other than the Supreme Court, it must not exercise that power as to deprive any person of life, liberty, or property without due process or just compensation ...."). In addition, other judicial decisions point to the doctrine of sovereign immunity and the ability of the government to limit the remedies available to plaintiffs. *See Bartlett v. Bowen*, 816 F.2d 695, 719-720 (1987)(Bork, J., dissenting).

Plaintiffs' Exhibit
3

| Subject | Endangered Species Act and National Environmental Protection Act Regulations | Date |
|---|---|---|
| | | MAR 6 1997 |
| To | See Distribution List | From    Office of Administration |

Attached please find a copy of Section 102(c) of the illegal Immigration Reform and Immigrant Responsibility Act, Public Law No. 104-207, which concerns the Attorney General's (AG) authority to waive the requirements of the National Environmental Policy Act (NEPA) and the Endangered Species Act (ESA) in the areas adjacent to the United States-Mexican border. The INS position is that we will not seek the AG's use of this waiver, and the INS will continue to abide by all environmental laws. This approach is consistent with the Department of Justice (DOJ) position on this issue.

The DOJ view is based upon the following statement by President Clinton accompanying the signing of the law:

"I am extremely concerned about a provision in this bill that could lead to the Federal Government waiving the Endangered Species Act and the National Environmental Policy Act in order to expeditiously construct physical barriers and roads on the U. S. border. I know the Attorney General shares my commitment to those important environmental laws and will make every effort, in consultation with environmental agencies, to implement the immigration law in compliance with those environmental laws."

Thank you for your cooperation in these matters, for further information please contact Jack Finglass on 305-1438.

David A. Yentzer
Assistant Commissioner

Attachment

Plaintiffs' Exhibit
4

Copyright 2005 Congressional Quarterly, Inc. All Rights Reserved.
Congressional Press Releases

May 10, 2005 Tuesday

**SECTION:** PRESS RELEASE

**LENGTH:** 1858 words

**HEADLINE:** SENATOR FEINSTEIN EXPRESSES CONCERN ABOUT REAL ID ACT IN SUPPLEMENTAL AP-PROPRIATIONS BILL

**BYLINE:** DIANNE FEINSTEIN, SENATOR, SENATE

**BODY:**

For Immediate Release:

Senator Feinstein Expresses Concern about REAL ID Act in Supplemental Appropriations Bill

Contact: Howard Gantman 202/224-9629

May 10, 2005

Washington, DC - The U.S. Senate today approved the emergency supplemental spending conference report to provide $82 billion for troops in Iraq and Afghanistan, Tsunami relief, and other emergency funding, but also included controversial immigration provisions that were not included in the original bill approved by the Senate, nor were they subject to review and amendment by the Senate.

The bill approved by Congress included provisions sponsored by Senator Feinstein to provide $24.39 million to repair national forest roads and facilities in Southern California that were damaged by winter flooding and $10 million for the Overseas Private Investment Corporation (OPIC) to help bolster economic and infrastructure development in the Gaza Strip.

Following is the statement of U.S. Senator Dianne Feinstein (D- Calif.) on the Emergency Supplemental Appropriations bill:

"Mr. President, I will vote to support the Conference Report on H.R. 1268, the FY 05 Supplemental Appropriations bill, although I have serious reservations about the process that was used to attach the REAL ID Act to legislation urgently needed to ensure our troops are adequately funded.

I am voting for this legislation because it provides needed support to our troops in combat, additional border patrol agents to secure our porous frontiers, vital relief to areas affected by the recent tsunami in the Indian Ocean, and important disaster relief here at home.

My colleagues have noted that this legislation funds important needs for our military, from additional up-armored Humvees to increased death benefits for those who have lost their lives in service to our Nation in Iraq and Afghanistan.

I agree with my colleagues that it is vital that we get these resources to our men and women in uniform without delay.

REAL ID Act

However, I have serious concerns about the process by which controversial immigration provisions were attached to the bill.

And I want to again express my opposition to the inclusion of the REAL ID Act - despite the negotiated changes during conference - because an emergency supplemental is not the place for the Congress to enact substantive immigration provisions.

SENATOR FEINSTEIN EXPRESSES CONCERN ABOUT REAL ID ACT IN SUPPLEMENTAL
APPROPRIATIONS BILL Congressional Press Releases May 10, 2005 Tuesday

The REAL ID provisions included in this legislation will bring about significant legal and policy changes in the areas of asylum law, judicial review, deportation of individuals alleged linked to terrorist activities, drivers' licenses and the border fence.

And while I recognize that there were modifications to the REAL ID Act during conference - including provisions relating to bounty hunters - we are still talking major changes to our immigration laws and I don't believe the Senate was given adequate opportunity to review, consider, debate and amend these issues.

Any voices of opposition to the REAL ID Act were all but silenced. I was a member of the Conference Committee, but I was not able to see the final language until the bill was ready to be filed and it was too late to do anything. Essentially, the minority was shut out of the conference negotiations on this bill.

The REAL ID Act wasn't the only immigration language added to this bill in which the Democrats were shut out.

For instance, the Republican leadership added language at the 11th hour, post cloture, which creates a new temporary worker program for 10,500 Australian workers.

So each year now we will see an influx of 10,500 Australian workers, along with their families. Assuming that each of these professional workers brings their spouse and child, in reality we could be seeing an increase of 31,500 individuals each year - in addition to the other categories of professional workers, such as H-1B and L-1 workers.

At what point do we stop creating special carve outs for different groups of people or different countries? And after Australia, what country is going to come to us and ask for special exceptions to our immigration laws?

Border Patrol

I am pleased that the Conference Committee came to a reasonable compromise on the issue of funding additional Border Patrol Agents. The Conference Report makes available $635 million to address understaffing at our borders.

While this is a reduction from the amount provided by the Senate, it will provide for 500 new Border Patrol Agents, 50 additional Immigration and Customs Enforcement Investigators, 168 Detentions Officers, as well as needed support staff and construction of additional detention space.

This is a good start toward meeting the goals of the Intelligence Reform and Terrorism Prevention Act, which authorizes the hiring of 2,000 new Border Patrol agents. That goal was developed in concert with the recommendations of the 9/11 Commission.

I look forward to working with my colleagues on the Homeland Security Appropriations Subcommittee to ensure that next year we continue to hire additional Agents to secure our borders. Unfortunately President Bush's budget for FY 2006 only provides for 210 additional agents, which is simply not enough.

Military Construction

I would like to briefly comment on the Military Construction portion of this legislation. The House and Senate conferees included $1.128 billion to support military construction projects worldwide.

This includes $250 million for projects requested by the Army in Alaska, Colorado, Georgia, Kansas, New York, North Carolina and Texas, to support Army modernization.

The bill also includes $647 million for the Army to support the Global War on Terror - $38.5 million for projects in Afghanistan, $40.4 million for a prison and security fence in Cuba, $479 million for projects in Iraq, and an additional $39 million for the design of these projects.

In addition, there is $140 million included in the bill to support the Marine Corps Force Structure Review Group to alleviate the overall stress on the Marine Corps produced by deployments related to the Global War on Terrorism. These projects are located in California, North Carolina and Djibouti.

The bill includes $141 million to support Air Force projects in Central Command - $31 million for Afghanistan, $58 million for projects in Iraq, $1.4 million for the United Arab Emirates, $42.5 million for Uzbekistan, and an additional $8 million for the design of these projects.

Road Repair in National Forests

SENATOR FEINSTEIN EXPRESSES CONCERN ABOUT REAL ID ACT IN SUPPLEMENTAL
APPROPRIATIONS BILL Congressional Press Releases May 10, 2005 Tuesday

Let me turn to an issue that is of particular importance to me and to my State - and that is preventing and fighting wildfires that have struck the West with increasing regularity and intensity in recent years.

As many of my colleagues know, Southern California was hit this winter with unusually heavy rain storms that caused severe flooding - at this point it is the second wettest winter in Los Angeles since records have been kept.

These storms dumped 70 to 90 inches of rain in parts of Southern California that include several National Forests, causing flooding, debris flows, and mudslides which destroyed or damaged more than 90 percent of the roads in four National Forests:

* Angeles National Forest;

* Cleveland National Forest;

* Los Padres National Forest; and

* San Bernardino National Forest.

The Conference Report provides $24.39 million in Capital Improvement and Maintenance funding to the Forest Service to repair those roads. This funding will make it possible to repair roads that are vital to firefighting efforts for thousands of acres in these forests.

We all know about the disastrous wildfires that burned in Southern California in 2003. Fires burned 739,597 acres, destroyed 3,631 homes, and killed 24 people, according to the California Department of Forestry.

San Bernardino Forest Supervisor Gene Zimmerman told my staff that he's never seen the grass grow as high as it has this year, and it's starting to turn brown - which means it could burn later this year.

Here is the biggest difference from 2003: right now, firefighters cannot get in to the forests to contain fires. The Forest Service estimates that 2.3 million acres of National Forest System lands are inaccessible to ground-based fire vehicles.

The Forest Service tells me that they need to begin work immediately on roads to allow access for the 2005 fire season. They already have contractors working and will add to their contracts as funding is available. They have done the necessary damage assessments to enable immediate start up of work.

With the $24 million in this Conference Report, the Forest Service can open the majority of roads to accommodate fire apparatus by July and August, which is still the early part of this year's fire season.

I would like to thank Chairman Cochran, Senator Byrd, Interior Subcommittee Chairman Burns and Senator Dorgan, as well as their able staffs for helping to secure this funding in the Senate bill.

I also would like to thank House Chairman Lewis for working with us in the Conference Committee on an issue that is crucial to preventing a repeat of the devastating fires our State suffered in 2003.

Aid to Gaza Infrastructure

I want to briefly highlight one last issue that is important to me, and I believe to the prospects for peace in the Middle East.

This Conference Report includes a provision that I offered to provide legal authority for a federal agency, the Overseas Private Investment Corporation (OPIC), to receive $10 million to help bolster economic and infrastructure development in the Gaza Strip.

OPIC is combining forces with private organizations to build a $250 million loan fund that would be aimed at microfinance, small business, corporate and mortgage lending to deserving businesses, firms and entities in the Gaza Strip and West Bank.

A meeting is being held this coming week in London among the various loan fund participants to continue sorting out appropriate financial and legal mechanisms for distributing these funds.

As the group moves forward, this $10 million subsidy will play a crucial role in extending OPIC political risk guarantees for loans to deserving Palestinian business recipients and I was pleased to assist in this process.

SENATOR FEINSTEIN EXPRESSES CONCERN ABOUT REAL ID ACT IN SUPPLEMENTAL APPROPRIATIONS BILL Congressional Press Releases May 10, 2005 Tuesday

On a larger scale, as we begin the process of Gaza disengagement, we need to help provide the Palestinians with real economic hope - not continued frustration about the lack of jobs and exports.

The lack of agreed mechanisms to coordinate disengagement, developing an agreed concept on how Palestinian security forces will take over areas evacuated by Israeli Defense Forces, and permitting greater freedom of movement, between Gaza and the West Bank, to assist with rehabilitation efforts are just a few areas of concern.

I hope the $150 million provided by this Conference Report will contribute to framing key security and economic arrangements that allow Gaza Disengagement to occur peacefully and not violently.

Conclusion

Though I am troubled by the inclusion of the REAL ID Act in this bill, the bottom line is that it provides necessary funding to our troops in Iraq and Afghanistan, as well as relief to countries struck by the Tsunami in the Indian Ocean and disasters here at home. It may not be perfect, but it gives vital financial support to those who badly need it."

**LOAD-DATE:** May 11, 2005

Plaintiffs' Exhibit
5

**55622**    **Federal Register** / Vol. 70, No. 183 / Thursday, September 22, 2005 / Notices

2005, unless modified by a subsequent notice to incorporate comments received from the public.

**ADDRESSES:** Mail written comments to Debra Buccolo, Privacy Act Officer, Farm Credit Administration, McLean, Virginia 22102–5090. You may send comments by e-mail to *dbuccolo@fca.gov*. Copies of all communications received will be available for examination by interested parties in the offices of the FCA.

**FOR FURTHER INFORMATION CONTACT:**

Debra Buccolo, Privacy Act Officer, Farm Credit Administration, McLean, Virginia 22102–5090, (703) 883–4022, TTY (703) 883–4020,
Or

Jane Virga, Office of General Counsel, Farm Credit Administration, McLean, Virginia, 22102–5090, (703) 883–4071, TTY (703) 883–4020.

**SUPPLEMENTARY INFORMATION:** This publication satisfies the requirement of the Privacy Act of 1974 that an agency publish a system notice in the **Federal Register** when there is a revision, change, or addition to the system of records. The FCA did not file a System Report with Congress and the Office of Management and Budget because the changes were minor. There were no significant changes to this system of records. The amended system notice reflects minor changes in the Agency's organization and filing, and clearly identifies the record sources for this system of records.

The amended system of records is: FCA–9, Personnel Security Files. The notice is published in its entirety below.

**FCA–9**

**SYSTEM NAME:**

Personnel Security Files—FCA.

**SECURITY CLASSIFICATION:**

None.

**SYSTEM LOCATION:**

Farm Credit Administration, 1501 Farm Credit Drive, McLean, VA 22102–5090.

**CATEGORIES OF INDIVIDUALS COVERED BY THE SYSTEM:**

Current and former FCA employees.

**CATEGORIES OF RECORDS IN THE SYSTEM:**

This system contains case files compiled during background investigations of employees in sensitive positions. It may include: (a) Security forms (*e.g.*, SF 85P, Questionnaire for Public Trust Positions); (b) investigative reports that may include a credit check, a check of police records, and interviews with neighbors, former supervisors, and coworkers; (c) a

determination of suitability for employment or for a security clearance by FCA's security officer; and (d) issuance of clearance statement.

**AUTHORITY FOR MAINTENANCE OF THE SYSTEM:**

12 U.S.C. 2243, 2252; Executive orders 10450 and 10577.

**PURPOSE(S):**

We use information in this system of records to determine suitability for employment and to issue a clearance.

**ROUTINE USES OF RECORDS MAINTAINED IN THE SYSTEM, INCLUDING CATEGORIES OF USERS AND THE PURPOSES OF SUCH USES:**

See the "General Statement of Routine Uses."

**DISCLOSURE TO CONSUMER REPORTING AGENCIES:**

None.

**POLICIES AND PRACTICES FOR STORING, RETRIEVING, ACCESSING, RETAINING, AND DISPOSING OF RECORDS IN THE SYSTEM: STORAGE:**

We maintain records in file folders.

**RETRIEVABILITY:**

We retrieve records by name.

**SAFEGUARDS:**

We maintain records in a locked safe in an area that is secured after business hours. Only the Personnel Security Officer and Alternate Personnel Security Officer have access to the records.

**RETENTION AND DISPOSAL:**

Files are retained in accordance with the National Archives and Records Administration General Records Schedule requirements for personnel security records.

**SYSTEM MANAGER(S) AND ADDRESS:**

Personnel Security Officer, Office of the Chief Administrative Officer, Farm Credit Administration, 1501 Farm Credit Drive, McLean, VA 22102–5090.

**NOTIFICATION PROCEDURE:**

Address inquiries about this system of records to: Privacy Act Officer, Farm Credit Administration, 1501 Farm Credit Drive, McLean, VA 22102–5090.

**RECORD ACCESS PROCEDURES:**

To obtain a record, contact: Privacy Act Officer, Farm Credit Administration, 1501 Farm Credit Drive, McLean, VA 22102–5090, as provided in 12 CFR part 603.

**CONTESTING RECORD PROCEDURES:**

Direct requests for amendments to a record to: Privacy Act Officer, Farm Credit Administration, 1501 Farm Credit Drive, McLean, VA 22102–5090, as provided in 12 CFR part 603.

**RECORD SOURCE CATEGORIES:**

Information in this system of records comes from: (1) The individual to whom the record applies; (2) Office of Personnel Management's investigative files maintained by the Investigations Service; (3) employment information maintained by the FCA; and (4) external and internal investigative inquiries by Federal law enforcement agencies.

**EXEMPTIONS CLAIMED FOR THE SYSTEM:**

Information in this system of records about a confidential source's identity is subject to a specific exemption, 5 U.S.C. 552a(k)(5), to ensure accurate information on employment suitability.

Dated: September 16, 2005.

**Jeanette C. Brinkley,**

*Secretary, Farm Credit Administration Board.*

[FR Doc. 05–18891 Filed 9–21–05; 8:45 am]

**BILLING CODE 6705–01–P**

## FEDERAL ELECTION COMMISSION

### Sunshine Act Meeting

**DATE AND TIME:** Tuesday, September 27, 2005 at 10 a.m.

**PLACE:** 999 E Street, NW., Washington, DC.

**STATUS:** This meeting will be closed to the public.

**ITEMS TO BE DISCUSSED:** Compliance matters pursuant to 2 U.S.C. 437g.

Audits conducted pursuant to 2 U.S.C. 437g, 438(b), and Title 26, U.S.C.

Matters concerning participation in civil actions or proceedings or arbitration.

Internal personnel rules and procedures or matters affecting a particular employee.

**PERSON TO CONTACT FOR INFORMATION:** Mr. Robert Biersack, Press Officer, Telephone (202) 694–1220.

**Mary W. Dove,**

*Secretary of the Commission.*

[FR Doc. 05–19075 Filed 9–20–05; 2:53 pm]

**BILLING CODE 6715–01–M**

## DEPARTMENT OF HOMELAND SECURITY

### Office of the Secretary

**Determination Pursuant to Section 102 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 as Amended by Section 102 of the REAL ID Act of 2005**

**AGENCY:** Office of the Secretary, Department of Homeland Security

**ACTION:** Notice of determination.

**SUMMARY:** The Secretary of Homeland Security has determined, pursuant to law, that it is necessary to waive certain laws, regulations and other legal requirements in order to ensure the expeditious construction of barriers and roads along the international land border of the United States in California.

