**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| DEFENDERS OF WILDLIFE and SIERRA CLUB | ) ) ) ) | |
| Plaintiffs | ) ) ) | |
| v. | ) ) | Civil Action No. 1:07-CV-01801 (ESH) |
| MICHAEL CHERTOFF, Secretary U.S. Department of Homeland Security <u>et al.</u> | ) ) ) ) | |
| Defendants. | ) ) ) | |

**REPLY MEMORANDUM IN SUPPORT OF
DEFENDANTS' RENEWED MOTION TO DISMISS**

## I.    INTRODUCTION

The Secretary of the Department of Homeland Security ("the Secretary") has determined

that the area in the vicinity of the United States border approximately 4.75 miles west of Naco,

Arizona to the western boundary of the San Pedro Riparian National Conservation Area is an

area of high illegal entry into the United States.  <u>See</u> 72 Fed. Reg. 60870 (October 26, 2007).  For

Fiscal Year 2007 alone, U.S. Customs and Border Protection documented "over 21,000 illegal

entries" and "over 19,000 apprehensions" of undocumented aliens in the San Pedro area.  Decl.

of Jayson P. Ahearn, Paper No. 5, Ex. C,  p. 11.  Further, a 2004 study conducted by the United

States General Accounting Office found:

1

Illegal border activity on federal lands not only threatens people, but endangered species and the land, itself.  Illegal aliens and smugglers have created hundreds of new trails and roads while crossing borderlands [and] have destroyed cactus and other sensitive vegetation that can take decades to recover, including habitat for endangered species...Tons of trash and human waste are left behind each year, affecting wildlife, vegetation, and water quality...[I]llegal border crossers left behind close to 4,500 abandoned vehicles in fiscal year 2002 and an estimated 4 million pounds of trash each year as they crossed over the lands. [A tribal police department] removed over 7,000 [abandoned UDA] vehicles in 2003.

GAO Report to Congressional Requesters, Paper No. 5, Ex. D, p. 16.

To ensure the expeditious construction of barriers and roads in the San Pedro area, the Secretary of the U.S. Department of Homeland Security ("the Secretary"), pursuant to an express grant of authority contained in section 102(c) of the Illegal Immigration Reform and Immigrant Responsibilities Act of 1996 ("IIRIRA"), as amended, Pub. L. No. 109-13, 119 Stat. 231, 8 U.S.C. § 1103 Note ("section 102" or "the Waiver Legislation"), waived the applicability of certain statutes, including those which served as the basis for Plaintiffs' initial complaint.  See 72 Fed. Reg. 60870 (October 26, 2007).  In response to the Secretary's waiver, Plaintiffs have amended their complaint to include a challenge to the constitutionality of the Waiver Legislation, alleging that the Legislation constitutes an impermissible delegation of legislative authority to the Executive Branch.

Plaintiffs' base their constitutional argument primarily on the Supreme Court's decision in Clinton v. New York, 524 U.S. 417 (1998), in which the Court ruled that Congress's grant to the President of a broad line item veto power constituted an unconstitutional delegation.  Section 102's waiver provision, however, differs from the cancellation provision contained in the Line Item Veto Act in both form and effect.  Further, the Supreme Court has explicitly held that in areas in which the Executive Branch maintains significant independent constitutional authority,

2

delegations may be particularly broad. Loving v. U.S., 748 U.S. 772 (1996). Here, the waiver authority exists in a statutory scheme addressing matters of immigration and national security, areas which fall within the Executive Branch's independent constitutional domain. Plaintiffs reliance on Clinton, therefore, is misplaced.

In delegating powers to the Executive Branch, Congress need only identify an "intelligible principle." Whitman v. Am. Trucking Ass'n, 531 U.S. 457, 472 (2001). The Supreme Court has upheld as sufficiently intelligible such sweeping delegations as action taken in the general "public interest, convenience or necessity," Nat'l Broadcasting Co. v. U.S., 319 U.S. 190, 216 (1943), or that is "requisite to protect the public health," Am. Trucking Ass'n, 531 U.S. at 473-74, or "necessary to avoid an imminent hazard to the public safety." Touby v. U.S., 500 U.S. 160, 165 (1991). The standard that Congress identified in the Waiver Legislation, "necessary to ensure expeditious construction of barriers and roads," IIRIRA, § 102(c)(1), fits well within the scope of constitutionality established by Supreme Court precedent. The Waiver Legislation satisfies the Supreme Court's intelligible principle test and must be upheld.

