UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                    )
**DEFENDERS OF WILDLIFE,** *et al.*, )
                                    )
                **Plaintiffs,** )
                                    )
                v.                )    Civil Action No. 07-1801 (ESH)
                                    )
**MICHAEL CHERTOFF,**               )
**Secretary of Homeland Security,** *et al.*, )
                                    )
                **Defendants.** )
_____)

## MEMORANDUM OPINION

Plaintiffs Defenders of Wildlife and the Sierra Club initially brought this lawsuit to challenge defendants' compliance with several environmental statutes with respect to the construction of physical barriers and roads along the U.S.-Mexico Border within the San Pedro Riparian National Conservation Area ("SPRNCA") in Arizona. Plaintiffs have now amended their complaint to allege that the Secretary of Homeland Security's waiver of numerous federal environmental laws under section 102 of the REAL ID Act of 2005, Pub. L. No. 109-13, 119 Stat. 231, 306, 8 U.S.C. § 1103 note, is unconstitutional. Because the Court finds that the waiver does not offend the principles of separation of powers or the nondelegation doctrine, it rejects plaintiffs' constitutional attack, and it will grant defendants' motion to dismiss.

## BACKGROUND

At the direction of Congress, the Department of Homeland Security ("DHS") has undertaken to construct "physical barriers and roads" at various points along the United States' border with Mexico in order "to deter illegal crossings in areas of high illegal entry into the

United States." 8 U.S.C. § 1103 note. On or about September 29, 2007, the Army Corps of Engineers, on behalf of DHS, began constructing border fencing, an accompanying road and drainage structures within the SPRNCA, an area which plaintiffs describe as "a unique and invaluable environmental resource" and "one of the most biologically diverse areas of the United States."[1] (Pls.' Mem. in Sup. of Mot. for Temporary Restraining Order ["TRO Mot."] at 1, 4-5.) The SPRNCA is managed by the Bureau of Land Management ("BLM"), which issued a perpetual right of way to DHS for the area of the fence project. (*Id.* at 1; Defs.' TRO Opp'n at 1, 3.) Before granting the right of way, BLM completed an Environmental Assessment ("EA"), which concluded that the proposed fencing would have no significant impact on the environment when paired with certain mitigation measures, and that an Environmental Impact Statement ("IS") was therefore not required by the National Environmental Policy Act of 1969 ("NEPA"), 42 U.S.C. § 4321 *et seq.* (*See* Ex. A to Defs.' TRO Opp'n at 3-4.)

After initially attempting to pursue administrative remedies within the BLM (*see* Pls.' TRO Mot. at 2), plaintiffs filed this action on October 5, 2007, and simultaneously moved for emergency injunctive relief to halt the construction of the fence within the SPRNCA. In support of their motion, plaintiffs argued that BLM's EA was inadequate and that NEPA required the preparation of a full IS. (*See id.* at 8-18.) They also argued that the BLM's grant of the right-of-way violated the Arizona-Idaho Conservation Act of 1988, which directs the BLM to manage the SPRNCA "in a manner that conserves, protects, and enhances the riparian area and the aquatic,

---

[1] The challenged fence construction requires excavation on up to 225 of the SPRNCA's 58,000 acres, and the proposed fence segments will cover approximately 9,938 feet at the border when completed. (Defs.' Opp'n to Pls.' Mot. for Temporary Restraining Order ["TRO Opp'n"] at 3; Ex. A to Defs.' TRO Opp'n [BLM's EA and Finding of No Significant Impact] at 12).

wildlife, archeological, paleontological, scientific, cultural, educational, and recreational resources of the conservation area" and to "only allow such uses of the conservation area" that further the purposes for which it was established.  16 U.S.C. § 460xx-1.  After conducting a hearing on October 10, 2007, the Court granted plaintiffs' motion for a Temporary Restraining Order ("TRO"), finding that plaintiffs had demonstrated a substantial likelihood of success on the merits with respect to their NEPA claims and that the balance of the equities favored plaintiffs.  In response to the Court's order, defendants halted construction of the fence within the SPRNCA.