**DATES:** This Notice is effective on September 22, 2005.

## Determination and Waiver

In section 102(a) of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Public Law 104–208, Div. C, 110 Stat. 3009–546, 3009–554 (Sept. 30, 1996) (8 U.S.C 1103 note (2000) (IIRIRA)), Congress provided that the Attorney General shall take such actions as may be necessary to install additional physical barriers and roads (including the removal of obstacles to detection of illegal entrants) in the vicinity of the United States border to deter illegal crossings in areas of high illegal entry into the United States. Pursuant to sections 1511 and 1517 of the Homeland Security Act of 2002, Public Law 107–296, 116 Stat. 2135, 2309, 2311 (Nov. 25, 2002) (HSA) (6 U.S.C. 551, 557), the authorities of the Attorney General contained in section 102 of the IIRIRA were transferred to me. In section 102(c) of the IIRIRA, as amended by section 102 of the REAL ID Act of 2005, Public Law 109–13, Div. B, 119 Stat. 231, 302, 306 (May 11, 2005) (REAL ID Act) 8 U.S.C. 1103 note), Congress granted to me the authority to waive all legal requirements that I, in my sole discretion, determine necessary to ensure the expeditious construction of barriers and roads under section 102 of IIRIRA.

In section 102(b) of the IIRIRA, Congress specifically provided for the construction along the 14 miles of the international land border of the United States, starting at the Pacific Ocean and extending eastward, of second and third fences, in addition to the existing reinforced fence, and for roads between the fences. In section 446 of the HSA, Congress expressed its sense that completing the 14-mile border project under section 102(b) of the IIRIRA should be a priority for the Secretary of Homeland Security. Nearly nine years after the passage of the IIRIRA, the project prescribed in section 102(b) of the IIRIRA remains incomplete.

In order to ensure the expeditious construction of the barriers and roads that Congress prescribed in section 102(b) of the IIRIRA, regarding which Congress expressed its support in section 446 of the HSA, 116 Stat. 2195 (6 U.S.C. 256), and which is an area of high illegal entry into the United States,

I have determined that it is necessary that I exercise the authority that was transferred to me by sections 1511 and 1517 of the HSA and that is vested in me by section 102(c) of the IIRIRA as amended by section 102 of the REAL ID Act. Accordingly, I hereby waive in their entirety, with respect to the construction of the barriers and roads prescribed in section 102(b) of the IIRIRA (including, but not limited to, the conduct of earthwork, excavation, fill, and site preparation, and installation and upkeep of fences, roads, supporting elements, drainage, erosion controls, safety features, detection equipment, and lighting), all federal, state, or other laws, regulations and legal requirements of, deriving from, or related to the subject of, the following laws, as amended: The National Environmental Policy Act (Pub. L. 91–190, 83 Stat. 852, (Jan. 1, 1970) (42 U.S.C. 4321 *et seq.*)), the Endangered Species Act (Pub. L. 93–205, 87 Stat. 884 (Dec. 28, 1973) (16 U.S.C. 1531 *et seq.*)), the Coastal Zone Management Act (Pub. L. 92–583, 86 Stat. 1280 (Oct. 27, 1972] (16 U.S.C. 1451 *et seq.*)), the Federal Water Pollution Control Act (commonly referred to as the Clean Water Act) (Act of June 30, 1948, c. 758, 62 Stat. 1155 (33 U.S.C. 1251 *et seq.*)), the National Historic Preservation Act (Pub. L. 89–665, 80 Stat. 915 (Oct. 15, 1966) (16 U.S.C. 470 *et seq.*)), the Migratory Bird Treaty Act (16 U.S.C. 703 *et seq.*), the Clean Air Act (42 U.S.C. 7401 *et seq.*), and the Administrative Procedure Act (5 U.S.C. 551 *et seq.*). I reserve the authority to make further waivers from time to time under the authority granted to me by section 102(c) of the IIRIRA, as amended by section 102 of the REAL ID Act, as I may determine to be necessary to accomplish the provisions of section 102 of IIRIRA.

Dated: September 13, 2005.

**Michael Chertoff,**

*Secretary of Homeland Security.*

[FR Doc. 05–18882 Filed 9–21–05; 8:45 am]

**BILLING CODE 4410–10–P**

---

# DEPARTMENT OF HOMELAND SECURITY

## Bureau of Customs and Border Protection

## Automated Commercial Environment (ACE): Elimination of Bond Rider Requirement for Participation in Periodic Monthly Statement Payment Process

**AGENCY:** Customs and Border Protection; Department of Homeland Security.

**ACTION:** General notice.

---

**SUMMARY:** This notice announces changes in the Bureau of Customs and Border Protection's (CBP) National Customs Automation Program (NCAP) test concerning periodic monthly deposit of estimated duties and fees. Participants in the Periodic Monthly Statement test are no longer required to provide a bond rider covering the periodic payment of estimated duties and fees. Nonpayment or untimely payment of estimated duties and fees, however, may result in action by CBP to impose sanctions on the delinquent importer of record or to allow the surety to terminate its basic importation bond. If the bond principal is a participant in the Periodic Monthly Statement test, sureties will now be allowed, under certain conditions, to terminate bonds with 3 business days notice to the bond principal and CBP.

**EFFECTIVE DATES:** The elimination of the requirement to provide a bond rider covering the periodic payment of estimated duties is effective immediately.

**ADDRESSES:** Comments concerning this notice should be submitted to Robert B. Hamilton via e-mail at *Robert.B.Hamilton@dhs.gov.*

**SUPPLEMENTARY INFORMATION:**

## Background

On February 4, 2004, the Bureau of Customs and Border Protection (CBP) published a General Notice in the **Federal Register** (69 FR 5362) announcing the National Customs Automation Program (NCAP) test for Periodic Monthly Payment Statement Process. The test, which is part of CBP's Automated Commercial Environment (ACE), benefits participants by giving them access to operational data through the ACE Secured Data Portal (''ACE Portal''), which provides them the capability to interact electronically with CBP, and by allowing them to deposit estimated duties and fees on a monthly basis based on a Periodic Monthly Statement generated by CBP.

When the test started, only importers were eligible to apply for the test. Eligibility was later expanded to allow brokers to apply if they were specifically designated by an ACE importer.

On September 8, 2004, CBP published a General Notice in the **Federal Register** (69 FR 54302) which invited customs brokers, regardless of whether they were designated by participating importers to make Periodic Monthly Statement payments on their behalf, to apply to participate in the test. That notice set

Plaintiffs' Exhibit
6

Copyright 2005 The San Diego Union-Tribune
The San Diego Union-Tribune

September 15, 2005 Thursday

**SECTION:** LOCAL; Pg. B-1

**LENGTH:** 982 words

**HEADLINE:** Feds override laws, give OK to border fence

**BYLINE:** Leslie Berestein, STAFF WRITER

**BODY:**

A top federal official has cleared the way for the completion of a hotly contested stretch of border fence south of San Diego, essentially waiving all laws and legal challenges standing in the way of construction.

Homeland Security Secretary Michael Chertoff exercised the authority given to him by recent legislation, the department said yesterday. At issue is a 14-mile segment of secondary fencing, running from the ocean to Otay Mountain.

While nine miles have been completed, fencing has yet to be constructed on five additional miles because of environmental concerns and pending litigation. A key environmental sticking point has been a deep canyon known as Smuggler's Gulch, which stands to be filled in, requiring a massive earth-moving operation.

Chertoff's decision also makes the project virtually unchallengeable in court and sets a precedent for the federal government to exercise similar authority in future projects deemed necessary to national security.

"With one stroke of the pen, Secretary Chertoff has basically eliminated all legal requirements along a 14-mile stretch of the southern border," said Brian Segee, a staff attorney with Defenders of Wildlife, an environmental organization in Washington, D.C. "It is an enormous and unnecessary precedent."

Federal officials contend the additional fencing is necessary for national security. The project includes access roads, stadium-style lighting and surveillance cameras and will allow the Border Patrol to make better use of its local resources, according to David Aguilar, national chief of the Border Patrol.

"By applying this infrastructure, it will increase our effectiveness there by minimizing the need for additional agents to any large degree in San Diego," Aguilar said yesterday from Washington, D.C.

Aguilar said there were no plans to move agents out of the San Diego sector but that once the fence is completed, it will allow the agency to send new hires to more porous areas of the border.

The Homeland Security Department will be able to exercise the same waiver authority for future projects, though Aguilar and other federal officials said yesterday that there are no plans to wall off the entire Southwest border.

"It is not our policy to build physical barriers across the length of our borders," Chertoff said in a written statement. "However, projects like this make sense in certain settings like the urban environment around San Diego."

The waiver authority is part of the Real ID Act of 2005, national security legislation that was tacked onto a military spending bill approved earlier this year. After hearing of Chertoff's decision yesterday, longtime supporters of the fencing project, which began in 1996, rejoiced.

"It's good to know that Secretary Chertoff recognizes that our nation remains susceptible and vulnerable to the threat of terrorism and extraneous illegal activity unless efforts are made to secure our border," said Congressman Duncan Hunter, R-El Cajon, in a written statement.

`Great news,' says Jacob

Feds override laws, give OK to border fence The San Diego Union-Tribune September 15, 2005 Thursday

San Diego County Supervisor Dianne Jacob was among the four supervisors who last spring voted 4-1 in support of federal legislation to exempt the fence from environmental regulations. Yesterday, she called the decision "great news," saying that commerce and development has thrived in areas already fenced, and playing down environmental concerns.

"When we are talking about national security, whatever environmental concerns exist, which I feel are unfounded, should take a second seat," Jacob said.

Those not pleased were members of the California Coastal Commission, one of the most vocal opponents of the project. The commission stalled construction in February 2004 after ruling that building the western segment of the fence -- including the part that would stretch across Smuggler's Gulch -- would cause environmental damage.

Filling in the canyon to build the fence and an access road will require more than 2 million cubic yards of earth, said Peter Douglas, executive director of the commission, who believes the consequences will be disastrous to nearby Tijuana River wetlands.

Estuary damage feared

"There is no question that it will lead to erosion and siltation in the estuary, in the wetlands the state of California spent millions of dollars trying to restore," Douglas said. "This is basically going to undo that in the long run. There are alternatives, but they have refused to look at them."

Jim Peugh of the San Diego Audubon Society, one of a group of local environmental organizations that sued the federal government over the project last year, said he's still not sure if the waiver applies to their case or not, because it was filed before Real ID was passed.

"We'll just have to see," he said. "I hope we can get them to make a more intelligent decision."

Environmental concerns aside, it is the waiving of all laws that could impede the fencing project -- and future security projects -- that is most disturbing to those who opposed Real ID.

According to Sean Garcia, a senior policy associate with the Latin America Working Group, a human rights lobbying coalition in Washington, any federal, state or local law can be waived as long as it is not a constitutionally protected right. That can include tribal, labor and zoning laws.

Segee, the attorney, said there is now little recourse available to opponents of this and future projects for which laws are waived. One is a constitutional challenge, which the state of California could choose to present. But according to Douglas of the Coastal Commission, this would be futile.

"There was never a meaningful avenue for judicial relief," he said. "It would be a waste of public resources to pursue it. This is it. It is a sad day. It is a victory for the politics of fear."

The decision takes effect tomorrow when it will be published in the Federal Register.

Leslie Berestein: (619) 542-4579; leslie.berestein@uniontrib.com

**GRAPHIC:** 1 MAP; CAPTIONS: Proposed additional fencing -- Existing double fencing (Eds. 1,2,7); PHOTOBY: UNION-TRIBUNE

**LOAD-DATE:** September 17, 2005

Plaintiffs' Exhibit
7

petitioners per petition is 10,995 hours, for a total burden of 21,990 hours. There are no capital costs or operating and maintenance costs associated with the burden hours being transferred from OMB control number 0910–0016 to OMB control number 0910–0495.

Electronic submissions of petitions contain the same petition information required for paper submissions. The agency estimates that one petitioner for both food and color additives will take advantage of the electronic submission process per year. By using the guidelines and forms that FDA is providing, the petitioner will be able to organize the petition to focus on the information needed for FDA's safety review. Therefore, we estimate that petitioners will only need to spend approximately 1 hour completing the electronic submission application form (Form 3503 or 3504, as appropriate) because they will have already used the guidelines to organize the petition information needed for the submission.

The labeling requirements for food and color additives were designed to specify the minimum information needed for labeling in order that food and color manufacturers may comply with all applicable provisions of the act and other specific labeling acts administered by FDA. Label information does not require any additional information gathering beyond what is already required to assure conformance with all specifications and limitations in any given food or color additive regulation. Label information does not have any specific recordkeeping requirements unique to preparing the label. Therefore, because under § 70.25, labeling requirements for a particular color additive involve information required as part of the CAP safety review process, the estimate for number of respondents is the same for § 70.25 and § 71.1, and the burden hours for labeling are included in the estimate for § 71.1. Also, because labeling requirements under parts 172, 173, 179, and 180 for particular food additives involve information required as part of the FAP safety review process under § 171.1, the burden hours for labeling are included in the estimate for § 171.1.

In cases where a regulation implements a statutory information collection requirement, only the additional burden attributable to the regulation, if any, has been included in FDA's burden estimate.

Dated: January 12, 2007.

**Jeffrey Shuren,**

*Assistant Commissioner for Policy.*

[FR Doc. E7–681 Filed 1–18–07; 8:45 am]

**BILLING CODE 4160–01–S**

# DEPARTMENT OF HOMELAND SECURITY

## Office of the Secretary

## Determination Pursuant to Section 102 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 as Amended by Section 102 of the REAL ID Act of 2005 and as Amended by the Secure Fence Act of 2006

**AGENCY:** Office of the Secretary, Department of Homeland Security.

**ACTION:** Notice of determination.

**SUMMARY:** The Secretary of Homeland Security has determined, pursuant to law, that it is necessary to waive certain laws, regulations and other legal requirements in order to ensure the expeditious construction of physical barriers and roads in the vicinity of the international land border of the United States in Arizona. The Secretary's waiver is effective upon publication of this Notice.

**DATES:** This Notice is effective on January 19, 2007.

*Determination and Waiver:* In section 102(a) of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), Public Law 104–208, Div. C, 110 Stat. 3009–546, 3009–554 (Sept. 30, 1996) (8 U.S.C. 1103, note), Congress provided that the Attorney General shall take such actions as may be necessary to install additional physical barriers and roads (including the removal of obstacles to detection of illegal entrants) in the vicinity of the United States border to deter illegal crossings in areas of high illegal entry into the United States. Pursuant to sections 1511 and 1517 of the Homeland Security Act of 2002 (HSA), Public Law 107–296, 116 Stat. 2135, 2309, 2311 (Nov. 25, 2002) (6 U.S.C. 551, 557), the authorities of the Attorney General contained in section 102 of the IIRIRA were transferred to the Secretary of Homeland Security (Secretary).

In section 3 of the Secure Fence Act of 2006 (Secure Fence Act), Public Law 109–367), Congress amended Section 102(b) of IIRIRA to provide for the installation of fencing, barriers, roads, lighting, cameras, and sensors along five segments of the southern border of the United States, including much of the border between Arizona and Mexico. In section 102(c) of the IIRIRA, as amended by section 102 of the REAL ID Act of 2005, Public Law 109–13, Div. B, 119 Stat. 231, 302, 306 (May 11, 2005) (REAL ID Act) (8 U.S.C. 1103 note), Congress granted the Secretary "authority to waive all legal requirements such Secretary, in such

Secretary's sole discretion, determines necessary to ensure the expeditious construction of barriers and roads under" section 102 of IIRIRA.

I have determined that the area in the vicinity of the United States border known as the Barry M. Goldwater Range (BMGR), as described in the Bureau of Land Management's "Legal Description of Barry M. Goldwater Range Withdrawal, AZ" (66 FR 59813 (November 30, 2001)), in southwestern Arizona, including the adjacent area to the west of the BMGR, is an area of high illegal entry. This area is also within the footprint of infrastructure provided for in section 102(b)(1)(A)(ii) of IIRIRA as amended by the Secure Fence Act. There is presently a need to construct fixed and mobile barriers (such as fencing, vehicle barriers, towers, sensors, cameras, and other surveillance, communication, and detection equipment) and roads in the vicinity of the border of the United States within and in the vicinity of the BMGR. In order to ensure the expeditious construction of the barriers and roads that Congress prescribed in sections 102(a) and 102(b) of the IIRIRA in the BMGR, which is an area of high illegal entry into the United States, I have determined that it is necessary to exercise the authority that was transferred to me by sections 1511 and 1517 of the HSA and that is vested in me by section 102(c) of the IIRIRA as amended by section 102 of the REAL ID Act.

Accordingly, with respect to the construction, as prescribed in sections 102(a) and 102(b) of the IIRIRA, of roads and fixed and mobile barriers within the BMGR and within five miles to the west of the BMGR (including, but not limited to, accessing the project area, the conduct of earthwork, excavation, fill, and site preparation, and installation and upkeep of fences, roads, supporting elements, drainage, erosion controls, safety features, surveillance, communication, and detection equipment of all types, radar and radio towers, and lighting), I hereby waive, in their entirety, all Federal, State, or other laws, regulations and legal requirements of, deriving from, or related to the subject of, the following laws, as amended: the National Environmental Policy Act (Pub. L. 91–190, 83 Stat. 852, (Jan. 1, 1970) (42 U.S.C. 4321 *et seq.*)); the Endangered Species Act (Pub. L. 93–205, 87 Stat. 884 (Dec. 28, 1973) (16 U.S.C. 1531 *et seq.*)); the Federal Water Pollution Control Act (commonly referred to as the Clean Water Act) (Act of June 30, 1948, ca. 758, 62 Stat. 1155 (33 U.S.C. 1251 *et seq.*)); the Wilderness Act (Pub. L. 88–577, 16 U.S.C. 1131 *et*

*seq.*); the National Historic Preservation Act (Pub. L. 89–665, 80 Stat. 915 (Oct. 15, 1966) (16 U.S.C. 470 *et seq.*)); the National Wildlife Refuge System Administration Act (Pub. L. 89–669, 16 U.S.C. 668dd–668ee); the Military Lands Withdrawal Act of 1999 (Pub. L. 106–65, 113 Stat. 885 (Oct. 5, 1999)); the Sikes Act (16 U.S.C. 670 *et seq.*); and the Administrative Procedure Act (5 U.S.C. 551 *et seq.*).