## II.     STATUTORY BACKGROUND

### A. IIRIRA

The Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104-208, 8 U.S.C. § 1103 Note, as originally enacted, reflected a concerted effort by Congress to halt illegal immigration. Section 102(a) of IIRIRA required "the Attorney General . . . [to] take such actions as may be necessary to install additional physical barriers and roads (including the removal of obstacles to detection of illegal entrants) in the vicinity of the United States border to deter illegal crossings in areas of high illegal entry into the United States." Id. § 102(a). Section

3

102(c) of IIRIRA, as originally enacted, authorized the Attorney General to waive the

Endangered Species Act of 1973 and the National Environmental Policy Act of 1969 when he

determined such waiver was "necessary to ensure expeditious construction of the barriers and

roads under this section." Id. § 102(c).

### B.  The Homeland Security Act of 2002

Responsibility for the construction of border barriers transferred from the Attorney

General to the Department of Homeland Security with passage of the Homeland Security Act of

2002, Pub. L. No. 107-296; see also Pub. L. No. 108-7, Division L, § 105.  The Act essentially

created DHS from other departments, abolished INS, and transferred Border Patrol functions to

the Under Secretary for Border and Transportation Security at DHS.  See 6 U.S.C. §§ 251, 291.

The Act also amended IIRIRA to state that the Secretary of DHS has the power and duty to

control and guard U.S. borders against illegal entry.  8 U.S.C. §1103(a)(5).

### C.  The REAL ID Act of 2005

In 2005, as part of the REAL ID Act, Pub. L. No. 109-13, 119 Stat. 231, 8 U.S.C. § 1103

Note, Congress substantially broadened the IIRIRA waiver provision to provide the Secretary of

DHS authority "notwithstanding any other provision of law" to "waive all legal requirements"

that he determines, in his "sole discretion," are "necessary to ensure expeditious construction" of

the barriers and roads authorized under Section 102 of IIRIRA.  See Id. § 102(c)(1).  The Waiver

Legislation, as amended by the REAL ID Act,  makes waivers effective upon publication in the

Federal Register and limits challenges to alleged constitutional violations.  Id. § 102(c)(1), (2).

### D.  The Secure Fence Act of 2006

With the enactment of the Secure Fence Act of 2006, Congress revised section 102(b) of

IIRIRA to clarify that the barriers authorized under section 102(b) consisted of not only fencing, but also "additional physical barriers, roads, lighting, cameras, and sensors." <u>Id</u>.  The Secure Fence Act also mandated that the Secretary take all actions that he deems necessary and appropriate to "achieve and maintain operational control" over the entire international land and maritime border of the United States.  P.L. 109-367 Sec. 2, 120 Stat. 2638, 8 U.S.C. 1701 Note.

III.    **ARGUMENT**

   A. <u>**The Waiver Legislation Does Not Authorize Legislative  Repeal or Amendment**</u>

   Plaintiffs first argue that the Waiver Legislation improperly authorizes the Executive Branch to repeal or amend laws in violation of the procedural requirements of Article I of the Constitution.  Opp'n 9.  It does not.  Rather, section 102 grants the Secretary discretion to waive legal requirements that he "determines necessary to ensure expeditious construction of the barriers and roads under this section."  IIRIRA, § 102(c).  The statutory provisions made inapplicable to the construction of the San Pedro barrier by the Secretary's exercise of his waiver authority remain law and are fully applicable in all other relevant contexts.

   In making their argument, Plaintiffs equate section 102's waiver provision with the cancellation provision of the Line Item Veto Act, which the Supreme Court rejected as an unconstitutional violation of the Presentment Clause.  <u>Clinton v. City of New York</u>, 524 U.S. 417, 449 (1998) (holding that the Line Item Veto Act allowed for amendment of statutes without the required bicameral action by Congress and presentment to the President).  Plaintiffs confuse waiver with amendment and repeal.  The Line Item Veto Act provided the President with the authority to "cancel in whole" certain provisions of legislation he had recently signed into law.  <u>See</u> 2 U.S.C. § 691(a) (1994 ed., Supp. II).  Items subjected to presidential cancellation no longer