Approximately two weeks later on October 26, 2007, DHS Secretary Michael Chertoff published a notice in the Federal Register waiving NEPA, the Arizona-Idaho Conservation Act, and eighteen other laws with respect to the construction of the SPRNCA fence under the authority granted to him by section 102 of the REAL ID Act of 2005.[2]  *See* 72 Fed. Reg. 60,870 (Oct. 26, 2007); 8 U.S.C. § 1103 note.  Section 102 of the REAL ID Act gives the Secretary of Homeland Security "the authority to waive all legal requirements" that he determines "necessary to ensure expeditious construction" of border fences and roads "to deter illegal crossings in areas of high illegal entry."  8 U.S.C. § 1103 note.  This provision also limits judicial review of claims arising from the Secretary's exercise of the waiver authority, and it allows the district courts to consider only those claims that allege a violation of the Constitution.[3]

---

[2] Section 102 of the REAL ID Act amended section 102 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Pub. L. 104-208, 110 Stat. 3009-546, 3009-554, and both are codified at 8 U.S.C. § 1103 note.

[3] The REAL ID Act's waiver provision states:

In his Federal Register notice, the Secretary stated that the area within the SPRNCA covered by this Court's TRO was "an area of high illegal entry," that "[t]here [wa]s presently a need to construct fixed and mobile barriers" in the area, and that it was therefore "necessary" for him to exercise the REAL ID Act's waiver authority "[i]n order to ensure the expeditious

---

      (c) Waiver.--

      (1) In general.--Notwithstanding any other provision of law, the Secretary of Homeland Security shall have the authority to waive all legal requirements such Secretary, in such Secretary's sole discretion, determines necessary to ensure expeditious construction of the barriers and roads under this section. Any such decision by the Secretary shall be effective upon being published in the Federal Register.

      (2) Federal court review.--

      (A) In general.--The district courts of the United States shall have exclusive jurisdiction to hear all causes or claims arising from any action undertaken, or any decision made, by the Secretary of Homeland Security pursuant to paragraph (1). A cause of action or claim may only be brought alleging a violation of the Constitution of the United States. The court shall not have jurisdiction to hear any claim not specified in this subparagraph.

      (B) Time for filing of complaint.--Any cause or claim brought pursuant to subparagraph (A) shall be filed not later than 60 days after the date of the action or decision made by the Secretary of Homeland Security. A claim shall be barred unless it is filed within the time specified.

      (C) Ability to seek appellate review.--An interlocutory or final judgment, decree, or order of the district court may be reviewed only upon petition for a writ of certiorari to the Supreme Court of the United States.

REAL ID Act § 102(c), 8 U.S.C. § 1103 note.

construction of the barriers and roads that Congress prescribed . . . ."[4]  72 Fed. Reg. 60,870.

Upon notification of the Secretary's waiver, the Court vacated the TRO.  *Defenders of Wildlife v. Chertoff*, Civ. No. 07-1801, Minute Order (Oct. 26, 2007).  Plaintiffs subsequently amended their complaint to allege that the waiver provision of the REAL ID Act violates the separation of powers principles embodied in Articles I and II of the Constitution because it "impermissibly delegates legislative powers to the DHS Secretary, a politically-appointed Executive Branch official."  (Am. Compl. ¶¶ 36-38.)

In response, defendants have moved to dismiss plaintiffs' amended complaint under Rules 12(b)(1) and (6).  Defendants argue, based on the Supreme Court's "nondelegation" line of cases, that the REAL ID Act's waiver provision is a constitutionally permissible delegation of legislative power to the Executive Branch because it provides the Secretary with an "intelligible principle" that "clearly delineate[s] the general policy, the public agency which is to apply it, and the boundaries of th[e] delegated authority" -- *i.e.*, that he may only waive the legal requirements