I reserve the authority to make further waivers from time to time under the authority granted to me by section 102(c) of the IIRIRA, as amended by section 102 of the REAL ID Act, as I may determine to be necessary to accomplish the provisions of section 102 of IIRIRA.

Dated: January 12, 2007.

**Michael Chertoff,**

*Secretary of Homeland Security.*

[FR Doc. E7–738 Filed 1–18–07; 8:45 am]

**BILLING CODE 4410–10–P**

---

## DEPARTMENT OF HOMELAND SECURITY

### Coast Guard

**[USCG–2006–26136]**

### Potential Revision of Mandatory Ballast Water Management Reporting Requirements

**AGENCY:** Coast Guard, DHS.

**ACTION:** Notice of public meeting; request for public comment.

**SUMMARY:** The Coast Guard requests public comments on its current ballast water management reporting and recordkeeping requirements. To provide additional opportunities for public comment, public meetings will be held in Chicago, IL and in New Orleans, LA. All stakeholders and interested parties are encouraged to submit comments to the docket and to attend one of the scheduled meetings.

**DATES:** The public meetings will be held on the following dates:

• Chicago, IL, March 13, 2007 from 1 p.m. to 5 p.m.

• New Orleans, LA, March 15, 2007 from 1 p.m. to 5 p.m.

Comments and related material must reach the Docket Management Facility on or before March 16, 2007.

**ADDRESSES:** The Coast Guard will hold the public meetings at the following addresses:

• Chicago, IL, Radisson Chicago Hotel and Suites,160 East Huron Street, Chicago, IL, 60611, 312–787–2900, *www.radisson.com/chicago.*

• New Orleans, LA, Hotel Monteleone, 214 Royal Street, New Orleans, LA 70130, 504–532–3341, *www.hotelmonteleone.com.*

You may also submit comments identified by Coast Guard docket number USCG–2006–26136 to the Docket Management Facility at the U.S. Department of Transportation. To avoid duplication, please use only one of the following methods:

(1) *Web site: http://dms.dot.gov.*

(2) *Mail:* Docket Management Facility, U.S. Department of Transportation, 400 Seventh Street SW., Washington, DC 20590–0001.

(3) *Fax:* 202–493–2251.

(4) *Delivery:* Room PL–401 on the Plaza level of the Nassif Building, 400 Seventh Street SW., Washington, DC, between 9 a.m. and 5 p.m., Monday through Friday, except Federal holidays. The telephone number is 202–366–9329.

**FOR FURTHER INFORMATION CONTACT:** If you have questions on this notice, contact LT Heather St. Pierre, Project Manager, Environmental Standards Division, Coast Guard, via telephone at 202–372–1432 or via e-mail at *Heather.J.St.Pierre@uscg.mil.* If you have questions on viewing or submitting material to the docket, call Renee V. Wright, Program Manager, Docket Operations, telephone 202–493–0402.

**SUPPLEMENTARY INFORMATION:**

**Request for Comments**

All comments received will be posted, without change, to *http://dms.dot.gov* and will include any personal information you have provided. We have an agreement with the Department of Transportation (DOT) to use the Docket Management Facility. Please see DOT's "Privacy Act" paragraph below.

*Submitting comments:* If you submit a comment, please include your name and address, identify the docket number for this notice (USCG–2006–26136) and give the number for each comment. You may submit your comments by electronic means, mail, fax, or delivery to the Docket Management Facility at the address under **ADDRESSES**; but please submit your comments by only one means. If you submit them by mail or delivery, submit them in an unbound format, no larger than 8½ by 11 inches, suitable for copying and electronic filing. If you submit them by mail and would like to know that they reached the Facility, please enclose a stamped, self-addressed postcard or envelope. We will consider all comments received during the comment period.

*Viewing comments and documents:* To view comments, go to *http://dms.dot.gov* at any time, click on "Simple Search," enter the last five digits of the docket number for this notice, and click on "Search." You may also visit the Docket Management Facility in room PL–401 on the Plaza level of the Nassif Building, 400 Seventh Street SW., Washington, DC, between 9 a.m. and 5 p.m., Monday through Friday, except Federal holidays.

*Privacy Act:* Anyone can search the electronic form of all comments received into any of our dockets by the name of the individual submitting the comment (or signing the comment, if submitted on behalf of an association, business, labor union, etc.). You may review the Department of Transportation's Privacy Act Statement in the **Federal Register** published on April 11, 2000 (65 FR 19477), or you may visit *http://dms.dot.gov.*

**Public Meetings**

The Coast Guard encourages interested and affected stakeholders to attend one of the scheduled public meetings and provide oral or written comments. These meetings will be open to the public. Please note that the public meeting may close early if all business is finished. Oral or written comments received at the public meeting will be entered into the Docket. If you are unable to attend, you may submit comments to the Docket Management Facility at the address listed under **ADDRESSES** by March 16, 2007.

For the public meeting in Chicago, the Radisson Hotel and Suites Chicago is holding a limited number of rooms for the meeting. To receive the group rate of $138.00 plus tax per night, reservations must be made directly with the Radisson Hotel and Suites Chicago by calling 312–787–2900 no later than February 16, 2007. Please mention the 'Coast Guard Meeting' to receive the block rate. After this date, rooms will be available at the standard rate on a space available basis only.

For the public meeting in New Orleans, the Hotel Monteleone is holding a limited number of rooms for the meeting. To receive the group rate of $148.00 plus tax per night, reservations must be made directly with the Hotel Monteleone by calling 504–523–3341 no later than February 16, 2007. Please mention the 'Coast Guard Meeting' to receive the block rate. After this date, rooms will be available at the standard rate on a space available basis only.

**Information on Services for Individuals With Disabilities**

If you plan to attend one of the public meetings and require special assistance, such as sign language interpretation or other reasonable accommodations,

Plaintiffs' Exhibit
8

HENRY A. WAXMAN, CALIFORNIA
EDWARD J. MARKEY, MASSACHUSETTS
RICK BOUCHER, VIRGINIA
EDOLPHUS TOWNS, NEW YORK
FRANK PALLONE, Jr., NEW JERSEY
BART GORDON, TENNESSEE
BOBBY L. RUSH, ILLINOIS
ANNA G. ESHOO, CALIFORNIA
BART STUPAK, MICHIGAN
ELIOT L. ENGEL, NEW YORK
ALBERT R. WYNN, MARYLAND
GENE GREEN, TEXAS
DIANA DeGETTE, COLORADO
   VICE CHAIRMAN
LOIS CAPPS, CALIFORNIA
MIKE DOYLE, PENNSYLVANIA
JANE HARMAN, CALIFORNIA
TOM ALLEN, MAINE
JAN SCHAKOWSKY, ILLINOIS
HILDA L. SOLIS, CALIFORNIA
CHARLES A. GONZALEZ, TEXAS
JAY INSLEE, WASHINGTON
TAMMY BALDWIN, WISCONSIN
MIKE ROSS, ARKANSAS
DARLENE HOOLEY, OREGON
ANTHONY D. WEINER, NEW YORK
JIM MATHESON, UTAH
G.K. BUTTERFIELD, NORTH CAROLINA
CHARLIE MELANCON, LOUISIANA
JOHN BARROW, GEORGIA
BARON P. HILL, INDIANA

DENNIS B. FITZGIBBONS, CHIEF OF STAFF
GREGG A. ROTHSCHILD, CHIEF COUNSEL

JOE BARTON, TEXAS
   RANKING MEMBER
RALPH M. HALL, TEXAS
J. DENNIS HASTERT, ILLINOIS
FRED UPTON, MICHIGAN
CLIFF STEARNS, FLORIDA
NATHAN DEAL, GEORGIA
ED WHITFIELD, KENTUCKY
BARBARA CUBIN, WYOMING
JOHN SHIMKUS, ILLINOIS
HEATHER WILSON, NEW MEXICO
JOHN B. SHADEGG, ARIZONA
CHARLES W. "CHIP" PICKERING, MISSISSIPPI
VITO FOSSELLA, NEW YORK
STEVE BUYER, INDIANA
GEORGE RADANOVICH, CALIFORNIA
JOSEPH R. PITTS, PENNSYLVANIA
MARY BONO, CALIFORNIA
GREG WALDEN, OREGON
LEE TERRY, NEBRASKA
MIKE FERGUSON, NEW JERSEY
MIKE ROGERS, MICHIGAN
SUE MYRICK, NORTH CAROLINA
JOHN SULLIVAN, OKLAHOMA
TIM MURPHY, PENNSYLVANIA
MICHAEL C. BURGESS, TEXAS
MARSHA BLACKBURN, TENNESSEE

ONE HUNDRED TENTH CONGRESS

# U.S. House of Representatives
# Committee on Energy and Commerce
## Washington, DC 20515–6115

JOHN D. DINGELL, MICHIGAN
CHAIRMAN

November 7, 2007

The Honorable Michael Chertoff
Secretary
Department of Homeland Security
Washington, D.C. 20528

Dear Mr. Secretary:

On October 19, 2007, you issued a determination pursuant to Section 102 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, as amended, waiving the applicability of 20 Federal laws, including certain laws within the jurisdiction of the Committee on Energy and Commerce, with respect to land in the vicinity of the United States border from approximately 4.75 miles west of the Naco, Arizona, Port of Entry to the western boundary of the San Pedro Riparian National Conservation Area. The laws within the Committee's jurisdiction include the Safe Drinking Water Act; the Solid Waste Disposal Act; the Clean Air Act; the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA); and the Noise Control Act.

This letter is an inquiry as to the specific facts and circumstances that support your determination that waiver of these laws was "necessary to ensure expeditious construction of the barriers and roads" in the geographic area described.

In particular, we request responses to the following questions no later than Wednesday, November 21, 2007.

1.   What specific facts and/or circumstances on the ground caused you to determine that the requirements of the Safe Drinking Water Act were preventing the expeditious construction of roads and barriers? Further, please identify the particular regulations and specific requirements of the Safe Drinking Water Act that were impeding construction of physical barriers and roads in the area.

The Honorable Michael Chertoff
Page 2

2.  What specific facts and/or circumstances on the ground caused you to determine that
    the requirements of the Solid Waste Disposal Act were preventing the expeditious
    construction of roads and barriers?  Further, please identify the particular regulations
    and specific requirements of the Solid Waste Disposal Act that were impeding
    construction of physical barriers and roads in the area.

3.  What specific facts and/or circumstances on the ground caused you to determine that
    the requirements of the Clean Air Act were preventing the expeditious construction of
    roads and barriers?  Further, please identify the particular regulations and specific
    requirements of the Clean Air Act that were impeding construction of physical barriers
    and roads in the area.

4.  What specific facts and/or circumstances on the ground caused you to determine that
    the requirements of the Comprehensive Environmental Response, Compensation, and
    Liability Act were preventing the expeditious construction of roads and barriers?
    Further, please identify the particular regulations and specific requirements of
    CERCLA that were impeding construction of physical barriers and roads in the area.

5.  What specific facts and/or circumstances on the ground caused you to determine that
    the requirements of the Noise Control Act were preventing the expeditious
    construction of roads and barriers?  Further, please identify the particular regulations
    and specific requirements of the Noise Control Act that were impeding construction of
    physical barriers and roads in the area.

6.  Prior to deciding to waive the applicability of the Safe Drinking Water Act, the Solid
    Waste Disposal Act, the Clean Air Act, the Comprehensive Environmental Response,
    Compensation and Liability Act, and the Noise Control Act, did you identify the
    specific statutory provisions that were impeding or preventing expeditious construction
    of physical barriers and roads in the area?  If so, please identify those provisions.
    Please also explain why you waived the Acts in their entirety rather than the specific
    offending sections, if any.

7.  Were there any lawsuits or judicial judgments citing the authority of the Safe Drinking
    Water Act, the Solid Waste Disposal Act, the Clean Air Act, the Comprehensive
    Environmental Response, Compensation and Liability Act, and the Noise Control Act
    or regulations promulgated thereunder that affected or prevented the expeditious
    construction of physical barriers and roads in the vicinity of the international land
    border of the United States?  If so, please identify each of them and provide copies of
    the pleadings and/or judicial opinions.

The Honorable Michael Chertoff
Page 3

8.    Did you conduct any analysis of the harm to the environment from waiving any or all of the following statutes:  the Safe Drinking Water Act, the Solid Waste Disposal Act, the Clean Air Act, the Comprehensive Environmental Response, Compensation and Liability Act, and the Noise Control Act?  If so, please provide any such analysis.

9.    What specific facts and/or circumstances on the ground caused you to determine that the requirements of the Administrative Procedure Act were preventing the expeditious construction of roads and barriers?  Further, please identify the particular regulations and specific requirements of the Administrative Procedure Act that you believe were impeding construction of physical barriers and roads in the area.

Thank you for your cooperation with the work of the Committee.  If you have any questions, please contact us or have your staff contact Richard A. Frandsen or Lorie Schmidt with the Committee on Energy and Commerce staff at (202) 225-2927.

Sincerely,

John D. Dingell            Albert R. Wynn                 Hilda L. Solis
Chairman                   Chairman                       Vice Chair
                           Subcommittee on                Subcommittee on
                           Environment                    Environment
                             and Hazardous Materials        and Hazardous Materials


cc:    The Honorable Joe Barton, Ranking Member
       Committee on Energy and Commerce

       The Honorable John Shimkus, Ranking Member
       Subcommittee on Environment and Hazardous Materials

Plaintiffs' Exhibit
9

Order Code RL33659

---

# CRS Report for Congress

### Received through the CRS Web

---

## Border Security: Barriers Along the U.S. International Border

**Updated December 12, 2006**

Blas Nuñez-Neto
Analyst in Domestic Security
Domestic Social Policy Division

Stephen Viña
Legislative Attorney
American Law Division

---

*Congressional Research Service ❖ The Library of Congress*

# Border Security: Barriers Along the
# U.S. International Border

## Summary

Congress has been considering expanding the barriers currently deployed along the U.S. international land border. Currently, the United States Border Patrol (USBP) deploys fencing, which aims to impede the illegal entry of individuals, and vehicle barriers, which aim to impede the illegal entry of vehicles (but not individuals) along the border. The USBP first began erecting barriers in 1990 to deter illegal entries and drug smuggling in its San Diego sector. The ensuing 14 mile-long San Diego "primary fence" formed part of the USBP's "Prevention Through Deterrence" strategy, which called for reducing unauthorized migration by placing agents and resources directly on the border along population centers in order to deter would-be migrants from entering the country. In 1996, Congress passed the Illegal Immigration Reform and Immigrant Responsibility Act which, among other things, explicitly gave the Attorney General (now the Secretary of the Department of Homeland Security) broad authority to construct barriers along the border and authorized the construction of a secondary layer of fencing to buttress the completed 14 mile primary fence. Construction of the secondary fence stalled due to environmental concerns raised by the California Coastal Commission. In 2005, Congress passed the REAL ID Act that authorized the Secretary of the Department of Homeland Security (DHS) to waive all legal requirements in order to expedite the construction of border barriers. DHS has since announced it will use this waiver authority to complete the San Diego fence and is in the process of acquiring the necessary land. The Secure Fence Act of 2006 directed DHS to construct 850 miles of additional border fencing.

While the San Diego fence, combined with an increase in agents and other resources in the USBP's San Diego sector, has proven effective in reducing the number of apprehensions made in that sector, there is considerable evidence that the flow of illegal immigration has adapted to this enforcement posture and has shifted to the more remote areas of the Arizona desert. Nationally, the USBP made 1.2 million apprehensions in 1992 and again in 2004, suggesting that the increased enforcement in San Diego sector has had little impact on overall apprehensions.

In addition to border fencing, the USBP deploys both permanent and temporary vehicle barriers to the border. Temporary vehicle barriers are typically chained together and can be moved to different locations at the USBP's discretion. Permanent vehicle barriers are embedded in the ground and are meant to remain in one location. The USBP is currently erecting a 150 mile stretch of vehicle barriers, in conjunction with the National Park Service, near Yuma, Arizona.

A number of policy issues concerning border barriers generally and fencing specifically may be of interest to Congress, including, but not limited, to their effectiveness, costs versus benefits, location, design, environmental impact, potential diplomatic ramifications, and the costs of acquiring the land needed for construction.

This report will be updated periodically as needed.