5

had "legal force or effect" under any circumstance.  Clinton, 524 U.S. at 437 (citing 2 U.S.C. §§ 691e(4)(B)-(C) (1994 ed., Supp. II)).  Essentially, the Line Item Veto Act "[gave] the President the unilateral power to change the text of duly enacted statutes."  Id. at 447 (finding that this power was the "critical" difference between the Line Item Veto Act and its predecessors) (emphasis added).  The Clinton Court characterized the permanent alteration of statutory text by the President as a "repeal" of such text and rejected the cancellation provision as providing repeal authority which failed to conform with the procedural requirements of Article I.  Id. at 438 (citing INS v. Chadha, 462 919, 954 (1983) ("Repeal of statutes, no less than enactment, must conform with Art. I.")).

Unlike items subjected to presidential cancellation under the Line Item Veto Act, here, the statutes waived by the Secretary to effect the construction of the San Pedro barrier have not been repealed.  The statutes remain valid law and are fully applicable outside the limited setting of the construction of a barrier "in the vicinity of the United States border from approximately 4.75 miles west of the Naco, Arizona Port of Entry to the western boundary of the San Pedro Riparian National Conservation Area."  72 Fed. Reg. 60870 (October 26, 2007).  Thus, unlike those items subject to presidential cancellation in accordance with the Line Item Veto Act, the statutes waived in accordance with the authority granted in section 102 are neither repealed nor amended.

The United States District Court for the District of Columbia has recently distinguished the cancellation authority rejected by the Supreme Court in Clinton from statutory waiver authority granted to the Executive Branch.  See Jacobsen v. Oliver, 451 F. Supp. 2d 181, 193 (D.D.C. 2006).  In Jacobsen, the Court dismissed a separation of powers challenge to the wavier

6

provision contained in section 117(d) of the Foreign Sovereign Immunities Act (FSIA).  451 F.

Supp. 2d at 193.  Section 117(d) provided the President with the authority to "waive the

requirements of this section in the interest of national security."  Pub. L. No. 105-277, 112 Stat.

2681 (1998).  In upholding the validity of the FSIA waiver provision, the Court adopted the

reasoning of Judge (now Chief Justice) Roberts in his analysis of a similar provision contained in

the Emergency Wartime Supplemental Appropriations Act (EWSAA).[1]  Id. (citing Acree v. Iraq,

370 F.3d 41, 64 n.3 (D.C. Cir. 2004) (ROBERTS, J. concurring)).  In Acree, Judge Roberts

found that the EWSAA waiver was "a far cry from the line-item veto at issue in Clinton[.]"

Acree, 370 F.3d at 64 n.3.  Instead, Judge Roberts likened the EWSAA waiver to "the waivers

that the President is routinely empowered to make in other areas, particularly in the realm of

foreign affairs."  Id.  Relying on Judge Roberts's logic distinguishing line-item repeal from

delegated waiver authority, the Jacobsen Court rejected the constitutional challenge to the

validity of the FSIA waiver provision.  451 F. Supp. at 193.

　　　As observed in both Jacobsen and Acree, Congress commonly provides the Executive

Branch the authority to waive preexisting laws.  Id.; see, e.g., 10 U.S.C. § 433 (Secretary of

Defense, in connection with a commercial activity,  may waive "certain Federal laws or

regulations pertaining to the management and administration of Federal agencies" if they would

"create an unacceptable risk of compromise of an authorized intelligence activity"); 15 U.S.C. §

2621 (EPA may waive compliance with Toxic Substances Act upon determination by the

---

[1]  Section 1503 of the EWSAA authorized the President to "suspend the application of any provision of the Iraq Sanctions Act of 1990" and "provided further, that the President may make inapplicable with respect to Iraq section 620A of the Foreign Assistance Act of 1961 or any other provision of law that applies to countries that have supported terrorism."  Pub. L. No. 108-11, 117 Stat. 559, 579 (2003) (emphasis added).