---

[4]In addition to NEPA and the Arizona-Idaho Conservation Act, the Secretary also waived the Endangered Species Act, 16 U.S.C. § 1531 *et seq.*; the Clean Water Act, 33 U.S.C. § 1251 *et seq.*; the National Historic Preservation Act, 16 U.S.C. § 470 *et seq.*; the Migratory Bird Treaty Act, 16 U.S.C. § 703 *et seq.*; the Clean Air Act, 42 U.S.C. § 7401 *et seq.*; the Archeological Resources Protection Act, 16 U.S.C. § 470aa *et seq.*; the Safe Drinking Water Act, 42 U.S.C. § 300f *et seq.*; the Noise Control Act, 42 U.S.C. § 4901 *et seq.*; the Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act, 42 U.S.C. § 6901 *et seq.*; the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. § 9601 *et seq.*; the Federal Land Policy and Management Act, 43 U.S.C. § 1701 *et seq.*; the Fish and Wildlife Coordination Act, 16 U.S.C. § 661 *et seq.*; the Archaeological and Historic Preservation Act, 16 U.S.C. § 469 *et seq.*; the Antiquities Act, 16 U.S.C. § 431 *et seq.*; the Historic Sites, Buildings, and Antiquities Act, 16 U.S.C. § 461 *et seq.*; the Wild and Scenic Rivers Act, 16 U.S.C. § 1281 *et seq.*; the Farmland Protection Policy Act, 7 U.S.C. § 4201 *et seq.*; and the Administrative Procedure Act, 5 U.S.C. § 551 *et seq.*  The Secretary waived all of these laws "in their entirety, with respect to the construction of roads and fixed and mobile barriers . . . in the area starting approximately 4.75 miles west of the Naco, Arizona Port of Entry to the western boundary of the SPRNCA and any and all land covered by the TRO."  72 Fed. Reg. 60,870.

that he "determines necessary to ensure expeditious construction of the barriers and roads." (Defs.' Renewed Mot. to Dismiss at 3-4 (quoting *Mistretta v. United States*, 488 U.S. 361, 372-73 (1989))), and 8 U.S.C. § 1103 note (internal quotation marks omitted)).  In support of their argument, defendants also emphasize that "Congress may delegate in even broader terms" than otherwise permissible in matters of immigration policy, foreign affairs, and national security, because "the Executive Branch already maintains significant independent control" over these areas.  (Defs.' Renewed Mot. to Dismiss at 4-5.)

## ANALYSIS

The only issue presented is whether the Secretary's waiver under the REAL ID Act is constitutional.  First and foremost, plaintiffs argue that the REAL ID Act's waiver provision is unconstitutional under *Clinton v. City of New York*, 524 U.S. 417 (1998), because it "provides the DHS Secretary with a roving commission to repeal, in his sole discretion, any law in all 50 titles of the United States Code that he concludes might impede construction of a border wall." (Pls.' Opp'n at 3-4 (emphasis omitted).)  In *Clinton*, the Supreme Court struck down the Line Item Veto Act of 1996, which gave the President the authority to "cancel" certain federal spending items that had been passed by Congress, because the Court found that the Act -- "[i]n both legal and practical effect" -- allowed the President to amend Acts of Congress by repealing portions of them.  *Clinton*, 524 U.S. at 438.  Article I of the Constitution requires that all federal legislation pass both houses of Congress, and "before it become a Law, be presented to the President of the United States: If he approve he shall sign it, but if not he shall return it, with his Objections to that House in which it shall have originated, who shall enter the Objections at large on their Journal, and proceed to reconsider it."  U.S. CONST. art. I, § 7.  The cancellation

procedures in the Line Item Veto Act, the Court held, were unconstitutional because "[t]here is no provision in the Constitution that authorizes the President to enact, to amend, or to repeal statutes." *Clinton*, 524 U.S. at 438. "Amendment and repeal of statutes, no less than enactment, must conform with" the bicameralism and presentment requirements of Article I. *INS v. Chadha*, 462 U.S. 919, 954 (1983).