# Contents

Background  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

The San Diego Border Primary Fence  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    Operation Gatekeeper  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
    Sandia National Laboratory Study  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Original Congressional Border Barrier Legislation  . . . . . . . . . . . . . . . . . . . . . . 5
    Section 102 of IIRIRA — Improvement of Barriers at the Border  . . . . . . . 5

The San Diego Sandia Fence  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
    The California Coastal Commission  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
    The REAL ID Act  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
    Current Status of the San Diego Triple Fence  . . . . . . . . . . . . . . . . . . . . . . 9

The San Diego Fence and USBP Apprehensions  . . . . . . . . . . . . . . . . . . . . . . . . 9

Border Barrier Construction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
    Steps Prior to Construction  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
        Environmental Impact Assessments  . . . . . . . . . . . . . . . . . . . . . . . . 14
        Land Acquisition  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
    Border Fence Construction Process and Funding  . . . . . . . . . . . . . . . . . . 16
    Types of Fences and Barriers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
        Landing Mat Fencing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
        Sandia Secondary Fence  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
    Other Border Barriers: Vehicle Barriers  . . . . . . . . . . . . . . . . . . . . . . . . . 21
        Permanent Vehicle Barriers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
        Temporary Vehicle Barriers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Legislation in the 109th Congress . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Issues For Congress  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
    Effectiveness  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
    Costs  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
    Fence Design  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
    Fence Location . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
    Land Acquisition  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
    Diplomatic Ramifications  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29
    Environmental Considerations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30
    Legal Considerations  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
    Unintended Consequences . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

Appendix I: Examples of USBP Border Fencing  . . . . . . . . . . . . . . . . . . . . . . . 34

Appendix II: The San Diego Fence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

Appendix III: Permanent Vehicle Barrier Schematic . . . . . . . . . . . . . . . . . . . . . 36

Appendix IV: Permanent Vehicle Barriers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

Appendix V: Data From Figure 4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

Appendix VI.  Legal Requirements Waived by DHS for the Construction of
     the San Diego Border Fence.  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

## List of Figures

Figure 1.  Imperial Beach Station Apprehensions . . . . . . . . . . . . . . . . . . . . . . . 10
Figure 2.  Chula Vista Station Apprehensions . . . . . . . . . . . . . . . . . . . . . . . . . 11
Figure 3.  Apprehensions at San Diego Sector Stations, Excluding
     Imperial Beach and Chula Vista  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
Figure 4.  Apprehensions at San Diego Sector Stations and Tucson Sector  . . . . 13

## List of Tables

Table 1.  Border Patrol Tactical Infrastructure Appropriations . . . . . . . . . . . . . 17
Table 2.  DOD Funding for the Southwest Border Fence  . . . . . . . . . . . . . . . . . 18

# Border Security: Barriers Along the U.S. International Border

## Background

Within the Department of Homeland Security's (DHS) Customs and Border Protection (CBP), the U.S. Border Patrol (USBP) is charged with securing our nation's land and maritime borders between official ports of entry (POE) to deter and interdict terrorists, weapons of mass destruction, and aliens attempting to enter the country unlawfully.  In order to discharge its duties, the USBP deploys personnel, technology, and tactical infrastructure such as vehicle barriers and fencing.  Fencing is erected on the border to impede the illegal entry of unauthorized aliens, while vehicle barriers are designed to impede the entry of vehicles but do not impede the entry of individuals.  This report will analyze the barriers that are currently being constructed and maintained along the border by the USBP, including historical and future cost estimates and the policy issues involved.  Because the current debate has largely focused on the deployment of fencing to the border, this report will focus on the policy issues surrounding the construction of border fencing.   However, information concerning the kinds of vehicle barriers being deployed at the border will be provided where available.

Using the broad powers granted to the Attorney General (AG) to control and guard the U.S. border,[1] the USBP began erecting a barrier known as the "primary fence" directly on the border in 1990 to deter illegal entries and drug smuggling in its San Diego sector.[2]  The San Diego fence formed part of the USBP's "Prevention Through Deterrence" strategy,[3] which called for reducing unauthorized migration by placing agents and resources directly on the border along population centers in order to deter would-be migrants from entering the country.  The San Diego primary fence was completed in 1993, covering the first 14 miles of the border from the Pacific Ocean. The fence was constructed of 10-foot-high welded steel army surplus landing

---

[1] 8 U.S.C. §1103 (a)(5).  Although the law still cites to the Attorney General, the authorities granted by this section now appear to rest with the Secretary of DHS. See The Homeland Security Act of 2002, P.L. 104-208, §§102(a), 441, 1512(d) and 1517 (references to the Attorney General or Commissioner in statute and regulations are deemed to refer to the Secretary of DHS).

[2] For more information on the San Diego border fence, please refer to CRS Report RS22026, *Border Security: The San Diego Fence*, by Blas Nuñez-Neto and Stephen Viña.

[3] For an expanded discussion of the USBP, please refer to CRS Report RL32562, *Border Security:  The Role of the U.S. Border Patrol*, by Blas Nuñez-Neto.

mats[4] with the assistance of the Corps of Engineers and the California National Guard. In addition to the 14 miles of primary fencing erected in its San Diego sector, the USBP maintains stretches of primary fencing in several other sectors along the southwest border, including Yuma, Tucson, El Centro, and El Paso.

In 1996, Congress passed the Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA), which, among other things, explicitly gave the Attorney General broad authority to construct barriers along the border and authorized the Immigration and Naturalization Service (INS) to construct a secondary layer of fencing to buttress the completed 14 mile primary fence.[5] Construction of the secondary fence stalled after 9.5 miles had been completed due to environmental concerns raised by the California Coastal Commission (CCC). In 2005, Congress passed the REAL ID Act, which, among other things, authorized the Secretary of the Department of Homeland Security (DHS) to waive all legal requirements to expedite the construction of border barriers.[6] In 2006, Congress passed the Secure Fence Act, which, among other things, directs DHS to construct five separate stretches of fencing along the southern border totaling 850 miles.

In addition to border fencing, the USBP deploys both permanent and temporary vehicle barriers at the border. Vehicle barriers are meant to stop the entry of vehicles, but not people, into the United States. Temporary vehicle barriers are typically chained together and can be moved to different locations at the USBP's discretion. Permanent vehicle barriers are embedded in the ground and are meant to remain in one location. The USBP is currently erecting a 150 mile stretch of vehicle barriers in conjunction with the National Park Service near Yuma, Arizona.

## The San Diego Border Primary Fence

The USBP's San Diego sector extends along the first 66 miles from the Pacific Ocean of the international border with Mexico, and covers approximately 7,000 square miles of territory. Located north of Tijuana and Tecate, Mexican cities with a combined population of more than two million people, the sector features no natural barriers to entry by unauthorized migrants and smugglers.[7] As a result of this geographical reality and in response to the large numbers of unauthorized aliens crossing the border in the area, in 1990 the USBP began erecting a physical barrier to deter illegal entries and drug smuggling. The ensuing "primary" fence covered the

---

[4] U.S. Government Accountability Office, *Border Control — Revised Strategy Is Showing Some Positive Results*, GAO/GGD-95-30, Jan. 31, 1995. (Hereafter referred to as GAO Report 95-30.)

[5] See P.L. 104-208, Div. C. IIRIRA was passed as part of the Omnibus Consolidated Appropriations Act of 1997.

[6] P.L. 109-13.

[7] U.S. Department of Justice, Office of the Inspector General, *Operation Gatekeeper: An Investigation Into Allegations of Fraud and Misconduct,* July 1998, available at [http://www.usdoj.gov/oig/special/9807/gkp01.htm#P160_18689].

first 14 miles of the border, starting from the Pacific Ocean, and was constructed of 10-foot-high welded steel.[8]

## Operation Gatekeeper

The primary fence, by itself, did not have a discernible impact on the influx of unauthorized aliens coming across the border in San Diego. As a result of this, Operation Gatekeeper was officially announced in the San Diego sector on October 1, 1994. The chief elements of the operation were large increases in the overall manpower of the sector, and the deployment of USBP personnel directly along the border to deter illegal entry. The strategic plan called for three tiers of agent deployment. The first tier of agents was deployed to fixed positions on the border. The agents in this first tier were charged with preventing illegal entry, apprehending those who attempted to enter, and generally observing the border. A second tier of agents was deployed north of the border in the corridors that were heavily used by illegal aliens. The second tier of agents had more freedom of movement than the first tier and were charged with containing and apprehending those aliens who made it past the first tier. The third tier of agents were typically assigned to man vehicle checkpoints further inland to apprehend the traffic that eluded the first two tiers. As the Department of Justice Inspector General report notes, "given Gatekeeper's deterrence emphasis, many agents were assigned to first-tier, fixed positions along the border. These agents were instructed to remain in their assigned positions rather than chase alien traffic passing through adjacent areas. Prior to Gatekeeper, such stationary positions were relatively rare."[9]

Operation Gatekeeper resulted in significant increases in the manpower and other resources deployed to San Diego sector. Agents received additional night vision goggles, portable radios, and four-wheel drive vehicles, and light towers and seismic sensors were deployed.[10] According to the former INS, between October 1994 and June of 1998, San Diego sector saw the following increases in resources:

- USBP agent manpower increased by 150%;
- Seismic sensors deployed increased by 171%;
- Vehicle fleet increased by 152%.
- Infrared night-vision goggles increased from 12 to 49;
- Permanent lighting increased from 1 mile to 6 miles, and 100 portable lighting platforms were deployed;
- Helicopter fleet increased from 6 to 10.[11]

---

[8] GAO Report 95-30.

[9] U.S. Department of Justice, Office of the Inspector General, *Operation Gatekeeper: An Investigation Into Allegations of Fraud and Misconduct*, July 1998, available at [http://www.usdoj.gov/oig/special/9807/index.htm]. (Hereafter referred to as DOJ-OIG Gatekeeper Report.)

[10] DOJ-OIG Gatekeeper Report.

[11] U.S. Department of Justice, Immigration and Naturalization Service, "Operation Gatekeeper Fact Sheet," July 14, 1998.

CRS-4

As a result of the increase in resources and the new strategy that were the main components of Operation Gatekeeper, the USBP estimated in 1998 that the entire 66 miles of border patrolled by the San Diego sector's agents could be brought under control in five years.[12]

## Sandia National Laboratory Study

According to CBP, the primary fence, in combination with various USBP enforcement initiatives along the San Diego border region (i.e., Operation Gatekeeper), proved to be successful but fiscally and environmentally costly.[13]  For example, as unauthorized aliens and smugglers breached the primary fence and attempted to evade detection, USBP agents were often forced to pursue the suspects through environmentally sensitive areas.  It soon became apparent to immigration officials and lawmakers that the USBP needed, among other things, a "rigid" enforcement system that could integrate infrastructure (i.e., a multi-tiered fence and roads), manpower, and new technologies to further control the border region.

The concept of a three-tiered fence system was first recommended by a 1993 Sandia Laboratory study commissioned by the former Immigration and Naturalization Service (INS).  According to the Sandia study, the use of multiple barriers in urban areas would increase the USBP's ability to discourage a significant number of illegal border crossers, to detect intruders early and delay them as long as possible, and to channel a reduced number of illegal border crossers to geographic locations where the USBP was better prepared to deal with them.[14]  The Sandia study further noted that segments of the border could not be controlled at the immediate border due to the ruggedness of the terrain, and recommended the use of highway checkpoints in those areas to contain aliens after they had entered the country illegally.[15]  The study concluded that aliens attempting to enter the United States from Mexico had shown remarkable resiliency in bypassing or destroying obstacles in their path, including the existing primary fence, and postulated that "[a] three-fence barrier system with vehicle patrol roads between the fences and lights will provide the necessary discouragement."[16]

---

[12] DOJ-OIG Gatekeeper Report.

[13] See California Coastal Commission, *W 13a Staff Report and Recommendation on Consistency Determination*, CD-063-03, Oct. 2003, at 14-16 (stating that construction of the primary fence significantly assisted the USBP's efforts in deterring smuggling attempts via drive-throughs using automobiles and motorcycles).  (Hereafter referred to as CCC *Staff Report*.)

[14] GAO 95-30, p. 13.

[15] GAO 95-30, p. 13.

[16] Peter Andreas, "The Escalation of U.S. Immigration Control in the Post-NAFTA Era," *Political Science Quarterly*, vol. 113, no. 4, winter 1998-1999, p. 595.

# Original Congressional Border Barrier Legislation

As previously mentioned, the INS constructed the primary fencing in San Diego using the broad authority granted to the AG in order to guard and control the U.S. border by the Immigration and Nationality Act (INA).[17] In 1996, Congress expressly authorized the AG to construct barriers at the border for the first time in the Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA).[18]

## Section 102 of IIRIRA — Improvement of Barriers at the Border

Section 102 of IIRIRA concerned the improvement and construction of barriers at our international borders. Section 102(a) appeared to give the AG[19] broad authority to install additional physical barriers and roads "in the vicinity of the United States border to deter illegal crossings in areas of high illegal entry into the United States." The phrase *vicinity of the United States border* is not defined in the Immigration and Nationality Act (8 U.S.C. §1101 *et seq.*) or in immigration regulations. The section also did not stipulate what specific characteristics would designate an area as one of *high illegal entry*.

Section 102(b) mandated that the AG construct a barrier in the border area near San Diego. Specifically, §102(b) directed the AG to construct a three-tiered barrier along the 14 miles of the international land border of the U.S., starting at the Pacific Ocean and extending eastward. Section 102(b) ensured that the AG will build a barrier, pursuant to his broader authority in §102(a), near the San Diego area, although there is some debate concerning whether IIRIRA required *continuous* triple fencing and roads for the entire 14-mile corridor.[20] Section 102(b) also provided authority for the acquisition of necessary easements, required certain safety features be incorporated into the design of the fence, and authorized a total appropriation not to exceed $12 million to carry out the section.[21]

Section 102(c) waived the Endangered Species Act (ESA) of 1973 (16 U.S.C. §§1531 *et seq.*) and the National Environmental Policy Act (NEPA) of 1969 (42 U.S.C. §§4321 *et seq.*), to the extent the AG determined necessary, in order to ensure expeditious construction of the barriers authorized to be constructed under §102. The waiver authority in this provision appeared to apply both to barriers that may be constructed *in the vicinity of the border* and to the barrier that was to be constructed

---

[17] 8 U.S.C. §1103 (a)(5).

[18] P.L. 104-208, §102.

[19] Although the law still cites to the Attorney General, the authorities granted by this section now appear to rest with the Secretary of DHS. See The Homeland Security Act of 2002, P.L. 104-208, §§102(a), 441, 1512(d) and 1517 (references to the Attorney General or Commissioner in statute and regulations are deemed to refer to the Secretary).

[20] See CCC, *Staff Report*, at 7 nt. 2 and p. 23 nt. 4.

[21] The actual costs associated with constructing the San Diego fence have been considerably greater than anticipated by IIRIRA and will be discussed in more detail later in this report.

near the San Diego area. The INS (and CBP after 2003) never exercized this original waiver authority, instead choosing to comply with the NEPA and the ESA. The INS published a Final Environmental Impact Study pursuant to NEPA and received a non-jeopardy Biological Opinion from the U.S. Fish and Wildlife Service under the ESA.[22] This waiver authority was expanded in the 109th Congress by the REAL ID Act, which will be discussed in greater detail subsequently, and DHS has subsequently announced it will be implementing this expanded waiver authority.

Section 102(d) also provides the AG with various land acquisition authorities. In 2002, Congress amended the U.S. Code to authorize the AG to use INS funds to purchase land for enforcement fences and to construct the fences.[23]

# The San Diego Sandia Fence

In 1996, construction began on the secondary fence that had been recommended by the Sandia study with congressional approval. The new fence was to parallel the fourteen miles of primary fence already constructed on land patrolled by the Imperial Beach Station of the San Diego sector, and included permanent lighting as well as an access road in between the two layers of fencing. Of the 14 miles of fencing authorized to be constructed by IIRIRA, nine miles of the triple fence had been completed by the end of FY2005. Two sections, including the final three mile stretch of fence that leads to the Pacific Ocean, have not been finished.

## The California Coastal Commission

In order to finish the fence, the USBP proposed to fill a deep canyon known as "Smuggler's Gulch" with over two million cubic yards of dirt. The triple-fence would then be extended across the filled gulch. California's Coastal Commission (CCC), however, objected to and essentially halted the completion of the fence in February 2004, because it determined that CBP had not demonstrated, among other things, that the project was consistent "to the maximum extent practicable" with the policies of the California Coastal Management Program — a state program approved under the federal Coastal Zone Management Act (CZMA) (16 U.S.C. §§1451-1464).[24] The CZMA requires federal agency activity within or outside the coastal zone that affects any land or water use or natural resource of the coastal zone to be carried out in a manner that is consistent to the maximum extent practicable with the

---

[22] Department of Homeland Security, *Environmental Impact Statement for the Completion of the 14-mile Border Infrastructure System, San Diego, California* (July 2003) [hereinafter EIS, San Diego Border Fence].

[23] P.L.107-273, §201(a).

[24] See CCC, *Staff Report*, at 5-7. After California's Coastal Management Plan was approved by the National Oceanic and Atmospheric Administration pursuant to the CZMA in 1977, apparently all federal activities affecting coastal zone resources in California became subject to the CCC's regulatory purview.

policies of an approved state management program.[25]  If a federal court finds a federal activity to be inconsistent with an approved state program and the Secretary of DHS (Secretary) determines that compliance is unlikely to be achieved through mediation, the President may exempt from compliance the activity if the President determines that the activity is in the "paramount interest of the United States."[26]

According to the CCC, CBP did not believe that it could make further environmental concessions and still comply with IIRIRA.  The CCC held that Congress did not specify a particular design in the IIRIRA, and that CBP failed to present a convincing argument that the less environmentally damaging alternative projects it rejected would have prevented compliance with the IIRIRA.  Specifically, the CCC was concerned with the potential for significant adverse effects on (1) the Tijuana River National Estuarine Research and Reserve; (2) state and federally listed threatened and endangered species; (3) lands set aside for protection within California's Multiple Species Conservation Program; and, (4) other aspects of the environment.  In response to the CCC's findings, Congress expanded the waiver authority in the REAL ID Act, described in more detail below, in order to allow DHS to waive the CZMA, among other things.