President that "the requested waiver is necessary in the interest of national defense"); 20 U.S.C. §

7426(f) (Secretaries of the Interior, Labor, Health and Human Services, and Education

"[n]otwithstanding any other provision of law . . . shall have the authority to waive any

regulation, policy, or procedure promulgated by [their] department" necessary for the integration

of education and related services provided to Indian students); 22 U.S.C. § 7207(a)(3) (President

may waive a statutory prohibition on assistance to certain countries if he determines that the

waiver is in the interest of national security); 25 U.S.C. § 3406 (Secretaries of the Interior, Labor,

Health and Human Services, and Education "[n]otwithstanding any other provision of law . . .

shall have the authority to waive any statutory requirement, regulation, policy, or procedure

promulgated by that agency" necessary to implement a submitted tribal plan); 42 U.S.C. §

7545(m) (EPA may waive, in a limited geographical area, requirement regarding oxygen content

of gasoline); 43 U.S.C. § 2008 (President may waive "those provisions of Federal law . . . which,

in the national interest, as determined by the President, should be waived in whole or in part to

facilitate construction or operation of [crude oil transportation systems]"); 50 U.S.C. § 1701 Note

(President may waive sanctions on Sudan if he deems it to be in the national interest).

Congress has authorized particularly broad waivers, where, as here, it has expressed an

interest in the expeditious construction of a public works project. See, e.g., 43 U.S.C. § 1652(c)

(Secretary of the Interior or other qualified federal officer "may waive any procedural

requirements of law or regulation which they deem desirable to waive" to insure that the trans-

Alaska oil pipeline be constructed promptly and without administrative or judicial delay).

Congress included the waiver provision of the trans-Alaska pipeline legislation upon a

determination that "[a]fter years of delay and protracted litigation . . . the national interest

requires a clear and unequivocal policy decision on the pipeline.  Congress has decided that an

oil pipeline is necessary . . . [the waiver provision] implements that national policy decision."

Joint Conf. Rep. 93-924 (1973), reprinted in 1973 U.S.C.C.A.N. 2523, 2528.  In expanding

IIRIRA's waiver legislation with the passage of the REAL ID Act, Congress also emphasized the

need for expedient construction, noting that "[d]espite the existing waiver provision, construction

of the San Diego area barriers has been delayed due to a dispute involving other laws.  Continued

delays caused by litigation have demonstrated the need for additional waiver authority with

respect to other laws that might impede the expeditious construction of security infrastructure

along the border[.]" H.R. Rep. No. 109-72 (2005) (Conf. Rep.), reprinted in 2005 U.S.C.C.A.N.

240, 296.

      Additionally, the Supreme Court has repeatedly confirmed that "the same limitations on

delegation do not apply where the entity exercising the delegated authority itself possesses

independent authority over the subject matter[.]"  Loving v. United States, 517 U.S. 748, 772

(1996).  The Waiver Legislation, which relates to matters of immigration policy, foreign affairs,

and national security, falls squarely within these areas.  See, e.g., Knauff v. Shaughnessy, 338

U.S. 537, 542-43 (1950) ("The exclusion of aliens is a fundamental act of sovereignty . . . [and]

is inherent in the executive power to control the foreign affairs of the nation.") (citations

omitted); Sierra Club v. Ashcroft, No. 04-CV-0272, 2005 U.S. Dist. LEXIS 44244, at *22-23

(S.D. Cal. Dec. 13, 2005).  Addressing the precise issue raised by the exercise of the waiver

authority here - Congressional delegation to the Executive Branch in the area of immigration

policy - the Supreme Court explained the interrelation of delegation and deference in foreign

affairs matters:

9

> When Congress prescribes a procedure concerning the admissibility of aliens, it is not dealing alone with a legislative power. It is implementing an inherent executive power. . . . [B]ecause the power of exclusion of aliens is also inherent in the executive department of the sovereign, Congress may in broad terms authorize the executive to exercise the power.

Knauff, 338 U.S. at 537. Accordingly, the Supreme Court has never struck down a delegation of foreign affairs power or immigration power to the Executive Branch, and it has acknowledged the "unwisdom" of attempts to restrict the President's discretion in this context. See United States v. Curtiss-Wright Export Corp., 299 U.S. 304, 320 (1936) (holding that it is the President, "not Congress, [who] has the better opportunity of knowing the conditions which prevail in foreign countries, and especially is this true in time of war").

Using Plaintiffs' logic, the waiver provision of the Alaska pipeline legislation, as well as every other grant of executive waiver, could be re-characterized as one permitting amendment or repeal of the statute subject to waiver. Yet, it would be unreasonable to suggest that every executive waiver of a statutory provision pursuant to express congressional authorization constitutes an impermissible amendment to the statute. Plaintiffs cite no court that has so held. Section 102's waiver provision does not provide the Secretary with the authority to amend, repeal, or otherwise alter duly enacted legislation and Plaintiffs' attempt to equate waiver with repeal is simply a false comparison.