Plaintiffs argue that "[t]he power granted by section 102 of the REAL ID Act to the Secretary of DHS to 'waive' the applicability of any law that would otherwise apply to border wall and fence construction projects is unmistakably the power partially to repeal or amend such laws," and thus, that *Clinton* "squarely governs this case." (Pls.' Opp'n at 9-10.) The laws waived by the Secretary's federal register notice are "repeal[ed]," plaintiffs argue, "to the extent that they otherwise would have applied to wall and road construction" within the SPRNCA, and the waiver is therefore an "impermissible exercise of legislative authority." (Pls.' Surreply at 1, 2.)

Plaintiffs' arguments are unavailing, however, because the waiver provision of the REAL ID Act is not equivalent to the partial repeal or amendment at issue in *Clinton*. *See Sierra Club v. Ashcroft*, Civ. No. 04-272, 2005 U.S. Dist. LEXIS 44244, *21 (S.D. Cal. Dec. 12, 2005) (distinguishing the waiver of laws under the REAL ID Act from their "repeal"). It was "critical" to the *Clinton* Court's decision that the Line Item Veto Act essentially "g[a]ve[] the President the unilateral power to change the text of duly enacted statutes." *Clinton*, 524 U.S. at 446-47. The line items cancelled by the President would no longer have any "legal force or effect" under any circumstance. *Id.* at 437 (citing 2 U.S.C. §§ 691e(4)(B)-(C)). Similarly, in *Byrd v. Raines*, 956 F. Supp. 25, 37 (D.D.C. 1997) (vacated on other grounds), the predecessor case to *Clinton*, Judge

Jackson of this Court reasoned that cancellation under the Line Item Veto Act "forever render[ed] a provision of federal law without legal force or effect, so the President who canceled an item and his successors must turn to Congress to reauthorize the foregone spending." *Id.* at 37. Judge Jackson also distinguished the Line Item Veto Act's cancellation provision from the President's traditional authority to impound -- or refrain from spending -- funds appropriated by Congress, explaining: "Whereas delegated authority to impound is exercised from time to time, in light of changed circumstances or shifting executive (or legislative) priorities, cancellation occurs immediately and irreversibly . . . ." *Id.* at 36. He therefore held that the cancellation provision violated the Presentment Clause and constituted "a radical transfer of the legislative power to repeal statutory law." *Id.* at 33, 35 ("The President's cancellation of an item unilaterally effects a repeal of statutory law such that the bill he signed is not the law that will govern the Nation. That is precisely what the Presentment Clause was designed to prevent.").

The REAL ID Act's waiver provision differs significantly from the Line Item Veto Act. The Secretary has no authority to alter the text of any statute, repeal any law, or cancel any statutory provision, in whole or in part. Each of the twenty laws waived by the Secretary on October 26, 2007, retains the same legal force and effect as it had when it was passed by both houses of Congress and presented to the President. The fact that the laws no longer apply to the extent they otherwise would have with respect to the construction of border barriers and roads within the SPRNCA does not, as plaintiffs argue, transform the waiver into an unconstitutional "partial repeal" of those laws. By that logic, *any* waiver, no matter how limited in scope, would violate Article I because it would allow the Executive Branch to unilaterally "repeal"or nullify the law with respect to the limited purpose delineated by the waiver legislation. Yet, as plaintiffs

acknowledge, there are myriad examples of waiver provisions in federal statutes,[5] and they have not questioned Congress's ability to confer the waiver power in these circumstances. (*See* Pls.' Surreply at 6.) If the REAL ID Act's waiver provision is unconstitutional under *Clinton*, numerous other statutory authorizations of executive waivers would also be invalid. Such a conclusion is certainly not supportable under *Clinton* or any other case cited by plaintiffs.