## The REAL ID Act

In the 109th Congress, H.R. 418, the REAL ID Act of 2005, contained language requiring the Secretary of DHS to waive *all laws* necessary to ensure expeditious construction of the security barriers.  H.R. 418 was passed by the House as a stand-alone piece of legislation, but was also attached as an amendment to House-passed H.R. 1268, the emergency supplemental appropriations bill for FY2005.  During conference, language was revised in H.R. 1268 to "authorize," instead of "require," the Secretary of DHS to waive all "legal requirements," instead of "all laws."  The conferees also added a new provision that would make such waiver decisions effective upon publication in the Federal Register.  Language was also added granting federal district courts exclusive jurisdiction to review claims alleging that the actions or decisions of the Secretary violate the U.S. Constitution, and allowing district court rulings to be reviewed only by the U.S. Supreme Court.  H.R. 1268 was signed into law on May 11, 2005 (P.L. 109-13).[27]

The waiver authority provided in §102 of the REAL ID Act appears to be a broad grant of authority because, in part, it authorizes the waiver of *all* legal requirements determined necessary by the Secretary for the expeditious construction of authorized barriers and only allows judicial review for constitutional claims.[28]

---

[25] 16 U.S.C. §1456(c).

[26] 16 U.S.C. §1456(c)(1)(B).

[27] For more information on the REAL ID Act, please refer to CRS Report RL32754, *Immigration: Analysis of the Major Provisions of the REAL ID Act of 2005*, by Michael John Garcia, Margaret Mikyung Lee, and Todd Tatelman.

[28] One of the most analogous provisions CRS located appears to be, at least on its face, 43 U.S.C. §1652(c), which authorizes the waiver of all procedural requirements in law related

(continued...)

CRS-8

Furthermore, these claims can only be appealed to the Supreme Court (i.e., there is no intermediate appellate review), whose review is discretionary. Moreover, because §102 of the REAL ID Act amends only the waiver provision of §102 of IIRIRA, the new waiver authority appears to apply to all the barriers that may be constructed under IIRIRA — that is, both to barriers constructed in the vicinity of the border in areas of high illegal entry and to the barrier that is to be constructed near the San Diego area.

Many are concerned with the apparent breadth of the waiver provision and limited judicial review. As passed into law, the REAL ID Act waiver provision begins with the arguably ambiguous "notwithstanding any other law" phrase[29] and allows the waiver of all "legal requirements." Although the term "legal requirement" is not defined, it cannot grant the Secretary the authority to unilaterally waive a person's constitutional rights.[30] The provision, however, has been construed by Secretary Chertoff to permit him to waive laws in their entirety. Congress commonly waives preexisting laws, but the new waiver provision used language and a combination of terms not typically seen in law. Most waiver provisions have qualifying language that (1) exempt an action from other requirements contained in the act that authorizes the action, (2) specifically delineate the laws to be waived, or (3) waive a grouping of similar laws. Also common are waiver provisions that contain reporting requirements or restrictions which appear to limit their breadth.[31] One analogous law appears to be 43 U.S.C. §1652(c), which authorizes the Secretary of the Interior to waive all procedural requirements in law related to the construction of the Trans-Alaska pipeline and limits judicial review to constitutional claims (see below).

Although some argue that the waiver authority can extend to any law, including those seemingly unrelated to building a fence (e.g., civil rights or child labor laws), the provision is tempered by the requirement that the Secretary must determine the

---

[28] (...continued)
to the construction of the Trans-Alaska pipeline and limits judicial review to constitutional claims.

[29] Some courts, for instance, have found the "notwithstanding" phrase not dispositive in determining the preemptive effect of a statute. *See, e.g.*, E.P. Paup v. Director, OWCP, 999 F.2d 1341, 1348 (9th Cir. 1993); Oregon Natural Resources Council v. Thomas, 92 F.3d 792, 796 (9th Cir. 1996). *But see* Puerto Rico v. M/V Emily S., 132 F.3d 818 (1st Cir. 1997); Schneider v. United States, 27 F.3d 1327 (8th Cir. 1994).

[30] "[T]he Constitution is filled with provisions that grant Congress or the States specific power to legislate in certain areas," Justice Black wrote for the Court, but "these granted powers are always subject to the limitations that they may not be exercised in a way that violates other specific provisions of the Constitution." Williams v. Rhodes, 393 U.S. 23, 29 (1968).

[31] Some of these waiver provisions grant the President or the head of an Executive agency the authority to waive a law[s] if deemed necessary in the *national interest* or in the interest of *national defense*. *See, e.g.*, 10 U.S.C. §1107(a); 22 U.S.C. §2375(d); 29 U.S.C. §793; 42 U.S.C. §6212(b); 42 U.S.C. §6393(a)(2); 50 U.S.C. §2426(e). Examples of waiver authority with a congressional notification element include 15 U.S.C. §719f; 22 U.S.C. §2378; 22 U.S.C. §2371; and 41 U.S.C. §413.

law (subject to the waiver) is necessary "to ensure expeditious construction" of the barriers. In other words, the Secretary may be confined to laws that, in effect, will impede the construction of the fence — not those that only tangentially relate to or do not necessarily interfere with construction. For example, because child labor laws would not prevent the Secretary from expeditiously constructing the fence, it follows that the Secretary does not have the authority to waive these protections. This interpretation is buttressed by the legislative history where several Members called for the waiver provision because of laws that were complicating and ultimately preventing the completion of the fence.[32] The decision to waive a law, nonetheless, is solely in the Secretary's discretion. Until such time that DHS waives an applicable law, however, it must follow all legal requirements normally imposed on federal agencies.

## Current Status of the San Diego Triple Fence

The military has now begun upgrading and rebuilding the San Diego border fence. The Senate-passed version of the FY2006 DHS Appropriations bill, H.R. 2360, includes $50 million for construction of the border fence in San Diego, and $50 million for border infrastructure, including fences and vehicle barriers, in Arizona. On September 14, 2005, DHS announced it is applying its new waiver authority to complete the San Diego fence.[33] DHS is currently in the land acquisition phase of the project, and construction had not started on the outstanding 4.5 miles of fencing as of September 2006.[34]

# The San Diego Fence and USBP Apprehensions

Apprehension statistics have long been used as a performance measure by the USBP. However, the number of apprehensions may be a misleading statistic for several reasons, including the data's focus on events rather than people[35] and the fact that there are no reliable estimates for how many aliens successfully evade capture. This makes it difficult to establish a firm correlation between the number of apprehensions in a given sector and the number of people attempting to enter through that sector. While caution should be taken when attempting to draw conclusions about the efficacy of policy initiatives based solely on apprehensions statistics, *they remain the most reliable way to codify* trends in illegal migration along the border.

---

[32] 151 Cong. Rec. H557 (daily ed. Feb. 10, 2005).

[33] Department of Homeland Security, "Determination Pursuant to Section 102 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 as Amended by Section 102 of the REAL ID Act of 2005," 70 *Federal Register* 55622-02, September 22, 2005.

[34] Interview with CBP Congressional Affairs, September 13, 2006.

[35] If the same person is apprehended multiple times attempting to enter the country in one year, each apprehension will be counted separately by the USBP in generating their apprehension statistics. This means that apprehension statistics may overstate the number of aliens apprehended each year.

CRS-10

The San Diego fence spans two border patrol stations within the San Diego sector: Imperial Beach station and Chula Vista station. As previously noted, the primary fence was constructed in those two stations beginning in FY1990; the secondary fence was constructed beginning in FY1996. **Figure 1** shows the stark decrease in apprehensions at the Imperial Beach station *from* fiscal year (FY) 1992 *to* FY2004. The majority of the decrease occurred in the four year period from FY1995 through FY1998 and coincided with Operation Gatekeeper, which as previously noted combined the construction of fencing along the border with an increase in agents and other resources deployed directly along the border. For the period from FY1998 to FY2004, apprehensions at the Imperial Beach station averaged about 14,000 each year.

### Figure 1. Imperial Beach Station Apprehensions



**Source:** CRS analysis of CBP data.

**Figure 2** shows the apprehensions at the Chula Vista station over the same period of time. The trend in apprehensions at Chula Vista is somewhat similar to Imperial Beach, with overall apprehensions dropping significantly *from* FY1992 *to* FY2002. Apprehensions increased slightly from FY2002 to FY2004, but remain far below their early 1990s levels. Interestingly, the rate of decline in Chula Vista in the mid-1990s lagged behind the rate of decline in Imperial Beach station during this period. This suggests that as enforcement ramped up in Imperial Beach station, unauthorized migration shifted westward to Chula Vista. From FY1992 to FY1998, for example, apprehensions decreased by 92% in Imperial Beach, but only by 54% in Chula Vista. From FY1998 through FY2001, apprehensions leveled off in Imperial Beach, averaging around 16,000 a year, but continued to decline at Chula

Vista, from 72,648 in FY1998 to 3,080 in FY2002. Overall, the trend indicates the following: as enforcement measures, in this case including fencing, were deployed — first focusing on Imperial Beach, and later extending to Chula Vista — the flow of unauthorized migration pushed eastward. The drop in apprehensions occurred first in Imperial Beach, and then later pushed eastward to Chula Vista.

**Figure 2. Chula Vista Station Apprehensions**



**Source:** CRS analysis of CBP data.

**Figure 3** shows the aggregate apprehensions made at the other San Diego sector stations, excluding Imperial Beach and Chula Vista. Those stations are El Cajon, Campo, San Clemente, Temecula, and Brown Field. **Figure 3** shows that at the time apprehensions were beginning to decline in Imperial Beach (starting in FY1995) and Chula Vista (starting in FY1996), apprehensions at other San Diego sector stations almost doubled. This suggests that as enforcement efforts increased in the two westernmost stations, including the installation of fencing and the deployment of additional agents, the flow of illegal migration pushed eastward to the other stations in the San Diego sector. While apprehensions declined in the non-fenced stations of the San Diego sector from FY1997 to FY2001, the rate of decline was not as steep as the rate of decline at the stations where fencing was deployed. Overall, the decline in apprehensions in the rest of the San Diego sector has lagged behind the decreases in Imperial Beach and Chula Vista: from FY1992 to FY2004, apprehensions in the other San Diego sector stations decreased by 42%, compared to decreases of 95% in Imperial Beach and 94% in Chula Vista. In FY2003 and FY2004, apprehensions increased slightly in the rest of San Diego sector, possibly in response to the

CRS-12

increasing USBP focus on the Tucson sector in Arizona.[36]  It seems, then, that the installation of border fencing, in combination with an increase in agent manpower and technological assets, has had a significant effect on the apprehensions made in the San Diego sector.  This in turn suggests that fewer unauthorized aliens are attempting to cross the border in the San Diego sector as a result of the increased enforcement measures, including fencing, manpower, and other resources, that were deployed to that sector.

**Figure 3.  Apprehensions at San Diego Sector Stations, Excluding Imperial Beach and Chula Vista**



**Source:** CRS analysis of CBP data.

**Figure 4** shows overall San Diego sector apprehensions, breaking out the Imperial Beach and Chula Vista stations, and compares them to the apprehensions made at the Tucson sector between FY1992 and FY2004.  The data used to create this graph can be seen presented in table form in **Appendix V**.  **Figure 4** shows that in FY1992, Imperial Beach and Chula Vista accounted for 64% of all apprehensions made in the San Diego sector; by FY2004 the two stations accounted for only 14% of all apprehensions made in the sector. However, as apprehensions declined in Imperial Beach and Chula Vista stations and San Diego sector as a whole over the late 1990s and early 2000s, apprehensions in the Tucson sector in Arizona increased significantly over this period.  Over the 12-year period between 1992 and 2004, overall apprehensions in the San Diego sector declined by 76%.  However, as

---

[36] For more information on overall apprehension trends, please refer to CRS Report RL32562, *Border Security: The Role of the U.S. Border Patrol*, by Blas Nuñez-Neto.

CRS-13

apprehensions were decreasing in the San Diego sector, they were increasing in other sectors further east. This increase was most notable within the Tucson sector in Arizona, where apprehensions increased six-fold (591%) between FY1992 and FY2004. As **Figure 4** shows, overall apprehensions in the San Diego and Tucson sectors combined have averaged roughly 620,000 yearly since FY1992, with the San Diego sector accounting for the lion's share during the early 1990s and the Tucson sector accounting for the majority in the early 2000s. This provides further indication that the construction of the fence, combined with the increases in manpower in the San Diego sector, changed the patterns of migration for unauthorized aliens attempting to enter the country illegally from Mexico.

**Figure 4. Apprehensions at San Diego Sector Stations and Tucson Sector**



**Source:** CRS analysis of CBP data.

As **Figures 1-4** show, the increased deployment of agents, infrastructure, technology, and other resources within the San Diego sector has resulted in a significant decline in the number of apprehensions made in that sector. Nationally, apprehensions made by the USBP grew steadily through the late 1990s, only to decline in the early 2000s. However, in 1992 the USBP apprehended 1.2 million unauthorized aliens; in 2004, the USBP also apprehended 1.2 million unauthorized

aliens.[37] While the increased enforcement in the San Diego sector has resulted in a shift in migration patterns for unauthorized aliens, it does not appear to have decreased the overall number of apprehensions made each year by USBP agents. As previously noted, apprehensions statistics can be somewhat misleading, but they nevertheless remain the best way to codify trends in unauthorized migration along the border. However, it is impossible to ascertain solely by looking at apprehensions statistics how many unauthorized aliens are attempting to enter the country illegally, because it is unclear how many individuals evade being captured by the USBP each year.

# Border Barrier Construction

The USBP has been constructing and maintaining barriers along the international land border since 1991. These barriers have historically been limited to selected urban areas as part of the USBP's overall strategy of rerouting illegal migration away from urban areas towards geographically isolated areas where their agents have a tactical advantage over border crossers. Two main types of border fencing have been constructed: primary fencing located directly on the border along several urban areas; and Sandia fencing, also known as secondary or triple fencing, in San Diego. Additionally, the USBP has begun installing permanent vehicle barriers in various segments of the border. Vehicle barriers are designed to impede the entry of vehicles while allowing individuals and animals to cross the border freely. As such, they have a lower environmental footprint than border fencing.

## Steps Prior to Construction

Several considerations come into play whenever the USBP contemplates construction along the border. There are a number of steps that must be taken before the construction process can begin. These steps include, but are not limited to, determining what the environmental impact of the construction will be; acquiring the land needed for the fence; acquiring the materials that will be used for the fence; and securing the assistance of the Corps of Engineers and the National Guard for the construction process. The role the Corps of Engineers plays in assisting the USBP with th entire process of constructing border fencing, including acquiring materials, will be discussed subsequently in the construction process section. This section will cover the issues associated with environmental assessments and land acquisition.

**Environmental Impact Assessments.** Land along the southwest border supports a number of animals and plants and provides habitat to many protected species. The U.S. Fish and Wildlife Service, for example, reported that a total of 18 federally protected species have the potential to be found along certain sections of the California border.[38] In Arizona, at least 39 federally endangered, threatened, or

---

[37] CRS analysis of CBP data.

[38] EIS, San Diego Border Fence.

CRS-15

candidate species can be found living along its border.[39]  More than 85% of the lands directly along the Arizona border are federal lands, much of it set aside to protect wilderness and wildlife.  For example, the Organ Pipe Cactus National Monument, the Cabeza Prieta National Wildlife Refuge, and the Buenos Aires National Wildlife Refuge can all be found adjacent to the border.  The southwest border region is considered a fragile environment, susceptible to harm from even the slightest changes to the ecosystem.[40]

Many are concerned with the geographic footprint and subsequent environmental impacts of both illegal immigration and USBP activities.  Until the early 1990s, the USBP's enforcement activities along the border were nominal and the environmental consequences of illegal crossings went largely unnoticed.  As illicit trafficking escalated, however, so did the USBP's activities and enforcement footprint, including the construction of fencing and other barriers.  Although the San Diego fence reportedly reduced the number of aliens attempting to drive across the open border (and consequently the enforcement footprint to stop such activities), it did little to block the flow of foot traffic.[41]  Illegal aliens often damage habitat by cutting vegetation for shelter and fire, causing wildfires, increasing erosion through repeated use of trails, and discarding trash.[42]  Environmentalists claim that the USBP's enforcement activities, including the pursuit of illegal aliens, use of off-road vehicles and construction of roads and fences, compound the degradation.[43]  The REAL ID Act will allow the Secretary of DHS to waive any legal requirements needed to expedite the construction of border fencing.  Until such time that DHS waives an applicable law, however, it must follow all legal requirements normally imposed on federal agencies, including, for example, NEPA documentary requirements.

**Land Acquisition.**  The construction of a fence along the border necessarily requires the government to acquire some type of interest in the land.  The San Diego border fence, for example, is to extend approximately 150-feet north of the international boundary.[44]  Current immigration law authorizes the Secretary of DHS to contract for and buy any interest in land adjacent to or in the vicinity of the international land border when the Secretary deems the land essential to control and

---

[39] Defenders of Wildlife, *On the Line — The Impacts of Immigration Policy on Wildlife and Habitat in the Arizona Borderlands*, 2006, p. 26.  (Hereinafter, Defenders of Wildlife, *On the Line*.)

[40] Eilene Zimmerman, SFGate.com, *Border protections imperil environment — Last wilderness area south of San Diego could be damaged*, Feb. 27, 2006, available at [http://www.sfgate.com/cgi-bin/article.cgi?file=/c/a/2006/02/27/MNG2GHFBFL1.DTL &type=printable].

[41] EIS, San Diego Border Fence, at 1-10.

[42] Id. at 1-11.

[43] See generally, Defenders of Wildlife, *On the Line*, p. 26.

[44] Letter from Peter C. Sornsen, Acting Field Supervisor, U.S. Dept. of the Interior, to James Caffrey, Acting Director, Facilities & Engineering Division, Immigration and Naturalization Service, Re: Endangered Species Consultation for the Proposed 14-Mile Border Infrastructure System (July 1, 2003) (on file with author).

CRS-16

guard the border against any violation of immigration law.[45]  It also authorizes the Secretary to accept any interest in land along the border as a gift and to commence condemnation proceedings if a reasonable purchase price can not be agreed upon. With respect to the San Diego border fence, the law requires the Secretary to promptly acquire such easements as necessary to implement the statute.[46]  If DHS exercises its eminent domain powers, it must provide just compensation as required by the Constitution.  In the case of the San Diego fence, construction of the final 4.5 miles continues to be held up as DHS acquires the necessary land.