### B. *Clinton* "Critical Differences" Are Inapplicable to the Waiver Legislation

In further reliance on Clinton, Plaintiffs attempt to apply to the Waiver Legislation

three "critical differences" that the <u>Clinton</u> Court identified between the Line Item Veto

Act and the Tariff Act of 1890, which the Supreme Court upheld as constitutional in

<u>Field v. Clark</u>, 143 U.S. 649 (1892).[2]  <u>Clinton</u>, 524 U.S. 443-44 (noting that, under the

Tariff Act, the delegations depended on a condition that did not exist when the Act was

passed, the President was required to act upon the conditions occurrence, and the

President was implementing congressional policy).  The Supreme Court, however, never

suggested that these considerations are necessary to sustain any delegation of power to the

President.  Moreover, even if this Court were to consider those factors, section 102's

waiver authority is more akin to the waiver authority granted in the Tariff Act than to the

cancellation provisions of the Line Item Veto Act.  Further, nowhere in its analysis or

holding does <u>Clinton</u> purport to disturb prior Supreme Court precedent that Congress may

authorize the President to act "in respect of subjects affecting foreign relations, which

either leave the exercise of the power to his unrestricted judgment, or provide a standard

far more general than that which has always been considered requisite with regard to

domestic affairs."  <u>Curtiss-Wright Export Corp.</u>, 299 U.S. at 324.

 While the three "critical differences" identified in <u>Clinton</u> did not create a new

test necessary to sustain a delegation of legislative power, a brief analysis of those factors

reveals that the waiver authority in section 102 relates more closely to the permissible

---

[2]  The Tariff Act contained a special provision that directed the President to suspend an
exemption from import duties for certain products "whenever, and so often" as he should be
satisfied that any country producing and exporting those products imposed duties on the
agricultural products of the United States that he deemed to be "reciprocally unequal and
unreasonable[.]" <u>Clinton</u>, 524 U.S. at 442 (citing Act of Oct. 1, 1890, 26 Stat. 567, 602).

waiver provisions of the Tariff Act.  The exercise of the cancellation power under the

Line Item Veto Act occurred at the time the President signed a bill into law, and,

therefore, under the same conditions existing when Congress sent the bill for signature.

Clinton, 524 U.S. at 443.  In contrast, the exercise of section 102's waiver authority, like

that of the waiver provisions of the Tariff Act, depends upon constantly changing

conditions with respect to the construction of barriers and roads on the United States

border.  Additionally, while section 102 does not require waiver, the Secretary is

specifically implementing Congressional policy identified in the text of the statute and the

surrounding statutory framework, namely, deterrence of "illegal crossings in areas of high

illegal entry" and improving border protection by expediting the construction of necessary

barriers and roads.  IIRIRA, §§ 102(a), (c).[3]

    In addition to these three "critical factors," the Clinton Court explicitly

distinguished the powers delegated under the Tariff Act as relating to foreign trade.

Clinton, 524 U.S. at 444-45.  The Court noted that "in the foreign affairs arena, the

President has 'a degree of discretion and freedom from statutory restriction which would

not be admissible were domestic affairs alone involved.'" Id. (quoting Curtiss-Wright

Export Corp., 299 U.S. at 320.  Like the Tariff Act, the Waiver Legislation relates to

matters of foreign affairs.  See Knauff, 338 U.S. at. 537.  Thus, as stated above,

_____

[3]  Indeed, in exercising his waiver authority under section 102, the Secretary effectuates a policy choice expressly authorized by Congress.  Conversely, under the Line Item Veto Act, the President and Congress were at odds with respect to any cancelled  provision.  See Clinton, 524 U.S. at 444 & n.35 (noting that "every exercise of the cancellation power will necessarily . . . constitute a rejection of the policy choice made by Congress") (emphasis in original).