Nor can plaintiffs gain any solace by citing *Clinton*'s discussion of *Marshall Field & Co. v. Clark*, 143 U.S. 649 (1892), in which the Supreme Court upheld the constitutionality of a suspension provision in the Tariff Act of 1890. (*See* Pls.' Opp'n at 24.) The Tariff Act exempted certain import commodities from tariffs, but directed the President to "suspend" the exemption with respect to any country that he found imposed "reciprocally unequal and unreasonable" duties on American exports. *Field*, 143 U.S. at 680. *Clinton* distinguished the Tariff Act from the Line Item Veto Act, identifying "three critical differences" between the two,[6]

---

[5]*See, e.g.*, 10 U.S.C. § 433 (Secretary of Defense, "in connection with a commercial activity," may waive compliance with "certain Federal laws or regulations pertaining to the management and administration of Federal agencies" if they would "create an unacceptable risk of compromise of an authorized intelligence activity."); 15 U.S.C. § 2621 (EPA may waive compliance with Toxic Substances Act "upon a request and determination by the President that the requested waiver is necessary in the interest of national defense."); 20 U.S.C. § 7426(e) (Secretaries of the Interior, Labor, Health and Human Services, and Education "[n]otwithstanding any other provision of law . . . shall have the authority to waive any regulation, policy, or procedure promulgated by [their] department" necessary for the integration of education and related services provided to Indian students.); 22 U.S.C. § 7207(a)(3) (President may waive a statutory prohibition on assistance to certain countries "to the degree [he] determines that it is in the national security interest of the United States to do so, or for humanitarian reasons.").

[6]Specifically, the Court found that in the Tariff Act, but not in the Line Item Veto Act, (1) "the exercise of the suspension power was contingent upon a condition that did not exist" when the statute was passed; (2) there was a duty to suspend or waive once a defined contingency had arisen; and (3) whenever the President suspended an exemption, he was executing the express congressional policy embodied in the statute. *Clinton*, 524 U.S. at 443-44

and plaintiffs argue that these differences demonstrate that the REAL ID Act's waiver provision must be invalidated under *Clinton*. *Clinton*, 524 U.S. at 443-44. (*See* Pls.' Opp'n at 25.)

However, in distinguishing *Field*, the *Clinton* Court did not purport to adopt a three-part test based on these distinctions to determine whether a particular waiver provision is constitutional. Rather, the deciding factor for the *Clinton* Court was that the cancellations under the Line Item Veto Act were the "functional equivalent of repeals of Acts of Congress," while the suspensions under the Tariff Act were "not exercises of legislative power." *Clinton*, 524 U.S. at 444. In particular, the Court noted that the Line Item Veto Act authorized the President "to effect the repeal of laws[] for his own policy reasons," thereby "rejecting the policy judgment made by Congress and relying on his own policy judgment." *Id* at 444, 45. By contrast, when the DHS Secretary exercises his waiver authority under the REAL ID Act, he is acting as Congress has expressly directed -- *i.e.*, to "expeditious[ly]" construct "physical barriers and roads . . . to deter illegal crossings in areas of high illegal entry . . . ." 8 U.S.C. § 1103 note. And more importantly, the *Clinton* Court distinguished the Tariff Act from the Line Item Veto Act on the ground that it related to "the foreign affairs arena," a realm in which the President has "a degree of discretion and freedom from statutory restriction which would not be admissible were domestic affairs alone involved." *Id.* at 445 (quoting *United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 320 (1936)) (internal quotation marks omitted); *see also Field*, 143 U.S. at 691 ("[I]n the judgment of the legislative branch of government, it is often desirable, if not essential for the protection of the interests of our people . . . to invest the President with large discretion in matters arising out of the execution of statutes relating to trade and commerce with other nations.") The REAL ID Act's waiver provision, like the Tariff Act, relates to foreign

-10-

affairs and immigration control -- another area in which the Executive Branch has traditionally exercised a large degree of discretion. For these reasons, the *Clinton* Court's discussion of *Field* does not support plaintiffs' arguments.