DHS is authorized to acquire new interests in lands under the INA.  However, the federal government may already own some land along the border pursuant to presidential proclamations made long ago.  In 1907, President Roosevelt reserved from entry and set apart as a public reservation all public lands within 60-feet of the international boundary between the United States and Mexico within the State of California and the Territories of Arizona and New Mexico.[47]  Known as the "Roosevelt Reservation," this land withdrawal was found "necessary for the public welfare ... as a protection against the smuggling of goods."  The proclamation excepted from the reservation all lands, which, as of its date, were (1) embraced in any legal entry; (2) covered by any lawful filing, selection or rights of way duly recorded in the proper U.S. Land Office; (3) validly settled pursuant to law; or (4) within any withdrawal or reservation for any use or purpose inconsistent with its purposes.  A similar reservation was made by President Taft in 1912, for all public lands laying within 60-feet of the boundary line between the United States and Canada.[48]  This proclamation states that the customs and immigration laws of the United States could be better enforced and the public welfare thereby advanced by the retention in the federal government of complete control of the use and occupation of lands abutting the international boundary lines.  The proclamation also provides exceptions similar to those described in the Roosevelt Reservation.

## Border Fence Construction Process and Funding

CBP currently constructs border fencing under a Memorandum of Agreement (MOA) with the ECSO (Engineering and Construction Support Office) of the U.S. Army Corps of Engineers (Corps).  ECSO manages several components of the construction process for CBP, including planning and acquisition of real estate;

---

[45] 8 U.S.C. §1103(b).

[46] 8 U.S.C. §1101 note (b)(2).

[47] 35 Stat. 2136. The reservation also extends sixty-feet from the margin of any river that forms the international boundary.  This language, however, does not apply to lands that abut the Rio Grande River in Texas since there are no federal "public lands" in Texas. Title to most of the western territories was obtained by the United States from foreign powers through purchase and treaty. Generally, the terms of acquisition provided for recognition of the few existing private property rights, but granted title over the vast non-private lands to the United States. Texas was an exception; it was admitted by annexation in 1845, and retained title to all its public lands.  See United States v. Denver, 656 P.2d 1, 5 n.2 (Co. 1982).

[48] 37 Stat. 1741.

drafting the environmental protection plan; designing the project and formulating the engineering costs; overseeing the construction process; and enforcing the appropriate warranties. On most of the tactical infrastructure projects, National Guard units and military units from the Department of Defense (DOD) Joint Task Force North provide the labor. DOD uses these projects as part of their training regimen, leveraging their ability to deploy tactical infrastructure and thereby providing zero labor costs to CBP.[49] The funding for land acquisition and fence materials comes out of the CBP construction account within the DHS appropriation. Specific funding for fence construction is rarely identified in the conference reports, though it typically has been identified within the DHS (and previously the former INS) Congressional Budget Justifications.[50] **Table 1** shows the overall amount appropriated for the USBP construction account, and the specific amounts identified for tactical infrastructure within that account, since FY1996. Appropriations for fencing and other border barriers has increased markedly over the past five years, from $6 million in FY2002 to $93 million in FY2006.

## Table 1.  Border Patrol Tactical Infrastructure Appropriations
(millions of dollars)

| Fiscal Year | Construction Account (total) | Tactical Infrastructure Construction |
|---|---|---|
| 2007 (request) | 256 | 106 |
| 2006 | 298 | 93 |
| 2005 | 92 | 15 |
| 2004 | 89 | 14 |
| 2003 | 235 | 23 |
| 2002 | 128 | 6 |
| 2001 | 133 | 3 |
| 2000 | 100 | 9 |
| 1999 | 90 | 4 |
| 1998 | 76 | 8 |
| 1997 | 10 | 4 |
| 1996 | 25 | 4 |

---

[49] Department of Homeland Security, Congressional Budget Justifications for Fiscal Year 2007, pg. CBP Construction 20.  Hereafter referred to as DHS FY2007 Justifications.

[50] FY2006 is an exception.  Within the conference report, $35 million was identified for the Southwest Border Fence and $35 million was identified for the construction of vehicle barriers and other border infrastructure in Tucson sector.  H.Rept. 109-241.

CRS-18

**Sources:** For FY2006-FY2007, the amounts appropriated for construction and tactical infrastructure were identified from the FY2007 DHS Congressional Budget Justifications.  For FY2004-FY2005, the amounts appropriated for construction and tactical infrastructure were identified from the FY2006 DHS Congressional Budget Justifications.  FY2003 construction and tactical infrastructure funding was identified from the FY2005 DHS Congressional Budget Justifications.  FY1996-FY2002 tactical infrastructure funding was identified in the FY2003 INS Congressional Budget Justifications; funding for FY1998-FY2000 includes San Diego fencing as well as fencing, light, and road projects in El Centro, Tucson, El Paso, and Marfa.  FY2001 and FY2002 construction funding identified from the FY2002 INS Congressional Budget Justifications.  FY2000 construction funding identified from the FY2001 INS Congressional Budget Justifications and H.Rept. 107-278.  FY1999 construction funding identified from P.L. 105-277.  FY1998 construction funding identified from P.L. 105-119.  FY1997 funding identified from P.L. 104-208.  FY1996 construction funding identified from P.L. 104-134.

**Note:** In FY2003 immigration inspections from the former INS, Customs inspections from the former customs service, and the USBP were merged to form the Bureau of Customs and Border Protection within DHS.  As a result of this the data for years prior to FY2003 may not be comparable with the data for FY2004 and after.

Under the current MOA, once CBP purchases the materials and acquires the land, the Corps of Engineers undertakes the engineering studies and provides the manpower and machinery that are used to install the fencing.  The actual manpower is typically provided by the State National Guard (the California National Guard, for example, constructed much of the San Diego fence), although occasionally the military, and sometimes the USBP, are involved in the construction.[51]  The Corps of Engineers funding comes from the Department of Defense Drug Interdiction and Counter-Drug Activities Account.  **Table 2** shows the funding for the "Southwest Border Fence" sub-account within this DOD Account, from FY1997 to FY2006.

### Table 2.  DOD Funding for the Southwest Border Fence
(millions of dollars)

| Fiscal Year | DOD Funding |
|:-----------:|:-----------:|
| 2006 | 3.5 |
| 2005 | N/A |
| 2004 | 4.0 |
| 2003 | 4.7 |
| 2002 | 5.0 |
| 2001 | 5.0 |
| 2000 | 4.0 |
| 1999 | 3.0 |
| 1998 | 4.0 |
| 1997 | 5.0 |

---

[51] From interviews with CBP, November 30, 2005 and September 13, 2006, and the Corps of Engineers, November 29, 2005.

**Source:** FY2006, H.Rept. 109-359; FY2005, H.Rept. 108-622; FY2004, H.Rept. 108-283; FY2004, H.Rept. 107-732; FY2002, H.Rept. 107-333; FY2002, H.Rept. 106-945; FY2000, H.Rept. 106-371, FY1999, H.Rept. 105-746; FY1998, H.Rept. 105-265; FY1997, H.Rept. 104-724.

**Notes:** FY2005 funding for the "Southwest Border Fence" sub-account was not identified in the Conference Report, H.Rept. 108-622. The House Committee had recommended $7 million for this sub-account in H.Rept. 108-553; while the Senate Committee had not recommended any funding for it in S.Rept. 108-284.

## Types of Fences and Barriers

The USBP currently uses three main types of barriers along the border: primary fencing immediately on the international border, Sandia fencing behind the primary fencing, and vehicle barriers meant to stop vehicles, but not people on foot, from traversing the border. While other forms of primary fencing, such as bollard fencing[52] and picket fencing,[53] have been constructed in limited areas,[54] to date the agency has largely focused on using the landing mat fencing as a primary fence and the Sandia fence as a secondary fence.

**Landing Mat Fencing.** Landing mat fencing is composed of army surplus carbon steel landing mats which were used to create landing strips during the Vietnam War. The landing mats form panels 12 feet long, 20 inches wide, and 1/4 inch thick, which are welded to steel pipes buried 8 feet deep every 6 feet along the fence. Each mile of fencing requires the use of 3,080 panels.[55] There are about 5 miles of surplus landing mat fencing remaining as of 2006.[56] According to the USBP, sites that feature landing mat fencing include the following USBP stations: Campo, CA; Yuma, AZ; Nogales, AZ; Naco, AZ; Douglas, AZ, and El Paso, TX.[57] There are 62 miles of landing mat fencing currently constructed.[58]

---

[52] Bollard fencing is comprised of vertical installations of solid concrete, metal spheres, or large posts, embedded into the ground at small enough intervals as to be impassable. Bollard fencing is difficult to compromise but expensive to install. See **Appendix I** for a depiction of bollard fencing.

[53] Picket fencing is comprised of metal stakes set sufficiently close together as to be impassable. See **Appendix I** for a depiction of picket fencing.

[54] Roughly 13 miles of these alternate forms of fencing have been constructed to date, according to an interview with CBP Congressional Affairs on September 13, 2006.

[55] U.S. Army Corps of Engineers, Construction Engineering Research Laboratories, *Engineering Life-Cycle Cost Comparison Study of Barrier Fencing Systems*, USACERL Technical Report 99/28, February 1999, p. 14. Hereafter referred to as Corps of Engineers Study.

[56] Interview with CBP Congressional Affairs, September 13, 2006.

[57] Telephone conversation with CBP, November 30, 2005.

[58] Interview with CBP Congressional Affairs, December 23, 2005.

    In a 1999 study, the Corps of Engineers predicted that construction costs for the landing mat fencing would range from $388,005 to $431,117 per mile.[59]  This estimate includes the cost of materials, despite the fact that the landing mat fencing constructed to date has been comprised of army-surplus panels acquired by CBP at no cost.  As previously noted, however, only about 5 miles of surplus landing mat fencing material remains available.  Maintenance costs per year could vary widely depending on the number of breaches the fence undergoes.  Low levels of damage to the fence would result in low annual repair costs, while a large number of breaches could result in stretches of fencing needing to be replaced.  Per mile, the Corps of Engineers estimated that yearly maintenance costs would probably range from $1,742 to $17,753.[60]  The Corps of Engineers noted that the net present value[61] of the fence after 25 years of operation, per mile, would range from $5.4 million and $8.3 million a mile depending on the amount of damage sustained by the fencing each year.

    **Sandia Secondary Fence.**  The secondary fence proposed by the Sandia study has only been constructed over roughly 9.5 miles of the 14 miles in the original plan due to environmental concerns voiced by the California Coastal Commission.  As previously discussed, P.L. 109-13 included language that will allow waiver of all legal requirements determined necessary by the Secretary of DHS for the expeditious construction of authorized barriers and only allows judicial review for constitutional claims.  On September 14, 2005, DHS announced it is applying its new waiver authority to complete the San Diego fence.[62]  However, construction has not begun on the remaining four miles of the San Diego fence because DHS is in the process of acquiring the necessary land.[63]  DHS is currently estimating that it will cost an additional $66 million to finish the San Diego fence, bringing overall costs for this 14 mile-long project to $127 million.  Additionally, DHS notes that it will use a mix

---

[59] The Corps of Engineers used 1997 dollars in their study.  For the purposes of this memorandum, the numbers predicted by the Corps have been adjusted to 2005 dollars using the Gross Domestic Product (GDP) deflator, available at [http://www1.jsc.nasa.gov/bu2/inflateGDP.html].  The actual predictions made by the Corps, in 1997 dollars, were $341,584 to $379,538 per mile for construction costs, and $1,534 to $15,629 per year in maintenance costs.

[60] Corps of Engineers Study, p. 21.

[61] Net present value is a term used by the Corps of Engineers in their life cycle costs analyses for construction projects.  It amortizes the future costs of a project and shows what the entire costs of the project will be.  In this case, these numbers represent 25 year predictions and have been adjusted from 1997 dollars to 2005 dollars using a GDP Deflator

[62] DHS published a Federal Register notice on September 22, 2005, declaring the waiver of, in their entirety: (1) the National Environmental Protection Act  (42 U.S.C. 4321 et seq.); (2) the Endangered Species Act (16 U.S.C. 1531 et seq.); (3) the Coastal Zone Management Act (16 U.S.C. 1451 et seq.); (4) the Federal Water Pollution Control Act (33 U.S.C. §§1251 et seq.); (5) the National Historic Preservation Act (16 U.S.C. §§470 et seq.); (6) the Migratory Bird Treaty Act (16 U.S.C. §§703 et seq.); (7) the Clean Air Act (42 U.S.C. §§7401 et seq.); and (8) the Administrative Procedure Act (5 U.S.C. §§551 et seq.).

[63] Telephone conversation with CBP, November 30, 2005.

of DOD resources and private contractors to finish the fence, and that the cost of using contractors is included in the request.[64]

The Sandia fence, as it has been constructed in the San Diego sector, is a secondary fence constructed behind the primary fence. Enough space is left between the two fences to accommodate an access road. The secondary fence is an angled two-piece fence. The fence is vertical up to ten feet high, and then extends out at an angle towards the climber. This prevents climbing by using gravity and the weight of the climber against them. The Corps of Engineers estimated that Sandia fencing costs per mile would range from $785,679 to $872,977 for construction and $953 to $7,628 per mile yearly for maintenance. Additionally, the Corps of Engineers study notes that the Sandia fence would possibly need to be replaced in the fifth year of operation and in every fourth year thereafter if man-made damage to the fence was "severe and ongoing." For this reason, in the study the Corps of Engineers noted that the net present value of the fence after 25 years of operation, per mile, would range from $11.1 million to $61.6 million.[65]

## Other Border Barriers: Vehicle Barriers

The USBP utilizes various different types of barriers to impede vehicles from crossing into the United States from Mexico. Some of these barriers are temporary and can be moved to different locations when needed, others are permanent barriers. The main purpose of vehicle barriers is to prevent smugglers from easily driving their vehicles across the border.

**Permanent Vehicle Barriers.** Permanent vehicle barriers, as their name suggests, are not designed to be moved but rather are permanent installations. Permanent vehicle barriers are typically steel posts, or bollards, that are excavated 5 feet deep and inserted into a poured concrete base. The posts alternate in above-ground height in order to dissuade individuals from forming a ramp over the barrier. They are spaced so as to allow foot and animal traffic but not vehicular traffic. The USBP recently began building permanent vehicle barriers in the Yuma sector, with a substantial stretch slated to be built along the Organ Pipe Cactus National Monument. When linked with the 30 miles of vehicle barriers built by the National Park Service, a USBP spokesman reportedly noted that the total 123 mile length of the project "will form the largest continuous physical barrier along the border in the nation."[66]

In the FY2007 DHS Congressional Budget Justifications, DHS notes that the Yuma vehicle barrier project would take until at least 2010 (and possibly longer) to

---

[64] DHS FY2007 Justifications. pg. CBP Construction 18.

[65] The numbers used by the Corps of Engineers were cited in 1997 dollars. They have been adjusted to 2005 dollars using the GDP deflator cited above. The actual costs per mile in the Corps of Engineers Study were: $691,680 to $768,533 for construction, and $839 to $6,715 for maintenance. Net Present Value after 25 years in 1997 dollars ranged from $9.73 million to $54.23 million. Corps of Engineer Study, p. 3 and p. 23.

[66] Jonathan Athens, "Officials say OK to Border Fence," YumaSun.com (July 20, 2005) available at [http://sun.yumasun.com/google/ysarchive14980.html].

CRS-22

complete if CBP continued to use the Corps of Engineers and other military personnel to construct the barriers. Instead, CBP proposes hiring commercial contractors to build 39 miles of vehicle barriers in the Yuma sector, or almost half of the project's 93 mile total.[67]  CBP is projecting that the project will be completed by FY2011, and that the overall project costs will be $116 million.[68]  This means that, overall, the project will cost roughly $1.25 million per mile.  The National Park Service has spent $11.1 million to construct 18 miles of permanent vehicle barriers in Organ Pipe Cactus National Monument, and has obligated, but not yet spent, an additional $6.6 million in FY2005 funding to complete the remaining 13 miles of the project.[69]

DHS currently has roughly 50 miles of vehicle barriers deployed along the border.[70]  Vehicle barriers have been used in the El Centro, CA, Yuma, AZ, Tucson, AZ, and El Paso, TX sectors.[71]

**Temporary Vehicle Barriers.** Temporary vehicle barriers are typically built from welded metal, such as railroad track, but can also be constructed from telephone poles or pipe.  These barriers are built so that they cannot be rolled or moved manually; they can only be moved with a forklift or a front-end loader.  They are usually built at USBP stations and transported to areas of high vehicle entry, where they are placed and chained together.[72]  The main advantage of the temporary vehicle barriers is their ability to be redeployed to different areas to address changes in smuggling patterns.  The main disadvantage of these barriers is that they are easier to compromise than permanent vehicle barriers.

# Legislation in the 109th Congress

The 109th Congress enacted three pieces of legislation concerning border fencing.  The REAL ID Act (P.L. 109-13), as previously noted, expanded DHS' waiver authority to expedite the construction of border fencing.  The Secure Fence Act of 2006 (P.L. 109-367) directed DHS to construct roughly 850 miles of border fencing. The FY2007 DHS Appropriations Act (P.L. 109-295) provided $1.2 billion

---

[67] DHS FY2007 Justifications, pg. CBP Construction-7.  CBP project length does not include the 30 miles of vehicle barriers maintained by the National Park Service.

[68] DHS FY2007 Justifications, pg. CBP Construction-18.  It is unclear why the project is predicted to take less time with contractors, and yet the overall completion date for the construction is predicted to be 2011.

[69] From the National Park Service, February 9, 2006.  The National Park Service notes that 30 miles of permanent vehicle barriers are being built at the Organ Pipe Cactus National Monument, and one mile is being built in the Coronado National Monument.

[70] Email correspondence with CBP Congressional affairs, December 23, 2005.