Congressional delegation is appropriate in even broader terms than generally used.  See

Loving, 517 U.S. at 772

### C. The Waiver Legislation Does Not Violate Separation of Powers Principles

Like their initial argument, Plaintiffs base their contention that the Waiver

Legislation violates basic separation of powers principles in part on the false premise that

the Secretary's waiver authority is commensurate with the power to amend or repeal

existing law.  See Opp'n 16.  Again, it is not.  While Plaintiffs rely on Clinton to support

their contention that granting the Executive Branch the power to repeal or amend statutes

would violate constitutional separation of powers principles, they cite no authority

extending that holding to express statutory authorizations of executive waivers.  See

Opp'n 13-21.  Plaintiffs also suggest that the delegation contained in the Waiver

Legislation is so significant that even the inclusion of an intelligible principle cannot save

the Legislation from a separation of powers challenge.  This argument lacks legal support

and contravenes well-established Supreme Court precedent.

The separation of powers principles upon which Plaintiffs rely form the

foundation of the non-delegation doctrine.  Mistretta v. U.S., 488 U.S. 361, 371 (U.S.

1989).  Yet, despite the strong emphasis the Supreme Court has placed upon maintaining

independence among the three branches, it has consistently held that "the separation-of-

powers principle, and the nondelegation doctrine in particular, do not prevent Congress

from obtaining the assistance of its coordinate branches."  Id. at 372.  Thus, "[s]o long as

Congress 'shall lay down by legislative act an intelligible principle to which the person or

body authorized to [exercise the delegated authority] is directed to conform, such legislative action is not a forbidden delegation of legislative power.'" Id. (quoting J.W. Hampton, Jr., & Co. v. United States, 276 U.S. 394, 406 (1928)).

Rather than apply the widely accepted non-delegation test, however, Plaintiffs argue that the Waiver Legislation is "so egregious" that its delegation of authority cannot be rendered constitutionally permissible through the presence of the required intelligible principle. Opp'n 18. In making this argument, Plaintiffs cite no controlling non-delegation jurisprudence. Instead, they rely on language from Justice Thomas's concurring opinion in Am. Trucking Ass'n,[4] Justice Scalia's dissenting opinion in Mistretta,[5] and Judge Jackson's vacated opinion in Byrd v. Raines,[6] regarding the cancellation provisions of the Line Item Veto Act. Opp'n 19-21. These authorities have no precedential value. Conversely, an analysis of the majority in Am. Trucking Ass'n, and Mistretta reinforces the well-established standard that the intelligible principle test controls the analysis of the constitutionality of Congressional delegation. See Am. Trucking Ass'n, 531 U.S. 457, 472 ("[W]e repeatedly have said that when Congress confers decision making authority upon agencies Congress must lay down by legislative act an intelligible principle to which the person or body authorized to [act] is directed to conform.") (internal quotations omitted); Mistretta, 488 U.S. at 372-73 ("Congress simply cannot do its job absent an ability to delegate power under broad general directives . . .

---

[4]  Whitman v. Am. Trucking Ass'n, 531 U.S. 457, 487 (2001).

[5]  488 U.S. at 420.

[6]  956 F. Supp. 25, 37 (D.D.C. 1997), vacated, 521 U.S. 811 (1997).

[a]ccordingly, this Court has deemed it constitutionally sufficient if Congress clearly

delineates the general policy, the public agency which is to apply it, and the boundaries of

this delegated authority") (internal citations and quotations omitted).  Thus, the applicable

test for determining the constitutional sufficiency of Congressional delegation, as the

Supreme Court has repeatedly stated, is whether Congress has laid down "by legislative

act an intelligible principle to which the person or body authorized to [exercise the

delegated authority] is directed to conform." Mistretta, 488 U.S. at 372 (quoting J.W.

Hampton, Jr., 276 U.S. at 406 (1928)).

### D.  The Waiver Legislation Satisfies the Intelligible Principle Test

Plaintiffs' final argument, that the Waiver Legislation fails to pass the intelligible

principle test, must be rejected in light of clear Supreme Court and District of Columbia

Circuit precedent.  The standard of necessity contained in the Waiver Legislation has

been repeatedly accepted by the Supreme Court, and Congress clearly expressed in its

waiver delegation the general policy, the boundary of the authority granted, and the

agency to carry out that authority.  The breadth of the delegation is consistent with the

Executive Branch's independent authority over matters of national security and

immigration policy, and the Secretary complied with the Legislation by making a finding

of necessity and publishing that finding in the Federal Register.  As the Waiver

Legislation meets the requirements of the intelligible principle test, it must pass

constitutional scrutiny.