In sum, the waiver provision at issue here is not equivalent to the power to amend or repeal duly enacted laws, and therefore the holding of *Clinton* is inapplicable. This conclusion finds additional support in Judge (now Chief Justice) Roberts' concurring opinion in *Acree v. Republic of Iraq*, 370 F.3d 41, 64 n.3 (D.C. Cir. 2004), where he was addressing the validity of a waiver provision contained in the Emergency Wartime Supplemental Appropriations Act ("EWSAA"). Section 1503 of the EWSAA authorizes the President to "make inapplicable to Iraq Section 620A of the Foreign Assistance Act of 1961 and '*any* other provision of law that applies to countries that have supported terrorism.'" *Id.* at 60 (Roberts, J., concurring) (emphasis added by Judge Roberts). Judge Roberts summarily dismissed in a footnote plaintiffs' argument that "the grant of such authority to the President is unconstitutional in light of [*Clinton*] because such a grant would empower the President to . . . 'repeal [a statute] solely as it relates to Iraq.'" *Id.* at 64 n.3 (quoting appellees' brief). Rather, he found that "[t]he actions authorized by the EWSAA are a far cry from the line-item veto at issue in *Clinton*, and are instead akin to the waivers that the President is routinely empowered to make in other areas, particularly in the realm of foreign affairs." *Id*; *see also Jacobsen v. Oliver*, 451 F. Supp. 2d 181, 193 (D.D.C. 2006) (citing *Acree*, 370 F.3d at 64 n. 3).

Plaintiffs also argue more generally that the waiver authority violates fundamental separation of powers principles because it is an unconstitutional delegation of legislative power to the Executive Branch. "[T]he fundamental constitutional role of the Executive Branch under

Article II," plaintiffs argue, "is to 'faithfully execute' -- not selectively void -- the laws. The Secretary's attempt to repeal unilaterally nineteen laws that otherwise would have constrained his conduct, and the law that purports to authorize him in taking such improper action, thus squarely offend both Article I and Article II." (Pls.' Opp'n at 2.)  But "the Supreme Court has widely permitted the Congress to delegate its legislative authority to the other branches," so long as the delegation is accompanied by sufficient guidance.  *Smith v. Fed. Reserve Bank of N.Y.*, 280 F. Supp. 2d 314, 324 (S.D.N.Y. 2003) (upholding EWSAA's waiver provision against a nondelegation challenge) (citing *Loving v. United States*, 517 U.S. 748, 771 (1996) ("Though in 1935 we struck down two delegations for lack of an intelligible principle, *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495 (1935), and *Panama Refining Co. v. Ryan*, 293 U.S. 388 (1935), we have since upheld, without exception, delegations under standards phrased in sweeping terms."), and *Mistretta*, 488 U.S. at 373 ("After invalidating in 1935 two statutes as excessive delegations, we have upheld, again without deviation, Congress' ability to delegate power under broad standards." (citations omitted))).  A delegation of legislative power to the Executive Branch is permissible under Supreme Court precedent where Congress "lay[s] down by legislative act an intelligible principle to which the person or body authorized to [exercise the delegated authority] is directed to conform . . . ." *Mistretta*, 488 U.S. at 372 (quoting *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 409 (1928)) (second alteration in original) (internal quotation marks omitted).

In order to exercise the waiver authority under the REAL ID Act, Congress has required the Secretary to determine if the waiver is "necessary to ensure expeditious construction of the barriers and roads under [section 102 of IIRIRA]." 8 U.S.C. § 1103 note.  Furthermore, he is

directed to construct fencing only "in the vicinity of the United States border to deter illegal crossings in areas of high illegal entry into the United States." *Id.* This legislative directive meets the requirements of the Supreme Court's nondelegation cases. The "general policy" is "clearly delineated" -- *i.e.* to expeditiously "install additional physical barriers and roads . . . to deter illegal crossings in areas of high illegal entry." *Mistretta*, 488 U.S. at 372-73; 8 U.S.C. § 1103 note. And, the "boundaries" of the delegated authority are clearly defined by Congress's requirement that the Secretary may waive only those laws that he determines "necessary to ensure expeditious construction." *Mistretta*, 488 U.S. at 372-73; 8 U.S.C. § 1103 note.