[71] Telephone conversation with CBP, November 30, 2005.

[72] U.S. Department of Justice, Immigration and Naturalization Service, *Final Environmental Assessment U.S. Border Patrol Temporary Vehicle Barriers Naco and Douglas, Arizona*, November 2002.

for the installation of fencing, infrastructure, and technology along the border. In addition to these Acts, a number of bills with fencing related provisions were passed by the House and the Senate. H.R. 4437 which would have directed DHS to construct roughly 850 miles of fencing along the border, was passed by the House on December 16, 2005. S. 2611, which called for 370 miles of fencing to be constructed, was passed by the Senate on May 25, 2006. S.Amdt. 4788 was added to the Department of Defense Appropriation bill, H.R. 5631, on August 2, 2006, and would have appropriated $1.8 billion to the National Guard for the construction of border fencing. H.R. 5631 was passed by the Senate on September 7, 2006; however, this fencing provision was stripped from the bill during conference.

P.L. 109-295, the FY2007 DHS Appropriations Act, provided $1.2 billion in funding for border fencing, infrastructure, and technology; combined with the supplemental appropriation provided by P.L. 109-234, the conferees noted that DHS would have $1.5 billion for border infrastructure construction in FY2007.[73] The conferees directed DHS to submit an expenditure plan for this funding within 60 days of the bill's enactment, and withheld $950 million of the funding until the plan is received and approved by the House and Senate Committees. However, the act did not place any restrictions on how DHS is to apportion this appropriation between fencing, infrastructure, and technology.

P.L. 109-367, the Secure Fence Act, originated in the House as H.R. 6061 and was passed on September 14, 2006. H.R. 6061 was passed by the Senate on September 29, 2006 and signed into law on October 26, 2006. The act directed DHS to construct two-layered reinforced fencing and additional physical barriers, roads, lighting, cameras, and sensors along roughly 850 miles[74] of the southern border. The five stretches of the border that DHS was required to fence were the 20 miles around Tecate, CA; from Calexico, CA to Douglas, AZ; from Columbus, NM to El Paso, TX; from Del Rio, TX to Eagle Pass, TX; and from Laredo, TX to Brownsville, TX. The act designated the roughly 370 mile portion of the fence between Calexico, CA, and Douglas, AZ, a priority area and directed DHS to ensure that "an interlocking surveillance camera system" is installed along this area by May 30, 2007, and that the fence is completed in this area by May 30, 2008. The Act also designated a 30-mile stretch around Laredo, TX, as a priority area and directed DHS to complete this fencing by December 31, 2008. This language was similar to that passed earlier by the House in H.R. 4437. The fencing provisions in H.R. 4437 were largely identical to those in H.R. 6061, except that H.R. 4437 featured earlier construction deadlines for the priority areas identified by one year for the Calexico, CA, to Douglas, AZ, stretch of fencing and by two years for the 30-mile stretch around Laredo, TX.

In addition to the bills discussed above, there were a number of bills in the 109th Congress that would have expanded the current fencing and other forms of barriers at the international land border. Some of these bills would have required fencing to be constructed along the entire southwest border, others would have identified

---

[73] For more information about DHS Appropriations, please refer to CRS Report RL33428, *Homeland Security Department: FY2007 Appropriations*, Jennifer Lake and Blas Nuñez-Neto, Coordinators.

[74] From CBP Congressional Affairs, September 25, 2006.

particular stretches of land which would receive fencing, and still others would have called for studies to determine whether fencing is a cost-effective way of securing the border.[75]

# Issues For Congress

Congress may consider a number of policy issues concerning the construction of barriers along the border, including, but not limited to, their effectiveness, overall costs compared with benefits, possible diplomatic ramifications, unintended consequences, and the locations in which they are to be constructed. Although these issues apply to all potential barriers at the border, due to the focus on border fencing in the current congressional debate, this section will focus its analysis on the potential policy issues surrounding the construction of fencing at the border.

## Effectiveness

Proponents of border fences point to the substantial reduction in apprehensions along the San Diego sector as tangible proof that fences succeed in reducing cross-border smuggling and migration where they are constructed.[76] Opponents attribute part of the decrease in apprehensions to the increase in manpower and resources in the sector and, pointing to the increase in apprehensions in less-populated sectors, contend that the fence only succeeds in re-routing unauthorized migration and not in stopping it.[77] The USBP, for its part, states that border fencing is a force multiplier because it allows its agents to focus enforcement actions in other areas. The USBP has also stated that the fencing constructed in urban areas has helped reroute unauthorized migration to less populated areas where its agents have a tactical advantage over border crossers. As previously noted, the number of USBP apprehensions in 2004 were almost identical to the number of apprehensions in 1992; the main difference is that while San Diego accounted for the majority of apprehensions in 1992, in 2004 Tucson and Yuma sectors accounted for the majority of apprehensions.

A possible issue for Congress concerns the overall effectiveness of border fencing, especially if it is not constructed across the entire border in question. In the

---

[75] Bills with border fencing language in the 109th Congress included: H.R. 418, H.R. 1268, H.R. 4083, H.R. 4312, H.R. 4313, H.R. 4437, H.R. 5067, H.R. 5456, H.R. 5631, H.R. 6061, S. 1916, S. 2049, S. 2061, S. 2117, S. 2368, S. 2377, S. 2454, S.Amdt. 3192, S. 2611, S. 2612, S. 3564, and S.Amdt. 4788.

[76] For the views of supporters of border fencing, refer to "We Need a Fence," available at [http://www.weneedafence.com/], last visited September 21, 2006, and Thomas Sowell, "Let's Get Our Terms Straight," available at [http://www.annistonstar.com/opinion/2006/as-insight-0402-0-6d01s3130.htm], last visited September 21, 2006.

[77] For the views of opponents of border fencing, refer to Eilene Zimmerman, "Against the Wall," *Salon,* December 12, 2005, available at [http://dir.salon.com/story/news/feature/2005/12/12/border_wall/index.html], last visited September 21, 2006, and Molly Ivins, "Another Brick in the Wall," available at [http://www.annistonstar.com/opinion/2006/as-insight-0402-0-6d01s3130.htm] last visited September 21, 2006.

limited urban areas where border fencing has been constructed, it has typically reduced apprehensions. However, there is also strong indication that the fencing, combined with added enforcement, has re-routed illegal immigrants to other less fortified areas of the border. Additionally, in the limited areas where fencing has been erected there have been numerous breaches of the border fencing and a number of tunnels discovered crossing underneath the fencing. It stands to reason that even if border fencing is constructed over a significant portion of the land border, the incidences of fence breaches and underground tunnels would increase. Possible policy options to address these issues could include mandating that border fencing be highly tamper-resistant or directing CBP to invest in tunnel-detection technologies.

## Costs

Because border fencing is a relatively new and limited phenomenon along the U.S.-Mexico border, there is a dearth of information concerning its overall costs and benefits. The Corps of Engineers study predicted that the costs of constructing a double layer fence consisting of primary fencing and Sandia fencing would range from $1.2 million to $1.3 million a mile, excluding the costs of land acquisition. The Corps of Engineers also predicted that the 25-year life cycle cost of the fence would range from $16.4 million to $70 million per mile depending on the amount of damage sustained by the fencing. If significant portions of the border were to be fenced, reducing the areas along which individuals could cross the border, it may stand to reason that the fencing will be subjected to more breaches and other attempts to compromise than the fencing that has already been constructed. This may mean that the costs of maintaining border fencing that is widely deployed in the future will be higher than they have been thus far for the limited deployment. The Corps estimates do not include the costs of acquiring the land or most labor costs, since construction would be done by DOD; these could well turn out to be significant expenses if private contractors are used to construct the fencing as per DHS' FY2007 Congressional Budget Justifications. The Congressional Budget Office (CBO) has estimated that border fencing would cost $3 million a mile to construct.[78] However, the CBO does not elaborate on what is included in that estimate. DHS predicts that the San Diego fence will have a total cost of $127 million for its 14-mile length when it is completed — roughly $9 million a mile. Construction of the first 9.5 miles of fencing cost $31 million, or roughly $3 million a mile, while construction of the last 4.5 miles of fencing is projected to cost $96 million, or roughly $21 million a mile. However these costs may be somewhat misleading due to the following factors: construction of the fence was delayed for an extended period of time; the remaining construction involves filling a relatively large gulch which may be more complex than the average stretch of border; and DHS is proposing to use private contractors to expedite the construction process which will increase the labor costs and thus the project costs.

---

[78] Congressional Budget Office, *Congressional Budget Office Cost Estimate: S. 2611 Comprehensive Immigration Reform Act of 2006*, May 16, 2006, p. 34. Available at [http://www.cbo.gov/ftpdocs/72xx/doc7208/s2611.pdf], visited August 2, 2006.

CRS-26

Some have argued that building fences on the border is too expensive and would consume funding that would be better spent on hiring additional agents or deploying additional technologies to the border.[79]  Others maintain that the costs of fencing are negligible compared to the costs of illegal immigration, and that fencing has been proven effective at decreasing illegal immigration in those areas where it has been deployed.[80]  The USBP has testified that "for border control, for border security, we need that appropriate mix. It's not about fences. It's not about Border Patrol agents. It's not about technology. It's about all of those things."[81]  At issue for Congress is how best to allocate scarce border security resources while safeguarding homeland security.  Does border fencing represent the best investment of border security funding, and what is the appropriate mix of border security resources?  How much will maintaining border fencing cost in the future, and which agency will be responsible for this maintenance?  Will using private contractors to expedite the construction of border fencing increase the costs?

## Fence Design

Congress mandated the design of the border fence in San Diego in IIRIRA. Many of the bills being considered in the 109th Congress that include fencing provisions also identify the kind of fencing — typically double or triple fencing — that should be constructed.  There are many different fence designs that could be deployed to the border, and each have their relative strengths and weaknesses. Concrete panels, for example, are among the more cost-effective solutions but USBP agents cannot see through this type of fencing; the USBP has testified about their preference for fencing that can be seen through, so as to identify the activity occurring on the Mexican side of the border and thus preserve their tactical advantage over potential border crossers, and to better avoid potential rockings[82] or other violent incidents.  Sandia fencing has been effective in San Diego and can be seen through, but is among the more expensive fencing options.  Bollard fencing has been effective

---

[79] See Jason Ackleson, "Fencing in Failure; Effective Border Control is Not Achieved by Building More Fences," *Immigration Policy in Focus*, Vol. 4, Issue 2, April 2005, available at [http://www.ailf.org/ipc/policy_reports_2005_fencinginfailure.asp], visited September 21, 2006.

[80] For a series of examples, see Parapundit, *Immigration Border Control Archives*, available at [http://www.parapundit.com/archives/cat_immigration_border_control.html], last visited August 20, 2006.

[81] Testimony of Kevin Stevens, Senior Associate Chief of Customs and Border Protection, in U.S. Congress, House Homeland Security Committee, Economic Security, Infrastructure Protection and Cyber Security Subcommittee, and House Government Reform Committee, Criminal Justice, Drug Policy, and Human Resources Subcommittee, *Fencing the Border: Construction Options and Strategic Placement*, 109th Cong., 2nd sess, July 20, 2006. Hereafter referred to as: *Fencing the Border* hearing, July 20, 2006.

[82] Rockings refer to the phenomenon of individuals on the Mexican side of the border hurling stones and other items over the fence at USBP agents and vehicles.  In the Yuma sector, for example, agents patrolling along the fence are deployed in armored vehicles known as "war-wagons" to protect themselves from rockings and other forms of assault, which are common in that area.  Information obtained during a CRS site visit to Yuma sector in August, 2005.

CRS-27

in its limited deployment and can also be seen through, but is also expensive to install and to maintain. Chain link fencing is relatively economical, but more easily compromised.[83] If fencing is to be constructed along the border, an issue concerns what kinds of fencing should be constructed in order to maximize its deterrent effect and its utility to the USBP while minimizing the costs associated with its construction and maintenance.

## Fence Location

The USBP has testified that border fencing is most effective for its operational purposes when deployed along urban areas.[84] In these areas, individuals crossing the border have a short distance to cover before disappearing into neighborhoods; once they have entered neighborhoods it is much more difficult for USBP agents to identify and apprehend unauthorized aliens. Additionally, from populated areas it is relatively easy for unauthorized aliens to find transportation into the interior. For these reasons, all of the border fencing constructed by the USBP to date has been built in urban areas abutting the border, such as San Diego, Nogales, and El Paso. In rural areas, the USBP has testified that it has a tactical advantage over border crossers because they must travel longer distances before reaching populated areas. According to CBP, fencing is manpower intensive because agents must continually check the fence for breaches and for illegal activity. This does not represent a problem in urban areas, because the USBP stations are typically located near the border in those areas. In some of the more rural areas of the border, where the nearest towns and USBP stations may be many miles away from the border, this would mean that agents would need to spend much of their working day commuting from the nearest USBP station to the fence location.[85] Additionally, because the border fencing constructed to date has been built along urban areas it has been relatively easy to house the individuals involved in its construction. If border fencing is extended into the more remote areas of the border, the costs of its construction may increase due to the need to bring the individuals and goods needed to build the fence to these areas for extended periods of time. Lastly, some areas of the border are prone to severe weather effects, such as flash flooding, that could compromise any permanent structures constructed there.

A very practical issue concerns what areas of the border should be fenced. Should fencing be restricted to urban or semi-urban areas in order to give the USBP a tactical advantage over border crossers, or should fencing be constructed along any geographical area of the border that features large numbers of unauthorized immigration? In rural areas, should fencing be limited to areas of high illegal entry in order to impede individuals from crossing the border, or should fencing be constructed as a deterrent in any area, even those featuring low levels of illegal entry? Should fencing be deployed in sectors where the distance between the nearest USBP station and the fence requires agents to spend most of their day commuting? Should fencing be deployed to the northern border as well as the southwest border? Will

---

[83] *Fencing the Border* hearing, July 20, 2006.

[84] *Fencing the Border* hearing, July 20, 2006.

[85] Interview with CBP Congressional Affairs, September 13, 2006.

building fencing along more remote or environmentally harsher areas of the border increase the construction costs?

## Land Acquisition

There are a number of issues associated with the acquisition of the land that would be required for border fencing. Much of the land along the California and Arizona border is owned by the federal government; however most of the land along the Texas border is owned by private individuals. What will the costs of acquiring the land to construct border fencing be, and have these costs been factored into estimates of border fencing costs? Will eminent domain be used to confiscate land from individuals who do not wish to have fencing built on their lands?

The reservations made by Presidents Roosevelt and Taft may have kept substantial parcels of land within the federal domain, depending mostly on the amount of public lands at the time and valid existing claims. CRS was not able to determine how many valid claims and land patents exist, if any, or the number of private developments that may be encroaching on the reservations. Nonetheless, it appears that only those who qualify under an exception or were provided land by statute have valid fee title claims within the reserved strip. If lands were mistakenly granted, sold, or transferred to private parties, these conveyances could be void because, as a general rule, rights can not be acquired in lands actually embraced in a legally valid withdrawal.[86] Compensation under the Fifth Amendment for private landowners may not be owed if private claims are not legitimate. Because the proclamations do not cite any supporting authority, some question the President's implied or inherent constitutional powers to issue them.[87] Others may argue that they conflict with the exclusive mandate given Congress by the Property Clause of the Constitution to regulate and dispose of federal property.[88] An issue for Congress may include whether these proclamations are, in fact, valid, and if so what actions are appropriate to take in the instances where individuals own land within the reservation's boundaries. Assuming the proclamations are valid, the reservations

---

[86] Charles F. Wheatley, *Study of Withdrawals and Reservations of Public Domain Lands,* at Vol. III, at A-7 (1969); *see also* Steel v. Smelting Co., 106 U.S. 447, 453 (1882) (observing that the patent, like the deed of an individual, is inoperative if the government never owned the property, or had previously conveyed it, or had reserved it from sale); United States v. Fennell, 381 F. Supp. 2d 1300 (D. N.M. 2005). *Cf.* United States v. California, 332 U.S. 19, 39 (1947) (finding the federal government's paramount rights in the three-mile belt along the California coast were not lost by reason of the conduct of its agents or the acquiescence of such agents in California's claim of title).

[87] See United States v. Midwest Oil, 236 U.S. 459, 471 (1915) (upholding the President's authority to make land withdrawals on the basis of implied acquiescence in such withdrawals by Congress), *repealed by* 43 U.S.C. §1714. The President's constitutional inherent withdrawal power derived from three theories — residual Executive power, stewardship, and constitutional necessity. See Wheatley, *Study of Withdrawals,* at Vol I, at 134. In *Midwest Oil*, the Court noted that by 1910, the President had implemented at least 252 executive orders making reservations for useful, though non-statutory purposes. Id. at 471.

[88] U.S. CONST. Art. IV, §3, cl.2.

may provide the first sixty-feet of necessary space for fence construction in many areas. However, the two layer fencing constructed to date includes 150 feet of land between its layers. An issue for Congress may involve whether to confine border fencing to the 60 feet easement reserved by the proclamations, or whether to acquire the additional 90 feet of land that would be needed to construct Sandia-style fencing.