To provide a constitutionally permissible "intelligible principle," Congress need

only "clearly delineate[] the general policy, the public agency which is to apply it, and the

15

boundaries of this delegated authority." <u>Mistretta</u>, 488 U.S. at 372-73 (1989) (quoting

<u>American Power & Light Co. v. SEC</u>, 329 U.S. 90, 105 (1946)).  To invalidate a

delegation of Congressional power, the party challenging the legislative act must

demonstrate that there is an "absence of standards" to guide executive action so that it

would not be possible to ascertain whether the will of Congress has been obeyed.  <u>Yakus</u>

<u>v. United States</u>, 321 U.S. 414, 426 (1944).  "Only the most extravagant delegations of

authority, those providing <u>no standards</u> to constrain administrative discretion, have been

condemned by the Supreme Court as unconstitutional." <u>Humphrey v. Baker</u>, 848 F.2d

211, 217 (D.C. Cir. 1988) (emphasis added).  This Circuit has held that the use of the

non-delegation doctrine to overturn legislation is reserved only for "the extremist

instance." <u>Milk Indus. Found. v. Glickman</u>, 949 F. Supp. 882, 890 (D.D.C. 1996)

(quoting <u>Amalgamated Meat Cutters and Butcher Workmen of North America, AFL-CIO</u>

<u>v. Connally</u>, 337 F. Supp. 737, 762 (D.D.C. 1971)).

        The Waiver Legislation meets the requirements of the intelligible principle test.

The waiver authority is expressly vested in the Secretary of DHS.  <u>See</u> IIRIRA, §

102(c)(1).  The Legislation further contains the "clearly delineate[d] general policy of

improving U.S. border protection: actions to be taken are those "as may be necessary to

install additional physical barriers and roads (including the removal of obstacles to

detection of illegal entrants) in the vicinity of the United States border to deter illegal

crossings in areas of high illegal entry into the United States." <u>Id.</u> § 102(a).

Additionally, the Legislation includes the required method of achieving this goal.  <u>Id.</u> §

102(b).  In furtherance of the general homeland security policy, the Waiver Legislation

permits the Secretary to "waive all legal requirements [that he] determines <u>necessary to</u> <u>ensure expeditious construction of the barriers and roads</u> under this section." <u>Id.</u> § 102(c) (emphasis added). Not only does this clause (and the surrounding statutory framework) establish a policy to guide the Secretary - (<u>i.e.</u>, that improving border protection by expediting the construction of necessary barriers and roads is a high Congressional priority), but it also marks the "boundaries of this delegated authority." <u>See</u> <u>Mistretta</u>, 488 U.S. at 372-73. The Waiver may be exercised <u>only</u> when the Secretary makes a <u>determination of necessity</u>.

In <u>Am. Trucking Ass'n</u>, the Supreme Court found constitutionally permissible a delegation to EPA of authority "to set air quality standards at the level that is 'requisite,' that is, <u>not lower or higher than necessary</u> - to protect public health." 531 U.S. at 474-76 (emphasis added); <u>see also</u> <u>Touby v. U.S.</u>, 500 U.S. 160, 163 (1991) (approving delegation to the Attorney General the authority to designate a drug as a controlled substance for purposes of criminal drug enforcement if doing so was "necessary to avoid an imminent hazard to the public safety"). Accordingly, the Supreme Court has already determined that a standard of necessity "fits comfortably within the scope of discretion permitted by [its] precedent." <u>Am. Trucking Ass'n</u>, 531 U.S. at 475-76. Additionally, the United States District Court for the Southern District of California recently rejected a non-delegation doctrine challenge to the Waiver Legislation. <u>Sierra Club v. Ashcroft</u>, No. 04-CV-0272, 2005 U.S. Dist. LEXIS 44244, at *22-23 (S.D. Cal. Dec. 13, 2005). While that Court focused its analysis on the limited scope of the particular project at issue, its constitutional holding, that the standard of necessity contained in the Waiver

Legislation satisfied the "intelligible principle" test, applies here as well.  Id. at *21

(finding that "[a]pplying a standard of 'necessity' to Congress' delegation of authority

passes constitutional muster").