      The Supreme Court upheld a similar standard in *Whitman v. American Trucking Ass'ns*, 531 U.S. 457 (2001), its most recent opinion to address the nondelegation doctrine. The *Whitman* Court rejected a nondelegation challenge to a provision of the Clean Air Act that directed the Environmental Protection Agency to set air quality standards at a level "requisite to protect public health." *Id.* at 465 (citing 42 U.S.C. § 7409(b)(1)). The "scope of discretion" allowed by such a standard, which the Court interpreted to mean "not lower or higher than is necessary," was "well within the outer limits of [the Supreme Court's] nondelegation precedents." *Id.* at 474, 76 (noting that the Clean Air Act's standard was also "strikingly similar" to the standard approved in *Touby v. United States*, 500 U.S. 160, 163 (1991), which permitted the Attorney General to designate a drug as a controlled substance if doing so was "necessary to avoid an imminent hazard to the public safety."). The Court confirmed that its nondelegation precedent has never required Congress to define, for example, "how 'necessary' was necessary enough." *Id.* at 475.

      Given this precedent, this Court cannot agree that the REAL ID Act's waiver provision

constitutes an impermissibly standardless delegation. This conclusion is also in accord with the only other decision to address the question of whether the REAL ID Act's waiver provision is a constitutional delegation. In that case, the district court upheld the waiver provision, finding that "[a]pplying a standard of 'necessity' to Congress' delegation of authority passes constitutional muster."[7] *Sierra Club*, 2005 U.S. Dist. LEXIS 44244 at *21 ("The Court finds Congress provided an adequate standard [within the REAL ID Act] for the exercise of the DHS Secretary's delegated waiver authority over laws impeding the completion of the [border fence]: 'necessity,' *i.e.*, when needed 'to ensure expeditious construction of the barriers and roads under this section.'").

Finally, plaintiffs argue that while there are numerous examples in federal laws of provisions that allow the Executive Branch to waive various legal requirements in certain circumstances, "[t]he scope of the REAL ID Act's waiver provision . . . is unprecedented in our history." (Pls.' Opp'n at 3.) Plaintiffs rely on the fact that the REAL ID Act waiver permits the Secretary to waive any law with respect to the construction of the border fences and roads. (*See* Pls.' Opp'n at 22 ("The sweeping power to void existing law given to the Secretary by section 102 differs in fundamental ways from prior legally-valid Congressional waivers.").) Previous statutory waivers, plaintiffs contend, have often "involved Congress itself directly waiving particular laws, or instructing the President or another officer to waive particular provisions (usually provisions of the same law containing the waiver) if certain circumstances occur." (*Id.*

---

[7] As plaintiffs point out, the *Sierra Club* court mistakenly believed that the REAL ID Act's waiver provision applies only to the construction of a specific section of fencing near San Diego. *See Sierra Club*, 2005 U.S. Dist. LEXIS 44244, *21. But the court's reasoning was not dependent on the belief that the geographic scope of the waiver authority was so limited. Rather, the court upheld the waiver because the "necessity" standard provided an adequate intelligible principle to circumscribe the actions the Secretary was permitted to take. *Id.* at *20-21.

at 3.)  Plaintiffs also argue that many of the waiver provisions cited by the government permit the Executive Branch to waive only legal requirements contained within the same statute.  (Pls.' Surreply at 3.)  Indeed, a memorandum produced by the Congressional Research Service notes that the REAL ID Act's waiver provision appears to be unprecedented in that it "contains 'notwithstanding language,' provides a secretary of an executive agency the authority to waive all laws such secretary determines necessary, and directs the secretary to waive such laws." (Pls.' Ex. 2 at 2-3).  But even if, as argued by plaintiffs, this waiver provision is unique insofar as the number of laws that may be waived is theoretically unlimited, the Secretary may only exercise the waiver authority for the "narrow purpose" prescribed by Congress: "expeditious completion" of the border fences authorized by IIRIRA in areas of high illegal entry.  *Sierra Club*, 2005 U.S. Dist. LEXIS 44244, at *20.  Thus, the scope of the Secretary's discretion is expressly limited.