A corollary issue may involve DHS' authority to construct border fencing along tribal lands. The Arizona desert along the Tohono O'odham reservation has become one of the most heavily trafficked border areas in the country, and the USBP has been restricted in its operations in the reservation due to tribal concerns.[89] The Tohono O'odham have reportedly vowed to fight the construction of fencing on tribe-owned land, citing environmental and cultural concerns.[90] Under current law, the Secretary of the Interior may grant rights-of-way over and across tribal land, provided the Secretary receives prior written consent of the tribe.[91] If the tribe does not consent, DHS may look to its new waiver authority to construct a fence across tribal lands. It is unclear, however, whether the expanded waiver that was given to the Secretary of DHS would allow (or was intended to allow) the Department to override the statutory authority given to another federal agency. Ultimately, federal government holds all Indian lands in trust, and Congress may take such lands for public purposes, as long as it provides just compensation as required by the Fifth Amendment.[92]

## Diplomatic Ramifications

The governments of Mexico and Canada have both voiced concern about the United States constructing barriers along the international border. Mexican President Vicente Fox has come out strongly against the construction of border barriers on numerous occasions, stating his belief that these projects isolate the two nations, create frustration and misunderstandings, and do not solve the underlying problems that lead individuals to enter the United States illegally. Mexican Press Secretary Rubén Aguilar Valenzuela stated his government's belief that "history has also taught us that a wall is never the solution to problems and that all walls eventually get torn down."[93] The Mexican government has reportedly forwarded numerous diplomatic notes to the White House registering its complaints against the possible expansion of border fencing. The Canadian government has also reportedly voiced concern over language that was inserted into H.R. 4437 that would require a study of fencing

---

[89] The USBP has been prohibited from building permanent camera installations and from paving access roads leading to and along the border. Information obtained during a CRS site-visit to the Tohono O'odham reservation, August 2005.

[90] Randal Archibald, "Border Fence Must Skirt Objections From Arizona Tribe," *New York Times*, September 20, 2006.

[91] 25 U.S.C. §324.

[92] United States v. Sioux Nation of Indians, 448 U.S. 371 (1980).

[93] Mexican Government Press Release, "Crecimiento con Calidad: El Presidente Vicente Fox encabezará la cena de gala de la XI Cumbre Anual Hemispheria San Pedro 2005: Rubén Aguilar, Vocero de Presidencia," May 12, 2005. Translation by CRS. Available at [http://www.presidencia.gob.mx/actividades/crecimiento/?contenido=18195&pagina=31], visited August 20, 2006.

options along the northern border, citing the impracticality of fencing the northen border and the fact that the U.S. government has never discussed such a plan with Canadian authorities.[94]    Deputy Assistant Secretary for Immigration and Customs Enforcement John P. Clark reportedly stated during Congressional testimony that the proposed expansion of border fencing "harkens back to the Chinese wall and the Berlin Wall, not the message we want to send to the Mexican government, the Canadian government, and the rest of the world."[95]   There are a number of possible issues for Congress to consider involving the potential diplomatic ramifications of constructing barriers along the border: Do the gains in border security outweigh the risk of alienating Mexico and Canada?    Should the Mexican or Canadian government's opinions or wishes be taken into account when border fencing is concerned?  Given the need to coordinate intelligence and law enforcement activities at the border, should maintaining cordial working relationships with Mexico and Canada take precedence over sealing the border with physical barriers?

## Environmental Considerations

There has been a great deal of debate around the environmental impacts of border fencing.  The addition of fences along the southwest border, according to some, could harm sensitive environments, adversely affect critical habitat for protected species, and block migratory patterns for animals.  Indeed, these concerns were among the many voiced by the CCC in its objection to the completion of the San Diego border fence.    After immigration officials, the CCC, and the environmental community could not agree on a fence design, Congress passed waiver language in the REAL ID Act that allows the Secretary of DHS to waive all "legal requirements" necessary to ensure expeditious construction of the barriers and roads in the vicinity of the U.S. border.  The Secretary used this provision to waive a number of primarily environmental laws (See **Appendix I**) in order to complete the San Diego border fence.   DHS maintains, however, that it will follow "best management practices" throughout construction and will be "mindful of the environmental impacts" that might occur.[96]   Nonetheless, the Secretary's broad waiver authority has many worried about potential fence projects along other areas of the southwest border.  Some argue that a fence along the Arizona border could be especially destructive to endangered jaguar and Sonoran desert pronghorn populations that usually roam this area because it would fragment native habitat and ultimately reduce gene pools.[97]   Officials from the U.S. Fish and Wildlife Service, however, have said that it is too early to speculate about the potential impact of a

---

[94] Beth Gorham, "Canada Balks at U.S. Plan for Border Fence," *Canadian Press*, December 17, 2005.  Available at  [http://www.canada.com/nationalpost/story.html?id=6c13f3fd -bdfb-4346-99ef-3f01f870c801&k=60592&p=1], visited August 20, 2006.

[95] Eunice Moscoso, "Border Fence Would Cost Millions, Not Work Critics Say," *Cox News Service*, November 9, 2005.

[96]  Eilene Zimmerman, SFGate.com, *Border protections imperil environment — Last wilderness area south of San Diego could be damaged*, Feb. 27, 2006, available at [http://www.sfgate.com/cgi-bin/article.cgi?file=/c/a/2006/02/27/MNG2GHFBFL1.DTL &type=printable].

[97] Id; Defenders of Wildlife, *On the Line*, pp. 16-19.

border fence on wildlife migration.[98]  Others note that unauthorized migration negatively impacts the environment, and believe that the construction of fencing could actually have a beneficial impact for protected lands if it reduces the number of unauthorized migrants traversing through environmentally sensitive lands.

As Congress debates immigration reform and the addition of new border fences, Members will undoubtedly be called upon to balance national security interests with environmental protections.  Because there does not appear to be a clear consensus on the environmental impacts of border fencing, there is some interest in a study of the issue.[99]  The effects of the San Diego border fence, for example, may help scientists better understand and predict potential environmental consequences elsewhere. Should fencing be expanded along the southwest border, Congress may be interested in environmentally sensitive alternatives to normal fencing and whether they can effectively limit illegitimate cross-border traffic.  Some argue that vehicle barriers may be less intrusive because they allow unimpeded wildlife movement but can limit damaging vehicular traffic.[100]  Congress may also call on the Secretary to cooperate or coordinate certain activities with the environmental community, since the Secretary could waive many environmental requirements.[101]

## Legal Considerations

The building of barriers along the international border has raised a number of legal issues.  Most stem from requirements posed by environmental laws.  Before the passage of the REAL ID Act waiver provision, for example, the Sierra Club and other environmental groups challenged, under the National Environmental Policy Act, the federal government's plan to complete the San Diego border fence.[102]  The lawsuit alleged, among other things, that the government's final environmental impact statement did not address the entire 14-mile border infrastructure system and inadequately addressed the parts that were evaluated.  After Secretary Chertoff exercised the waiver authority, the court dismissed the environmentalists' lawsuit in December 2005.  The groups will reportedly file an entirely new lawsuit arguing that the government must still comply with certain laws, including the Clean Water Act

---

[98] Chuck Mueller, Dailybulletin.com, *Experts say border fence would hurt bighorn sheep* (Aug. 14, 2006) available at [http://www.dailybulletin.com/news/ci_4177153]. Reports also indicate that a constant flow of illegal aliens into the native habitat for these animals interferes with their use of certain lands and survival. See Defenders of Wildlife, *On the Line*, p. 18.

[99] Indeed, §129 of S. 2611 calls on the Secretaries of the Interior, Agriculture, Defense, and Commerce, and the Administrator of the EPA to assess the environmental impacts, including the impact on zoning, global climate change, ozone depletion, biodiversity loss, and transboundary pollution, of physical barriers along the southern international land and maritime borders.

[100] Defenders of Wildlife, *On the Line*, p. 35; Anne Minard, National Geographic News, *U.S. Immigration Law Could Harm Desert Animals, Critics Say*, (Mar. 31, 2006) available at [http://news.nationalgeographic.com/news/2006/03/0331_060331_desert_fence.html].

[101] See generally, Defenders of Wildlife, *On the Line.*

[102] Sierra Club v. Ashcroft, No. 04-CV-272, (S.D. Cal. Feb. 10, 2004).

CRS-32

and Clean Air Act and contend that the waiver extends beyond Congress's authority.[103]

With respect to the Secretary's use of the waiver authority, the provision allows legal redress for only constitutional violations and limits review to the district courts of the United States. In essence, an individual could not sue DHS for bypassing the environmental impact statement requirements of the National Environmental Policy Act (a law it has waived) because that would be a statutory violation but could sue for the taking of property without "just compensation" as provided by the Fifth Amendment. Should a district court make a ruling, that decision can only be appealed to the Supreme Court — i.e., there is no appellate court review. Appeal directly from a district court to the Supreme Court rarely appears in law[104] and according to some scholars, has been a "failure."[105] Past experiences, for example, demonstrated that the cases took up a disproportionate amount of time for oral argument and came to the Court on inadequate records.[106] Still, when Congress determines a particular class of cases to be of great public import, it is not unprecedented for it to require prompt review in the highest court of the land.

## Unintended Consequences

There is considerable evidence that the USBP's historical strategy of "Prevention through Deterrence," whereby agents and resources including border fencing and other barriers have been concentrated along urban areas and areas traditionally featuring high levels of illegal entry, has succeeded in changing the flow of illegal migration. While San Diego and El Paso were historically the two sectors that featured the most apprehensions and the highest levels of illegal immigration, since the mid-1990s and the advent of Operations Gatekeeper and Hold the Line in those sectors, the more remote geographical areas of the Arizona border have become the hot-spots for illegal migration into the United States. One unintended consequence of this enforcement posture and the shift in migration patterns has been an increase in the number of migrant deaths each year; on average 200 migrants died each year in the early 1990s, compared with 472 migrant deaths in 2005. Another unintended consequence of this enforcement posture may have been a relative increase, compared to the national average, in crime along the border in these more-remote regions. While crime rates in San Diego, CA and El Paso, TX, have declined over the past 15 years, the reduction in crime rates along the more rural areas of the

---

[103] Rob Davis, Voice of San Diego.com, *The Border's Pending Fight*, May 5, 2006, available at [http://www.ccis-ucsd.org/news/vosd-5-5-06.pdf#search=%22the%20borders%20pending%20fight%22].

[104] Laws that allow a district court ruling to be appealed directly to the Supreme Court include 13 U.S.C. §141 (illegal use of census data); 15 U.S.C. §29 (Sherman Act violations); 18 U.S.C. §700 (flag desecration violations); 42 U.S.C. §1971 (voting rights violations); and 42 U.S.C. §2000a-5 (civil rights violations).

[105] Charles Alan Wright & Mary Kay Kane, Law of Federal Courts, Ch. 12, §105 (6th ed. 2002).

[106] Id. Moreover, 28 U.S.C. §1254 allows the Court to bypass the courts of appeals by granting certiorari before judgement in those courts.

CRS-33

border have lagged behind the national trends. Another unintended consequence of the border fencing has been the proliferation of tunnels dug underneath the border. In San Diego, where the double-layer Sandia fencing has been constructed, smugglers have dug a number of tunnels underneath the border fence. One of these tunnels was almost a kilometer long and was built from reinforced concrete — evidence of a rather sophisticated smuggling operation.

A possible issue for Congress to consider as it debates expanding the existing border fencing concerns what the unintended consequences of this expansion could be. Given the re-routing of migration flows that have already occurred, are DHS and the relevant border communities prepared to handle the increased flow of illegal migration to non-reinforced areas? Is DHS prepared to deal with an increase in the phenomenon of cross-border tunnels and other attempts to defeat the purpose of the fencing? What will the impact on crime rates be along the unreinforced areas of the border? Will USBP agents be required to spend some of their patrolling time guarding the fence?

CRS-34

# Appendix I: Examples of USBP Border Fencing



*Bollard fence*

*Landing mat fence*

*Picket or decorative fence*

*Sandia fence*

**Source:** U.S. Department of Justice, Immigration and Naturalization Service, *Environmental Assessment for Infrastructure Within U.S. Border Patrol Naco-Douglas Corridor Cochise County, Arizona*, August, 2000, p. 1-13.

CRS-35

# Appendix II: The San Diego Fence



**Source:** U.S. Department of Homeland Security; *Environmental Impact Statement for the Completion of the 14-Mile Border Infrastructure System San Diego, California*, July 2003.

CRS-36

# Appendix III: Permanent Vehicle Barrier Schematic



**Source:** U.S. Department of the Interior, National Park Service, *Proposed Vehicle Barrier Environmental Assessment*, April, 2003.

CRS-37

## Appendix IV: Permanent Vehicle Barriers



**Source:** CBP Congressional Affairs.

CRS-38

# Appendix V: Data From Figure 4

| | FY1992 | FY1993 | FY1994 | FY1995 | FY1996 | FY1997 | FY1998 | FY1999 | FY2000 | FY2001 | FY2002 | FY2003 | FY2004 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Other San Diego Sector Stations | 204,456 | 210,129 | 155,386 | 262,505 | 297,423 | 189,321 | 160,781 | 140,640 | 113,866 | 85,815 | 87,195 | 96,752 | 119,293 |
| Chula Vista Station | 158,952 | 156,273 | 107,872 | 141,096 | 111,413 | 67,804 | 72,648 | 27,085 | 19,453 | 9,627 | 3,080 | 4,545 | 9,923 |
| Imperial Beach Station | 202,173 | 165,287 | 186,894 | 120,630 | 74,979 | 27,865 | 15,832 | 15,974 | 19,815 | 15,480 | 11,405 | 10,218 | 9,112 |
| Tucson | 71,036 | 92,639 | 139,473 | 227,529 | 305,348 | 272,397 | 387,406 | 470,449 | 616,346 | 449,675 | 333,648 | 347,263 | 490,827 |

**Source:** CRS Presentation of CBP data.

CRS-39

# Appendix VI.
# Legal Requirements Waived by DHS for the Construction of the San Diego Border Fence.

| Laws Waived | General Requirements |
|---|---|
| National Environmental Policy Act (NEPA) 16 U.S.C. §§ 4321 *et seq.* | Under NEPA, an environmental impact statement must be prepared for "every recommendation or report on proposals for legislation and other major federal actions significantly affecting the quality of the human environment." If an agency is uncertain whether an action's impacts on the environment will be significant, it usually prepares an environmental assessment (EA). An EA is carried out to clarify issues and determine the extent of an action's environmental effects. |
| Endangered Species Act (ESA) 16 U.S.C. §§ 1531 *et seq.* | Section 7 of the ESA mandates that each federal agency consult with the Fish and Wildlife Service (FWS) or National Marine Fishery Services (NMFS), depending on the listed species involved, to ensure that its actions are "not likely to jeopardize the continued existence of any endangered species or threatened species, or result in the destruction or adverse modification of" designated critical habitat. Once consulted, FWS or NMFS must, if listed endangered species might be affected, prepare a *biological opinion* to determine the actual impact of the proposed action. |
| Costal Zone Management Act (CZMA) 16 U.S.C. §§ 1451 *et seq.* | The CZMA requires federal agency activity within or outside the coastal zone that affects any land or water use or natural resource of the coastal zone to be carried out in a manner that is consistent to the maximum extent practicable with the policies of an approved state management program. The federal agency must submit a *consistency determination* to the applicable state agency. |
| Federal Water Pollution Control Act (Clean Water Act) 33 U.S.C. §§ 1251 *et seq.* | Section 404 of the Clean Water Act establishes a program to regulate the discharge of dredged or fill material into waters of the United States, including wetlands. Section 404 requires a permit before dredged or fill material may be discharged into waters of the United States, unless the activity is exempt. |

CRS-40

| Laws Waived | General Requirements |
|---|---|
| National Environmental Policy Act (NEPA) 16 U.S.C. §§ 4321 *et seq.* | Under NEPA, an environmental impact statement must be prepared for "every recommendation or report on proposals for legislation and other major federal actions significantly affecting the quality of the human environment." If an agency is uncertain whether an action's impacts on the environment will be significant, it usually prepares an environmental assessment (EA). An EA is carried out to clarify issues and determine the extent of an action's environmental effects. |
| National Historic Preservation Act (NHPA) 16 U.S.C. §§ 470 *et seq.* | In accordance with the NHPA and its implementing regulations, 36 CFR Part 800, sites determined to be eligible for inclusion in the National Register of Historic Places must be protected, either through avoidance or other mitigative action, from direct and indirect impacts. |
| Migratory Bird Treaty Act (MTBA) 16 U.S.C. §§ 703 *et seq.* | Section 2 of the MTBA sets out the types of prohibited conduct and states: "Unless and except as permitted by regulations ... it shall be unlawful at any time, by any means, or in any manner, to pursue, hunt, take, capture, kill, attempt to do these acts, [or] possess ... any migratory bird, [or] any part, nest, or eggs of any such bird...." |
| Clean Air Act (CAA) 42 U.S.C. §§ 7401 *et seq.* | The Clean Air Act requires the Environmental Protection Agency to establish minimum national standards for air quality, known as National Ambient Air Quality Standards (NAAQS), and assigns primary responsibility to the states to assure compliance with the standards. Areas not meeting the standards, referred to as "nonattainment areas," are required to implement specified air pollution control measures. Federal actions located in NAAQS nonattainment areas must comply with the federal general air conformity rule set forth by the CAA and codified in 40 CFR Part 51. The general conformity rule requires federal agencies to ensure that actions undertaken in nonattainment or maintenance areas are consistent with the applicable state plan.  The states administer the CAA through a comprehensive permitting program. |

CRS-41

| Laws Waived | General Requirements |
|---|---|
| National Environmental Policy Act (NEPA) 16 U.S.C. §§ 4321 *et seq.* | Under NEPA, an environmental impact statement must be prepared for "every recommendation or report on proposals for legislation and other major federal actions significantly affecting the quality of the human environment." If an agency is uncertain whether an action's impacts on the environment will be significant, it usually prepares an environmental assessment (EA). An EA is carried out to clarify issues and determine the extent of an action's environmental effects. |
| Administrative Procedure Act (APA) 5 U.S.C. §§ 551 *et seq.* | The APA establishes the general procedures that an agency must follow when promulgating a legislative rule. An agency must publish a notice of proposed rulemaking in the Federal Register, afford interested persons an opportunity to participate in the proceeding through the submission of written comments or, at the discretion of the agency, by oral presentation, and when consideration of the matter is completed, incorporate in the rules adopted "a concise general statement of their basis and purpose." A final rule must be published in the Federal Register "not less than 30 days before its effective date." |