 Despite its requirement that the Secretary make a determination of necessity,

Plaintiffs contend that the Waiver Legislation impermissibly neglects to require the

Secretary to consider "objective scientific standard[s]," or to undergo "independent

review," as did the legislation upheld in Touby.  Opp'n 31.  The Supreme Court has held,

however, that, while "[i]t is true enough that the degree of agency discretion that is

acceptable varies according to the scope of the power congressionally conferred[,] . . .

even in sweeping regulatory schemes we have never demanded . . . that statutes provide a

determinate criterion for saying how much [of the regulated harm] is too much . . . or how

necessary was necessary enough[.]"  Am. Trucking Ass'n, 531 U.S. at 475 (internal

quotations and citations omitted).  Moreover, as stated above, Congress may delegate in

even broader terms than generally used where the delegation relates to powers over which

the Executive Branch already maintains significant independent control.  See Loving, 517

U.S. at 772.  The Waiver Legislation, which relates to matters of immigration policy,

foreign affairs, and national security, falls squarely within these areas.  See Knauff, 338

U.S. at 542-543. ; Sierra Club, No. 04-CV-0272, 2005 U.S. Dist. LEXIS 44244, at *22-

23.  (S.D. Cal. Dec. 13, 2005) (rejecting a non-delegation doctrine challenge to the

Waiver Legislation).

 Finally, Plaintiffs' contention that the Secretary's notice in the Federal Register in

some way failed to satisfy the requirements of the Legislation is both inapplicable to the

18

constitutionality of the delegated authority and incorrect.  The Waiver Legislation

provides only that the Secretary's determination of necessity "shall be effective upon

being published in the Federal Register."  IIRIRA, § 102(c)(1).  On October 26, 2007, the

Secretary published his determination that the area in question "is an area of high illegal

entry" and that "[t]here is presently a need to construct fixed and mobile barriers . . . and

roads" in the area.  72 Fed. Reg. 60870 (October 26, 2007).  The Secretary also stated that

"to ensure the expeditious construction of the barriers and roads . . . I have determined

that it is necessary that I exercise the authority that . . . is vested in me by section 102(c)

of IIRIRA as amended by section 102 of the REAL ID Act."  Id.  The Secretary's findings

confirm his compliance with his delegated duties and the publication effectuates his

waiver.  Plaintiffs present no valid argument to the contrary.

    The Waiver Legislation does not present "the extremist instance" in which no

standards are presented to constrain administrative discretion.  Milk Indus. Found., 949 F.

Supp. at 890.  The Supreme Court has clearly established that, in addressing the

constitutionality of Congressional delegations, the courts must apply the intelligible

principle test.  Mistretta, 488 U.S. at 372-73.  Here, that test is readily met.  The Waiver

Legislation provides the standard of necessity which the Supreme Court has previously

approved and Congress has provided the agency to carry out the authority delegated, has

expressed the general policy behind the delegation, and has established the boundary of

the authority granted.  Further, the breadth of the delegation reflects the heightened level

of authority the Executive Branch enjoys over matters of national security and

immigration policy.  Thus, Plaintiffs' challenge to the Waiver Legislation's

constitutionality must fail.

## IV.  CONCLUSION

For the foregoing reasons, the Court should dismiss Plaintiffs' amended

complaint.

DATED: November 27, 2007

JEFFREY S. BUCHOLTZ
Assistant Attorney General

CARL NICHOLS
Deputy Assistant Attorney General

SANDRA M. SCHRAIBMAN
Assistant Director
DC Bar 188599

_____

STEPHEN J. BUCKINGHAM
Attorney (MD Bar)
U.S. Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue, N.W. Rm. 7119
Washington, DC 20530
Telephone: (202) 514-3330
Facsimile: (202) 616-8470
Email: stephen.buckingham@usdoj.gov

GREGORY D. PAGE
DC Bar 398121

20

U.S. Department of Justice

Environment and Natural Resources
    Division

P.O. Box 663
Washington, DC 20044-0663

Telephone: (202) 305-0446

Facsimile:  (202) 305-0505

E-mail: gregroy.page@usdoj.gov

<u>Certificate of Service</u>

I hereby certify that true and correct copies of the foregoing Defendants' Renewed Motion to Dismiss Amended Complaint were served on November 27, 2007, by electronic filing to:

> Robert G. Dreher
>
> Brian Segee
>
> Defenders of Wildlife
>
> 1130 17th Street, NW
>
> Washington, DC 20036

> Harold M. Crystal
>
> Meyer Glitzen & Crystal
>
> 1601 Connecticut Avenue, NW
>
> Suite 700
>
> Washington, DC 20009

 

 

_____

STEPHEN J. BUCKINGHAM