More importantly, despite the surface appeal of plaintiffs' arguments, they cannot survive careful scrutiny, for there is no legal authority or principled basis upon which a court may strike down an otherwise permissible delegation simply because of its broad scope.  *See Loving*, 517 U.S. at 771 ("[W]e have since [1935] upheld, without exception, delegations under standards phrased in sweeping terms.")  This lack of authority is hardly surprising, since to provide a constitutionally permissible "intelligible principle," Congress need only "clearly delineate[] the general policy, the public agency which is to apply it, and the boundaries of this delegated authority."  *Mistretta*, 488 U.S. at 372-73 (quoting *Am. Power & Light Co. v. SEC*, 329 U.S. 90, 105 (1946)).  Moreover, as cautioned by this Circuit, "[o]nly the most extravagant delegations of authority, those providing *no* standards to constrain administrative discretion, have been

condemned by the Supreme Court as unconstitutional." *Humphrey v. Baker*, 848 F.2d 211, 217 (D.C. Cir. 1988) (emphasis added); *see also Yakus v. United States*, 321 U.S. 414, 426 (1944) ("Only if we could say that there is an *absence* of standards for the guidance of the Administrator's action . . . would we be justified in overriding [Congress's] choice of means for effecting its declared purpose . . . ." (emphasis added)); *Milk Indus. Found. v. Glickman*, 949 F. Supp. 882, 890 (D.D.C. 1996) (use of the nondelegation doctrine to overturn legislation should only be used in the "extremist instance") (quoting *Amalgamated Meat Cutters & Butcher Workmen of N. Am., AFL-CIO v. Connally*, 337 F. Supp. at 737, 762 (D.D.C. 1971)).

Applying these precedents, the Court concludes that it lacks the power to invalidate the waiver provision merely because of the unlimited number of statutes that could potentially be encompassed by the Secretary's exercise of his waiver power. Rather, under the nondelegation doctrine, the relevant inquiry is whether the Legislative Branch has laid down an intelligible principle to guide the Executive Branch, not the scope of the waiver power. Therefore, based on controlling Supreme Court precedent, the Court finds that the REAL ID Act's waiver provision is a valid delegation of authority.

This conclusion is further buttressed by the well-established principle that was decisive in the *Clinton* case, 524 U.S. at 445 -- "[w]hen the area to which the legislation pertains is one where the Executive Branch already has significant independent constitutional authority, delegations may be broader than in other contexts." *Sierra Club*, 2005 U.S. Dist. LEXIS 44244 at *17 (citing *Loving*, 517 U.S. at 772). The construction of the border fence pertains to both foreign affairs and immigration control -- areas over which the Executive Branch traditionally exercises independent constitutional authority. Thus, with respect to border control measures

such as those at issue here, the Executive has "a degree of discretion and freedom from statutory restriction which would not be admissible were domestic affairs alone involved." *Clinton*, 524 U.S. at 445 (quoting *Curtiss-Wright Export Corp.*, 299 U.S. at 320) (internal quotation marks omitted). When Congress legislates regarding foreign affairs or immigration control, "it is not dealing alone with a legislative power. It is implementing an inherent executive power." *Knauff v. Shaughnessy*, 338 U.S. 537, 542 (1950). Because these powers are "also inherent in the executive department of the sovereign, Congress may in broad terms authorize the executive to exercise [them]. . . ." *Id.* at 543.

In sum, given the Supreme Court's ready acceptance of the "necessity" standard as an adequate "intelligible principle" to guide a delegation of legislative authority to the Executive Branch, as well as the Executive's independent constitutional authority in the areas of foreign affairs and immigration control, the Court is constrained to reject plaintiffs' claim that the waiver provision of the REAL ID Act is an unconstitutional delegation.

## CONCLUSION

Because the Court holds that the Secretary's waiver is constitutional, and because it has no jurisdiction to decide plaintiffs' statutory claims, defendants' renewed motion to dismiss [Dkt. # 17] is **GRANTED**, and the case is dismissed with prejudice. A separate order accompanies this Memorandum Opinion.

/s/
ELLEN SEGAL HUVELLE
United States District Judge

Date: December 18, 2007